**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11626 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JEFFREY S. STEIN
IN SUPPORT OF THE DEBTORS' MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION
CLAIMS OF CRITICAL VENDORS AND (II) GRANTING RELATED RELIEF**

I, Jeffrey S. Stein, declare as follows:

1. I am the Chief Restructuring Officer of PES Energy Inc. and its subsidiaries (together with the above captioned debtors and debtors in possession, the "Debtors") and have held this position since July 1, 2019. I am also a member of the board of directors of PES Energy Inc. and have held that position since July 8, 2019. In addition, prior to these chapter 11 cases, I was an independent board member of North Yard GP, LLC. I am generally familiar with the Debtors' day to day operations, business, financial affairs, and books and records. I provide this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (the "Motion").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2. In addition, I am the Managing Partner of Stein Advisors LLC, a financial advisory firm that provides consulting services to institutional investors focused on distressed debt and special situations equity investments. Prior to founding Stein Advisors LLC in 2010, from January 2003 through December 2009, I served as Principal of Durham Asset Management LLC, a global event-driven distressed debt and special situations equity asset management firm that I co-founded. In that capacity, I was responsible for the identification, evaluation and management of investments for various investment portfolios. From July 1997 to December 2002, I served as Co-Director of Research at The Delaware Bay Company, Inc., a boutique research and investment banking firm focused on the distressed debt and special situations equity asset classes. From September 1991 to August 1995, I was an Associate and Assistant Vice President at Shearson Lehman Brothers in the Capital Preservation and Restructuring Group. I received a B.A. in Economics from Brandeis University and an M.B.A. with Honors in Finance and Accounting from New York University.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations and financial affairs or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**I.     The Critical Vendors**.

4.     In the ordinary course of their businesses, the Debtors engage a limited number of providers for certain critical services, logistics, refinery expenses, capital expenditures, raw materials, SG&A and payroll and benefits, natural gas and electric, and other materials the Debtors depend upon to operate their business.  The Debtors obtain such services, equipment, or parts from a limited number of highly specialized vendors, service providers, and other businesses (collectively, the "Critical Vendors")—often on an order-by-order basis and without long-term contracts—replacement of which likely would be impossible or would result in substantially higher costs for the Debtors.  Further, certain Critical Vendors are the sole source providers of replacement parts necessary to maintain the Debtors' equipment, and the inability to acquire these parts would result in the deterioration of the Debtors' equipment.  In light of the current extreme preservation-focused operational mode of conduct and Safing process (such process, "Safing"), the Debtors are only seeking relief with respect to those Critical Vendors that provide goods and services critical to the limited crude oil processing and Safing process.

5.     The Debtors rely on timely and frequent delivery of these equipment, parts, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations, impact their revenue, and their ability to service clients, likely causing irreparable harm to their businesses, reputation, goodwill, employees, customer base, and market share, and potentially compliance with certain health and safety regulations.  I believe such harm would likely far outweigh the cost of payment of certain of the prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business (collectively, the "Critical Vendor Claims").

6.     The Debtors believe some of their vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing terms—assuming such parties will continue to

supply the Debtors at all.  Indeed, prior to the Petition Date, certain of the Debtors' vendors cancelled existing favorable trade terms due to rumors of a bankruptcy filing.  Certain vendors that previously allowed payments on a net 30 or net 60 day basis instead began requiring the Debtors to pay on a prepay basis or cash on delivery.  I believe that further deterioration in trade terms (whether on account of demands for cash in advance, prepay basis, cash on delivery, or otherwise) will negatively impact the Debtors' liquidity and jeopardize their ability to maintain and service their equipment and to purchase any additional equipment required for their operations.

7.    It is important that the Debtors maintain positive relationships with the Critical Vendors that are essential to their business operations throughout the course of these chapter 11 cases.  An adequate supply of equipment and timely services from the vendors to the Debtors are vital to continue and maintain operations and to avoid significant costs associated with missing contractual deadlines.

8.    The Debtors' requested amount of relief on account of the Critical Vendor Claims pales in comparison to the potential damage to the Debtors' businesses if the Debtors' operations were to experience any delays in services or the shipment of equipment.  Therefore, I believe that the Debtors, their estates, and their stakeholders would benefit from the Debtors' payments to the Critical Vendors.

### A.    Process for Identifying Critical Vendors

9.    With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements and the purchase orders incorporated thereunder, and analyzing applicable laws, regulations, and historical practice to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' businesses—the loss of which could materially harm their businesses, or reduce

their enterprise value.  Specifically, in identifying the Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms and whether failure to pay under an agreement would result in the vendor refusing to ship goods or provide critical services under other non-contractual arrangements;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship goods or to provide critical services on a postpetition basis; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

10. In addition to these factors, the Debtors and their advisors examined the health of each vendor relationship, their familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claim could be satisfied elsewhere in the chapter 11 process. This process resulted in the Debtors identifying approximately 78 critical vendors, which account for approximately 16.3 percent of their prepetition vendors that have amounts outstanding as of the Petition Date.

11. I believe that the Debtors' selection process balanced the need to ensure that these chapter 11 cases do not disrupt their operations or adversely affect their business, with the need to limit the expenditure of estate resources.  To that end, the Debtors undertook a lengthy process to ensure that the Critical Vendors truly represent those vendors that are vital to the Debtors' operations.  Paying targeted Critical Vendor Claims renders a benefit to the Debtors' estates both monetarily and operationally by preserving liquidity and enabling the Debtors to operate smoothly during the chapter 11 cases.  Therefore, I believe that the requested relief will allow the Debtors

to preserve stakeholder value by paying certain prepetition claims of certain counterparties where critical to unlock incremental liquidity for the Debtors' business enterprise.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated: July 22, 2019
Wilmington, Delaware

By: _____
Jeffrey S. Stein
Chief Restructuring Officer
PES HOLDINGS, LLC

*[Signature Page to Critical Vendors Declaration]*