**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11626 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion (this "Motion").

**Relief Requested**

1. The Debtors seek entry of an order, substantially in the forms attached hereto as **Exhibit A** (the "Order"): (a) authorizing the Debtors to (i) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits (as defined below) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits, including payment of prepetition obligations related thereto; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within 21 days

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on July 21, 2019 (the "Petition Date").

after the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(m).

## Background

5. Headquartered in Philadelphia, Pennsylvania, the Debtors are owners and operators of the largest oil refining complex on the United States Eastern seaboard and have been continuously operating in some form for over 150 years. The refining complex sits on an approximately 1,300 acre industrial site roughly 2.5 miles from downtown Philadelphia. It is comprised of two separate refineries that have a combined distillation and refining capacity of 335,000 barrels of crude oil per day. The refining complex produces a full range of

transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products, including home heating oil, jet fuel, kerosene, fuel oil, propane, propylene, butane, cumene, and sulfur. The Debtors market and distribute these products by truck, rail, pipeline, and waterborne vessels throughout population centers in the northeastern United States and by waterborne vessels to international markets.

6. On the Petition Date, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

## **The Debtors' Workforce**

7. The Debtors employ approximately 950 individuals on a part- or full-time basis (the "Employees"). Approximately 620 Employees are paid on an hourly basis, and approximately 330 Employees earn a salary. Approximately 620 Employees are represented by a collective bargaining unit.[3] In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors to complete discrete projects (the "Independent Contractors"), as well as temporary workers (the "Temporary Staff" and, together with the Independent Contractors, the "Independent Contractors and Temporary Staff") sourced periodically from various staffing agencies (the "Staffing Agencies") to fulfill certain

[3] The Debtors are party to collective bargain agreements with United Steel, Paper and Forestry Rubber, Manufacturing, Energy Allied Industrial and Service Workers International Union, AFL-CIO-CLC, United Steelworkers and its Philadelphia Local 10-1. The Debtors are not assuming or affirming any contracts, agreements, programs, or applicability of any law related to any collective bargaining agreement, and the Debtors reserve all of their rights with regard to any such collective bargaining agreement.

duties on a short-term basis. At this time, the Debtors retain approximately 225 Independent Contractors and Temporary Staff. The Independent Contractors and Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

8. The Debtors' Employees, Temporary Staff, and Independent Contractors perform a wide variety of functions critical to the Debtors' operations. In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Without the continued, uninterrupted services of their Employees, Temporary Staff, and Independent Contractors, the Debtors' efforts during these chapter 11 cases will be threatened.

## Employee Compensation and Benefits

9. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits"):

- Employee Compensation;
- Independent Contractor and Temporary Staff Compensation;
- Deductions and Payroll Taxes;
- Corporate Credit Cards;
- Non-Insider Employee Incentive Programs;
- Health and Welfare Programs;
- Travel Accident Insurance;
- Supplemental Assistance Programs;
- Paid Leave and Unpaid Leave;
- Retiree Payments; and
- Non-Employee Director Compensation.

10. The vast majority of Employees rely exclusively on the Employee Compensation and Benefits to pay their daily living expenses and support their families. Thus, Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue the Employee Compensation and Benefits in the ordinary course of business. Consequently, the relief requested is necessary and appropriate.

11. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

12. By this Motion, the Debtors seek authority to pay the following prepetition amounts owed on account of the Employee Compensation and Benefits:

| Employee Obligation | Amount |
|---|---|
| Unpaid Wages | $75,000 |
| Unpaid Independent Contractor and Temporary Staff Compensation | $300,000 |
| Withholding Obligations | $0 |
| Corporate Credit Cards | $86,000 |
| Benefit Administrator Costs | $15,000 |
| Non-Insider Employee Incentive Programs | $0 |
| Health Insurance Programs | $1,800,000 |
| Life and AD&D Insurance | $10,000 |
| Occupational Death Benefit Plan and Travel Accident Plan | $0 |
| Disability Benefits | $10,000 |
| Workers' Compensation Program | $0 |
| Retirement Plans | $0 |
| Supplemental Assistance Programs | $0 |
| Paid and Unpaid Leave | $0 |
| Retiree Payments | $0 |
| Non-Employee Director Compensation | $0 |
| **Total** | $2,296,000 |

13. As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Employee Compensation and Benefits is approximately $2.3 million. The

Debtors do not believe any Employee is owed Employee Compensation in excess of the $13,650 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Cap").

