**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PES HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF JEFFREY S. STEIN,
CHIEF RESTRUCTURING OFFICER OF THE DEBTORS,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Jeffrey S. Stein, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of PES Holdings, LLC ("PES Holdings"), as well as the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") and have held that position since July 1, 2019.  I am also a member of the board of directors of PES Energy Inc., the indirect parent of PES Holdings, LLC, and have held that position since July 8, 2019.  In addition, prior to and during the Prior Chapter 11 Cases (as defined below), I was an independent board member of North Yard GP.  I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.  I am above 18 years of age and am competent to testify.

2.      In addition, I am the Managing Partner of Stein Advisors LLC, a financial advisory firm that provides consulting services to institutional investors focused on distressed debt and special situations equity investments.  Prior to founding Stein Advisors LLC in 2010, from January

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

2003 through December 2009, I served as Principal of Durham Asset Management LLC, a global event-driven distressed debt and special situations equity asset management firm that I co-founded. In that capacity, I was responsible for the identification, evaluation and management of investments for various investment portfolios. From July 1997 to December 2002, I served as Co-Director of Research at The Delaware Bay Company, Inc., a boutique research and investment banking firm focused on the distressed debt and special situations equity asset classes. From September 1991 to August 1995, I was an Associate and Assistant Vice President at Shearson Lehman Brothers in the Capital Preservation and Restructuring Group. I received a B.A. in Economics from Brandeis University and an M.B.A. with Honors in Finance and Accounting from New York University.

3.        On July 21, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"). To minimize any disruption resulting from the filing of these chapter 11 cases as well as other possible adverse effects on their business, the Debtors have filed various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions").

4.        Except as otherwise indicated herein, all facts set forth in this declaration (this "Declaration") are based upon: my personal knowledge of the Debtors' employees, operations, and finances; information learned from my review of relevant documents; information supplied to me by other members of the Debtors' management and third-party advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**Preliminary Statement**

5.    The Company's principal asset is a refining complex (the "Refining Complex") located on an approximately 1,300 acre industrial site 2.5 miles from downtown Philadelphia. The Refining Complex site has been used for petroleum refining since the 1800s under multiple owners and operators.

6.    The Refining Complex produces a full range of transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products, including home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur. These products are marketed and distributed by truck, rail, pipeline, and waterborne vessels throughout the northeastern United States, and by waterborne vessels to international markets.

7.    When fully operational, the Refining Complex consisted of two separate refineries with a combined distillation and refining capacity of approximately 335,000 barrels of crude oil per day, which represented approximately 28% of the crude oil refining capacity of the United States' east coast—a region otherwise known as the Petroleum Administration for Defense District I ("PADD I").  Until recent events, the Refining Complex employed approximately 1,100 individuals.

8.    On January 21, 2018, the Debtors filed petitions for relief under the Bankruptcy Code (the "Prior Chapter 11 Cases"), primarily due to challenging macroeconomic trends in the energy sector and regulatory compliance costs that penalize independent merchant refiners. On August 7, 2018, the Debtors successfully emerged from the Prior Chapter 11 Cases pursuant to a plan of reorganization (the "Prior Plan") that:  (i) secured a capital infusion of approximately $260 million; (ii) extended the Debtors' debt maturities through 2022; (iii) reduced the Debtors' anticipated debt service obligations by approximately $35 million per year; (iv) provided

the Debtors with access to a new intermediation facility; and (v) provided the Debtors with relief from certain regulatory obligations.

9.      After the Prior Chapter 11 Cases, the Debtors conducted a complex multi-stage operational and legal implementation of their intermediation facility with ICBCS (as defined below).  The Debtors completed this process on June 18, 2019.  Given the challenging commodity and regulatory environment in which the Debtors operate, the implementation of the new intermediation facility was a major step forward for the Debtors.  This momentum was lost days later when, early on June 21, 2019, the Debtors suffered a historic, large-scale, catastrophic incident involving an explosion at the alkylation unit at their Girard Point refining facility (the "Girard Point Incident"):



10.      As a result of the Girard Point Incident, the Girard Point refinery is currently inoperable and will require an extensive rebuild.  The Girard Point Incident left the Debtors significantly impaired, with an ability to operate at a severely limited capacity through the Point Breeze refinery.  The significant fixed costs and obligations of operating the Refining Complex,

weighed against the Debtors' reduced capacity, would have consumed over $100 million in liquidity within a few short weeks and precipitated the filing of these chapter 11 cases.

11.     Faced with these challenging circumstances, the Debtors immediately began working with their stakeholders on their liquidity and the path ahead.  To assist them with these efforts, the Debtors retained Kirkland & Ellis LLP ("K&E") as their legal advisors, PJT Partners Inc. ("PJT") as their investment bankers, and Alvarez & Marsal North America, LLC ("A&M") as their restructuring advisors.  The Debtors took immediate steps to reduce their workforce and manage their payables to preserve liquidity while ensuring adherence to health, safety, and environmental obligations.  The Debtors also immediately began a process to engage with their insurers—as it relates to property and business interruption insurance claims for the losses caused by the Girard Point Incident—to advance a dialogue toward an immediate advance and a global resolution that will allow the Debtors to restore their operations.  The Debtors have yet to obtain such an advance.  But they were ultimately successful in securing a debtor in possession financing facility from their Term Loan Lenders, and are in discussions to obtain a second facility from their Intermediation Lender, to fund these chapter 11 cases.  The Debtors intend to use the tools of chapter 11 to engage with their stakeholders, insurers, and third parties around a value-maximizing plan transaction and seek to preserve and restore the operations of their refinery and maximize the value of their assets.

12.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into three sections.  The *first* section provides background information on the Debtors' corporate history, structure, and their business.  This first section also explains the

Debtors' capital structure and other significant obligations.[2]    The *second* section details the circumstances surrounding the commencement of these chapter 11 cases, the current state of lender negotiations, and the Debtors' proposed debtor-in-possession financing and cash collateral arrangements.    The *third* section discusses the factual bases supporting the First Day Motions.

<u>Discussion</u>

**I.      The Debtors' Corporate History, Structure, and Business Overview.**

13.      The Debtors are privately held limited liability companies and limited partnerships. As of the Petition Date, the Debtors employ approximately 950 individuals, approximately 620 of whom are unionized members of the United Steelworkers (the "<u>USW</u>").[3]    The Debtors conduct their operations through two business segments, refining and logistics, which are operated by Debtor entities Philadelphia Energy Solutions Refining and Marketing, LLC ("<u>PESRM</u>") and North Yard Logistics, L.P. ("<u>NYL</u>"), respectively.    PESRM includes the operations of the Refining Complex.    NYL owns and operates the North Yard Terminal (as defined below), which provides rail unloading services to the Refining Complex.

**A.      The Debtors' Corporate History.**

14.      The Refining Complex has a proud Philadelphia history, and has been continuously operating in some form since the mid-1860's.    Until the Girard Point Incident, the Refining Complex had the capacity to refine 335,000 barrels of crude oil per day, and was the largest oil refining complex on the U.S. eastern seaboard.    The Refining Complex produces a full range of

---

[2]    Many of the financial figures presented in this Declaration, which reflect the Debtors' most recent review of their business, are unaudited and potentially subject to change.    The Debtors reserve all rights to revise and supplement the figures presented herein.

