**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PES HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR**
**ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING DEBTORS TO (A)**
**OBTAIN POST-PETITION FINANCING PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3),**
**364(D)(1) AND 364(E) AND (B) UTILIZE CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE**
**PROTECTION TO PREPETITION SECURED PARTIES PURSUANT**
**TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(B) AND (III) SCHEDULING**
**FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

The above-captioned debtor PES Holdings, LLC (the "Borrower"), together with its affiliated debtors (the "Debtors")[2] in the above captioned chapter 11 cases (the "Chapter 11 Cases"), respectfully submit this motion (this "Motion")[3] for the relief set forth herein. In support of this Motion, the Debtors respectfully submit: (a) the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of PES Holdings, LLC, in Support of Chapter 11 Petitions and First Day*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

[2]  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

[3]  Capitalized terms used but not defined in this Motion have the meaning ascribed to such terms in the Interim Order, as defined below.

*Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith, (b) the *Declaration of John Singh in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* (the "<u>Singh Declaration</u>") attached hereto as **Exhibit B**, and (c) the *Declaration of Jeffrey S. Stein in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* (the "<u>Stein Declaration</u>"), attached hereto as **Exhibit C**.  In further support of this Motion, the Debtors respectfully state the following:

### Preliminary Statement

1.      On January 21, 2018, the Debtors filed petitions for relief under the Bankruptcy Code (the "<u>Prior Chapter 11 Cases</u>"), primarily due to certain regulatory compliance costs that specifically penalize independent merchant refiners like the Debtors, challenging macroeconomic trends in the energy sector, and a number of adverse government policy decisions.  On August 7, 2018, the Debtors successfully emerged from the Prior Chapter 11 Cases pursuant to a plan of reorganization (the "<u>Prior Plan</u>").  Despite the relief and benefits achieved pursuant to the Prior Plan, the Debtors have continued to face significant headwinds, some old and some new. However, on June 21, 2019, the Debtors suffered a large scale, catastrophic incident involving explosions and a fire at the alkylation unit at their Girard Point refining facility (the "<u>Girard Point</u>

Incident"). As a result of the incident, the Girard Point refining facility has been severely damaged, is currently inoperable, and will require a lengthy and extensive rebuild. The Girard Point Incident has left the Debtors in a crippled state, and has precipitated the filing of these Chapter 11 Cases.

2.      By this Motion, the Debtors request that the Court approve $100 million in senior secured debtor-in-possession financing (the "DIP Financing") provided to the Debtors by those certain existing term loan lenders or affiliates or subsidiaries thereof, including on behalf of, as the investment advisors to, or managers of, certain investment vehicles and certain other lenders from time to time (the "DIP Lenders"),[4] with Cortland Capital Markets Services LLC, as administrative and collateral agent (in such capacities, the "DIP Agent" and, collectively with the DIP Lenders, the "DIP Secured Parties"). If approved, the Debtors will use the proceeds of the DIP Financing to, among other things, maximize value for stakeholders and ensure adherence to health, safety, and environmental obligations while pursuing other significant sources of value for their estates, including property and business interruption insurance claims for the losses caused by the Girard Point Incident.

3.      The Debtors were able to obtain the terms of the DIP Financing based on hard fought, arm's-length negotiations with their key stakeholders. Moreover, the Debtors are unable to obtain such financing as unsecured credit pursuant to section 364(a) or (b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or as secured credit pursuant to section 364(c) of the Bankruptcy Code on more favorable terms from other sources.

---

[4]    All Existing Term Lenders had the opportunity to participate in the DIP Financing.

4.     The use of cash collateral (as defined in the Bankruptcy Code, the "Cash Collateral")[5] alone would be insufficient to meet the Debtors' postpetition liquidity needs.  While the use of Cash Collateral will allow the Debtors to continue operations in the short-term, and conduct critical operations including the shut down and idling of the Debtors' refining facilities, removal of elevated risk chemicals, and placement of equipment in a safe state this cash on its own is insufficient to fund the Chapter 11 Cases.  The DIP Financing provides additional liquidity that is essential to fund the administrative cost of these Chapter 11 Cases, conduct a marketing and sale process to identify value-maximizing transactions, and to pay certain critical suppliers and other participants in the Debtors' supply chain in the ordinary course.  Without access to the DIP Financing, the Debtors likely would need to liquidate in the near term, to the serious detriment of their stakeholders, and in a manner that could create unnecessary risk to the community.

---

[5]     Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

5.      The Debtors believe that the DIP Financing gives the Debtors access to liquidity that is necessary to ensure that the Debtors have sufficient liquidity to stabilize their operations, provide for necessary safing of their facilities, and fund the administration of these chapter 11 cases as the Debtors seek to implement a restructuring process.  Finally, the Debtors believe that the DIP Financing is on the most favorable terms available, presents the best—and likely only— option for the Debtors to sell their businesses as a going concern, was negotiated in good faith and at arm's length, and will allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

6.      For these reasons, and for the reasons set forth below and in the Singh Declaration, the Stein Declaration, and the First Day Declaration, the Debtors firmly believe that the DIP Financing will maximize value for all of the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein.

**Jurisdiction and Venue**

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1(b) and 4001-2.

## Relief Requested

10.     The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order"[6] and, together with the Interim Order, the "DIP Orders"):

>   (i)     authorization for (1) the Borrower to obtain the DIP Financing, consisting of a senior secured delayed draw term loan in the aggregate principal amount of  up to $100,000,000, and an option to draw up to an additional $20,000,000 of Incremental Loans from the DIP Lenders, with Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, collectively with the DIP Lenders, the "DIP Secured Parties") and (2) the Guarantors to provide a guaranty of payment in respect to the Borrower's obligations in connection with the DIP Financing;
>
>   (ii)    authorization for the Debtors to (1) execute and enter into the Superpriority Secured Debtor-in-Possession Credit Agreement, among the Debtors, the DIP Lenders and the DIP Agent (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement" and, together with the schedules and exhibits attached thereto and all agreements, documents, mortgages, instruments and/or amendments executed and delivered in connection therewith), (2) perform under that certain fee letter attached hereto as **Exhibit D** (the "DIP Agent Fee Letter"), and (3) perform all such other and further acts as may be required in connection with the DIP Documents;
>
>   (iii)   authorization for the Debtors to immediately use proceeds of the DIP Financing and Cash Collateral to pay the fees, costs and expenses required to be paid in connection with the transactions contemplated hereby and the Chapter 11 Cases;
>
>   (iv)    the grant of adequate protection to (1) the SOA Secured Parties (as defined below) under or in connection with that certain Sixth Amended and Restated

---

[6]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

Supply and Offtake Agreement, dated as of June 18, 2019, by and among Philadelphia Energy Solutions Refining and Marketing LLC ("PESRM"), the guarantors party thereto from time to time and ICBC Standard Bank PLC as collateral agent (in such capacity and any successors thereto, the "SOA Agent") and as Party to the agreement (the "SOA Secured Parties") (as amended, supplemented or otherwise modified prior to the date hereof, the "SOA Agreement") certain of whose liens and security interests with respect to the Prepetition Collateral (as defined herein) other than SOA Priority Collateral (as defined below) are being primed by the DIP Liens (as defined below) and (2) the Existing Term Loan Agent and the Existing Term Loan Secured Parties (each as defined below) under or in connection with that certain Credit Agreement, dated as of August 7, 2018, by and among PES Holdings LLC, as borrower, each of the guarantors party thereto from time to time, the several banks and other financial institutions or entities party thereto from time to time, the lenders party thereto from time to time (collectively, in such capacities, the "Existing Term Loan Lenders") and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "Existing Term Loan Agent" and, together with the Existing Term Loan Lenders, the "Existing Term Loan Secured Parties" and, together with the SOA Secured Parties, the "Prepetition Secured Parties") (as amended by that certain First Amendment and Incremental Joinder thereto, dated as of February 11, 2019 and as further amended, supplemented or otherwise modified prior to the date hereof, the "Existing Term Loan Credit Agreement" and collectively with the mortgages, security agreements and all other agreements and documentation executed in connection therewith, the "Existing Term Loan Agreements" and, together with the SOA Agreements, the "Prepetition Debt Documents"), whose liens and security interests are being primed by the DIP Liens;

(v)     authorization for the Debtors, subject to the Approved Budget (including permitted variances thereunder), to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Existing Term Loan Secured Parties or the SOA Secured Parties (collectively, the "Adequate Protection Parties") has an interest, and the granting of adequate protection to the Adequate Protection Parties with respect to, inter alia, such use of their Cash Collateral and all use of and diminution in the value of the Prepetition Collateral, including Cash Collateral;

(vi)    subject to certain challenge rights set forth herein, approval of certain stipulations and releases by the Debtors with respect to the Prepetition Debt Documents and the liens and security interests arising therefrom;

(vii)   the grant of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all

prepetition and post-petition property of the Debtors' estates (other than the Excluded Property (as defined in the DIP Documents)) and all proceeds thereof (including any Avoidance Proceeds (as defined below)) and subject to the Carve Out (as defined below), in each case with the relative priorities set forth on Exhibit A to the Interim Order;

(viii)   authorization for the Debtors, subject to the conditions set forth therein, to pay the fees set forth in the DIP Agent Fee Letter, attached as **Exhibit D** hereto;

(ix)    the waiver of the Debtors' right to surcharge the Prepetition Existing Term Loan Collateral and the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and, subject to entry of the Final Order (as defined below) any right of the Debtors with respect to the Existing Term Loan Secured Parties and Existing Term Loan Collateral under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(x)    modification of the automatic stay to the extent set forth in the Interim Order and the DIP Documents; and

(xi)    scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of the Final Order, approving the relief granted herein on a final basis and authorizing the Borrower to forthwith borrow from the DIP Lenders in accordance with the DIP Documents up to the full amount of the DIP Facility, and PES Holdings, LLC and its subsidiaries as guarantors (the "Guarantors") of all obligations owing to the DIP Lenders under the DIP Documents;

