**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------x

In re:

PES HOLDINGS, LLC, *et al.*,[1]

                                        Debtors.

------------------------------------------------------------x

: Chapter 11
:
: Case No. 19-11626 (KG)
:
:
: Joint Administration Requested
:
:

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) UTILIZE
CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT
TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING
FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion (the "Motion")[2] of PES Holdings, LLC (the "Borrower") and its

affiliated debtors, each as a debtor and debtor in possession (collectively and including the

Borrower, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to

sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and

507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and

rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and the local rules for the District of Delaware (the "Local Bankruptcy Rules"), seeking,

among other things:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate Holdings, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in, as applicable, the Motion or the DIP Credit Agreement.

(i)     authorization for (1) the Borrower to obtain post-petition financing (the "DIP Financing") consisting of a senior secured delayed draw term loan in the aggregate committed principal amount of  up to $100,000,000 (the "DIP Term Loan"), with an Initial Commitment (as defined in the DIP Credit Agreement) of $65,000,000, and an option to draw up to an additional $20,000,000 of Incremental Loans (as defined in the DIP Credit Agreement, the "Incremental Facility", and together with the DIP Term Loan, the "DIP Facility") from certain Existing Term Loan Lenders, or affiliates or subsidiaries thereof, including on behalf of, as the investment advisors to, or managers of, certain investment vehicles and certain other lenders from time to time (collectively, the "DIP Lenders"), with Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, collectively with the DIP Lenders, the "DIP Secured Parties")) and (2) the Guarantors to provide a guaranty of payment in respect to the Borrower's obligations in connection with the DIP Financing;

(ii)    authorization for the Debtors to (1) execute and enter into the Superpriority Secured Debtor-in-Possession Credit Agreement, among the Debtors, the DIP Lenders and the DIP Agent, substantially in the form attached hereto as Exhibit B (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement" and, together with the schedules and exhibits attached thereto and all agreements, documents, mortgages, instruments and/or amendments executed and delivered in connection therewith, including  the "Rolling DIP Budget" (as defined in the DIP Credit Agreement) and attached as Exhibit E to the DIP Motion, the "DIP Documents"), (2) perform under the DIP Agent Fee Letter attached to the Motion as Exhibit D (the "DIP Agent Fee Letter"), and (3) perform all such other and further acts as may be required in connection with the DIP Documents;

(iii)   authorization for the Debtors to immediately use proceeds of the DIP Financing and Cash Collateral (as defined below) to pay the fees, costs and expenses required to be paid in connection with the transactions contemplated hereby and the above-captioned cases (the "Chapter 11 Cases"), in each case, in accordance with the Rolling DIP Budget, as set forth in the DIP Documents, and finance working capital needs and general corporate purposes, in accordance with the Rolling DIP Budget, as set forth in the DIP Documents, and the DIP Credit Agreement, on the terms set forth herein and in the DIP Documents and in each case subject to the Rolling DIP Budget, as set forth in the DIP Documents;

(iv)    the grant of adequate protection to (1) the SOA Secured Parties (as defined below) under or in connection with that certain Sixth Amended and Restated Supply and Offtake Agreement, dated as of June 18, 2019, by and among Philadelphia Energy Solutions Refining and Marketing LLC ("PESRM"), the guarantors party thereto from time to time and ICBC Standard Bank PLC as collateral agent (in such capacity and any successors thereto, the "SOA Agent")  and as Party to the agreement (the "SOA Secured Parties") (as amended, supplemented or otherwise modified prior to the date hereof, the "SOA Agreement") certain of whose liens and security interests

2

with respect to the Prepetition Collateral (as defined herein) other than SOA Priority Collateral  (as defined below) are being primed by the DIP Liens (as defined below) and (2) the Existing Term Loan Agent and the Existing Term Loan Secured Parties (each as defined below) under or in connection with that certain Credit Agreement, dated as of August 7, 2018, by and among PES Holdings LLC, as borrower, each of the guarantors party thereto from time to time, the several banks and other financial institutions or entities party thereto from time to time, the lenders party thereto from time to time (collectively, in such capacities, the "Existing Term Loan Lenders") and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "Existing Term Loan Agent" and, together with the Existing Term Loan Lenders, the "Existing Term Loan Secured Parties" and, together with the SOA Secured Parties, the "Prepetition Secured Parties") (as amended by that certain First Amendment and Incremental Joinder thereto, dated as of February 11, 2019 and as further amended, supplemented or otherwise modified prior to the date hereof, the "Existing Term Loan Credit Agreement" and collectively with the mortgages, security agreements and all other agreements and documentation executed in connection therewith, the "Existing Term Loan Agreements" and, together with the SOA Agreements, the "Prepetition Debt Documents"), whose liens and security interests are being primed by the DIP Liens;

(v)     authorization for the Debtors, subject to the Approved Budget (including permitted variances thereunder), to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Existing Term Loan Secured Parties or the SOA Secured Parties (collectively, the "Adequate Protection Parties") has an interest, and the granting of adequate protection to the Adequate Protection Parties with respect to, inter alia, such use of their Cash Collateral and all use of and diminution in the value of the Prepetition Collateral, including Cash Collateral;

(vi)    subject to certain challenge rights set forth herein, approval of certain stipulations and releases by the Debtors with respect to the Prepetition Debt Documents and the liens and security interests arising therefrom;

(vii)   the grant of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and post-petition property of the Debtors' estates (other than the Excluded Property (as defined in the DIP Documents)) and all proceeds thereof (including any Avoidance Proceeds (as defined below)) and subject to the Carve Out (as defined below), in each case with the relative priorities set forth on Exhibit A hereto;

(viii)  authorization for the Debtors, subject to the conditions set forth therein, to pay the fees set forth in the DIP Agent Fee Letter;

(ix)    the waiver of the Debtors' right to surcharge the Prepetition Existing Term Loan Collateral and the Collateral (as defined below) pursuant to section 506(c) of the

Bankruptcy Code and, subject to entry of the Final Order, any right of the Debtors with respect to the Existing Term Loan Secured Parties and Existing Term Loan Collateral under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(x)     modification of the automatic stay to the extent set forth herein and in the DIP Documents;

(xi)    pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before the Court to consider entry of an order granting the Motion on an interim basis (this "Interim Order");

(xii)   that the Court schedule a final hearing (the "Final Hearing") on the Motion to consider entry of an order granting the Motion on a final basis (the "Final Order"), approving the relief granted herein on a final basis and authorizing the Borrower to forthwith borrow from the DIP Lenders in accordance with the DIP Documents up to the full amount of the DIP Facility, and PES Holdings, LLC and its subsidiaries as guarantors (the "Guarantors") of all obligations owing to the DIP Lenders under the DIP Documents;

due and appropriate notice of the Motion and the Interim Hearing having been served by the Debtors on (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the DIP Agent, (iv) counsel to the DIP Lenders, (v) counsel to the SOA Agent, (vi) counsel to the Existing Term Loan Agent, (vii) the Internal Revenue Service, (viii) all parties known by the Debtors to hold or assert a lien on any asset of any Debtor, (ix) all relevant state taxing authorities, (x) all of the Debtors' landlords, and owners and/or operators of premises at which any of the Debtors' inventory and/or equipment is located, and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002. It appearing that no other or further notice need be provided; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Court having reviewed the Motion; and the Interim Hearing having been held by the Court on July [●], 2019; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties in

interest in the Chapter 11 Cases; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the Debtors in the Motion, the *Declaration of John Singh in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b), and (III) Granting Related Relief*, attached to the Motion as <u>Exhibit B</u>, the *Declaration of Jeffrey S. Stein in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b), and (III) Granting Related Relief*, attached to the Motion as <u>Exhibit C</u>, and *the Declaration of Jeffrey S. Stein, Chief Restructuring Officer of PES Holdings, LLC, in Support of Chapter 11 Petitions and First Day Motions*, and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *Disposition.* The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all

reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2.      *Jurisdiction*.   The Court has core jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.   Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required, except as set forth in paragraph 38.   The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

4.      *Debtors' Stipulations*. Without prejudice to the rights of any party in interest (subject to the limitations thereon contained in paragraphs 21 and 22 below), the Debtors admit, acknowledge, stipulate and agree that:

(a)    (i) as of the date (the "Petition Date") of the filing of the Debtors' Chapter 11 Cases, (A) PESRM was justly and lawfully indebted and liable to the SOA Secured Parties, without defense, counterclaim or offset of any kind, pursuant to, and in accordance with the terms of, the SOA Agreement for all Obligations (as defined in the SOA Agreement) (the "SOA Debt"), which SOA Debt has been guaranteed on a joint and several basis by PES Holdings, LLC, North Yard Logistics, L.P., North Yard GP, LLC, and PES Administrative Services, LLC (in such capacity, the "SOA Guarantors") and (2) the Existing Term Loan Secured Parties without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of approximately $698,639,651.00 in respect of loans made

pursuant to, and in accordance with the terms of, the Existing Term Loan Agreements, plus

accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants',

appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under

the Existing Term Loan Agreements), charges, indemnities and other obligations incurred in

connection therewith as provided in the Existing Term Loan Agreements (collectively,

the "Existing Term Loan Debt" and, together with the SOA Debt, the "Prepetition Debt"),

which Existing Term Loan Debt has been guaranteed on a joint and several basis by each

subsidiary of the Borrower (in such capacity, the "Existing Term Loan Guarantors"), (ii) the

Prepetition Debt  constitutes the legal, valid, binding, and non-avoidable obligations of the

Borrower, SOA Guarantors, and the Existing Term Loan Guarantors, as applicable,

enforceable in accordance with its terms (other than in respect of the stay of enforcement

arising from section 362 of the Bankruptcy Code), and (iii) no portion of the Prepetition Debt

or any payments made to the Prepetition Secured Parties or applied to or paid on account of the

obligations owing under the Prepetition Debt Documents prior to the Petition Date is subject to

any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset,

subordination, recharacterization, avoidance, or other claim, cause of action or other challenge

of any nature under the Bankruptcy Code or applicable non-bankruptcy law (except in the case

of the SOA Debt, to the extent set forth in the SOA Agreement);

(b)    the liens and security interests granted to the SOA Secured Parties

(the "SOA Liens") pursuant to and in connection with the SOA Agreement, are (i) valid,

binding, perfected, enforceable, first-priority liens and security interests in the SOA Priority

Collateral (as defined in that certain Intercreditor Agreement, dated as of August 7, 2018,

among the Existing Term Loan Agent, Merrill Lynch Commodities, Inc., as the Initial SOA

Collateral Agent, ICBC Standard Bank PLC, as the Successor SOA Collateral Agent, the Borrower, PESRM, and the Other Grantors Party Thereto (the "Existing Intercreditor Agreement") (the "SOA Priority Collateral"), (ii) valid, binding, perfected, enforceable, junior-priority liens and security interests in the Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement) (the "Term Loan Priority Collateral" and, together with the SOA Priority Collateral, the "Prepetition Collateral"), (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law and (iv) as of the Petition Date, subject and subordinate only to, (A) the Carve Out, (B) in the case of the Term Loan Priority Collateral, the liens and security interests in favor of the Existing Term Loan Secured Parties, and (C) valid, perfected and unavoidable liens permitted under the SOA Agreements to the extent that such permitted liens are senior to or *pari passu* with the liens of the SOA Agent on the Prepetition Collateral;

(c)    the liens and security interests granted to the Existing Term Loan Secured Parties (the "Existing Term Loan Liens") pursuant to and in connection with the Existing Term Loan Agreements, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Term Loan Priority Collateral, (ii) valid, binding, perfected, enforceable, junior-priority liens and security interests in the SOA Priority Collateral, (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, crossclaim, offset, recoupment, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law and (iv) as of the Petition Date, subject and subordinate only to (A) the Carve Out, (B) in the case of the SOA Priority Collateral, the liens and security interests in favor of the SOA Secured Parties, and (C) valid, perfected and unavoidable liens permitted under the Existing

Term Loan Agreements to the extent that such permitted liens are senior to or *pari passu* with the liens of the Existing Term Loan Agent on the Prepetition Collateral;

(d)    the proceeds of any claim under the Debtors' property damage and/or business interruption insurance policies, relating directly or indirectly, to the fire that occurred in the Girard Point refinery on June 21, 2019 (the "June 21 Incident"), including, without limitation, Policy No. 10F152096-2018-1 dated as of December 10, 2018 and issued by the General Security Indemnity Company of Arizona (the "June 21 Insurance Proceeds"), constitute Term Loan Priority Collateral;

(e)    none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt Documents;

(f)    no claims, counterclaims, objections, defenses, set-off, rights, challenges or causes of action exist against, or with respect to, the Prepetition Secured Parties or any of their respective affiliates, agents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the aforementioned parties or their interest in the Prepetition Collateral, subordination, avoidance or other claims), in connection with or arising under any Prepetition Documents or the transactions contemplated thereunder or the  Prepetition Debt or Prepetition Liens, including without limitation, any right to assert any disgorgement or

recovery; and the Debtors and their estates hereby release and discharge any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of actions;

(g)    subject to paragraph 21 below, effective as of the date of entry of this Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective Representatives (as defined below) (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Debt Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured, contingent, liquidated, unliquidated, unmatured, known, unknown or otherwise;

(h)    The Existing Intercreditor Agreement is binding and enforceable against the Borrower and the Guarantors in accordance with its terms; and

(i)    all cash, securities or other property of the Debtors (and the proceeds therefrom) as of the Petition Date, including all cash, securities or other property (and the

proceeds therefrom) and other amounts on deposit or maintained by the Debtors in any account or accounts with any depository institution (collectively, the "Depository Institutions") were subject to rights of set-off and valid, perfected, enforceable liens under the Prepetition Debt Documents and applicable law, for the benefit of the Prepetition Secured Parties.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

5.    *Findings Regarding the DIP Financing, Cash Collateral, and Adequate Protection.*

(a)    Good and sufficient cause has been shown for the entry of this Interim Order and authorization for the Debtors to obtain financing pursuant to the DIP Credit Agreement.

(b)    The Debtors have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) in order to permit the Debtors, among other things, to maximize value for stakeholders and ensure adherence to health, safety, and environmental obligations while pursuing other significant sources of value for their estates, including property and business interruption insurance claims for the losses caused by the Girard Point incident.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided

under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Agent and the DIP Lenders, the DIP Liens and the DIP Superpriority Claims (as defined below), and incurring the Adequate Protection Obligations (as defined below), in each case subject to the Carve Out and on the terms and conditions set forth in this Interim Order and in the DIP Documents.

(d)    Based on the Motion, the declarations filed in support of the Motion and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing and, the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed under the Existing Intercreditor Agreement to have consented to the Debtors' use of the Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(f)    The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders and the Adequate Protection Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including (i) all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents (the "DIP Loans") and (ii) any "Obligations" (as defined in the DIP Credit Agreement), in each case owing to the DIP Agent, any DIP Lender or any of their respective banking affiliates (all of the foregoing in clauses (i) through (i) collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent, the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Adequate Protection Parties have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined below)), in accordance with the terms hereof, and the Adequate Protection Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)    The Adequate Protection Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided* that nothing in this Interim Order or the other DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, to seek new, different or additional adequate protection for any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date or assert the interests of any of the Prepetition Secured Parties and the rights of any other party in interest to object to such relief are hereby preserved.

(h)    The Debtors have prepared and delivered to DIP Agent and the DIP Lenders an initial budget (the "Initial Rolling DIP Budget"), a copy of which is attached to the Motion as Exhibit C.  The Initial Rolling DIP Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Rolling DIP Budget and each subsequent Rolling DIP Budget that

is approved in accordance with the DIP Credit Agreement, an "Approved Budget"). The Debtors and DIP Lenders believe that the Initial Rolling DIP Budget is reasonable under the facts and circumstances. The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Approved Budget, the other DIP Documents, this Interim DIP Order, and any Final Order which shall be acceptable to the DIP Lenders in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(i)    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and their creditors. The terms of this Interim Order and the DIP Documents are fair and reasonable under the circumstances, reflect the Debtors' reasonable exercise of their business judgment and fiduciary duties, are in the best interests of the Debtors, and are supported by reasonably equivalent value and fair consideration.

6.    *Authorization of the DIP Financing, the DIP Documents and the DIP Agent Fee Letter.*

(a)    The Debtors are hereby authorized to execute, enter into and perform all obligations under the DIP Documents and the DIP Agent Fee Letter. The Borrower is hereby authorized to forthwith borrow the full amount of the DIP Facility pursuant to the DIP Credit Agreement, each Guarantor is hereby authorized to provide a guaranty of payment in respect of the Borrower's obligations with respect to such borrowings, subject to any limitations on

borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including to provide working capital for the Debtors and to pay interest, fees and expenses in accordance with this Interim Order and the DIP Documents and subject to the Approved Budget, as set forth in the DIP Documents.  The Borrower is further authorized, subject to conditions set forth therein, to pay the fees set forth in the DIP Agent Fee Letter.

(b)    In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including the execution or recordation of security agreements, mortgages, deeds of trust and financing statements), and to pay all fees and expenses that may be reasonably required or necessary for the Debtors to implement the terms of performance of their obligations under the DIP Financing, including:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors, the DIP Agent and the requisite DIP Lenders may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and expenses paid in connection therewith) that do not (1) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments (other than in an amount equal to the Incremental Loans) or the rate of interest, funding fees or undrawn commitment fees payable thereunder, (2) increase existing fees or add new fees thereunder or (3) shorten the case milestones (as set forth in the DIP Credit Agreement) (such authorizations, amendments,

waivers, consents or other modifications not requiring further approval of the Court, "Immaterial Amendments");

(iii)    the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all reasonable and documented fees (which fees shall be, and shall be deemed to have been, approved upon entry of this Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Debtors, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, reasonable and documented fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or

recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548 or 549 of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

       7.    *Carve Out.*

       (a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $6,250,000.00 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the

Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors'

Committee, which notice may be delivered following the occurrence and during the continuation

of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating

that the Post-Carve Out Trigger Notice Cap has been invoked.

       (b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is

given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the

"<u>Termination Declaration Date</u>"), the Debtors shall utilize all cash on hand as of such date and

any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then

unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such

amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed

Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other

claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice

Reserve, the Debtors shall utilize all cash on hand as of such date and any available cash

thereafter held by any Debtor, to fund a reserve in an amount equal to the Post-Carve Out

Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-

Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other

claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the

obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the

"<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger

Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve

has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the

DIP Obligations have been indefeasibly Paid in Full[3] in which case any such excess shall be paid

---

[3] For purposes of this Interim Order, the terms "Paid in Full," and "Payment in Full" shall mean, with
respect to any referenced DIP Obligations and/or Existing Term Loan Debt, (i) the indefeasible payment in full in

to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition

Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the

obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve

Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been

reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP

Obligations have been Paid in Full, and all Commitments have been terminated, in which case

any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights

and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP

Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the

amounts set forth in this paragraph 7(b), then, any excess funds in one of the Carve Out Reserves

following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts,

respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set

forth in this paragraph 7(b), prior to making any payments to the DIP Agent or the Prepetition

Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents

or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not

sweep or foreclose on cash (including cash received as a result of the sale or other disposition of

any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a

security interest in any residual interest in the Carve Out Reserves, with any excess paid to the

DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding

anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve

Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or

reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the

---

cash (or other agreed consideration) of such obligations, and (ii) the termination of all commitments under the DIP
Documents and/or the Existing Term Loan Agreements, as applicable.

Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Rolling Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Debt Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligation or the Prepetition Secured Debt.

(c)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve Out Trigger Notice Cap.

(d)    No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination

21

Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

8.      *DIP Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations of the Debtors shall constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including, to the extent set forth herein and in **Exhibit A**, the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof (excluding Avoidance Actions (as defined below) but, upon entry of the Final Order, including Avoidance Proceeds (as defined below)), subject only to the liens on such property and the Carve Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

9.      *DIP Liens*.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control

by the DIP Agent of, or over, any Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), subject to the payment of the Carve Out and in each case in accordance with the priorities set forth in **Exhibit A** hereto (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all tangible and intangible pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "Unencumbered Property"), including the Catalyst Assets (as defined in the Existing Term Loan Credit Agreement), any and all unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise, and including any cash proceeds of the DIP Financing) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than (A) the Excluded Property (as defined in the DIP Documents and

including the SOA Separate Assets and Collateral (as defined in the Existing Intercreditor Agreement), but including any proceeds of Excluded Property that do not otherwise constitute Excluded Property) and (B) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but including, subject only to and effective upon entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds");

(b)    Liens Priming the Prepetition Secured Parties' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries wherever located and the proceeds, products, rents and profits of the foregoing), which shall be senior in all respects to (A) with respect to Term Loan Priority Collateral, including the June 21 Insurance Proceeds regardless of whether any court of competent jurisdiction finds that the June 21 Insurance Proceeds do not constitute Term Loan Priority Collateral, the Existing Term Loan Liens, the SOA Liens and the Adequate Protection Liens, (B) with respect to SOA Priority Collateral, the Existing Term Loan Liens and the Existing Term Loan Adequate Protection Liens (it being understood and agreed that, with respect to the SOA Priority Collateral (other than any June 21

Insurance Proceeds that are found by a court of competent jurisdiction to constitute Term Loan Priority Collateral), the DIP Liens are junior in all respects to the SOA Liens, the SOA Adequate Protection Liens and that the DIP Liens do not extend to the SOA Separate Assets and Collateral);

(c)      Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing) immediately junior to (A) with respect to the SOA Priority Collateral, the SOA Liens and the SOA Adequate Protection Liens; *provided*, for the avoidance of doubt and notwithstanding anything to the contrary in this paragraph 9(c), that the DIP Liens shall be senior to the SOA Liens and SOA Adequate Protection Liens with respect to any June 21 Insurance Proceeds, regardless of whether any court of competent jurisdiction finds that the June 21 Insurance Proceeds constitute SOA Priority Collateral, (B) the valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are permitted under the Prepetition Debt Documents to the extent such permitted liens are senior or *pari passu* to the liens securing the Prepetition Debt, including, to the extent valid, perfected and unavoidable, (i) the liens securing PESRM's obligations under the Installment Sale and Purchase Agreement dates as of May 7, 2014 between NGL Energy Partners L.P. (the

"NGL Liens") and PESRM and (ii) the liens of Sunoco Logistics Partners Operations L.P. ("SXL" and such liens, the "SXL Liens") upon those certain above-ground storage tanks listed on Schedule 1 to that certain Promissory Note, dated as of August 7, 2018 between SXL and PESRM, and (C) any such valid and unavoidable permitted liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (A), (B), and (C) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(d)     <u>Liens Senior to Certain Other Liens</u>.   The DIP Liens shall not be (A) subject or subordinate to (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (2) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (3) any intercompany or affiliate liens or security interests of the Debtors or (B) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code.

(e)     <u>Relative Priority of Liens</u>. Notwithstanding anything to the contrary in this Interim Order or in the DIP Documents, the relative priority of each DIP Lien granted in this paragraph 9, the SOA Liens, the Existing Term Loan Liens, the SOA Adequate Protection Liens and the Existing Term Loan Adequate Protection Liens, the NGL Liens, and the SXL Liens shall be as set forth in **Exhibit A** attached hereto; *provided* that for the avoidance of

doubt, each such lien shall be subject and subordinate to the Carve Out and the Superpriority Carve Out Funding Lien in all respects.

10.     *Protection of DIP Lenders' Rights.*

(a)     So long as the DIP Obligations have not been Paid in Full, in each case that are secured by DIP Liens that, in accordance with **Exhibit A** hereto, are senior to any liens held by the Prepetition Secured Parties with respect to any Collateral, then with respect to such Collateral, such Prepetition Secured Party shall (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Debt  Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such Collateral, including in connection with the Adequate Protection Liens, (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after the DIP Obligations are Paid in Full), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such Collateral unless, solely as to this clause (i), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date.

(b)     To the extent any Prepetition Debt Secured Party has possession of any Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or Collateral that is subject to a DIP Lien that in accordance with **Exhibit A** hereto senior to the

lien held by such Prepetition Debt Secured Party, then such Prepetition Debt Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral or Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their respective rights under the DIP Documents including any cash dominion with respect to a deposit account of the Debtors that is subject to a Deposit Account Control Agreement (as defined in the DIP Documents), as provided for in the DIP Documents (subject to the priorities set forth herein), and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains, (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors and (C) the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the Obligations) and (ii) unless the Court orders otherwise during the Remedies Notice Period (as defined below) upon a Remedies Hearing, upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the

DIP Documents) (the "<u>Remedies Notice Period</u>") via email to the Debtors and counsel to the Debtors (and, upon receipt, the Debtors shall promptly provide a copy of such notice to lead counsel for the Creditors' Committee, if any, and the U.S. Trustee) to (A) withdraw consent to the Debtors' continued sue of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law, with respect to the Collateral.

(d)     During the Remedies Notice Period, the Debtors shall be permitted to use Cash Collateral to (A) pay payroll and other administrative expenses to keep the business of the Debtors operating and maximize value of the DIP Collateral in accordance with the Approved Budget, (B) to finance operations required to maintain the safety of the refinery, (C) to administer the Chapter 11 Cases and (D) fund the Carve Out.  Except as set forth in this Interim Order, the Debtors shall waive their right to seek relief under section 105 of the Bankruptcy Code to the extent that such relief would in any way impair or restrict the rights or remedies of the DIP Secured Parties set forth in this Interim Order or the DIP Documents.

(e)     In no event shall the DIP Agent, the DIP Lenders or the Existing Term Loan Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, without prejudice to any provisions of the Final Order.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Existing Term Loan Secured Parties, subject to entry of the Final Order.

(f)     No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral, (ii) any actual or

purported termination of the Debtors' authority to continue to use Cash Collateral or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

(g)    If the DIP Agent takes any enforcement action with respect to the June 21 Insurance Proceeds (whether or not the Debtors' stipulation that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral is challenged in any respect) or any Collateral that does not constitute SOA Priority Collateral, the SOA Secured Parties (i) shall cooperate with the DIP Agent (at the sole cost and expense of the DIP Secured Parties, subject to any indemnification or reimbursement available under the DIP Documents, and subject to the condition that no SOA Secured Party shall have any obligation or duty to take any action, or refrain from taking any action, that could reasonably be expected to result in the incurrence of any liability or damage to any SOA Secured Party) in its efforts to enforce its security interest in the Collateral including the continuation of any business or mechanical process required to maximize the value of the Collateral and (ii) shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect the DIP Agent from enforcing its security interest in the Collateral or from continuing any business or mechanic process required to maximize the value of the Collateral.

