## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11626 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| PES HOLDINGS, LLC, *et al.*, | ) | |
| CORTLAND CAPITAL MARKET | ) | |
| SERVICES, LLC | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary Proceeding |
| | ) | |
| v. | ) | Case No. 19-_____ (KG) |
| | ) | |
| ICBC STANDARD BANK PLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs PES Ultimate Holdings, LLC ("PES Ultimate Holdings", together with the above-captioned debtors and debtors-in-possession, the "Debtor Plaintiffs"), and Cortland Capital Market Services LLC (the "Term Loan Agent"; collectively with the Debtor Plaintiffs, the "Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendant ICBC Standard Bank PLC ("ICBCS"), allege as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

**NATURE OF THE ACTION**

1.     In the aftermath of the historic, large-scale, catastrophic incident involving an explosion at the alkylation unit at PESRM's Girard Point refining facility (the "Girard Point Incident") on June 21, 2019, Plaintiffs bring this action seeking a declaratory judgment that the Debtor Plaintiffs' insurance proceeds for business interruption losses resulting from the Girard Point Incident constitute "Term Loan Priority Collateral" as defined in an August 7, 2018 intercreditor agreement ("Intercreditor Agreement") between, *inter alia*, ICBCS, the Term Loan Agent, and the Debtors.

2.     This case is a simple matter of contract interpretation.  Pursuant to the Term Loan Facility and Term Loan Security Agreement, and Intermediation Facility and ICBCS Security Agreement (defined below), the Term Loan Agent and ICBCS, respectively, have security interests in insurance proceeds.  Because both parties have interests, the Intercreditor Agreement governs the priority of those interests.

3.     The Intercreditor Agreement is clear—ICBCS has a priority interest in a defined set of collateral, and the Term Loan Agent has priority in all other Common Collateral (as defined below).  Accordingly, because the business interruption insurance proceeds are not within ICBCS's defined list of priority collateral, the business interruption insurance proceeds are "Term Loan Priority Collateral" which must flow first to the benefit of the Term Loan Agent.

4.     The business interruption insurance proceeds are at the very heart of these chapter 11 cases and quick resolution of the parties' interests with respect to the proceeds is paramount. The DIP Credit Agreement requires entry of an Insurance Proceeds Order determining that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral by no later than October 21, 2019.  Without such an order, an "Event of Default" will occur, thereby allowing the DIP

2

Lenders to immediately accelerate the DIP Obligations and terminate the right of the Debtors to use Cash Collateral (with a corresponding right of ICBCS to terminate cash collateral usage).  In essence, absent entry of the requested declaratory judgment, the Debtors run the serious risk of losing access to the cash necessary to pursue the insurance proceeds and emerge as a going concern for the benefit of their stakeholders.

## JURISDICTION AND VENUE

5.    On July 21, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

6.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b).

7.    This Court has personal jurisdiction over each of the Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).

8.    In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 157(c)(1).  Plaintiffs' claims are directly related to the Debtors' bankruptcy cases and will have significant impact on the Debtors' estates.

9.    Pursuant to Bankruptcy Rule 7008(a), Plaintiffs consent to the entry of final orders or judgment by this Court.  Plaintiffs also consent to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United Sates Constitution.

10.    Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

11.     This adversary proceeding is initiated under Bankruptcy Rule 7001(2) and (9), and 28 U.S.C. § 2201.

## THE PARTIES

12.     PES Ultimate Holdings is a limited liability company organized under the laws of the State of Delaware with its headquarters in the State of Pennsylvania.  All other Debtors are privately held limited liability companies and limited partnerships that are parent and subsidiaries of PES Holdings, and are organized under the laws of the State of Delaware with their headquarters in the State of Pennsylvania.

13.     The Term Loan Agent is a limited liability company organized under the laws of the State of Delaware with its headquarters in the State of Illinois.

14.     The Term Loan Agent is the administrative agent for the Term Loan Lenders subject to an August 7, 2018 intercreditor agreement between Merrill Lynch Commodities, Inc. ("MLC"), ICBCS, Term Loan Agent, and certain of the Debtors.

