## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:

PES HOLDINGS, LLC, *et al.*,[1]

                 Debtors.

: Chapter 11
:
: Case No. 19-11626 (KG)
:
:
: Jointly Administered
:
: RE: D.I. 464
:

-------------------------------------------------------- x

### FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b)

Upon the motion (the "Motion")[2] of PES Holdings, LLC (the "Borrower") and its affiliated debtors, each as a debtor and debtor in possession (collectively and including the Borrower, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the local rules for the District of Delaware (the "Local Bankruptcy Rules"), seeking, among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in, as applicable, the Motion or the DIP Credit Agreement.

(i)     authorization for (1) the Borrower to obtain post-petition financing (the "DIP Financing") consisting of a senior secured delayed draw term loan in the aggregate committed principal amount of up to $100,000,000 (the "DIP Term Loan"), with an Initial Commitment (as defined in the DIP Credit Agreement) of $65,000,000, and an option to draw up to an additional $20,000,000 of Incremental Loans (as defined in the DIP Credit Agreement, the "Incremental Facility", and together with the DIP Term Loan, the "DIP Facility") from certain Existing Term Loan Lenders, or affiliates or subsidiaries thereof, including on behalf of, as the investment advisors to, or managers of, certain investment vehicles and certain other lenders from time to time (collectively, the "DIP Lenders"), with Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, collectively with the DIP Lenders, the "DIP Secured Parties") and (2) the Guarantors to provide a guaranty of payment in respect to the Borrower's obligations in connection with the DIP Financing;

(ii)    authorization for the Debtors to (1) execute and enter into the Superpriority Secured Debtor-in-Possession Credit Agreement, among the Debtors, the DIP Lenders and the DIP Agent, substantially in the form attached as Exhibit B to the Interim Order (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement" and, together with the schedules and exhibits attached thereto and all agreements, documents, mortgages, instruments and/or amendments executed and delivered in connection therewith, including the "Rolling DIP Budget" (as defined in the DIP Credit Agreement) and attached as Exhibit C to the Interim Order, the "DIP Documents"), (2) perform under the DIP Agent Fee Letter attached to the Motion as Exhibit E (the "DIP Agent Fee Letter"), and (3) perform all such other and further acts as may be required in connection with the DIP Documents;

(iii)   authorization for the Debtors to immediately use proceeds of the DIP Financing and Cash Collateral (but excluding ICBCS's Cash Collateral (each as defined below)) to pay the fees including a funding fee in an amount equal to 8.00% of the amount of any Loan made by such Lender, which funding fee shall be earned on the date of the funding of any Loan by such Lender and payable in cash on the earliest to occur of (I) the repayment of such Loan (or any portion thereof, to the extent earned with respect to such portion), (II) the Maturity Date, and (III) the acceleration of the Loans and the termination of all Commitments with respect to the Facility in accordance therewith;

(iv)    costs and expenses required to be paid in connection with the transactions contemplated hereby and the above-captioned cases (the "Chapter 11 Cases"), in each case, in accordance with the Rolling DIP Budget, as set forth in the DIP Documents, and finance working capital needs and general corporate purposes, in accordance with the Rolling DIP Budget, as set forth in the DIP Documents, and the DIP Credit Agreement, on the terms set forth herein and in the DIP Documents and in each case subject to the Rolling DIP Budget, as set forth in the DIP Documents;

(v)     the grant of adequate protection to (1) the SOA Secured Parties (as defined below) under or in connection with that certain Sixth Amended and Restated Supply and Offtake Agreement, dated as of June 18, 2019, by and among Philadelphia Energy Solutions Refining and Marketing LLC ("PESRM"), the guarantors party thereto from time to time and ICBC Standard Bank Plc ("ICBCS") as collateral agent (in such capacity and any successors thereto, the "SOA Agent") and as Party to the agreement (the "SOA Secured Parties") (as amended, supplemented or otherwise modified prior to the date hereof, the "SOA Agreement") certain of whose liens and security interests with respect to the Prepetition Collateral (as defined herein) other than SOA Priority Collateral (as defined below) are being primed by the DIP Liens (as defined below) and (2) the Existing Term Loan Agent and the Existing Term Loan Secured Parties (each as defined below) under or in connection with that certain Credit Agreement, dated as of August 7, 2018, by and among PES Holdings LLC, as borrower, each of the guarantors party thereto from time to time, the several banks and other financial institutions or entities party thereto from time to time, the lenders party thereto from time to time (collectively, in such capacities, the "Existing Term Loan Lenders") and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "Existing Term Loan Agent" and, together with the Existing Term Loan Lenders, the "Existing Term Loan Secured Parties" and, together with the SOA Secured Parties, the "Prepetition Secured Parties" and, each, a "Prepetition Secured Party") (as amended by that certain First Amendment and Incremental Joinder thereto, dated as of February 11, 2019 and as further amended, supplemented or otherwise modified prior to the date hereof, the "Existing Term Loan Credit Agreement" and collectively with the mortgages, security agreements and all other agreements and documentation executed in connection therewith, the "Existing Term Loan Agreements" and, together with the SOA Transaction Documents (as defined below), the "Prepetition Debt Documents"), whose liens and security interests are being primed by the DIP Liens;

(vi)    authorization for the Debtors, subject to the Approved Budget (including permitted variances thereunder) and approval of the ICBCS Cash Collateral Terms (as defined herein), to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Existing Term Loan Secured Parties or the SOA Secured Parties (collectively, the "Adequate Protection Parties") has an interest, and the granting of adequate protection to the Adequate Protection Parties with respect to, *inter alia*, such use of their Cash Collateral and all use of and diminution in the value of the Prepetition Collateral, including Cash Collateral;

(vii)   subject to certain challenge rights set forth herein, approval of certain stipulations and releases by the Debtors with respect to the Prepetition Debt Documents and the liens and security interests arising therefrom;

(viii)  the grant of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and post-petition

property of the Debtors' estates (other than the Excluded Property (as defined in the DIP Documents) and other than as excluded herein) and all proceeds thereof (including any Avoidance Proceeds (as defined below) and subject to the Carve Out (as defined below), in each case with the relative priorities set forth on **Exhibit A** hereto;

(ix)    authorization for the Debtors, subject to the conditions set forth therein, to pay the fees set forth in the DIP Agent Fee Letter;

(x)    the limited waiver of the Debtors' right to surcharge the Prepetition Collateral and the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code (except the Insurance Recovery Surcharge (as defined below)) and any right of the Debtors with respect to the Prepetition Secured Parties and Prepetition Collateral under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(xi)    authorization of the Insurance Recovery Surcharge, subject to the conditions set forth herein;

(xii)    modification of the automatic stay to the extent set forth herein, in the DIP Documents, and in the Global Term Sheet (as defined below); and

(xiii)    that the Court schedule a final hearing (the "Final Hearing") on the Motion to consider entry of an order granting the Motion on a final basis (the "Final Order"), approving the relief granted herein on a final basis and authorizing the Borrower to forthwith borrow from the DIP Lenders in accordance with the DIP Documents up to the full amount of the DIP Facility, and PES Holdings, LLC and its subsidiaries as guarantors (the "Guarantors") to guaranty all obligations owing to the DIP Lenders under the DIP Documents.

Notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules on (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the DIP Agent, (iv) counsel to the DIP Lenders, (v) counsel to the SOA Agent, (vi) counsel to the Existing Term Loan Agent, (vii) the Internal Revenue Service, (viii) all parties known by the Debtors to hold or assert a lien on any asset of any Debtor, (ix) all relevant state taxing authorities, (x) all of the Debtors' landlords, and owners and/or operators of premises at which any of the Debtors' inventory and/or equipment is located, and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002. It appearing that

4

no other or further notice need be provided; and the Court having found that it may enter a final

order consistent with Article III of the United States Constitution; and the Court having reviewed

the Motion; and the Final Hearing having been held by the Court on November 14, 2019; and

the relief requested in the Motion being in the best interests of the Debtors, their creditors and

their estates and all other parties in interest in the Chapter 11 Cases; and the Court having

determined that the relief requested in the Motion is necessary to avoid immediate and

irreparable harm; and the Court having determined that the legal and factual bases set forth in

the Motion establish just cause for the relief granted herein; and upon the record made by the

Debtors in the Motion, the *Declaration of John Singh in Support of the Debtors' Motion for

Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition

Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting

Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363,

364, and 507(b), and (III) Granting Related Relief*, attached to the Motion as <u>Exhibit B</u>, the

*Declaration of Jeffrey S. Stein in Support of the Debtors' Motion for Entry of Interim and Final

Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C.

§§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize

Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition

Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(b), and (III) Granting

Related Relief*, attached to the Motion as <u>Exhibit C</u>, and *the Declaration of Jeffrey S. Stein, Chief

Restructuring Officer of PES Holdings, LLC, in Support of Chapter 11 Petitions and First Day

Motions*, and at the Interim Hearing and the Final Hearing and after due deliberation and

sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.*  The relief requested in the Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Final Order shall become effective immediately upon its entry.  Except as specifically amended, supplemented, or otherwise modified by this Final Order, all provisions of the Interim Order, including, but not limited to, findings of fact, conclusions of law, and authorizations made by this Court, remain in full force and effect and are hereby ratified by this Final Order and incorporated herein by reference as though set forth fully below.

2.    *Jurisdiction.*  The Court has core jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice.*  Notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Final Order shall be required.

4.    *Prior Chapter 11 Orders and Prepetition SOA Transactions.*

(i)    The Prior Chapter 11 Cases.

(a)    The Debtors previously reorganized under chapter 11 of the Bankruptcy Code in Jointly Administered Case No. 18-10122.  In those cases, the Bankruptcy Court entered the *Order (I) Approving Technical Modifications to the Plan and Confirmation Order Regarding the Debtors' New Intermediation Facility, and (II) Granting Related Relief* [Docket No. 463] (the "Confirmation Modification Order") dated June 4, 2018, which provides

that transfers of inventory to ICBCS are absolute conveyances and true sales such that ICBCS takes title to and owns such inventory.

(b)        On July 23, 2018, the Bankruptcy Court entered the *Order (i) Approving Certain Implementation Conditions with Respect to New Intermediation Facility, and (ii) Granting Related Relief* [Docket No. 499] (the "Bankruptcy Emergence Order") under which the Bankruptcy Court approved a proposed Master Transaction Agreement (as defined below) and the phase transactions contemplated therein. In addition, the Bankruptcy Emergence Order provides that the true-sale protections and other protections granted to ICBCS in the Confirmation Modification Order apply to the transactions contemplated under the Master Transaction Agreement, including the SOA.