**I. Compensation and Withholding Obligations.**

**A. Unpaid Wages.**

14. The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable expenses, severance, and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Because certain portions of the Employee Compensation is paid two weeks in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, overtime work in the days preceding the commencement of these chapter 11 cases and potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. In the last twelve (12) months, the Debtors spent an average of approximately $8.9 million per month on Employee Compensation.

15. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $75,000 on account of accrued Employee Compensation earned before the Petition Date. Accordingly, by this Motion, the Debtors request authority to honor any prepetition obligations on account of Employee Compensation, and to continue the Employee Compensation practices on a postpetition basis in the ordinary course of the Debtors' business and consistent with past practice.

16. For the avoidance of doubt, the Debtors do not believe they owe any Employees unpaid compensation in excess of the Priority Cap and do not seek to pay Employee Compensation, to any Employee, in excess of the Priority Cap by this Motion.

**B. Independent Contractor and Temporary Staff Compensation.**

17. The Debtors make payments to the Independent Contractors and Temporary Staff (the "Independent Contractor and Temporary Staff Compensation"), often through the Staffing Agencies, for the performance of certain services critical to the Debtors' operations, including, among other things, administrative functions, such as information technology and maintenance services, and operational functions related to the Debtors' refining business. The Debtors' Employees rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and Temporary Staff to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors and Temporary Staff is critical to minimize disruption of the Debtors' continued business operations.

18. In the last twelve (12) months, the Debtors' Independent Contractor Compensation and Temporary Staff Compensation totaled approximately $209 million. As of the Petition Date, the Debtors estimate that Independent Contractors and Temporary staff are owed an aggregate of approximately $300,000 on account of accrued but unpaid services rendered prior to the Petition Date. Accordingly, by this Motion, the Debtors request authority to honor any prepetition obligations on account of Independent Contractor Compensation and Temporary Staff Compensation and to continue paying such Independent Contractor and Temporary Staff Compensation on a postpetition basis in the ordinary course of business and consistent with past practice. The Debtors do not believe they owe any individual Independent Contractor or Temporary Staff amounts in excess of the Priority Cap.

**C. Withholding Obligations.**

19. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support,

and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Some of the Deductions are forwarded to various third-party recipients. In the last twelve (12) months, monthly Deductions totaled approximately $22 million.

20. The Debtors are also required by law to withhold from Employee Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. In the last twelve (12) months, monthly Payroll Taxes totaled approximately $48 million.

21. As of the Petition Date, the Debtors estimate that there are no outstanding obligations on account of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations"). However, out of an abundance of caution, the Debtors request authority to honor any prepetition Withholding Obligations to the appropriate third parties, and to continue to pay such Withholding Obligations on a postpetition basis in the ordinary course of business and consistent with historical practice.

**D. Corporate Credit Cards.**

22. The Debtors provide corporate credit cards through Bank of America to certain Employees for certain expenses incurred in the scope of their duties (the "Corporate Credit Cards"). Reimbursable expenses typically include purchases of necessary

parts and supplies, as well as expenses associated with transportation, lodging, and meals incurred in connection with business travel and certain other work-related expenses.

23. In the last twelve (12) months, monthly obligations on account of the Corporate Credit Cards totaled approximately $2.8 million. As of the Petition Date, the Debtors estimate there is approximately $86,000 in outstanding obligations on account of the Corporate Credit Cards. The Debtors request authority to honor any prepetition obligations on account of Corporate Credit Cards and to continue paying such Corporate Credit Cards on a postpetition basis in the ordinary course of business and consistent with best practice.

## II. Non-Insider Employee Incentive Programs.

24. In the ordinary course of business, the Debtors maintain two incentive programs to drive performance among their Employees, the Employee Incentive Plan and the Spot Awards (each as defined below and, together, the "Non-Insider Employee Incentive Programs").[4] The Debtors believe each of these bonus programs is integral to the operation of their business. In particular, the Non-Insider Employee Incentive Programs align Employees' interests with those of the Debtors generally by promoting and maintaining Employee morale as well as assisting in the retention of the Debtors' workforce.