[3]    In June 2015, the Debtors renewed the terms of a collective bargaining agreement (the "<u>CBA</u>") with the USW that covers all represented hourly employees and contains a no-strike clause effective through the CBA's September 8, 2019 expiration date.

transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products, including home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur.

15.     The Debtors were formed in 2012, in connection with the Debtors' acquisition of the Refining Complex from Sunoco Inc. ("Sunoco"), a subsidiary of Energy Transfer Partners, L.P. ("Energy Transfer Partners").   The Debtors believed that rapid growth in the production of light, sweet domestic crude oil from developing shale formations such as the Bakken, Eagle Ford, and Permian, constrained domestic pipeline infrastructure, the federal ban on the export of domestic crude oil, and relatively static domestic distillation capacity, would create opportunities to secure domestic crude oil at advantaged prices relative to other sources of crude oil.   Accordingly, in 2013, $100 million was invested to construct a crude oil rail terminal on the North Yard of the Refining Complex (the "North Yard Terminal") to capitalize on this development.   One year later, an additional $30 million investment doubled the North Yard Terminal's capacity to unload four crude unit trains per day, or 280,000 barrels per day, making the North Yard Terminal the largest crude oil unloading terminal on the east coast.   In addition to the investments in the North Yard Terminal, the Debtors invested, over the past five years, approximately $630 million in the Refining Complex's infrastructure to enable it to operate safely and efficiently, and to position it for success in the highly competitive transportation and fuel market.   The Debtors also had expanded their employee base to approximately 1,100 employees, though that number was reduced to approximately 950 employees following the Girard Point Incident.

B.      **Assets and Operations.**

1.      **PESRM.**

16.     PESRM is an independent merchant refiner that operates the Refining Complex. The Refining Complex is located on a 1,300 acre tract of land, 2.5 miles from downtown Philadelphia, that includes two interconnected refineries:  Girard Point and Point Breeze. The Refining Complex processes a mix of predominantly light, sweet crude oils from West Africa, Canada, North Dakota, Texas, and other parts of the world and produce a full range of refined products (including gasoline, ultra-low sulfur diesel, home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur) that PESRM markets.  The specific locations of the Refining Complex's major refinery units are described in the map below:



17.     These refinery units allowed Girard Point and Point Breeze to collectively distill up to 335,000 barrels per day into a full range of refined products, including but not limited to gasoline (approximately 50% of refined product yields) and diesel (approximately 38% of refined product yields).

18.     PESRM's earnings and cash flow from operations are primarily affected by the relationship between refined product prices and the prices for crude oil and other non-crude

feedstocks, which is best illustrated in the gross refining margin financial metric ("Gross Refining Margin").  Gross Refining Margin is the difference between (i) the amount of revenue received for the refined products produced by the Refining Complex and (ii) the amount paid for crude oil and the other raw materials refined in the Refining Complex (input costs).  The proceeds represented by the Gross Refining Margin are used to fund, among other things, operating expenses (*i.e.*, direct labor, plant management salaries, engineering and technical salaries, utilities, maintenance expense, operating materials, chemicals, and catalysts used in the refining process), administrative expenses, capital expenditures, regulatory compliance costs, and debt service.

19.     While operating expenses, administrative expenses, and capital expenditures are relatively predictable and stable over time, Gross Refining Margin and regulatory compliance costs are volatile and highly unpredictable.  As a result, the cash available to service debt and provide a return on invested capital varies widely from period to period and, at times, can be negative for extended periods.

20.     The cost of acquiring crude oil and other non-crude feedstocks, and the price of refined products ultimately sold, depend on numerous factors beyond PESRM's control, including the supply of and demand for, crude oil, gasoline, diesel, and other refined products, which in turn depend on other factors, including changes in global and regional economies, weather conditions, global and regional political affairs, crude oil production levels, the availability of imports, the marketing of competitive fuels, pipeline capacity, prevailing exchange rates, and the extent of government regulation.  While PESRM's costs of products sold fluctuate significantly with movements in crude oil prices, income fluctuates significantly with movements in refined product prices.  Therefore, the effect of changes in crude oil prices on PESRM's operating results is influenced by how the prices of refined products adjust to reflect such changes.

2.    **NYL.**

21.    NYL owns and operates the North Yard Terminal, the east coast's largest crude oil rail unloading terminal, located in the North Yard of the Refining Complex.  Following an expansion project completed in October 2014, the North Yard Terminal currently has unloading capacity of four crude unit trains per day, or 280,000 barrels per day.

22.    The major components of the North Yard Terminal include 6.4 miles of track on the Debtors' property, one mile of additional track with rights-of-way on adjacent land owned by a third-party, two 4,000 foot, 24-inch underground pipeline manifolds, a 20,000 barrel per hour pumping station, 1,500 feet of 24-inch pipeline, and a custody transfer meter station.

23.    NYL provides rail-unloading services to PESRM by receiving, handling, and transferring crude oil that is delivered to PESRM by rail.  NYL does not take ownership of, or receive any payments for the crude oil it handles.

C.    **Logistics Capabilities.**

24.    The Debtors optimize their business through access to a wide range of logistics assets and infrastructure that facilitate:  (i) crude oil and other feedstock supply; (ii) intermediate blendstock acquisition, storage, and handling; and (iii) refined product sales and marketing.  A significant portion of these logistics assets and infrastructure are owned by third parties and the Debtors access them by contract.

1.    **Crude Oil and Other Feedstock Supply Infrastructure.**

25.    As much as 75% of the Refining Complex's crude oil can be supplied by rail from domestic sources when those sources are available.  The North Yard Terminal is designed to receive and unload domestic crude oil supplied by rail.

26.    Additionally, as much as 100% of the Refining Complex's crude oil can be supplied by ship via the Delaware River.  The Debtors have a long-term throughput contract with Sunoco

Partners Marketing & Terminals L.P. ("SPMT") at their Fort Mifflin and Darby Creek crude oil docks and terminal. These facilities have the capability to receive and handle more than 300,000 barrels per day of crude oil as well as other refinery feedstocks delivered by waterborne vessels. Although the majority of the Debtors' waterborne crude comes from foreign sources, domestic crude oil can be brought in from the United States Gulf Coast to the Refining Complex through these facilities, which the Debtors have an option to purchase at fair market value. The map below shows the location of the Debtors' primary offloading points and other notable assets.



2.      **Blendstock Acquisition, Storage, and Handling Infrastructure.**

27.      To support butane blending into gasoline in the winter, and storage of butane not used in gasoline in the summer (necessitated by the seasonal gasoline "Reid vapor pressure" regulatory requirements), the Debtors have access to two facilities that collectively allow them to seasonally store, purchase, and blend butane. The Debtors have contracted with SPMT at its Marcus Hook terminal for 775,000 barrels of capacity in their underground natural gas liquids

storage caverns. These caverns are directly connected to the Refining Complex by pipelines that the Debtors also lease from a SPMT affiliate.