## Concise Statements Pursuant to Bankruptcy Rule 4001(b)[7]

11.    The chart below contains a summary of the material terms of the proposed DIP Financing, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B).

| Bankruptcy Code | DIP Financing |
|---|---|
| **Borrower(s)**<br>Bankruptcy Rule 4001(c)(1)(B) | PES Holdings, LLC, as debtor-in-possession.<br>*See* DIP Credit Agreement, § 1.01. |

---

[7]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreement and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in this Motion, the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | DIP Financing |
|---|---|
| **Guarantor(s)**<br>Bankruptcy Rule 4001(c)(1)(B) | All Debtor affiliates of the DIP Facility Borrower.<br>*See* DIP Credit Agreement, § 1.01. |
| **Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Those certain Existing Term Loan Lenders that have agreed to provide commitments to fund the DIP Facility.<br>*See* DIP Credit Agreement, § 1.01. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | A report of the Budget Variance (for receipts and disbursements) on a line item basis in a form reasonably acceptable to the Required Lenders or their advisors for (i) the cumulative period from the Petition Date to the last Business Day of the week ended prior to the date on which such report is required to be delivered and (ii) the four-week period ending on the last Business Day of the week ended prior to the date on which such report is required to be delivered.<br><br>DIP Credit Agreement, Preamble |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Secured Parties have an interest in the Cash Collateral:<br><br>*See* Interim Order ¶ 4. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | <u>Initial Maturity Date</u>. April 30, 2020.<br><br>*See* DIP Credit Agreement § 1.01. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Adequate Protection of SOA Secured Parties:<br><br>a) a valid, perfected replacement security interest in and liens upon the SOA Priority Collateral in accordance with the priorities shown in Exhibit A of the Interim Order and in each case subject to the Carve Out;<br><br>b) subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code against the Debtors in the amount of the SOA Adequate Protection Claim with, except as set forth in the Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "SOA 507(b) Claim"); which SOA 507(b) Claim shall have recourse to and be payable from all of the SOA Priority Collateral, including subject to entry of the Final Order, the Avoidance Proceeds. The SOA 507(b) Claim shall be subject and subordinate to the Carve Out.  Except to the extent expressly set forth in the Interim Order or the DIP Credit Agreement, the SOA Secured Parties shall not receive or retain any payments, property or other amounts in respect of the SOA 507(b) Claim, other than from the SOA Priority Collateral;<br><br>c) current cash payments of the reasonable and documented pre- and post-petition fees and expenses incurred payable to the SOA Agent under the SOA Agreement, including, but not limited to, in the case of retained professionals, the reasonable and documented fees and disbursements of one lead counsel and one local counsel in each relevant jurisdiction and the fees of FTI Consulting, which payments shall be made in the manner provided for in paragraph 14(d) of the Interim Order;<br><br>d) the payment of the fees, expenses and disbursements set forth in paragraph [15(c) and 16(c)] of the Interim Order (to the extent incurred after the Petition Date) shall be made within 10 days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the Creditors' Committee, if any, and the U.S. Trustee (the "Review Period") of invoices therefor (the "Invoiced Fees") |

| Bankruptcy Code | DIP Financing |
|---|---|
|  | and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; provided, however, that any such invoice (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (provided that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates).  The Debtors, the Creditors' Committee, if any, and the U.S. Trustee may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least 10 days' prior written notice of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; provided that payment of any undisputed portion of Invoiced Fees shall not be delayed based on any objections thereto. |

Adequate Protection of Existing Term Loan Secured Parties:

a)  a valid, perfected replacement security interest in and lien (the "Existing Term Loan Adequate Protection Liens" upon the Collateral in accordance with the priorities shown in Exhibit A and in each case subject to the Carve Out;

b)  subject to the Carve Out, an allowed superpriority administrative expense claim (in the Debtors' cases only) as provided for in section 507(b) of the Bankruptcy Code in the amount of the Existing Term Loan Adequate Protection Claim with, except as set forth in the Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Existing Term Loan 507(b) Claim"); which Existing Term Loan 507(b) Claim shall have recourse to and be payable from all of the Collateral, including subject to entry of the Final Order, the Avoidance Proceeds.  The Existing Term Loan 507(b) Claim shall be subject and subordinate only to the Carve Out and, with respect to the SOA Priority Collateral, the SOA 507(b) Claim, the DIP Superpriority Claims and the prepetition claims of the SOA Secured Parties.  Except to the extent expressly set forth in the Interim Order or the DIP Credit Agreement, the Existing Term Loan Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Existing Term Loan 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or pari passu with the DIP Superpriority Claims have indefeasibly been Paid in Full in cash or such other agreed consideration;

c)  current cash payment when due for all interest at the default rate applicable to ABR Loans as provided for in the Existing Term Loan Credit Agreement, with payment-in-kind;

d)  current cash payments of all reasonable and documented pre- and post-petition fees and expenses, which payments shall be made in the manner provided for in paragraph 14(d), including, but not limited to: (i) in the case of each of the Existing Term Loan Agent and the Ad Hoc Term Loan Lenders, the reasonable and documented fees and disbursements of counsel to the Existing Term Loan Agent and counsel to the Ad Hoc Term Loan Lenders, (ii) in the case of the Ad Hoc Term Loan Lenders, (A) the fees and expenses of Davis Polk & Wardwell LLP, and (B) Houlihan Lokey Capital, Inc., including, for the avoidance of doubt, the financing fee and completion fee payable in accordance with the terms of the Houlihan Lokey Engagement Letter;

| Bankruptcy Code | DIP Financing |
|---|---|
| | e) Following the expiration of the challenge period and the Payment in Full in cash of the DIP Facility, the application of all mandatory prepayments (as described in the DIP Credit Agreement) to repayment of Obligations (as defined in the Existing Term Loan Credit Agreement) in accordance with the priority set forth in the Existing Term Loan Credit Agreement with a minimum cash threshold of $10,000,000.00, but solely to the extent that the source of such repayment constitutes Term Loan Priority Collateral, any amount in excess shall be applied to the repayment of the Existing Term Loan Lenders' outstanding Obligations under the Existing Term Loan Credit Agreement in a manner consistent with Section 7.03 of the Existing Term Loan Credit Agreement.<br><br>*See* Interim Order ¶¶ 15,16 |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Modification of Automatic Stay.<br>The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their respective rights under the DIP Documents including any cash dominion with respect to a deposit account of the Debtors that is subject to a Deposit Account Control Agreement (as defined in the DIP Documents), as provided for in the DIP Documents (subject to the priorities set forth herein), and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains, (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors and (C) the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the Obligations) and (ii) unless the Court orders otherwise during the Remedies Notice Period (as defined below) upon a Remedies Hearing, upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "Remedies Notice Period") via email to the Debtors and counsel to the Debtors (and, upon receipt, the Debtors shall promptly provide a copy of such notice to lead counsel for the Creditors' Committee, if any, and the U.S. Trustee) to (A) withdraw consent to the Debtors' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law, with respect to the Collateral; provided, that no such notice shall be required for any exercise of rights or remedies (A) to block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement) or (B) in the event of DIP Obligations that have not been Paid in Full (other than contingent indemnification obligations as to which no claim has been asserted) on the applicable termination of the respective DIP Document.<br><br>*See* Interim Order ¶ 11(c) |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B); | Carve Out. the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger |

| Bankruptcy Code | DIP Financing |
| --- | --- |
| | Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $6,250,000.00 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.; <br><br> Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the Commitment (as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding Commitment), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for Loans under the Commitment (on a pro rata basis based on the then outstanding Commitment), in an amount equal to the Post Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Loans under the DIP Facility, any termination of the Commitments following an Event of Default, or the occurrence of the Maturity Date, each Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out |

| Bankruptcy Code | DIP Financing |
|---|---|
| | Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Documents, or the Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph 7(b) of the Interim Order, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7(b) of the Interim Order, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or the Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in the Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Order, the DIP Facility, or in any Prepetition Debt Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligation or the Prepetition Secured Debt.<br><br>*See* Interim Order ¶ 7 |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x) | The waiver of the Debtors' right to surcharge the Existing Term Loan Collateral and the Collateral pursuant to section 506(c) of the Bankruptcy Code.  In no event shall the DIP Agent, the DIP Lenders or the Existing Term Loan Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, without prejudice to any provisions of the Final Order<br><br>*See* Interim Order ¶ 10 |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B) | The waiver of the Debtors' right to surcharge the Existing Term Loan Collateral and the Collateral  pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code, subject to entry of the Final Order.<br><br>*See* Interim Order ¶ 10 |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | Commitments.<br>Subject to the terms and conditions of the DIP Credit Agreement and in the Orders, each Lender severally agrees to make Loans to the Borrower on any Business Day (i) on the Closing Date, in an amount not to exceed the amount of the Initial Commitment and (ii) in up to five drawings on or after the Final Order Entry Date during the Availability Period (six months from the Closing Date), in an amount not to exceed the amount of the Final |