(h)    In addition, the DIP Secured Parties are hereby granted a non-exclusive worldwide license or right to use, to the maximum extent permitted by applicable law and to the extent of their interest therein, exercisable without payment of royalty or other compensation, any of the Collateral consisting of intellectual property in connection with the liquidation, collection, disposition or other realization upon Collateral or any other assets of the Debtors pursuant to any enforcement action by the DIP Agent and the DIP Lenders.

11.    *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Carve Out no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Existing Term Loan Agent, as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Existing Term Loan Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Existing Term Loan Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise; **provided** that the foregoing waiver shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order. For the avoidance of doubt, to the extent that any Collateral is used to benefit an SOA Secured Party, the Debtors reserve the right to seek recovery from the SOA Priority Collateral and/or the SOA Separate Assets and Collateral under section 506(c) of the Bankruptcy Code or other applicable law.

12.    *Payments Free and Clear.*  Subject only to the Carve Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Existing Term Loan Agent on behalf of the Existing Term Loan Lenders pursuant to the provisions of this Interim Order, the Final Order or the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, subject to entry of the Final Order, any such claim or charge arising out of or based on, directly

31

or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Debtors or 552(b) of the Bankruptcy Code.

13.    *Use of Cash Collateral.*  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral, and shall be permitted to use Cash Collateral of the SOA Secured Parties for expenses related to the operation of the Debtors' refining operations, and as otherwise provided herein; *provided* that (a) the Adequate Protection Parties are granted the adequate protection as hereinafter set forth, and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court;

14.    *Adequate Protection of SOA Secured Parties.*  The SOA Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the SOA Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the SOA Agent's security interests and liens in the Term Loan Priority Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "SOA Adequate Protection Claim").  In consideration of the foregoing, the SOA Agent and the SOA Secured Parties are hereby granted the following (collectively, the "SOA Adequate Protection Obligations"):

(a)    <u>SOA Adequate Protection</u>.  The SOA Agent (for itself and for the benefit of the SOA Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the SOA Adequate Protection Claim, a valid, perfected replacement security interest in and lien (the "<u>SOA Adequate Protection Liens</u>") upon the SOA Priority Collateral in accordance with the priorities shown in **<u>Exhibit A</u>** and in each case subject to the Carve Out, and, solely to the extent any court of competent jurisdiction determines that the June 21 Insurance Proceeds constitute SOA Priority Collateral, the DIP Liens.

(b)    <u>SOA Section 507(b) Claim</u>.  The SOA Secured Parties are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code against the Debtors in the amount of the SOA Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>SOA 507(b) Claim</u>"); which SOA 507(b) Claim shall have recourse to and be payable from all of the SOA Priority Collateral, including subject to entry of the Final Order, the Avoidance Proceeds. The SOA 507(b) Claim shall be subject and subordinate to the Carve Out.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the SOA Secured Parties shall not receive or retain any payments, property or other amounts in respect of the SOA 507(b) Claim, other than from the SOA Priority Collateral.

(c)    <u>SOA Agent Fees and Expenses</u>.  The SOA Agent shall receive from the Debtors, for the benefit of the SOA Secured Parties and from the SOA Priority Collateral,

current cash payments of the reasonable and documented pre- and post-petition fees and expenses incurred payable to the SOA Agent under the SOA Agreement, including, but not limited to, in the case of retained professionals, the reasonable and documented fees and disbursements of one lead counsel and the fees of FTI Consulting), which payments shall be made in the manner provided for in paragraph 14(d) below.

      (d)   <u>Payment of Fees and Expenses</u>. The payment of the fees, expenses and disbursements set forth in paragraph 14(c) and 15(c) of this Interim Order (to the extent incurred after the Petition Date) shall be made within 10 days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the Creditors' Committee, if any, and the U.S. Trustee (the "<u>Review Period</u>") of invoices therefor (the "<u>Invoiced Fees</u>") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (*provided* that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates).  The Debtors, the Creditors' Committee, if any, and the U.S. Trustee may object to any portion of the Invoiced Fees (the "<u>Disputed Invoiced Fees</u>") within the Review Period by filing with the Court a motion or other pleading, on at least 10 days' prior written notice of any hearing on such motion or other pleading, setting forth the specific

objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided* that payment of any undisputed portion of Invoiced Fees shall not be delayed based on any objections thereto.

15.     *Adequate Protection of Existing Term Loan Secured Parties*.  The Existing Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, for and equal in amount to the aggregate diminution in the value of the Existing Term Loan Secured Parties' prepetition security interests in all Prepetition Collateral from and after the Petition Date, if any, including any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Existing Term Loan Secured Parties' security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Existing Term Loan Adequate Protection Claim").   In consideration of the foregoing, the Existing Term Loan Secured Parties are hereby granted the following (collectively, the "Existing Term Loan Adequate Protection Obligations"):

(a)     Existing Term Loan Secured Parties Adequate Protection Liens.   The Existing Term Loan Agent (for itself and for the benefit of the Existing Term Loan Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Existing Term Loan Adequate Protection Claim, a valid, perfected replacement security interest in and lien (the "Existing Term Loan Adequate Protection Liens" and, together with the SOA Adequate Protection Liens,

the "<u>Adequate Protection Liens</u>") upon the Collateral in accordance with the priorities shown in **Exhibit A** and in each case subject to the Carve Out; and

(b)    <u>Existing Term Loan Secured Parties Section 507(b) Claim</u>.  The Existing Term Loan Secured Parties are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim (in the Debtors' cases only) as provided for in section 507(b) of the Bankruptcy Code in the amount of the Existing Term Loan Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>Existing Term Loan 507(b) Claim</u>"); which Existing Term Loan 507(b) Claim shall have recourse to and be payable from all of the Collateral, including subject to entry of the Final Order, the Avoidance Proceeds.  The Existing Term Loan 507(b) Claim shall be subject and subordinate only to the Carve Out and, with respect to the SOA Priority Collateral, the SOA 507(b) Claim, the DIP Superpriority Claims and the prepetition claims of the SOA Secured Parties.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Existing Term Loan Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Existing Term Loan 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have been Paid in Full.

(c)    <u>Existing Term Loan Secured Party Fees and Expenses</u>.  The Existing Term Loan Agent, for the benefit of the Existing Term Loan Lenders, and the ad hoc committee of Existing Term Loan Lenders (the "<u>Ad Hoc Term Loan Lenders</u>") shall each receive current cash payments of all reasonable and documented pre- and post-petition fees and expenses

(including pursuant to any fee letter related to the Existing Term Loan Agreements), which payments shall be made in the manner provided for in paragraph 14(d) above, including, but not limited to: (i) in the case of each of the Existing Term Loan Agent and the Ad Hoc Term Loan Lenders, the reasonable and documented fees and disbursements of counsel to the Existing Term Loan Agent and counsel to the Ad Hoc Term Loan Lenders, (ii) in the case of the Ad Hoc Term Loan Lenders, (A) the fees and expenses of Davis Polk & Wardwell LLP, and (B) Houlihan Lokey Capital, Inc., including, for the avoidance of doubt, the financing fee and completion fee payable in accordance with the terms of the Houlihan Lokey Engagement Letter (which letter the Debtors shall be hereby authorized to execute), and (iii) in the case of the Existing Term Loan Agent, (A) the fees and expenses of Norton Rose Fulbright US LLP and (B) one local counsel in the relevant jurisdiction, which counsel may be the same as such local counsel to the Ad Hoc Term Loan Lenders.

(d)    Milestones.    The Existing Term Loan Secured Parties are hereby entitled to performance of the Milestones as set forth in the DIP Credit Agreement; and

(e)    Excess Cash Flow Sweep.    Following the Payment in Full in cash of the DIP Obligations, the application of all mandatory prepayments (as described in the DIP Credit Agreement) to repayment of Obligations (as defined in the Existing Term Loan Credit Agreement) in accordance with the priority set forth in the Existing Term Loan Credit Agreement with a minimum cash threshold of $10,000,000.00, but solely to the extent that the source of such repayment constitutes Term Loan Priority Collateral, any amount in excess shall be applied to the repayment of the Existing Term Loan Lenders' outstanding Obligations under the Existing Term Loan Credit Agreement in a manner consistent with Section 7.03 of the Existing Term Loan Credit Agreement; *provided*, that notwithstanding anything to the contrary

in this Interim Order, an initial portion of such excess amount, from cash received on account of or related to asset sales and/or the June 21 Insurance Proceeds, such initial portion to be equal to $[●], shall be exempt from repayment of the Existing Term Loan Lenders' outstanding Obligations;

(f)    <u>Insurance Covenant</u>.    Following the Payment in Full of the DIP Obligations, the consent of the "Required Lenders" (as defined in the Existing Term Loan Credit Agreement, the "<u>Required Existing Term Loan Lenders</u>") shall be required to settle any claim under the Debtors' property damage and/or business interruption insurance claims related to the June 21 Incident.

(g)    <u>Existing Term Loan Secured Parties' Additional Adequate Protection</u>. Prior to the Debtors filing, supporting, bringing to the board for discussion or consideration, or making a proposal or counterproposal to any party relating to (any of the foregoing, a "<u>Non-Permitted Action</u>"), a plan of reorganization that does not propose to pay all claims on account of the Existing Term Loan Debt in cash or with such other consideration acceptable to the Required Existing Term Loan Lenders) (a "<u>Non-Permitted Plan</u>"), the Debtors shall provide not less than five (5) days written notice to counsel to the Existing Term Loan Agent (any such notice, a "<u>Non-Permitted Plan Notice</u>").    Upon delivery of a Non-Permitted Plan Notice, the Existing Term Loan Secured Parties shall have the right to terminate the Debtors' right to use Cash Collateral pursuant to this Final Order.    Notwithstanding the foregoing, a Non-Permitted Action shall not include the Debtors' receipt from the Creditors' Committee of a proposal with respect to a Non-Permitted Plan or discussions with the Creditors' Committee regarding such proposal; and

(h)    Upon Payment in Full of all DIP Obligations, the Rolling Budget shall continue to be updated in accordance with the terms and conditions of the DIP Credit Agreement, except that the approval of Required Existing Term Loan Lenders shall be substituted for the approval of the DIP Agent and/or the DIP Lenders.

16.    *Insurance Proceeds Order*.  Within 21 days of entry of the Interim Order, the Debtors shall file a motion seeking entry of an order of the Bankruptcy Court (the "Insurance Proceeds Order") determining that the June 21 Insurance Proceeds constitute "Term Loan Priority Collateral".

17.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties; *provided* that any of the Prepetition Secured Parties, upon a change in circumstances, may request further or different adequate protection, and the Debtors or any other party may contest any such request.

18.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    The DIP Agent, the DIP Lenders and the Adequate Protection Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders, or the Adequate Protection Parties shall, in their sole discretion, choose to file such

financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order. Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, is authorized (in the case of the Debtors) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

19.    *Preservation of Rights Granted Under This Interim Order.*

(a)    The relative priority of the claims and liens expressly granted by this Interim Order shall be as set forth in **Exhibit A**.

(b)     Other than the Carve Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders, the SOA Secured Parties, or the Existing Term Loan Secured Parties, respectively, shall be granted or allowed while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in paragraphs 9, 14(a), 15(a) or 16 of this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors and (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(c)     Unless otherwise ordered by the Court or waived by the Required Existing Term Loan Lenders, the occurrence of any of the following events shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral:

(i)      the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), unless the DIP Obligations have been Paid in Full;

(ii)     any modification, amendment, reversal, stay, supplement, vacation or extension of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

(iii)    an order converting or dismissing any of the Chapter 11 Cases;

(iv)     an order appointing a chapter 11 trustee in the Chapter 11 Cases;

(v)     an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vi)    any termination or reduction of the period pursuant to section 1121 of the Bankruptcy Code during with the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof or such period shall expire without extension by the court;

(vii)   any material breach by the Debtors of any provisions of this Interim Order; **provided** that any breach of any of the provisions of paragraph 15 of this Interim Order is hereby deemed a material breach ;

(viii)  an order charging any of the Term Loan Priority Collateral of the Existing Term Loan Secured Parties or the Collateral of the DIP Secured Parties under sections 506(c) or 522(b) of the Bankruptcy Code, or an order requiring any of the Existing Term Loan Secured Parties or DIP Secured Parties to be subject to the equitable doctrine of "marshaling";

(ix)     a plan of reorganization, which does not provide for Payment in Full of the DIP Obligations; or

(x)     the sale of all or substantially all of the assets of any of the Debtors (except to the extent permitted under the DIP Documents), which does not provide for the Payment in Full of the DIP Obligations upon the consummation thereof;

(xi)    the Debtors deliver a Non-Permitted Plan Notice or take any Non-Permitted Action;

(xii)   the Debtors have not: (a) filed a motion seeking entry of the Insurance Proceeds Order, within 21 calendar days after the entry of the Interim Order; and/or (b) obtained entry of the Insurance Proceeds Order, within 90 calendar days after the entry of the Interim Order;

(xiii)  an order of any court of competent jurisdiction issuing a determination contrary to the Insurance Proceeds Order (whether or not the Insurance Proceeds Order has been entered);

(xiv)   any payment is made under any "first day order" that is materially inconsistent with the Approved Budget (without regard to any permitted variances) without the consent of the Required DIP Lenders or, following the Payment in Full of the DIP Obligations,

the Required Existing Term Loan Lenders (in each case, as communicated by counsel thereto);

(xv)  following the later of (A) the Payment in Full of the DIP Obligations and (B) September 14, 2019, the negative Budget Variance with respect to disbursements of the Debtors (including with respect to disbursements of the professionals for the Debtors) shall exceed (i) 10%, or (ii) $5 million;

(xvi)  any of the Debtors, without the prior written consent of the Required Existing Term Loan Lenders seeks, proposes or supports, or if there is entered or confirmed (in each case, as applicable) any of the foregoing;

(xvii)  the Debtors retain counsel (or expand the scope of retention of existing counsel) to pursue any claims related to the June 21 Insurance Proceeds, unless such counsel is reasonably acceptable to the Required DIP Lenders (or, after the DIP Obligations have been paid in full, the Existing Term Loan Lenders);

(xviii)  following the Payment in Full of the DIP Obligations, any Debtor seeks approval or publicly announces that it will seek approval of any material non-ordinary course Disposition (as defined in the DIP Credit Agreement) in excess of $1,000,000, without the consent of the Required Existing Term Loan Lenders; or

(xix)  the failure of the Debtors to make any payment provided for under this Interim Order for the benefit of the Existing Term Loan Secured Parties within five (5) business days after the date such payment is due.

Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or that otherwise is at any time entered (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly Paid in Full (or other agreed consideration) (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the other rights granted by this Interim

Order shall not be affected and (iii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order

(d)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the SOA Agent, or the Existing Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders or the Adequate Protection Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the SOA Agent, or the Existing Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Adequate Protection Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents.

(e)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Adequate Protection Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall

not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, substantively consolidating any of the cases with another case, terminating the joint administration of the Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents) or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Cases, in any successor cases if the Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Adequate Protection Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are Paid in Full.

20.    *SOA Obligations*.    The following SOA Obligations (as defined in the SOA Agreement) shall be paid through utilization of the SOA Secured Parties' Cash Collateral: (a) the crude and product logistics invoice costs as agreed to in that certain budget agreed upon between the SOA Agent and the Debtors (the "ICBCS Budget"), (b) amounts to be paid to the Debtors from butane sales to third parties (in an amount up to $8.5 million), and (c) amounts and payments as otherwise set forth in the ICBCS Budget; *provided,* that the SOA Agent agrees to forbear, but shall not be deemed to have waived or improperly delayed in exercising, any and all

remedies under the SOA Agreement unless and until the Debtors utilize Cash Collateral in a manner that is not permitted under the Interim Order or another order of the Court.    For the avoidance of doubt, the SOA Agent agrees to forbear, but not waive, enforcement of their "safe harbor" rights under section 556 and/or section 560 of the Bankruptcy Code, unless otherwise permitted to exercise such rights under this Interim Order or another order of the Court.

21.    *Effect of Stipulations on Third Parties*.    The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including in paragraph 4 of this Interim Order, shall be binding upon the Debtors in all circumstances and for all purposes.    The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including in paragraph 4 of this Interim Order, shall be binding upon all other parties in interest, including the SOA Secured Parties and any statutory committees appointed or non-statutory committees formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless (a) such committee or any other party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with standing granted by the Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 21) (i) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt  or the Prepetition Debt Liens or (ii) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "Challenge Proceeding")

against the Prepetition Secured Parties or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "<u>Representative</u>" and, collectively, the "<u>Representatives</u>") in connection with matters related to the Prepetition Debt Documents, the Prepetition Debt, the Prepetition Debt Liens and the Prepetition Collateral, by no later than a date (1) with respect to parties in interest with standing other than the Creditors' Committee, the earlier of an order confirming a chapter 11 plan and 75 days after entry of this Interim Order and (2) with respect to the Creditors' Committee, the earlier of an order confirming a chapter 11 plan and 60 days after the appointment of the Creditors' Committee or, in each case, any such later date as has been agreed to, in writing, by (A) the SOA Agent with respect to any Challenge Proceeding against any SOA Secured Parties or (B) the Existing Term Loan Agent with respect to any Challenge Proceeding against any Existing Term Loan Secured Parties (the "<u>Challenge Period</u>"), *provided* that, in the event that a Creditors' Committee or any other party files a motion seeking standing to pursue a Challenge Proceeding against any SOA Secured Party or any Existing Term Loan Secured Party on or prior to the end of such Challenge Period, the Challenge Period shall be extended, solely with respect to the Challenge Proceeding for which such party seeks standing, to the date that is two business days after the Court rules on such standing motion; and (b) there is a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding. Any complaint or motion for standing filed in, or in connection with, any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred. If no such Challenge

Proceeding is timely filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then (i) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including those contained in paragraph 4 of this Interim Order shall be binding on all parties in interest, including the Creditors' Committee, if any, (ii) the obligations of the Debtors under the Prepetition Debt Documents, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s), (iii) the Prepetition Debt Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense and (iv) the Prepetition Debt and the Prepetition Debt Liens shall not be subject to any other or further claim or challenge by a Creditors' Committee, if any, any non-statutory committees formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims and offsets by a Creditors' Committee, if any, any non-statutory committees formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to the Prepetition Debt Documents shall be deemed forever waived, released and barred.  If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order, including those contained in paragraph 4 of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on a Creditors' Committee, if any, and on any other person or entity, except to the extent that such stipulations,

admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including a Creditors' Committee, if any, or any non-statutory committees formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenge Proceedings with respect to the Prepetition Debt Documents, the Prepetition Debt or the Prepetition Debt Liens.

22. *Limitation on Use of DIP Financing Proceeds and Collateral.* Notwithstanding anything herein or in any other order by the Court to the contrary, no DIP Loans, Cash Collateral, Collateral, Prepetition Collateral, or the Carve Out may be used (a) for professional fees and expenses incurred for (i) any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise, including any investigation in connection with litigation or threatened litigation) against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or (ii) asserting any defense, claim, cause of action, counterclaim or offset with respect to the DIP Obligations, the Prepetition Debt (including for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise), the DIP Liens or the Prepetition Debt Liens or against any of the Prepetition Secured Parties or their respective Representatives, (b) to prevent, hinder or otherwise delay any of the DIP Agent's or the Prepetition Secured Parties' assertion, enforcement or realization on the Prepetition Collateral or the Collateral in accordance with the DIP Documents, the Prepetition Debt

Documents or this Interim Order other than to seek a determination that an Event of Default has not occurred or is not continuing, (c) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties under this Interim Order or under the DIP Documents or the Prepetition Debt Documents, in each of the foregoing cases without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion or (d) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (including hereunder) and (ii) permitted under the DIP Documents; *provided* that notwithstanding anything to the contrary herein, the Creditors' Committee, if any, may use the proceeds of the DIP Loans, Collateral (including Cash Collateral) and/or the Carve Out (subject to paragraph 7) to investigate, but not prosecute (y) the claims and liens of the Prepetition Secured Parties and (z) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties; *provided further* that no more than an aggregate of $50,000 of the proceeds of the DIP Loans, Collateral (including Cash Collateral) and/or the Carve Out may be used by the Creditors' Committee, if any, in respect of the investigations set forth in the preceding proviso or in paragraph 7 of this Interim Order (the "Investigation Budget").

23. *Exculpation*. Nothing in this Interim Order, the DIP Documents or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or any DIP Lender of any liability for any claims arising from the prepetition or post-petition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders

shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

24.     *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents or any other order entered by the Court, or any amendments, supplements, or other modifications thereto, the provisions of this Interim Order shall govern. Notwithstanding anything to the contrary in any other order entered by the Court, any payment made, or authorization contained in, any other order entered by the Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including the Approved Budget as set forth therein.

25.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, if any, any non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Adequate Protection Parties, the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation

to permit the use of the Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

26.    *Limitation of Liability*.    In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and the DIP Lenders shall not (a) be deemed to be in "control" of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates and (c) be deemed to be acting as a "Responsible Person," "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

27.    *Master Proof of Claim*.    In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the SOA Agent and the Existing Term Loan Agent is authorized to file in the Debtors' lead chapter 11 case *In re PES Holdings, LLC, et al.,* Case No. [●], a single, master proof of claim on behalf of the SOA Secured Parties and the Existing Term Loan Secured Parties, as applicable, on account of any and all of their respective claims arising under the applicable Prepetition Debt Documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors, to the extent applicable.

28.    *Insurance*.    To the extent that any of the SOA Agent or the Existing Term Loan Agent is listed as loss payee under any of the Borrower's or Guarantor's insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that

capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the priorities set forth on **Exhibit A** hereto.

29.     *Effectiveness*.  This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any Local Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

30.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

31.     *Payments Held in Trust*.   Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by the Court, for application in accordance with the DIP Documents and this Interim Order; *provided* that the foregoing shall not apply to the receipt of SOA Priority Collateral (or any proceeds thereof to the extent not constituting Term Loan Priority Collateral) by any SOA Secured Party on account of their security interest in SOA Priority Collateral.

32.    *Credit Bidding*.  (a)  The DIP Agent (acting at the direction of the requisite DIP Lenders) shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the Collateral (other than any SOA Priority Collateral), (b) subject to entry of the Final Order and the Existing Intercreditor Agreement, the Existing Term Loan Secured Parties shall have the right to credit bid, up to the full amount of its Existing Term Loan Debt in any sale of the Collateral (other than the SOA Priority Collateral), and (c) subject to entry of the Final Order and the Existing Intercreditor Agreement, the SOA Secured Parties shall have the right to credit bid up to the full amount of its SOA Debt in any sale of the SOA Priority Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise.

33.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

34.    *Necessary Action*.  The Debtors are authorized to take any and all such actions as are necessary or appropriate to implement the terms of this Interim Order.

35.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

36.    *Final Hearing*.  The Final Hearing is scheduled for [●] at [●:00 p.m.] before the Court.

37.     *Objections.*   Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) proposed counsel to the Debtors, (b) the Office of the U.S. Trustee for the District of Delaware; (c) counsel to the DIP Agent, (d) counsel to the DIP Lenders, (e) counsel to the SOA Agent, (f) counsel to the Existing Term Loan Agent, (h) the Internal Revenue Service, and (i) any other party that has filed a request for notices with the Court, in each case to allow actual receipt by the foregoing no later than [●] at [4:00 p.m.] (prevailing Eastern Time).

38.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with the Court and to the Creditors' Committee after the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been appointed.

Dated:   July [●], 2019
             Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Lien Priorities[4]**

| Priority | SOA Priority Collateral | Term Loan Priority Collateral (other than June 21 Insurance Proceeds) | June 21 Insurance Proceeds | Unencumbered Property; SXL Collateral; NGL Collateral |
|---|---|---|---|---|
| 1 | • SOA Adequate Protection Liens | • DIP Liens | • DIP Liens | • SXL Liens (solely upon SXL Collateral)<br>• NGL Liens (solely upon NGL Collateral |
| 2 | • SOA Liens | • Existing Term Loan Adequate Protection Liens | • When it is determined whether the June 21 Insurance Proceeds constitute Term Loan Priority Collateral or SOA Priority Collateral, subject to the applicable priorities determined thereby. | • DIP Liens |
| 3 | • DIP Liens | • Existing Term Loan Liens | | • Existing Term Loan Adequate Protection Liens |
| 4 | • Existing Term Loan Adequate Protection Liens | • SOA Adequate Protection Liens | | • N/A |
| 5 | • Existing Term Loan Liens | • SOA Liens | | • N/A |

---

[4]    All liens shall be subject and subordinate to the Carve Out.