15.     ICBCS is organized under the laws of England and Wales with its headquarters in London, United Kingdom.

## FACTUAL BACKGROUND

### I.     OVERVIEW OF THE DEBTORS AND THEIR BUSINESS.

16.     PESRM's principal asset is a refining complex (the "Refining Complex") located on an approximately 1,300 acre industrial site 2.5 miles from downtown Philadelphia.

17.     The Refining Complex includes two interconnected refineries: Girard Point and Point Breeze.

18.     The Refining Complex produces a full range of transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products, including home heating

4

oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur. These products are marketed and distributed by truck, rail, pipeline, and waterborne vessels throughout the northeastern United States, and by waterborne vessels to international markets. When fully operational, the Refining Complex has a distillation and refining capacity of approximately 335,000 barrels of crude oil per day.

19.     The Debtors have two main operational segments: refining (operated by Philadelphia Energy Solutions Refining and Marketing, LLC, or "PESRM,") and logistics (operated by North Yard Logistics, L.P., or "NYL," which operates the "North Yard Terminal"). These two operational segments—logistics and refining—work together to make the Refining Complex operate efficiently from the beginning, to the middle and end of the refining process.

20.     The Debtors' "inbound" logistics operations is the beginning of the process. This is when the Debtors receive raw materials, such as crude oil.

21.     The "middle" of the process is when the refining of these raw materials occurs at the Refinery Complex.

22.     Finally, at the "end" of the process there is a complex "outbound" logistics operation, whereby the final products are shipped out after the raw materials received from the "inbound" logistics side have been refined.

23.     The Debtors have access to a network of truck loading racks, pipelines, barges, refined product storage terminals and docks located at or downstream of the Refining Complex that enable the Debtors to market and distribute their refined products.

24.     PESRM's earnings and cash flow from operations are primarily a function of the relationship between refined product prices for crude oil and other non-crude feedstocks, *i.e.*,

how much the Debtors must pay for the refinery "inputs", and how much market participants are willing to pay for the refinery's "outputs" (like gasoline and other refined products).

25.     Because of the way the Debtors' operations are structured, certain Debtors are party to a working capital arrangement that helps them run their business: the "Intermediation Facility," dated as of June 18, 2019 between, *inter alia*, PESRM and ICBCS.[2]

26.     Generally, the Intermediation Facility provider (here, ICBCS) supplies substantially all of the crude oil and non-crude feedstock requirements of the Refining Complex, purchasing these feedstocks from third parties that PESRM identifies at prices based on pricing mechanisms that PESRM negotiates.

27.     The feedstocks are stored in the tanks at the Refining Complex or at third-party facilities, and are ultimately purchased by PESRM as they are removed from tankage and processed at the Refining Complex.

28.     Once the inputs are refined, ICBCS purchases substantially all of the barrels processed through the Refining Complex.  The price ICBCS pays for the refined output is based upon agreed pricing indexes for each refined product at the time of purchase.  ICBCS then sells the refined products to third parties that PESRM identifies and at prices PESRM negotiates.

29.     In other words, the Intermediation Facility provides, among other things, the working capital necessary for Debtors to operate the refinery.  The Debtors' profits are generally a function of the revenue generated by their outputs minus the costs of the inputs used to generate that revenue, and minus the cost to refine them as of the date the PESRM purchased the inputs, also taking into account fixed costs.

---

[2]     A copy of the Intermediation Facility is attached as **Exhibit A**.  More specific details regarding the current Intermediation Facility, including how it is collateralized and how ICBCS is prioritized vis-à-vis the Company's other secured lenders is discussed further below.

II.    **THE 2018 CHAPTER 11 CASES.**

30.    In 2018, the costs of both PESRM's raw materials when compared to the revenue PESRM could generate from its refined materials were not favorable.  Thus, like most companies in the oil & gas industry, the Company experienced financial distress because of challenging macroeconomic conditions.

31.    Certain burdensome regulatory compliance obligations, combined with challenging market conditions, required certain of the Debtors to file petitions for relief under the Bankruptcy Code (the "Prior Chapter 11 Cases") on January 21, 2018.

32.    On August 7, 2018, certain Debtors successfully emerged from the Prior Chapter 11 Cases.  The August 2018 Plan of Reorganization (the "Prior Chapter 11 Plan") conferred a number of benefits on the Debtors, including access to a new Intermediation Facility and Term Loan Facility.