(c)        Under the Bankruptcy Emergence Order, the Bankruptcy Court found that (i) ICBCS is a "forward contract merchant" and/or "swap participant" as such terms are used in sections 556 and/or 560 and defined in section 101 of the Bankruptcy Code; (ii) that the transactions contemplated by the Master Transaction Agreement (as defined below) are "forward contracts" and/or "swap agreements," as the case may be, as such terms are defined in sections 101 of the Bankruptcy Code and, are therefore safe harbor contracts under the applicable provisions of the Bankruptcy Code ("Safe Harbor Contracts"). As Safe Harbor Contracts, the right of ICBCS to cause the liquidation and/or termination of the transactions contemplated by the Master Transaction Agreement because of a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code is not and cannot be stayed, avoided or otherwise limited by operation of any provision of the Bankruptcy Code or order of this Court.

(ii)        The Supply and Offtake Agreement and Related Documents

(a)    Following entry of the Bankruptcy Emergence Order, on August 7, 2018, Merrill Lynch Commodities, Inc. ("MLC"), ICBCS, PESRM, and PES Inventory Company, LLC ("PESIC") entered into the Master Transaction Agreement dated August 7, 2018 (the "Master Transaction Agreement"), which governs the terms of intermediation, hedging, and certain other transactions among MLC, ICBCS, PESRM, and PESIC.

(b)    On June 18, 2019, ICBCS and PESRM, along with certain guarantor parties, entered into the Sixth Amended and Restated Supply and Offtake Agreement (the "SOA Agreement") under which ICBCS provides intermediation services to PESRM with respect to both crude oil and refined products.  Under the SOA Agreement, it is the stated intention of PESRM and ICBCS that each conveyance of inventory under the SOA Agreement constitutes a true sale and an absolute conveyance.

(c)    The following documents were also executed in connection with the SOA Agreement (collectively, the "SOA Related Documents"): (1) Amended and Restated Consulting Agreement between PESRM and ICBCS dated June 18, 2019 (the "Consulting Agreement"); (2) Amended and Restated Marketing and Sourcing Agreement between PESRM and ICBCS dated June 18, 2019 (the "MS Agreement"); (3) Amended and Restated Pledge and Security Agreement among PESRM and the other grantor parties thereto in favor of ICBCS dated June 18, 2019 (the "Security Agreement"); (4) Amended and Restated Terminating, Transportation and Storage Services Agreement dated June 18, 2019 (the "Storage Agreement"). The Master Transaction Agreement, the SOA Agreement, the SOA Related Documents, Uniform Commercial Code financing statements, and all other related documents are collectively referred to herein as the "SOA Transaction Documents").   Events of default have occurred and are continuing under, without limitation, (1) (i) Section 14.01(a) of the SOA Agreement and (ii)

Section 14.01(b) of the SOA Agreement with respect to Section 8.04(b), (2) the foregoing events of default are material and not capable of being cured, and (3) as a result of such defaults, on July 19, 2019 ICBCS terminated the SOA Agreement prior to the Petition Date. Prior to the Petition Date, the Debtors sent ICBCS a notice that a Force Majeure event had occurred pursuant to Article 15 of the SOA Agreement, due to the June 21, 2019 Incident. The foregoing statements in this paragraph 4 are subject to the rights of the Official Committee of Unsecured Creditors (the "Creditors' Committee") to assert a challenge pursuant to paragraph 22 of this Order.

5.    *Debtors' Stipulations.* Without prejudice to the rights of the Creditors' Committee or any other party in interest (in each case, subject to the limitations thereon contained in paragraphs 22 and 24 below), the Debtors admit, acknowledge, stipulate and agree that:

(a)    (i) as of the date (the "Petition Date") of the filing of the Debtors' Chapter 11 Cases, PESRM was justly and lawfully indebted and liable to (1) the SOA Secured Parties, without defense, counterclaim or offset of any kind, pursuant to, and in accordance with the terms of, the SOA Agreement for all Obligations (as defined in the SOA Agreement) (the "SOA Debt"), which SOA Debt has been guaranteed on a joint and several basis by PES Holdings, LLC, North Yard Logistics, L.P., North Yard GP, LLC, and PES Administrative Services, LLC (in such capacity, the "SOA Guarantors") and (2) the Existing Term Loan Secured Parties without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of approximately $698,639,651.00 in respect of loans made pursuant to, and in accordance with the terms of, the Existing Term Loan Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under

the Existing Term Loan Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the Existing Term Loan Agreements (collectively, the "Existing Term Loan Debt" and, together with the SOA Debt, the "Prepetition Debt"), which Existing Term Loan Debt has been guaranteed on a joint and several basis by each subsidiary of the Borrower (in such capacity, the "Existing Term Loan Guarantors"), (ii) the Prepetition Debt  constitutes the legal, valid, binding, and non-avoidable obligations of the Borrower, SOA Guarantors, and the Existing Term Loan Guarantors, as applicable, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Debt Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law (except in the case of the SOA Debt, to the extent set forth in the SOA Agreement);

(b)    the liens and security interests granted to the SOA Secured Parties (the "SOA Liens") pursuant to and in connection with the SOA Transaction Documents, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the SOA Separate Assets and Collateral (as defined in that certain Intercreditor Agreement, dated as of August 7, 2018, among the Existing Term Loan Agent, Merrill Lynch Commodities, Inc., as the Initial SOA Collateral Agent, ICBCS, as the Successor SOA Collateral Agent, the Borrower, PESRM, and the Other Grantors Party Thereto (the "Existing Intercreditor

Agreement")); (ii) valid, binding, perfected, enforceable, first-priority liens and security interests in the SOA Priority Collateral (as defined in the Existing Intercreditor Agreement) (the "SOA Priority Collateral"), (iii) valid, binding, perfected, enforceable, junior-priority liens and security interests in the Term Loan Priority Collateral (as defined in the Existing Intercreditor Agreement) (the "Term Loan Priority Collateral" and, together with the SOA Separate Assets and Collateral and the SOA Priority Collateral, the "Prepetition Collateral"), (iv) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law and (v) as of the Petition Date, subject and subordinate only to, (A) in the case of the Term Loan Priority Collateral, the liens and security interests in favor of the Existing Term Loan Secured Parties and (B) valid, perfected and unavoidable liens permitted under the SOA Transaction Documents to the extent that such permitted liens are senior to or *pari passu* with the liens of the SOA Agent on the Prepetition Collateral;

(c)    the liens and security interests granted to the Existing Term Loan Secured Parties (the "Existing Term Loan Liens") pursuant to and in connection with the Existing Term Loan Agreements, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Term Loan Priority Collateral, (ii) valid, binding, perfected, enforceable, junior-priority liens and security interests in the SOA Priority Collateral, (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, crossclaim, offset, recoupment, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law, and (iv) as of the Petition Date, subject and subordinate only to (A) in the case of the SOA Priority Collateral, the liens and security interests in favor of the SOA Secured Parties and (B) valid, perfected and unavoidable liens permitted under the Existing Term Loan

Agreements to the extent that such permitted liens are senior to or *pari passu* with the liens of the Existing Term Loan Agent on the Prepetition Collateral;

(d)    the proceeds of any claim of the Debtors under the Debtors' property damage and/or business interruption insurance policies, relating directly or indirectly, to the fire that occurred in the Girard Point refinery on June 21, 2019 (the "June 21 Incident"), including, without limitation, Policy No. 10F152096-2018-1 dated as of December 10, 2018 and issued by the General Security Indemnity Company of Arizona (collectively, the "June 21 Insurance Proceeds"), constitute Term Loan Priority Collateral; *provided, that*, for the avoidance of doubt, the June 21 Insurance Proceeds do not include any proceeds on account of the ICBCS Direct Insurance Claim (as defined below) which do not constitute Common Collateral (as defined in the Existing Intercreditor Agreement) and, *provided, further, however*, that the foregoing admission is subject to the provisions of paragraph 6 hereof;

(e)    none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt Documents;

(f)    no claims, counterclaims, objections, defenses, set-off, rights, challenges or causes of action exist against, or with respect to, the Prepetition Secured Parties or any of their respective affiliates, agents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the aforementioned parties or their interest in the Prepetition

Collateral, subordination, avoidance or other claims), in connection with or arising under any Prepetition Documents or the transactions contemplated thereunder or the Prepetition Debt or Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery; and the Debtors and their estates hereby release and discharge any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of actions;

(g)    subject to paragraph 22 below, effective as of the date of entry of the Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective Representatives (as defined below) in their capacity as such and not in any other capacity related to the Debtors (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Debt Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties in their capacity as such and not in any other capacity related to the Debtors for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim Order, whether such Released Claims are matured, contingent, liquidated, unliquidated, unmatured, known, unknown or otherwise;

(h)    The Existing Intercreditor Agreement is binding and enforceable against the Borrower and the Guarantors in accordance with its terms; and

(i)    all cash, securities or other property of the Debtors (and the proceeds therefrom) as of the Petition Date, including all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Debtors in any account or accounts with any depository institution (collectively, the "Depository Institutions") were subject to rights of set-off and valid, perfected, enforceable liens under the Prepetition Debt Documents and applicable law, for the benefit of the Prepetition Secured Parties.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

6.    *Effect of Stipulation.*  The Creditors' Committee, the SOA Secured Parties, and the Existing Term Loan Lenders dispute, among other things, whether the Inventory (as defined in the Existing Intercreditor Agreement) portion of the property damage portion of the June 21 Insurance Proceeds and/or whether the business interruption portion of the June 21 Insurance Proceeds constitute Term Loan Priority Collateral (collectively, the "Disputed Priority June 21 Insurance Proceeds"), and the Creditors' Committee disputes whether the property damage portion of the June 21 Insurance Proceeds constitutes Term Loan Priority Collateral, and such parties are currently litigating such issues (and other issues related to the June 21 Insurance Proceeds) in Adv. Pro. No. 19-50282 (KG) (the "Insurance Adversary Proceeding").  The Debtors' stipulation in paragraph 5(d) above does not modify or shift any burden, including the

burden of proof, of any party for any claim or defense in any Challenge Proceeding, including the Insurance Adversary Proceeding, or constitute a waiver of any claims, defenses, or other rights the SOA Secured Parties may have to challenge the respective priority of liens on the June 21 Insurance Proceeds or any claims or other rights the Creditors' Committee may have to challenge the respective claims or liens of the SOA Secured Parties and/or the Existing Term Lenders to the business interruption portion or any other aspect of the June 21 Insurance Proceeds pursuant to Paragraph 22 hereof (subject to the limitations set forth in Paragraphs 22 and 23 hereof). For the avoidance of doubt, unless otherwise provided herein, nothing in the Interim Order or this Final Order shall be deemed to alter, limit, modify, or impair any rights provided in section 502(a) of the Bankruptcy Code, Rule 3007 the Bankruptcy Rules, or Local Bankruptcy Rules 3007-1 and 3007-2 of parties in interest to object to proofs of claim filed against any of the Debtors.

7.    *Findings Regarding the DIP Financing, Cash Collateral, and Adequate Protection.*

(a)    Good and sufficient cause has been shown for the entry of this Final Order and authorization for the Debtors to obtain financing pursuant to the DIP Credit Agreement.