### A. The Employee Incentive Plan.

25. Each year, in their sole discretion, the Debtors pay to certain eligible employees (each, a "Participant") awards under the Incentive Plan. There are two components of award payments under a long-term incentive plan (the "Incentive Plan"). The first component of awards is paid in the first quarter of each year and is based on each individual Employee's

[4] The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority for payment respect to such parties and reserve all rights with respect to the "insider" status of such parties.

performance in the prior year. The second component, which is only awarded to a subset of those Employees receiving awards under the first component, consists of deferred award payments equal to an additional 60 percent of the annual award amount. As of the Petition Date, the Debtors do not have any current outstanding obligations to Employees on account of the Incentive Plan. However, out of an abundance of caution, the Debtors seek authority to continue the Incentive Plan on a postpetition basis in the ordinary course of business and consistent with past practice.

**B. Spot Awards.**

26. The Debtors also provide a short-term incentive program (the "Spot Awards") across the Debtors' enterprise. More specifically, managers have discretion to issue individual awards to certain Employees whose performance exceeds expectations and exemplifies model behavior. For example, an Employee may receive a standard Spot Award of up to $5,000 for their increased time and efforts in conjunction with a specific event. The Spot Awards align the Employees' incentives with those of the Debtors and their stakeholders by emphasizing workplace performance that goes above and beyond the Debtors' expectations to the benefit of the Debtors' operations as a whole.

27. Because the Spot Awards are awarded based on ongoing performance where an Employee goes above and beyond performance expectations, the performance invariably takes into account efforts that took place before the Petition Date. As of the Petition Date, the Debtors do not believe they have any current outstanding obligations to Employees on account of the Spot Awards. However, out of an abundance of caution, the Debtors request authority to honor any prepetition obligations on account of Spot Awards and to continue paying such Spot Awards on a postpetition basis in the ordinary course of business and consistent with past practice.

**III. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

28. The Debtors offer a number of health and welfare benefits programs to eligible current Employees, including the Health Insurance Programs, the Life and AD&D Insurance, the Disability Benefits, the Workers' Compensation Program, the Retirement Plans, and the Supplemental Assistance Programs, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs").

**1. Health Insurance Programs.**

29. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plans, the Stop-Loss Insurance, the FSA, the Dental Plans, the Vision Plans, and the EmpoweredHealth Program (each as defined herein, and collectively, the "Health Insurance Programs"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

30. The Debtors offer medical, vision, and prescription drug benefit programs (the "Medical Plans") to current Employees, which are administered by Independence Administrators ("Independence") and Welldyne ("Welldyne"). The coverage in the Medical Plans and associated premiums differ depending on the level of coverage Employees elect to receive and whether the Employee has dependents covered by the applicable plan. The premiums range between $700 to $3,000 per employee each month. While the Medical Plans are self-insured, the Debtors maintain a stop-loss insurance policy with Independence to cover catastrophic medical claims (the "Stop-Loss Insurance"). The Debtors pay premiums on account

of the Stop-Loss Insurance, which are approximately $55,000 per month. The total cost of the Medical Plans, including the Stop-Loss Insurance, is approximately $1 million per month. The Debtors request authority to honor any prepetition obligations on account of the Stop-Loss Insurance, and to continue paying such Stop-Loss Insurance on a postpetition basis, in the ordinary course of business and consistent with past practice.

31. The Debtors provide Employees who participate in certain of the Medical Plans with access to a flexible spending account (the "FSA"), administered by WageWorks, Inc., which can be used to cover incidental medical costs and dependent childcare. The Debtors do not make any contributions to any Employee's FSA. The Debtors pay a monthly administration fee of approximately $2,000 to WageWorks, Inc. on account of the FSA.