28. Additionally, the Debtors have contractual access to an on-site third-party natural gas liquids rail terminal (the "South Yard Terminal") that allows them to transport excess summer butane to and from terminals other than Marcus Hook and to purchase additional domestic butane from third parties for blending in the winter months. The South Yard Terminal was constructed by NGL Energy Partners LP, a Delaware master limited partnership ("NGL"), at the Refining Complex. The Debtors agreed to purchase the terminal from NGL on an installment sale basis, and have an option to accelerate this purchase and acquire the terminal at any time from NGL at a predetermined price.

**3.       Outbound Refined Product Offtake.**

29. As an independent merchant refiner with the ability to produce a wide range of transportation fuels, the Debtors' ability to target a multitude of attractive markets is key to maximizing revenue generation. The Debtors have access to a network of truck loading racks, pipelines, barges, refined product storage terminals and docks located at or downstream of the Refining Complex that enable the Debtors to market and distribute their refined products throughout PADD I and internationally. Much of the gasoline and distillate leaves the Refining Complex through pipelines that transport these products to cities such as Pittsburgh, Pennsylvania, New York City and Buffalo, New York. Products can also be shipped by barge from the Refining Complex docks, or by truck through a SPMT truck rack terminal. PESRM is also able to ship diesel to Europe and gasoline to Africa when economics dictate.

30. A connection to the Harbor pipeline at the Debtors' Schuylkill River Tank Farm allows the Debtors to transport their products to the New York Harbor, which is the largest refined product market in the world. Access to this market (by barge as well as by pipeline) is important

as the region is short refined products, particularly considering the closure of several East Coast and PADD I refineries that have traditionally served the New York market in the past. The Debtors' Schuylkill River Tank Farm also provides a connection to points west via the Laurel pipeline. The Debtors access international markets through exports from SMPT's Eagle Point terminal on the Delaware River. The chart below highlights the Debtors' outbound logistical flexibility:



### D.    Organization and Prepetition Capital Structure.

#### 1.    Organizational Structure.

31.     A chart of the Debtors corporate structure is attached hereto as **Exhibit B**. PES Holdings is organized in Delaware. PESRM is a Delaware limited liability company and conducts all of the Debtors' refining operations. Its primary asset is the Refining Complex. NYL is a Delaware limited partnership that owns and operates the North Yard Terminal. Since completion of its construction in October 2013, the North Yard Terminal has provided PESRM with a rail

unloading terminal that allows it to source domestic crude oil by rail, primarily light sweet crude extracted from the Bakken shale region of North Dakota.

2.      **The Debtors' Prepetition Capital Structure.**

As detailed herein, as of the Petition Date, the Debtors' funded debt consists of (i) a senior secured term loan facility dated August 7, 2018 (as amended, modified, or supplemented in accordance with the terms thereof, the "Term Loan Facility" and the principal amount outstanding thereunder, the "Term Loan Debt"), in an aggregate outstanding amount of approximately $698.6 million; (ii) a promissory note dated August 7, 2018 (as amended, modified, or supplemented in accordance with the terms thereof, the "SXL Promissory Note" and the principal amount outstanding thereunder, the "SXL Promissory Note Debt"), in an outstanding amount of $75.0 million; (iii) an installment sale and purchase agreement (the "NGL Installment Sale Agreement") with NGL as seller, in an outstanding amount of $26.4 million, and (iv) an intermediation facility, dated August 7, 2018 (as amended, modified, or supplemented in accordance with the terms thereof, the "Intermediation Facility"), in an outstanding amount estimated at approximately $950.0 million as of July 8, 2019.  The chart below reflects the Debtors' capital structure as of June 30, 2019.

| Capital Structure | | | |
|---|---|---|---|
| | Maturity | Outstanding | Interest |
| **PES Holdings** | | | |
| Tranche A | 12/31/22 | $120,000,000 | 8.85%* |
| Tranche A-2 | 2/11/22 | $59,738,319 | 10.6%* |
| Tranche B | 12/31/22 | $77,500,000 | 7.1%* |
| Tranche C | 12/31/22 | $441,401,332 | 10.09%* |
| **Total PES Holdings Debt** | | **$698,639,651** | |
| **PESRM** | | | |
| SXL Promissory Note | 8/7/28 | $75,000,000 | 8.30%[4] |
| NGL Installment Sale Agreement | 4/30/21 | $26,441,365 | 12.00% |
| Intermediation Facility | Rolling | $950,000,000[5] | N/A |
| **Total PESRM Debt** | | **$1,051,441,365** | |
| **Total Debt** | | **$1,750,081,016** | |
| * These represent variable rates, and are a function of the Eurodollar Rate or ABR plus an applicable margin for each Tranche as defined in the Term Loan Facility's documents. Applicable margin per Tranche is (A: 5.25-6.25% ; A2: 7-8% ; B: 3.5-4.5%; C: 2.5%-4%). | | | |

### 3.    Term Loan Facility.

32.    PES Holdings is the borrower under the approximately $698.6 million Term Loan Facility by and among PES Holdings, the lenders from time to time party thereto (the "Term Loan Lenders"), and Cortland Capital Market Services LLC, as administrative agent (the "Term Loan Agent"). The Term Loan Facility is guaranteed by certain subsidiaries of PES Holdings. The Term Loan Facility consists of four tranches. Tranche A ("Tranche A") is comprised of approximately $120 million in secured term loan debt; tranche A-2 ("Tranche A-2"), which was funded in February of 2019, is comprised of approximately $59.7 million in secured term loan debt; tranche B ("Tranche B") is comprised of approximately $77.5 million in secured term loan debt; and tranche C ("Tranche C") is comprised of approximately $441.4 million of secured term loan debt. As collateral security, each guarantor pledged to the Term Loan Agent for the benefit

---

[4]    In connection with the issuance of the SXL Promissory Note, PESRM also entered into a sharing agreement with the SXL Promissory Note Lender, whereby PESRM agreed to a contractual maximum quarterly payment of $3.1 million to be paid to the SXL Promissory Note Lender, which is offset by interest payments and subject to potential further reduction through the sharing of certain benefits obtained through commercial agreements between the parties.

[5]    The estimate shown herein of the outstanding amount under the Intermediation Facility is dated as of July 8, 2019.

of the Term Loan Lenders a priority security interest in certain assets of each guarantor including: (i) all accounts; (ii) all inventory; (iii) all money and deposit accounts; (iv) all documents and chattel paper, instruments, general intangibles and investment property, commercial tort claims, and supporting obligations; (v) letters of credit; (vi) equipment; (vii) fixtures; (viii) intellectual property; (ix) equity interests in subsidiaries; (x) records; and (xi) proceeds of the foregoing. The priority of these security interests is subject to an August 7, 2018 intercreditor agreement between MLC, ICBCS (as defined below), Cortland Capital Market Services LLC, and the Debtors.

**4.    The SXL Promissory Note.**

33.    PESRM is the borrower on the $75 million SXL Promissory Note with Sunoco Logistics Partners Operations L.P. as lender (the "SXL Promissory Note Lender").  The SXL Promissory Note Lender has a priority security interest in the "aboveground storage tanks" (as defined in the Pennsylvania Tank Act, 25 Pa. Code § 245.1) referenced in the SXL Promissory Note.