| Bankruptcy Code | DIP Financing |
|---|---|
| | Commitment of such Lender. The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.02 and 2.07 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement Section 2.01 and Schedule 1.1A. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | Conditions of Effectiveness.<br>The DIP Credit Agreement shall become effective upon the satisfaction or waiver of the following conditions precedent:<br>a)  *Agreement; Security Agreement*. The Administrative Agent shall have received a. the DIP Credit Agreement Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person listed on Schedule 1.01A, and b. the Security Agreement, executed and delivered by the Borrower and each Subsidiary Guarantor.<br>b)  [Reserved].<br>c)  *Lien Searches*. The Administrative Agent shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by **Error! Reference source not found.** or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.<br>d)  *Fees*. (i) The Administrative Agent shall have received a copy of the Administrative Agent Fee Letter, and (ii) the Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), in each case on or before the Closing Date.<br>e)  *Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates; Perfection Certificate*. The Administrative Agent shall have received a. a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party, b. a long form good standing certificate for each Loan Party from its jurisdiction of organization, and c. a Perfection Certificate.<br>f)  *Legal Opinions*. The Administrative Agent shall have received a legal opinion of Kirkland & Ellis LLP, counsel to the Borrower and the other Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent.<br>g)  [Reserved].<br>h)  *Initial DIP Budget*. The Administrative Agent shall have received the Initial DIP Budget.<br>i)  [Reserved]<br>j)  [Reserved]<br>k)  *Material Approvals*. All material Governmental Authority and, except as set forth on Schedule 3.03, third party licenses, registrations, permits, consents and approvals necessary in connection with the DIP Credit Agreement and the transactions contemplated therein shall have been obtained and no law, regulation, order or decree is then in effect that materially and adversely restrains or prevents the DIP Credit Agreement or the Transactions or imposes conditions that materially impair the rights, or materially increase the liabilities or obligations, of the Administrative Agent or the Lenders, without the prior consent of the Administrative Agent each affected Lender (not to be unreasonably withheld or delayed).<br>l)  [Reserved]<br>m)  *Representations and Warranties*. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if qualified by materiality) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material |

| Bankruptcy Code | DIP Financing |
|---|---|
|  | respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date. |
|  | n) *No Default*. No Default or Event of Default shall have occurred and be continuing on the Closing Date or after giving effect to the extension of credit hereunder on the Closing Date. |
|  | o) *Patriot Act Information; Beneficial Ownership Certification*. The Administrative Agent and the Lenders shall have received all documentation and other information about the Loan Parties as is reasonably requested in writing at least three (3) days prior to the Closing Date by the Administrative Agent or the Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and the Beneficial Ownership Certification. |
|  | p) *Petition Date*. The Petition Date shall have occurred. |
|  | q) *Entry of Interim Order*. Not later than five (5) days following the Petition Date (or such later date as the Required Lenders may agree in their reasonable discretion), the Administrative Agent and the Lenders shall have received reasonably satisfactory evidence of the entry of the Interim Order, which shall not have been vacated, reversed modified, amended or stayed without the consent of the Required Lenders. |
|  | r) *First Day Orders*. All "first day" orders and all related pleadings intended to be entered on or prior to the date of entry of the Interim Order shall have been entered by the Bankruptcy Court, shall not have been modified, stayed or vacated (except with the consent of the Required Lenders and such consent shall not be unreasonably withheld, delayed or conditioned), and shall be reasonably satisfactory in form and substance to the Required Lenders, it being understood that drafts approved by counsel to the Required Lenders prior to the Petition Date are reasonably satisfactory. |
|  | s) *No Trustee*. No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases. |
|  | t) *Required Lenders Satisfaction*. The Required Lenders shall not have provided written notice to the Borrower prior to the release of their signature pages to the DIP Credit Agreement that they are not satisfied in their reasonable judgment that there shall not occur as a result of, and after giving effect to, the effectiveness of the DIP Credit Agreement, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective subsidiaries' debt instruments and other material agreements which, in the case of the Loan Parties' debt instruments and other material agreements, would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis or would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. |
|  | u) The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this *0* and in *0*. |
|  | For the purpose of determining compliance with the conditions specified in *0*, each Lender that has signed the DIP Credit Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this *0* unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto. |
|  | <u>Conditions to All Borrowings of Loans</u>. The obligation of each Lender to honor any Notice of Borrowing of Loans, including any Borrowing to occur on the Closing Date, is subject to the following conditions precedent: |
|  | (a) The Closing Date shall have occurred. |
|  | (b) a. With respect to the Borrowing under the Initial Commitments, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders and b. with respect to the Borrowing under the Final Commitments, the Final Order shall be in full force and |

| Bankruptcy Code | DIP Financing |
|---|---|
| | effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders. |
| | (c) The representations and warranties of each Loan Party contained in **Error! Reference source not found.** or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) on and as of the date of such borrowing of Loans, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that for purposes of this *θ*, the representations and warranties contained in **Error! Reference source not found.** shall be deemed to refer to the most recent statements furnished pursuant to Section 5.01(c), respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries. |
| | (d) No Default or Event of Default shall exist, or would result from such proposed borrowing of Loans or from the application of the proceeds thereof. |
| | (e) a. All fees required to be paid to the Administrative Agent on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid and b. all fees required to be paid to the Lenders on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid. |
| | (f) Unless waived by the Administrative Agent and the Required Lenders, the Borrower shall have paid all reasonable and documented fees, charges and disbursements of Norton Rose Fulbright US LLP and Davis Polk & Wardwell LLP, counsel to the Administrative Agent and Lenders, respectively (directly to such counsel if requested by the Administrative Agent), and local counsel to the Administrative Agent in each applicable jurisdiction, in each case in accordance with **Error! Reference source not found.** and solely to the extent invoiced no later than five Business Days prior to the date of such borrowing of Loans. |
| | (g) The Administrative Agent shall have received a Notice of Borrowing in accordance with the requirements hereof. |
| | (h) After giving effect to the proposed Borrowing, Liquidity (as projected in good faith by the Borrower) at the end of the four week period following the receipt of the proceeds thereof, will not exceed $30,000,000. |
| | *See* DIP Credit Agreement §§ 4.01, 4.02. |

| Bankruptcy Code | DIP Financing |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Rates and Payment of Interest.<br>(a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.<br>(b) Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.<br>(c) (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all overdue Loans shall bear interest at a rate per annum equal to in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of Section 2.09(c) plus 2% and (ii) if all or a portion of any interest payable on any Loan or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans under the relevant Facility plus 2% in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).<br>(d) Interest shall be payable in arrears on each Interest Payment Date; *provided* that (x) the portion of such interest attributable to the Eurodollar Rate or ABR, as applicable, shall be payable in cash and (y) the portion of such interest attributable to the Applicable Margin shall be payable in cash on the earliest to occur of (I) the repayment of such Loan (or any portion thereof, to the extent accrued thereon), (II) the Maturity Date and (III) the acceleration of the Loans and the termination of all Commitments with respect to the Facility in accordance herewith; *provided further* that interest accruing pursuant to paragraph (c) of Section 2.09 shall be payable in cash from time to time on demand. Any additional principal amounts under the Loans resulting from any in-kind payment of interest thereon or from the payment of fees pursuant to Section 2.04 shall be treated as principal for all purposes hereunder and shall bear interest after such in-kind payment.<br>(e) Notwithstanding anything to the contrary in the DIP Credit Agreement or any other Loan Document, if the Administrative Agent determines (which determination shall be conclusive absent manifest error) or Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that Borrower or Required Lenders (as applicable), have determined that: (i) adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any requested Interest Period, including, without limitation, because the LIBOR Rate is not available or published on a current basis and such circumstances are unlikely to be temporary, (ii) the administrator of the LIBOR Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be made available or used for determining the interest rate of loans (such specific date, the "Scheduled Unavailability Date"), or (iii) syndicated loans currently being executed, or that include language similar to that contained in Section 2.09(e), are being executed or amended (as applicable) to incorporate or adopt a new benchmark rate to replace the LIBOR Rate, then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Borrower may amend the DIP Credit Agreement to replace the LIBOR Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark)(if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such rate, a "LIBOR Successor Rate"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not |

| Bankruptcy Code | DIP Financing |
|---|---|
| | accept such amendment.    If no LIBOR Successor Rate has been determine and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods) and (y) the Eurodollar Rate component shall no longer be utilized in determining the ABR.  Upon receipt of such notice, any Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a borrowing of ABR Loans (subject to the foregoing clause (y)) in the amount specified therein. <br><br> *See* DIP Credit Agreement § 2.09 |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) | Milestones. <br> (a) the Interim DIP Order shall be entered within 5 days of the Petition Date; <br> (b) the Final DIP Order shall be entered within 35 days of the Petition Date; <br> (c) a report of the steps the Loan Parties have taken and intend to take as a response to the June 21 Incident shall be delivered to the Administrative Agent (for distribution to the Lenders) within 45 days of the Petition Date; <br> (d) the Borrower shall have entered into Management Compensation Plans within 30 days of the Petition Date; <br> (e) By 21 days following entry of the Interim Order, the Debtors shall have filed a pleading seeking entry of the Insurance Proceeds Order; <br> (f) By 90 days following entry of the Interim Order, the Debtors shall have obtained entry of the Insurance Proceeds Order; <br> (e) a marketing plan reasonably acceptable to the Required Lenders shall be delivered to the Administrative Agent (for distribution to the Lenders) within 75 days of the Petition Date; <br> (f) the Acceptable Disclosure Statement shall be filed within 100 days of the Petition Date; <br> (g) an order approving the Acceptable Disclosure Statement shall be entered within 150 days of the Petition Date; <br> (h) the Acceptable Plan of Reorganization shall be confirmed within 205 days of the Petition Date; and <br> (i) the Acceptable Plan of Reorganization shall be consummated within 210 days of the Petition Date. <br><br> *See* DIP Credit Agreement § 5.17. |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) | Effect of Stipulations on Third Parties. <br><br> The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all other parties in interest, including the SOA Secured Parties and any statutory committees appointed or non-statutory committees formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless (a) such committee or any other party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with standing granted by the Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained in the Interim Order) (i) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt  or the Prepetition Debt Liens or |