**Exhibit B**

**DIP Credit Agreement**

**[K&E DRAFT 7/22/19]**

**[CONFIDENTIAL ATTORNEY WORK PRODUCT, SUBJECT TO FRE 408 AND SIMILAR RULES]**

---

$100,000,000

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

PES HOLDINGS, LLC,

A Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Borrower,

EACH OF THE SUBSIDIARIES OF THE BORROWER, each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Guarantors


and


The Several Lenders from Time to Time Parties Hereto,


And


CORTLAND CAPITAL MARKET SERVICES LLC,

as Administrative Agent


Dated as of [_], 2019

---

# TABLE OF CONTENTS

### ARTICLE 1
### DEFINITIONS

Section 1.01.  *Defined Terms*
..................................................................................................................2

Section 1.02.  *Other Definitional Provisions*
................................................................................................29

Section 1.03.  *Accounting Terms; GAAP*
................................................................................................29

Section 1.04.  *Payments Due on Days Other than Business Days*
................................................................................................30

Section 1.05.  *LLC Division*
................................................................................................30

### ARTICLE 2
### AMOUNT AND TERMS OF COMMITMENTS

Section 2.01.  *Commitments*
................................................................................................31

Section 2.02.  *Procedure for Loan Borrowing*
................................................................................................31

Section 2.03.  *Repayment of Loans*
................................................................................................31

Section 2.04.  *Fees*
................................................................................................31

Section 2.05.  *Optional Prepayments*
................................................................................................32

Section 2.06.  *Mandatory Prepayments and Commitment Reductions*
................................................................................................32

Section 2.07.  *Conversion and Continuation Options*
................................................................................................33

Section 2.08.  *Limitations on Eurodollar Tranches*
................................................................................................33

Section 2.09.  *Interest Rates and Payment Dates*
................................................................................................34

Section 2.10.  *Computation of Interest and Fees*
................................................................................................34

Section 2.11.  *Inability to Determine Interest Rate*
................................................................................................35

Section 2.12.  *Pro Rata Treatment and Payments*
................................................................................................35

i

Section 2.13.  *Requirements of Law*
..................................................................................................37

Section 2.14.  *Taxes*
..................................................................................................38

Section 2.15.  *Indemnity*
..................................................................................................42

Section 2.16.  *Change of Lending Office*
..................................................................................................43

Section 2.17.  *Replacement of Lenders*
..................................................................................................43

Section 2.18.  *Extension of Initial Maturity Date*
..................................................................................................44

Section 2.19.  *[Priority and Liens; No Discharge*
..................................................................................................44

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Section 3.01.  *Organization; Powers*
..................................................................................................44

Section 3.02.  *Authorizations; Enforceability*
..................................................................................................44

Section 3.03.  *Governmental Approvals; No Conflicts*
..................................................................................................45

Section 3.04.  *Financial Statements; Material Adverse Effect*
..................................................................................................45

Section 3.05.  *Properties*
..................................................................................................46

Section 3.06.  *Intellectual Property*
..................................................................................................46

Section 3.07.  *Capital Stock and Subsidiaries*
..................................................................................................47

Section 3.08.  *Litigation; Compliance with Laws; No Default*
..................................................................................................47

Section 3.09.  *Federal Reserve Regulations*
..................................................................................................48

Section 3.10.  *Investment Company Act*
..................................................................................................48

Section 3.11.  *Use of Proceeds*
..................................................................................................48

Section 3.12.  *Taxes*
..................................................................................................48

Section 3.13.  *No Material Misstatements*
..................................................................................................48

Section 3.14.  *Labor Matters*
..................................................................................................49

Error! Unknown document property name.

Section 3.15.  *[Reserved]*

................................................................................................................49

Section 3.16.  *ERISA*

................................................................................................................49

Section 3.17.  *Environmental Matters*

................................................................................................................50

Section 3.18.  *Insurance*

................................................................................................................51

Section 3.19.  *Security Documents*

................................................................................................................51

Section 3.20.  *Anti-Terrorism Laws*

................................................................................................................51

Section 3.21.  *Affiliate Transactions*

................................................................................................................52

ARTICLE 4
CONDITIONS PRECEDENT

Section 4.01.  *Conditions of Effectiveness*

................................................................................................................52

Section 4.02.  *Conditions to All Borrowings of Loans*

................................................................................................................54

ARTICLE 5
AFFIRMATIVE COVENANTS

Section 5.01.  *Financial Statements*

................................................................................................................55

Section 5.02.  *Certificates; Other Information*

................................................................................................................56

Section 5.03.  *Payment of Taxes*

................................................................................................................58

Section 5.04.  *Maintenance of Existence; Compliance*

................................................................................................................58

Section 5.05.  *Maintenance of Property; Insurance*

................................................................................................................58

Section 5.06.  *Inspection of Property; Books and Records; Discussions*

................................................................................................................59

Section 5.07.  *Litigation and Other Notices*

................................................................................................................59

Section 5.08.  *Environmental Laws*

................................................................................................................60

Section 5.09.  *Credit Rating*

................................................................................................................61

Section 5.10.  *Additional Collateral, etc*

................................................................................................................61

Error! Unknown document property name.

Section 5.11.  *Mortgages, etc*
...................................................................................................................62
Section 5.12.  *[Reserved]*
...................................................................................................................62
Section 5.13.  *Anti-Terrorism Laws, Sanctions, Anti-Corruption Laws*
...................................................................................................................62
Section 5.14.  *Use of Proceeds*
...................................................................................................................63
Section 5.15.  *First and Second Day Orders*
...................................................................................................................63
Section 5.16.  *Post-Closing Obligations*
...................................................................................................................63
Section 5.17.  *Milestones*
...................................................................................................................63

ARTICLE 6
NEGATIVE COVENANTS

Section 6.01.  *Indebtedness*
...................................................................................................................64
Section 6.02.  *Liens*
...................................................................................................................66
Section 6.03.  *Fundamental Changes*
...................................................................................................................70
Section 6.04.  *Disposition of Property*
...................................................................................................................71
Section 6.05.  *Restricted Payments*
...................................................................................................................72
Section 6.06.  *Lines of Business*
...................................................................................................................73
Section 6.07.  *Investments*
...................................................................................................................73
Section 6.08.  *Prepayments, Etc*
...................................................................................................................75
Section 6.09.  *Transactions with Affiliates*
...................................................................................................................75
Section 6.10.  *Sales and Leasebacks*
...................................................................................................................76
Section 6.11.  *Swap Agreements*
...................................................................................................................77
Section 6.12.  *Changes in Fiscal Periods*
...................................................................................................................77
Section 6.13.  *Negative Pledge Clauses*
...................................................................................................................77
Section 6.14.  *Clauses Restricting Subsidiary Distributions*
...................................................................................................................77

iv

Section 6.15.  *Sanctions, and Anti-Corruption Laws*

...................................................................................................78

Section 6.16.  *Compliance with Minimum Liquidity Covenant*

...................................................................................................78

Section 6.17.  *Budget Variance*

...................................................................................................78


ARTICLE 7
EVENTS OF DEFAULT

Section 7.01.  *Events of Default*

...................................................................................................78


ARTICLE 8
THE AGENTS

Section 8.01.  *Appointment*

...................................................................................................85

Section 8.02.  *Delegation of Duties*

...................................................................................................85

Section 8.03.  *Exculpatory Provisions*

...................................................................................................85

Section 8.04.  *Reliance by Administrative Agent*

...................................................................................................86

Section 8.05.  *Notice of Default*

...................................................................................................86

Section 8.06.  *Non-Reliance on Agents and Other Lenders*

...................................................................................................87

Section 8.07.  *Indemnification*

...................................................................................................87

Section 8.08.  *Agent in Its Individual Capacity*

...................................................................................................88

Section 8.09.  *Successor Administrative Agent*

...................................................................................................88


ARTICLE 9
MISCELLANEOUS

Section 9.01.  *Amendments and Waivers*

...................................................................................................88

Section 9.02.  *Notices*

...................................................................................................89

Section 9.03.  *No Waiver; Cumulative Remedies*

...................................................................................................91

Section 9.04.  *Survival of Representations and Warranties*

...................................................................................................91

Error! Unknown document property name.

Section 9.05.  *Payment of Expenses and Taxes*
.................................................................................................................91

Section 9.06.  *Successors and Assigns; Participations and Assignments*
.................................................................................................................92

Section 9.07.  *Adjustments; Set off*
.................................................................................................................97

Section 9.08.  *Counterparts*
.................................................................................................................98

Section 9.09.  *Severability*
.................................................................................................................98

Section 9.10.  *Integration*
.................................................................................................................98

Section 9.11.  *GOVERNING LAW*
.................................................................................................................98

Section 9.12.  *Submission to Jurisdiction; Waivers*
.................................................................................................................98

Section 9.13.  *Acknowledgements*
.................................................................................................................99

Section 9.14.  *[Reserved]*
.................................................................................................................99

Section 9.15.  *Confidentiality*
.................................................................................................................100

Section 9.16.  *WAIVERS OF JURY TRIAL*
.................................................................................................................101

Section 9.17.  *USA Patriot Act*
.................................................................................................................101

Section 9.18.  *Acknowledgement and Consent to Bail-In of EEA Financial Institutions* .................................................................................................101

ARTICLE 10
GUARANTEE

Section 10.01.  *Guarantee*
.................................................................................................................102

Section 10.02.  *Rights of Secured Parties*
.................................................................................................................102

Section 10.03.  *Obligations Unconditional*
.................................................................................................................103

Section 10.04.  *Reinstatement*
.................................................................................................................104

Section 10.05.  *Subrogation; Subordination*
.................................................................................................................105

Section 10.06.  *Remedies*
.................................................................................................................105

Section 10.07.  *Instrument for the Payment of Money*
.................................................................................................................105

Error! Unknown document property name.

Section 10.08.  *Continuing Guarantee*

.................................................................................................................105

Section 10.09.  *General Limitation on Guaranteed Obligations*

.................................................................................................................105

Section 10.10.  *[Reserved]*

.................................................................................................................106

Section 10.11.  *Right of Contribution*

.................................................................................................................106

Section 10.12.  *Default; Remedies; Bankruptcy; Etc*

.................................................................................................................106

Section 10.13.  *[Reserved]*

.................................................................................................................107

Section 10.14.  *Enforcement Expenses; Indemnification*

.................................................................................................................107

Section 10.15.  *Acknowledgements*

.................................................................................................................108

Section 10.16.  *Additional Guarantors*

.................................................................................................................108

Section 10.17.  *Releases*

.................................................................................................................108

**Error! Unknown document property name.**

**SCHEDULES:**

1.01A      Commitments
1.01B      Mortgaged Property
1.01C      Supply and Offtake Documents
3.07       Subsidiaries
3.08(a)    Litigation
3.08(d)    Material Permits
3.14       Labor Matters
3.17       Environmental Matters
3.18       Insurance
6.07       Existing Investments
6.09       Existing Affiliate Transactions

**EXHIBITS:**

A          Form of Security Agreement
B          Form of Notice of Borrowing
C          Form of Closing Certificate
D          Form of Assignment and Assumption
E          Form of Notice of Conversion/Continuation
F          Forms of U.S. Tax Compliance Certificate
G          [Reserved]
H          Form of Compliance Certificate
I          Form of Perfection Certificate
J          Form of Interim Order

Error! Unknown document property name.

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**"), dated as of [_], 2019, is by and among PES HOLDINGS, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), each of the Guarantors (as defined herein) party hereto from time to time, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, the several banks and other financial institutions or entities from time to time parties to this Agreement (the "**Lenders**") and CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent.

WHEREAS, on [_], 2019 (the "**Petition Date**"), the Borrower and each of its Subsidiaries (each, a "**Debtor**" and collectively the "**Debtors**") (along with certain of its Affiliates) filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**", and collectively the "**Cases**") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide a term loan facility denominated in Dollars in an aggregate principal amount not to exceed $100,000,000 (as may be increased to give effect to any Incremental Loans provided as set forth herein) (the "**Facility**"), with all of the Borrower's obligations under the Facility to be guaranteed by each Guarantor, and the Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein;

WHEREAS, the Facility is made by the Lenders with a view to and related to such Lenders being lenders under the Existing Term Loan Credit Agreement;

WHEREAS, the relative priority of the Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court, and in the Collateral Documents;

WHEREAS, all of the claims and the Liens granted under the Orders and the Loan Documents to the Administrative Agent and the Lenders in respect of the Facility shall be subject to the Carve-Out;

WHEREAS, the proceeds of the extensions of credit under this Agreement will be used in part to enable the Borrower to make valuable transfers to one or more of the other Guarantors and otherwise in connection with the operation of their respective businesses;

WHEREAS, the Borrower and the other Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

Article 1

DEFINITIONS

Section 1.01. *Defined Terms.* As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.01 shall have the respective meanings set forth in this Section 1.01.

"**ABR**": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the next preceding Business Day) for a deposit in Dollars with a maturity of one (1) month plus 1.0% and (d) 2.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"**ABR Loans**": Loans the rate of interest applicable to which is based upon the ABR.

"**Acceptable Disclosure Statement**": a disclosure statement relating to the Acceptable Plan of Reorganization that is reasonably acceptable to the Required Lenders.

"**Acceptable Plan of Reorganization**": a Reorganization Plan for each of the Cases, in form and substance reasonably satisfactory to the Required Lenders, which, in any event, provides for the termination of the Commitments and the indefeasible payment in full and, subject to Section 2.03, in cash and full discharge of the Obligations under the Facility upon the Consummation Date with respect to such Reorganization Plan and for releases for the Administrative Agent, and the Lenders.

"**Administrative Agent**": Cortland Capital Market Services LLC, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"**Administrative Agent Fee Letter**": that certain fee letter between the Administrative Agent and the Borrower dated as of [_], 2019.

"**Affiliate**": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. For the avoidance of doubt, absent a change in circumstance from that which exists on the Closing Date, none of Carlyle, SXL, Sunoco Inc. and Energy Transfer Partners is an Affiliate of the Borrower or any other Loan Party.

"**Agents**": the collective reference to the Administrative Agent and any other agent identified on the cover page of this Agreement.

2

"**Aggregate Exposure**": with respect to any Lender at any time, an amount equal to the sum of the aggregate then unpaid principal amount of such Lender's Loans.

"**Aggregate Exposure Percentage**": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"**Agreement**": as defined in the preamble hereto.

"**Anti-Corruption Law**": any Requirement of Law related to anti-corruption or anti-bribery, including the Foreign Corrupt Practices Act.

"**Anti-Terrorism Law**": any Requirement of Law related to terrorism financing or money laundering, including the Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "**Bank Secrecy Act**", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) and Executive Order 13224 (effective September 24, 2001).

"**Applicable Margin**": with respect to the Loans that are ABR Loans, 13.00% per annum and with respect to the Loans that are Eurodollar Loans, 14.00% per annum.

"**Approved Fund**": as defined in Section 9.06(b)(i).

"**Asset Sale**": any Disposition or related series of Dispositions of property (other than (i) any Disposition of SOA Separate Assets and Collateral or SOA Priority Collateral (each as defined in the Existing Intercreditor Agreement) and (ii) any Disposition or series of Dispositions permitted by Section 6.04 (other than Section 6.04(o) or (p)) that yields gross proceeds to any Loan Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) (i) for any individual Disposition or series of Dispositions, in excess of $1,000,000 or (ii) combined with all prior Dispositions or series of Dispositions during the term of this Agreement that fall below the threshold in the immediately preceding clause (i), in excess of $3,500,000.

"**Assignee**": as defined in Section 9.06(b)(i).

"**Assignment and Assumption**": an Assignment and Assumption, substantially in the form of Exhibit D, or such other form as may be agreed by the Administrative Agent.

"**Availability Period**": the period from and including the Closing Date to but excluding the earlier of (i) [  ], 2020[1] and (ii) the Maturity Date.

"**Avoidance Actions**": claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code.

---

[1] To be the date that is six months from the Closing Date.

Error! Unknown document property name.

"**Bail-In Action**": the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**": (a) with respect to any EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation for such EEA Member Country as described in the EU Bail-In Legislation Schedule from time to time; and (b) and, in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

"**Bankruptcy Code**": Title 11 of the United States Code.

"**Bankruptcy Court**": the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Bardin Hill**": Bardin Hill Investment Partners LP.

"**Beneficial Ownership Certification**": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**": 31 C.F.R. § 1010.230, as amended, or any successor thereto.

"**Benefitted Lender**": as defined in Section 9.07(a).

"**Board**": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**": as defined in the preamble hereto.

"**Borrowing Date**": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"**Budget Variance**": the variance of actual receipts and disbursements as compared with receipts and disbursements set forth in the Initial DIP Budget or Rolling DIP Budget, as applicable.

"**Budget Variance Report**": a report of the Budget Variance (for receipts and disbursements) on a line item basis in a form reasonably acceptable to the Required Lenders or their advisors for (i) the cumulative period from the Petition Date to the last Business Day of the week ended prior to the date on which such report is required to be delivered and (ii) the four-week period ending on the last Business Day of the week ended prior to the date on which such report is required to be delivered.

Error! Unknown document property name.

"**Business Day**": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, *provided*, that with respect to notices and determinations in connection with, and payments of principal and interest on, Loans having an interest rate determined by reference to the Eurodollar Rate, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"**Capital Expenditures**": for any period, without duplication, all cash expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for capital assets as determined in accordance with GAAP, but excluding capital expenditures from: (i) proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower or any Guarantor (but in each case not with respect to the June 21 Incident and any matters related thereto) and (ii) any leases that as of the date hereof qualify as operating leases under GAAP (whether or not such leases are required to be accounted for as capital leases under GAAP after the date hereof). For purposes of this definition, the purchase price of equipment or other fixed assets that are purchased simultaneously with the trade-in of existing assets shall be included in Capital Expenditures only to the extent of the gross amount by which such purchase price exceeds the credit granted by the seller of such assets for the assets being traded in at such time.

"**Capital Lease Obligations**": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Capital Stock**": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"**Carlyle**": collectively, Carlyle U.S. Equity Opportunity Fund, L.P. and Carlyle Energy Mezzanine Opportunities Fund, L.P.

"**Carve-Out**": as defined in the Interim Order or the Final Order, as applicable.

"**Cases**": as defined in the preamble hereto.

"**Cash Collateral**": as defined in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**": as to any person,

(a)        securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of twelve (12) months or less from the date of acquisition;

(b)        certificates of deposit, time deposits and eurodollar time deposits with maturities of one (1) year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one (1) year and overnight bank deposits, in each case with any domestic or foreign commercial bank in the United States having capital and surplus of not less than $500,000,000;

(c)        repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clauses (a) and (b) entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)        commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within twenty-four (24) months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition;

(e)        readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating of "BBB+" or higher from S&P or "Baa1" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition; or

(f)        Investments with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's.

"**CERCLA**": the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

"**Closing Date**": the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied or waived in accordance with **Section** 9.01(a).

"**Code**": the Internal Revenue Code of 1986, as amended.

"**Collateral**": all property upon which a Lien is purported to be created by the Interim Order, the Final Order or any Security Document, whether now owned or hereafter acquired.

"**Collateral Agent**": Cortland Capital Market Services LLC, as the collateral agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

Error! Unknown document property name.

"**Commitment**": as to any Lender, its Initial Commitment and its Final Commitment. The aggregate amount of Commitments of all Lenders shall not exceed $100,000,000.

"**Commodity Exchange Act**": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit H.

"**Connection Income Taxes**": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consummation Date**": the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"**Contractual Obligation**": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Contribution Agreement**": that certain Refinancing Contribution Agreement, dated as of July 2, 2012, by and among Philadelphia Energy Solutions LLC, Sunoco, Inc. and Carlyle PES, L.L.C., as amended by that certain Amendment No. 1 to Refining Contribution Agreement, effective as of September 8, 2012, by and among Philadelphia Energy Solutions LLC, Sunoco, Inc., PESRM and Carlyle PES, L.L.C. and as assigned by that certain Assignment Agreement dated as of January 17, 2018 by and among each of the parties but without giving effect to any other amendment or modification thereto.

"**Controlled Investment Affiliate**": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Credit Party**": the Administrative Agent or any other Lender and, for the purposes of Section 9.13(a) only, any other Agent.

"**CSAM**": Credit Suisse Asset Management, LLC.

"**Debtor**" and "**Debtors**": as defined in the preamble hereto.

"**Default**": any of the events specified in Article 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

Error! Unknown document property name.

"**Disposition**": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"**Disqualified Capital Stock**": any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part (other than in Capital Stock that are otherwise not Disqualified Capital Stock), on or prior to the date that is 121 days after the Stated Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in (a) above, in each case at any time on or prior to the date that is 121 days after the Stated Maturity Date, or (c) contains any repurchase obligation for cash purchase which may come into effect prior to the date that is 121 days after the Stated Maturity Date; *provided*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of a change in control or an asset sale occurring prior to the date that is 121 days after the Stated Maturity Date shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the repayment in full of the Obligations (other than taxes, costs, indemnifications, reimbursements, damages and other claims and liabilities (including Guarantee Obligations) in respect of which no written assertion of liability or no claim or demand for payment has been made at such time).

"**Dollars**" and "**$**": dollars in lawful currency of the United States.

"**EEA Financial Institution**": (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any Person established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**": any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Environment**": ambient air, indoor air, surface water and groundwater (including potable and non-potable water, navigable water and wetlands), the land surface or

Error! Unknown document property name.

subsurface strata, natural resources, flora, fauna, or as otherwise defined in any Environmental Law.

"**Environmental and Necessary Capex**": capital expenditures deemed reasonably necessary by the Loan Parties, in good faith and pursuant to prudent judgment, to satisfy applicable Requirements of Law (including Environmental Laws), and any expenditures relating to investigation, remediation, or other actions in connection with the June 21 Incident.

"**Environmental Claim**": any claim, notice, demand, order, legal action, suit or proceeding alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location, (ii) any Environmental Law, or (iii) any Environmental Liability, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury to the Environment or, as it relates to exposure to Hazardous Material, to human health.

"**Environmental Laws**": any and all laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning the Environment, natural resources, human health and safety (as it relates to exposure to Hazardous Material), or Hazardous Materials, as now or may at any time hereafter be in effect.

"**Environmental Liability**": any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of or relating to the Loan Parties or any Subsidiary resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure of any person to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**": any permit, license, approval, registration, consent or other authorization under Environmental Law.

"**ERISA**": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**": (a) any entity, whether or not incorporated, that is under common control with a Loan Party within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which a Loan Party is a member; (c) any trade

Error! Unknown document property name.

or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which a Loan Party is a member; and (d) solely for purposes of Section 412 of the Code and Section 302 of ERISA, with respect to any Loan Party, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Loan Party is a member. Any former ERISA Affiliate of any Loan Party shall continue to be considered an ERISA Affiliate of the Loan Party within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Loan Party and with respect to liabilities arising after such period for which the Loan Party is liable under Section 412 of the Code or Title IV of ERISA.

"**ERISA Event**": (a) any Reportable Event; (b) the failure of any Loan Party or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (d) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (e) the occurrence of any event or condition which would constitute grounds under ERISA for the termination by the PBGC of, or the appointment by the PBGC of a trustee to administer, any Pension Plan or the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA to the PBGC with respect to the termination of any Pension Plan, including but not limited to the imposition on a Loan Party of any Lien in favor of the PBGC or any Pension Plan; (f) the receipt by any Loan Party or any ERISA Affiliate of any notice from the PBGC relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (g) the failure by any Loan Party or any ERISA Affiliate to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (h) the incurrence by any Loan Party or any ERISA Affiliate of any liability with respect to its complete withdrawal or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan; (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability on it or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in "endangered" or "critical" status (within the meaning of Sections 431 or 432 of the Code or Sections 304 or 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA) or that it intends to terminate or has terminated (under Section 4041A or 4042 of ERISA); (j) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA; (k) the withdrawal by any Loan Party or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors, or the termination of any such Pension Plan, resulting in liability to such Loan Party or such Affiliate pursuant to Section 4062 or 4064 of ERISA; (l) the imposition of liability on any ERISA Loan Party or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (m) receipt from the IRS of notice of the failure of any Plan to qualify under Section 401(a) of the Code, or the failure

Error! Unknown document property name.

of any trust forming part of any Plan to qualify for exemption from taxation under Section 501(a) of the Code; or (n) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to ERISA on the assets of Loan Party with respect to any Pension Plan.

"**ERISA Loan Parties**": the Borrower and any direct or indirect subsidiary thereof.

"**EU Bail-In Legislation Schedule**": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurocurrency Reserve Requirements**": for any day as applied to a Eurodollar Loan, the average (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day applicable to any member bank of the Federal Reserve System as published from time to time by the Board at https://federalreserve.gov/monetarypolicy/reservereq.htm (or any successor thereto) or under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"**Eurodollar Base Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the greater of (a) 1.00% and (b) the LIBOR Rate.

"**Eurodollar Loans**": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"**Eurodollar Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.0 - \text{Eurocurrency Reserve Requirements}}$$

"**Eurodollar Tranche**": the collective reference to Eurodollar Loans under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"**Event of Default**": any of the events specified in Article 7, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**Exchange Act**": as defined in **Section** 7.01(k)(i).

"**Excluded Taxes**": any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its

applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan (other than pursuant to an assignment request by the Borrower under Section 2.17(a)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.14(f)(i) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**Existing Intercreditor Agreement**": the Intercreditor Agreement, dated as of August 7, 2018, by and among Cortland Capital Market Services LLC, as Term Loan Agent, Merrill Lynch Commodities, Inc., as the Initial SOA Collateral Agent, ICBC Standard Bank PLC, as the Successor SOA Collateral Agent, the Borrower and the other Grantors party thereto.

"**Existing Term Loan Credit Agreement**": the Term Loan Agreement dated as of August 7, 2018, among the Borrower, each of the subsidiaries of the Borrower as guarantors, the several lenders from time to time parties to such agreement, as lenders and Cortland Capital Market Services LLC, as Administrative Agent as amended by that certain First Amendment and Incremental Joinder thereto, dated as of February 11, 2019, and as otherwise amended, restated, or modified from time to time prior to the Petition Date.

"**Existing Term Loan Credit Agreement Agent**": the "Administrative Agent" as defined in the Existing Term Loan Credit Agreement.

"**Existing Term Loan Credit Agreement Documents**": the "Loan Documents" as defined in the Existing Term Loan Credit Agreement.

"**Existing Term Loan Credit Agreement Lenders**": the "Lenders" as defined in the Existing Term Loan Credit Agreement.

"**Existing Term Loan Indebtedness**": Indebtedness incurred under the Existing Term Loan Credit Agreement Documents.

"**Facility**": as defined in the preamble hereto.

"**FATCA**": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code (or any amended or successor version described above), and any intergovernmental agreements and fiscal or regulatory legislation, rules or official

Error! Unknown document property name.

interpretations adopted pursuant to any intergovernmental agreement implementing the foregoing.

"**Federal Funds Effective Rate**": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by Cortland Capital Market Services LLC from three U.S. banks recognized standing selected by it.

"**Final Commitment**": as to each Lender, its several and not joint obligation, if any, to make a Loan to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Final Commitment**" opposite such Lender's name on Schedule 1.01A, or in the Final Commitment Assignment or Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement, including pursuant to Section 9.06(b)(vi). The aggregate amount of the Final Commitments of all Lenders shall not exceed $35,000,000.