III.    **THE GIRARD POINT INCIDENT AND THE 2019 CHAPTER 11 CASES.**

33.    Overall, the changes to the Debtors' capital structure and operations that were made during the Prior Chapter 11 Cases put the Debtors in a healthier position than they were before the Prior Chapter 11 Cases.  But the Debtors experienced a terrible setback on June 21, 2019, when there was a large-scale, catastrophic explosion at PESRM's Girard Point refining facility (the "Girard Point Incident").

34.    The Girard Point Incident rendered the Girard Point Refinery currently inoperable, and it will remain inoperable until an extensive rebuild effort can put the refinery back on its feet and allow it to resume generating revenue.

35.     As a direct result of the Girard Point Incident, the Debtors announced that they would cease operating the Refining Complex after the run off through the Point Breeze Refinery of the limited inventory of crude oil on hand.

36.     As described further in the Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, In Support of Chapter 11 Petitions and First Day Motions [Case No. 19-11626-KG, Dkt. 32], these circumstances necessitated a second chapter 11 filing.

## IV.    THE DEBTORS' CAPITAL STRUCTURE.

37.     As of the Petition Date, the Debtors have a total of $800,081,016 in outstanding funded debt obligations.

38.     The Debtors' capital structure as of the Petition Date can be summarized as follows:

| Obligation | Amount |
|---|---|
| "Term Loan Facility" dated August 7, 2018[3] | ~$698.6 million[4] |
| "SXL Promissory Note" dated August 7, 2018 | $75.0 million |
| "NGL Installment Sale Agreement" | $26.4 million |
| **Total** | $800,081,016 |

39.     As of the Petition Date, the Debtors also had obligations under its Intermediation Facility.

---

[3]     A copy of the Term Loan Facility is attached hereto as **Exhibit B**.

[4]     The Term Loan Facility is comprised of four different tranches: Tranche A ($120.0 million due 12/3/2022), Tranche A-2 ($59,738,319 due 2/11/2022), Tranche B ($77,500,000 due 12/31/2022), Tranche C ($441,401,332 due 12/31/2022).

40.    At issue in this Adversary Proceeding seeking a declaratory judgment are the Term Loan Facility and the Intermediation Facility, and their respective priorities with respect to business interruption insurance proceeds under the Intercreditor Agreement.

**A.    The Term Loan Facility and Term Loan Security Agreement.**

41.    Debtor PES Holdings is the borrower under the approximately $698.6 million Term Loan Facility by and among PES Holdings, the lenders from time to time party thereto (the "Term Loan Lenders"), and Cortland Capital Market Services LLC, as administrative agent (the "Term Loan Agent"), dated August 7, 2018.

42.    The Term Loan Facility financed the Debtors' exit from the Prior Chapter 11 Cases, was approved pursuant to the Court's order confirming the Prior Chapter 11 Plan (the "Prior Confirmation Order, a copy of which is attached as **Exhibit C**").  The Prior Confirmation Order provides that, on the effective date of the Prior Chapter 11 Plan, "the liens granted and contemplated by the New First Lien Term Loan Documents shall be valid, binding, perfected, and enforceable liens on the collateral specified in the New First Lien Term Loan Documents for the benefit of the secured parties under the New First Lien Term Loan Documents." Confirmation Order at ¶ 84.

43.    The interested parties in the Term Loan Facility can and do change, both in terms of which entities they are, and how much of an interest each entity holds in the Term Loan Facility.

44.    The Term Loan Facility is guaranteed by certain subsidiaries of PES Holdings.

45.    Under the Term Loan Facility, the Debtors committed to "name the Administrative Agent as insured party or loss payee with respect to applicable insurance policies."  Term Loan Facility at § 5.5(c).

46.     In conjunction with the Term Loan Facility, Debtors executed a Pledge and Security Agreement with Cortland Capital Market Services LLC., dated August 7, 2018 (the "Term Loan Security Agreement," a copy of which is attached as **Exhibit D**).

47.     Under the Term Loan Security Agreement, the Term Loan Agent received a collateral security interest in certain assets of each guarantor, as enumerated in Section 2.1 of the Term Loan Security Agreement.  *See* Term Loan Security Agreement at § 2.1.

48.     The Term Loan Agent's collateral security interest includes, in part, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1.  *See id.* at § 2.1.