(b)    The Debtors have a need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) in order to permit the Debtors, among other things, to maximize value for stakeholders and ensure adherence to health, safety, and environmental obligations while pursuing other significant sources of value for their estates, including property and business interruption insurance claims for the losses caused by the June 21 Incident. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness

15

under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Agent and the DIP Lenders, the DIP Liens and the DIP Superpriority Claims (as defined below), and incurring the Adequate Protection Obligations (as defined below), in each case subject to the Carve Out and on the terms and conditions set forth in this Final Order and in the DIP Documents.

(d)    Based on the Motion, the declarations filed in support of the Motion and the record presented to the Court at the Final Hearing, the terms of the DIP Financing and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed under the Existing Intercreditor Agreement to have consented to the Debtors' use of the Cash Collateral and the other Prepetition Collateral on the terms set forth herein, and the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Final Order, the DIP Documents, and the Global Term Sheet.

(f)     The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral), and the other terms and arrangements set forth herein, have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders and the Adequate Protection Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including (i) all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents (the "DIP Loans") and (ii) any "Obligations" (as defined in the DIP Credit Agreement), in each case owing to the DIP Agent, any DIP Lender or any of their respective banking affiliates (all of the foregoing in clauses (i) through (ii) collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent, the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Adequate Protection Parties have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined below)), in accordance with the terms hereof, and the Adequate Protection Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)    The Adequate Protection Parties are entitled to the adequate protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral), together with the other terms and arrangements set forth herein, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided* that nothing in the Interim Order, this Final Order, the other DIP Documents, or the Global Term Sheet shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Final Order, the Global Term Sheet, and in the context of the DIP Financing authorized by this Final Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, to seek new, different or additional adequate protection for any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date or assert the interests of any of the Prepetition Secured Parties and the rights of any other party in interest to object to such relief are hereby preserved.

(h)    The Debtors prepared and delivered to the DIP Agent and the DIP Lenders an initial budget (the "Initial Rolling DIP Budget"), a copy of which is attached to the Motion as Exhibit C.  As of the Petition Date, the Initial Rolling DIP Budget reflected the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar

week following the Petition Date (the Initial Rolling DIP Budget and each subsequent Rolling DIP Budget that is approved in accordance with the DIP Credit Agreement, an "Approved Budget"). The Debtors and DIP Lenders believe that the Initial Rolling DIP Budget is reasonable under the facts and circumstances. The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Approved Budget, the other DIP Documents, and this Final Order which shall be acceptable to the DIP Lenders in determining to enter into the postpetition financing arrangements provided for in this Final Order. The Debtors shall deliver each Rolling DIP Budget to ICBCS and the financial advisors to the Creditors' Committee substantially contemporaneously with delivery to the DIP Agent and/or the DIP Lenders.

(i)    Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, together with the other terms and arrangements set forth herein, in each case in accordance with this Final Order, the DIP Documents, and Global Term Sheet, are in the best interests of the Debtors' estates and their creditors. The terms of this Final Order, the DIP Documents, and Global Term Sheet are fair and reasonable under the circumstances, reflect the Debtors' reasonable exercise of their business judgment and fiduciary duties, are in the best interests of the Debtors, and are supported by reasonably equivalent value and fair consideration.

8.    *Authorization of the DIP Financing, the DIP Documents and the DIP Agent Fee Letter.*

(a)    The Debtors are authorized on a final basis to execute, enter into and perform all obligations under the DIP Documents and the DIP Agent Fee Letter. The Borrower is authorized to forthwith borrow the full amount of the DIP Facility pursuant to the DIP Credit Agreement, each Guarantor is authorized to provide a guaranty of payment in respect of the

Borrower's obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including to provide working capital for the Debtors and to pay interest, fees and expenses in accordance with this Final Order and the DIP Documents and subject to the Approved Budget, as set forth in the DIP Documents. The Borrower is further authorized, subject to conditions set forth therein, to pay the fees set forth in the DIP Agent Fee Letter.

(b)    In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including the execution or recordation of security agreements, mortgages, deeds of trust and financing statements), and to pay all fees and expenses that may be reasonably required or necessary for the Debtors to implement the terms of performance of their obligations under the DIP Financing, including:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors, the DIP Agent and the requisite DIP Lenders may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and expenses paid in connection therewith, subject, in the case of professional fees and expenses, to the procedures set forth in paragraph 17(h) of this Final Order), that do not (1) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments (other than in an amount equal to the Incremental Loans) or the rate of interest,

funding fees or undrawn commitment fees payable thereunder, (2) increase existing fees or add new fees thereunder, (3) shorten the case milestones (as set forth in the DIP Credit Agreement), or (4) provide for the application, use, and/or disposition, of the June 21 Insurance Proceeds in a manner inconsistent with this Final Order or the Global Term Sheet (such authorizations, amendments, waivers, consents or other modifications not requiring further approval of the Court, "Immaterial Amendments"); a copy of all amendments to the DIP Documents, whether material or immaterial, shall be provided by the Debtors to lead counsel to each of the Creditors' Committee and SOA Agent within one (1) business day of the date when executed;

(iii)    the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all reasonable and documented fees which fees are, and are deemed to have been, approved by this Final Order and, upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Debtors, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, reasonable and documented fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; provided, that the approval of fees payable under this paragraph shall be subject to the requirements for payments of such fees as outlined in paragraph 17(h) and 17(c) of this Final Order; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    The DIP Documents constitute valid, binding and unavoidable obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents and this Final Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Final Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548 or 549 of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

(d)    In accordance with the Global Term Sheet, ICBCS shall have an allowed administrative claim in the amount of $5,000,000.00, an allowed secured claim in the amount of $20,382,069.00, and an allowed subordinated unsecured claim ranking behind all other non-subordinated general unsecured claims with respect to priority in the amount of $9,956,573.00 on account of the Remaining Volume Claims (as defined in the Global Term Sheet); *provided*, nothing in the Interim Order, this Final Order, or the Global Term Sheet shall affect, modify, amend, or limit ICBCS's rights, claims, and defenses to claims other than the Remaining Volume Claims that ICBCS may assert against the Debtors or the rights, claims, or defenses of the Debtors, Creditors' Committee, and other parties in interest to object to claims other than the Remaining Volume Claims as provided herein.

9.    *Carve Out.*

(a)    Carve Out.  As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory

rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees"), whether allowed prior to or after the issuance of the Carve-out Trigger Notice (as defined herein), incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $6,250,000.00 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and counsel to the SOA Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP

Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

        (b)    <u>Carve Out Reserves</u>.  Subject to the limitations set forth in paragraph 9(f), on the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee and counsel to the SOA Agent (the "<u>Termination Declaration Date</u>"), the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  Subject to the limitations set forth in paragraph 9(f), on the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly Paid in Full[3] in which case any such excess shall be paid

---

[3] For purposes of this Final Order, the terms "Paid in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations, Existing Term Loan Debt, and/or SOA Debt (i) the indefeasible payment in full

to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been Paid in Full, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order, but subject to the limitations set forth in paragraph 9(f), if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 9(b), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserves, up to the applicable amount set forth in this paragraph 9(b), prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order, but subject to the limitations set forth in paragraph 9(f), following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents; *provided, however,* any portion of the Carve Out Reserves

---

in cash (or other agreed consideration) of such obligations, and (ii) the termination of all commitments under the DIP Documents, the Existing Term Loan Agreements, and/or the SOA Transaction Documents, as applicable.

funded from ICBCS's Cash Collateral or the June 21 Insurance Proceeds shall only be subject to a lien in favor of the DIP Agent and/or paid to the DIP Agent in an amount up to the Insurance Priming Cap (as defined below). Further, notwithstanding anything to the contrary in the Interim Order or this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Rolling Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors or allowable by the Court. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Order or this Final Order, the DIP Facility, or in any Prepetition Debt Documents, but subject to the limitations set forth in paragraph 9(f), the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligation or the Prepetition Secured Debt.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve Out Trigger Notice Cap.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy

Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the

DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to

reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient

funds to pay such compensation or reimbursement.

(e)    Payment of Carve Out On or After the Termination Declaration

Date.  Any payment or reimbursement made on or after the occurrence of the Termination

Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the

Carve Out on a dollar-for-dollar basis.

(f)    Limitation on Use of ICBCS's Cash Collateral.    Notwithstanding

anything to the contrary in paragraph 9(b), the DIP Documents, the Interim Order, or this Final

Order, the Debtors shall not sweep, foreclose on, or fund the Carve Out Reserves with ICBCS's

Cash Collateral without express written consent from ICBCS; *provided*, *however*, pursuant to

paragraph 9(b) and subject to the Global Term Sheet, the Debtors shall be permitted to sweep or

foreclose on ICBCS's Cash Collateral to fund the Carve Out Reserves solely in the amount of

any Allowed Professional Fees which have been agreed to by ICBCS, but are unpaid on the

Termination Declaration Date; *provided*, *further*, the Debtors shall be permitted to sweep or

foreclose on any additional amounts that the Debtors estimate in good faith, subject to the use of

commercially reasonable efforts, are required to ensure that the funding of the Carve Out

Reserves is proportionate to the Pre-Carve Out Amounts and Post-Carve Out Amounts allocable

to the applicable collateral pools, including, but not limited to, costs and expenses related to each

of the property damage and business interruption portions of the June 21 Insurance Proceeds.

Pursuant to paragraph 14, any SOA Priority June 21 Insurance Proceeds swept, foreclosed on,

or used to fund the Carve Out Reserves shall reduce dollar-for-dollar the Insurance Recovery

Surcharge and cannot exceed the amount of the Insurance Recovery Surcharge; *provided*, *further*, that notwithstanding anything to the contrary in this Final Order, to the extent that any SOA Priority June 21 Insurance Proceeds in excess of the Insurance Recovery Surcharge are swept, foreclosed upon, or used to fund the Carve Out Reserves pursuant to paragraph 9 hereof, the Adequate Protection Liens and Adequate Protection Claims of ICBCS shall be senior to the DIP Liens to the extent of the amount of such excess; *provided, further*, that the Marshall Away Amount shall only be swept, foreclosed on, or used to fund the Carve Out Reserves to the extent all other cash that the Debtors are entitled to sweep, foreclose on, or use to fund the Carve Out Reserves pursuant to the terms herein are insufficient to fund the Carve Out Reserves.

10.    *DIP Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations of the Debtors constitute allowed superpriority administrative expense claims against the Debtors (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including, to the extent set forth herein and in **Exhibit A**, the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof (excluding Avoidance Actions (as defined below) but including Avoidance Proceeds (as defined below)), subject only to the liens on such property and the Carve

Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

11.     *DIP Liens*. As security for the DIP Obligations, effective and automatically and properly perfected upon the date of entry of the Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens were granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), subject to the payment of the Carve Out and in each case in accordance with the priorities set forth in **Exhibit A** hereto (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Final Order and the DIP Documents, the "DIP Liens"):

(a)     First Lien On Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all tangible and intangible pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "Unencumbered Property"), including the Catalyst Assets (as defined in the Existing Term Loan Credit Agreement), any and all unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise, and including any cash proceeds of the DIP Financing) and any investment of such cash, inventory, accounts receivable, other rights

to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than (A) the Excluded Property (as defined in the Existing Intercreditor Agreement), but including any proceeds of Excluded Property that do not otherwise constitute Excluded Property, (B) the SOA Separate Assets and Collateral (as defined in the Existing Intercreditor Agreement), and (C) the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds").