32. The Debtors also offer to current Employees dental benefit programs (the "Dental Plans"), administered by Aetna Dental ("Aetna"), and vision benefit programs (the "Vision Plans"), administered by Davis Vision ("Davis"). The coverage in the Dental Plans and the Vision Plans differs depending on (a) the level of coverage Employees elect to receive and (b) whether such coverage is provided by an in- or out-of-network provider. Monthly health care premiums differ depending on the Dental Plan or Vision Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. The total cost of the Dental Plans and the Vision Plans is approximately $32,000 per month. The Debtors request authority to honor any prepetition obligations on account of the Dental Plans and the Vision Plans and to continue the Dental Plans and the Vision Plans on a postpetition basis in the ordinary course of business and consistent with past practice.

33. The Debtors offer a healthcare assistance program (the "EmpoweredHealth Program") to current Employees, which is administered by Health

Advocate ("Health Advocate"). The EmpoweredHealth Program provides a range of personalized services to help Employees and their families navigate the healthcare and insurance systems, address wellness or work-life issues, and improve overall health. The total cost of the EmpoweredHealth Program is approximately $10,000 per month. The Debtors request authority to honor any prepetition obligations on account of the EmpoweredHealth Program and to continue the EmpoweredHealth Program on a postpetition basis in the ordinary course of business and consistent with past practice

34. Additionally, the Debtors work with Quantum Care Coordination ("Quantum") to assist in the administration, advisement, and management of the Medical Plans. The Debtors expect to spend approximately $30,000 per month on average on account of Quantum.

35. The Debtors pay approximately $1.05 million per month in the aggregate for their contributions to and the administrative and premium payments for the Health Insurance Programs. As of the Petition Date, the Debtors estimate they owe approximately $1.8 million of accrued but unpaid obligations on account of the Health Insurance Programs. Accordingly, by this Motion, the Debtors request authority to honor any prepetition obligations on account of Health Insurance Programs and to continue administering such Health Programs on a postpetition basis in the ordinary course of business and in a manner consistent with past practice.

**2. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

36. The Debtors provide life (the "Basic Life Insurance") and accidental death and dismemberment insurance coverage (the "Basic AD&D Insurance," and together with the Basic Life Insurance, the "Basic Life and AD&D Insurance") to current Employees through Reliance Standard Life Insurance Company ("RSLI"), which each provide maximum coverage of

approximately $800,000 in the event of an Employee's death or dismemberment. Current Employees may also purchase supplemental life insurance (the "Supplemental Life Insurance") and supplemental accidental death and dismemberment insurance (the "Supplemental AD&D Insurance" and, together with the Supplemental Life Insurance, the "Supplemental Life and AD&D Insurance"), covering themselves and their spouses and unmarried dependent children,[5] through RSLI.

37. Current Employees may also purchase accident insurance, whole life insurance, group critical care insurance, and group hospital confinement insurance (collectively, the "Voluntary Life Insurance," and together with the Basic Life and AD&D Insurance and the Supplemental Life and AD&D Insurance, the "Life and AD&D Insurance") through Colonial Life.

38. Employees are eligible for company-sponsored Life and AD&D Insurance upon the Employee's date of hire. The Debtors are fully insured through the Life and AD&D Insurance.

39. In the last twelve (12) months, the Debtors paid approximately $220,000 on account of premiums for the Life and AD&D Insurance. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance is approximately $10,000. Accordingly, the Debtors request authority to honor any prepetition obligations on account of Life and AD&D Insurance, and to continue providing such Life and AD&D Insurance on a postpetition basis in the ordinary course of business and consistent with past practice.

[5] Unmarried dependent children are eligible for coverage up to age 19 or, if a full-time student, up to age 25.

**b. Occupational Death Benefits Plan.**

40. The Debtors provide Employees with occupational death benefit (the "ODB") through RSLI. Employees are automatically covered under the ODB upon the Employee's date of hire, at no additional cost to the Employee. The ODB coverage commences when an Employee gets injured on the Company's premises in the course of the job and dies as a direct result of these injuries and from no other cause. The ODB provides for coverage equal to a principal lump-sum of up to approximately $250,000 if an Employee dies in an accident while on the job. The ODB also integrates with the Travel Accident Plan (as defined herein) to provide a total minimum benefit of approximately $250,000 if an Employee dies in an accident while travelling on Company Business.[6] The ODB does not pay benefits if the benefit provided under the Travel Accident Plan is greater than approximately $250,000. The Debtors pay premiums related to the ODB and the Travel Accident Plan in a lump sum to RSLI, as discussed further herein.