**5.    The NGL Installment Sale and Purchase Agreement.**

34.    PESRM is purchasing the South Yard Terminal from NGL pursuant to the NGL Installment Sale Agreement.  NGL has a purchase money security interest in the South Yard Terminal.

**6.     The Intermediation Facility.**

35.    Upon emergence from the Prior Chapter 11 Cases on August 7, 2018, the Debtors entered into a series of agreements that governed the Debtors' post-emergence intermediation process, including the Intermediation Facility with Merrill Lynch Commodities, Inc. ("MLC") and ICBC Standard Bank PLC ("ICBCS").  The Intermediation Facility contemplated a three-step post-effective date process under which ICBCS would replace MLC as the provider of the Debtors'

supply and offtake facility (the "Intermediation Lender").  As part of the first phase of the process, MLC provided PESRM with an exit phase-in intermediation facility for crude oil and refined products on agreed-upon terms.  In exchange, MLC received certain cash collateral, and other collateral and guarantees.  In the second phase, ICBCS replaced MLC as the Debtors' primary crude oil Intermediation Lender.  Finally, in the third phase, ICBCS replaced MLC as the Debtors' refined products Intermediation Lender.  The third phase was completed on June 18, 2019. ICBCS's extension of credit under the Intermediation Facility is variable and was estimated at approximately $950 million as of July 8, 2019.  On July 19, 2019, ICBCS delivered to the Debtors a notice of event of default under the Intermediation Facility.

**7.     Parent Entities and Equity Holders.**

36.     Parent PES Energy Inc. (the "Parent") is a privately-held Delaware corporation with two classes of outstanding equity.  Class A shares convey both voting rights in the Parent and rights to the proceeds of the Parent ("Class A") and class B shares convey only voting rights in the Parent, with no rights to proceeds ("Class B").  Class A shares represent 85% of total shares outstanding and consequently, 85% of voting authority.  Conversely, Class B shares represent 15% of total shares outstanding and 15% of voting authority.  Class B shares are coupled with a membership interest in PES Ultimate Holdings, LLC, a Delaware limited liability company, pursuant to which holders of Class B shares derive their economic interests in the Company.

**II.    Events Leading to These Chapter 11 Cases.**

**A.     The Prior Chapter 11 Cases.**

37.     The Debtors filed the Prior Chapter 11 Cases in January 2018.  The reason for the Prior Chapter 11 Cases was a combination of exceptionally volatile market conditions and burdensome regulatory compliance cost imposed on the Debtors (particularly with respect to the

Clean Air Act's renewable fuel standard program (42 U.S.C. § 7545(o), including regulations promulgated thereunder, the "RFS Program")).

38.     After confirmation of the Prior Plan on March 26, 2018, the Debtors successfully emerged from the Prior Chapter 11 Cases having secured a capital infusion of approximately $260 million, reduced their anticipated debt service obligations by approximately $35 million per year, extended certain of their debt maturities through 2022, secured access to the Intermediation Facility, and reduced their obligations under the RFS Program pursuant to a negotiated and court-approved settlement between the Debtors and the United States (on behalf of the Environmental Protection Agency).

**B.      Developments After the Prior Chapter 11 Cases.**

39.     Following the effective date of the Prior Chapter 11 Cases, the Debtors continued to pursue initiatives to improve their profitability, while also implementing and transitioning their highly complex Intermediation Facility with ICBCS over multiple stages.  This transition was completed on June 18, 2019, and was a major boost to the Debtors.  Just days later, on June 21, 2019, the Girard Point Incident occurred, which caused substantial property damage and left the Girard Point refinery significantly damaged:



40.     The Girard Point Incident and the unavailability of an immediate advance on the related insurance proceeds severely jeopardized the Debtors' liquidity, forced the Debtors into a preservation-focused operational status until they receive such proceeds, and ultimately forced the Debtors to seek debtor-in-possession financing and to commence these chapter 11 cases. The Debtors' goal in the near term remains continuing to preserve the safe operation of the Refining Complex while they seek to recover as quickly as possible on their property and business interruption insurance claims and pursue various transactions to preserve their operations and maximize value.

**C.     Insurance Recovery Efforts.**

41.     The Debtors have sustained significant losses as a result of the Girard Point Incident.  The scope of the physical damage is massive and immediately apparent; much of the Girard Point facility has severely damaged.  Girard Point has been rendered largely inoperable, and it will remain so until an extensive rebuild effort can put the refinery back on its feet and allow it to resume generating revenue.

42.     The Debtors have $1.25 billion in property and business interruption insurance coverage to protect against these kinds of losses (in addition to other insurance policies that cover other aspects of the Girard Point Incident).  The Debtors are working with the insurers under that program to make the Debtors whole for the physical loss of the refinery and the resulting interruption of the Debtors' business.  These insurance proceeds are the very heart of these chapter 11 cases:  the sooner the Debtors can recover, the sooner the business can complete its recovery.

43.     Over the past several weeks, the Debtors have engaged with the insurers through their broker and have met directly with the insurers' loss adjuster to advance the dialogue and to underscore the urgency of providing payment under the policies.  To date, the insurers have yet to make an advance payment, although the Debtors maintain hope that one can be made in the very

near term.  Having now filed these cases, the Debtors will continue to work with their insurers to obtain payment for their losses in an appropriate amount and on a schedule that recognizes the exigencies of restoring the Refining Complex and allowing the Debtors to emerge as a going concern for the benefit of their stakeholders.

**D.    The Debtors' Liquidity Conservation and Stakeholder Outreach Efforts.**

44.    In response to the Girard Point Incident, the Debtors swiftly shifted their focus to conserving liquidity and stopping losses, taking all necessary steps to ensure that the Refining Complex is safe and operating in compliance with environmental laws, and cooperating with all governmental investigations related to the incident.  To preserve liquidity, the Debtors immediately sought to reduce their operational workforce to only those necessary to maintain safety and run the refinery at greatly reduced rates to process remaining crude inventory, manage their outstanding payables to vendors (except those whose service was critical to operations, health, and safety), and engaged with their key stakeholders regarding additional liquidity.  As a direct result of the Girard Point Incident, the Debtors announced that they would cease operating the Refining Complex—after the run off through the Point Breeze refinery of remaining inventories, subject to available liquidity—until satisfactory arrangements can be made with their insurers to rebuild the damaged infrastructure and restart operations.  Additionally, on June 26, 2019, approximately 1,025 employees were informed via written notices issued pursuant to the Worker Adjustment and Retraining Notification Act of upcoming reductions in force.  The Debtors' decision to reduce their workforce was a direct result of the unforeseeable Girard Point Incident, and was driven by the necessity to preserve liquidity as a result thereof, until the Debtors succeed in recovering on the insurance proceeds to which they are entitled and ultimately rebuild their damaged facilities.