| Bankruptcy Code | DIP Financing |
| --- | --- |
| | (ii) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "Challenge Proceeding") against the Prepetition Secured Parties or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Debt Documents, the Prepetition Debt , the Prepetition Debt Liens and the Prepetition Collateral, by no later than a date (1) with respect to parties in interest with standing other than the Creditors' Committee, the earlier of an order confirming a chapter 11 plan and 60 days after entry of the Interim Order and (2) with respect to the Creditors' Committee, the earlier of an order confirming a chapter 11 plan and 60 days after the appointment of the Creditors' Committee, in each case, any such later date as has been agreed to, in writing, by (A) the SOA Agent with respect to any Challenge Proceeding against any SOA Secured Parties or (B) the Existing Term Loan Agent with respect to any Challenge Proceeding against any Existing Term Loan Secured Parties (the "Challenge Period"), *provided* that, in the event that a Creditors' Committee or any other party files a motion seeking standing to pursue a Challenge Proceeding against any SOA Secured Party or any Existing Term Loan Secured Party on or prior to the end of such Challenge Period, the Challenge Period shall be extended, solely with respect to the Challenge Proceeding for which such party seeks standing, to the date that is two business days after the Court rules on such standing motion; and (b) there is a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding. Any complaint or motion for standing filed in, or in connection with, any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge Proceeding is timely filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then (i) the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order, including those contained in the Interim Order shall be binding on all parties in interest, including the Creditors' Committee, if any, (ii) the obligations of the Debtors under the Prepetition Debt Documents, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s), (iii) the Prepetition Debt Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense and (iv) the Prepetition Debt and the Prepetition Debt Liens shall not be subject to any other or further claim or challenge by a Creditors' Committee, if any, any non-statutory committees formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims and offsets by a Creditors' Committee, if any, any non-statutory committees formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to the Prepetition Debt Documents shall be deemed forever waived, released and barred.  If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order, including those contained in the Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on a Creditors' Committee, if any, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and |

| Bankruptcy Code | DIP Financing |
|---|---|
| | successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.<br><br>*See* Interim Order ¶ 20. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | Use of Proceeds.<br>Use the proceeds of the Loans (a) in each case solely in accordance with (subject to Budget Variances permitted pursuant to Section 6.17) the Initial DIP Budget and any subsequent Rolling DIP Budget for safing, general and administrative expenses, the marketing and sales process, the administration of the Cases, operating expenses necessary to maximize the value of the Collateral, expenses (including legal expenses) related to the recovery of June 21 Insurance Proceeds and the investigation of the June 21 Incident, any expenses incurred in connection with compliance with the Loan Documents ; and for Bankruptcy Court approved administrative expenses for estate professionals and (b) such other expenses to which the Required Lenders may consent in their sole direction, in each case not in contravention of any Law or of any Loan Document.  Notwithstanding anything to the contrary herein, the proceeds of the Loans shall not be used for costs solely attributable to the realization of the SOA Separate Assets and Collateral or SOA Priority Collateral, including access to crude and product SOA Separate Assets and Collateral or non-crude feedstock purchases (it being understood and agreed that the utilization of cash maintained in the same deposit account as proceeds of Loans shall not, in and of itself, be deemed to be a utilization of the proceeds of Loans).<br><br>*See* DIP Credit Agreement §§3.11, 5.14. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>**Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | Debtors' Stipulations.<br>Without prejudice to the rights of any party in interest, the Debtors admit, acknowledge, stipulate and agree that:<br>(a) (i) as of the Petition Date of the filing of the Debtors' Chapter 11 Cases, (A) PESRM was justly and lawfully indebted and liable to the SOA Secured Parties, without defense, counterclaim or offset of any kind, pursuant to, and in accordance with the terms of, the SOA Agreement for all Obligations (as defined in the SOA Agreement) (the "SOA Debt"), which SOA Debt has been guaranteed on a joint and several basis by PES Holdings, LLC and each of its subsidiaries (in such capacity, the "SOA Guarantors") and (2) the Existing Term Loan Secured Parties without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of approximately $698,639,651 in respect of loans made pursuant to, and in accordance with the terms of, the Existing Term Loan Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Existing Term Loan Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the Existing Term Loan Agreements (collectively, the "Existing Term Loan Debt" and, together with the SOA Debt, the "Prepetition Debt"), which Existing Term Debt has been guaranteed on a joint and several basis by each subsidiary of the Borrower (in such capacity, the "Existing Term Loan Guarantors"), (ii) the Prepetition Debt  constitutes the legal, valid, binding, and non-avoidable obligations of the Borrower, SOA Guarantors, and the Existing Term Loan Guarantors, as applicable, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Debt Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law (except in the case of the SOA Debt, to the extent set forth in the SOA Agreement); |

| Bankruptcy Code | DIP Financing |
|---|---|
| | (b) the SOA Liens pursuant to and in connection with the SOA Agreements, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the SOA Priority Collateral (as defined in that certain Intercreditor Agreement, dated as of August 7, 2018, among the Existing Term Loan Agent, Merrill Lynch Commodities, Inc., as the Initial SOA Collateral Agent, ICBC Standard Bank PLC, as the Successor SOA Collateral Agent, the Borrower, PESRM, and the Other Grantors Party Thereto (the "Existing Intercreditor Agreement") (the "SOA Priority Collateral"), (ii) valid, binding, perfected, enforceable, junior-priority liens and security interests in the Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement) (the "Term Loan Priority Collateral" and, together with the SOA Priority Collateral and all other property pledged pursuant to the Existing Agreements, the "Prepetition Collateral"), (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law and (iv) as of the Petition Date, subject and subordinate only to, (A) in the case of the Term Loan Priority Collateral, the liens and security interests in favor of the Existing Term Loan Secured Parties, and (B) valid, perfected and unavoidable liens permitted under the SOA Agreements to the extent that such permitted liens are senior to or *pari passu* with the liens of the SOA Agent on the Prepetition Collateral; |
| | (c) the liens and security interests granted to the Existing Term Loan Secured Parties (the "Existing Term Loan Liens") pursuant to and in connection with the Existing Term Loan Agreements, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Term Loan Priority Collateral, (ii) valid, binding, perfected, enforceable, junior-priority liens and security interests in the SOA Priority Collateral, (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, crossclaim, offset, recoupment, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law and (iv) as of the Petition Date, subject and subordinate only to (A) in the case of the SOA Priority Collateral, the liens and security interests in favor of the SOA Secured Parties, and (B) valid, perfected and unavoidable liens permitted under the Existing Term Loan Agreements to the extent that such permitted liens are senior to or *pari passu* with the liens of the Existing Term Loan Agent on the Prepetition Collateral; |
| | (d) The proceeds of any claim under the Debtors' insurance policies, whether for property damage, business interruption or otherwise, resulting, directly or indirectly, to the fire that occurred in the Girard Point refinery on June 21, 2019 (the "June 21 Incident"), including, without limitation, Policy No. 10F152096-2018-1 dated as of December 10, 2018 and issued by the General Security Indemnity Company of Arizona (the "June 21 Insurance Proceeds"), constitute Term Loan Priority Collateral; |
| | (e) none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt Documents; |
| | (f) no claims, counterclaims, objections, defenses, set-off, rights, challenges or causes of action exist against, or with respect to, the Prepetition Secured Parties or any of their respective affiliates, agents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the aforementioned parties or their interest in the Prepetition Collateral, subordination, avoidance or other claims, including any claims or causes of action arising under or pursuant to sections 105, 502(d), 510, 542 through 553(b) or 724(a) of the Bankruptcy Code), in connection with or arising under any Prepetition Documents or the transactions contemplated thereunder or the Prepetition Debt or Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery; and the Debtors and their estates hereby release and discharge |

| Bankruptcy Code | DIP Financing |
|---|---|
| | any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of actions; |
| | (g) subject to the Interim Order, effective as of the date of entry of the Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective Representatives (as defined below) (collectively, the "<u>Released Parties</u>") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "<u>Released Claims</u>") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Debt Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim Order, whether such Released Claims are matured, contingent, liquidated, unliquidated, unmatured, known, unknown or otherwise; |
| | (h) The Existing Intercreditor Agreement is binding and enforceable against the Borrower and the Guarantors in accordance with its terms, and the Borrower and the Guarantors are not entitled to take any action that would be contrary to the provisions of the Existing Intercreditor Agreement; and |
| | (i) all cash, securities or other property of the Debtors (and the proceeds therefrom) as of the Petition Date, including all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Debtors in any account or accounts with any depository institution (collectively, the "<u>Depository Institutions</u>") were subject to rights of set-off and valid, perfected, enforceable liens under the Prepetition Debt  Documents and applicable law, for the benefit of the Prepetition Secured Parties.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>"). <br><br> *See* Interim Order ¶ 4. |
| **Liens on Avoidance Actions** | As security for the DIP Obligations, effective and automatically and properly perfected upon the date of the Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses 0, 0 and 0 below being collectively referred to as the "<u>Collateral</u>"), subject to the payment of the Carve Out and in each case in accordance with the priorities set forth in <u>Exhibit A</u> hereto (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to the Interim Order and the DIP Documents, the "<u>DIP Liens</u>"): |
| | (a) <u>First Lien On Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all tangible and intangible pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien |

| Bankruptcy Code | DIP Financing |
|---|---|
|  | (collectively, "<u>Unencumbered Property</u>"), including the Catalyst Assets (as defined in the Existing Term Loan Credit Agreement), any and all unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise, and including any cash proceeds of the DIP Financing) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than (A) the Excluded Property (as defined in the DIP Documents and including the SOA Separate Assets and Collateral, but including any proceeds of Excluded Property that do not otherwise constitute Excluded Property and (B) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>"), but including, subject only to and effective upon entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("<u>Avoidance Proceeds</u>"); <br><br>(b) <u>Liens Priming the Prepetition Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries wherever located and the proceeds, products, rents and profits of the foregoing), which shall be senior in all respects to (A) with respect to collateral of the same nature, scope and type as the Term Loan Priority Collateral (the "<u>Term Loan Priority Collateral</u>") and—whether or not the Debtors' stipulation that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral is challenged in any respect—the June 21 Insurance Proceeds, the Existing Term Loan Liens, the SOA Liens and the Adequate Protection Liens, (B) with respect to collateral of the same nature, scope and type as the SOA Priority Collateral (the "<u>SOA Priority Collateral</u>"), the Existing Term Loan Liens and the Existing Term Loan Adequate Protection Liens (it being understood and agreed that, with respect to the SOA Priority Collateral, the DIP Liens are junior in all respects to the SOA Liens, the SOA Adequate Protection Liens and that the DIP Liens do not extend to the SOA Separate Assets and Collateral); <br><br>(c) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing) immediately junior to (A) with respect to the SOA Priority Collateral, the SOA Liens and the SOA Adequate Protection Liens, (B) the valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are permitted under the Prepetition Debt  Documents to the extent such permitted liens are senior or *pari passu* to the liens securing the Prepetition Debt, including, to the extent valid, perfected and unavoidable, (i) the liens securing Refining's obligations under the Installment Sale and Purchase Agreement dates as of |