"**Final Commitment Assignment**": as defined in Section 9.06.

"**Final Order**": an order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications which are not adverse to the Administrative Agent or the Lenders) as to which no stay has been entered and which has not been reversed, vacated or overturned, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) waive such requirement in writing.

"**Final Order Entry Date**": the date on which the Final Order is entered by the Bankruptcy Court.

"**Foreign Benefit Arrangement**": any employee benefit arrangement mandated by non-US law that is maintained or contributed to by any Loan Party or with respect to which any Loan Party has any material actual or contingent liability.

"**Foreign Plan**": each employee benefit plan (within the meaning of Section 3(3)) of ERISA that is not subject to US law and is maintained or contributed to by any Loan Party or with respect to which any Loan Party has any material actual or contingent liability.

"**Foreign Plan Event**": with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure by a Loan Party to make any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign

Error! Unknown document property name.

Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"**Funding Office**": the office or account of the Administrative Agent specified in Section 9.02 or such other office or account as may be specified from time to time by the Administrative Agent as its funding office or account by written notice to the Borrower and the Lenders.

"**GAAP**": subject to Section 1.03(i), generally accepting accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Group Members**": the collective reference to the Borrower and its Subsidiaries.

"**Guarantee Obligation**": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or has the economic effect of guaranteeing, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or has the economic effect of guaranteeing, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

14

"**Guaranteed Obligations**": as defined in Section 10.01.

"**Guarantor Obligations**": with respect to any Guarantor, all obligations and liabilities of such Guarantor which may arise under or in connection with Article 10 or any other Loan Document, in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to the Lenders that are required to be paid by such Guarantor pursuant to the terms of this Agreement or any other Loan Document).

"**Guarantors**": the collective reference to the Subsidiary Guarantors.

"**Hazardous Material**": (i) any hazardous substances, hazardous waste, petroleum or fraction thereof, contaminant, polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs, asbestos or any asbestos-containing material in any form or condition, radon or any other radioactive material (including any source, special nuclear or by-product material); and (ii) any other chemical, waste, material, compound, constituent or substance that is subject to regulation as hazardous, toxic, a pollutant or a contaminant or which can give rise to liability under any Environmental Laws.

"**Incremental Amendment**": an Incremental Amendment, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, among the Borrower, the Administrative Agent and one or more Incremental Lenders, establishing Incremental Loans and effecting such other amendments hereto and to the other Loan Documents as are contemplated by Section 2.19.

"**Incremental Lender**": a Lender with an outstanding Incremental Loan.

"**Incremental Loans**": any Loans made pursuant to Section 2.19.

"**Indebtedness**": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all Disqualified Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such

Error! Unknown document property name.

obligation, and (j) for the purposes of Section 7.01(e)(A) only, all obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Taxes**": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"**Initial Commitment**": as to each Lender, its several and not joint obligation, if any, to make a Loan to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Initial Commitment**" opposite such Lender's name on Schedule 1.01A. The aggregate amount of the Initial Commitments of all Lenders is $65,000,000.

"**Initial Maturity Date**": April 30, 2020.

"**Initial DIP Budget**": a projected statement of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis, starting with the week of the Petition Date and for the following thirteen (13) calendar weeks, including the anticipated use of the Facility and of Cash Collateral for each week during such period, and which sets forth, among other things the projected cash disbursements and projected cash receipts for each applicable week, and the cumulative impact on cash, in a form substantially similar to the budget provided by the Debtors to the Lenders prior to the Closing Date.

"**Insolvent**": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Insurance Claims**": insurance claims with respect to the June 21 Incident.

"**Intellectual Property**": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Interest Payment Date**": (a) as to any ABR Loan, the last Business Day of each March, June, September and December (or, if an Event of Default is in existence, the last Business Day of each calendar month) to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three (3) months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three (3) months, (i) each day that is three (3) months, or a whole multiple thereof, after the first day of such Interest Period and (ii) the

last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"**Interest Period**": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two or three months thereafter, as selected by the Borrower in its Notice of Borrowing or Notice of Conversion/Continuation, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with respect thereto; *provided* that, all of the foregoing provisions relating to Interest Periods are subject to the following:

      (i)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

      (ii)    the Borrower may not select an Interest Period under a particular Facility that would extend beyond the date final payment is due on the relevant Loans;

      (iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month of such Interest Period.

"**Interim Order**": an interim order of the Bankruptcy Court, in the form set forth in Exhibit J, (i) authorizing, on an interim basis, the Facility in the amount and on the terms set forth herein and the use of Cash Collateral, (ii) granting the Superpriority Claim status and other Collateral and Liens referred to herein and in the other Loan Documents, (iii) approve the payment by the Borrower of the fees provided for herein and (iv) provide for other customary matters, with only such modifications as are satisfactory to the Required Lenders and the Borrower in their respective sole discretion.

"**Investments**": as defined in Section 6.07.

"**IP Rights**": as defined in Section 3.06.

"**IRS**": the United States Internal Revenue Service.

"**Joinder Effective Date**": as defined in Section 9.06.

"**Joining Lender**": as defined in Section 3.06Section 9.06.

17

"**June 21 Incident**": the fire that occurred in the Refinery on or around June 21, 2019.

"**June 21 Insurance Proceeds**": current, past and future proceeds of any claim under the Debtors' insurance policies, whether for property damage, business interruption or otherwise (but excluding directors' and officers' insurance and any other liability insurance payable directly to a third party pursuant to the terms of the underlying insurance policy), resulting, directly or indirectly, to the June 21 Incident, including, without limitation, Policy No. 10F152096-2018-1 dated as of December 10, 2018 and issued by the General Security Indemnity Company of Arizona.

"**Lenders**": as defined in the preamble hereto.

"**LIBOR Rate**":  the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the applicable Bloomberg LIBOR Screen Page as of 11:00 A.M., London time, two (2) Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on such page (or otherwise on such screen), the "LIBOR Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered to major banks in immediately available funds in the London interbank market at approximately 11:00 A.M., London time, two (2) Business Days prior to the commencement of such Interest Period.

"**LIBOR Successor Rate**":  as defined in Section 2.09(e).

"**LIBOR Successor Rate Conforming Changes**":  with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of ABR, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines in consultation with the Borrower).

"**Lien**": with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge, collateral assignment, hypothecation, security interest or encumbrance of any kind or any arrangement effective to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or

any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Liquidity**": as of any date, the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and its Subsidiaries on a consolidated basis on such date.

"**Loan**": any loans made pursuant to Section 2.01 and any Incremental Loans.

"**Loan Documents**": this Agreement, the Security Documents, any Incremental Amendment, the Notes (if any), the Administrative Agent Fee Letter and any amendment, waiver, supplement or other modification to any of the foregoing.

"**Loan Parties**": the Borrower and Guarantors.

"**Loan Percentage**": as to any Lender at any time, the percentage which the aggregate principal amount of such Lender's Initial Commitments and Final Commitments, as applicable, then constitutes of the aggregate Initial Commitments and, Final Commitments of all Lenders then outstanding.

"**Management Compensation Plans**": compensation arrangements with senior management reasonably acceptable to the Required Lenders, it being understood that such arrangements shall incentivize senior management to maximize recoveries (taking into account the timing of such recoveries).

"**Material Adverse Effect**": a material adverse effect on (a) the business, property, financial condition results of operations of the Loan Parties, taken as a whole, other than (i) as customarily occurs as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, (ii) the commencement of the Cases and (iii) the June 21 Incident, the events related thereto and the effects therefrom, (b) Loan Parties' ability to fully perform their respective payment obligations under any Loan Document or (c) the rights or remedies of the Administrative Agent or the Lenders hereunder or under any other Loan Document.

"**Material Permit**": permits required for the Borrower to conduct of its businesses, operations and Real Property in accordance with Requirements of Law, excluding such permits the absence of which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

"**Maturity Date**": the earliest of (a) the Stated Maturity Date, (b) the Consummation Date and (c) the acceleration of the Loans and the termination of all Commitments with respect to the Facility in accordance herewith.

Error! Unknown document property name.

"**Minimum Liquidity Covenant**": a requirement not to permit Liquidity to be, as of the end of the last Business Day of any calendar week, less than $[__][2].

"**Moody's**": Moody's Investors Service, Inc.

"**Mortgaged Properties**": the parcels of Real Property described by metes and bounds on Schedule 1.01B.

"**Mortgages**": each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent, acting in its capacity on behalf of the Lenders, in form and substance reasonably satisfactory to the Administrative Agent or the Required Lenders.

"**Multiemployer Plan**": a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (i) makes or is obligated to make contributions; (ii) during the preceding five (5) plan years, has made or been obligated to make contributions or (iii) has any actual or contingent liability.

"**Multiple Employer Plan**": an employee pension benefit plan (as defined in Section 3(2) of ERISA) which has two or more contributing sponsors (including any Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Cash Proceeds**": (a) with respect to any Asset Sale or Recovery Event, the cash proceeds actually received by the Borrower or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by the Borrower or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) reasonable and documented selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional, advisory, consulting, investment banking and transactional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes actually paid or payable by a Debtor in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, by a Debtor against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by the Borrower or any of its Subsidiaries associated with the properties sold in such Asset Sale (*provided*, that to the extent and at the time any such amounts are released from such reserve, such amounts shall then constitute Net Cash Proceeds); (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness or indebtedness which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness or indebtedness assumed by the purchaser of such properties); (iv) any survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees payable by a Debtor in respect of any such Asset Sale; and (v) taxes paid or reasonably estimated to be actually payable by a Debtor in connection

---

[2] $2,500,000 plus agreed amount of post-trigger carve out cap.

Error! Unknown document property name.

therewith and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"**Non-U.S. Lender**": a Lender that is not a U.S. Person.

"**Notes**": the collective reference to any promissory note evidencing Loans.

"**Notice of Borrowing**": as defined in Section 2.02.

"**Notice of Conversion/Continuation**": as defined in Section 2.07(a).

"**Obligations**": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"**OFAC**": as defined in Sanctioned Persons.

"**Orders**": collectively, the Interim Order and the Final Order.

"**Organizational Documents**": with respect to any person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such person and (v) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**": with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

Error! Unknown document property name.

"**Other Superpriority Claim**" shall mean a superpriority administrative expense claim against any of the Debtors (without the need to file any proof of claim) with priority over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code other than the Superpriority Claims described in Section 2.20.

"**Other Taxes**": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17(a)).

"**Participant**": as defined in Section 9.06(c)(i).

"**Participant Register**": as defined in Section 9.06(c)(i).

"**Patriot Act**": as defined in Section 9.17.

"**PBGC**": the Pension Benefit Guaranty Corporation established under Section 4002 of ERISA and any successor entity performing similar functions.

"**PCB**": as defined in Hazardous Materials.

"**Pension Plan**": any employee benefit plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (i) which is sponsored, maintained or contributed to by, or required to be contributed to by, any Loan Party or any of their respective ERISA Affiliates or (ii) with respect to which any Loan Party or any of their respective ERISA Affiliates has any actual or contingent liability.

"**Perfection Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit I.

"**Permitted Holders**": shall mean (a) Carlyle, (b) CSAM, (c) Bardin Hill, (d) Energy Transfer Partners, L.P. and (e) in each case, Controlled Investment Affiliates and Related Parties of any of the foregoing.

"**Person**": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Petition Date**" as defined in the preamble hereto.

Error! Unknown document property name.

"**Plan**": any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Loan Party is an "employer" as defined in Section 3(5) of ERISA.

"**Pre-Petition Payment**": a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Indebtedness of any Debtor outstanding and unpaid on the date on which such Person becomes a Debtor, (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims) or other pre-petition claims against any Debtor.

"**Preferred Stock**": with respect to any person, any and all preferred or preference Capital Stock (however designated) of such person whether now outstanding or issued after the Closing Date.

"**Prime Rate**": the per annum rate of interest publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (as determined by the Administrative Agent) (x) the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by Administrative Agent or (y) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the bank prime loan rate or its equivalent) or any similar release by the Federal Reserve Board.

"**Purchase Money Obligation**": for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Capital Stock of any person) or the cost of installation, construction, development or improvement of any property and any refinancing thereof; *provided*, that (i) such Indebtedness is incurred within one (1) year after such acquisition, installation, construction or improvement of such property by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**Real Property**": any parcel or tract, or portion thereof, of real property owned by any Loan Party.

"**Recovery Event**": any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower or any of its Subsidiaries which constitutes Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement) occurring after the Petition Date. "Recovery Event" shall include but not be limited to any taking of all or any part of any Real Property which constitutes Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement) of the Borrower or any of its Subsidiaries or any part thereof, in or by condemnation or other eminent domain

Error! Unknown document property name.

proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property which constitutes Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement) of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof. For the avoidance of doubt, the June 21, Incident and events related thereto shall not be considered a Recovery Event.

"**Refinery**": the refinery located in Philadelphia, Pennsylvania (consisting of two formerly separate refining operations commonly known as "**Point Breeze**" and "**Girard Point**").

"**Register**": as defined in Section 9.06(b)(iv).

"**Regulation T**": Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**": Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**": Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Related Parties**": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release**": any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganization Plan**": a chapter 11 plan of reorganization or liquidation in any or all of the Cases of the Debtors.

"**Reportable Event**": any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to applicable regulations.

"**Required Extension Lenders**": at any time, the holders of more than 75% of the aggregate unpaid principal amount of the Loans and the aggregate amount of Commitments then outstanding.

"**Required Lenders**": at any time, the holders of more than 50% of the aggregate unpaid principal amount of the Loans and the aggregate amount of Commitments then outstanding.

Error! Unknown document property name.

"**Required Repayment Lenders**": at any time, the holders of more than 75% of the aggregate unpaid principal amount of the Loans and the aggregate amount of Commitments then outstanding.

"**Requirement of Law**": as to any Person, any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**": the chief restructuring officer, the chief executive officer, president, chief financial officer of the Borrower, or any executive officer of such Person responsible for administration of the obligations of such Person under this Agreement, but in any event, with respect to financial matters, the chief financial officer or treasurer of the Borrower.

"**Restricted Payments**": as defined in Section 6.05.

"**Restricted Subsidiary**": each Subsidiary of the Borrower.

"**Rolling DIP Budget**": a projected statement of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis, for the following thirteen (13) calendar weeks, including anticipated use of the Facility and of Cash Collateral for each week during such period, and which sets forth, among other things, the projected cash disbursements and projected cash receipts for each applicable week and the cumulative impact on cash in form substantially similar to the Initial DIP Budget (unless otherwise agreed by the Required Lenders).  Any proposed Rolling DIP Budget delivered (x) pursuant to Section 5.01(e) or (y) at any other time, at the election of the Borrower, shall in each case only become the Rolling DIP Budget upon its approval by the Required Lenders, which may be communicated by email, it being understood that (i) unless such Rolling DIP Budget is acceptable to and has been so approved by the Required Lenders, the Initial DIP Budget or Rolling DIP Budget, as applicable, that was previously in effect shall continue to be in effect and (ii) for any weekly period that is not included in the Initial DIP Budget or any Rolling DIP Budget that is acceptable to and has been approved by the Required Lenders, the "Rolling DIP Budget" shall be a Rolling DIP Budget as reasonably determined by the Required Lenders or their advisors to be a consistent continuation of the last previously applicable Rolling DIP Budget.

"**S&P**": Standard & Poor's Ratings Services.

"**Sale and Leaseback Transaction**": any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**Sanctioned Person**": any party that (i) is identified on the "Specially Designated Nationals and Blocked Persons List", the "Sectoral Sanctions Identification List" or any

Error! Unknown document property name.

other similar list maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or any other US government agency or is a national of, ordinarily resident in, is organized or chartered in, or has a place of business in a country or territory that is the subject of a comprehensive OFAC sanctions or embargo program or (ii) is otherwise a person with whom US persons are prohibited from engaging in transactions or whose property must be blocked by US persons under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any economic sanctions administered by OFAC other Requirement of Law.

"**Scheduled Unavailability Date**":  as defined in Section 2.09(e).

"**SEC**": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"**Secured Parties**": collectively, the Administrative Agent, the Lenders and any party that is a holder of any Obligation.

"**Security Agreement**": the Pledge and Security Agreement to be executed and delivered by the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A.

"**Security Documents**": the collective reference to the Security Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.  The Security Documents shall supplement, and shall not limit, the security interests granted pursuant to the Orders.

"**Stated Maturity Date**": the earlier of (i) the Initial Maturity Date (as such date may be extended pursuant to Section 2.18); (ii) the effective date of a Reorganization Plan, (iii) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under Bankruptcy Code section 363, and (iv) the date of acceleration of the Loans in accordance with Article 7.

"**Subsidiary**": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**": each wholly-owned Subsidiary of the Borrower.

"**Superpriority Claim**": as defined in **Section** 2.20.

"**Supply and Offtake Agreement**":  the Sixth Amended and Restated Supply and Offtake Agreement, dated as of June 18, 2019, among Philadelphia Energy Solutions Refining and Marketing, LLC, and ICBC Standard Bank PLC and the other transaction parties party thereto, as in effect on the Petition Date.

"**Supply and Offtake Documents**":  collectively, (i) the PESRM Transaction Documents (as defined in the Supply and Offtake Agreement and as in effect on the Petition Date) and (ii) any other material agreements related to the Supply and Offtake Agreement listed on Schedule 1.01C, in each case as in effect on the Petition Date.

"**Swap Agreement**": any agreement related to (a) a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction, forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions), (b) a transaction similar to any transaction referred to in clause (a) that is currently, or in the future becomes, regularly entered into in the financial markets (including terms and conditions incorporated by reference into such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, or economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are made and (c) any transaction that is a combination of the transactions described in clauses (a) and (b) above. For the avoidance of doubt, "**Swap Agreement**" shall not include the Supply and Offtake Agreement the Supply and Offtake Documents or any agreements or obligations entered into in the ordinary course of business to buy or sell any security, commodity, or other financial instrument or instrument in a transaction that contemplates or settles by physical delivery of the underlying security, commodity, or other financial instrument or instrument.

"**Tax Return**": all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Transactions**": collectively, (a) the entering into by the Loan Parties and their applicable Subsidiaries of the Loan Documents to which they are or are intended to be a party and the creation of the Liens pursuant to the Collateral Documents, the Interim Order and the Final Order and the borrowings of the Loans hereunder and (b) the payment of the fees and expenses incurred in connection with the consummation of the foregoing.

Error! Unknown document property name.

"**Transferee**": any Assignee or Participant.

"**Unasserted Contingent Obligations**": taxes, costs, indemnifications, reimbursements, damages and other claims and liabilities in respect of which no written assertion of liability or no claim or demand for payment has been made at such time.

"**United States**": the United States of America.

"**U.S. Person**": a "**United States person**" within the meaning of Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**": as defined in Section 2.14(f)(ii)(B)(3).

"**Voting Stock**": with respect to any person, any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such person.

"**Wholly Owned Subsidiary**": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"**Withdrawal Liability**": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are used in Sections 4203 and 4205, respectively, of ERISA.

"**Write-Down and Conversion Powers**": (a) in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the write-down and conversion powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and (b) in relation to any other applicable Bail-In Legislation, (i) any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and (ii) any similar or analogous powers under that Bail-In Legislation.

Section 1.02. *Other Definitional Provisions.* (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in

28

respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

Section 1.03. *Accounting Terms; GAAP*. Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Required Lenders. If, after the Closing Date, any change in the accounting principles used in the preparation of the most recent financial statements referred to in Section 5.01 is hereafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successors thereto) and such change is adopted by the Borrower and results in a change in any of the calculations required by Article 6 that would not have resulted had such accounting change not occurred, if requested by the Borrower or the Administrative Agent, the parties hereto agree to enter into negotiations in good faith in order to amend such provisions so as to equitably reflect such change such that the criteria for evaluating compliance with such covenants by Borrower shall be the same after such change as if such change had not been made (subject to the approval of the Required Lenders and not subject to any amendment fee or increase in pricing hereunder); *provided, however*, that (i) no change in GAAP that would affect a calculation that measures compliance with any covenant contained in Article 6 shall be given effect until such provisions are amended to reflect such changes in GAAP and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between such calculations made before and after giving effect to such change in GAAP. Notwithstanding any other provision of this Agreement to the contrary, for all purposes during the term of this Agreement and any other Loan Document, each lease that pursuant to GAAP as in effect on the Closing Date would be classified as a capital lease or an operating lease will continue to be so classified, notwithstanding any change in characterization of that lease subsequent to the Closing Date based on changes to GAAP or interpretation of GAAP.

Error! Unknown document property name.

Section 1.04. *Payments Due on Days Other than Business Days*. If any payment or deliverable hereunder shall be due on a day that is not a Business Day, the date for payment or delivery shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.05. *LLC Division.* Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale or transfer or disposition or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale or transfer or disposition, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, subsidiary, joint venture or any other like term shall also constitute such a Person or entity), and to the extent any covenant in any Loan Document is applicable to such limited liability company immediately prior to such division, such covenant shall apply to any Person resulting from such division immediately after such division.

## Article 2
### AMOUNT AND TERMS OF COMMITMENTS

Section 2.01. *Commitments*. Subject to the terms and conditions hereof and in the Orders, each Lender severally agrees to make loans to the Borrower on any Business Day (i) on the Closing Date, in an amount not to exceed the amount of the Initial Commitment and (ii) in up to five drawings on or after the Final Order Entry Date during the Availability Period, in an amount not to exceed the amount of the Final Commitment of such Lender. The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.02 and 2.07.a).

Section 2.02. *Procedure for Loan Borrowing*. The Borrower shall give the Administrative Agent irrevocable written notice (which notice must be received by the Administrative Agent prior to 11:00 A.M., New York City time, [two (2)] Business Days prior to the date of the proposed borrowing) requesting that the Lender make the Loans on the date of the proposed borrowing and specifying the amount to be borrowed.  Such notice (the "**Notice of Borrowing**") shall be irrevocable and shall be in writing, substantially in the form of Exhibit B, appropriately completed. Upon receipt of such Notice of Borrowing, the Administrative Agent, shall promptly notify each Lender thereof. Not later than 11:00 A.M., New York City time, on the date of the proposed borrowing, each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan or Loans to be made by such Lender. The Administrative Agent shall make available to the account of the Borrower on the books of such office of the Administrative Agent, or such other account as the Borrower may specify in writing to the Administrative Agent, with the aggregate of the amounts made available to the Administrative Agent by the Lenders in immediately available funds.

Error! Unknown document property name.

Section 2.03. *Repayment of Loans*. The Loans shall mature, and shall be due and payable in cash without any further notice, on the Maturity Date; *provided*, that, subject to the prior written consent of the Required Repayment Lenders, the Loans may be repaid in any manner other than in cash.

Section 2.04. *Fees*.

(a)    The Borrower agrees to pay to each Lender making a Loan a funding fee in an amount equal to 8.00% of the amount of any Loan made by such Lender, which funding fee shall be earned on the date of the funding of any Loan by such Lender and payable in cash on the earliest to occur of (I) the repayment of such Loan (or any portion thereof, to the extent earned with respect to such portion), (II) the Maturity Date and (III) the acceleration of the Loans and the termination of all Commitments with respect to the Facility in accordance herewith.

(b)    The Borrower agrees to pay to each Lender an undrawn fee equal to 3.00% per annum of the undrawn and outstanding Commitments of such Lender, which undrawn fee shall be payable in cash on the earliest to occur of (I) the repayment of all loans and voluntary or mandatory termination or expiration of all Commitments hereunder, (II) the Maturity Date and (III) the acceleration of the Loans and the termination of all Commitments with respect to the Facility in accordance herewith.

(c)    The Borrower agrees to pay the Administrative Agent the fees in the amounts and on the dates as set forth in the Administrative Agent Fee Letter.

Section 2.05. *Optional Prepayments*. (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty but subject to the fees set forth in Section 2.04, upon irrevocable written notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, three (3) Business Days prior thereto, in the case of Eurodollar Loans, and no later than 11:00 A.M., New York City time, one (1) Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; *provided*, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall pay any amounts owing pursuant to Section 2.15(a). Upon receipt of any such notice, the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof, or, if less, the amount outstanding.

Section 2.06. *Mandatory Prepayments and Commitment Reductions*. (a) If any Indebtedness shall be issued or incurred by any Loan Parties (excluding any Indebtedness incurred in accordance with **Section** 6.01), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence to the prepayment of the Loans as set forth in **Section** 2.06(c).

Error! Unknown document property name.

(b)    If, on any date, any Loan Party shall receive Net Cash Proceeds from any Asset Sale or Recovery Event, then 100% of such Net Cash Proceeds shall be supplied on or prior to the fifth Business Day following the receipt of Net Cash Proceeds from such Asset Sale or Recovery Event to the prepayment of the Loans as set forth in **Section** 2.06(c).

(c)    If, for a period of ten consecutive Business Days Liquidity exceeds the projected cash balance for each such Business Day by $30,000,000 in the Initial DIP Budget or Rolling DIP Budget, as applicable, an amount equal to 100% of any such excess amount as of the last Business Day of such ten-Business-Day period shall be applied to the prepayment of the Loans on the next succeeding Business Day as set forth in **Section** 2.06(c).

(d)    Amounts to be applied in connection with prepayments made pursuant to **Section** 2.06(a) shall be applied to the prepayment of the Loans in accordance with **Section** 2.12(b). The application of any prepayment pursuant to **Section** 2.06(a) shall be made, first, to ABR Loans and, second, to Eurodollar Loans. Each prepayment of the Loans under **Section** 2.06(a) shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e)    The Borrower shall provide the Administrative Agent not later than 11:00 A.M., New York City time, one (1) Business Day's prior written notice of any prepayment under this Section 2.06.

(f)    All Commitments shall expire and be reduced to $0 on 5:00 P.M., New York City time, on the last day of the Availability Period.