49.     On November 1, 2018, Cortland Capital Markets Services LLC, as Term Loan Agent was issued an Evidence of Property Insurance Certificate ("Term Loan Agent Certificate"), stating that the Term Loan Agent is an "Additional Insured" and "Loss Payee" under the Policy.  *See* Term Loan Agent Evidence of Property Insurance Certificate at 1 (attached as **Exhibit E**).

50.     The Remarks of the Term Loan Agent Certificate state "Certificate holder as administrative agent, along with its successors and assigns (hereinafter referred to as the Lender), is named, as applicable, additional insured, mortgagee, and loss payee as its interests may appear and where required by written contract."  *Id.*

**B.    The Intermediation Facility and ICBCS Security Agreement.**

51.    On June 18, 2019, the Sixth Amended and Restated Supply and Offtake Agreement, among Philadelphia Energy Solutions Refining and Marketing LLC as PESRM, and ICBC Standard Bank PLC, as ICBCS.  (*See* Exhibit A.)

52.    Under the Intermediation Facility, PESRM committed to "name ICBCS as mortgagee, additional insured and loss payee…."  *See* Intermediation Facility at § 10.04(c)(ii).

53.    In addition to the Intermediation Facility, certain of the Debtors executed an Amended and Restated Pledge and Security Agreement among certain of the Debtors as Grantors, and ICBCS as SOA Collateral Agent, dated as of June 18, 2019 (the "ICBCS Security Agreement", attached hereto as **Exhibit F**).

54.    Under the ICBCS Security Agreement, ICBCS received a collateral security interest in certain assets of each guarantor, as enumerated in Section 2.1.  *See* ICBCS Security Agreement § 2.1.

55.    The ICBCS Pledged Collateral includes, in part, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1.  *See id.* at § 2.1(a)(xii).

56.    On November 1, 2018, ICBCS was issued an Evidence of Property Insurance Certificate ("ICBCS Certificate"), stating that ICBCS is an "Additional Insured" and "Loss Payee" under the Policy.  *See* ICBCS Evidence of Property Insurance Certificate at 1 (attached as **Exhibit G**).

57.    The Remarks of the ICBCS Certificate state "Certificate holder is named, mortgagee, loss payee, and additional insured as their interests may appear and where required by written contract."  *Id.*

11

## V.     THE INSURANCE PROCEEDS.

58.     The Debtors purchased an insurance program providing a total of $1.25 billion in coverage for property damage and business interruption losses during the period from November 1, 2018 through November 1, 2019.

59.     That program comprises several insurance policies with different insurers (collectively, the "Insurers"), each of which insures a portion—be it primary, excess, or a quota share of the total—of the $1.25 billion coverage limit stipulated in the Policy.

60.     Each Insurer's policy follows—albeit with minor deviations immaterial to the instant litigation—a base insurance contract form.   *See, e.g.,* General Security Indemnity Company of Arizona ("GSICA Policy"), **Exhibit H**.

61.     The Policy lists PES Energy Inc., PES Ultimate Holdings, LLC, and the other Debtors, as "Named Insureds."   *Id.* at Declarations ¶ 1.

62.     The "Business Interruption" provision in the "Time Element" section of the Policy covers "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein…"   *Id.* at Section II - Time Element Coverage ¶ 1.

63.     Pursuant to the Policy, Debtors are entitled to business interruption insurance proceeds for covered losses sustained over a period not to exceed to "twenty-four (24) months after application of the Retentions."   *Id.* at Section II - Time Element Coverage, ¶ 10(c).

64.     Put differently, subject to the terms of the policies, the business interruption insurance provision of the Policy provides coverage for losses associated with the Debtors' future inability to conduct business after the Girard Point Incident, for a coverage period as long as two years (following the application of a contractual waiting period).

12

### A.    The Term Loan Agent's Interest In The Proceeds.

65.    Under the Policy's "Loss Payable" clause, "[l]oss, if any, shall be adjusted with and made payable to the first Named Insured, or their order, whose receipt will constitute a full release of the Insurers' liability under this Policy." *Id.* Declarations ¶ 2.

66.    Additionally, pursuant to the "Lenders Loss Payable Clause," "[l]oss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract . . . as their interests may appear . . . ." *Id.* at General Conditions ¶ 33(a).