(b)　　Liens Priming the Prepetition Secured Parties' Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries wherever located and the proceeds, products, rents and profits of the foregoing), which shall be senior in all respects

to (A) with respect to the Term Loan Priority Collateral including all June 21 Insurance Proceeds (other than the SOA Priority June 21 Insurance Proceeds[4] in excess of the amount of the Insurance Priming Cap[5]), the Existing Term Loan Liens, the SOA Liens, and the Adequate Protection Liens, and (B) with respect to SOA Priority Collateral other than SOA Priority June 21 Insurance Proceeds up to the Insurance Priming Cap, the Existing Term Loan Liens and the Existing Term Loan Adequate Protection Liens (it being understood and agreed that, with respect to the SOA Priority Collateral in excess of the Insurance Priming Cap, the DIP Liens are junior in all respects to the SOA Liens and the SOA Adequate Protection Liens, and that the DIP Liens do not extend to the SOA Separate Assets and Collateral); *provided*, that for the duration of these Chapter 11 Cases, the Debtors, DIP Lenders, and Existing Term Loan Lenders will not seek and hereby waive any right to grant or obtain liens on the SOA Priority Collateral, the SOA Separate Assets and Collateral, or the June 21 Insurance Proceeds that are senior to or *pari passu* with the SOA Liens and the SOA Adequate Protection Liens (as defined below), and the Debtors will oppose and object to any request by any other party to do so.

(c)    <u>Liens Junior to Certain Other Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all pre- and post-petition property of the Debtors (including cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general

---

[4] "SOA Priority June 21 Insurance Proceeds" means any portion of the June 21 Insurance Proceeds that is determined by final non-appealable order to constitute SOA Priority Collateral.

[5] The "Insurance Priming Cap" shall mean, as of any date of determination, the amount of the DIP Obligations outstanding under the Initial Loans (as defined in Amendment No. 3 to Superpriority Secured Debtor-In-Possession Credit Agreement, dated August 27, 2019 [D.I. 358-1], without giving effect to any outstanding Incremental Facility, received as of the day prior to the entry of this Final Order.

intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing) immediately junior to (A) with respect to the SOA Priority Collateral, the valid, perfected and unavoidable SOA Liens and the SOA Adequate Protection Liens; *provided*, for the avoidance of doubt and notwithstanding anything to the contrary in this paragraph 11(c), that with respect to the SOA Priority June 21 Insurance Proceeds, the DIP Liens shall be senior to the SOA Liens and SOA Adequate Protection Liens only in an amount up to the Insurance Priming Cap, (B) the valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are permitted under the Prepetition Debt Documents to the extent such permitted liens are senior or *pari passu* to the liens securing the Prepetition Debt, including, to the extent valid, perfected and unavoidable, (i) the valid, perfected and unavoidable  liens securing PESRM's obligations under the Installment Sale and Purchase Agreement dates as of May 7, 2014 between NGL Energy Partners L.P. (the "NGL Liens") and PESRM and (ii) the valid, perfected and unavoidable  liens of Sunoco Logistics Partners Operations L.P. ("SXL" and such liens, the "SXL Liens") upon those certain above-ground storage tanks listed on Schedule 1 to that certain Promissory Note, dated as of August 7, 2018 between SXL and PESRM, and (C) any such valid and unavoidable permitted liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (A), (B), and (C) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder.

(d)    <u>Liens Senior to Certain Other Liens</u>.    The DIP Liens shall not be (A) subject or subordinate to (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (2) unless otherwise provided for in the DIP Documents or in this Final Order, any liens or security interests arising after the Petition Date or (3) any intercompany or affiliate liens or security interests of the Debtors or (B) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code.

(e)    <u>Relative Priority of Liens</u>. Notwithstanding anything to the contrary in this Final Order or in the DIP Documents, the relative priority of each DIP Lien granted in this paragraph 11, the SOA Liens, the Existing Term Loan Liens, the SOA Adequate Protection Liens, the Existing Term Loan Adequate Protection Liens, the NGL Liens, and the SXL Liens shall be as set forth in **Exhibit A** attached hereto; *provided*, that for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve Out in all respects; *provided*, *further*, *that*, the relative priorities of certain liens and claims are subject to the Insurance Adversary Proceeding.

12.    *Protection of DIP Lenders' Rights.*

(a)    So long as the DIP Obligations have not been Paid in Full, in each case that are secured by DIP Liens that, in accordance with **Exhibit A** hereto, are senior to any liens held by the Prepetition Secured Parties with respect to any Collateral, then with respect to such Collateral, such Prepetition Secured Party shall (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Debt Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against such Collateral, including in connection with the Adequate

Protection Liens, (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after the DIP Obligations are Paid in Full), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such Collateral unless, solely as to this clause (iii), the DIP Agent or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date.

(b)    To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or Collateral that is subject to a DIP Lien that in accordance with **Exhibit A** hereto senior to the lien held by such Prepetition Secured Party, then such Prepetition Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any Prepetition Secured Party, to maintain possession or control of any Prepetition Collateral or Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP

Lenders to enforce all of their respective rights under the DIP Documents including any cash dominion with respect to a deposit account of the Debtors that is subject to a Deposit Account Control Agreement (as defined in the DIP Documents), as provided for in the DIP Documents (subject to the priorities set forth herein), and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains, (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors and (C) the termination of the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the Obligations) and (ii) unless the Court orders otherwise during the Remedies Notice Period (as defined below) upon a Remedies Hearing, upon the occurrence of an Event of Default and the giving of five (5) business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "Remedies Notice Period") via email to the Debtors, and counsel to the Debtors, lead counsel for the Creditors' Committee, counsel to the SOA Agent, and the U.S. Trustee to (A) withdraw consent to the Debtors' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law, with respect to the Collateral, subject to the limitations set forth in this Final Order; *provided*, that, for the avoidance of doubt, paragraph 12(c) shall exclude any deposit accounts of the Debtors that are subject to Deposit Account Control Agreements in favor of ICBCS.

(d)     During the Remedies Notice Period, the Debtors shall be permitted to use Cash Collateral constituting DIP Collateral to (A) pay payroll and other administrative expenses to keep the business of the Debtors operating and maximize value of the DIP

Collateral in accordance with the Approved Budget, (B) finance operations required to maintain the safety of the refinery, (C) administer the Chapter 11 Cases and (D) fund the Carve Out.

(e)    In no event shall the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or Prepetition Collateral; *provided, however*, that with respect to the business interruption portion of the June 21 Insurance Proceeds (the "June 21 Business Interruption Insurance Proceeds"), to the extent the SOA Debt and SOA Adequate Protection Obligations remain outstanding, the DIP Lenders agree to marshal away from all but $25.0 million of such June 21 Business Interruption Insurance Proceeds (the "Marshall Away Amount"). Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties; *provided, further*, that notwithstanding anything in this paragraph or any provisions of the Interim Order, unless otherwise stated in this Final Order, the "equities of the case" exception in section 552(b) of the Bankruptcy Code and all marshaling rights under applicable law shall be fully preserved with respect to parties other than the DIP Secured Parties and the Prepetition Secured Parties; *provided, further*, as provided in paragraph 14, the Insurance Recovery Surcharge (as defined herein) shall only apply to any SOA Priority June 21 Insurance Proceeds and nothing contained in this Paragraph shall relieve ICBCS from its obligations to make the payments to the Debtors expressly set forth in the Global Term Sheet.

(f)    Notwithstanding anything to the contrary herein, in the event that ICBCS exercises any actions to sweep or foreclose on ICBCS's Cash Collateral, including pursuant to any applicable Safe Harbor Contract rights, any such action to sweep or foreclose (i) shall

extend only to Prepetition Collateral constituting SOA Priority Collateral and shall not include proceeds, products, or offspring of the DIP Financing, and (ii) shall not extend to cash dominion with respect to a deposit account of the Debtors that forecloses, limits, or otherwise impairs the Debtors' access to proceeds, products, or offspring of the DIP Financing; *provided* that the Debtors shall deposit the DIP Financing proceeds in a separate account from the account containing the ICBCS's Cash Collateral to the extent practical.

(g)    No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Final Order or the DIP Documents shall be limited, modified or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral, (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

(h)    In addition, the DIP Secured Parties are hereby granted a non-exclusive worldwide license or right to use, to the maximum extent permitted by applicable law and to the extent of their interest therein, exercisable without payment of royalty or other compensation, any of the Collateral consisting of intellectual property in connection with the liquidation, collection, disposition or other realization upon Collateral or any other assets of the Debtors pursuant to any enforcement action by the DIP Agent and the DIP Lenders.

13.    *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Carve Out (subject to the limitation set forth in paragraph 9(f)) and the Insurance Recovery Surcharge (as set forth in paragraph 14 below), no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in

bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral), the SOA Priority Collateral, or the SOA Separate Assets and Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Existing Term Loan Agent, or the SOA Agent, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, and except to the extent set forth in paragraph 14, nothing contained in the Interim Order, this Final Order, the DIP Documents, or the Global Term Sheet shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral, the SOA Priority Collateral, or the SOA Separate Assets and Collateral under section 506(c) of the Bankruptcy Code or otherwise; *provided, however*, solely to the extent that it is determined by final non-appealable order that the SOA Secured Parties have failed to pay an amount owed under the Global Term Sheet, the Debtors may also seek to surcharge the SOA Priority Collateral and/or the SOA Separate Assets and Collateral pursuant to section 506(c) of the Bankruptcy Code up to the amount of any such non-payment. For the avoidance of doubt, nothing contained in this Paragraph shall relieve ICBCS from its obligation to make the payments to the Debtors expressly set forth in the Global Term Sheet.

14.    *Insurance Recovery Surcharge*.    Solely to the extent the June 21 Insurance Proceeds are determined by final non-appealable order to constitute SOA Priority Collateral, the Debtors may surcharge the SOA Priority June 21 Insurance Proceeds pursuant to section 506(c) of the Bankruptcy Code in an amount equal to the reasonable and necessary costs and expenses determined by the Court, or agreed to by the Debtors, the DIP Lenders, or after the DIP Obligations have been paid in full, the Required Existing Term Lenders, and ICBCS, as being

allocable to the preservation, preparation, and pursuit of the SOA Priority June 21 Insurance Proceeds (and the Debtors' claims thereto) *less* any amount of SOA Priority June 21 Insurance Proceeds applied to repay DIP Obligations (the "Insurance Recovery Surcharge"); *provided*, that the Insurance Recovery Surcharge shall not include such costs and expenses paid by the Debtors that are reimbursed or otherwise paid for directly or indirectly by the applicable insurers. For the avoidance of doubt, any SOA Priority June 21 Insurance Proceeds swept, foreclosed on, or used to fund the Carve Out Reserves pursuant to paragraph 9, shall reduce dollar-for-dollar the Insurance Recovery Surcharge and cannot exceed the amount of the Insurance Recovery Surcharge.