**c. Disability Benefits.**

41. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits") through RSLI. Employees are eligible for Disability Benefits upon the Employee's date of hire. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of up to 100 percent of their base wages, depending on such Employee's length of service with the Debtors, in the event of a short-term medical disability due to an illness or injury (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of

[6] "Company Business" includes all circumstances arising from or occurring while an Employee is traveling on assignment by or at the direction of the Debtors, including relocation trips (which are considered an assignment to a new regular place of employment).

60 percent of their wages, up to a monthly limit of approximately $15,000, in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits").

42. Employees' Short-Term Disability Benefits begin after an Employee's first day of absence due to illness or injury and continue for up to a maximum of 26 weeks. The Long-Term Disability Benefits begin after an Employee is continuously absent for 180 days and continue until the Employee no longer meets the eligibility criteria or has reached the Social Security Normal Retirement Age. Both the Short-Term Disability Benefits and the Long-Term Disability Benefits are fully insured and administered through Matrix.

43. The Debtors pay for the Short-Term Disability Benefits, with no costs to the Eligible Employees. The Debtors pay Matrix approximately $3,500 per month in premiums on account of the Short-Term Disability Benefits. Currently approximately 52 Employees are receiving Short-Term Disability Benefits. The Employees pay for the Long-Term Disability Benefits as a requirement of employment. Currently approximately 24 Employees are receiving Long-Term Disability Benefits.

44. In the last twelve (12) months, the Debtors paid Matrix approximately $50,000 in administrative fees and premiums on account of the Disability Benefits. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Disability Benefits is approximately $10,000. Accordingly, the Debtors request the authority to honor any prepetition obligations on account of Disability Benefits, and to continue providing such Disability Benefits on a postpetition basis in the ordinary course of business and consistent with past practice.

**d. Travel Accident Insurance.**

45. The Debtors provide travel accident insurance coverage through RSLI for Employees of the Company, in the event of an accident while traveling on Company Business that results in death or dismemberment (the "Travel Accident Plan"). Employees are eligible for the Travel Accident Plan upon the Employee's date of hire, provided that the Employee performs all customary duties of the employee's occupation at the Debtors' place of business. Travel Accident Plan coverage is provided by the Debtors at no additional cost to the Employee and is paid in addition to any Basic Life or AD&D insurance that an Employee may already have. For any authorized Company Business, coverage commences when an Employee leaves their place of regular employment or residence, whichever is later, and ends when the Employee returns to their place of regular employment or residence, whichever is earlier. Coverage includes any accident that an Employee incurs while traveling on Company Business, including pedestrian or hotel accidents or accidents while visiting construction sites. Furthermore, coverage extends globally, and captures most modes of transportation and types of accidents resulting from such travel. The Travel Accident Plan provides for coverage equal to three times an Employee's current annual base pay, with a maximum coverage amount of approximately $1 million.[7]

46. In the last twelve (12) months, the Debtors paid approximately $13,000 in premiums related to the Travel Accident Plan and the ODB. As of the Petition Date, the Debtors do not have any current outstanding obligations on account of the Travel Accident Plan and the ODB. However, out of abundance of caution, the Debtors request authority to honor any prepetition obligations on account of the Travel Accident Plan and the ODB, and to continue

[7] "Annual base pay" is an Employee's annual base salary, exclusive of any bonuses, commissions, overtime pay or other compensation.

paying the Travel Accident Plan and the ODB on a postpetition basis, in the ordinary course of business and consistent with past practice.

**e. Workers' Compensation Program.**

47. The Debtors maintain workers' compensation insurance for Employees at the levels required by applicable laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). All Employees participate in the Debtors' Workers' Compensation Program, which is self-insured by the Debtors up to approximately $2 million per occurrence. The Debtors maintain coverage for the Workers' Compensation Program through ESIS Global RiskAdvantage ("ESIS"). The Debtors pay approximately $300,000 annually to ESIS for maintaining the Workers' Compensation Program.

48. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[8]

49. In addition, to the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

50. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the chapter 11 process. Thus, the Debtors request the authority,

[8] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

pursuant to the Order (a) to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, and (b) to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

51. There are currently approximately 18 open claims under the Workers' Compensation Program, of which all are covered by the ESIS policy. As of the Petition Date, the Debtors have four current outstanding obligations on account of the Workers' Compensation Program. Out of abundance of caution, the Debtors seek authority to honor any prepetition obligations on account of the Workers Compensation Program, and to continue paying such Workers' Compensation Program on a postpetition basis in the ordinary course of business and consistent with past practice.

**3. Retirement Plans.**

52. The Debtors offer their Employees the opportunity to participate in a 401(k) Plan, including the 401(k) Contributions, and the Profit Sharing Plan (each as defined herein, and collectively, including the Retirement Plan Fees, the "Retirement Plans").

53. Specifically, the Debtors provide all Employees with the opportunity to participate in a 401(k) program (the "401(k) Plan"), which is administered by Transamerica Retirement Services. Employees become eligible for the 401(k) Plan on the date of hire. The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors match the Employees' 401(k) Plan contributions dollar-for-dollar in an amount up to five percent of the Employees' eligible compensation (the "401(k) Contributions"). Under the 401(k) Plan, the Debtors also make disbursements on account of payroll deductions for repayment of loans that Employees previously drew from their individual 401(k) accounts (the "401(k) Participant Loan Payments").

54. In the last twelve (12) months, the Debtors' monthly payments and disbursements on account of 401(k) Contributions averaged approximately $2 million. As of the Petition Date, the Debtors do not have any current outstanding obligations on account of the 401(k) Plan.

55. The Debtors also provide all Employees with the opportunity to participate in a cash option retirement plan (the "Cash Option Plan"). The Cash Option Plan provides Employees with future financial security through a combination of personal savings, current tax savings, and contributions made by the Debtors. Full-time Employees automatically join the Cash Option Plan upon the date of hire. Part-time or seasonal employees become eligible to join the Cash Option Plan upon completion of a year of service with the Debtors. The Debtors contribution to the Profit Sharing Plan is fully discretionary. The Debtors may choose to make a discretionary contribution for an amount equal to three percent or seven percent of base pay for non-represented and represented Employees, respectively, for that Cash Option Plan year. The Debtors may also choose to make a discretionary contribution. The amount credited to each Employee's account for the non-elective contribution will be in the same ratio that the Employee's salary bears to the total salary of all participants in the Cash Option Plan. The Debtors, at their own discretion, may choose to make contributions for any year that contributions were suspended. The amount of the discretionary contribution, if any, is determined by the Debtors at each Cash Option Plan year.

56. In the last twelve (12) months, the Debtors contributed $5.8 million to the Cash Option Plan. As of the Petition Date, the Debtors do not have any current outstanding obligations to Employees on account of the Cash Option Plan. Nevertheless, out of an abundance of caution, the Debtors request authority to reserve the right to honor any prepetition

obligations on account of the Cash Option Plan, and to continue the Cash Option Plan on a postpetition basis, in the ordinary course of business consistent with past practice.

**4. Supplemental Assistance Programs.**

57. The Debtors partner with Bank of America to offer Employees a program that provides them with educational resources to help improve overall financial wellness (the "BoA Program"). There are no monthly cash obligations in connection with the BoA Program.

58. The Debtors also provide Employees with a service that connects Employees with an independent investment advisory firm, CAPTRUST, to help Employees navigate retirement benefits (the "CAPTRUST Program"). On average, the Debtors spend approximately $20,000 per quarter on account of the CAPTRUST Program.

59. The Debtors partner with Identity Guard to provide Employees with the option to purchase identity theft protection coverage (the "Identity Theft Protection Plan"). The Identity Theft Protection Plan is fully funded by participating Employees, and accordingly, is not a current cash obligation of the Debtors.