E.      **The Proposed DIP Financing/Use of Cash Collateral.**

1.      **Proposed DIP Financing.**

45.      At the same time the Debtors were engaging with their insurers and reducing their costs, they immediately engaged with their various stakeholders and third parties to obtain financing.  To fund the administration of these chapter 11 cases, certain Term Loan Lenders (the "DIP Commitment Parties") have agreed to provide debtor-in-possession financing (the "Proposed DIP Financing") in the form of a post-petition senior secured term loan credit facility.  Pursuant to the terms of a credit agreement between the Debtors and the DIP Commitment Parties (the "DIP Credit Agreement"), the DIP Commitment Parties will provide up to $100 million in committed principal amount of financing, with an additional $20 million available with the consent of the Required Lenders (as defined in the DIP Credit Agreement).

46.      As of the commencement of these chapter 11 cases, the Debtors have approximately $45 million of cash in deposit accounts, which is collateral of ICBCS.  This cash is insufficient to sustain the full extraction of ICBCS's hydrocarbon collateral, no less fund the chapter 11 cases.  Accordingly, the Debtors believe that the Proposed DIP Financing provides liquidity that is essential to fund the administrative costs of these chapter 11 cases, conduct safing operations and fire-related cleanup related to the Girard Point Incident, evaluate value-maximizing transaction proposals, and prosecute economic recoveries for the estates related to the Girard Point incident.  Without access to the Proposed DIP Financing, the Debtors likely would need to liquidate in the near term, to the serious detriment of their stakeholders.

47.      ICBCS, at various times, has proposed to offer a DIP financing facility that would have provided for less than the $100 million new money commitment from the DIP Commitment Parties.  The ICBCS DIP proposal would have been insufficient to fund the administration of the chapter 11 cases on a standalone basis.  As a result, the Debtors attempted to build consensus on a

two-DIP structure with both the DIP Commitment Parties and ICBCS as a DIP lender, and although a fully documented agreement has not yet been reached, the parties have made substantial progress and are hopeful that a resolution can be reached in the very near term.  Accordingly, the Debtors believe that the Proposed DIP Financing is on the most favorable terms currently available, presents the best—and only—option for the Debtors to reorganize their businesses as a going concern, was negotiated in good faith and at arm's length, and allows the Debtors to maximize the value of their estates for the benefit of all parties in interest.

**2.        Proposed Use of Cash Collateral.**

48.        In addition to the Proposed DIP Financing, the Debtors are seeking to use ICBC's cash collateral (the "Cash Collateral") solely in accordance with a budget the Debtors have shared with ICBCS and attached to the Proposed DIP Financing order.  The budget would provide the Debtors with limited authorization to use cash on-hand to continue certain near-term refining operations to extract ICBCS's hydrocarbon collateral.  The Cash Collateral is insufficient to fully extract the ICBCS's hydrocarbon collateral, and the Debtors are engaged in discussions with ICBCS for the procurement of ICBCS's hydrocarbon collateral.  Given the circumstances, the Debtors' value-preservation efforts require immediate access to liquidity to ensure public safety and maximal value preservation for all parties in interest.

**III.    First Day Motions.**

49.        To minimize any disruption resulting from the filing of these chapter 11 cases as well as other possible adverse effects on their business, the Debtors have filed contemporaneously herewith the First Day Motions seeking certain critical relief.  I have reviewed and am familiar with the content of each of the First Day Motions.  Based on my knowledge and after reasonable inquiry, I believe approval of the relief sought therein:  (i) is necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or

loss of value, (ii) is critical to the Debtors conducting safe and orderly operations, and (iii) is critical to the pursuit of the Debtors' insurance assets, and (iv) is in the best interest of the Debtors' estates, their stakeholders, and the public at large.

50.     I understand the Debtors intend to seek the entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules for the United States Bankruptcy Court for the District of Delaware.  If the Court does not grant the relief requested by the Debtors in the First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

51.     The relief requested and the facts supporting each of the First Day Motions is set forth in detail in **<u>Exhibit A</u>** attached hereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 22, 2019

_____
Jeffrey S. Stein
Chief Restructuring Officer
PES HOLDINGS, LLC

## **Exhibit A**

**Evidentiary Support for the First Day Motions**

## <u>Administrative and Procedural Motions</u>[6]

I.   **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief ("<u>Joint Administration Motion</u>").**

1.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these eight chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and allow the office of the United States Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  I believe that parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I believe that the joint administration of these chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

II.  **Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Management Group, Inc. as Claims and Noticing Agent and (II) Granting Related Relief ("<u>Claims Agent Application</u>").**

2.     Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Omni Management Group, Inc. ("<u>Omni</u>") as the Claims and Noticing Agent for the Debtors in their chapter 11 cases to (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest, (b) provide computerized claims, objection, and solicitation and balloting-related services, and (c) assist the Debtors in claim and

---

[6]     Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

ballot processing and other administrative services with respect to these chapter 11 cases, in each case, pursuant to the terms of the Engagement Agreement.

3.      Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of persons and entities to be noticed and that many of those parties are expected to file proofs of claim.  Given the number of creditors and other parties in interest involved in these chapter 11 cases, I believe that the appointment of a claims and noticing agent will relieve this Court and the Clerk's Office of the administrative burden of, noticing, administering claims, soliciting, and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

**III.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (II) Granting Related Relief ("Creditor Matrix Motion").**

4.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to file a consolidated creditor matrix in a single consolidated list of creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, and (b)  granting related relief.

5.      I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.  The preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be approved by the Court.

IV.   **Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs and (II) Granting Related Relief ("SOFA Schedules Extension Motion").**

6.     Pursuant to the SOFA Schedules Extension Motion, the Debtors seek entry of an order extending the deadline by which they must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 30 days, in addition to the extension provided by Local Rule 1007-1(b), for a total of 58 days from the Petition Date, to and including September 21, 2019, without prejudice to the Debtors' ability to request additional extensions for cause shown.

7.     The Debtors submit that ample cause exists to grant the relief requested herein.  The Debtors' business operations are complex and vast, and preparing the Schedules and Statements accurately and in appropriate detail will require significant attention from the Debtors' personnel and the Debtors' advisors.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, and contracts from each Debtor entity.  This information is extensive and located in numerous places throughout the Debtors' organization.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors.  Additionally, although the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, resources are strained.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist with stabilizing business operations during the initial postpetition period, and the critical matters that the Debtors' management and professionals were

required to address prior to the commencement of these chapter 11 cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

8.    In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for these chapter 11 cases, and negotiating with their significant creditor constituencies. Focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest. An extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these chapter 11 cases.  The Debtors therefore request that the Court extend the twenty-eight day period for an additional thirty days, without prejudice to the Debtors' right to request further extensions, for cause shown.

9.    Accordingly, I believe it is crucial that the Debtors' request that the Court extend the twenty-eight day period for an additional thirty days to file the Schedules and Statements, without prejudice to the Debtors' ability to request additional extensions for cause shown, is appropriate and should be granted.

### Operational Motions

**V.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief ("<u>Cash Management Motion</u>").**

10.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue to operate their Cash Management System, (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees, (iii) maintain existing

Business Forms in the ordinary course of business, and (iv) continue to perform the Intercompany Transactions consistent with historical practice; and (b) granting related relief.