| Bankruptcy Code | DIP Financing |
|---|---|
| | May 7, 2014 between NGL Energy Partners L.P. and PESRM and (ii) the liens of Sunoco Logistics Partners Operations L.P. ("SXL") upon those certain above-ground storage tanks listed on Schedule 1 to that certain Promissory Note, dated as of August 7, 2018 between SXL and PESRM, and (C) any such valid and unavoidable permitted liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (A), (B), and (C) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and<br><br>(d) <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (A) subject or subordinate to (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (2) unless otherwise provided for in the DIP Documents or in the Interim Order, any liens or security interests arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (3) any intercompany or affiliate liens or security interests of the Debtors or (B) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code.<br><br>(e) <u>Relative Priority of Liens</u>. Notwithstanding anything to the contrary in the Interim Order or in the DIP Documents, the relative priority of each DIP Lien granted in the Interim Order, the SOA Liens, the Existing Term Loan Liens, the SOA Adequate Protection Liens and the Existing Term Loan Adequate Protection Liens, shall be as set forth in <u>Exhibit A</u> attached hereto; *provided* that for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve Out and the Superpriority Carve Out Funding Lien in all respects.<br><br>*See* Interim Order ¶ 9. |
| **Repayment Features** | <u>Mandatory Prepayments</u>.<br>a)   (i) If any Indebtedness shall be issued or incurred by any Loan Parties (excluding any Indebtedness incurred in accordance with Section 6.01), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence to the prepayment of the Loans as set forth in Section 2.06(c).<br><br>b)   If, on any date, any Loan Party shall receive Net Cash Proceeds from any Asset Sale or Recovery Event, then 100% of such Net Cash Proceeds shall be supplied on or prior to the fifth Business Day following the receipt of Net Cash Proceeds from such Asset Sale or Recovery Event to the prepayment of the Loans as set forth in Section 2.06(c).<br><br>c)   If, for a period of ten consecutive Business Days Liquidity exceeds the projected cash balance for each such Business Day by $30,000,000 in the Initial DIP Budget or Rolling DIP Budget, as applicable, an amount equal to 100% of any such excess amount as of the last Business Day of such ten-Business-Day period shall be applied to the prepayment of the Loans on the next succeeding Business Day as set forth in Section 2.06(d).<br><br>d)   Amounts to be applied in connection with prepayments made pursuant to Section 2.06 shall be applied to the prepayment of the Loans in accordance with Section 2.12(b). The application of any prepayment pursuant to Section 2.06 shall be made, first, to ABR Loans and, second, to Eurodollar Loans. Each prepayment of the Loans under Section 2.06 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.<br><br>e)   The Borrower shall provide the Administrative Agent not later than 11:00 A.M., New York City time, one (1) Business Day's prior written notice of any prepayment under Section 2.06. |

| Bankruptcy Code | DIP Financing |
|---|---|
| | f)    All Commitments shall expire and be reduced to $0 on 5:00 P.M., New York City time, on the last day of the Availability Period.<br><br>*See* DIP Credit Agreement § 2.06. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>DIP Funding Fee</u>. Each DIP Facility Lender shall receive a funding fee in an amount equal to 8% of any Loan made by such DIP Facility Lender payable in cash on the earliest to occur of (I) the repayment of such Loan, (II) the Maturity Date and (III) the acceleration of the Loan.<br><br><u>Undrawn Fee</u>: Each DIP Lender shall receive an undrawn fee in an amount equal to 3% per annum of the undrawn outstanding commitments of such Lender under the DIP Facility, payable in cash on the earliest to occur of (I) the repayment of such Loan, (II) the Maturity Date and (III) the acceleration of the Loan.<br><br>*See* DIP Credit Agreement § 2.04. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | <u>Rolling DIP Budget</u> The Initial DIP Budget, which has heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to 1. the Transactions and 2. the payment of fees and expenses in connection with the foregoing. The Initial DIP Budget presents fairly the estimated financial position of Borrower and its consolidated Subsidiaries for the periods covered therein.<br><br>*See* DIP Credit Agreement § 3.04(c). |
| **Financial Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | Minimum liquidity to be no less than $2,500,000 plus an agreed amount of post-trigger carveout, tested weekly.<br><br>*See* DIP Credit Agreement § 1.01; 6.16 |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | DIP Obligations shall be secured, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3) and 364(d), by the DIP Liens, all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of the Loan Parties, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, insurance policies, precious metals, tax attributes and claims (including any excise tax refund claims) and all products and proceeds thereof, excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law; *provided* that, upon the entry of the DIP Order, the DIP Obligations shall be secured by the proceeds thereof (all such property, the "<u>DIP Collateral</u>").<br><br>a)    First Lien On Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in Unencumbered Property, including the Catalyst Assets (as defined in the Existing Term Loan Credit Agreement), any and all unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise, and including any cash proceeds of the DIP Financing) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than (A) the |

| Bankruptcy Code | DIP Financing |
|---|---|
| | Excluded Property (as defined in the DIP Documents and including the SOA Separate Assets and Collateral (as defined in the Existing Intercreditor Agreement), but including any proceeds of Excluded Property that do not otherwise constitute Excluded Property) and (B) the Avoidance Actions, but including, subject only to and effective upon entry of the Final Order, Avoidance Proceeds; |
| | b)  Liens Priming the Prepetition Secured Parties' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries wherever located and the proceeds, products, rents and profits of the foregoing), which shall be senior in all respects to (A) with respect to Term Loan Priority Collateral, including the June 21 Insurance Proceeds regardless of whether any court of competent jurisdiction finds that the June 21 Insurance Proceeds do not constitute Term Loan Priority Collateral, the Existing Term Loan Liens, the SOA Liens and the Adequate Protection Liens, (B) with respect to SOA Priority Collateral, the Existing Term Loan Liens and the Existing Term Loan Adequate Protection Liens (it being understood and agreed that, with respect to the SOA Priority Collateral (other than any June 21 Insurance Proceeds that are found by a court of competent jurisdiction to constitute Term Loan Priority Collateral), the DIP Liens are junior in all respects to the SOA Liens, the SOA Adequate Protection Liens and that the DIP Liens do not extend to the SOA Separate Assets and Collateral); |
| | c)  Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing) immediately junior to (A) with respect to the SOA Priority Collateral, the SOA Liens and the SOA Adequate Protection Liens; provided, for the avoidance of doubt and notwithstanding anything to the contrary in this paragraph 9(c), that the DIP Liens shall be senior to the SOA Liens and SOA Adequate Protection Liens with respect to any June 21 Insurance Proceeds, regardless of whether any court of competent jurisdiction finds that the June 21 Insurance Proceeds constitute SOA Priority Collateral, (B) the valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are permitted under the Prepetition Debt Documents to the extent such permitted liens are senior or pari passu to the liens securing the Prepetition Debt, including, to the extent valid, perfected and unavoidable, (i) the liens securing PESRM's obligations under the Installment Sale and Purchase Agreement dates as of May 7, 2014 between NGL Energy Partners L.P. (the "NGL Liens") and PESRM and (ii) the liens of Sunoco Logistics Partners Operations L.P. ("SXL" and such liens, the "SXL Liens") upon those certain above-ground storage tanks listed on Schedule 1 to that certain Promissory Note, dated as of August 7, 2018 between SXL and PESRM, and (C) any such valid and unavoidable permitted liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; provided that nothing in the foregoing clauses (A), (B), and (C) shall limit the |

| Bankruptcy Code | DIP Financing |
|---|---|
| | rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and |
| | d)    Liens Senior to Certain Other Liens.  The DIP Liens shall not be (A) subject or subordinate to (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (2) unless otherwise provided for in the DIP Documents or in the Interim Order, any liens or security interests arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (3) any intercompany or affiliate liens or security interests of the Debtors or (B) subordinated to or made pari passu with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code. |
| | e)    Relative Priority of Liens. Notwithstanding anything to the contrary in the Interim Order or in the DIP Documents, the relative priority of each DIP Lien granted in this paragraph 9, the SOA Liens, the Existing Term Loan Liens, the SOA Adequate Protection Liens and the Existing Term Loan Adequate Protection Liens, the NGL Liens, and the SXL Liens shall be as set forth in Exhibit A attached hereto; provided that for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve Out and the Superpriority Carve Out Funding Lien in all respects. |
| | f)    Notwithstanding anything to the contrary in the foregoing, the DIP Collateral will not include the SOA Separate Assets and Collateral. |
| | *See* Interim Order ¶ 9, <u>Ex.</u> A. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) | If any of the following events shall occur and be continuing: |
| | a.    the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within five (5) days after any such interest or other amount becomes due in accordance with the terms hereof; or |
| | b.    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or |
| | c.    any Loan Party shall default in the observance or performance of any agreement contained in Sections 5.04, 5.07(a), 5.07(e), 5.14, 5.15, 5.16 and 5.17 or Article 6 of the DIP Credit Agreement Agreement or Section 4.5(a) of the Security Agreement; or |
| | d.    any Loan Party shall default in the observance or performance of any other agreement contained in the DIP Credit Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of Section 7.01), and such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent or the Required Lenders; or |
| | e.    any Loan Party shall (A) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto beyond any applicable grace period; or (B) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the |