Section 2.07. *Conversion and Continuation Options*. (a) The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election, in each case in the form of Exhibit E, appropriately completed (the "**Notice of Conversion/Continuation**"), no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, *provided* that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), *provided* that no ABR Loan under a particular Facility may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent (acting at the direction of the Required Lenders) has determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "**Interest Period**" set forth in **Section** 1.01, of the length of the next Interest Period to be

Error! Unknown document property name.

applicable to such Loans, *provided* that no Eurodollar Loan under a particular Facility may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent (acting at the direction of the Required Lenders) has determined in its sole discretion not to permit such continuations or (ii) if an Event of Default specified in clause (i) or (i) of **Section** 7.01(f)(i) with respect to the Borrower is in existence, and *provided*, *further*, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

Section 2.08. *Limitations on Eurodollar Tranches*. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be not less than $1,000,000 or a whole multiple of $100,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time (or, if less, the entire outstanding principal amount of any Loan).

Section 2.09. *Interest Rates and Payment Dates*. (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all overdue Loans shall bear interest at a rate per annum equal to in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% and (ii) if all or a portion of any interest payable on any Loan or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans under the relevant Facility plus 2% in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d)    Interest shall be payable in arrears on each Interest Payment Date; *provided* that (x) the portion of such interest attributable to the Eurodollar Rate or ABR, as applicable, shall be payable in cash on each Interest Payment Date and (y) the portion of such interest attributable to the Applicable Margin shall be payable in cash on the earliest to occur of (I) the repayment of such Loan (or any portion thereof, to the extent accrued thereon), (II) the Maturity Date and (III) the acceleration of the Loans and the termination of all Commitments with respect to the Facility in accordance herewith; *provided further* that interest accruing pursuant to paragraph (i) of this Section shall be payable in cash from time to time on demand.

Error! Unknown document property name.

(e)     Notwithstanding anything to the contrary in this Agreement or any other Loan Document, if the Administrative Agent determines (which determination shall be conclusive absent manifest error) or Borrower or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that Borrower or Required Lenders (as applicable), have determined that:

(i)     adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any requested Interest Period, including, without limitation, because the LIBOR Rate is not available or published on a current basis and such circumstances are unlikely to be temporary,

(ii)     the administrator of the LIBOR Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be made available or used for determining the interest rate of loans (such specific date, the "**Scheduled Unavailability Date**"), or

(iii)     syndicated loans currently being executed, or that include language similar to that contained in this Section 2.09(e), are being executed or amended (as applicable) to incorporate or adopt a new benchmark rate to replace the LIBOR Rate,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the LIBOR Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark)(if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such rate, a "**LIBOR Successor Rate**"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not accept such amendment.

If no LIBOR Successor Rate has been determine and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods) and (y) the Eurodollar Rate component shall no longer be utilized in determining the ABR.  Upon receipt of such notice, any Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a

Error! Unknown document property name.

borrowing of ABR Loans (subject to the foregoing clause (y)) in the amount specified therein.

Section 2.10. *Computation of Interest and Fees*. (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day), except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed (including the first day but excluding the last day). The Administrative Agent shall as soon as determined pursuant to this Agreement notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as determined pursuant to this Agreement notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to **Section** 2.09(a).

Section 2.11. *Inability to Determine Interest Rate*. If prior to the first day of any Interest Period:

(a)    the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent a manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)    the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period, the Administrative Agent shall give telecopy or written notice (which may be by email) thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans under the relevant Facility shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Facility to Eurodollar Loans.

Error! Unknown document property name.

Section 2.12. *Pro Rata Treatment and Payments*. (a) Each borrowing by the Borrower of the Loans from the Lenders hereunder shall be made pro rata according to the respective Loan Percentages of the Lenders.

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of all Loans then held by the Lenders. Amounts prepaid on account of the Loans may not be reborrowed.

(c)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. Any such payments made later than 12:00 Noon, New York City time on any day shall, at the sole discretion of the Administrative Agent, be deemed to have been made on the next succeeding Business Day for purposes of calculating interest thereon. The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to **Section** 8.07. If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three (3) Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrower.

36

(e)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three (3) Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)    If any Lender shall fail to make any payment required to be made by it pursuant to Sections **2.12.d**)i), 2.12.e), 2.14.e)i) or 8.07, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in any order as determined by the Administrative Agent in its discretion.

Section 2.13. *Requirements of Law*. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender or other Credit Party with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    shall impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)    shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable. If any Lender or such other Credit Party becomes entitled to

37

claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company as a consequence of its obligations hereunder (taking into consideration such Lender's or such Lender's holding company's policies with respect to capital adequacy or liquidity)by an amount deemed by such Lender to be material and, in any event, to a level below that which such Lender or such Lender's holding company could have achieved but for such change in Requirement of Law, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for such reduction.

(c)    Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented.

(d)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than six (6) months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; *provided* that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.14. *Taxes*. (a) Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings

Error! Unknown document property name.

applicable to additional sums payable under this Section 2.14(a)), the amounts received with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse the Administrative Agent for, any Other Taxes.

(c)     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this **Section** 2.14(a), such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     The Loan Parties shall jointly and severally indemnify each Credit Party, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis for the calculations of such payment or liability and including reasonable supporting evidence shall be prima facie evidence thereof absent manifest error.

(e)     Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section** 9.06(c)(i) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (i).

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested

Error! Unknown document property name.

by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than documentation relating to U.S. federal withholding taxes, including such documentation set forth in Section 2.14(f)(ii)(A), (B) and (D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

      (ii)    Without limiting the generality of the foregoing,

      (A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

      (B)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

      (1)    in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

      (2)    executed originals of IRS Form W-8ECI;

Error! Unknown document property name.

(3)     in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "ten (10) percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)    any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Credit Party under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Credit Party were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Credit Party shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the

41

Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Credit Party has complied with such Credit Party's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause 2.14(f)(ii)(D), "**FATCA**" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)    On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement, the Administrative Agent shall deliver to the Borrower two duly completed original copies of, if it is not a United States person (as defined in Section 7701(a)(30) of the Code), IRS Form W-8ECI or W-8BEN-E with respect to payments to be received by it as a beneficial owner and IRS Form W-8IMY (together with required accompanying documentation) with respect to payments to be received by it on behalf of the Lenders. If the Administrative Agent is a United States Person (as defined in Section 7701(a)(30) of the Code), the Administrative Agent shall deliver to the Borrower two duly completed original copies of IRS Form W-9. The Administrative Agent shall update such documentation on or before any date on which such documentation expires or becomes obsolete or invalid, after the occurrence of any change in the Administrative Agent's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time thereafter if reasonably requested by the Borrower, and shall promptly notify the Borrower in writing if it is no longer legally eligible to provide any documentation previously provided.

(h)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section** 2.14(a) (including by the payment of additional amounts pursuant to this **Section** 2.14(a)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make

Error! Unknown document property name.

available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Each party's obligations under this **Section** 2.14(a) shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(j)     For purposes of this **Section** 2.14(a), the term "applicable law" includes FATCA.

Section 2.15. *Indemnity*. The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.16. *Change of Lending Office*. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.13(a) or 2.14.a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; *provided*, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending offices to suffer no economic, legal or regulatory disadvantage, and *provided*, *further*, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.13(a) or 2.14.a).

Error! Unknown document property name.

Section 2.17. *Replacement of Lenders*. The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to ***Section*** 2.13(a) or 2.14.a), or (b) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders has been obtained), with a replacement financial institution; *provided* that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall not have eliminated the need for payment of amounts owing pursuant to ***Section*** 2.13(a) or 2.14.a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under ***Section*** 2.15(a) if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of ***Section*** 9.06(a) (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to ***Section*** 2.13(a) or 2.14.a), as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

Section 2.18. *Extension of Initial Maturity Date.* The Borrower shall have the right to extend the Initial Maturity Date to a date no later than August 31, 2020, subject to the following conditions: (i) the Borrower shall have provided the Administrative Agent (for distribution to the Lenders) with not less than five (5) Business Days' prior written notice of such extension and (ii) the Required Extension Lenders shall have consented to such extension in writing.

Section 2.19. *Incremental Loans*.

(a)    The Borrower may on one or more occasions, by written notice to the Administrative Agent, request the making of Incremental Loans; provided that (i) the making of any Incremental Loans shall require the prior written consent of the Required Lenders and (ii) the aggregate amount of all Incremental Loans after the Closing Date shall not exceed $20,000,000. Each such notice shall specify (A) the date on which the Borrower proposes the Incremental Loans to be made, which shall be a date not less than 10 Business Days (or such shorter period as may be agreed to by the Administrative Agent and the Required Lenders) after the date on which such notice is delivered to the Administrative Agent, and (B) the amount of the Incremental Loans being requested (it being agreed that (x) any Lender approached to provide any Incremental Loan may elect or decline, in its sole discretion, to provide such Incremental Loan and (y) any Person that the Borrower

Error! Unknown document property name.

proposes to become an Incremental Lender, if such Person is not then a Lender, must be reasonably acceptable to the Administrative Agent and the Required Lenders).

(b)    The terms and conditions of any Incremental Loans shall be, except as otherwise set forth herein or in the applicable Incremental Amendment, identical to those of the Loans that are then outstanding.

(c)    Any Incremental Loans shall be effected pursuant to one or more Incremental Amendments executed and delivered by the Borrower, each Incremental Lender providing such Incremental Loans and the Administrative Agent.  Each Incremental Amendment may, with the consent of the Required Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent and the Required Lenders, to give effect to the provisions of this Section 2.19.

(d)    Upon the making of an Incremental Loan by any Incremental Lender, such Incremental Lender shall be deemed to be a "Lender" hereunder, and henceforth shall be entitled to all the rights of, and benefits accruing to, Lenders hereunder and shall be bound by all agreements, acknowledgements and other obligations of Lenders hereunder and under the other Loan Documents.  Upon the making of any Incremental Loans, such Incremental Loans shall be deemed to be and treated as New Money Loans for all purposes of this Agreement.

Section 2.20. *Priority and Liens; No Discharge*.

(a)    [__]³

## Article 3
### REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender that, as of the Closing Date:

Section 3.01. *Organization; Powers*. Each Loan Party (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.02. *Authorizations; Enforceability*. Subject to the entry of the Orders and subject to the terms thereof, the Transactions to be entered into by each Loan Party are

---

³ NTD: Language from order to be inserted.

Error! Unknown document property name.

within such Loan Party's powers and have been duly authorized by all necessary limited liability company and limited partnership action on the part of such Loan Party. Subject to the entry of the Orders and subject to the terms thereof, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03. *Governmental Approvals; No Conflicts*. Subject to the entry of the Orders and subject to the terms thereof, the Transactions (i) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (A) such as has been obtained or made and are in full force and effect, (B) filings necessary to perfect or maintain Liens created by the Security Documents and (C) consents, approvals, registrations, filings, permits or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Effect, (ii) do not violate the Organizational Documents of any Loan Party or any Requirement of Law, except, in each case, for any such violation which could not reasonably be expected to result in a Material Adverse Effect, (iii) do not violate or result in a default or require any consent or approval under any contractual obligation binding upon any Loan Party or its property, or give rise to a right under any of the foregoing to require any payment to be made by any Loan Party, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect and (iv) do not result in the creation or imposition of any Lien on any property of any Loan Party, except Liens permitted pursuant to **Section** 6.02.

Section 3.04. *Financial Statements; Material Adverse Effect*.

(a)    *Financial Statements*. All financial statements delivered pursuant to **Section** 5.01 have been prepared in accordance with GAAP consistently applied and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of Borrower and its Subsidiaries as of the dates and for the periods to which they relate, except for, in the case of interim financial statements delivered, the absence of footnote disclosures and normal year-end adjustments.

(b)    *No Material Adverse Effect*. Since December 31, 2018, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect; *provided*, *however*, that any adverse change, event or effect arising from or related to any of the following shall not be deemed to constitute and shall not be taken into account in determining whether a material adverse effect has occurred: (i) changes in general economic conditions or changes affecting the industries in which the Borrower or any of its Subsidiaries operates (except to the extent that such changes have a disproportionately adverse effect on the Borrower and its Subsidiaries, taken as a whole), (ii) macroeconomic factors, interest rates, currency exchange rates or general financial market conditions (except to the extent that such changes have a disproportionately adverse effect on the Borrower and its Subsidiaries,

46

taken as a whole), (iii) changes in GAAP and other accounting requirements after the Closing Date and/or (iv) changes in or effects arising from or relating to changes in laws, rules or regulations applicable to the Borrower or any of its Subsidiaries (except to the extent that such changes have a disproportionately adverse effect on the Borrower and its Subsidiaries, taken as a whole).

(c)     *Rolling DIP Budget*. The Initial DIP Budget, which has heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to (i) the Transactions and (ii) the payment of fees and expenses in connection with the foregoing. The Initial DIP Budget presents fairly the estimated financial position of Borrower and its consolidated Subsidiaries for the periods covered therein.

Section 3.05. *Properties*.

(a)     *Generally*. Each Loan Party has good title to, a license to or valid leasehold or easement interests in, all its property material to its business, free and clear of all Liens except for Liens permitted pursuant to **Section** 6.02 and, in the case of all other property, Liens permitted pursuant to **Section** 6.02 and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose in either case, except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The property of the Loan Parties, taken as a whole, except with respect to the effects of the June 21 Incident (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Loan Parties as presently conducted.

(b)     *No Recovery Event*. No Loan Party has received any written notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Recovery Event affecting all or any portion of its property, which Recovery Event could reasonably be expected to have a Material Adverse Effect.

(c)     *Collateral*. No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 3.06. *Intellectual Property*. Each Loan Party owns, licenses or possesses the right to use all of the trademarks, service marks, trade names, copyrights, patents, franchises, licenses and other intellectual property rights (collectively, "**IP Rights**") that are necessary for the operation of its respective business, as currently conducted, and such IP Rights do not conflict with the rights of any other Person, except to the extent such failure to own, license or possess or such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The conduct of the business of any Loan Party as currently conducted or as contemplated to be conducted does not infringe upon or violate any rights held by any other Person except for such infringements and violations which, individually or in the aggregate, could not reasonably

47

be expected to have a Material Adverse Effect. No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 3.07. *Capital Stock and Subsidiaries*. Each Loan Party has no Subsidiaries other than those set forth on Schedule 3.07. Schedule 3.07 sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party. All of the outstanding Capital Stock in such Subsidiaries that are owned by a Loan Party have been validly issued, are fully paid and non-assessable (to the extent such concepts are applicable in the relevant jurisdiction) and are owned free and clear of all Liens except Liens permitted pursuant to **Section** 6.02.

Section 3.08. *Litigation; Compliance with Laws; No Default*.

(a)     Except as set forth in Schedule 3.08(a) and except for the Cases, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Loan Party, threatened in writing against or affecting any Loan Party or any business, property or rights of any Loan Party (i) that involve any Loan Document or, as of the Closing Date, any of the other Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except for matters covered by **Section** 3.17(a), no Loan Party or any of its businesses, operations and Real Property is in violation of, nor will the continued operation of its businesses, operations or the facilities and properties owned, leased or operated by such Loan Party as currently conducted or contemplated by any Contractual Obligation of such Loan Party violate, any Requirements of Law where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(c)     No Default or Event of Default has occurred and is continuing.

(d)     Other than as described on Schedule 3.08(d), the Borrower or any Affiliate thereof has obtained all Material Permits; all such Material Permits are valid and in good standing and, where subject to renewal and/or transfer, the Loan Parties have timely submitted complete renewal and/or transfer applications; the Borrower is currently in compliance with all such Material Permits, other than any non-compliance that could not reasonably be expected to have a Material Adverse Effect.

Section 3.09. *Federal Reserve Regulations*. No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately,

Error! Unknown document property name.

incidentally or ultimately, for any purpose that violates the provisions of Regulation T, U or X.

Section 3.10. *Investment Company Act*. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section 3.11. *Use of Proceeds*. All proceeds of the Loans shall be and shall have been used by the Loan Parties solely for the purposes permitted under Sections 5.13 and 5.14.a) of this Agreement.

Section 3.12. *Taxes*. Each Loan Party has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP, (ii) which the nonpayment of could not be reasonably expected to, individually or in the aggregate result in a Material Adverse Effect, or (iii) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court and (c) satisfied all of its withholding tax obligations except for failures that could not be reasonably expected to, individually or in the aggregate result in a Material Adverse Effect.  Each Loan Party is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.13. *No Material Misstatements*. (a) All written information, other than projections and information of a general economic or industry specific nature, that has been made available by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby, when taken as a whole, was or is correct in all material respects and did not or does not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates thereto that may have been subsequently delivered) and (b) the financial projections and other forward- looking information (giving effect to all supplements and updates thereto that may have been subsequently delivered) that have been made available by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby have been prepared in good faith based upon assumptions believed by such Loan Party to be reasonable at the time furnished (it being recognized that such projections are as to future events and are not to be viewed as facts, such projections are subject to significant uncertainties and contingencies, many of which are beyond such Loan Party's control, that no assurance can be given that any such projections will be realized and that actual results during the period or periods covered by

Error! Unknown document property name.

any such projections may differ significantly from the projected results and such differences may be material).

Section 3.14. *Labor Matters*. There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other Requirement of Law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages have been paid or accrued as a liability on the books of such Loan Party except as described on Schedule 3.14 or where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

Section 3.15. *[Reserved]*.

Section 3.16. *ERISA*. (a) Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Loan Party and, with respect to a Pension Plan, as applicable, each ERISA Loan Party is in compliance with all applicable provisions and requirements of ERISA and the Code and other federal and state laws and the regulations and published interpretations thereunder with respect to each Plan and Pension Plan and have performed all their obligations required to have been performed under each Plan and Pension Plan; (ii) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur; (iii) each Plan which is intended to qualify under Section 401(a) of the Code has either received from the Internal Revenue Service a favorable determination letter or, if such Plan is a master or prototype plan, it has received a favorable opinion letter from the Internal Revenue Service or, if such Plan is a volume submitter plan, it has received a favorable advisory letter from the Internal Revenue Service and, there are no circumstances reasonably likely to result in revocation of any such letter; (iv) no liability to the PBGC (other than required premium payments), has been or is expected to be incurred by any Loan Party or any ERISA Affiliate; (v) no ERISA Event has occurred and, to the knowledge of the Borrower, no fact, event or circumstance exists that could reasonably be expected to constitute or result in an ERISA Event; and (vi) each Loan Party and each ERISA Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan, as applicable, and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(b)    The Borrower is currently not and at any time during the term of this Agreement will not be (i) an employee benefit plan, as defined in, and subject to Title I of ERISA, (ii) a "plan" as defined in, and subject to Section 4975 of the Code, (iii) an entity deemed to hold "plan assets" of any such "employee benefit plan" or "plan" for purposes of the U.S. Department of Labor Regulation located at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA or (iv) a "governmental plan" within the meaning of 3(32) of ERISA.

Error! Unknown document property name.

Section 3.17. *Environmental Matters*. (a) Except as set forth in Schedule 3.17, and except as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect:

(i)    The Loan Parties and their businesses, operations and Real Property are in compliance with all and are not in violation of any applicable Environmental Law and possess all Environmental Permits required to conduct their business and operations in accordance with applicable Environmental Law; all such Environmental Permits are valid and in good standing and, where subject to renewal and/or transfer, the Loan Parties have timely submitted complete renewal and/or transfer applications and timely and adequately responded to any requests from any Governmental Authority in connection with such applications; and there are no proceedings pending or, to the knowledge of the Loan Parties, threatened which could reasonably be expected to affect the validity of any such Environmental Permit or the ability of the Loan Parties to renew, modify or transfer any Environmental Permits as required under any Environmental Law;

(ii)    There has been no Release or, to the knowledge of the Loan Parties, threatened Release of Hazardous Material on, at, under or from any Real Property, or other facilities currently owned, leased or operated by the Loan Parties, or any other location, that has resulted in, or would reasonably be expected to result in any Environmental Liability of the Loan Parties;

(iii)    There is no Environmental Claim pending or, to the knowledge of the Loan Parties, threatened against the Loan Parties, or relating to any Real Property, or other facilities currently owned, leased or operated by the Loan Parties;

(iv)    Except as set forth on Schedule 3.17, to the knowledge of any Loan Party, no Person with an indemnity or contribution obligation to the Loan Parties relating to compliance with or liability under Environmental Law is in default or, to the knowledge of any Loan Party, has defaulted or threatened to default with respect to such obligation;

(v)    [Reserved];

(vi)    No Loan Party is obligated to perform any action or otherwise incur any expense under applicable Environmental Law pursuant to any order, decree, judgment or agreement to which it is bound or has assumed by contract or agreement, and no Loan Party is conducting or financing any investigation, remediation or other response action pursuant to any Environmental Law with respect to any Real Property or any other location;

(vii)    No Real Property or facility is owned, leased or operated by any Loan Party that is material to its business and is listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or included on any similar list maintained by any Governmental Authority; and

51

(viii)    No Lien has been recorded or, to the knowledge of any Loan Party, threatened under any Environmental Law with respect to any Real Property or other assets of the Loan Parties.

Section 3.18. *Insurance*. Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by each Loan Party as of the Closing Date. All insurance maintained by the Loan Parties is in full force and effect, all premiums have been duly paid, no Loan Party has received notice of any material violation or cancellation thereof.

Section 3.19. *Security Documents*. Subject to, and upon the entry of the Orders, each of the Orders and each Security Document (and the Mortgage upon delivery thereof) is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law) Liens on, and security interests in, the Collateral to the extent that an enforceable Lien in such Collateral may be created under any applicable law of the United States or any state thereof, including the applicable UCC and when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 5 to the Perfection Certificate with payment of any associated filing fee and (ii) upon the taking of possession or control by the Administrative Agent of the Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by such Security Document), the Liens created by the Security Documents shall constitute perfected Liens on, and security interests in, all right, title and interest of the grantors in the Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Liens permitted pursuant to ***Section*** 6.02.

Section 3.20. *Anti-Terrorism Laws*.

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary (i) has violated or is in violation of Anti-Terrorism Laws or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of the respective officers, directors, employees or brokers of such Loan Party, such Subsidiary, or agents of such Loan Party, such Subsidiary acting or benefiting in any capacity in connection with the Loans, is a Sanctioned Person or is owned or controlled by one or more Persons that are Sanctioned Persons.

Error! Unknown document property name.

(c)     Each Loan Party, its Subsidiaries and, to the knowledge of each Loan Party and the respective officers, directors, employees, brokers and agents of such Loan Party, such Subsidiary and such Affiliate are in compliance with sanctions administered by OFAC, all applicable Anti-Terrorism Laws and all applicable Anti-Corruption Laws.

Section 3.21. *Affiliate Transactions*. Except as permitted by Section 6.08(a), there are no existing or proposed agreements, arrangements, understandings or transactions between any Loan Party, Affiliate of any Loan Party or any of their respective officers, members, managers, directors, stockholders, parents, other interest holders or employees, or any members of their respective immediate families.

Article 4

CONDITIONS PRECEDENT

Section 4.01. *Conditions of Effectiveness*. This Agreement shall become effective upon the satisfaction or waiver of the following conditions precedent:

(a)     *Agreement; Security Agreement*. The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person listed on Schedule 1.01A, and (ii) the Security Agreement, executed and delivered by the Borrower and each Subsidiary Guarantor.

(b)     [Reserved].

(c)     *Lien Searches*. The Administrative Agent shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by **Section** 6.02 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.

(d)     *Fees*. (i) The Administrative Agent shall have received a fully-executed copy of the Administrative Agent Fee Letter, and (ii) the Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), in each case on or before the Closing Date.

(e)     *Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates; Perfection Certificate*. The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party, (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization, and (iii) a Perfection Certificate.

(f)     *Legal Opinions*. The Administrative Agent shall have received a legal opinion of Kirkland & Ellis LLP, counsel to the Borrower and the other Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent.

Error! Unknown document property name.

(g)    [Reserved].

(h)    *Initial DIP Budget*. The Administrative Agent shall have received the Initial DIP Budget.

(i)    [Reserved]

(j)    [Reserved]

(k)    *Material Approvals*. All material Governmental Authority and, except as set forth on Schedule 3.03, third party licenses, registrations, permits, consents and approvals necessary in connection with this Agreement and the transactions contemplated hereby shall have been obtained and no law, regulation, order or decree is then in effect that materially and adversely restrains or prevents this Agreement or the Transactions or imposes conditions that materially impair the rights, or materially increase the liabilities or obligations, of the Administrative Agent or the Lenders, without the prior consent of the Administrative Agent each affected Lender (not to be unreasonably withheld or delayed).

(l)    [Reserved]

(m)    *Representations and Warranties*. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if qualified by materiality) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date.

(n)    *No Default*. No Default or Event of Default shall have occurred and be continuing on the Closing Date or after giving effect to the extension of credit hereunder on the Closing Date.

(o)    *Patriot Act Information; Beneficial Ownership Certification*. The Administrative Agent and the Lenders shall have received all documentation and other information about the Loan Parties as is reasonably requested in writing at least three (3) days prior to the Closing Date by the Administrative Agent or the Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and the Beneficial Ownership Certification.

(p)    *Petition Date*. The Petition Date shall have occurred.

(q)    *Entry of Interim Order*. Not later than five (5) days following the Petition Date (or such later date as the Required Lenders may agree in their reasonable discretion), the Administrative Agent and the Lenders shall have received reasonably satisfactory evidence of the entry of the Interim Order, which shall not have been vacated, reversed modified, amended or stayed without the consent of the Required Lenders.

Error! Unknown document property name.

(r)    *First Day Orders*. All "first day" orders and all related pleadings intended to be entered on or prior to the date of entry of the Interim Order shall have been entered by the Bankruptcy Court, shall not have been modified, stayed or vacated (except with the consent of the Required Lenders and such consent shall not be unreasonably withheld, delayed or conditioned), and shall be reasonably satisfactory in form and substance to the Required Lenders, it being understood that drafts approved by counsel to the Required Lenders prior to the Petition Date are reasonably satisfactory.

(s)    *No Trustee*. No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(t)    [Reserved].

(u)    The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this **Section** 4.01 and in **Section** 4.02.

For the purpose of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 4.01 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02. *Conditions to All Borrowings of Loans*. The obligation of each Lender to honor any Notice of Borrowing of Loans, including any Borrowing to occur on the Closing Date, is subject to the following conditions precedent:

(a)    The Closing Date shall have occurred.