67.    The "Loss Payable" and "Lender Loss Payable" clauses work together to ensure that insurance proceeds are made payable to the Debtors as Insureds, or any lender designated by the Debtors.

68.    As discussed above, the Term Loan Security Agreement pledged, in writing, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1, to the Term Loan Agent. *See* Term Loan Security Agreement at § 2.1 (a)(xii).

69.    As such, the Term Loan Agent is a proper designee of the business interruption insurance proceeds pursuant to the Lenders Loss Payable Clause in the Policy.

70.    The Debtors further acknowledged the Term Loan Agent's security interest in the business interruption insurance proceeds in the forbearance agreement between PES Holdings, LLC and Cortland Capital Market Services LLC on July 3, 2019 (the "Term Loan Facility Forbearance Agreement," attached hereto as **Exhibit I**). *See id.* at Preliminary Statement ("acknowledging" that certain "property insurance proceeds" including "business interruption insurance proceeds" that are related to the Girard Point Incident "constitute Collateral securing the Obligations," and that the Term Loan Facility lenders "hold valid and perfected liens over any and all such" insurance proceeds).

13

### B.      ICBCS's Interest In The Proceeds.

71.     The Policy also contains four endorsements, two of which are loss-payee clauses. *See* GSICA Policy at 61.

72.     One loss payee clause states that ICBC is "hereby understood and agreed" to be "named as a Loss Payee / Mortgagee" under the Policy.  *See id.* at Endorsements ¶ 4.

73.     Thus, under the Policy, both the Term Loan Agent and ICBCS both have interests in the insurance proceeds owed to the Insureds under the Policy as a consequence of the Girard Point Incident (the "June 21 Insurance Proceeds").  The priority of the competing interests, however, is governed by the Intercreditor Agreement (discussed below), which provides the Term Loan Agent first priority over the business interruption insurance proceeds collateral.

## VI.    THE INTERCREDITOR AGREEMENT DETERMINES PRIORITY OVER THE COMMON COLLATERAL.

74.     The August 7, 2018 intercreditor agreement between MLC, ICBCS, Cortland Capital Market Services LLC, and certain of the Debtors (the "Intercreditor Agreement"), a copy of which is attached hereto as **Exhibit J**, governs the respective rights and priorities of the Term Loan Lenders and ICBCS with respect to the pledged collateral, including the business interruption insurance proceeds.

75.     The Intercreditor Agreement governs two primary categories of collateral—SOA Separate Assets and Collateral (which is collateral of ICBCS only), and Common Collateral (which is collateral that secures the obligations owed to ICBCS and the Term Loan Lenders).

14

A. **SOA Separate Assets and Collateral.**

76.     Under to the Intercreditor Agreement, certain collateral, identified as "SOA Separate Assets and Collateral" is collateral in which ICBCS has an exclusive security interest. *See* Intercreditor Agreement §§ 1.02, 9.01.

77.     The SOA Separate Assets and Collateral include, in relevant part, "(i) Certain Hydrocarbon Assets, (ii) Certain Refined Products Assets, (iii) Certain Rack Sale Refined Products Assets, (iv) Certain Hydrocarbon Receivables, (v) all Renewable Identification Numbers (other than those required to satisfy the obligations under the Consent Decree and Environmental Settlement Agreement entered into as of March 12, 2018 among the U.S., the U.S. Environmental Protection Agency and the Company), (vi) "all payments under any insurance, indemnity, warranty or guaranty of the foregoing…." *Id.* § 1.02, "SOA Separate Assets and Collateral" Definition.

78.     Put differently, ICBCS has an exclusive security interest in Certain Hydrocarbons—and Refined Products generated therefrom—and insurance proceeds only to the extent those proceeds are payments "of the foregoing" hydrocarbons or refined products.

79.     The Intercreditor Agreement does not grant ICBCS an exclusive security interest in business interruption insurance proceeds.

B. **The Term Loan Lenders Have A First Priority Lien On The Business Interruption Insurance Proceeds.**

80.     The Intercreditor Agreement sets out the parties' respective rights and priorities with respect to collateral pledged to both ICBCS and the Term Loan Lenders ("<u>Common Collateral</u>").