15. *Payments Free and Clear*. Subject only to the Carve Out and the Insurance Recovery Surcharge, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Existing Term Loan Agent, on behalf of the Existing Term Loan Lenders, or the SOA Agent on behalf of ICBCS pursuant to the provisions of the Interim Order, this Final Order, the DIP Documents, the Global Term Sheet, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the Debtors or 552(b) of the Bankruptcy Code).

16. *Adequate Protection of SOA Secured Parties*. The SOA Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the SOA Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any,

for any reason provided for under the Bankruptcy Code, including any such diminution that has or may result from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, any priming of the SOA Agent's security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Final Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "SOA Adequate Protection Claim"); *provided*, *however*, that the Creditors' Committee's and all other parties in interest's rights are reserved with respect to whether any asserted diminution has been caused by the imposition of the automatic stay due to the bankruptcy as contemplated by section 361 of the Bankruptcy Code and whether the SOA Secured Parties' SOA Liens have suffered any diminution by any priming of such liens by the DIP Obligations.    In consideration of the foregoing, the SOA Agent and the SOA Secured Parties are hereby granted the following (collectively, the "SOA Adequate Protection Obligations"):

(a)    SOA Adequate Protection Liens.  The SOA Agent (for itself and for the benefit of the SOA Secured Parties) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the SOA Adequate Protection Claim, and subject to the Insurance Recovery Surcharge, a valid, perfected replacement security interest in and lien upon the SOA Priority Collateral and the Term Loan Priority Collateral and adequate protection liens on the Unencumbered Property, including the Catalyst Assets (the "SOA Adequate Protection Liens"), the SXL Collateral, and the NGL Collateral (except any Avoidance Proceeds or other proceeds arising from Avoidance Actions or other causes of actions asserted against any of the SOA Secured Parties), in

accordance with the priorities shown in **Exhibit A** and in each case subject to the Carve Out and paragraph 9(f).

(b)    SOA Section 507(b) Claim. The SOA Secured Parties are hereby granted, subject to the Carve Out and paragraph 9(f), an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code against the Debtors in the amount of the SOA Adequate Protection Claim with, except as set forth in this Final Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "SOA 507(b) Claim"); which SOA 507(b) Claim shall have recourse to and be payable from all of the Prepetition Collateral, including the Avoidance Proceeds (except any Avoidance Proceeds or other proceeds arising from Avoidance Actions or other causes of action asserted against any of the SOA Secured Parties). The SOA 507(b) Claim shall be subject and subordinate to the Carve Out.

17.    *Adequate Protection of Existing Term Loan Secured Parties.* The Existing Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, for and equal in amount to the aggregate diminution in the value of the Existing Term Loan Secured Parties' prepetition security interests in all Prepetition Collateral from and after the Petition Date, if any, including any such diminution that has or may result from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Existing Term Loan Secured Parties' security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Final Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Existing Term Loan Adequate Protection Claim"); *provided, however,* that the rights of the Creditors' Committee

and all other parties in interest are reserved with respect to the extent of any such diminution, including whether any diminution has been caused by the imposition of the automatic stay due to the bankruptcy as contemplated by section 361 of the Bankruptcy Code and whether the Existing Term Loan Secured Parties' Existing Term Loan Liens have suffered any diminution by the priming of the Existing Term Loan Liens by the DIP Obligations. In consideration of the foregoing, the Existing Term Loan Secured Parties are hereby granted the following (collectively, the "Existing Term Loan Adequate Protection Obligations"):

(a)    Existing Term Loan Secured Parties Adequate Protection Liens. The Existing Term Loan Agent (for itself and for the benefit of the Existing Term Loan Lenders) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Existing Term Loan Adequate Protection Claim, a valid, perfected replacement security interest in and lien upon the Collateral including the Avoidance Proceeds (except any Avoidance Proceeds or other proceeds arising from Avoidance Actions or other causes of action asserted against any of the Existing Term Loan Secured Parties) and adequate protection liens on the Unencumbered Property, including the Catalyst Assets (the "Existing Term Loan Adequate Protection Liens" and, together with the SOA Adequate Protection Liens, the "Adequate Protection Liens"), the SXL Collateral and the NGL Collateral in accordance with the priorities shown in **Exhibit A** and in each case subject to the Carve Out.

(b)    Existing Term Loan Secured Parties Section 507(b) Claim. The Existing Term Loan Secured Parties are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim (in the Debtors' cases only) as provided for in

section 507(b) of the Bankruptcy Code in the amount of the Existing Term Loan Adequate Protection Claim with, except as set forth in this Final Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Existing Term Loan 507(b) Claim" and together with the SOA 507(b) Claim, the "507(b) Claims"); which Existing Term Loan 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, the Avoidance Proceeds (except any Avoidance Proceeds or other proceeds arising from Avoidance Actions or other causes of action asserted against any of the Existing Term Loan Secured Parties). The Existing Term Loan 507(b) Claim shall be subject and subordinate only to the Carve Out and, with respect to the SOA Priority Collateral, the SOA 507(b) Claim, the DIP Superpriority Claims and the prepetition claims of the SOA Secured Parties. Except to the extent expressly set forth in this Final Order or the DIP Credit Agreement, the Existing Term Loan Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Existing Term Loan 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have been Paid in Full.

(c)    Existing Term Loan Secured Party Fees and Expenses.    The Existing Term Loan Agent, for the benefit of the Existing Term Loan Lenders, and the ad hoc committee of Existing Term Loan Lenders (the "Ad Hoc Term Loan Lenders") shall each receive current cash payments of all reasonable and documented pre- and post-petition fees and expenses (including pursuant to any fee letter related to the Existing Term Loan Agreements), which payments shall be made in the manner provided for in paragraph 17(h) below, including, but not limited to: (i) in the case of the Ad Hoc Term Loan Lenders, the reasonable and documented

fees and expenses of (A) Davis Polk & Wardwell LLP, (B) Morris, Nichols, Arsht & Tunnell LLP, (C) Houlihan Lokey Capital, Inc., including, for the avoidance of doubt, the financing fee and completion fee payable in accordance with the terms of the Houlihan Lokey Engagement Letter (which letter the Debtors shall be hereby authorized to execute) and, (D) if applicable, one counsel for issues pertaining to the Debtors' agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Services Workers International Union, AFL-CIO, CLC, and its Philadelphia Local 10-1 and (ii) in the case of the Existing Term Loan Agent, the reasonable and documented fees and expenses of (A) Norton Rose Fulbright US LLP, (B) one local counsel in the relevant jurisdiction, which counsel may be the same as such local counsel to the Ad Hoc Term Loan Lenders and (c) as special litigation counsel, Davis Polk & Wardwell LLP.  The rights of all parties, including, but not limited to the Existing Term Loan Secured Parties, are reserved as to whether payments made on account of the Ad Hoc Term Loan Lenders' fees and expenses pursuant to this paragraph 17(c) constitute payments of principal, interest or otherwise pursuant to section 506(b) of the Bankruptcy Code.

(d)    <u>Milestones</u>.    The Existing Term Loan Secured Parties are hereby entitled to performance of the Milestones as set forth in the DIP Credit Agreement; *provided*, that the Debtors shall provide the report contemplated in Section 5.17(c) of the DIP Credit Agreement to ICBCS and the Creditors' Committee's professionals substantially contemporaneously with delivery to the DIP Agent and/or DIP Lenders and shall also provide ICBCS and the Creditors' Committee professionals with the marketing plan contemplated by Section 5.17(d) of the DIP Creditors Agreement substantially contemporaneously with delivery to the DIP Agent and/or DIP Lenders.  The Debtors shall keep the Existing Term Loan

Secured Parties and ICBCS apprised of the status of the Debtors' sale and marketing process on a weekly basis.

        (e)   <u>Excess Cash Flow Sweep</u>.    Following the Payment in Full in cash of the DIP Obligations, the application of all mandatory prepayments (as described in the DIP Credit Agreement) to repayment of Obligations (as defined in the Existing Term Loan Credit Agreement) in accordance with the priority set forth in the Existing Term Loan Credit Agreement with a minimum cash threshold of $10,000,000.00, but solely to the extent that the source of such repayment constitutes Term Loan Priority Collateral, any amount in excess shall be applied to the repayment of the Existing Term Loan Lenders' outstanding Obligations under the Existing Term Loan Credit Agreement in a manner consistent with Section 7.03 of the Existing Term Loan Credit Agreement; it being understood, for the avoidance of doubt, that receipt of any June 21 Insurance Proceeds does not constitute a Recovery Event pursuant to the DIP Credit Agreement but that such proceeds shall be subject to any mandatory prepayment from excess liquidity under the DIP Credit Agreement, but that any mandatory prepayment of any June 21 Insurance Proceeds to be applied to the Existing Term Loan Lenders' outstanding Obligations under the Existing Term Loan Credit Agreement shall only be permitted upon notice and hearing before this Court; *provided*, *however*, that notwithstanding anything to the contrary in the Interim Order, this Final Order, or the DIP Agreements, the provisions of this paragraph 17(e) requiring mandatory prepayment shall exclude any SOA Priority June 21 Insurance Proceeds and any Disputed Priority June 21 Insurance Proceeds until such proceeds have been determined by final non-appealable order to constitute Term Loan Priority Collateral; *provided*, *further*, that, after the DIP Obligations have been paid in full, subject to paragraphs 17(f) and 21 herein, the consent of the Existing Term Loan Lenders shall be

required to apply any June 21 Insurance Proceeds constituting Term Loan Priority Collateral, excluding any Disputed Priority June 21 Insurance Proceeds until such proceeds have been determined by final non-appealable order to constitute Term Loan Priority Collateral, other than in accordance with section 5.12 of the DIP Credit Agreement, subject to further order of the Court; *provided, further*, that such consent of the Existing Term Loan Lenders shall not be required if it has been determined by final, non-appealable order that the Existing Term Loan Secured Parties do not have a valid, perfected, and non-avoidable interest in such June 21 Insurance Proceeds. For the avoidance of doubt, all rights of the Creditors' Committee and ICBCS to object to the proposed application of any property damage and/or business interruption insurance against the Obligations under the Existing Term Loan Credit Agreement or SOA Agreements, as provided in paragraphs 22(a) and 22(b) below, are hereby expressly preserved.