60. Full-time Employees are eligible for the Debtors' tuition assistance program, under which the Debtors reimburse eligible expenses for tuition, fees, books, supplies, and coursework relevant to an Employee's current occupation from certain accredited and preferred higher education institutions (the "Tuition Assistance Program," and together with the BoA Program, the CAPTRUST Program, and the Identity Theft Protection Plan, collectively, the "Supplemental Assistance Programs"). The Tuition Assistance Program provides reimbursements for up to two courses at a time upon successful completion of a course. Employees who participate in the Tuition Assistance Program are expected to remain with the

Debtors for 36 months after receipt of their last reimbursement. In 2019, the Debtors paid approximately $50,000 on account of the Tuition Assistance Program.

61. In 2019, the Debtors paid approximately $150,000 on account of the Supplemental Assistance Programs. As of the Petition Date, the Debtors do not have any current outstanding obligations on account of the Supplemental Assistance Programs. However, out of abundance of caution, the Debtors request authority to honor any prepetition obligations on account of the Supplemental Assistance Programs and to continue administering such Supplemental Assistance Programs on a postpetition basis in the ordinary course of business and consistent with past practice.

**5. Paid and Unpaid Leave.**

62. The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for PTO, ETO, Holidays, FMLA Leave, Maternity Leave, and Other Paid Leave (each as defined below, and collectively, the "Paid Leave").

63. In the ordinary course of business, the Debtors provide paid time off ("PTO") to the Employees as a Paid Leave benefit. PTO accrues at a specified rate based on the Employee's years of service and date of hire. Employees may carry over up to a maximum of 80 hours of unused PTO into the next calendar year as extended time off ("ETO"). ETO may be used as a Paid Leave benefit for qualifying absences under the Family and Medical Leave Act (the "FMLA"). Employees who are terminated or resign are entitled to a cash payment in lieu of the accrued but unused PTO and ETO.

64. The Debtors estimate that, as of the Petition Date, they do not have any obligations on account of accrued but unused PTO. In the event this amount were greater than zero, it would not be a current cash payment obligation unless an Employee were to leave the Debtors' employment or were terminated. As stated, employees who voluntarily leave the

Debtors' employment or are terminated are entitled to a cash payout of their accrued but unused PTO and ETO.[9]

65. In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including:

- 10 paid holidays throughout the year, during which Employees are not required to work and are paid their base rate of pay (the "Holidays");
- paid and unpaid leave under the FMLA for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs (the "FMLA Leave");
- six weeks paid maternity leave (the "Maternity Leave") for expecting female Employees who are eligible under the FMLA; and
- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting (the "Other Paid Leave") and unpaid leaves of absence for family medical leaves and military leaves (the "Unpaid Leave").

These other forms of Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations. The Debtors retain Cigna to administer the Paid Leave program.

66. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

[9] Certain states in which the Debtors operate require payment of PTO upon termination. To the extent applicable, the Debtors will pay PTO as required by state statute.

**a. Retiree Payments.**

67. Additionally, in the ordinary course of business, the Debtors provide a lump sum payment to those retired Employees who, prior to retirement, were employed by the Debtors (or their predecessor, Sunoco Inc.) for at least ten years and were 55 years of age or older on the date of retirement (each, a "Retiree Payment"). The Debtors estimate that, as of the Petition Date, they have no outstanding current obligations on account of accrued but unpaid Retiree Payments. The Debtors nonetheless request the authority to honor any prepetition obligations on account of Retiree Payments and to continue paying such Retiree Payments on a postpetition basis in the ordinary course of business and consistent with best practice.

**6. Postpetition Non-Employee Director Compensation.**

68. As of the Petition Date, Non-debtor PES Energy Inc. maintains a board of directors comprised of nine directors (each, a "Director"). Each of the non-Employee Directors is compensated up to approximately $200,000 per year,[10] payable quarterly in advance (together, the "Director Payments").[11] In addition, the non-Employee Directors will be reimbursed for all reasonable and documented out-of-pocket business expenses incurred in connection with the non-Employee services to the Company as a member of the Board (the "Director Fees"). The non-Employee Directors will also be covered by the Company's directors' and officers' insurance policy, in an amount and on terms as reasonably determined by the Board

[10] In addition to his service as a member of the Board of Directors of PES Energy Inc., Jeffrey S. Stein serves as the Chief Restructuring Officer of the Debtors. Under Mr. Stein's consulting agreement with the Debtors, the parties have agreed that: (a) Mr. Stein will receive a monthly retainer of $125,000 during the pendency of these chapter 11 cases; and (b) Mr. Stein may be eligible to receive a success fee at a later date. As of the Petition Date, no amounts were outstanding under Mr. Stein's consulting agreement with respect to monthly retainer payments.