11. The Debtors' Cash Management System consists of nine active Bank Accounts residing at two different Cash Management Banks. Eight of the Bank Accounts reside at BAML, and one Bank Account resides at SFCU.

12. The Cash Management System is comparable to the cash management systems used by similarly-situated companies to manage the cash of operating units in a cost-effective, efficient manner. The Debtors use the Cash Management System in the ordinary course of business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions. The Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

13. PESRM maintains a deposit account at BAML that serves as the centralized master account for the Debtors' business and provides funding to the other accounts in the Cash Management System. To manage daily cash inflows associated with operations, PESRM maintains two master deposit accounts with BAML: (a) one deposit account that drafts payments directly from customers' accounts for fuel sales; and one deposit account that receives payments from non-draft customers, typically for chemical and propane sales via wires, and automated-clearing-house transfers. Funds in the Deposit Accounts are swept at least once daily to the Main Concentration Account (*i.e.*, the Deposit Accounts are zero balance accounts).

14.     Within the Cash Management, the Debtors also maintain: (a) one Operating Account at BAML to fund various ordinary course operating expenditures; (b) two Controlled Disbursement Accounts at BAML to fund certain daily payment and vendor obligations via check or ACH transfer; (c) the P-Card Account at BAML that is prefunded to serve as collateral to secure any purchases made by an employee on a company credit card on account of Employee Purchases; and (d) the Gift Card Account that is prefunded to purchase gift cards in nominal amounts that are distributed as awards to employees at the Debtors' discretion. The Debtors also maintain a segregated account at BAML that the Debtors propose will hold an adequate assurance deposit for the benefit of the Debtors' utility providers throughout the course of these chapter 11 cases.

15.     The Debtors pay to the Cash Management Bank net service fees incurred in connection with the Bank Accounts. The Bank Fees are generally payable on a monthly basis and total approximately $23,000 and $41,000 per month. As of the Petition Date, the Debtors estimate that they do not owe any Bank Fees. The Debtors nonetheless seek authority to pay prepetition Bank Fees to the extent any are outstanding as of the Petition Date and to continue paying Bank Fees in the ordinary course on a postpetition basis, consistent with past practice.

16.     As of the Petition Date, the Debtors maintain Bank Accounts at banks that are both designated as authorized depositories pursuant to the U.S. Trustee Guidelines and insured by the FDIC. BAML, which houses all but one of the Bank Accounts, is designated as an authorized depository by the U.S. Trustee. The remaining Cash Management Bank, SFCU, which houses only one Bank Account, the Gift Card Account, is not an authorized depository. Nonetheless, with respect to the Gift Card Account, the Debtors believe, based on their business relationship, that SFCU is a well-capitalized and financially stable institution. Moreover, the balance in the Gift Card Account is kept at nominal levels. In any event, all of the Bank Accounts are Federal Deposit

Insurance Corporation or NCUA insured and therefore comply with section 345(b) of the Bankruptcy Code.

17.     Therefore, the Debtors believe they can maintain the Gift Card Account at SFCU without jeopardizing any parties in interest.  Importantly, the Debtors will not be depositing any additional funds into the Gift Card Account postpetition and believe that funds currently in the Gift Card Account are secure.

18.     In the ordinary course of their business, the Debtors utilize a variety of preprinted correspondence and business forms, including, but not limited to, letterhead, checks, and purchase orders.  The Debtors also maintain books and records to document their financial results and a wide array of operating information.  To minimize unnecessary additional expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases,, the Debtors request that the Court authorize their continued use of their Business Forms and Books and Records to the limited extent they are preprinted and in existence before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the unnecessary expense and delay of ordering entirely new forms as required by the U.S. Trustee Guidelines.  If the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will print or order checks with the designation "Debtor in Possession" and the corresponding bankruptcy case number.

19.     The Debtors maintain business relationships with each other resulting in intercompany receivables and payables in the ordinary course of business.  Intercompany Transactions are made through CashPro (BAML's online platform) or sent in file format from SAP to BAML for processing to either (a) reimburse certain Debtors for various expenditures associated with their business or (b) fund certain Debtors' accounts in anticipation of such expenditures as

needed.  The Main Concentration Account receives funds from daily sweeps of the Deposit Accounts and disburses funds, as necessary, throughout the Cash Management System.

20.     In connection with the daily operation of the Cash Management System, as funds are swept and disbursed throughout the Cash Management System and as business is transacted between the Debtors, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor.  Certain Intercompany Claims are settled in cash while others are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

21.     The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.[7]

22.     The Cash Management System is an essential aspect of the Debtors' complex operations.  The Cash Management System provides the Debtors with the ability to instantaneously track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  Any disruption of the Cash Management System could have a negative effect on the Debtors' restructuring efforts.  I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business.  Indeed, absent the relief requested in the Cash Management Motion, requiring the

---

[7]     Moreover, the Cash Management Motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in the Cash Management Motion.  To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

Debtors to adopt a new, segmented cash management system would needlessly reduce the value of the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities. Moreover, the Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' treasury department. In light of such protective measures, I believe that maintaining the Cash Management System is in the best interests of their estates and creditors.

**VI.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs and (II) Granting Related Relief ("<u>Wages Motion</u>").**

23.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay certain prepetition wages, salaries, and other compensation and reimbursable employee expenses in the ordinary course of business, and continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

24.     The Debtors employ approximately 950 Employees on a part- or full-time basis. Approximately 330 Employees are paid a salary, while approximately 620 Employees are paid on

10

an hourly basis.  In addition to the Employees, the Debtors also periodically retain temporary workers sourced periodically from various staffing agencies to fulfill certain duties on a short-term basis.  At this time, the Debtors retain approximately 225 Independent Contractors and Temporary Staff.  The Independent Contractors and Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

25.     The Debtors' Employees, Independent Contractors, and Temporary Workers perform a wide variety of functions critical to the Debtors' operations.  In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced.

26.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.  Such Employees may then elect to seek alternative employment opportunities.

27.     Additionally, a significant portion of the value of the Debtors' business is reliant on their workforce, which cannot be replaced without costs.  Enterprise value may be materially impaired to the detriment of all stakeholders in the event the relief sought through the Wages motion is not granted.  I therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to transition into these chapter 11 cases.

11

**VII.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors'
Proposed Adequate Assurance of Payment for Future Utility Services,
(II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing
Services, and (III) Approving the Debtors' Proposed Procedures for Resolving
Additional Assurance Requests, and (IV) Granting Related Relief ("Utilities Motion").**

28.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders

(a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services,

(b) prohibiting Utility Companies from altering, refusing, or discontinuing services, (c) approving

the Debtors' proposed procedures for resolving Adequate Assurance Requests, and (d) granting

related relief.

29.    In connection with the operation of their business and management of their

properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste

management (including sewer and trash), internet, and other similar services from a number of

utility companies or brokers.  On average, the Debtors pay approximately $5.8 million each month

for third-party Utility Services, calculated as a historical average payment for the twelve-month

period ended June 30, 2019.  Accordingly, the Debtors estimate that their cost for Utility Services

during the next 30 days (not including any deposits to be paid) will be approximately $5.8 million.