| Bankruptcy Code | DIP Financing |
|---|---|
|  | instrument or agreement under which such Indebtedness was created; or (C) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (A), (B) or (C) of this clause (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (A), (B) or (C) of this clause (e) shall have occurred and be continuing with respect to Indebtedness the aggregate outstanding principal amount of which is $2,000,000 or more; provided that this clause (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is expressly permitted hereunder; provided, that this clause (e) shall not apply to any Indebtedness outstanding hereunder and any Indebtedness of any Debtor that was incurred prior to the Petition Date; or<br><br>f.   (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of any Subsidiary (other than a Debtor), or of a substantial part of the property of any Subsidiary (other than a Debtor), under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Subsidiary (other than a Debtor) or for a substantial part of the property of any Subsidiary (other than a Debtor) or (C) the winding-up or liquidation of any Subsidiary (other than a Debtor); and such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) any Subsidiary (other than a Debtor) shall (A) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (i) above; (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Subsidiary (other than a Debtor) or for a substantial part of the property of any Subsidiary (other than a Debtor); (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (E) make a general assignment for the benefit of creditors; (F) become unable, admit in writing its inability or fail generally to pay its debts as they become due; (G) take any action for the purpose of effecting any of the foregoing; or (H) wind up or liquidate; unless (x) prior to any of the foregoing described in clause (f), such Subsidiary becomes a Loan Party, (y) within five (5) Business Days of such action, such Subsidiary's or Holding's insolvency proceeding becomes jointly administered with that of the Borrower, and (iii) each of the Interim Order (within seven (7) Business Days of the commencement of such proceeding or such other circumstance) and Final Order (within thirty (30) days of the commencement of such |

| Bankruptcy Code | DIP Financing |
|---|---|
| | proceeding or such other circumstance) are made applicable to such Subsidiary; or |
| | g. (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; or (iv) any ERISA Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in clauses (i) through (iv) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect; or |
| | h. one or more judgments or decrees shall be entered against any Loan Party (which, in the case of the Debtors only, arose post-petition) involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $5,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed, insured or bonded pending appeal within thirty (30) days from the entry thereof; or |
| | i. any of the Security Documents, after delivery thereof pursuant to the DIP Credit Agreement or the Orders, shall cease, for any reason, to be in full force and effect (other than pursuant to the terms thereof), or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents on Collateral (other than Collateral the value of which is de minimis) shall cease to be enforceable and of the same effect and priority purported to be created thereby to the extent applicable subject to Liens that are permitted to exist on such Collateral under Section 6.02; or |
| | j. the guarantee contained in Article 10 shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or |
| | k. (i) PES Ultimate Holdings, LLC at any time ceases to own directly or indirectly, (A) 100% of the Capital Stock of the Borrower on a fully diluted basis; or (ii) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), other than the Permitted Holders shall "beneficially own" (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, shares representing more than the greater of (x) 35% of the aggregate ordinary voting power represented by the issued and outstanding equity interests of PES Inc. or PES Ultimate Holdings, LLC and (y) the percentage of the aggregate ordinary voting power represented by such equity interests beneficially owned by such person or group that exceeds the percentage of the aggregate ordinary voting power represented by equity interests of the Borrower then beneficially owned, directly or indirectly, by the Permitted Holders unless (A) the Permitted Holders have, at such time, the right or the ability, directly or indirectly, by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable or (B) during any period of twelve (12) consecutive months, a majority of the seats (other than vacant seats) on the board of directors of the PES Inc. or PES Ultimate Holdings, LLC, as applicable, shall be occupied by persons who |

| Bankruptcy Code | DIP Financing |
|---|---|
| | were (x) members of the board of directors of the Borrower on the Closing Date or nominated by the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, or by one or more of the Permitted Holders or persons nominated by one or more of the Permitted Holders or (y) appointed by directors so nominated (it being understood and agreed that, for purposes of this clause (k), a person shall not be deemed to have beneficial ownership of Capital Stock subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement (unless such agreement provides for the ability of the purchaser therein to vote the Capital Stock)); or |
| | l. ICBC Standard Bank PLC shall commence the exercise of remedies under Section 14.04 of the Supply and Offtake Agreement as a result of a default or an event of default by the Borrower or any of its Affiliates thereunder; or |
| | m. (i) (Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of the Cases of the Debtors under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders or (ii) a trustee under Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof unless consented to by the Required Lenders; or |
| | n. an application shall be filed by any Debtor for the approval of any Other Superpriority Claim, or an order of the Bankruptcy Court shall be entered granting any Other Superpriority Claim (other than with respect to the Carve-Out in any of the Cases that is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrower or any other Loan Party hereunder or under any of the other Loan Documents), or there shall arise or otherwise be granted any such pari passu or senior Other Superpriority Claim, in each case other than Superpriority Claims or other than with respect to the Carve-Out, and the Liens permitted to have such priority under the Loan Documents and the Orders, the Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is pari passu with or senior to any Liens under the Loan Documents or the adequate protection Liens granted under the Interim Order; or |
| | o. Other than any relief from the automatic stay to permit liquidation of positions under the Supply and Offtake Agreement, the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay application under Section 362 of the Bankruptcy Code so as to (A) permit a third party to proceed on any assets of any of the Debtors which have a value in excess of $5,000,000 in the aggregate or (B) permit other actions that could result in a Material Adverse Effect on the Debtors or their estates (taken as a whole); or |
| | p. (A) the Final Order Entry Date shall not have occurred by the date that is thirty-five (35) days following the Petition Date (or such later date as is agreed by the Required Lenders); (B) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of five (5) days or more, vacating or otherwise amending, supplementing or modifying the Interim Order or Order, or the Borrower or any Subsidiary of the Borrower shall apply for the authority to do so, in each case in a manner |

| Bankruptcy Code | DIP Financing |
|---|---|
| | that is adverse to the Administrative Agent or the Lenders, without the prior written consent of the Administrative Agent and the Required Lenders; (C) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties and the Loan Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Administrative Agent (with the consent of the Required Lenders); (D) the Interim Order (prior to the entry of the Final Order) or Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; (E) without the written consent of the Administrative Agent and the Required Lenders, the entry of an order in any of the Cases granting adequate protection to any other person; (F) an order shall have been entered by the Bankruptcy Court modifying the adequate protection obligations granted in any Order without the prior written consent of the Administrative Agent and the Required Lenders, (G) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, (H) any Loan Party shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not provide for termination of the Commitments and indefeasible payment in full and, subject to Section 2.03, in cash of the Obligations, defined in (x) below; or (I) other than with respect to the Carve-Out, a final non-appealable order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders; or<br><br>q. Except as permitted by the Orders or as otherwise agreed to by the Administrative Agent and the Required Lenders, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with the "first day" orders of the Bankruptcy Court; or<br><br>r. A Reorganization Plan that is not an Acceptable Plan of Reorganization shall be (i) confirmed by any Person or (ii) confirmed or filed by any Loan Party in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and indefeasible payment in full and, subject to Section 2.03, in cash of the Obligations under the Loan Documents and continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnification obligations not yet due and payable), or any of the Debtors shall seek confirmation of any such plan or entry of any such order; or<br><br>s. Any Loan Party or other Subsidiary shall take any action in support of any matter set forth in paragraphs (i)-(vi) above or in support of any filing by any Person of a Reorganization Plan that is not an Acceptable Plan of Reorganization or any other Person shall do so and such application is not contested in good faith in the sole discretion of the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the Administrative Agent (with the consent of the Required Lenders) consents to such action; or<br><br>t. Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (1) disallow in whole or in part any of the Obligations arising |

| Bankruptcy Code | DIP Financing |
|---|---|
| | under the DIP Credit Agreement or any other Loan Document, (2) disallow in whole or in part any of the Indebtedness owed by the Loan Parties under the Existing Term Loan Credit Agreement or any related document, (3) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in any Order in favor of the Administrative Agent, (4) challenge the validity and enforceability of the Liens or security interests granted under the Existing Term Loan Credit Agreement Documents and related documents or in any Order in favor of the Existing Term Loan Credit Agreement Agent or Existing Term Loan Credit Agreement Lenders or (5) contest that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement); or |
| | u.  an order of any court of competent jurisdiction issuing a determination contrary to the Insurance Proceeds Order (whether or not the Insurance Proceeds Order has been entered); or |
| | v.  Termination or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a Reorganization Plan; or |
| | w.  Noncompliance by any Loan Party or any of its Subsidiaries with the terms of the Interim Order or the Final Order; |
| | *See* DIP Credit Agreement § 7.01, Interim DIP Order ¶ 19. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Lenders agree to indemnify each Agent Indemnitee ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under Section 8.07 (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Credit Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in Section 8.07 shall survive the termination of the Credit Agreement and the payment of the Loans and all other amounts payable hereunder. <br><br> *See* DIP Credit Agreement § 8.07. |

## **The Debtors' Prepetition Capital Structure**[8]

12.    As detailed herein, as of the Petition Date, the Debtors' funded debt consist of

(a) a senior secured term loan facility dated August 7, 2018 (as amended, modified, or

---

[8]    The descriptions of the Debtors' prepetition debt facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity,

supplemented in accordance with the terms thereof, the "Existing Term Loan Facility" and the principal amount outstanding thereunder, the "Existing Term Loan Debt"), in an aggregate outstanding amount of approximately $698.6 million; (b) a promissory note dated August 7, 2018 (as amended, modified, or supplemented in accordance with the terms thereof, the "SXL Promissory Note" and the principal amount outstanding thereunder, the "SXL Promissory Note Debt"), in an outstanding amount of $75.0 million; (c) an installment sale and purchase agreement (the "NGL Installment Sale Agreement") with NGL as seller, in an outstanding amount of $26.4 million, and (d) an intermediation facility, the SOA Agreement, in an outstanding amount of approximately $950.0 million.  The chart below reflects the Debtors' capital structure as of June 30, 2019.

| Capital Structure as of 6/30/2019 | | | |
|---|---|---|---|
| | Maturity | Outstanding | Interest |
| **PES Holdings** | | | |
| Tranche A | 12/31/22 | $120,000,000 | 8.85%* |
| Tranche A-2 | 2/11/22 | $59,738,319 | 10.6%* |
| Tranche B | 12/31/22 | $77,500,000 | 7.1%* |
| Tranche C | 12/31/22 | $441,401,332 | 10.09%* |
| **Total PES Holdings Debt** | | **$698,639,651** | |
| **PESRM** | | | |
| SXL Promissory Note | 8/7/28 | $75,000,000 | 8.30%[9] |
| NGL Installment Sale Agreement | 4/30/21 | $26,441,365 | 12.00% |
| Intermediation Facility | Rolling | $950,000,000 | [N/A] |
| **Total PESRM Debt** | | **$1,051,441,365** | |
| **Total Debt** | | **$1,750,081,016** | |

priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.  Capitalized terms used within this summary of lenders with liens on Cash Collateral but not otherwise defined herein shall have the meanings set forth in the Interim Order or the First Day Declaration, as applicable.