(b)    (i) With respect to the Borrowing under the Initial Commitments, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders and (ii) with respect to the Borrowing under the Final Commitments, the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders.

(c)    The representations and warranties of each Loan Party contained in **Article** 3 or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) on and as of the date of such borrowing of Loans, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that for purposes of this **Section** 4.02,

Error! Unknown document property name.

the representations and warranties contained in **Section** 3.04 shall be deemed to refer to the most recent statements furnished pursuant to **Section** 5.01(a)(c), respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries.

(d)    No Default or Event of Default shall exist, or would result from such proposed borrowing of Loans or from the application of the proceeds thereof.

(e)    (i) All fees required to be paid to the Administrative Agent on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid and (ii) all fees required to be paid to the Lenders on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid.

(f)    Unless waived by the Administrative Agent and the Required Lenders, the Borrower shall have paid all reasonable and documented fees, charges and disbursements of Norton Rose Fulbright US LLP and Davis Polk & Wardwell LLP, counsel to the Administrative Agent and Lenders, respectively (directly to such counsel if requested by the Administrative Agent), and local counsel to the Administrative Agent in each applicable jurisdiction, in each case in accordance with **Section** 9.05(a) and solely to the extent invoiced no later than five Business Days prior to the date of such borrowing of Loans.

(g)    The Administrative Agent shall have received a Notice of Borrowing in accordance with the requirements hereof.

(h)    After giving effect to the proposed Borrowing, Liquidity (as projected in good faith by the Borrower) at the end of the four week period following the receipt of the proceeds thereof, will not exceed $30,000,000.

Article 5

AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and shall cause each of its Subsidiaries to:

Section 5.01. *Financial Statements*. Furnish to the Administrative Agent for prompt distribution to each Lender:

(a)    [reserved];

(b)    [reserved];

(c)    as soon as available, but in any event not later than forty-five (45) days after the end of each fiscal month of each fiscal year of the Borrower beginning from the fiscal month ending on July 31, 2019, the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such fiscal month and the related unaudited consolidated statements of income and of cash flows (if any) for such fiscal month and the

Error! Unknown document property name.

portion of the fiscal year then ended through the end of such fiscal month, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnote disclosures);

(d)    as soon as available, but in any event no later than ten (10) Business Days after the end of each month, a report on the amount of professional fees and expenses paid during such month;

(e)    in any event no later than on the fourth Business Day of each four-week period after the Closing Date, a proposed Rolling DIP Budget; and

(f)    on or prior to each fourth Business Day of each weekly period after the Closing Date, a Budget Variance Report and a report setting forth Liquidity on the last Business Day of the most recently ended week, each in a form reasonably similar to what has been previously provided by the Debtors.

Section 5.02. *Certificates; Other Information*. Furnish to the Administrative Agent for prompt distribution to each Lender (or, in the case of clause (i), to the relevant Lender):

(a)    within one hundred twenty  (120)  days after the end of the fiscal year of the Borrower ended December 31, 2019 and within sixty (60) days after the end of each of the first three quarterly periods of each fiscal year of the Borrower beginning from the fiscal quarter ending on June 30, 2019, (i) a certificate of a Responsible Officer stating that Responsible Officer has obtained no knowledge of any Default or Event of Default except as previously disclosed pursuant to Section 5.07(a)(i) or as specified in such certificate (and, in such case, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto) and (ii) (x) a Compliance Certificate and (y) to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2) a list of any Trademarks (as such term is defined in the Security Agreement) acquired by any Loan Party and (3) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (y) (or in the case of the first such report so delivered, since the Closing Date);

(b)    [Reserved];

(c)    [Reserved];

(d)    no later than five (5) Business Days following the effectiveness thereof, copies of any amendment or other modification with respect to any Supply and Offtake Document;

(e)    within five (5) days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its public debt or equity securities and, within five (5) days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC (*provided* that such financial statements and reports shall be deemed delivered pursuant to this clause (e) if made available to the Lenders at the SEC's website);

Error! Unknown document property name.

(f)    promptly upon request of the Administrative Agent, copies of any documents described in Section 101(k) or 101(l) of ERISA that any ERISA Loan Party may request with respect to any Multiemployer Plan to which an ERISA Loan Party is obligated to contribute; *provided*, that if the relevant ERISA Loan Party has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such ERISA Loan Party shall promptly make a request for such documents or notices from such administrator or sponsor and the ERISA Loan Party shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(g)    within fourteen (14) Business Days (or such longer period as the Administrative Agent may agree) after the delivery of information and certifications pursuant to **Section 5.01(a)** the Borrower shall conduct a meeting by teleconference at a time during normal business hours announced to the Lenders at least one (1) Business Day in advance with the Administrative Agent and the Lenders to discuss the business and other affairs of the Debtors;

(h)    promptly, such additional financial and other information as any Lender may from time to time reasonably request; and

(i)    (i) as soon as commercially reasonable in advance of filing with the Bankruptcy Court or delivering to any statutory committee appointed in the Cases or the U.S. Trustee, as the case may be, the Final Order and all other proposed orders and pleadings related to the Loans and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Reorganization Plan and/or any disclosure statement related thereto and (ii) by the earlier of (A) four (4) days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure.

Section 5.03. *Payment of Taxes*. In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay, discharge or otherwise satisfy before they become delinquent, all its Taxes of whatever nature (in the case of any Debtor, solely to the extent arising post-petition), except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves or other provisions in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or the failure to pay would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

Error! Unknown document property name.

Section 5.04. *Maintenance of Existence; Compliance.* (a) Preserve and keep in full force and effect its organizational existence (except, in the case of any Subsidiary, where the failure to do so could not reasonably be expected to result in a Material Adverse Effect) and (b) comply with all Requirements of Law except to the extent that failure to comply therewith (x) is otherwise excused by the Bankruptcy Court or (y) could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.05. *Maintenance of Property; Insurance.* (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, and except with respect to the direct and indirect effects of the June 21 Incident.

(b)     Maintain, and cause each Loan Party to maintain, with financially sound and reputable companies, insurance policies (i) insuring the inventory and equipment against loss by fire, explosion, theft and such other casualties in such form and amounts and having such coverage as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties and (ii) to the extent requested by the Administrative Agent, insuring the Loan Parties, the Administrative Agent and the Lenders against liability for personal injury or property damage relating to such inventory and equipment, such policies to be in such form and amounts and having such coverage as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties.

(c)     All such insurance shall (i) provide that no cancellation in coverage thereof shall be effective until at least thirty (30) days after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent as insured party or loss payee with respect to applicable insurance policies, and (iii) if reasonably requested by the Administrative Agent, include a breach of warranty clause.

(d)     [Reserved].

Section 5.06. *Inspection of Property; Books and Records; Discussions.* (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect (to the extent not in contravention of applicable health, safety and environmental rules) any of its properties and examine and make abstracts from any of its books and records at any reasonable time and, unless an Event of Default has occurred and is continuing, no more than once per fiscal year, and to discuss the affairs, finances, accounts, prospects and condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants.  Notwithstanding anything to the contrary in this Section 5.05(d), none of the Group Members will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by any Requirement of Law or binding agreement or (ii) that is subject to attorney-client privilege or constitutes attorney work product.

Error! Unknown document property name.

Section 5.07. *Litigation and Other Notices*. Furnish to the Administrative Agent written notice of the following promptly (and, in any event, within five (5) Business Days of a Responsible Officer having knowledge of the occurrence thereof):

(a)    (i) the occurrence of any Default or Event of Default, (ii) the occurrence of any event of default under the Supply and Offtake Agreement (that is not subject to a forbearance agreement by ICBC Standard Bank PLC and the other applicable parties thereto) and (iii) any notices under, or amendments and modifications of such forbearance agreement, in each case, other than as solely resulting from the Cases;

(b)    the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Loan Party or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)    any post-petition litigation or proceeding affecting any Group Member (i) in which the amount involved is $5,000,000 or more and not covered by insurance or (ii) in which injunctive or similar relief is sought;

(d)    (i) the occurrence of any ERISA Event that alone, or together with any other ERISA Event, could reasonably be expected to result in liability of the ERISA Loan Parties in an aggregate amount exceeding $5,000,000 or the imposition of a Lien on the assets of any ERISA Loan Party, a written notice specifying the nature thereof, what action any of the ERISA Loan Parties is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the IRS, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, upon Administrative Agent's reasonable request, copies of: (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by, any of the ERISA Loan Parties with the Department of Labor with respect to each Pension Plan; (2) all notices received by any of the ERISA Loan Parties from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Plan or Pension Plan sponsored by an ERISA Loan Party as Administrative Agent shall reasonably request; and

(e)    any development that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.07 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

Section 5.08. *Environmental Laws*. (a) Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect: (i) comply in all respects with, and exert commercially reasonable efforts to ensure compliance in all respects by all tenants and subtenants, if any, with all applicable Environmental Laws and (ii) obtain and comply in all respects with and maintain, and exert commercially reasonable

Error! Unknown document property name.

efforts to ensure that all tenants and subtenants obtain and comply in all respects with and maintain, any and all Environmental Permits applicable to its operations required by applicable Environmental Laws.

(b)    (i) Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws, except where failure to conduct such investigations, studies, sampling and testing and such remedial, removal and other actions would not reasonably be expected to result in a Material Adverse Effect and (ii) promptly comply in all respects with all orders and directives of all Governmental Authorities regarding Environmental Laws, unless all measures to challenge such orders and directives have been timely taken or the failure to comply with such orders or directives, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.09. *Credit Rating*. The Borrower shall use commercially reasonable efforts (i) no later than twenty (20) Business Days after the Closing Date, to request a preliminary ratings estimate (but not a specific rating) by each of Moody's and S&P in respect of the Facility and (ii) to maintain at all times, beginning with the date that is 60 days after the Closing Date, a credit rating (but not a specific rating) by each of Moody's and S&P in respect of the Facility.

Section 5.10. *Additional Collateral, etc.* (a) Subject to this **Section** 5.10(a), with respect to any property acquired after the Closing Date by any Group Member (other than (x) any real property or other property described in paragraph (b), (i) or (d) below and (y) any property subject to a Lien expressly permitted by **Section** 6.02(e)(1) or **6.02.j**)) that is of the same type as that included as Collateral in the Security Documents and/or the Orders and that is intended to be subject to the Lien created by any of the Security Documents and/or the Orders as to which the Administrative Agent, acting in its capacity as collateral agent on behalf of the Lenders, does not have a perfected Lien, promptly (and in any event within thirty (30) days after the acquisition thereof or such longer period of time not to exceed an addition thirty (30) days as may be permitted by the written consent of the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, acting in its capacity as collateral agent on behalf of the Lenders, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent.

(b)    [Reserved].

(c)    With respect to any new Subsidiary created or acquired after the Closing Date by any Group Member, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement as the Administrative Agent deems, in its reasonable discretion, to be necessary or advisable to grant to the Administrative Agent,

Error! Unknown document property name.

for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii) cause such new Subsidiary (A) to become a Guarantor and Loan Party under this Agreement, by executing an assumption agreement, and to become a party to the Security Agreement, (B) to take such actions reasonably necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected first priority security interest in the Collateral described in the Security Agreement with respect to such new Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent, (C) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments and (D) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance comparable or analogous to the applicable opinions delivered on the Closing Date and shall be from counsel reasonably satisfactory to the Administrative Agent.

(d)     Notwithstanding anything in this Agreement or any Security Document to the contrary, in no event shall the Collateral include, and no Loan Party or any Subsidiary shall be required to take any action to create, grant or perfect a security interest in, any property or assets that constitutes Excluded Property (as defined in the Security Agreement).

Section 5.11. *[Reserved]*.

Section 5.12. *[Reserved]*.

Section 5.13. *Anti-Terrorism Laws, Sanctions, Anti-Corruption Laws*.

(a)     The Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with **Section** 6.15(a).

(b)     Comply in all material respects with sanctions administered by OFAC, all applicable Anti-Terrorism Laws and all applicable Anti-Corruption Laws.

Section 5.14. *Use of Proceeds*. Use the proceeds of the Loans (a) in each case solely in accordance with (subject to Budget Variances permitted pursuant to Section 6.17) the Initial DIP Budget and any subsequent Rolling DIP Budget for safing, general and administrative expenses, the marketing and sales process, the administration of the Cases, operating expenses necessary to maximize the value of the Collateral, expenses (including legal expenses) related to the recovery of June 21 Insurance Proceeds and the investigation of the June 21 Incident, any expenses incurred in connection with compliance with the Loan Documents, and for Bankruptcy Court approved administrative expenses for estate professionals and (b) such other expenses to which the Required Lenders may consent in their sole direction, in each case not in contravention of any Law or of any Loan Document.

Error! Unknown document property name.

Notwithstanding anything to the contrary herein, the proceeds of the Loans shall not be used for costs solely attributable to the realization of the SOA Separate Assets and Collateral or SOA Priority Collateral, including access to crude and product SOA Separate Assets and Collateral or non-crude feedstock purchases (it being understood and agreed that the utilization of cash maintained in the same deposit account as proceeds of Loans shall not, in and of itself, be deemed to be a utilization of the proceeds of Loans).

Section 5.15. *First and Second Day Orders*. Cause all proposed "first day" orders, "second day" orders and all other orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are reasonably acceptable and any orders that provide for the termination of the Commitments and the indefeasible repayment of the Obligations, in full and, subject to Section 2.03, in cash, on or before the date of entry of such order are reasonably acceptable.

Section 5.16. *Post-Closing Obligations*. The Loan Parties will execute and deliver the documents and complete the tasks set forth on Schedule 5.16, in each case within the time limits specified on such schedule (or such longer period as the Administrative Agent may agree in its sole discretion).

Section 5.17. *Milestones*.

(a)     the Interim DIP Order shall be entered within 5 days of the Petition Date;

(b)     the Final DIP Order shall be entered within 35 days of the Petition Date;

(c)     a report of the steps the Loan Parties have taken and intend to take as a response to the June 21 Incident shall be delivered to the Administrative Agent (for distribution to the Lenders) within 45 days of the Petition Date;

(d)     the Borrower shall have entered into Management Compensation Plans within 30 days of the Petition Date;

(e)     [____][4];

(f)     a marketing plan reasonably acceptable to the Required Lenders shall be delivered to the Administrative Agent (for distribution to the Lenders) within 75 days of the Petition Date;

(g)     the Acceptable Disclosure Statement shall be filed within 100 days of the Petition Date;

---

[4] NTD: provisions regarding court actions with respect to insurance proceeds to be incorporated from the order.

Error! Unknown document property name.

(h)    an order approving the Acceptable Disclosure Statement shall be entered within 150 days of the Petition Date;

(i)    the Acceptable Plan of Reorganization shall be confirmed within 205 days of the Petition Date; and

(j)    the Acceptable Plan of Reorganization shall be consummated within 225 days of the Petition Date.

Article 6

NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

Section 6.01. *Indebtedness*. Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

(b)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary Guarantor to the Borrower or any other Subsidiary;

(c)    Guarantee Obligations incurred in the ordinary course of business by the Borrower or any of its Subsidiaries of post-petition obligations of the Borrower or any Subsidiary Guarantor permitted to be incurred hereunder;

(d)    Indebtedness outstanding on the Petition Date and any guarantees therefor, in each case permitted to be outstanding on the Petition Date pursuant to Section 6.01 of the Existing Term Loan Credit Agreement;

(e)    Indebtedness (including, without limitation, Purchase Money Obligations, any Attributable Indebtedness and Capital Lease Obligations) secured by Liens permitted by **Section** 6.02(e)(1), any Indebtedness financing the acquisition, construction, repair, replacement or improvement of any fixed or capital assets and refinancings or renewals thereof and in an aggregate principal amount not to exceed $0 at any one time outstanding;

(f)    [Reserved];

(g)    [Reserved];

(h)    [Reserved];

(i)    [Reserved];

(j)    [Reserved];

Error! Unknown document property name.

(k)    Indebtedness in respect of indemnification, purchase price adjustments or other similar obligations incurred by any Loan Party in a Disposition under agreements which provide for indemnification, the adjustment of the purchase price or for similar adjustments;

(l)    [Reserved];

(m)    [Reserved];

(n)    Indebtedness in respect of netting services, overdraft protections, credit card programs, automatic clearinghouse arrangements and similar arrangements in each case in connection with deposit accounts and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(o)    Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(p)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary; provided that the aggregate amount of Indebtedness outstanding under this Section 6.01(p) shall not (when combined with the aggregate amount of all Indebtedness outstanding under Section 6.01(x)) exceed $0 at any time outstanding;

(q)    Indebtedness consisting of (i) Indebtedness issued to insurance companies, or their affiliates, consisting of obligations with respect to the deferred payment of insurance premiums payable to such insurance companies, or their affiliates, in connection with policies purchased the Borrower or any of its Subsidiaries in the ordinary course of business not to exceed $15,000,000 at any time outstanding or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)    Indebtedness of the Borrower or any Restricted Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business (including with respect to customer deposits of advance payments received);

(s)    (i) unsecured Indebtedness in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods

Error! Unknown document property name.

sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(t)    unsecured Indebtedness of any Loan Party in an aggregate amount not to exceed $2,500,000; *provided*, that such Indebtedness has a later final maturity date than the Indebtedness incurred under this Agreement and the other Loan Documents;

(u)    Indebtedness incurred in connection with Environmental and Necessary Capex in an amount not to exceed $10,000,000 in the aggregate;

(v)    [Reserved];

(w)    [Reserved];

(x)    Indebtedness in respect of letter of credit facilities for the purposes set forth in **Section** 6.02(dd)(A)(A) and (B) in an aggregate amount not to exceed (when combined with the aggregate amount of all Indebtedness outstanding under Section 6.01(p)) $0 at any time outstanding;

(y)    [Reserved]; and

(z)    Indebtedness of any Loan Party in respect of a deferred compensation plan that provides bonus payouts to employees of any Loan Party over a defined period based on a percentage of the bonus paid in any given year or any incentive or retention based program in existence prior to the Petition Date.

Section 6.02. *Liens*. Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except the following:

(a)    Liens for pre-petition Taxes not yet due as of the Petition Date or that are being contested in good faith by appropriate proceedings diligently conducted or post-petition Taxes not yet due or that are being contested in good faith by appropriate proceedings diligently conducted, *provided* that, in each case, adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)    carriers', warehousemen's, mechanics', materialmen's, landlord's, workmen's, suppliers', repairmen's or other like Liens arising in the ordinary course of business;

(c)    Liens incurred in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation, (ii) securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries or under self-insurance arrangements in respect of such obligations or (iii) securing obligations in respect of letters of credit that have been posted by the Borrower or any of its Restricted Subsidiaries to support the payment of items set forth in clauses (i) and (ii);

Error! Unknown document property name.

(d)     Liens to secure the performance of tenders, statutory obligations, bids, trade contracts, governmental contracts, leases and other contracts (other than Indebtedness for borrowed money), statutory obligations (other than any such obligation imposed pursuant to Section 430(k) of the Code or 303(k) of ERISA), surety, stay and appeal bonds, performance and return-of-money bonds, performance and completion guarantees and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations, (ii) those required or requested by any Governmental Authority and (iii) letters of credit issued in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business;

(e)     Liens securing Indebtedness of the Borrower or any Subsidiary incurred pursuant to Section **6.01.e**), in each case, to finance the acquisition of fixed or capital assets (provided that (1) such Liens shall be created no later than 180 days after the acquisition of such fixed or capital assets, (2) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds therefrom and (3) the amount of Indebtedness secured thereby is not increased);

(f)     Liens in existence on the date hereof permitted to be outstanding on the Petition Date pursuant to Section 6.02 of the Existing Term Loan Credit Agreement; *provided* that, in each case, no such Lien is spread to cover any additional property (other than after-acquired property that is affixed or incorporated into the property encumbered by such Lien on the Closing Date) after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)     easements, rights-of-way, restrictions (including zoning restrictions and other similar permits), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, in each case existing on the Closing Date or as are incurred in the ordinary course of business and all other non-material exceptions to title that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(h)     any conditions to the Real Property shown on a current survey of the property which has been delivered to the Administrative Agent other than (i)  encroachments on such Real Property that materially detract from the value of the property subject thereto or materially and adversely interfere with the ordinary conduct of the business of the Loan Parties (unless otherwise permitted by applicable law) and (ii) all of the exceptions and the matters or documents stated therein set forth on Schedule B of the Mortgagee's Title Policy pertaining to any or all of the Mortgaged Properties;

(i)     Liens created pursuant to this Agreement, any of the Orders or the Security Documents;

(j)     any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased;

Error! Unknown document property name.

(k)     Liens on Collateral in effect on the Petition Date securing obligations under the Supply and Offtake Documents and subject to the Existing Intercreditor Agreement;

(l)     Liens on SOA Separate Assets and Collateral (as defined in the Existing Intercreditor Agreement) in effect on the Petition Date;

(m)     [Reserved];

(n)     Liens securing judgments for the payment of money not constituting an Event of Default under **Section** 7.01(h) and in respect of which the Borrower or such Restricted Subsidiary is contesting such Lien in good faith by appropriate proceedings for which adequate reserves have been established, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(o)     [Reserved];

(p)     [Reserved];

(q)     Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding consignment of goods or leases entered into by Borrower or any Subsidiary;

(r)     any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense agreement or secured by a lessor's, sublessor's, licensee's, sublicensee's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense (including software and other technology licenses), in each case as permitted by this Agreement;

(s)     [Reserved];

(t)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(u)     Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers, in the ordinary course of business;

(v)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(w)     any and all leases, easements, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other similar or related agreements, liens and encumbrances (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into,

Error! Unknown document property name.

affecting the use or occupancy of all or any portion of any Real Property or other property of the Loan Parties, of the properties from any Loan Party to any Affiliate or Subsidiary or to any third party, in any case, granted by such Loan Party, if the following requirements are met: (i) no Event of Default has occurred and is continuing, (ii) the property rights granted under such lease are not necessary for the business and operations of the Refinery, (iii) such lease will not cause at any time any material discontinuation or disruption of the business or operations conducted at the Refinery, (iv) such lease will not interfere in any material respect with the Borrower's or any other Loan Party's performance of and compliance with its obligations hereunder or under any Supply and Offtake Document, (v) the members of the Borrower's management have determined that such Loan Party's entry into such Lease is reasonably expected to provide a financial benefit to such Loan Party and is in the best interest of such Loan Party; (vi) such lease shall be on arm's length terms and the annual revenue therefrom shall not exceed $1,000,000, (vii) such Loan Party has delivered to the Administrative Agent a certificate certifying as to (i) through (i) above, which shall, if the revenues reasonably projected by the Borrower to be received by such Loan Party under or in connection with such Lease are expected to exceed $25,000,000 in aggregate, include a confirmation by the chief financial officer, treasurer or other financial officer of the Borrower of the determination of the Borrower's members of management referenced in clause (i) above, together with a reasonably detailed description of the nature of the financial benefit of such Loan Party;

(x)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any company in the ordinary course of business;

(y)    [Reserved];

(z)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(aa)    Liens on assets constituting or related to Environmental and Necessary Capex securing Indebtedness permitted by **Error! Reference source not found.**;

(bb)    [Reserved];

(cc)    such easements, licenses and access rights in effect as of the Petition Date granted to SXL (as defined in the Contribution Agreement) to the extent required for the operation and maintenance of assets of SXL which are located at, under or on the Refinery Real Property (as defined in the Contribution Agreement) as of the Closing Date, on the express condition that the exercise of such access, license or easement rights (x) not interfere with the operation of the Refinery and (y) could not reasonably be expected to give rise to a Material Adverse Effect;

(dd)    Liens on cash collateral accounts in an aggregate amount not to exceed $0 at any time outstanding securing obligations in connection with (A) any Governmental Authority, (B) any Swap Agreement, (C) any letter of credit facilities permitted pursuant

Error! Unknown document property name.

to Section 6.01(x) or (D) any Indebtedness permitted pursuant to Section 6.01(p); *provided* that, for the avoidance of doubt, the granting of such Liens shall not be required to be subject to the intercreditor agreement contemplated by **Error! Reference source not found.**;

(ee)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more deposit, securities and/or other similar accounts maintained by any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, (i) securing fees, charge-backs and other similar obligations and (ii) securing amounts owing to such bank with respect to credit card programs, cash management and operating account arrangements, including those involving pooled accounts and netting arrangements;

(ff)    [Reserved]; and

(gg)    Liens not otherwise permitted by this Section so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrower and all Subsidiaries) $2,500,000 at any one time.

Notwithstanding anything herein to the contrary, no Subsidiary of the Borrower that is not a Loan Party shall be permitted to create or incur any Liens under this Section 6.02 other than non-consensual Liens otherwise permitted under this Section 6.02.

Section 6.03.  *Fundamental Changes*. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)    any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (*provided* that the Borrower shall be the continuing or surviving corporation) or with or into any Subsidiary Guarantor (*provided* that the Subsidiary Guarantor shall be the continuing or surviving corporation);

(b)    [Reserved];

(c)    any Investment expressly permitted by **Section** 6.07 may be structured as a merger, consolidation or amalgamation; and

(d)    any Disposition expressly permitted by **Section** 6.04.

Section 6.04. *Disposition of Property*. Consummate any Disposition, except:

(a)    the Disposition of immaterial used, surplus, damaged, obsolete, worn out or other immaterial property in the ordinary course of business, including Intellectual Property that is, in the reasonable judgment of the Borrower, no longer commercially desirable to maintain or useful in the conduct of business taken as a whole;

Error! Unknown document property name.