81.     With respect to Common Collateral pledged to both ICBCS and the Term Loan Lenders, a party can either have a "First Priority Lien" in collateral, or a "Second Priority Lien"

which is "expressly junior in priority" with respect to "any and all First Priority Liens." Intercreditor Agreement § 2.01(a).

82.    ICBCS has a First Priority Lien on the SOA Priority Collateral, as defined in the Intercreditor Agreement.  *Id.* § 1.02, Definition of "SOA Priority Collateral."

83.    The Term Loan Lenders have a First Priority Lien in "all 'Collateral' (as defined in the Term Loan Agreement) that is not SOA Priority Collateral or Excluded Property."  *Id.* § 1.02, Definition of "Term Loan Priority Collateral."

84.    In other words, the Term Loan Lenders have First Priority in **all** Common Collateral, unless the collateral is ***expressly carved out*** and given to ICBCS as SOA Priority Collateral in the Intercreditor Agreement.

85.    The Intercreditor Agreement provides ICBCS with First Priority on "all such Grantor's now existing or hereinafter arising (i) Accounts; (ii) Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii) (together with the items in clauses (i) and (ii) above, the "<u>Current Assets Collateral</u>")…."  *See id.* § 1.02, Definition of "SOA Priority Collateral."  ICBCS also has first priority with respect to a number of items (*e.g.*, Money and Deposit Accounts, General Intangibles, Instruments, Commercial Tort Claims, Supporting Obligations, Letters of Credit), but only insofar as they relate to the Current Assets Collateral.  *See* Intercreditor Agreement at § 1.01, Definition of SOA Priority Collateral (iii)-(vii).

86.    ICBCS also has First Priority collateral rights to certain insurance proceeds, but those rights are limited.  Specifically, under the Intercreditor Agreement's definition of SOA Priority Collateral, ICBCS has First Priority on "any and all Proceeds of any insurance" only

16

"with respect to any of the foregoing" categories related to the Current Assets Collateral (*i.e.* Accounts or Inventory). *See id.* at §1.02, Definition of SOA Priority Collateral (vii).

87.     Business interruption insurance proceeds are not included in the SOA Priority Collateral definition under the Intercreditor Agreement.

88.     Because business interruption insurance proceeds are not included as SOA Priority Collateral, the Term Loan Lenders have First Priority on the business interruption insurance proceeds.

## VII.    THE DIP INTERIM ORDER AND THE INSURANCE PROCEEDS ORDER

89.     Determining which party—ICBCS or the Term Loan Lenders—has priority under the Intercreditor Agreement with respect to the business interruption insurance proceeds is integral to the continuation of the Debtors' chapter 11 case.

90.     On July 23, 2019, this Court approved the *Interim Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C §§ 105, 361, 362 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "Interim Order").

91.     Pursuant to the Interim Order, "the proceeds of any claim under the Debtors' property damage and/or business-interruption insurance policies, relating directly or indirectly, to the fire that occurred in the Girard Point refinery on June 21, 2019 . . . constitute Term Loan Priority Collateral; *provided*, that both the DIP Lenders and ICBCS reserve all rights in connection with the Final Order [*i.e.*, the order granting the DIP Motion on a final basis] with

17

respect to (i) the priority of additional DIP draws and (ii) marshaling obligations . . . of the DIP Lenders to the June 21 Insurance Proceeds in excess of $25 million."  Interim Order at ¶ 5(d).

92.     Borrowing language from that certain superpriority secured debtor-in-possession credit agreement dated as of July 24, 2019 and entered into between certain of the Debtors and several lenders (the "DIP Credit Agreement"), the Interim Order further provides that if the Debtors have not "(a) filed a motion seeking entry of the Insurance Proceeds Order, within 21 calendar days after the entry of the Interim Order; and/or (b) obtained entry of the Insurance Proceeds Order, within 90 calendar days after the entry of the Interim Order," then an "Event of Default" will have occurred thereby "terminat[ing] the right of the Debtors to use Cash Collateral."  Interim Order at ¶ 19(c)(xii); DIP Credit Agreement at 87.

93.     The DIP Credit Agreement defines the requisite "Insurance Proceeds Order" as "an order of the Bankruptcy Court determining that the June 21 Insurance Proceeds constitute 'Term Loan Priority Collateral'" as defined in the Term-SOA Intercreditor Agreement.