(f)    Insurance Covenant. In addition to the provisions in paragraph 29 of this Final Order, the consent of (i) the DIP Agent and the DIP Lenders, until such time as the DIP Obligations have been Paid in Full, and (ii) the "Required Lenders" (as defined in the Existing Term Loan Credit Agreement, the "Required Existing Term Loan Lenders") shall be required to settle any claim under the Debtors' property damage and/or business interruption insurance claims related to the June 21 Incident; *provided, however*, that, notwithstanding anything in this Final Order to the contrary, (i) any such settlement of an insurance claim shall be subject to the approval of this Court after proper notice and a hearing and (ii) the Existing Term Loan Agent and Required Existing Term Loan Lenders' consent to such settlement shall not be required if this Court or another court of competent jurisdiction has determined in a final non-appealable order that the Required Existing Term Loan Lenders (a) do not have a valid,

perfected lien in respect of such proceeds, or (b) do not have a priority lien (relative to the other party) in respect of such proceeds; *provided* and pursuant to the Global Term Sheet, that the Debtors shall, in good faith, consult in good faith and for a reasonable period of time prior to filing of a motion seeking approval of such settlement, with any such party (including, but not limited to, the Creditors' Committee, the Required Existing Term Loan Lenders, and the SOA Agent) regarding any such settlement; *provided, further,* that the respective rights of the Creditors' Committee, the Existing Term Loan Lenders, and the SOA Agent to object to any such settlement on any ground are hereby expressly preserved, and *provided, further,* the SOA Agent, the Debtors, the Creditors' Committee and the Existing Term Loan Lenders reserve all rights, claims, and defenses under the Existing Intercreditor Agreement, including, but not limited to, any right to assert that any settlement of the property damage and/or business interruption insurance claims related to the June 21 Incident proposed by the Debtors cannot be approved because it is impermissible as a matter of law and/or violates the Existing Intercreditor Agreement.  The Debtors shall keep the Creditors' Committee and ICBCS apprised of the status of the insurance claims related to the June 21 Incident and consult with the Creditors' Committee and ICBCS as to the settlement of any such insurance claim and the disposition of any settlement proceeds received in respect thereto prior to filing any such motion or settling any such claim.  For the avoidance of doubt, nothing in this paragraph shall limit or otherwise impair the Debtors' ability to request and/or receive advances on the June 21 Insurance Proceeds; *provided, however,* notwithstanding anything contrary in the Interim Order, this Final Order, or the DIP Agreements, the Debtors shall immediately deposit, or caused to be deposited, all Disputed Priority June 21 Insurance Proceeds in a segregated escrow account which shall be subject to the DIP Liens, the Adequate Protection Liens, and any

existing Prepetition Liens, each solely as provided in this Final Order, Court order, or upon agreement of the applicable parties; *provided*, *further*, *however*, the use and/or disposition of the Disputed Priority June 21 Insurance Proceeds, in each case, are subject to the provisions of this Final Order, the DIP Credit Agreement (including the Approved Budget), the ICBCS Cash Collateral Terms, and the express prior written consent of each of the Existing Term Loan Lenders and ICBCS shall be required (each subject to paragraph 20(e) herein).

(g)    Existing Term Loan Secured Parties' Additional Adequate Protection. Prior to the Debtors filing, supporting, bringing to the board for discussion or consideration, or making a proposal or counterproposal to any party relating to (any of the foregoing, a "Non-Permitted Action"), a plan of reorganization that does not propose to pay all claims on account of the Existing Term Loan Debt in cash or with such other consideration acceptable to the Required Existing Term Loan Lenders) (a "Non-Permitted Plan"), the Debtors shall provide not less than five (5) days written notice to counsel to the Existing Term Loan Agent (any such notice, a "Non-Permitted Plan Notice").  Upon delivery of a Non-Permitted Plan Notice, subject to the Remedies Notice Period, the Existing Term Loan Secured Parties shall have the right to terminate the Debtors' right to use Cash Collateral pursuant to this Final Order. Notwithstanding the foregoing, a Non-Permitted Action shall not include the Debtors' receipt from the Creditors' Committee of a proposal with respect to a Non-Permitted Plan or discussions with the Creditors' Committee regarding such proposal.

(h)    Payment of Fees and Expenses.  The payment of the fees, expenses and disbursements set forth in paragraph 17(c) of this Final Order (to the extent incurred after the Petition Date) shall be made within 10 days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the Creditors' Committee, if any, and

the U.S. Trustee (the "Review Period") of invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date. The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (*provided* that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates). The Debtors, the Creditors' Committee, if any, and the U.S. Trustee may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least 10 days' prior written notice of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided* that payment of any undisputed portion of Invoiced Fees shall not be delayed based on any objections thereto.

(i)    Upon Payment in Full of all DIP Obligations, the Rolling Budget shall continue to be updated in accordance with the terms and conditions of the DIP Credit Agreement, except that the approval of Required Existing Term Loan Lenders shall be substituted for the approval of the DIP Agent and/or the DIP Lenders. The Creditors' Committee's attorneys and financial advisors and the SOA Agent shall be provided with copies of the Rolling Budgets and all other financial reports and information to be provided to the DIP Secured Parties hereunder or under the DIP Credit Agreement.

18.   *Reservation of Rights of Prepetition Secured Parties.*   Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties; *provided* that any of the Prepetition Secured Parties, upon a change in circumstances, may request further or different adequate protection to be provided following notice and a hearing in this Court, and the Debtors or any other party may contest any such request.

19.   *Perfection of DIP Liens and Adequate Protection Liens.*

(a)   The DIP Agent, the DIP Lenders and the Adequate Protection Parties are authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.   Whether or not the DIP Agent, on behalf of the DIP Lenders, or the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final Order). Upon the request of the DIP Agent, each of the Prepetition Secured Parties (with respect to their respective Prepetition Collateral) and the Debtors, without any further consent of any

party, is authorized (in the case of the Debtors) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Final Order may, in the discretion of the DIP Agent, and the Adequate Protection Parties, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent and the Adequate Protection Parties to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

20.    *Preservation of Rights Granted Under This Final Order.*

(a)    The relative priority of the claims and liens expressly granted by this Final Order shall be as set forth in **Exhibit A**; *provided*, the relative priorities of certain liens and claims are subject to the Insurance Adversary Proceeding.

(b)    Other than the Carve Out and other claims and liens expressly granted by this Final Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Agent and the DIP Lenders, the SOA Secured Parties, or the Existing Term Loan Secured Parties, respectively, shall be granted or allowed while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in paragraphs 11, 16(a), 16(b), 17(a), or 17(b) of this Final Order,

the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date and (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(c)    Unless otherwise ordered by the Court or waived by the Required Existing Term Loan Lenders, the occurrence of any of the following events shall constitute an Event of Default and, subject to the Remedies Notice Period, terminate the right of the Debtors to use Cash Collateral:

(i)    the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), unless the DIP Obligations have been Paid in Full or such date has been extended pursuant to the terms of the DIP Credit Agreement;

(ii)    any modification, amendment, reversal, stay, supplement, vacation or extension of the Interim Order or this Final Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

(iii)    an order converting or dismissing any of the Chapter 11 Cases;

(iv)    an order appointing a chapter 11 trustee in the Chapter 11 Cases;

(v)    an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vi)    any termination or reduction of the period pursuant to section 1121 of the Bankruptcy Code during with the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof or such period shall expire without extension by the court;

(vii)    any material breach by the Debtors of any provisions of the Interim Order or this Final Order; *provided* that any breach of any

of the provisions of paragraph 17 of this Final Order is hereby deemed a material breach;

(viii)   other than in conjunction with the Insurance Recovery Surcharge, an order charging any of the Term Loan Priority Collateral of the Existing Term Loan Secured Parties or the Collateral of the DIP Secured Parties under sections 506(c) or 552(b) of the Bankruptcy Code, or an order requiring any of the Existing Term Loan Secured Parties or DIP Secured Parties to be subject to the equitable doctrine of "marshaling";

(ix)   entry of an order confirming a plan of reorganization that does not provide for Payment in Full of the DIP Obligations; or

(x)   the sale of all or substantially all of the assets of any of the Debtors (except to the extent permitted under the DIP Documents), which does not provide for the Payment in Full of the DIP Obligations upon the consummation thereof;

(xi)   the Debtors deliver a Non-Permitted Plan Notice or take any Non-Permitted Action;

(xii)   the Debtors have not: (a) filed a motion seeking entry of the Insurance Proceeds Order, within 21 calendar days after the entry of the Interim Order; and/or (b) obtained entry of the Insurance Proceeds Order within the later of (a) 120 calendar days after the entry of the Interim Order, and (b) any such period as provided for in the DIP Credit Agreement;

(xiii)   entry of a final order of any court of competent jurisdiction issuing a determination contrary to the Insurance Proceeds Order (whether or not the Insurance Proceeds Order has been entered);

(xiv)   any payment is made under any "first day order" that is materially inconsistent with the Approved Budget (without regard to any permitted variances) without the consent of the Required DIP Lenders or, following the Payment in Full of the DIP Obligations, the Required Existing Term Loan Lenders (in each case, as communicated by counsel thereto);

(xv)   following the later of (A) the Payment in Full of the DIP Obligations and (B) September 14, 2019, the negative Budget Variance with respect to disbursements of the Debtors (including with respect to disbursements of the professionals for the Debtors) shall exceed, in each case, the greater of (i) 10%, or (ii) $5 million;

(xvi)   any of the Debtors, without the prior written consent of the Required Existing Term Loan Lenders seeks, proposes or

53

supports, or if there is entered or confirmed (in each case, as applicable) any of the foregoing;

(xvii)   the Debtors retain counsel (or expand the scope of retention of existing counsel) to pursue any claims related to the June 21 Insurance Proceeds, unless such counsel is reasonably acceptable to the Required DIP Lenders (or, after the DIP Obligations have been paid in full, the Required Existing Term Loan Lenders);

(xviii)  following the Payment in Full of the DIP Obligations, any Debtor seeks approval or publicly announces that it will seek approval of any material non-ordinary course Disposition (as defined in the DIP Credit Agreement) in excess of $1,000,000, without the consent of the Required Existing Term Loan Lenders; or

(xix)    the failure of the Debtors to make any payment provided for under this Final Order for the benefit of the Existing Term Loan Secured Parties within five (5) business days after the date such payment is due.

Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or that otherwise is at any time entered (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly Paid in Full (or other agreed consideration) (and that such the DIP Superpriority Claims, the 507(b) Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the other rights granted by this Final Order shall not be affected and (iii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

(d)    If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations

incurred prior to the actual receipt of written notice by the DIP Agent, the SOA Agent, or the Existing Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, or the Adequate Protection Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the SOA Agent, or the Existing Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders, and the Adequate Protection Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and the DIP Documents.

(e)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, substantively consolidating any of the cases with another case, terminating the joint administration of the Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents) or (iii) the entry of an order confirming

a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Final Order and the DIP Documents shall continue in the Chapter 11 Cases, in any successor cases if the Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the 507(b) Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Adequate Protection Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are Paid in Full.