[11] The Chairman may be compensated for his service in amounts up to $300,000. In addition to his role as Chairman, the Chairman serves as a consultant to the Debtors. Under the Chairman's consulting agreement, the parties have agreed that the Chairman will receive a "per diem" payment in the amount of $1,500 during the pendency of these chapter 11 case. As of the Petition Date, approximately $4,000 was outstanding under the Chairman's consulting agreement with respect to per diem payments.

(the "Director Insurance Coverage" and, collectively with the Director Payments and Director Fees, the "Director Compensation").

69. The Debtors estimate that there are no amounts outstanding with respect to the Director Compensation as of the Petition Date. The Debtors request the authority to honor any prepetition obligations on account of Director Compensation and to continue paying such Director Compensation on a postpetition basis in the ordinary course of business and consistent with historical practice.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

70. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. Section 507(a)(4) of the Bankruptcy Code requires the Debtors to pay wages, salaries, commissions, vacation, severance, and sick leave as administrative priority claims up to a limit of $13,650 per individual. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

71. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475-81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

72. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring.

**II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.**

73. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Third Circuit and other circuits have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

74. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.

75. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Railway, Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

76. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re*

*Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

77. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

78. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

79. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. *See, e.g.*,

*In re Z Gallerie, LLC,* No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 6, 2019); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 4, 2018) (same); *PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 23, 2018) (same); (*In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 11, 2017) (same).[12] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practice.

## III. The Employee Incentive Programs are a Reasonable and a Sound Exercise of Business Judgment.

80. The Debtors further request that they be allowed to continue to honor the Employee Incentive Programs in the ordinary course of business. The Debtors submit that the Employee Incentive Programs should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the Employee Incentive Programs are simply preexisting programs that the Debtors have maintained in the ordinary course and seek to continue on a postpetition basis, and no insiders are part of the Employee Incentive Programs. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).

81. The Debtors submit that continuing to maintain the Employee Incentive Programs for non-insiders is a sound exercise of their business judgment and in the best interests of the estates. Importantly, the Employee Incentive Programs is a component of the Debtors' overall Employee Compensation and Benefits package and is intended to incentivize the Employees in

---

[12] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

the ordinary course of the Debtors' operations. The payments under the Employee Incentive Programs are only attained if an Employee attains certain performance in the respective period. The Debtors therefore believe that it is necessary to continue this program for non-insiders on a postpetition basis to continue to incentivize performance that exceeds expectations. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the Employee Incentive Programs on a postpetition basis in the ordinary course of business and consistent with past practice, including payment of prepetition obligations related thereto, if any.

## IV. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

82. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

83. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a significant disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors

request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

## V. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

84. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, the proposed debtor in possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

85. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As described above, the Debtors' Employees are critical to an immediate and orderly transition into chapter 11, and authorizing the relief requested herein is necessary to avoid the immediate and irreparable harm that would result from any disruption in providing the Employee Compensation and Benefits. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the

"immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Reservation of Rights**

86. Nothing contained herein is intended or shall be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay a prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

87. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

88. The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition first lien term loan facility and counsel thereto; (d) the lenders under the Debtors' prepetition first lien term loan facility and counsel thereto; (e) Merrill Lynch Commodities, Inc. and counsel thereto; (f) NGL Energy Partners LP and counsel thereto; (g) the lenders under the Debtors' prepetition promissory note and counsel thereto; (h) counsel to ICBC Standard Bank Plc; (i) the Internal Revenue Service; (j) all parties known by the Debtors to hold or assert a lien on any

asset of any Debtor; (k) all relevant state taxing authorities; (l) all of the Debtors' landlords, and owners and/or operators of premises at which any of the Debtors' inventory and/or equipment is located; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

89. No prior motion for the relief requested herein has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: July 22, 2019
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
joneill@pszjlaw.com
pkeane@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
steven.serajeddini@kirkland.com
matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*