The Debtors have provided certain of the Utility Companies with cash deposits, escrow

agreements, or letters of credit.  Additionally, with respect to Colonial Energy, Inc. and

Constellation New Energy Inc., the Debtors have reached agreements with the parties to provide

prepayment on a weekly or monthly basis.

30.    The Debtors intend to pay postpetition obligations owed to the Utility Companies

in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business,

and cash otherwise available to the Debtors under the proposed debtor in possession financing will

provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with

12

prepetition practice.  To provide additional assurance of payment, the Debtors propose to deposit

$900,000 into a segregated account at Bank of America for the benefit of the Utility Companies.

31.     I believe uninterrupted Utility Services are essential to the Debtors' ongoing

business operations and, hence, the overall success of these chapter 11 cases.  Should any Utility

Company refuse or discontinue service, even for a brief period, I believe the Debtors' business

operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability

to manage their efforts in reaching a value-preserving resolution.  Accordingly, I believe it is

essential that the Utility Services continue uninterrupted during these chapter 11 cases.

**VIII.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to 11. U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b), and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) ("DIP Motion").**

32.     Pursuant to the DIP Motion, the Debtors request that the Court approve $100

million in senior secured DIP Financing provided to the Debtors by those certain existing term

loan lenders or affiliates or subsidiaries thereof, including on behalf of, as the investment advisors

to, or managers of, certain investment vehicles and certain other lenders from time to time

(the "DIP Lenders"), with Cortland Capital Markets Services LLC, as administrative and collateral

agent (in such capacities, the "DIP Agent").

33.     The Debtors were able to obtain the terms of the DIP Financing based on hard

fought, arm's-length negotiations with their key stakeholders.  Moreover, the Debtors are unable

to obtain such financing as unsecured credit pursuant to section 364(a) or (b) of the Bankruptcy

Code, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or

as secured credit pursuant to section 364(c) of the Bankruptcy Code on more favorable terms from

other sources.

34.     I believe the use of Cash Collateral alone would be insufficient to meet the Debtors'

postpetition liquidity needs.  While the use of Cash Collateral will potentially allow the Debtors

to continue operations in the near-term and extract ICBCS's collateral, the DIP Facility is required

for the Debtors to conduct critical operations including the shut down and idling of the Debtors'

refining facilities, remove of elevated risk chemicals, and place equipment in a safe state this cash

on its own is insufficient to fund the Chapter 11 Cases.  Moreover, the DIP Financing provides

additional liquidity that is essential to fund the administrative cost of these Chapter 11 Cases,

pursue insurance claims related to the Girard Point Incident, conduct a marketing and sale process

to identify value-maximizing transactions, and to pay certain critical suppliers and other

participants in the Debtors' supply chain in the ordinary course.  Without access to the DIP

Financing, the Debtors likely would need to liquidate in the near term, to the serious detriment of

their stakeholders, and in a manner that could create unnecessary risk to the community.

35.     The Debtors and their advisors conducted arm's-length negotiations regarding each

proposal.  In response to the proposals received, the Debtors and their advisors continued nearly

constant discussions with the potential lenders and their advisors regarding key economic and

structural terms of the proposals under consideration.  These negotiations involved:  (a) numerous

telephone conferences and in-person meetings with principals and advisors; (b) the exchange of

multiple iterations of term sheet proposals, draft credit agreements, and related documents

reflecting the proposed DIP financing terms; and (c) circulation of proposed DIP budgets and other

due diligence materials to the potential lenders.  The competitive tension created through these

hard fought negotiations ultimately allowed the Debtors to obtain DIP financing on substantially

improved terms.

14

36.     In light of the foregoing, I do not believe that alternative sources of financing with terms as favorable as those of the DIP Facility are available to the Debtors.  I believe the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors were denied the liquidity that would be provided by the DIP Facility pursuant to the interim order and the final order.  Accordingly, I submit that the DIP Motion should be approved.

**IX.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

37.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to remit and pay (or use tax credits to offset) certain taxes and fees in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date, and (b) granting related relief.  The Debtors estimate that approximately $649,000 in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities in the first twenty-one days following the Petition Date.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days after the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

38.     The Debtors collect, withhold, and incur sales, excise, income, franchise, motor fuels, withholding, and gross receipts taxes, as well as import and export duties and other business, environmental, and regulatory fees.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

39.     The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them daily, semi-weekly, semi-monthly, monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of a particular Tax or Fee.

40.     I believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways.  First, the Authorities could initiate additional audits, which would unnecessarily divert the Debtors' attention from the restructuring process.  Second, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates.  Third, failing to pay Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. Finally, I believe unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' businesses.

**X.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Amend, Supplement, Extend, or Purchase and Finance Insurance Policies, (C) Continue and Renew their Surety Bond Program and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

41.     Pursuant to the Insurance Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to (i) continue prepetition practices related to the Insurance Policies and satisfy payment obligations related thereto, (ii) renew, amend, supplement, extend, or purchase and finance insurance coverage in the ordinary course of business, (iii) continue and renew their Surety Bond Program, and (b) granting related relief.

42.     In the ordinary course of business, the Debtors are beneficiaries of approximately thirty-nine (39) Insurance Policies administered by multiple third-party insurance carriers that provide the Debtors with coverage for, among other things, business automobile liability, general commercial liability, umbrella general commercial liability, premises pollution liability, marine terminal operator's liability, vessel chartering liability, directors' and officers' liability, business interruption liability, property damage liability, terrorism liability, cargo stock liability, flood, and

railroad property liability. The aggregate monthly premium for the Insurance Policies is approximately $1.4 million, plus applicable taxes and surcharges.

43.     The Debtors obtain the Insurance Policies through their insurance brokers, Texas Series of Lockton Companies, LLC ("Lockton") and AON Risk Services Northeast, Inc. ("Aon," and together with Lockton, collectively, the "Brokers"). The Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods. The Debtors pay Lockton a flat annual fee of $400,000 quoted on a net premium basis and pay Aon a fee quoted on a gross premium basis with the fee amount included in the premium.

44.     The Debtors also employ ESIS, Inc. (ESIS") as their third-party claims administrator to handle claims and litigation against their businesses including, but not limited to, general liability claims, automobile liability claims, workers' compensation claims, fidelity claims, errors and omissions claims, and other litigation-related claims. On account of such claims, the Debtors pay ESIS a fixed annual fee as well as a monthly fee,, in arrears (the "ESIS Fees"), the latter of which is dependent on the number of claims asserted against the Debtors. The Debtors believe that as of the Petition Date, the Debtors owe ESIS approximately $550,000 on account of prepetition services.

45.     Additionally, in the ordinary course of business, the Debtors are required to provide surety bonds or other forms of credit support to certain third parties, often governmental units or other public agencies, to secure the payment or performance of certain obligations. For example, the Debtors may be required to provide surety bonds with respect to fuel tax, sales tax, or pollutants tax in the ordinary course of business. As such, failing to provide, maintain, or timely replace their

17

surety bonds may prevent the Debtors from undertaking essential functions related to their operations.