[9]   In connection with the issuance of the SXL Promissory Note, PESRM also entered into a sharing agreement with the SXL Promissory Note Lender, whereby PESRM agreed to a contractual maximum quarterly payment of $3.1 million to be paid to the SXL Promissory Note Lender, which is offset by interest payments and subject to potential further reduction through the sharing of certain benefits obtained through commercial agreements between the parties.

## I.    Term Loan Facility

13.     PES Holdings is the borrower under the approximately $698.6 million Existing Term Loan Facility by and among PES Holdings, the Existing Term Loan Lenders, and the Existing Term Loan Agent.  The Existing Term Loan Facility is guaranteed by certain subsidiaries of PES Holdings.   The Existing Term Loan Facility consists of four tranches.   Tranche A is comprised of approximately $120 million in secured term loan debt; tranche A-2, which was funded in February of 2019, is comprised of approximately $59.7 million in secured term loan debt; tranche B is comprised of approximately $77.5 million in secured term loan debt; and tranche C is comprised of approximately $441.4 million of secured term loan debt.  As collateral security, each guarantor pledged to the Existing Term Loan Agent for the benefit of the Existing Term Loan Lenders a priority security interest in certain assets of each guarantor including:  (i) all accounts; (ii) all inventory; (iii) all money and deposit accounts; (iv) all documents and chattel paper, instruments, general intangibles and investment property, commercial tort claims, and supporting obligations;  (v) letters of credit;  (vi) equipment;  (vii) fixtures;  (viii) intellectual property; (ix) equity interests in subsidiaries; (x) records; and (xi) proceeds of the foregoing.  The priority of these security interests is subject to an August 7, 2018 intercreditor agreement between MLC (as defined below), ICBCS (as defined below), the Existing Term Loan Agent, and the Debtors.

## II.    The Intermediation Facility

14.     Following several months of negotiations, upon emergence from the Prior Chapter 11 Cases on August 7, 2018, the Debtors entered into a series of agreements that governed the Debtors' post-emergence intermediation process, including the Intermediation Facility with Merrill Lynch Commodities, Inc. ("MLC") and ICBC Standard Bank PLC ("ICBCS").

34

The Intermediation Facility contemplated a three-step post-effective date process under which ICBCS would replace MLC as the provider of the Debtors' SOA Agreement.  As part of the first phase of the process, MLC provided PESRM with an exit phase-in intermediation facility for crude oil and refined products on agreed-upon terms.  In exchange, MLC received certain cash collateral, and other collateral and guarantees.  In the second phase, ICBCS replaced MLC as the Debtors' primary crude oil Intermediation Lender.  Finally, in the third phase, ICBCS replaced MLC as the Debtors' refined products Intermediation Lender.  The third phase was completed on June 18, 2019.  ICBCS's extension of credit under the SOA Agreement is approximately $950 million.

### III.    The SXL Promissory Note

15.    PESRM is the borrower on the $75 million SXL Promissory Note with Sunoco Logistics Partners Operations L.P. as lender (the "SXL Promissory Note Lender").  The SXL Promissory Note Lender has a priority security interest in the "aboveground storage tanks" (as defined in the Pennsylvania Tank Act, 25 Pa. Code § 245.1) referenced in the SXL Promissory Note.

### IV.    The NGL Installment Sale and Purchase Agreement

16.    PESRM is purchasing the South Yard Terminal from NGL pursuant to the NGL Installment Sale Agreement.  NGL has a purchase money security interest in the South Yard Terminal.

### V.    Parent Equity

17.    Parent PES Energy Inc. ("Patent") is a privately-held Delaware corporation with two classes of outstanding equity.  Class A shares convey both voting rights in the Parent and rights to the proceeds of the Parent ("Class A") and class B shares convey only voting rights in the Parent, with no rights to proceeds ("Class B").  Class A shares represent 85% of total shares outstanding and consequently, 85% of voting authority.  Conversely, Class B shares represent 15%

of total shares outstanding and 15% of voting authority. Class B shares are coupled with a membership interest in PES Ultimate Holdings, LLC, a Delaware limited liability company, pursuant to which holders of Class B shares derive their economic interests in the Company.

## The Debtors' Liquidity Need and Marketing Efforts

## I.   The Debtors Cannot Prudently Operate Their Business With Cash Collateral Alone

18.    The Debtors are in need of an immediate capital infusion and lack sufficient funds to operate their enterprise and continue paying their debts as they come due. As of the Petition Date, the Debtors' total cash balance is approximately 45 million, and they do not have readily available sources of additional financing, other than the proposed DIP Facility. Singh Declaration ¶ 7; Stein Declaration ¶ 4.

19.    The Debtors, in consultation with Alvarez & Marsal, prepared and analyzed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during the 13-week projection period and considers a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees and interest expense associated with the DIP Facility, professional fees, and required operational payments. Singh Declaration ¶ 9; Stein Declaration ¶ 5. Based on the 13-week cash flow forecast, it would not be possible to administer the Debtors' chapter 11 cases through a cash collateral agreement given the Debtors' existing liquidity and forecasted expenses. Singh Declaration ¶ 9; Stein Declaration ¶ 5.

20.    The proposed DIP Facility will provide the liquidity that is necessary to conduct safing operations, administer the chapter 11 cases, bring the Debtors' facilities to a temporary resting status and to establish a restructuring process that maximizes value for the benefit of all parties in interest. Singh Declaration ¶ 21.

21.    Due to minimal cash on hand, the Debtors require interim approval of the DIP Facility to preserve and maximize the value of their estates and to position their estates for sale as

a going concern.  Additionally, absent the immediate relief requested by this Motion, the Debtors

face a material risk of substantial, irreparable, and ongoing harm.  Without the infusion of new

capital to fund the Chapter 11 Cases, the Debtors will be unable to process remaining inventory,

conduct necessary Safing Operations, and bring their facilities into a temporary resting phase, to

the detriment of the Debtors, their estates, and the broader community.  Singh Declaration ¶ 21;

Stein Declaration ¶ 8.

## II.      Third Party Sources of Financing Are Not Available on Better Terms

22.     To evaluate alternatives to the proposed DIP Facility, PJT initiated a marketing

process for DIP financing.  As part of this process, PJT reached out to 15 sources of financing

outside the Debtors' capital structure that routinely provide DIP financing to determine their

interest in providing such financing to the Debtors.  Singh Declaration ¶ 11.

23.     All 15 outside lenders contacted by PJT expressed concern about providing, and

were ultimately unwilling to provide, DIP financing because, among other things, the Debtors'

recent financial performance had deteriorated, the Girard Point Incident created an uncertain

operational environment, and existing lenders held liens on a significant portion of the Debtors'

assets, leaving a relatively small amount of unencumbered collateral available to be pledge to a

third party lender.  Additionally, these potential lenders informed PJT that they were not willing

to pursue a nonconsensual priming DIP against the Prepetition Secured Parties.

## III.     The DIP Facility Represents the Best Available Financing Option for the Debtors

24.     In parallel with the solicitation of proposals from new sources of financing, the

Debtors and their advisors continued to negotiate with their existing lenders.  These negotiations

resulted in two potential sources of DIP financing, one between the Debtors and the Existing Term

Lenders (the "Term Lenders", and such proposal, the "Term Lender Proposal"), and an alternative

proposal on competing terms between the Debtors and their existing intermediation counterparty

37

(such proposal, the "ICBCS Proposal").  Singh Declaration ¶ 14.  The Debtors capitalized on these competing proposals to maintain competitive tension between both parties and to extract favorable DIP financing terms on behalf of the Debtors.

25.      The Debtors also evaluated potential financing paths that contemplated terms of both the ICBCS Proposal and the Term Lender Proposal in a joint financing structure.  Singh Declaration ¶ 14.  While ultimately the Debtors were not able to finalize a joint financing agreement prior to the Petition Date, these negotiations remain ongoing in the hopes of striking a joint DIP financing arrangement post-petition.

26.      Based on this process, the Debtors believe that the proposed DIP Financing is on the most favorable terms available, presents the best—and likely only—option for the Debtors to fund necessary Safing Operations and reorganize their businesses as a going concern, was negotiated in good faith and at arm's length, and allows the Debtors to maximize the value of their estates for the benefit of all parties in interest.  Singh Declaration ¶ 15.