(b)    the sale of inventory or SOA Separate Assets and Collateral in the ordinary course of business or in connection with the runoff of the Refinery in a manner consistent with the Initial DIP Budget and the Rolling DIP Budget (subject to any Budget Variance permitted pursuant to Section 6.17);

(c)    the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Subsidiary Guarantor;

(d)    [Reserved];

(e)    [Reserved];

(f)    (i) Dispositions permitted by **Section** 6.03 (other than clause (d) thereof), (ii) Investments permitted by **Section** 6.07 (other than clause (g) thereof), (iii) Restricted Payments permitted by **Section** 6.05 and (iv) Liens permitted by **Section** 6.02;

(g)    Dispositions of cash and Cash Equivalents in the ordinary course of business consistent with past practice;

(h)    leases, subleases, licenses or sublicenses, in each case in the ordinary course of business consistent with past practice and which do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and any other similar agreements permitted under **Section** 6.02(w)(i) and 6.02.cc);

(i)    sales, Dispositions or contributions of property (i) between Loan Parties, (ii) between Restricted Subsidiaries that are not Loan Parties or (iii) by Restricted Subsidiaries that are not Loan Parties to the Loan Parties;

(j)    transfers of property subject to Recovery Events upon receipt of the Net Cash Proceeds of such Recovery Event;

(k)    the unwinding of Swap Agreements permitted hereunder;

(l)    transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(m)    transactions under the Supply and Offtake Documents to the extent consistent with the Initial DIP Budget and the Rolling DIP Budget (subject to any Budget Variance permitted pursuant Section 6.17);

(n)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

71

(o)    the Disposition of other property having a fair market value not to exceed $5,000,000 in the aggregate and consistent with the Initial DIP Budget and the Rolling DIP Budget (subject to any Budget Variance permitted pursuant to Section 6.17); and

(p)    the Disposition of other property for fair market value; *provided* that (x) the Net Cash Proceeds of any Asset Sale are applied as a prepayment pursuant to Section 2.06(b), (y) no less than 90% of the consideration for any such Disposition shall be in the form of cash or Cash Equivalents and (z) the Required Lenders shall have consented in writing thereto if the fair market value of any property Disposed of in a transaction or series of related Dispositions exceeds (i) for any individual Disposition or series of Dispositions, $1,500,000 or (ii) combined with all prior Dispositions or series of Dispositions during the term of this Agreement that fall below the threshold in the immediately preceding clause (i), $5,000,000.

Section 6.05. *Restricted Payments*. Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any of its Subsidiaries (collectively, "**Restricted Payments**"), except (a) any Subsidiary may make Restricted Payments to the Borrower or any Subsidiary Guarantor, (b) any Group Member may make Restricted Payments to the extent actually used by any direct or indirect parent company of the Borrower to pay franchise Taxes and other fees required to maintain the legal existence of the direct or indirect parent company, and payments by the Borrower to or on behalf of such direct or indirect parent company in an amount sufficient to pay out of pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of business of such direct or indirect parent company in an aggregate amount not to exceed the amount budgeted for such payments in the Initial DIP Budget and the Rolling DIP Budget (subject to any Budget Variance for such scheduled payment not to exceed 10%) and (c) Restricted Payments may be paid to any direct or indirect parent company of the Borrower in connection with customary salary, bonus and other benefits (including retirement, health, stock option and other benefits) in an aggregate amount not to exceed the amount budgeted for such payments in the Initial DIP Budget and the Rolling DIP Budget (subject to any Budget Variance for such scheduled payment not to exceed 10%) and indemnification arrangements payable to officers, directors, employees or consultants of such direct or indirect parent company (and such parent's Subsidiaries) of the Borrower to the extent such salaries, bonuses and other benefits are attributable to such officers', employees' or consultants' services provided to the Borrower and its Restricted Subsidiaries.

Section 6.06. *Lines of Business*. Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related or ancillary thereto or are complementary businesses (including related, complementary, synergistic or ancillary technologies).

Error! Unknown document property name.

Section 6.07. *Investments*. Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "**Investments**"), except:

(a)    investments in Cash Equivalents;

(b)    Guarantee Obligations permitted by **Section** 6.01;

(c)    loans and advances (i) to directors, employees and officers of the Borrower or any of its Subsidiaries or (ii) to Persons who are engaged in the management or operations of the Borrower or any of its Subsidiaries and (iii) for bona fide business purposes in an aggregate amount, for all loans and advances made under thisSection 6.07(c)(i), not to exceed $1,000,000 at any one time outstanding;

(d)    [Reserved];

(e)    intercompany Investments by the Borrower or any of its Subsidiaries in the Borrower or any Person that, prior to such investment, is a Subsidiary Guarantor;

(f)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business (including advances made to distributors), Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and Investments consisting of prepayments to suppliers in the ordinary course of business;

(g)    to the extent constituting Investments, transactions expressly permitted under Sections **6.01**, 6.02, 6.03 (other than clause (c)), 6.04 (other than clause (i)) (including the receipt of noncash consideration for the Dispositions of assets permitted thereunder) and **Section** 6.05;

(h)    Investments (i) existing on the Petition Date that are set forth on Schedule 6.07 and (ii) existing on the Closing Date of the Borrower or any Restricted Subsidiary in the Borrower or any Subsidiary Guarantor;

(i)    Investments in Swap Agreements permitted under **Section** 6.11(a);

(j)    promissory notes and other noncash consideration received in connection with Dispositions permitted by **Section** 6.04;

(k)    [Reserved];

(l)    Investments in the ordinary course of business consisting of endorsements for collection or deposit;

(m)    Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers

73

arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(n)    the licensing, sublicensing or contribution of intellectual property rights pursuant to joint marketing arrangements with Persons other than the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(o)    loans or advances made to distributors in the ordinary course of business and consistent with past practice;

(p)    [Reserved];

(q)    [Reserved];

(r)    the forgiveness or conversion to equity of any Indebtedness owed to a Loan Party and permitted by **Section** 6.01;

(s)    advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case consistent with past practice and in the ordinary course of business;

(t)    [Reserved];

(u)    Guarantees of the Borrower or any Restricted Subsidiary of leases entered into in the ordinary course of business;

(v)    [Reserved];

(w)    Investments in connection with any lease, utility and other customary, similar deposits consistent with past practice and in the ordinary course of business;

(x)    Capital Expenditures made by the Borrower or any Restricted Subsidiary on behalf of itself, the Borrower or any other Restricted Subsidiary (i) as set forth in the Initial DIP Budget and the Rolling DIP Budget in an amount not in excess of the applicable Budget Variance permitted pursuant to Section 6.17 and (ii) in respect of emergencies to prevent imminent damages (or further damage) to the refineries and/or to prevent injury and death or otherwise reasonably acceptable to the Required Lenders; and

(y)    in addition to Investments otherwise expressly permitted by this Section, Investments by the Borrower or any of its Subsidiaries in an aggregate amount (valued at cost) not to exceed $2,000,000 during the term of this Agreement.

Notwithstanding anything herein to the contrary, no Loan Party may make any Investment in any Subsidiary of the Borrower that is not a Loan Party under this **Section** 6.07.

Error! Unknown document property name.

Section 6.08. *Prepayments, Etc. of Indebtedness*. Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any post-petition Indebtedness or any Indebtedness existing on the Petition Date, except, in the case of such Indebtedness in existence on the Petition Date, (a) as expressly provided for in the "first day" orders entered by the Bankruptcy Court that are reasonably acceptable to the Administrative Agent and (b) payments that are made substantially simultaneous with or following the termination of the Commitments and the repayment of the Obligations in full and are provided for in the Acceptable Plan of Reorganization.

Section 6.09. *Transactions with Affiliates*. Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower or any Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the Borrower or the relevant Restricted Subsidiary, and (c) upon fair and reasonable terms no less favorable to the Borrower or the relevant Restricted Subsidiary than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except that the following shall be permitted:

(a)    Restricted Payments permitted by **Section** 6.05;

(b)    [Reserved];

(c)    [Reserved];

(d)    transactions among Loan Parties and the Restricted Subsidiaries that are Subsidiary Guarantors (or any entity that becomes a Restricted Subsidiary as a result of such transaction);

(e)    the payment of customary and reasonable out-of-pocket costs to, and indemnities provided on behalf of, current and former directors, officers, employees and consultants of any of the Loan Parties or any direct or indirect parent company of the Loan Parties in the ordinary course of business to the extent attributable to the ownership or operation of the Loan Parties;

(f)    employment, compensation, bonus, incentive, retention and severance arrangements and health, disability and similar insurance or benefit plans or other benefit arrangements between the Borrower, any direct or indirect parent company of the Borrower or any Restricted Subsidiary and their respective directors, officers, employees, managers, consultants or independent contractors (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Capital Stock pursuant to put/call rights or similar rights with current or former employees, officers, directors, managers, consultants or independent contractors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors of the Borrower (or any direct or indirect parent company thereof) or any Restricted Subsidiary;

75

(g)    transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 6.09 or any amendment to any such agreement to the extent such an amendment is not materially adverse, taken as a whole, to the Lenders in any material respect;

(h)    [Reserved];

(i)    [Reserved];

(j)    [Reserved];

(k)    [Reserved];

(l)    [Reserved]; and

(m)    transactions with wholly-owned Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business.

Section 6.10. *Sales and Leasebacks*. Enter into any arrangement with any Person providing for the leasing by the Borrower or any Restricted Subsidiary of real or personal property used or useful in its business that has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower or such Restricted Subsidiary.

Section 6.11. *Swap Agreements*. Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Capital Stock) or (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary; *provided* that any such Swap Agreements shall be consistent with the Initial DIP Budget and the Rolling DIP Budget (subject to any Budget Variance permitted pursuant to Section 6.17).

Section 6.12. *Changes in Fiscal Periods.* Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

Section 6.13. *Negative Pledge Clauses*. Enter into or suffer to exist or become effective any post-petition agreement that prohibits or limits the ability of the Borrower or any Restricted Subsidiary to create, incur, assume or suffer to exist any Lien upon any Collateral, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (i) Requirements of Law, (ii) this Agreement and the other Loan Documents, (iii) [reserved], (iv) [reserved], (v) [reserved], (vi) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and any proceeds thereof), (vii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest

Error! Unknown document property name.

of a Loan Party, (viii) customary provisions restricting assignment of any agreement entered into by a Loan Party in the ordinary course of business, (ix) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under **Section** 6.04 pending the consummation of such sale, (x) [reserved], (xi) [reserved], (xii) any Liens permitted pursuant to **Section** 6.02 in respect of assets subject thereto (other than Sections *6.02.g*), (h), (k), (l), (n), (t),(u), (v), (i), **Error! Reference source not found.**, (cc) and (A)), (xiii) [reserved], (xiv) customary restrictions in leases, subleases, licenses, asset sale or similar agreements, including with respect to intellectual property and other similar agreements, otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (xv) customary provisions restricting assignments of any agreement or (xvi) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business or otherwise permitted hereunder.

Section 6.14. *Clauses Restricting Subsidiary Distributions*. Enter into or suffer to exist or become effective any post-petition consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary, (b) make loans or advances to, or other Investments in, the Borrower or any other Restricted Subsidiary or (c) transfer any of its assets to the Borrower or any other Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of any restrictions existing under the Loan Documents any Liens permitted pursuant to Section 6.02 in respect of assets subject thereto; customary restrictions on leases, subleases, licenses, asset sale or similar agreements, including with respect to intellectual property and other similar agreements, otherwise permitted hereby so long as such restrictions relate to the assets subject thereto; customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any of its Subsidiaries; customary provisions restricting assignment of any agreement; or restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business or otherwise permitted hereunder.

Section 6.15. *Sanctions, and Anti-Corruption Laws*. (a) Directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of sanctions administered by OFAC, or (ii) in any other manner that would result in a violation of sanctions administered by OFAC by any Person (including any Person participating in the Loans, whether as lender, underwriter, advisor, investor, or otherwise).

(b)    Directly or indirectly, use the proceeds of the Loans in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Law.

Section 6.16. *Compliance with Minimum Liquidity Covenant*. Fail to comply with the Minimum Liquidity Covenant.

Error! Unknown document property name.

Section 6.17. *Budget Variance*. Beginning with the last Business Day of the week ended September 15, 2019, as of the last Business Day of each week, permit the negative Budget Variance with respect to disbursements of the Debtors (including with respect to disbursements of the professionals for the Debtors) for (i) the cumulative period from the Petition Date to the last Business Day of such week and (ii) the four-week period ending on the last Business Day of such week to exceed, in each case, the greater of (x) 10% and (y) $5,000,000.

Section 6.18. *Settlement of Insurance Claims*.  Enter into any final settlement or final determination with respect to the Insurance Claims (or allow any such final settlement or final determination to occur) without the prior written consent of the Required Lenders (which may be communicated by email); it being understood and agreed that the receipt of advances of June 21 Insurance Proceeds shall not in and of itself be deemed to be a final settlement or final determination with respect to the Insurance Claims.

Article 7

EVENTS OF DEFAULT

Section 7.01. *Events of Default*. If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within five (5) days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)    any Loan Party shall default in the observance or performance of any agreement contained in Sections **5.04.a**), 5.07.a)i), 5.07.e), 5.14.a), 5.15, 5.16 and 5.17 or **Article** 6 of this Agreement or Section 4.5(a) of the Security Agreement; or

(d)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(e)    any Loan Party shall (A) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto beyond any applicable grace period; or (B) default in making any payment of any interest on any such Indebtedness beyond the

Error! Unknown document property name.

period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (C) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided*, that a default, event or condition described in clause (A), (A) or (A) of this clause (A) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (A), (A) or (A) of this clause (A) shall have occurred and be continuing with respect to Indebtedness the aggregate outstanding principal amount of which is $2,000,000 or more; *provided* that this clause (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is expressly permitted hereunder; *provided*, that this clause (A) shall not apply to any Indebtedness outstanding hereunder and any Indebtedness of any Debtor that was incurred prior to the Petition Date; or

(f)     (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of any Subsidiary (other than a Debtor), or of a substantial part of the property of any Subsidiary (other than a Debtor), under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Subsidiary (other than a Debtor) or for a substantial part of the property of any Subsidiary (other than a Debtor) or (C) the winding-up or liquidation of any Subsidiary (other than a Debtor); and such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) any Subsidiary (other than a Debtor) shall (A) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (i) above; (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Subsidiary (other than a Debtor) or for a substantial part of the property of any Subsidiary (other than a Debtor); (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (E) make a general assignment for the benefit of creditors; (F) become unable, admit in writing its inability or fail generally to pay its debts as they become due; (G) take any action for the purpose of effecting any of the foregoing; or (H) wind up or liquidate; unless (x) prior to any of the foregoing described in clause (i), such Subsidiary becomes a Loan Party, (y) within five (5) Business Days of such action, such Subsidiary's or Holding's insolvency proceeding becomes jointly administered with that of the Borrower, and (iii) each of the Interim Order (within seven (7) Business Days of the commencement of such proceeding or such other circumstance) and Final Order (within

Error! Unknown document property name.

thirty (30) days of the commencement of such proceeding or such other circumstance) are made applicable to such Subsidiary; or

(g)    (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; or (iv) any ERISA Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in clauses (i) through (iv) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect; or

(h)    one or more judgments or decrees shall be entered against any Loan Party (which, in the case of the Debtors only, arose post-petition) involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $5,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed, insured or bonded pending appeal within thirty (30) days from the entry thereof; or

(i)    any of the Security Documents, after delivery thereof pursuant to this Agreement or the Orders, shall cease, for any reason, to be in full force and effect (other than pursuant to the terms thereof), or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents on Collateral (other than Collateral the value of which is de minimis) shall cease to be enforceable and of the same effect and priority purported to be created thereby to the extent applicable subject to Liens that are permitted to exist on such Collateral under Section 6.02; or

(j)    the guarantee contained in **Article** 10 shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)    (i) PES Ultimate Holdings, LLC at any time ceases to own directly or indirectly, (A) 100% of the Capital Stock of the Borrower on a fully diluted basis; or (ii) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), other than the Permitted Holders shall "beneficially own" (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, shares representing more than the greater of (x) 35% of the aggregate ordinary voting power represented by the issued and outstanding equity interests of PES Inc. or PES Ultimate Holdings, LLC and (y) the percentage of the aggregate ordinary voting power represented by such equity interests beneficially owned by such person or group that exceeds the percentage of the aggregate ordinary voting power represented by equity interests of the Borrower then beneficially owned, directly or indirectly, by the Permitted Holders unless (A) the Permitted Holders have, at such time, the right or the ability, directly or indirectly, by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable or (B) during any period of twelve (12) consecutive

Error! Unknown document property name.

months, a majority of the seats (other than vacant seats) on the board of directors of the PES Inc. or PES Ultimate Holdings, LLC, as applicable, shall be occupied by persons who were (x) members of the board of directors of the Borrower on the Closing Date or nominated by the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, or by one or more of the Permitted Holders or persons nominated by one or more of the Permitted Holders or (y) appointed by directors so nominated (it being understood and agreed that, for purposes of this clause (i), a person shall not be deemed to have beneficial ownership of Capital Stock subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement (unless such agreement provides for the ability of the purchaser therein to vote the Capital Stock)); or

(l)    ICBC Standard Bank PLC shall commence the exercise of remedies under Section 14.04 of the Supply and Offtake Agreement  as a result of a default or an event of default by the Borrower or any of its Affiliates thereunder; or

(m)

(i)    Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of the Cases of the Debtors under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders or (ii) a trustee under Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof unless consented to by the Required Lenders; or

(ii)    an application shall be filed by any Debtor for the approval of any Other Superpriority Claim, or an order of the Bankruptcy Court shall be entered granting any Other Superpriority Claim (other than with respect to the Carve-Out in any of the Cases that is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrower or any other Loan Party hereunder or under any of the other Loan Documents), or there shall arise or otherwise be granted any such pari passu or senior Other Superpriority Claim, in each case other than Superpriority Claims or other than with respect to the Carve-Out, and the Liens permitted to have such priority under the Loan Documents and the Orders, the Loan Parties shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is pari passu with or senior to any Liens under the Loan Documents or the adequate protection Liens granted under the Interim Order; or

(iii)    Other than any relief from the automatic stay to permit liquidation of positions under the Supply and Offtake Agreement, the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay application under

81

Section 362 of the Bankruptcy Code so as to (A) permit a third party to proceed on any assets of any of the Debtors which have a value in excess of $5,000,000 in the aggregate or (B) permit other actions that could result in a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(iv)    (A) the Final Order Entry Date shall not have occurred by the date that is thirty-five (35) days following the Petition Date (or such later date as is agreed by the Required Lenders); (B) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of five (5) days or more, vacating or otherwise amending, supplementing or modifying the Interim Order or Order, or the Borrower or any Subsidiary of the Borrower shall apply for the authority to do so, in each case in a manner that is adverse to the Administrative Agent or the Lenders, without the prior written consent of the Administrative Agent and the Required Lenders; (C) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties and the Loan Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Administrative Agent (with the consent of the Required Lenders); (D) the Interim Order (prior to the entry of the Final Order) or Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; (E) without the written consent of the Administrative Agent and the Required Lenders, the entry of an order in any of the Cases granting adequate protection to any other person; (F) an order shall have been entered by the Bankruptcy Court modifying the adequate protection obligations granted in any Order without the prior written consent of the Administrative Agent and the Required Lenders, (G) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, (H) any Loan Party shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not provide for termination of the Commitments and indefeasible payment in full and, subject to Section 2.03, in cash of the Obligations, defined in (xi) below; or (I) other than with respect to the Carve-Out, a final non-appealable order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders; or

(v)    Except as permitted by the Orders or as otherwise agreed to by the Administrative Agent and the Required Lenders, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with the "first day" orders of the Bankruptcy Court; or

(vi)    A Reorganization Plan that is not an Acceptable Plan of Reorganization shall be (i) confirmed by any Person or (ii) confirmed or filed by any Loan Party in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and indefeasible payment in full and, subject to Section 2.03, in cash of the Obligations under the Loan Documents and

Error! Unknown document property name.

continuation of the Liens with respect thereto until the effectiveness thereof (other than contingent indemnification obligations not yet due and payable), or any of the Debtors shall seek confirmation of any such plan or entry of any such order; or

(vii)    Any Loan Party or other Subsidiary shall take any action in support of any matter set forth in paragraphs (i)-(vi) above or in support of any filing by any Person of a Reorganization Plan that is not an Acceptable Plan of Reorganization or any other Person shall do so and such application is not contested in good faith in the sole discretion of the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the Administrative Agent (with the consent of the Required Lenders) consents to such action; or

(viii)    Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (1) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document, (2) disallow in whole or in part any of the Indebtedness owed by the Loan Parties under the Existing Term Loan Credit Agreement or any related document, (3) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in any Order in favor of the Administrative Agent, (4) challenge the validity and enforceability of the Liens or security interests granted under the Existing Term Loan Credit Agreement Documents and related documents or in any Order in favor of the Existing Term Loan Credit Agreement Agent or Existing Term Loan Credit Agreement Lenders or (5) contest that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement); or

(ix)    [____][5]; or

(x)    Termination or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a Reorganization Plan; or

(xi)    Noncompliance by any Loan Party or any of its Subsidiaries with the terms of the Interim Order or the Final Order;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (i) of paragraph (i) above with respect to any Subsidiary that is not a Debtor as of the Petition Date, automatically the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable and (B) if such event is any other Event of Default, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with

---

[5] NTD: provisions regarding court actions with respect to insurance proceeds to be incorporated from the order.

Error! Unknown document property name.

accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower; *provided* that, subject to the provisions of the Orders, upon the giving of five (5) Business Days' notice to the Debtors (the "**Remedies Notice Period**"), the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, (x) terminate the consensual use of cash collateral and (y) exercise all other rights and remedies provided for in the Collateral Documents and the Orders and under applicable law. Solely during the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices, including for the purpose of funding the Carve-Out. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing and cash collateral may be used for this purpose during the Remedies Notice Period.

Article 8

THE AGENTS

Section 8.01. *Appointment*. Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

Section 8.02. *Delegation of Duties*. The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.

Section 8.03. *Exculpatory Provisions*. Neither any Agent nor any of their respective officers, directors, employees, agents, advisors, attorneys in fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non- appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence, willful misconduct or fraudulent behavior) or (ii) responsible in any manner to any of the Lenders

84

for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.   The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.  The Administrative Agent does not warrant, nor accept responsibility, nor shall Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of LIBOR Rate or with respect to any comparable or successor rate thereto (including as may be provided pursuant to Section 2.09(e)).

Section 8.04. *Reliance by Administrative Agent*. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers. No request given to the

Error! Unknown document property name.

Administrative Agent by the Required Lenders or the Borrower or any Subsidiary Guarantor that in the sole judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

Section 8.05. *Notice of Default*. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06. *Non-Reliance on Agents and Other Lenders*. Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, advisors, attorneys in fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys in fact or affiliates.

Section 8.07. *Indemnification*. The Lenders agree to indemnify each Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an

Error! Unknown document property name.

"**Agent Indemnitee**"), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 8.08. *Agent in Its Individual Capacity*. Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

Section 8.09. *Successor Administrative Agent*. The Administrative Agent may resign as Administrative Agent upon ten (10) days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 7.01(a) or Section 7.01(f)(i) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "**Administrative Agent**" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as

Error! Unknown document property name.

Administrative Agent, the provisions of this Article 8 and of Section 9.05(a) shall continue to inure to its benefit.

## Article 9

### Miscellaneous

Section 9.01. *Amendments and Waivers*. Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 9.01(a). The Required Lenders and each Loan Party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided, however*, that no such waiver and no such amendment, supplement or modification shall (A) forgive the principal amount or, subject to Section 2.18, extend the final scheduled date of maturity of any Loan, extend the scheduled date of any amortization payment in respect of any Loan, reduce the stated rate of any interest or fee payable hereunder (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders)) or extend the scheduled date of any payment thereof, in each case without the written consent of each Lender directly affected thereby; (B) eliminate or reduce the voting rights of any Lender under this Section 9.01(a) without the written consent of such Lender; (C) reduce any percentage specified in the definition of Required Lenders, Required Extension Lenders or Required Repayment Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, amend or modify the Superpriority Claim status of the Lenders under the Orders or under any Loan Document, release all or substantially all of the Collateral or release all or substantially all of the Subsidiary Guarantors from their obligations under the Article 10, in each case without the written consent of all Lenders; (D) amend, modify or waive any provision of Section 2.12(a) without the written consent of each Lender directly affected thereby; or (E) amend, modify or waive any provision of Article 8 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Error! Unknown document property name.

Furthermore, notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document.

Section 9.02. *Notices*. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy) or email, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower and Guarantor

PES Holdings, LLC
1735 Market Street
Philadelphia, PA 19103
Attention: Treasury Department
Email: treasury@pes-companies.com
        legal@pes-companies.com

Administrative Agent:

Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Kaleigh Rowe
and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
email: cpcagency@cortlandglobal.com and
legal@cortlandglobal.com

with a copy to:

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attention: H. Stephen Castro
Telecopy: 212-318-3400
Telephone: 212-318-3147
email: stephen.castro@nortonrosefulbright.com

and with a copy to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

89

Attention: Damian Schaible
Telephone: 212-450-4580
Telecopy: 212-701-5580
email: Damian.Schaible@davispolk.com

*provided* that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

All information provided to the Administrative Agent or any Lender pursuant to this Agreement may also be provided to any "private" Lender under the Existing Term Loan Credit Agreement.

Section 9.03. *No Waiver; Cumulative Remedies*. No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Section 9.04. *Survival of Representations and Warranties*. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

Section 9.05. *Payment of Expenses and Taxes*. The Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable and documented costs and out-of-pocket expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of financial advisors and one New York firm of counsel to the Administrative Agent and one local counsel, as necessary, in each appropriate jurisdiction and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time

90

thereafter on a quarterly basis or such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender and the Administrative Agent for all its documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel to the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from all documentary and similar Taxes and charges in respect of the Loan Documents, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent, their respective affiliates, and their respective officers, directors, employees, agents, advisors and controlling persons (each, an "**Indemnitee**") harmless from and against any and all other losses, claims, damages, liabilities and expenses of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any claim, litigation, investigation or proceeding regardless of whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrower, its equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with Environmental Law or relating to any Environmental Liabilities applicable to any Group Member or any of the Real Property and the reasonable documented fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (a), collectively, the "**Indemnified Liabilities**"), *provided*, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee, and *provided*, *further*, that this Section 9.05(a) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws for any matters arising from the Transactions, that any of them might have by statute or otherwise against any Indemnitee, except to the extent such rights are asserted against an Indemnitee found by a final and non- appealable decision of a court of competent jurisdiction to have engaged in gross negligence or willful misconduct, for claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses resulting from such gross negligence or willful misconduct. No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby. All amounts due under this Section 9.05(a) shall be payable not later than ten (10) days after written demand therefor.