94.     Pursuant to the Interim Order and the Debtors' interests in exiting bankruptcy as efficiently as possible, the Debtors therefore file this Complaint seeking from this Court a declaratory judgment determining that the Term Loan Lenders have first priority over the June 21 Insurance Proceeds.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

95.     The Debtors repeat and reallege each of the averments contained in Paragraphs 1–94 above, as if fully set forth herein.

96.     An actual controversy exists between the Debtors and Defendants regarding the rights to the June 21 Insurance Proceeds, specifically whether the June 21 Insurance Proceeds

DOCS_DE:224899.1 70753/001

constitute Term Loan Priority collateral as defined in the Existing Intercreditor Agreement.  *See* 28 U.S.C. § 2201.

97.    Under the Policy and the Term Loan Agreement, both the Term Loan Agent and ICBCS are loss payees and thus have claims to the June 21 Insurance Proceeds.

98.    Pursuant to the Intercreditor Agreement, the Term Loan Agent has priority superior to that of ICBCS in all but a narrow, enumerated universe of the Debtors' collateral.

99.    The proceeds from the Debtors' business interruption insurance contracts do not fall within ICBCS's scope of priority.

100.    The Term Loan Lenders therefore have a right to the June 21 Insurance Proceeds superior to that of ICBCS.

101.    Pursuant to the foregoing, the Debtors respectfully requests that the Court: (1) declare and adjudge that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral as defined in the Intercreditor Agreement; and (2) award the Plaintiffs such other and further relief which this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment and granting the following relief:

a.   declaring and adjudging that the June 21 Insurance Proceeds constitute Term Loan Priority collateral as defined in the Existing Intercreditor Agreement; and

b.   awarding the Plaintiffs such other and further relief which this Court deems just and proper.

DOCS_DE:224899.1 70753/001

Dated:  August 7, 2019  
Wilmington, Delaware  

*/s/ Laura Davis Jones*  
Laura Davis Jones (DE Bar No. 2436)  
James E. O'Neill (DE Bar No. 4042)  
Peter J. Keane (DE Bar No. 5503)  
**PACHULSKI STANG ZIEHL & JONES LLP**  
919 North Market Street, 17th Floor  
P.O. Box 8705  
Wilmington, Delaware 19899-8705 (Courier 19801)  
Telephone:   (302) 652-4100  
Facsimile:   (302) 652-4400  
Email:        ljones@pszjlaw.com  
              joneill@pszjlaw.com  
              pkeane@pszjlaw.com  

- and -

Edward O. Sassower, P.C.  
Steven N. Serajeddini  (admitted *pro hac vice*)  
Matthew C. Fagen (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:   (212) 446-4800  
Facsimile:   (212) 446-4900  
Email:        edward.sassower@kirkland.com  
              steven.serajeddini@kirkland.com  
              matthew.fagen@kirkland.com  

Michael Slade (admitted *pro hac vice*)  
Nader R. Boulos (admitted *pro hac vice*)  
William T. Pruitt (admitted *pro hac vice*)  
Whitney L. Becker (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 N. LaSalle  
Chicago, Illinois 60654  
Telephone:   (312) 862-2000  
Facsimile:   (312) 862-2200  
Email:        mslade@kirkland.com  
              nboulos@kirkland.com  
              wpruitt@kirkland.com  
              whitney.becker@kirkland.com  

*Co-Counsel to the Debtors and Debtors in Possession*

*/s/ James I. McClammy*
Damian S. Schaible (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
David B. Toscano (admitted *pro hac vice*)
Aryeh Ethan Falk (admitted *pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone:    (212) 450-4000
Facsimile:    (212) 701-5800
Email:        damian.schaible@davispolk.com
              james.mcclammy@davispolk.com
              david.toscano@davispolk.com
              aryeh.falk@davispolk.com

Robert J. Dehney
Andrew R. Remming
Paige N. Topper
**MORRIS NICHOLS ARSHT & TUNNELL LLP**
1201 North Market Street
Wilmington, DE 19899
Telephone:    (302) 658-9200
Facsimile:    (302) 658-3989
Email:        rdehney@mnat.com
              aremming@mnat.com
              ptopper@mnat.com

*Counsel to the Term Loan Agent*