21.    *Cash Collateral and SOA Obligations.*  The Debtors shall be authorized to use ICBCS's Cash Collateral in accordance with this Final Order, including as set forth in the Global Term Sheet, dated November 13, 2019 (the "Global Term Sheet"), attached as **Exhibit C** to this Final Order (the "ICBCS Cash Collateral Terms"), which terms are approved and incorporated herein by reference. Unless otherwise provided in this Final Order, the Debtors shall obtain ICBCS's express prior written consent to use and/or dispose of ICBCS's Cash Collateral and/or the SOA Priority June 21 Insurance Proceeds and, solely with respect to the Disputed Priority June 21 Insurance Proceeds, the Debtors shall obtain the express prior written consent of each of the Existing Term Loan Lenders and ICBCS to use and/or dispose of the Disputed Priority June 21 Insurance Proceeds; *provided*, *however*, to the extent that Disputed Priority June 21 Insurance Proceeds cease to constitute Disputed Priority June 21 Insurance Proceeds because the Existing Term Loan Lenders and/or the SOA Agent, as applicable, (a) do not have a valid, perfected lien in respect of such proceeds, or (b) do not have a priority lien (relative to the other

party) in respect of such proceeds, the Existing Term Loan Lender's and/or SOA Agent's, as applicable, prior written consent shall not be required for use and/or disposition of such proceeds. Notwithstanding anything in this Final Order to the contrary, that release of the Disputed Priority June 21 Insurance Proceeds after the DIP Obligations have been paid in full shall only be permitted upon notice and hearing before this Court and all parties in interest (including, but not limited to, the Creditors' Committee, the Existing Term Lenders and the SOA Agent) reserve all of their rights to object to any such proposed release.  Pursuant to paragraph 17(f), the Debtors shall deposit into a separate segregated escrow account all Disputed Priority June 21 Insurance Proceeds which shall be subject to the DIP Liens, the Adequate Protection Liens, and any existing Prepetition Liens, each solely as provided in this Final Order, Court Order, or upon agreement of the applicable parties. In the event of a conflict between the terms of the Global Term Sheet and this Final Order, the terms of the Global Term Sheet shall control as to all matters specifically addressed in such Global Term Sheet.

22.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order and this Final Order, including in paragraphs 4 and 5 of the Interim Order and this Final Order, shall be binding upon the Debtors in all circumstances and for all purposes and  all other parties in interest, including the SOA Secured Parties, the Creditors' Committee, and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless (a) the SOA Secured Parties, the Creditors' Committee, or any other party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with standing granted by the Court, has timely and properly filed an

adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 22) (i) with respect to the SOA Secured Parties, challenging whether the June 21 Insurance Proceeds constitute Term Loan Priority Collateral; (ii) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of any of the Prepetition Debt  or the Prepetition Debt Liens; or (iii) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "Challenge Proceeding") against any of the Prepetition Secured Parties or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "Representative" and, collectively, the "Representatives") in connection with matters related to the Prepetition Debt Documents, the Prepetition Debt, the Prepetition Debt Liens, the Prepetition Collateral and the Existing Intercreditor Agreement by no later than a date (1) with respect to (x) the SOA Secured Parties and (y) parties in interest with standing other than the Creditors' Committee, the earlier of an order confirming a chapter 11 plan and 75 days after entry of the Interim Order and (2) with respect to the Creditors' Committee, entry of this Final Order or any such later date as has been agreed to, in writing without, for the avoidance of doubt the necessity of obtaining any further order of the Court, by (A) the SOA Agent with respect to any Challenge Proceeding against any SOA Secured Parties or (B) the Existing Term Loan Agent with respect to any Challenge Proceeding against any Existing Term Loan Secured Parties (the "Challenge Period"); *provided* that with respect to any chapter 7 trustee appointed prior to the expiration of the Challenge Period, such trustee shall have until (x) the end of the

Challenge Period and (y) 30 days from such appointment to commence a Challenge Proceeding; *provided further* that, notwithstanding any of the foregoing provisions of this paragraph to the contrary, in the event that the Creditors' Committee or any other party files a motion seeking standing to pursue a Challenge Proceeding against any SOA Secured Party or any Existing Term Loan Secured Party on or prior to the end of such Challenge Period, the Challenge Period shall be extended, solely with respect to the Challenge Proceeding for which such party seeks standing, to the date that is five (5) business days after the Court rules on such standing motion; and (b) there is a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding. Any complaint or motion for standing filed in, or in connection with, any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge Proceeding is timely filed during the Challenge Period or the Court or another court of competent jurisdiction does not rule in favor of the plaintiff in any such proceeding then (i) the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order or this Final Order, including those contained in paragraphs 4 and 5 of the Interim Order or this Final Order shall be binding on all parties in interest, including the Creditors' Committee, (ii) the obligations of the Debtors under the Prepetition Debt Documents, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s), (iii) the Prepetition Debt Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense, and (iv) the Prepetition Debt and the Prepetition Debt Liens shall

not be subject to any other or further claim or challenge by the Creditors' Committee, any non-statutory committees formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims and offsets by a Creditors' Committee, if any, any non-statutory committees formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties in their capacity as such and not in any other capacity; and their Representatives arising out of or relating to the Prepetition Debt Documents shall be deemed forever waived, released and barred.  If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim or this Final Order, including those contained in paragraphs 4 and 5 of the Interim or this Final Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee, if any, or any non-statutory committees formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenge Proceedings with respect to the Prepetition Debt Documents, the Prepetition Debt or the Prepetition Debt Liens, without further order of this Court upon the filing of a timely standing motion.  For the avoidance of doubt, the Insurance Adversary Proceeding shall constitute a Challenge Proceeding by ICBCS and the Creditors' Committee for the purpose of this paragraph 22.  Notwithstanding

the foregoing, prior to entry of an order confirming a chapter 11 plan, the Challenge Period established by this paragraph 22 --

     (a)    shall not apply to:

         (i)    Any objection, claim or defense to the priority or amount of the SOA Secured Parties' claims in these cases, (including, but not limited to, claims arising from or related to the Global Term Sheet, including any claim for amounts related to the Hydrocarbon Extraction & Evacuation Plan (as defined in the Global Term Sheet), but excluding the priority or amount of any allowed Remaining Volume Claims (as defined in the Global Term Sheet)), it being understood that the rights, claims and defenses of the SOA Secured Parties to assert, and the Debtors, the Creditors' Committee and all other parties in interest to challenge or object to on any grounds, any proof of claim other than the Remaining Volume Claims filed by the SOA Secured Parties, shall be fully preserved notwithstanding the Challenge Period; and

         (ii)    Any commercial tort claims which may be asserted during the pendency of these cases.

     (b)    shall be deemed extended through January 31, 2020 (or such other date as may be agreeable in writing by the Creditors' Committee, the SOA Agent, the Required Existing Term Loan Lenders, and the Term Loan Agent, as applicable) with respect to:

         (i)    Whether any payment made to the SOA Secured Parties prior to the Petition Date may be avoided as a preference or fraudulent transfer; and

(ii)     Whether a title survey or title examination would reveal that either

of the Prepetition Secured Parties failed to file or perfect mortgages on all

real property owned by the Debtors (but excluding, for the avoidance of

doubt, any other theory regarding perfection of the Prepetition Secured

Parties' liens on the real property owned by the Debtors).

(c)    shall be deemed extended through seven (7) calendar days from the entry

of this Final Order (or such other date as may be agreeable in writing by the Creditors'

Committee, the Required Existing Term Loan Lenders, and the Term Loan Agent) with respect

to:

(i)     Whether any payment made to the Existing Term Loan Secured

Parties prior to the Petition Date may be avoided as a preference or

fraudulent transfer.

For the avoidance of doubt, nothing in the Interim Order, this Final Order, the DIP Documents,

or the Global Term Sheet shall modify the Confirmation Modification Order or the Bankruptcy

Emergence Order.

23.    *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding

anything herein or in any other order by the Court to the contrary, no DIP Loans, Cash Collateral

(including ICBCS's Cash Collateral), Collateral, Prepetition Collateral, or the Carve Out may be

used (a) for professional fees and expenses incurred for (i) any litigation or threatened litigation

(whether by contested matter, adversary proceeding or otherwise, including any investigation in

connection with litigation or threatened litigation) against any of the DIP Agent, the DIP Lenders

or the Prepetition Secured Parties or for the purpose of objecting to or challenging the validity,

perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted

by any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or (ii) asserting any defense, claim, cause of action, counterclaim or offset with respect to the DIP Obligations, the Prepetition Debt  (including for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise), the DIP Liens or the Prepetition Debt Liens or against any of the Prepetition Secured Parties or their respective Representatives, (b) to prevent, hinder or otherwise delay any of the DIP Agent's or the Prepetition Secured Parties' assertion, enforcement or realization on the Prepetition Collateral or the Collateral in accordance with the DIP Documents, the Prepetition Debt Documents or this Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing, (c) to seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties under this Final Order or under the DIP Documents or the Prepetition Debt  Documents, in each of the foregoing cases without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion or (d) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (including hereunder) and (ii) permitted under the DIP Documents; *provided* that notwithstanding anything to the contrary herein, the Creditors' Committee may use the proceeds of the DIP Loans, Collateral (including Cash Collateral, but excluding ICBCS's Cash Collateral) and/or the Carve Out (subject to paragraph 9) to investigate, but not prosecute (y) the claims and liens of the Prepetition Secured Parties and (z) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties; *provided*, *further*, that no more than an aggregate of $250,000 of the proceeds of the DIP Loans, Collateral (including Cash Collateral, but excluding ICBCS's Cash Collateral) and/or the Carve Out (subject to paragraph 9) may be used by the

Creditors' Committee, in respect of the investigations set forth in the preceding proviso or in paragraph 9 of this Final Order (the "Investigation Budget"); *provided, further*, that a limited amount of proceeds of DIP Loans and Collateral (including Cash Collateral, but excluding ICBCS's Cash Collateral) and/or the Carve Out (subject to paragraph 9) may be used by the Creditors' Committee in connection with its participation in the Insurance Adversary Proceeding, such amount to be agreed between the Debtors and the DIP Lenders or, if the DIP Obligations have been Paid in Full, the Required Existing Term Loan Lenders.

24.    *Exculpation.*  Nothing in this Final Order, the DIP Documents or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender, or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts (except to the extent that the DIP Agent, any DIP Lender, or any Prepetition Secured Party are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its willful misconduct, bad faith, or gross negligence).  So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

25.     *Order Governs.*  In the event of any inconsistency between the provisions of this Final Order, the Interim Order, the DIP Documents, the Global Term Sheet, or any other order entered by the Court, or any amendments, supplements, or other modifications thereto, the provisions of this Final Order shall govern.  Notwithstanding anything to the contrary in any other order entered by the Court, any payment made, or authorization contained in, any other order entered by the Court shall be consistent with and subject to the requirements set forth in this Final Order and the DIP Documents, including the Approved Budget as set forth therein.