46.     The Debtors currently maintain twenty-three continuous surety bonds with Chubb and Western Suety Company in the aggregate amount of approximately $10 million.  Premiums related to the Surety Bond Program are generally determined on an annual basis or per-bond basis and are paid by the Debtors when a particular surety bond is issued or renewed.  The Debtors pay approximately $130,000 annually in premiums on account of the Surety Bond Program.  As of the Petition Date, the Debtors owe approximately $20,000 on account of the Surety Bond Program.

47.     To continue their business operations during the chapter 11 efforts, the Debtors must be able to provide financial assurance to governmental authorities and other third parties. This, in turn, requires the Debtors to maintain the existing Surety Bond Program, including paying bond premiums as they come due, providing collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of business, paying related fees to third parties, and executing other agreements, as needed, in connection with the Surety Bond Program.  Failing to provide, maintain, or timely replace their surety bonds in the ordinary course of business will prevent the Debtors from undertaking essential functions related to their operations.

48.     Based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties.  Moreover, the process of establishing a new Surety Bond Program would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of their surety bonds in time to avoid defaults or other consequences of the applicable obligations.

49.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

**XI.    Debtors' Motion for Entry of Interim and Final Orders  (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief (the "<u>Critical Vendors Motion</u>").**

50.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to pay Critical Vendor Claims in an amount not to exceed $9.25 million pursuant to the Interim Order and, in the aggregate, inclusive of amounts paid pursuant to the Interim Order, an amount not to exceed $35.13 million pursuant to the Final Order, in each case absent further order of the Court and (b) granting related relief.

51.     In the ordinary course of their business, the Debtors obtain services, equipment, or parts from a limited number of highly specialized vendors, service providers, and other business often on an order-by-order basis and without long-term contracts, replacement of which likely would be impossible or would result in substantially higher costs for the Debtors.  Further, certain Critical Vendors are the sole source providers of replacement parts necessary to maintain the Debtors' equipment, and the inability to acquire these parts would result in the deterioration of the Debtors' equipment.  In light of the current extreme preservation-focused operational mode of conduct and Safing process, the Debtors are only seeking relief with respect to those Critical Vendors that provide goods and services critical to the limited crude oil processing and Safing process.

52.     The Debtors rely on timely and frequent delivery of these equipment, parts, and services, and any interruption in this supply—however brief—would disrupt the Debtors' operations, impact their revenue, and their ability to service clients, likely causing irreparable harm

19

to their business, reputation, goodwill, employees, customer base, market share and potentially compliance with certain health and safety regulations.  Such harm would likely far outweigh the cost of payment of certain of the prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business.

53.    Some of the Debtors' vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing terms—assuming such parties will continue to supply the Debtors at all.  Indeed, prior to the Petition Date, certain of the Debtors' vendors cancelled existing favorable trade terms due to rumors of a bankruptcy filing.  As a result, certain vendors that previously allowed payments on a net 30 or net 60 day basis instead began requiring the Debtors to pay on a prepay basis or cash on delivery.  Any further deterioration in trade terms, whether on account of demands for cash in advance, prepay basis, cash on delivery, or otherwise, will negatively impact the Debtors' liquidity and jeopardize their ability to maintain and service their equipment and to purchase any additional equipment required for their operations.

54.    The Critical Vendors generally fall into the following categories:

- Logistics.  Vendors relating to the transportation of crude and/or refined product to and from the refinery.

- Refinery Expenses.  Suppliers, service providers, and vendors relating to refinery operations.

- Capital Expenditures.  Suppliers, service providers, and vendors relating to refinery maintenance and construction.

- Raw Materials.  Vendors relating to the purchase of refined products and crude from suppliers outside of the Debtors' intermediation arrangement.

- SG&A and Payroll and Benefits.  General corporate expenses (including office rent, professional fees and employee related expenses).

- Natural Gas and Electric.  Vendors relating to the purchase of natural gas & electricity for purposes of running the refinery.

55.     The ultimate goal of the Debtors' chapter 11 cases is to preserve the value of their assets for all stakeholders.  Accordingly, it is important that the Debtors maintain positive relationships with the Critical Vendors that are essential to their business operations throughout the course of these chapter 11 cases.  An adequate supply of equipment and timely services from the vendors to the Debtors are vital to continue and maintain operations and to avoid significant costs associated with missing contractual deadlines.

56.     Recognizing that payment of all prepetition claims of third-party vendors outside of the Debtor's chapter 11 plan would be extraordinary relief, the Debtors, with the assistance of their advisors, spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts, supply agreements and purchase orders incorporated thereunder, and analyzing applicable laws, regulations, and historical practice to identify the limited number of vendors that are critical to operation of the Debtors' business—the loss of which could further materially harm their business or reduce their enterprise value.  Specifically, in identifying the Critical Vendors, the Debtors examined each of their vendor relationships with the following criteria in mind:

- whether a vendor is a sole- or limited-source or high-volume supplier;

- whether alternative vendors are available;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship goods or to provide critical services on a postpetition basis; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

57.     In addition to these factors, the Debtors and their advisors examined the health of each vendor relationship, their familiarity with the chapter 11 process, and the extent to which

each vendor's prepetition claim could be satisfied elsewhere in the chapter 11 process. This process resulted in the Debtors identifying approximately 76 critical vendors, which account for approximately 15.9 percent of their prepetition vendors that have amounts outstanding as of the Petition Date.

58.     In summary, the Debtors' selection process balances the need to ensure that these chapter 11 cases do not disrupt their operations or adversely affect their business, with the need to limit the expenditure of estate resources.  To that end, the Debtors undertook a lengthy process to ensure that the Critical Vendors truly represent those vendors that are vital to the Debtors' operations.  Paying targeted Critical Vendor Claims renders a benefit to the Debtors' estates both monetarily and operationally by preserving liquidity and enabling the Debtors to operate smoothly during the chapter 11 cases.

59.     I believe that the requested relief will allow the Debtors to preserve stakeholder value by paying certain prepetition claims of certain counterparties where critical to unlock incremental liquidity for the Debtors' business enterprise.  As of the Petition Date, the Debtors owe approximately $35.13 million to the Critical Vendors on account of prepetition goods and services, approximately $9.25 million of which will become due within the first 21 days of these chapter 11 cases.

60.     Subject to the Court's approval, the Debtors intend to pay Critical Vendor Claims only to the extent necessary to preserve their business.  The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' business and in the Debtors value-preserving process to review, assess, and potentially recommend any payment on account of a Critical Vendor Claim.  In return for paying the Critical Vendor Claims, the Debtors will use commercially reasonable efforts to condition payment of Critical Vendor Claims upon

each Critical Vendor's agreement to continue supplying goods and services on terms that were in place in the 120 days prior to the Petition Date or are otherwise acceptable to the Debtors in light of customary industry practices.

61.     In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Critical Vendor Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

62.     I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  It is critical that the Debtors maintain a positive relationship with Critical Vendors that are essential to their business operations throughout the course of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Critical Vendors Motion should be granted.

**Exhibit B**

**Organizational Structure Chart**