## Basis for Relief

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents**

### A.      Entry into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment

27.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using their existing Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances that are present in these cases, as discussed herein.  Courts grant a debtor-in-possession considerable deference when acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the

agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

28.      Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on other grounds* 607 F.3d 957 (3d Cir. 2010); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

29.      Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). The Court

may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at \*4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

30.     The Debtors' determination to move forward with the DIP Facilities is an exercise of their sound business judgment following an arm's-length process and careful evaluation of alternatives. Specifically, the Debtors and their advisors determined that postpetition financing will provide the cash flows necessary for the administration of these chapter 11 cases. Moreover, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arms'-length, and with the assistance of their respective advisors. The Debtors are confident that the DIP Facility represents the best available financing under the current circumstances. Further, entry into the DIP Facility with certain of the DIP Lenders will avoid a costly adequate protection fight at the outset of these chapter 11 cases that would cause significant uncertainty among the Debtors' key constituents and potentially compromise the Debtors' ability to maintain compliance with environmental, health, and safety standards. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.**     **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

31.     The Debtors propose to obtain financing under the DIP Facility by providing security interests, liens, and superpriority claims as set forth in the DIP Documents pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the Prepetition Collateral, which includes substantially all of the Debtors' assets.

32.     The liens set forth in the DIP Documents on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Stein Declaration, were a necessary feature here to provide security for the proposed financing. Especially important to the DIP Lenders were the June 21 Insurance Proceeds.  Indeed, postpetition financing facilities approved by courts in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets.  *See, e.g.*, *In re Am. Apparel, LLC*, No. 16-12551 (Bankr. D. Del. Dec. 12, 2016) (granting the DIP liens first-priority security interests in "real property interests (including leasehold interests), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing"); *In re Vestis Retail Grp., LLC*, No. 16-10971 (Bankr. D. Del. Jun. 1, 2016) (granting DIP Lenders "valid and perfected first-priority security interest and liens . . . on the proceeds of any such real property leasehold interests"); *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882 (Bankr. D. Del. May 24, 2016) (approving DIP liens on the debtors' assets, including, among other things, all accounts, goods, letters of credit, owned real property and "proceeds of leases of real property"); *In re Sports Authority, Inc.*, No. 16-10527 (Bankr. D. Del. May 3, 2016) (approving DIP liens on assets, including "[l]ease proceeds, but not the [l]eases themselves, whether or not so perfected prior to the [p]etition [d]ate"); *In re Hancock Fabrics Inc.*, No. 16-10296 (Bankr. D. Del. Mar. 2, 2016) (same); *In re Am. Apparel Inc.*,

41

No. 15-12055 (Bankr. D. Del. Nov. 2, 2015) (same); *In re Quicksilver, Inc.*, No. 15-11880 (Bankr. D. Del. Oct. 28, 2015) (same); *In re Haggen Holdings, LLC*, No. 15-11874 (Bankr. D. Del. Oct. 15, 2015) (same); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (Bankr. D. Del. Oct. 11, 2013) (same); *see also In re BCBG Max Azria Glob. Holdings, LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 28, 2017) (same); *In re Aéropostale Inc.*, No. 16-11275 (Bankr. S.D.N.Y. Jun. 13, 2016) (same); *In re Great Atl. & Pac. Tea Co. Inc.*, No. 15-23007 (Bankr. S.D.N.Y. Aug. 12, 2015) (same); *In re Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (same).

33.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37-40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

42

34.     As described above and as set forth in the Singh Declaration, the Debtors' high level of existing secured debt obligations makes it unlikely that any third-party lenders would be willing to provide postpetition financing on an unsecured or junior priority basis.  Therefore, any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Agreements, are fair, reasonable, and adequate.

35.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Lenders pursuant to section 364(c) is also reasonable and appropriate.

36.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected").

37.     Critically, through the DIP Financing, the Debtors would provide priming liens to the DIP Lenders on the Liens of Prepetition Secured Parties, including property and/or business interruption insurance proceeds relating to the June 21 incident at the Debtors' Girard Point refining facility (the "June 21 Insurance Proceeds").  Without the DIP Financing, which was achieved through the priming of the June 21 Insurance Proceeds, the Debtors may be left only with access to Cash Collateral.  In that scenario, the Debtors would be unable to establish a process for marketing the estate's assets and identifying restructuring proposals to maximize value for all stakeholders.  Singh Declaration ¶ 21.

38.     Additionally, as described below, the Debtors propose to provide a robust adequate protection package to the Prepetition Secured Parties that will adequately protect against any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.      No Comparable Alternative to the DIP Facility Is Reasonably Available**

39.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused

to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

40.    The Debtors do not believe that any alternative sources of financing exist or are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals.  Singh Declaration ¶ 12.  The proposed DIP Facility will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' business is stabilized and value is maximized for the benefit of all parties in interest.  Singh Declaration ¶ 21.

## II.    The Use of Cash Collateral Is Warranted and Should Be Approved

41.    The Debtors' use of property of their estates, including the cash collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

42.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363 of the Bankruptcy Code generally governs the use of estate property.

43.    Section 363(e) provides for adequate protection against diminution in value of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition

of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Rocco*, 319 B.R. 411 (Bankr. W.D. Pa. 2005); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")). It was the intent of Congress in section 361 to give courts flexibility to fashion relief in light of each case in general equitable principals. *In re Wilson*, 30 B.R. 371 (Bankr. E.D. Pa. 1983).

44.      As set forth in the Interim Order, the Debtors propose to provide their respective creditors with a variety of forms of adequate protection to protect against any potential postpetition diminution in value of the Cash Collateral resulting from the use of the Cash Collateral, and the imposition of the automatic stay. Specifically, the Debtors have agreed to provide additional adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the SOA Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date. In consideration of the foregoing, the Debtors have agreed to provide the SOA Secured Parties (a) valid, perfected replacement security interests in and liens on the SOA Priority Collaterl in accordance with the priorities set forth in Exhibit A to the Interim Order; (b) an allowed superpriority administrative expense claim as provided for in 507(b); and (c) current cash

payments of all reasonable and documented pre- and post-petition fees and expenses pursuant to the terms and conditions set forth in the Interim Order

45.    The Debtors submit that the protections provided to the Adequate Protection Parties are sufficient to protect such parties from any diminution in value of the Collateral.  In light of the foregoing, the Debtors further submit that the proposed adequate protection to be provided for the benefit of the SOA Secured Parties is adequate and appropriate.  This provision of adequate protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases.

## III.    The Debtors Should Be Authorized to Pay the Fees and Payments Required by the DIP Agents and the DIP Lenders Under the DIP Documents

46.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees and payments to the DIP Agents and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

> a.    ***DIP Funding Fee***.  Payable to the DIP Lenders in an amount equal to 8% of the amount of any Loan made by such Lender, earned on the date of the funding of any Loan and payable in cash on the earlier of (a) repayment of such Loan, (b) the Maturity Date, and (c) acceleration of the Loans and termination of all Commitments under the DIP Facility; and
>
> b.    ***Undrawn Fee***.  An undrawn fee in an amount equal to 3% per annum of the undrawn outstanding commitments under the DIP Facility.

47.    It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing after arms'-length and good faith negotiations.  *See* Singh Declaration ¶ 15.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**IV.      The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e)**

48.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

49.      As explained herein, and in the Singh Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing, (b) no other third-party lender offered alternative financing on any other basis, and (c) arms'-length, good-faith negotiations between the Debtors and the DIP Agents and DIP Lenders.  Singh Declaration ¶ q5.  The terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should Be Modified on a Limited Basis**

50.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing

statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents including any cash dominion as provided for in the DIP Documents and immediately upon the occurrence of an Event of Default, pursue the remedies provided for in the Interim Order

51.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.     Failure to Obtain Immediate Interim Access to the DIP Facility, Cash Collateral Would Cause Immediate and Irreparable Harm

52.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53.     For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, and access the liquidity provided by the DIP Facility.  The Debtors lack sufficient funds to operate their enterprise and continue paying debts as they come due.  The proposed DIP Facility provides access to funds that are necessary to ensure that the Debtors have liquidity to conduct safing operations, administer the chapter 11 cases, bring their facilities to a temporary resting status, pursue insurance proceeds, and establish a restructuring process to maximize value for the benefit of all parties in interest.  The Debtors will use the DIP Facility to, among other things to, conduct safing operations of their facilities and fund the operation of their business and the administration of these chapter 11 cases.  Without access to these funds, the Debtors are unlikely to have liquidity to fund any of these goals.  Singh Declaration ¶ 21.

54.     The Debtors request that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive funding under the DIP Facility and utilize Cash Collateral on the terms and conditions set forth in the Interim Order.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for Final Hearing

55.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 35 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

56.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**<u>Reservation of Rights</u>**

57.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay a prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**<u>Notice</u>**

58.     The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition first lien term loan facility and counsel thereto; (d) the lenders under the Debtors' prepetition first lien term loan facility and counsel thereto; (e) Merrill Lynch Commodities, Inc. and counsel thereto; (f) NGL Energy Partners LP and counsel thereto; (g) the lenders under the Debtors' prepetition promissory note and counsel thereto; (h) counsel to ICBC Standard Bank Plc; (i) the Internal Revenue Service; (j) all parties known by the Debtors to hold or assert a lien on any asset of any Debtor; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2022.

## **No Prior Request**

59.    No prior Motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| Dated: July 22, 2019 | */s/ Laura Davis Jones* |
|---|---|
| Wilmington, Delaware | Laura Davis Jones (DE Bar No. 2436) |
| | James E. O'Neill (DE Bar No. 4042) |
| | Peter J. Keane (DE Bar No. 5503) |
| | **PACHULSKI STANG ZIEHL & JONES LLP** |
| | 919 North Market Street, 17th Floor |
| | P.O. Box 8705 |
| | Wilmington, Delaware 19899-8705 (Courier 19801) |

Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                pkeane@pszjlaw.com
                joneill@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com
                matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*