Error! Unknown document property name.

Statements payable by the Borrower pursuant to this Section 9.05(a) shall be submitted to the Treasury and Legal Departments (Telephone No. 215-339-1200) (Telecopy No. 866-456-1587), at the address of the Borrower set forth in Section 9.02, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 9.05(a) shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

Section 9.06. *Successors and Assigns; Participations and Assignments*. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no Guarantor may assign, transfer or delegate any of its rights or obligations under Article 10 without the prior written consent of the Administrative Agent and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "**Assignee**"), other than the Borrower or any of its Subsidiaries or a natural person, all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent of the Administrative Agent and the Borrower (such consent not to be unreasonably withheld), *provided* that no consent of:

(A)    The Borrower shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default has occurred and is continuing, any other Person; and *provided further*, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

(B)    the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    in except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under any Facility, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to and recorded by the Administrative Agent) shall not be less than $1,000,000) unless the Administrative Agent otherwise consents, *provided* that such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

Error! Unknown document property name.

(B)    (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act and an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 9.06(a), "**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13.a), 2.14.a), 2.15.a) and 9.05.a)). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this *Section* 9.06(a) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (i) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). No assignment shall be effective unless it has been recorded in the Register pursuant to this Section 9.06(b)(iv).  The entries in the Register shall be

Error! Unknown document property name.

conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In establishing and maintaining the Register, the Administrative Agent shall serve as the Borrower's non-fiduciary agent solely for tax purposes and solely with respect to the actions described in this Section.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, the processing and recordation fee referred to in paragraph (i) of this Section and any written consent to such assignment required by paragraph (i) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)    On any date that is no later than 25 calendar days after the Closing Date, additional Persons, other than the Borrower or any of its Subsidiaries or a natural person (each a "**Joining Lender**"), may become a party hereto as a Lender by providing a Final Commitment in replacement of the Final Commitments provided on the Closing Date, subject to the following conditions:

(A)    the aggregate amounts of the Final Commitments  on the Joinder Effective Date shall not exceed $35,000,000;

(B)    the consent of the Administrative Agent and the Required Lenders shall be required for any assignment to a Joining Lender that is not a Lender, an affiliate of a Lender or an Approved Fund or a Lender under the Existing Term Loan Agreement, or an Affiliate or Approved Fund thereof;

(C)    such Joining Lender shall have executed a master assignment and assumption agreement to this Credit Agreement in a form reasonably acceptable to the Administrative Agent (the "**Final Commitment Assignment**") pursuant to which such Joining Lender shall become a party hereto and provide a Final Commitment;

(D)    the Joining Lender, if it shall not be a Lender prior to the execution and delivery of the Final Commitment Assignment pursuant to the preceding clause (C), shall deliver to the Administrative Agent an administrative questionnaire in which the Joining Lender designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its

Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the Joining Lender's compliance procedures and applicable laws, including Federal and state securities laws; and

(E)     on the date that is 25 calendar days after the Closing Date (the "**Joinder Effective Date**"), the Administrative Agent shall accept each Joining Lender and record the necessary information with respect to such Joining Lender in the Register; *provided* that such Joining Lender has, on or prior to the Joinder Effective Date, duly completed, executed and delivered a counterpart to the Final Commitment Assignment and delivered a completed administrative questionnaire (if necessary) and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, as reasonably requested by the Administrative Agent or any Lender through the Administrative Agent, on or prior to the Joinder Effective Date. The Final Commitments of the Lenders as of the Closing Date shall be reduced on a pro rata basis by the amount of Final Commitments provided by Joining Lenders, and any Loans outstanding that have been funded pursuant to Final Commitments prior to such assignment shall be reallocated upon the effectiveness of such assignment, pro rata in accordance with the allocation of Final Commitments on such date. No assignment to a Joining Lender shall be effective (and commitment fees with respect to the Commitment of any Joining Lender shall be payable) for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than the Borrower or any of its Affiliates) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of **Section** 9.01(a) and (ii) directly affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections (a), (a) and (a) (subject to the requirements and limitations therein, including the requirements under **Section** 2.14(f)(i) (it being understood that the documentation required under **Section** 2.14(f)(i) shall be delivered to the participating Lender)) to the same

Error! Unknown document property name.

extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (i) of this Section; *provided* that such Participant (i) agrees to be subject to the provisions of Sections (a) and (a) as if it were an assignee under paragraph (i) of this Section and (ii) shall not be entitled to receive any greater payment under Sections (a) or (a), with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof that occurs after the Participant acquired the applicable participation. To the extent permitted by law, each Participant also shall be entitled to the benefits of **Section** 9.07(b) as though it were a Lender, *provided* such Participant shall be subject to Section 9.07(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**").  No participation shall be effective unless it has been recorded in the Participant Register pursuant to this Section 9.06(c). No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

Section 9.07. *Adjustments; Set off*. (a) Except to the extent that this Agreement or a court order expressly provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "**Benefitted Lender**") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 9.06(a)), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 7.01(f)(i), or otherwise), in a greater proportion than any such

payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such application.

Section 9.08. *Counterparts*. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

Section 9.09. *Severability*. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.10. *Integration*. This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.11. *GOVERNING LAW*. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE

Error! Unknown document property name.

WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 9.12. *Submission to Jurisdiction; Waivers*. The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from, jurisdiction, the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof; *provided*, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in **Section** 9.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any indirect, special, exemplary, punitive or consequential damages.

Section 9.13. *Acknowledgements*. The Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions

Error! Unknown document property name.

contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

Section 9.14. *Releases of Guarantees and Liens*. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 9.01(a)) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations to the extent necessary to permit consummation of any Disposition of any property or Subsidiary that constitutes Collateral not prohibited by any Loan Document or that has been consented to in accordance with Section 9.01(a) or under the circumstances described in paragraph (b) below.¶

(b) At such time as the Loans and the other obligations under the Loan Documents shall have been paid in full, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.  For the avoidance of doubt, nothing in this Section 9.14 shall affect any adequate protection Liens pursuant to any Order.

Section 9.15. *Confidentiality*. Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; *provided* that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any

court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document, (j) to any "private" Lender under the Existing Term Loan Credit Agreement or (k) if agreed by the Borrower in its sole discretion, to any other Person.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.16.  *WAIVERS OF JURY TRIAL*.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 9.17.  *USA Patriot Act*. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

Section 9.18.  *Acknowledgement and Consent to Bail-In of EEA Financial Institutions*. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Bail-In Action

Error! Unknown document property name.

of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) of any such liability;

(ii)     a cancellation of any such liability;

(iii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iv)     a variation of any term of any Loan Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

Article 10

GUARANTEE

Section 10.01. *Guarantee*. The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code after any bankruptcy or insolvency petition under the Bankruptcy Code) the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, whether or not enforceable as against the Borrower, whether now or hereafter existing, and whether due or to become due, including principal, interest (including interest at the contract rate applicable upon default accrued or accruing after the commencement of any proceeding under the Bankruptcy Code, or any applicable provisions of comparable state or foreign law, whether or not such interest is an allowed claim in such proceeding), fees and costs of collection, in each case, strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Loan Party or Loan Parties shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Loan Parties will promptly pay the same, subject to Section 2.03, in cash, without any demand or notice whatsoever, and that in the case of any extension of time of

Error! Unknown document property name.

payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 10.02. *Rights of Secured Parties*. Each Guarantor agrees that any Secured Party, upon such terms as it deems appropriate, without notice or demand to or on any person and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may, in accordance with the terms of this Article 10 and the other Loan Documents, (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of any Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, any Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any Guaranteed Obligations and take and hold security for the payment hereof or any Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of any Guaranteed Obligations, any other guaranties of any Guaranteed Obligations, or any other obligation of any person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or any Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent with the applicable Loan Document and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for its Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; provided that the foregoing shall not affect the right of any Loan Party to consent to any amendment, modification or waiver to any Loan Document to which it is a party.

Section 10.03. *Obligations Unconditional*. The obligations of the Guarantors under Section 10.01 shall constitute a guarantee of payment and, to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Article 10, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Loan Party (except for payment in full or an amendment or waiver adopted in accordance with Section 9.01(a)). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall

102

remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)    at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this **Article** 10 or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien or security interest granted to, or in favor of, any Secured Party as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)    the release of any other Loan Party pursuant to **Section** 10.10 and **Section** 9.01(a).

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive (i) any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee, (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations (other than any Unasserted Contingent Obligations), and (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not

Error! Unknown document property name.

be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Article 10 there may be no Guaranteed Obligations outstanding until payment in full thereof (other than Unasserted Contingent Obligations, or any amendment or waiver adopted in accordance with Section 9.01(a) or any other express provision set forth in a Loan Document).

Section 10.04. *Reinstatement*. The obligations of the Guarantors under this Article 10 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 10.05. *Subrogation; Subordination*. Each Guarantor hereby agrees that, until the payment and satisfaction in full and, subject to Section 2.03, in cash of all Guaranteed Obligations (other than Unasserted Contingent Obligations) and the expiration and termination of the Commitments of the Lenders under this Agreement, it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 10.01, whether by subrogation or otherwise, against the Borrower or any other Loan Party of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Guarantor permitted pursuant to Section 6.01(b) shall be subordinated to such Guarantor's Obligations in the manner set forth in the intercompany note evidencing such Indebtedness.

Section 10.06. *Remedies*. The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Article 7 (and shall be deemed to have become automatically due and payable in the circumstances provided in Article 7) for purposes of Section 10.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 10.01.

Section 10.07. *Instrument for the Payment of Money*. Each Guarantor hereby acknowledges that the guarantee in this Article 10 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Error! Unknown document property name.

Section 10.08. *Continuing Guarantee*. The guarantee in this Article 10 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 10.09. *General Limitation on Guaranteed Obligations*. In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 10.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 10.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any other Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 10.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 10.10. *Release of Loan Parties*. If, in compliance with the terms and provisions of the Loan Documents, all of the Capital Stock of any Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is the Borrower, a Guarantor or an Affiliate thereof, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 9.06) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document shall be automatically released       and, so long as the Borrower shall have provided the Administrative Agent with such reasonable certifications or reasonable documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as necessary or reasonably requested by the Borrower to effect such release described in this Section 10.10 in accordance with the relevant provisions of the Security Documents.

Section 10.11. *Right of Contribution*. Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 10.05. The provisions of this Section 10.11 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount of the Guaranteed Obligations.

Section 10.12. *Default; Remedies; Bankruptcy; Etc*.

(a)     The Guaranteed Obligations of each Guarantor hereunder are independent of and separate from the Obligations of such Guarantor. If any Obligation of the Borrower is not paid when due, or upon any Event of Default hereunder or upon any default by the Borrower as provided in any other Loan Document, the Administrative Agent may, at its sole election, proceed directly and at once, without notice, against any Guarantor to collect

Error! Unknown document property name.

and recover the full amount or any portion of the Obligations of the Borrower then due, without first proceeding against the Borrower or any other guarantor (including the Guarantors) of its Guaranteed Obligations, or against any Collateral under the Loan Documents or joining the Borrower or any other guarantor (including the Guarantors) in any proceeding against any Guarantor. At any time after maturity of the Guaranteed Obligations of a Guarantor, the Administrative Agent may (unless such Guaranteed Obligations have been paid in full (other than Unasserted Contingent Obligations)), without notice to such Guarantor and regardless of the acceptance of any Collateral for the payment thereof, appropriate and apply toward the payment of such Guaranteed Obligations (a) any indebtedness due or to become due from any Secured Party to such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor at any time held by or coming into the possession of any Secured Party or any of its respective Affiliates.

(b)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Administrative Agent acting pursuant to the instructions of Required Lenders, commence or join with any other person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any other Guarantor (other than the Cases). The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or applicable body resulting from any such proceeding (except as described in **Section** 10.09). Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in the immediately preceding sentence (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Secured Parties that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced. In the event that all or any portion of any Guaranteed Obligations are paid by the Borrower, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment or payments are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 10.13. *[Reserved]*.

Error! Unknown document property name.

Section 10.14. *Enforcement Expenses; Indemnification*.

(a)    Each Guarantor agrees to pay or reimburse each Lender and the Administrative Agent for all its documented costs and expenses incurred in collecting against such Guarantor under the guarantee contained in **Section** 10.01 or otherwise enforcing or preserving any rights under this **Article** 10 and the other Loan Documents to which such Guarantor is a party, including, without limitation, the fees and disbursements of counsel to the Administrative Agent.

(b)    Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable in connection with any of the transactions contemplated by this **Article** 10.

(c)    Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this **Article** 10 to the extent the Borrower would be required to do so pursuant to **Section** 9.05(a).

(d)    The agreements in this **Article** 10 shall survive repayment of the Obligations and all other amounts payable under this Agreement and the other Loan Documents.

Section 10.15. *Acknowledgements*. Each Guarantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(b)    neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Guarantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Guarantors, on the one hand, and the Administrative Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Guarantors and the Lenders.

Section 10.16. *Additional Guarantors*. Each Subsidiary of the Borrower that is required to become a party to this Agreement pursuant to Section 5.10(a) shall become a Guarantor for all purposes of this Agreement upon execution and delivery of an assumption agreement.

Section 10.17. *Releases*. At such time as the Loans and the other Obligations shall have been paid in full, this Article 10 and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Guarantor hereunder

Error! Unknown document property name.

shall terminate, all without delivery of any instrument or performance of any act by any party. At the request and sole expense of any Guarantor following any such termination, the Administrative Agent shall execute and deliver to such Guarantor such documents as such Guarantor shall reasonably request to evidence such termination.

[SIGNATURE PAGES FOLLOW]

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

PES HOLDINGS, LLC

By: _____
    Name:
    Title:

CORTLAND CAPITAL MARKET
SERVICES LLC, as
Administrative Agent and as a Lender


_____
Name:
Title:

**Schedule 1.01A**
**Commitments**

| Name of Lender | Initial Commitment | Final Commitment |
| --- | --- | --- |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| [●] | $[●] | $[●] |
| Total: | $65,000,000 | $35,000,000 |

# EXHIBIT A

## FORM OF SECURITY AGREEMENT

[See attached]

**Error! Unknown document property name.**

**EXHIBIT B**

**FORM OF**
**NOTICE OF BORROWING**

[●], 2019

Cortland Capital Market Services LLC, as
Administrative Agent (the "<u>Administrative
Agent</u>") for the Lenders party to the Credit
Agreement referred to below
Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Kaleigh Rowe and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
Email: CPCAgency@cortlandglobal.com
  and legal@cortlandglobal.com

Ladies and Gentlemen:

The undersigned, PES HOLDINGS, LLC (the "<u>Borrower</u>"), refers to the Superpriority Secured Debtor-In-Possession Credit Agreement, to be dated on or about [_], 2019 (the "<u>Credit Agreement</u>", the capitalized terms defined therein being used herein as therein defined), among the Borrower, each of the Guarantors party thereto from time to time, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, the several banks and other financial institutions or entities from time to time parties thereto (each, a "<u>Lender</u>" and collectively, the "<u>Lenders</u>"), and you, as Administrative Agent for such Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement, that the undersigned hereby requests that the Lenders make certain Loans under the Credit Agreement, and in that connection sets forth below the information relating to such Loans as required by Section 2.02 of the Credit Agreement:

    i.   The proposed Borrowing Date is [●], 2019.

   ii.   The aggregate principal amount of the proposed Loans is $[●].

  iii.   The Loans to be made on the proposed Borrowing Date shall be initially maintained as [ABR][Eurodollar] Loans.

  iv.   The initial Interest Period for the Loans is [one][two][three] month[s].

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the proposed Borrowing Date:

(A)    the representations and warranties of each Loan Party contained in Article 3 of the Credit Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, are true and correct in all material respects (without duplication of any materiality qualifier contained

herein or therein) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that the representations and warranties contained in Section 3.04 of the Credit Agreement are deemed to refer to the most recent statements furnished pursuant to Section 5.01(a)(c) of the Credit Agreement, respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries;

(B)     no Default or Event of Default has occurred and is continuing, or would result from such Loans;

(C)     the Interim Order/Final Order[6] is in full force and effect and has not been vacated or reversed, is not subject to a stay, and has not been modified or amended in any respect without the prior written consent of the Required Lenders; and

(D)     after giving effect to the proposed Borrowing, Liquidity (as projected in good faith by the Borrower) at the end of the four week period following the receipt of the proceeds thereof, will not exceed $30,000,000. [7]

[remainder of page intentionally left blank]

---

[6] As applicable, after the Final Order Entry Date.

[7] Not applicable to the initial borrowing on the Closing Date.

Very truly yours,

PES HOLDINGS, LLC, as Borrower

By: _____

    Name:

    Title:

**EXHIBIT C**

**FORM OF**
**CLOSING CERTIFICATE**

Pursuant to Section 4.01(e)(i) of the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (the "**Credit Agreement**"; terms defined therein being used herein as therein defined), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent (in such capacity, the "**Administrative Agent**"), the undersigned [INSERT TITLE OF OFFICER] of [INSERT NAME OF LOAN PARTY] (the "**Certifying Loan Party**") hereby certifies, in its capacity as [INSERT TITLE] and not in its individual capacity, as follows:

1.      The representations and warranties of the Certifying Loan Party set forth in each of the Loan Documents to which it is a party or which are contained in any certificate furnished by or on behalf of the Certifying Loan Party pursuant to any of the Loan Documents to which it is a party are true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

2.      _____ is the duly elected and qualified Corporate Secretary of the Certifying Loan Party and the signature set forth for such officer below is such officer's true and genuine signature.

3.      No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the Loans to be made on the date hereof. [Borrower only]


The undersigned Corporate Secretary of the Certifying Loan Party certifies, in its capacity as Corporate Secretary and not in its individual capacity, as follows:

4.      Other than the Cases, there are no liquidation or dissolution proceedings pending or to my knowledge threatened against the Certifying Loan Party.

5.      The Certifying Loan Party is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its organization.

6.      Attached hereto as Annex 1 is a true and complete copy of resolutions duly adopted by the Board of Directors of the Certifying Loan Party on _____; such resolutions have not in any way been amended, modified, revoked or rescinded and are in full force and effect on and as of the date hereof and are the only corporate proceedings of the Certifying Loan Party now in force relating to or affecting the matters referred to therein.

7.        Attached hereto as <u>Annex 2</u> is a true and complete copy of the By-Laws of the Certifying Loan Party as in effect on the date hereof.

8.        Attached hereto as <u>Annex 3</u> is a true and complete copy of the Certificate of Incorporation of the Certifying Loan Party as in effect on the date hereof.

9.        The following persons are now duly elected and qualified officers of the Certifying Loan Party holding the offices indicated next to their respective names below, and the signatures appearing opposite their respective names below are the true and genuine signatures of such officers, and each of such officers is duly authorized to execute and deliver on behalf of the Certifying Loan Party each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Certifying Loan Party pursuant to the Loan Documents to which it is a party:

| <u>Name</u> | <u>Office</u> | <u>Signature</u> |
|---|---|---|
| | | _____ |
| | | _____ |
| | | _____ |

        IN WITNESS WHEREOF, the undersigned have hereunto set our names as of the date set forth below.

_____        _____
Name:                                    Name:
Title:                                   Title:   Corporate Secretary

Date: _____, 20____

**EXHIBIT D**

**FORM OF
ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into between the Assignor named below (the "**Assignor**") and the Assignee named below (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Superpriority Secured Debtor-In-Possession Credit Agreement identified below (as amended, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor: _____

2.  Assignee: _____

    [and is an affiliate/Approved Fund of [*identify Lender*][1]/Lender]

3.  Borrower: PES HOLDINGS, LLC

_____

[1]Select as applicable

Error! Unknown document property name.

4.    Administrative Agent:    Cortland Capital Market Services LLC, as administrative agent under the Credit Agreement

5.    Credit Agreement:    The Superpriority Secured Debtor-In-Possession Credit Agreement dated as of [_], 2019 among PES HOLDINGS, LLC, the Lenders party thereto, and Cortland Capital Market Services LLC, as Administrative Agent

6.    Assigned Interest:

| Facility Assigned[2] | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[3] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

[The Assignee agrees to deliver to the Administrative Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.][4]

---

[2]Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Loans").

[3]Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders.

[4]Insert only if Assignee is not a Lender.

The terms set forth in this Assignment and Assumption are hereby agreed to:

<u>ASSIGNOR</u>

_____
NAME OF ASSIGNOR

By: _____
       Name:
       Title:

<u>ASSIGNEE</u>

_____
NAME OF ASSIGNEE

By: _____
       Name:
       Title:

[Consented to and][1] Accepted:

CORTLAND CAPITAL MARKET
SERVICES LLC, as
Administrative Agent


By: _____
       Name:
       Title:


[Consented to:][2]

PES HOLDINGS, LLC


By: _____
       Name:
       Title:

---

[1]To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement

[2]To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

# ANNEX 1

Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (as amended, supplemented or otherwise modified from time to time (the "**Credit Agreement**"), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto) and Cortland Capital Market Services LLC as administrative agent (in such capacity, the "**Administrative Agent**")

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (v) if it is a Non-U.S. Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents and (ii) it will perform

in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.     <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.     <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by email or telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT E**

**FORM OF
NOTICE OF CONVERSION/CONTINUATION**

[●], 2019

Cortland Capital Market Services LLC, as
Administrative Agent (the "Administrative
Agent") for the Lenders party to the Credit
Agreement referred to below
Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Kaleigh Rowe and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
Email: CPCAgency@cortlandglobal.com
  and legal@cortlandglobal.com

Ladies and Gentlemen:

The undersigned, PES HOLDINGS, LLC (the "Borrower"), refers to the Superpriority Secured Debtor-In-Possession Credit Agreement, to be dated on or about [_], 2019 (the "Credit Agreement", the capitalized terms defined therein being used herein as therein defined), among the Borrower, each of the Guarantors party thereto from time to time, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, the several banks and other financial institutions or entities from time to time parties thereto (each, a "Lender" and collectively, the "Lenders"), and you, as Administrative Agent for such Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.07(a) of the Credit Agreement, that the undersigned hereby requests to [convert] [continue] the Loans referred to below, and in that connection sets forth below the information relating to such [conversion] [continuation] (the "Proposed [Conversion] [Continuation]") as required by Section 2.07(a) of the Credit Agreement:

    i.   The Proposed [Conversion] [Continuation] relates to the Loans originally made on _____ _____, 201_ (the "Outstanding Loans") in the principal amount of $_____ and currently maintained as [ABR][Eurodollar] Loans with an Interest Period ending on _____ ____, 20__.

    ii.  The Business Day of the Proposed [Conversion] [Continuation] is _____ __, ____.[14]

---

[14] With respect to Eurodollar Loans into ABR Loans, shall be a Business Day at least one Business Day after the date hereof; provided that such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York City time) on such day.  With respect to ABR Loans into Eurodollar Loans, shall be at least three Business Days after the date hereof; provided that such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York City time).

iii.  The Outstanding Loans shall be [continued as [ABR][Eurodollar] Loans with an Interest Period of _____][converted into [ABR][Eurodollar] Loans with an Interest Period of _____].[15]

[The undersigned hereby certifies that no Default or Event of Default has occurred and will be continuing on the date of the Proposed [Conversion] [Continuation] or will have occurred and be continuing on the date of the Proposed [Conversion] [Continuation].][16]

Very truly yours,

PES HOLDINGS, LLC, as Borrower

By: _____

   Name:

   Title:

---

[15] In the event that either (x) only a portion of the outstanding Loans is to be so converted or continued or (y) the outstanding Loans are to be divided into separate Loans with different Interest Periods, the Borrower should make appropriate modifications to this clause to reflect same.

[16] In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that the conversion is from a Eurodollar Loan to an ABR Loan or in the case of a continuation of an ABR Loan.

**EXHIBIT F-1**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (as amended, supplemented or otherwise modified from time to time (the "**Credit Agreement**"), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14(a) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF LENDER]

By: _____

        Name:
        Title:

        Dated: _____ ___, 20__

**EXHIBIT F-2**

**FORM OF
U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (as amended, supplemented or otherwise modified from time to time (the "**Credit Agreement**"), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14(a) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF PARTICIPANT]


By: _____
        Name:
        Title:

        Dated: _____ ___, 20__

**EXHIBIT F-3**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (as amended, supplemented or otherwise modified from time to time (the "**Credit Agreement**"), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14(a) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____
     Name:
     Title:

     Dated: _____ ___, 20__

**EXHIBIT F-4**

**FORM OF**

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (as amended, supplemented or otherwise modified from time to time (the "**Credit Agreement**"), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14(a) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF LENDER]

By: _____
    Name:
    Title:

    Dated: _____ ___, 20__

**EXHIBIT G**

**[Reserved]**

**EXHIBIT H**

**FORM OF**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate is delivered pursuant to Section 5.02(a)(i) of the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of [_], 2019 (as amended, supplemented or otherwise modified from time to time (the "**Credit Agreement**"), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

1.      I am the duly elected, qualified and acting Chief Financial Officer of the Borrower.

2.      I have reviewed and am familiar with the contents of this Certificate.

3.      I have reviewed the terms of the Credit Agreement and the Loan Documents and have made or caused to be made under my supervision, a review in reasonable detail of the transactions and condition of the Borrower during the accounting period covered by the financial statements attached hereto as Attachment 1 (the "Financial Statements"). Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Certificate, of any condition or event which constitutes a Default or Event of Default[, except as set forth below].

IN WITNESS WHEREOF, I have executed this Certificate this _____day of _____, 20__.

_____
Name:
Title:

**Attachment 1**
**to Compliance Certificate**

The information described herein is as of _____, ____, and pertains to the period from _____, _____ to _____, _____.

[Set forth Calculations]

**Error! Unknown document property name.**

## EXHIBIT I

## FORM OF
## PERFECTION CERTIFICATE

**EXHIBIT J**

**FORM OF INTERIM ORDER**