26.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Adequate Protection Parties, the Prepetition Secured Parties, the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Collateral (including Cash Collateral (including ICBCS's Cash Collateral)) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

27.     *Limitation of Liability.*  In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any

rights or remedies, as and when permitted pursuant to this Final Order or the DIP Documents (but not, solely in the case of clause (b), following such exercise of remedies), the DIP Agent and the DIP Lenders shall not (a) be deemed to be in "control" of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates, and (c) be deemed to be acting as a "Responsible Person," "Owner," or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

28.     *Master Proof of Claim.*  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the SOA Agent and the Existing Term Loan Agent is authorized to file in the Debtors' lead chapter 11 case *In re PES Holdings, LLC, et al.,* Case No. 19-11626, a single, master proof of claim on behalf of the SOA Secured Parties and the Existing Term Loan Secured Parties, as applicable, on account of any and all of their respective claims arising under the applicable Prepetition Debt Documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors, to the extent applicable.

29.     *Insurance.*  To the extent that the Existing Term Loan Agent or SOA Agent is listed as loss payee under any of the Borrower's or Guarantor's insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the priorities set forth on **Exhibit A** hereto; *provided, however,* in the event it is determined, pursuant to a final non-appealable order that the June 21 Business Interruption Insurance Proceeds constitute SOA Priority Collateral, the DIP Agent shall only be deemed to

be the loss payee on such proceeds in the amount of the Insurance Priming Cap; *provided*, *further*, to the extent that the proceeds of the ICBCS Direct Insurance Claim (as defined below) do not constitute Common Collateral, the DIP Agent shall not be deemed to be the loss payee on such proceeds. In addition, the Debtors have agreed to the following terms with respect to the June 21 Incident and June 21 Insurance Proceeds:

        (a)    The automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the Debtors, Existing Term Loan Lenders, ICBCS, and the Creditors' Committee to take all actions, as applicable, as provided in the "Insurance Claim Process Regarding Debtors' Insurance Recovery" section of the Global Term Sheet related to the Debtors' information-sharing and consultation obligations with respect to the Debtors' insurance policies, relating directly or indirectly, to the June 21 Incident and/or the June 21 Insurance Proceeds.

        (b)    The automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the Debtors and ICBCS to take all actions, as applicable, for ICBCS to prepare, submit, and pursue any direct claims ICBCS, as an additional insured, may have pursuant to the Debtors' property damage and/or business interruption insurance policies, independently of the Debtors and on account of ICBCS's losses, relating directly or indirectly to the June 21 Incident (the "ICBCS Direct Insurance Claim"), including communications with and attendance at meetings with the loss adjuster or other representative of the insurance carrier, and as provided in "Insurance Claim Process Regarding any ICBCS Direct and Independent Insurance Recovery" section of the Global Term Sheet.

       30.    *Effectiveness.*  This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately

upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any Local Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

31.     *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

32.     *Payments Held in Trust*. In the event that any person or entity that has received notice of the Final Order receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source, in each case, in contravention of the priorities set forth on **Exhibit A** to this Final Order prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by the Court, for application in accordance with the DIP Documents and this Final Order; *provided* that the foregoing shall not apply to the receipt of SOA Separate Assets and Collateral by any SOA Secured Party.

33.     *Credit Bidding*. (a) The DIP Agent (acting at the direction of the requisite DIP Lenders) shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the Collateral (other than any SOA Priority Collateral), (b) subject to the Existing Intercreditor Agreement and Section 21 hereof, the Existing Term Loan Secured Parties shall have the right to credit bid, up to the full amount of its

Existing Term Loan Debt in any sale of the Collateral (other than the SOA Priority Collateral or SOA Separate Assets and Collateral), and (c) subject to the Existing Intercreditor Agreement, the SOA Secured Parties shall have the right to credit bid up to the full amount of the SOA Debt in any sale of the SOA Priority Collateral or SOA Separate Assets and Collateral, in each case to the extent provided for in section 363(k) of the Bankruptcy Code without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise. Notwithstanding anything to the contrary in the Interim Order, this Final Order or the DIP Documents, nothing in the Interim Order, this Final Order or the DIP Documents shall impair or adversely affect the right of the United States or a State or, other than with respect to the DIP Financing, the Creditors' Committee, to object to any credit bid for cause to the extent provided for in Section 363(k) of the Bankruptcy Code; provided that nothing herein shall provide or enlarge any such existing rights.

34. *Chubb Reservation of Rights.* For the avoidance of doubt, notwithstanding any provision of this Final Order or the DIP Credit Agreement, (i) to the extent ACE American Insurance Company, Westchester Fire Insurance Company, and/or any of their affiliates (collectively, and together with each of their successors, "Chubb") had valid, enforceable, perfected, and non-avoidable liens and/or security interests on property (including Cash Collateral) of the Debtors as of the Petition Date that were senior to the liens and/or security interests of the Prepetition Secured Parties on such property, such Chubb liens and/or security interests shall be senior to the liens on such property granted pursuant to this Final Order, (ii) this Final Order does not grant the Debtors the right to use any cash held by Chubb, including, but not limited to, any cash proceeds of letters of credit issued for the benefit of and drawn by Chubb

or cash held by Chubb pursuant to the Amended and Restated Cash Collateral Agreement dated December 20, 2018, (iii) to the extent the proceeds of any insurance policy issued by Chubb are payable directly to a third-party claimant (i.e. a claimant other than the Debtors) pursuant to the terms of the applicable insurance policy, such proceeds shall not constitute Collateral and are not subject to the stipulations set forth in Paragraph 5 of this Final Order;  (iv) nothing in the DIP Credit Agreement and/or this Final Order alters or modifies the terms and conditions of any bonds, indemnity agreements, collateral agreements, insurance policies, or respective related agreements issued by Chubb or to which Chubb is a party, and (v) all rights of Chubb that arise under applicable law, including the rights of equitable subrogation, exoneration, set off, and recoupment, are not impaired by the DIP Credit Agreement or this Final Order; provided, that the Debtors' rights to challenge any such rights of Chubb shall not be impaired or otherwise reduced by the DIP Credit Agreement or this Final Order.

35.    *Colonial Reservation of Rights.*  Entry of the Final Order shall not impair, in any respect, any setoff or recoupment rights or other affirmative defenses to payment that may be held by Colonial Pipeline Company; *provided* that the rights of the Debtors and any other party to contest such rights are expressly preserved.

36.    ~~*Nooter*~~ Certain Construction Lienholders' *Reservation of Rights.*  Notwithstanding anything herein to the contrary, nothing herein shall affect or impair the rights or claims of Nooter Construction Company, Belcher Roofing Corporation, or L-M Service Co., Inc. (collectively, the "Construction Lienholders") with respect to any lien encumbering the Debtors' property, including any mechanics' or materialman's lien securing a prepetition claim, and including the right to assert that any such lien is senior to those of the Prepetition Secured Parties and, if senior thereto, not primed by the DIP Liens. Further, nothing herein shall require that any of the Construction

Lienholders commence an action against the Prepetition Secured Parties with respect to the relative priority of their respective liens prior to the expiration of the Challenge Period. Nor shall anything herein waive any rights of the Construction Lienholders to seek the equitable remedy of marshalling with respect to the Prepetition Secured Parties (but not, for the avoidance of doubt, with respect to the DIP Secured Parties), or require that that either of Construction Lienholders commence any action with respect to the priority of their liens relative to the DIP Lenders' secured claims prior to the Challenge Deadline. Such rights are expressly subject to the rights of the Debtors, the Creditors Committee, the SOA Agent, and the DIP Lender to contest the liens (including their validity and priority), underlying claims or marshalling rights asserted by the Construction Lienholders.

37.    *Governmental Units.* Paragraphs 22 and 24 of this Order shall apply with respect to liabilities to governmental units under police or regulatory law only so long as the actions of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties, as applicable, have not constituted and do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by the Debtors, or otherwise cause lender liability to arise or the status of control, responsible person, owner, or operator to exist under applicable federal, state, or local law.    Paragraph 27 of this Order shall apply with respect to liabilities to governmental units under police or regulatory law only so long as the actions of the DIP Agent or DIP Lenders, as applicable, do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by the Debtors, or otherwise cause lender liability to arise or the status of control, responsible person, owner, or operator to exist under applicable federal, state, or local law.    For the avoidance of doubt, in determining to make

any loan or other extension of credit under the DIP Credit Agreement, permitting the use of Cash Collateral, performing under this Order and the DIP Documents in the ordinary course, no DIP Agent or DIP Lender shall be deemed to have participated in the management or operational affairs of a vessel or facility owned by the Debtors, or to have otherwise caused lender liability to arise or assumed the status of control, responsible person, owner, or operator, provided, however, that foreclosing, exercising remedies, or becoming involved in decision-making on debtors' compliance with police or regulatory laws or regulations would not be ordinary course performance. Each DIP Agent and DIP Lender preserves and is not waiving any defenses it may have to any claims as set forth in 42 U.S.C. § 9601(20)(F) or comparable federal, state and local law.

(a) Notwithstanding anything to the contrary in the Interim Order, this Final Order or the DIP Documents, nothing in the Interim Order, this Final Order or the DIP Documents shall impair or adversely affect any right or cause of action of the United States against any party with respect to the sale of RINS by Debtors following the June 21 Incident; *provided*, that nothing herein shall limit or otherwise impair the Debtors' rights to challenge or oppose any such rights or causes of action.

(b) Notwithstanding anything to the contrary in the Interim Order, this Final Order or the DIP Documents, nothing in the Interim Order or this Final Order or the DIP Documents shall impair or adversely affect any right under applicable law of any governmental unit with respect to any financial assurance, letter of credit, trust, or bond or limit any governmental unit in the exercise of its police powers in accordance with 11 U.S.C. § 362(b)(4); *provided*, that nothing herein shall limit or otherwise impair the Debtors' rights to challenge any such rights.

(c)    Notwithstanding anything to the contrary in the Interim Order, this Final Order or the DIP Documents, nothing in the Interim Order, this Final Order or the DIP Documents shall impair or adversely affect the United States of America's rights, claims and defenses of set-off and recoupment, or those of any State or any of the foregoing's respective agencies, departments or agents, and all such rights, claims and defenses shall be preserved in their entirety; *provided*, that nothing herein shall limit or otherwise impair the Debtors' rights to challenge any such rights, claims and defenses.

(d)    Notwithstanding anything to the contrary in the Interim Order, this Final Order, or the DIP Documents, nothing in the Interim Order, this Final Order, or the DIP Documents shall relieve the Debtors of any obligations under federal, state, or local police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors' rights to assert defenses under applicable law or create new defenses to obligations under police or regulatory laws or 28 U.S.C. 959(b)

38.    *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

39.    *Necessary Action.* The Debtors are authorized to take any and all such actions as are necessary or appropriate to implement the terms of this Final Order.

40.    *Retention of Jurisdiction.* The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

Dated:   November 14, 2019
         Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE