**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| PES HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) EXTENDING THEIR
EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND
SOLICIT ACCEPTANCES THEREOF AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state the following in support of this motion (this "Motion").

### Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"):  (a) extending by 180 days the periods during which the Debtors have

the exclusive right to file a chapter 11 plan (the "Filing Exclusivity Period") and to solicit votes

thereon (the "Solicitation Exclusivity Period,"[3] and together with the Filing Exclusivity Period,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

[2]    A detailed description of the Debtors and their business and the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 32] (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on July 21, 2019 (the "Petition Date").

[3]    The current deadlines by which the Debtors have the exclusive right to file a chapter 11 plan and to solicit votes thereon are November 18, 2019 and January 18, 2020, respectively.  180 days from November 18, 2019 is Saturday, May 16, 2020.  180 days from January 18, 2020 is Thursday, July 16, 2020.  Per rule 9006(a)(1)(C) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), when the last day of a period stated in days is a Saturday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal

the "Exclusivity Periods") through and including May 18, 2020 and July 16, 2020, respectively, without prejudice to the Debtors' right to seek further extensions to the Exclusivity Periods; and (b) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to Bankruptcy Rules and rules 9006-2 and 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are section 1121(d) of title 11 of the Bankruptcy Code, Bankruptcy Rule 9006, and Local Rules 9006-2, and 9013-1(f).

## Background

5.      On the Petition Date, each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases are procedurally consolidated and jointly administered

---

holiday.  *See* Fed. R. Bankr. P. 9006(a)(1)(C).  Therefore, the Debtors are seeking to extend the Filing Exclusivity Period to Monday, May 18, 2020.

pursuant to Bankruptcy Rule 1015(b).  On August 5, 2019, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 152].  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.

### Preliminary Statement

6.      Since the catastrophic incident at the Debtors' alkylation unit of the Girard Point refining facility (the "Girard Point Incident") and subsequent commencement of these chapter 11 cases, the Debtors have continued to work tirelessly to maximize value.  Despite the challenging circumstances the Debtors have faced, they have made significant progress advancing these chapter 11 cases.  Specifically, the Debtors have:  (a) stabilized the refinery site, began a demolition process, and ensured the health and safety of the public and their employees following the Girard Point Incident; (b) achieved a soft landing into chapter 11 while ensuring that the process did not in any way jeopardize the Debtors' efforts related health and safety; (c) facilitated and cooperated with investigations by numerous federal and local governmental agencies related to the Girard Point Incident; (d) pursued insurance proceeds in connection with the Girard Point Incident and successfully obtained an initial advance from their insurers with the support of stakeholders; (e) commenced a marketing process for a potential sale transaction of part or all the Debtors' assets and obtained Court approval of procedures therefore; (f) obtained a comprehensive settlement with their intermediation provider, ICBC Standard Bank Plc ("ICBCS"), the Committee, and debtor-in-possession lenders (the "DIP Lenders") relating to, among other things, the extraction and evacuation of ICBCS' hydrocarbons on the Debtors' property and access to the final $35 million DIP Facility draw; (g) entered into the MOU (as defined herein) with the Union (as defined herein); (h) filed the Plan (as defined herein) and related Disclosure Statement (as defined herein); (i) begun

and made progress regarding the process of reconciling claims and interests as promptly as possible; (j) completed their schedules of assets and liabilities and statements of financial affairs, which were filed on September 6, 2019, and amended on October 14, 2019 and attended three section 341 meetings with respect thereto; (k) rejected and/or entered into stipulations regarding onerous contracts to better position their go-forward business operations; and (l) otherwise actively engaged with their stakeholders and complied with all their obligations as debtors in possession.

7.    All of these efforts, which are described in more detail herein, demonstrate that cause exists for the extension of the Exclusivity Periods.  They therefore support the Debtors' request for an extension of the Exclusivity Periods.

## I.    Ensuring a Soft Landing in Chapter 11.

8.    After the catastrophic Girard Point Incident, the Debtors, in consultation with their advisors, worked tirelessly to stabilizing their operations to maximize value where available and ensuring safety of the refinery complex.  As part of these efforts, the Debtors were able to arrange for a soft landing into chapter 11 through swift and thorough action.  The Debtors obtained financing provided by the DIP Lenders and approval of various first day motions that provided the necessary stability to facilitate a value-maximizing path forward, including authority to pay certain vendors and suppliers, honor employee wages in the ordinary course of business, and maintain the ordinary course cash management system.[4]  Through these orders, the Debtors obtained relief critical to continuing the path forward in the Debtors' very challenging current environment.

---

[4]    *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 72]; *Order (I) Authorizing and Approving the Appointment of Omni Management Group, Inc. as Claims and Noticing Agent and (II) Granting Related Relief* [Docket 76]; *Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (II) Granting Related Relief* [Docket No. 77]; *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 79]; *Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase and Finance Insurance Policies, and (C) Continue and Renew Their*

## II.      The Safety and Investigation Process.

### A.      Safety Process.

9.      Since the Girard Point Incident, the Debtors have worked hard to ensure their facilities do not present any risk to the environment. The Debtors are evaluating to manage and minimize any environmental risks related to the facility. Specifically, the Debtors have begun the shut down and idling of the plant and equipment, removed elevated risk chemicals, and placed the catalyst, equipment, and vessels in a safe state to ensure safety during the idle period. This is an ongoing process that requires significant dedication from the Debtors' employees and their retained professionals.

---

*Surety Bond Program and (II) Granting Related Relief* [Docket No. 83]; *Interim Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 85]; *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 215]; *Final Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 219]; *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 220]; *Final Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 221]; *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* [Docket No. 222]; *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 231]; *Final Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 232]; *Amended Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Setting A Bar Date For the Filing of Proofs of Claim by Governmental Units, (III) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 255]; *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 231]; *Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and Procedures Related Thereto and (II) Granting Related Relief* [Docket No. 389]; *Order (A) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Nunc Pro Tunc to the Dates Specified Herein and (B) Granting Related Relief* [Docket No. 416].

**B.    Government Investigations.**

10.    In addition, the Debtors have dedicated significant attention to a variety of investigations into the Girard Point Incident conducted by federal and local government agencies, including, among others, The U.S. Chemical Safety Board, The Environmental Protection Agency, The Pennsylvania Department of Environmental Protection, Occupational Safety and Health Administration, and Philadelphia Fire Marshal.  The Debtors continue to fully cooperate and assist all parties in their investigations—a significant endeavor that has required substantial commitment and focus from the Debtors and their employees, above and beyond day-to-day duties.

**C.    The Debtors' Pursuit of Insurance Proceeds and Advances.**

11.    The Debtors are in the process of pursuing insurance recovery for the substantial property damage and business interruption caused by the Girard Point Incident.  Through the determined efforts of their management team and advisors, the Debtors obtained a $50 million advance on the property insurance losses in September 2019.  To secure the insurance advance, the Debtors worked diligently with representatives of their insurers and provided them with significant documentation, participated in extensive meetings and discussions, and hosted several on-site visits, both at their offices and at the refining complex, to demonstrate the Debtors' need for and entitlement to the insurance advance.  The insurance advance also required negotiation of stipulation with several constituencies, including the insurance carriers, which the insurers demanded as a condition to payment.  These efforts provided significant value to the Debtors' estate and much-needed liquidity to continue to move these chapter 11 cases forward.

12.    The Debtors' insurance-recovery work is not finished though.  The Debtors continue to pursue insurance recoveries and have scheduled near-daily meetings with their insurers to discuss the remainder of the Debtors' potential insurance claim, which includes hundreds of millions of dollars in coverage outstanding.  And, as outlined extensively in pleadings filed in the

6

adversary proceeding *PES Holdings et. al. v. The Official Committee of Unsecured Creditors of PES Inc. and ICBC Standard Bank PLC*, No. 19-50282-KG, the Debtors are seeking a ruling as to the priority with respect to certain insurance proceeds once they have been recovered from the insurance providers.

III.     **Negotiations with Various Stakeholders.**

    A.     **ICBCS.**

13.     The Debtors ultimately achieved a relatively soft landing in chapter 11, in spite of significant time pressures and complex negotiating dynamics with the Debtors key stakeholders. One of the Debtors' most complex relationships is with ICBCS, their intermediation provider. Overall, the Debtors, along with their advisors, engaged in robust negotiations with ICBCS that spanned several months.  As of October 30, 2019, ICBCS still had over three million barrels of hydrocarbons on the Debtors' property—hydrocarbons that ICBCS owned, but could not be extracted without significant time and effort from the Debtors.  Since the Girard Point Incident, the Debtors have aided ICBCS in selling and removing hydrocarbons and diverting undelivered cargos. These efforts required the Debtors to expend additional resources, including the management team and refinery personnel, to assist despite their already limited workforce.  The Debtors also hosted ICBCS' operations team for several weeks on-site to consult with ICBCS and their advisors regarding the refinery operations and extraction strategy.  The negotiation process included multiple in-person meetings with the ICBCS leadership and operations teams to develop, among other things, an agreeable approach for extracting and evacuating ICBCS' hydrocarbons.  The Debtors and their advisors worked diligently to provide numerous deliverables to ICBCS related to the proposed extraction effort.

14.     Based on these extensive negotiations, the Debtors were able to reach a global settlement with ICBCS resolving myriad issues.  This outcome is memorialized in two key

documents, the global resolution term sheet (the "Global Resolution Term Sheet"), attached as

Exhibit C to the Final DIP Order,[5] and the hydrocarbon extraction and evacuation plan (the

"HEEP") attached to the Global Resolution Term Sheet.    The Global Resolution Term Sheet

requires:

- ICBCS to release a certain portion of cash collateral to pay for certain accrued costs relating to the storage and transport of ICBCS' hydrocarbons, including valid administrative claims, from August 11, 2019 through and including October 4, 2019;

- ICBCS to pay a material portion of their professionals' fees accrued for work relating directly to the HEEP prior to the entry of the Global Resolution Term Sheet as well as its own professionals' fees going forward;

- ICBCS to pay the Debtors' reasonable professional fees relating to the HEEP incurred after September 30, 2019;

- ICBCS to sell certain volumes of inventory that remains following the HEEP to the Debtors in exchange for certain claims;

- the Debtors to use commercially reasonable efforts to give reasonable notice to ICBCS of discussions with regulators and to provide copies of significant correspondence with regulators;

- the Debtors to extract ICBCS' inventory and will be directly compensated by ICBCS for doing so, including additional incentive payments based on volumes extracted; and

- the Debtors and ICBCS to advance efforts to enter into a sale transaction of all Initial Inventory (as defined therein) under the HEEP within 125 days of the effective date of the Global Resolution Term Sheet.

**B.**    **The DIP Order.**

15.    Over the course of the last four months, the Debtors, the DIP Lenders, and the

Committee participated in numerous negotiations to reach a consensual Final DIP Order to finance

the administration of these chapter 11 cases.  The Final DIP Order, entered less than one week ago,

---

[5]  "Final DIP Order" means *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B)* [Docket No. 580].

allows the Debtors to access the additional liquidity provided by the DIP Lenders, which is necessary to administer these chapter 11 cases, pursue insurance proceeds, and continue the Debtors' ongoing marketing process to maximize value for the benefit of all parties in interest. Specifically, the Final DIP Order provides the Debtors with access to an incremental $35 million of liquidity, in addition to the $65 million already provided under the Interim DIP Order.[6]

### C.   The Committee.

16.   In addition to the negotiations regarding the Global Resolution Term Sheet and Final DIP Order, the Debtors have engaged continuously and hosted multiple meetings with the Committee and its professionals.  These meetings have included on-site visits, teleconferences and in-person meetings at the Debtors' headquarters and refining complex to discuss a myriad of topics, such as the Debtors' path forward in these chapter 11 cases and the shut down and idling of the plant and equipment, removal of elevated risk chemicals, and placement of the catalyst, equipment, and vessels in a safe state to ensure safety during the idle period of the Debtors' facility.  The Debtors and the Committee have also scheduled follow-up on-site meetings to take place in the coming days and weeks.  The Debtors intend to continue to work with the Committee constructively going forward.

### D.   The Union.

17.   The Debtors have also engaged in negotiations with the United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied and Industrial Service Workers International Union, AFL-CIO, CLC and its Philadelphia Local 10-1 (collectively, the "Union") regarding

---

[6]   "Interim DIP Order" means *Interim Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 85].

collective bargaining agreements and other related issues. These negotiations have included multiple meetings, phone conversations, and other correspondences with the Union in an effort to consensually resolve certain issues. Specifically, the Debtors and the Union have worked to modify their collective bargaining agreement to adjust Union employee pay, and apply a go-forward staffing plan that resulted in the MOU with the Union.[7] The MOU resolved outstanding grievances and set forth a staffing plan with respect to the shut down and idling of the plant and equipment, removal of elevated risk chemicals, and placement of the catalyst, equipment, and vessels in a safe state to ensure safety during the idle period of the facilities, the minimized on-going operations, facility caretaking, and to support the Girard Point Incident investigations. Following entry into the MOU, the Debtors intend to engage with the Committee on a comprehensive settlement of all remaining issues.

### E.    The Plan and Disclosure Statement.

18.    On October 10, 2019, the Debtors filed the *Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* [Docket No. 462] (the "Plan"), accompanied by the *Corrected Disclosure Statement for the Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* [Docket No. 465] (the "Disclosure Statement"). But given the complexity of and time required to successfully negotiate the above matters, the Debtors require the additional time provided under the Exclusivity Periods to further negotiate and pursue the Plan and the related Disclosure Statement to advance these chapter 11 cases towards the Debtors' ultimate goal.

19.    During the Exclusivity Periods, the Debtors plan to continue to engage with the DIP Lenders and their other constituents in efforts to reach a global resolution amongst all parties

---

[7]    "MOU" means the *Order (I) Authorizing Entry Into Memorandum of Understanding and (II) Granting Related Relief* [Docket No. 384].

in interest and maximize the value of the estate. The Debtors will endeavor to conduct these negotiations as quickly as they reasonably can to maximize efficiency. The extension of the Exclusivity Periods is critical to allow the Debtors to continue to work with the DIP Lenders, the Committee, and other parties in interest to efficiently work towards a confirmable Plan and related Disclosure Statement.

**IV.     The Debtors Have Made Significant Progress in Their Sale Process.**

20.     The Debtors have advanced these chapter 11 cases towards an ultimate resolution by conducting a robust, value-maximizing marketing process to potentially consummate one or more sales of the Debtors' assets. Specifically, the Debtors' investment banker, PJT Partners LP ("PJT") contacted approximately 214 potential bidders, comprised of both financial and strategic potential buyers. Of these potential bidders, all either reviewed a teaser document or participated in high-level discussions regarding a potential transaction.

21.     The sale process has required the Debtors' remaining employees to dedicate significant time and attention to diligence requests. Approximately 37 bidders ultimately negotiated and executed confidentiality agreements, and the Debtors provided them preliminary access to a virtual data room containing detailed information about the Debtors' assets. Parties who demonstrated significant interest during these meetings then received further diligence information. Interested buyers ultimately requested a large volume and variety of information, and satisfying these requests required significant effort from the Debtors' limited employees.

22.     These efforts have thus far yielded positive results: following an initial round of bids, 15 parties provided written indications of interest. The Debtors and their advisors are currently advancing discussions with these parties in an effort to identify the highest or otherwise best bidders amongst them as the second round bids are due on November 22, 2019. Many potential buyers who submitted indications of interest progressed into a second round of bidding, which involved

on-site diligence visits, management presentations, access to more detailed information regarding the Debtors' assets through a virtual data room, and importantly, a draft of a sale and purchase agreement. In the weeks ahead, the Debtors will have more clarity regarding the ultimate form of transaction that will provide the basis for their emergence from chapter 11.

## V.    The Debtors' Achievement of Additional Chapter 11 Milestones.

23.    Given the complexities of the Debtors' business and current status with diminished resources and limited workforce availability, even certain typical chapter 11 tasks require extra effort. The Debtors reviewed and analyzed information relating to tens of thousands of claims, assets, and contracts of each of the Debtors, and responded to creditors' inquiries and requests for explanations, additions, and changes thereto.[8] The ongoing review and analysis of the Debtors' executory contracts and unexpired leases has involved agreements presenting novel issues of law and has drawn both formal and informal objections to the rejection thereof that the Debtors have or are in the process of working through.[9] Ultimately, the Debtors rejected and/or entered into stipulations regarding approximately 50 onerous contracts to better position their go-forward

---

[8]    On September 6, 2019 [Docket Nos. 308-323] and October 14, 2019 [Docket Nos. 473-74], the Debtors filed their respective statements of financial affairs and schedules of assets and liabilities. *See also Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File Under Seal Certain Portions of Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 475].

[9]    *See, e.g., Union Tank Car Company's Objection to Debtors' Omnibus Motion for Entry of an Order (A) Authorizing Rejection of Unexpired Non-Residential Leases and Executory Contracts Nunc Pro Tunc to the Dates Specified Herein and (B) Granting Related Relief* [Docket No. 343]; *Objection of Moran Towing Corporation to the Debtors' Motion Seeking to Reject the Charter Nunc Pro Tunc to the Petition Date* [Docket No. 349]; *Objection of Sunoco Partners Marketing & Terminals L.P. and Sunoco Pipeline L.P. to Debtors' Omnibus Motion for Entry of an Order (A) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Nunc Pro Tunc to the Dates Specified Herein and (B) Granting Related Relief* [Docket No. 350]; *Objection of BNSF Railway Company to the Debtors' Omnibus Motion for Entry of an Order (A) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Nunc Pro Tunc to the Dates Specified Herein and (B) Granting Related Relief* [Docket No. 351].

business operations.[10]  The Debtors obtained entry of the claims bar date in these chapter 11 cases

to facilitate the timely administration of their claims pool and have already begun the process of

reconciling claims as promptly as possible.[11]  Lastly, the Debtors engaged and continue to engage

with numerous vendors, creditors, and other parties with respect to outstanding items that have

surfaced throughout these chapter 11 cases.

## VI.    Debtors' Management Teams' Involvement.

24.    To achieve all of these critical accomplishments and milestones, the Debtors have

relied heavily on its management team and employees.  The Debtors' management team hosted

ICBCS and their advisors for several weeks and dedicated significant time towards educating them

on the process as well as identifying their requirements and other requests.  The Debtors'

management is still significantly involved in the negotiations with various parties, participated in

the Girard Point Incident investigations with various federal and local government agencies, and

other third parties.

25.    Along with their involvement in the negotiation process, the Debtors also

coordinated with ICBCS to educate them on the refinery business as well as the intricacies of the

Debtors' operations.  In light of the Girard Point Incident and the disruption to the Debtors'

operations and supply chain, ICBCS relied heavily on the Debtors' management team's extensive

---

[10]  *See Order (A) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property And Executory Contracts* Nunc Pro Tunc *to the Dates Specified Herein and (B) Granting Related Relief* [Docket No. 416].

[11]  *See Amended Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Setting A Bar Date for the Filing of Proofs of Claim by Governmental Units, (III) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 255] (establishing October 21, 2019 as the claims bar date and January 17, 2020 as the governmental claims bar date).

experience and knowledge to lead the sale of ICBCS' hydrocarbons and other products located both at the Debtors' facilities and offsite.

26.    The Debtors' management team has been extensively involved with engaging the Debtors' various constituents, conducing many meetings, tours, and calls with the Committee, potential buyers, secured creditors, insurers, environmental regulators and professionals, and government investigators (efforts described in more detail above).

27.    In summary, during the brief pendency of these chapter 11 cases, the Debtors have:

- obtained the financing and received approval of various first day motions that provide the necessary stability to administer these chapter 11 cases and facilitate a value-maximizing path forward, including authority to pay certain vendors and suppliers, and honor employee wages in the ordinary course of business, and maintain the ordinary course cash management system;

- stabilized the refinery site, began a demolition process, and ensured the health and safety of the public and their employees following the Girard Point Incident;

- facilitated and cooperated with investigations by numerous federal and local governmental agencies related to the Girard Point Incident;

- continued to advance the pursuit of property damage and business interruption insurance recovery for losses sustained as a result of the Girard Point Incident, including the negotiation and procurement of a $50 million advance on the insurers' coverage obligations;

- commenced a marketing process for a sale of part or all the Debtors' assets;

- continued extensive negotiations with their intermediation provider, ICBCS, and the DIP Lenders, culminating in consensual comprehensive resolution with ICBCS and final approval of the DIP Facility, which provided the Debtors with access to a total of $100 million in liquidity, consisting of $65 million in liquidity on an interim basis and $35 million on a final basis;

- obtained Court approval for entry into the MOU with the Union;

- filed the Plan and related Disclosure Statement;

- completed their schedules of assets and liabilities and statements of financial affairs, which were filed on September 6, 2019, and amended on October 14, 2019;

- begun and made progress regarding the process of reconciling claims and interests as promptly as possible; and

- rejected and/or entered into stipulations regarding onerous contracts to better position their go-forward business operations.

28.      Based upon the current posture of these chapter 11 cases, the Debtors believe sufficient cause exists to warrant an extension of the Exclusivity Periods.  Given the complexities of these chapter 11 cases, the Debtors' ability to continue moving these chapter 11 cases forward, as well as obtain consensus from key parties with respect to the same, would be seriously disrupted if another party were permitted to file a plan.  An extension of the Exclusivity Periods is in the best interests of the Debtors, their estates, and all stakeholders, as it will allow the Debtors to procure the best recovery for its creditors and help to ensure a successful emergence from these chapter 11 cases.

29.      Accordingly, the Debtors seek a 180-day extension of the Exclusivity Periods so they have the exclusive right to file a plan through May 18, 2020 and to solicit votes thereon until July 16, 2020.  For all of the foregoing reasons and those set forth below, the Debtors respectfully submit that a 180-day extension of exclusivity and solicit acceptances is appropriate in these circumstances.

**Basis for Relief**

30.      Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the commencement of a chapter 11 case during which only a debtor may file a plan and an additional 60-day period during which only the debtor may solicit votes for a plan, both of which are subject to extension through motion practice.  Currently, the Filing Exclusivity Period will

expire on November 18, 2019[12] and the Solicitation Exclusivity Period will expire on January 18,

2020. As discussed above, the Debtors believe it is prudent to seek an extension of the Exclusivity

Periods out of an abundance of caution at this critical stage of the Debtors' chapter 11 cases.

31.     Section 1121(d)(1) of the Bankruptcy Code permits a court to extend a debtor's

exclusivity "for cause." Although the Bankruptcy Code does not define "cause," bankruptcy

courts within the Third Circuit and in other jurisdictions have held that the decision to extend the

exclusivity periods is left to the sound discretion of a bankruptcy court based upon the facts and

circumstances of a particular case. *See Bunch v. Hoffinger Indus., Inc. (In re Hoffinger Indus.,*

*Inc.)*, 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003); *First Am. Bank of N.Y. v. Sw. Gloves & Safety*

*Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986); *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr.

E.D. Mich. 1997); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *In re*

*McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re Wisc. Barge Line, Inc.*, 78

B.R. 946, 948 (Bankr. E.D. Mo. 1987); *In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y.

1987).

32.     Bankruptcy courts often use the following factors in determining whether "cause"

exists to extend a debtor's exclusivity period: (a) the size and complexity of the case; (b) the need

for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate

information; (c) whether the debtor has made progress in negotiations with its creditors; (d) the

existence of good faith progress toward reorganization; (e) whether the debtor is seeking to extend

exclusivity to pressure creditors to accede to the debtor's reorganization demands; (f) whether the

debtor has demonstrated reasonable prospects for filing a viable plan; (g) the fact that the debtor is

---

[12]   Pursuant to Local Rule 9006-2, the filing of this Motion prior to the current deadline shall serve to automatically
       extend the current deadline without the necessity for the entry of a bridge order, until the Court rules on this
       Motion. *See* Del. Bankr. LR 9006-2.

paying its bills as they become due; (h) the amount of time which has elapsed in the case; and/or (i) whether an unresolved contingency exists. *See, e.g.*, *In re GMG Cap. Partners III, L.P.*, 503 B.R. 596 (Bankr. S.D.N.Y. 2014); *In re Lichtin/Wade, L.L.C.*, 478 B.R. 204, 210 (Bankr. E.D.N.C. 2012); *In re Hoffinger*, 292 B.R. at 643–44; *In re Acceptance Ins. Cos.*, No. 05-80059, 2008 WL 3992799, at *2 (Bankr. Neb. Aug. 20, 2008); *In re Friedman's, Inc.*, 336 B.R. 884, 888 (Bankr. S.D. Ga. 2005); *Matter of Interco Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992).

33.     Not all factors are relevant to every case, and the existence of even one of the above-listed factors may be sufficient to extend a debtor's exclusivity periods. *See, e.g.*, *In re Hoffinger*, 292 B.R. at 644 ("As always, we emphasize that these are only factors, not all of which are relevant in every case. . . .  It is within the discretion of the bankruptcy court to decide which factors are relevant and give the appropriate weight to each."). Courts routinely grant a debtor's first request for an extension of the debtor's exclusivity period. *See In re Mirant Corp.*, 2004 WL 2250986, at *2 (N.D. Texas 2004) ("The debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts."); *see also In re Apex Pharm., Inc.*, 203 B.R. 432, 441 (N.D. Ind. 1996) ("It is true that during the initial 120-day period in which debtors have an exclusive right to file a plan of reorganization . . . the bankruptcy courts apply a lesser standard in determining whether the burden of showing 'a reasonable possibility of a successful reorganization within a reasonable time' has been satisfied."). Here, the relevant factors strongly favor an extension of the Debtors' Exclusivity Periods.

## I.     The Debtors' Cases Are Large and Complex.

34.     With, as of the Petition Date, over $1.75 billion of total funded debt, the largest oil refining complex on the United States Eastern seaboard with two interdependent refineries that when operating at full capacity have a combined distillation and refining capacity of 335,000 barrels of crude oil per day, and the ongoing investigation and insurance coverage recovery efforts

surrounding the Girard Point Incident, these cases are undoubtedly large and complex. The Debtors' 1,300 acre refinery complex, even though it is not currently producing refined product, continues to present massive operational complexities, particularly in the light of the need to ensure the ongoing safety of the facilities. While these operations are complicated in their own right, they now must now be managed under the parameters and the microscope of chapter 11, which only increases these challenges.

35.     Courts have regularly extended the exclusivity periods under section 1121(d) of the Bankruptcy Code in large, complex chapter 11 cases and have also acknowledged that the size and complexity of a debtor's case alone may provide cause for extending a debtor's exclusivity periods. *See, e.g.*, *In re Adelphia Commc'ns. Corp.*, 336 B.R. 610, 677 (Bankr. S.D.N.Y. 2006) (refusing to terminate debtors' exclusivity and finding that due to the case complexity, the time it will take for a new fiduciary to educate itself about the case would delay and interfere with its ability to confirm a plan in a timely way); *In re Lichtin/Wade, L.L.C.*, 478 B.R. 204, 215 (Bankr. E.D.N.C. 2012) (extending debtors' exclusivity finding that while this case may not be particularly large or complex in comparison to other districts, it is sufficiently complex when compared to other cases in its jurisdiction); *In re Wisc. Barge Line, Inc.*, 78 B.R. 946, 948 (Bankr. E.D. Mo. 1987) (stating that, if extensions of exclusivity were denied, "it would be virtually impossible for major corporations that are faced with extensive and time consuming litigation . . . to ever enjoy the exclusive benefits provided by 11 U.S.C. § 1121"); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (approving debtor's third exclusivity extension and noting that the "traditional ground for cause is the large size of the debtor and the concomitant difficulty in formulating a plan of reorganization"); *In re Crescent Mfg. Co.*, 122 B.R. 979, 982 (Bankr. N.D. Ohio 1990) (stating that "cause" can include an "unusually large case"); *In re Texaco*, 76 B.R. 322, 325–27 (Bankr.

S.D.N.Y. 1987) (cause existed to warrant extension of exclusivity based on the size and complexity of the case alone).   Thus, the size and complexity of the Debtors' capital structure, operational concerns, and negotiating dynamics in these chapter cases alone provides sufficient cause for the Court to extend the Exclusivity Periods.

## II.   The Debtors Have Made Significant Progress in Negotiating in Good Faith with All Creditors and Administering These Chapter 11 Cases.

36.   As previously stated, the Debtors have faced a tumultuous battle in addressing the go-forward status of their operations and estates.   Nonetheless, the Debtors have made significant progress in administering these chapter 11 cases, which warrants a further extension of the Exclusivity Periods.   A number of the factors courts typically consider in evaluating a request to extend exclusivity revolve around a debtor's good faith progress toward confirmation and consummation of a consensual plan.   Importantly, the Debtors filed the Disclosure Statement and the Plan less than three months into these chapter 11 cases.   Additionally, since the Petition Date, the Debtors have:

- stabilized the facilities through the shut down and idling of the plant and equipment, removed elevated risk chemicals, and placed the catalyst, equipment, and vessels in a safe state to ensure safety during the idle period, which maintained ability to adhere to health and safety obligations;

- fully engaged in the ongoing federal and local government agency investigations regarding the Girard Point Incident;

- assisted and participated in the insurance coverage recovery efforts and related litigation stemming from the Girard Point Incident;

- continued to engage with their property insurers to obtains property damage and business interruption insurance recovery for losses resulting from the Girard Point Incident, which included a $50 million advance of insurance proceeds;

- commenced a marketing process for their assets;

- reached a consensual comprehensive settlement with their intermediation provider, ICBCS, resolving an ongoing dispute that threatened extensive protracted litigation, culminating in consensual global resolution with ICBCS and final approval of the Debtors' $100 million DIP Facility;

- obtained Court approval for entry into the MOU with the Union;

- filed the Plan and related Disclosure Statement;

- continued to apprise the Committee of case updates and facilitate negotiations with the Committee;

- begun and made progress regarding the process of reconciling claims and interests as promptly as possible;

- continued to evaluate claims that have been, or that may be asserted, against the Debtors' estates;

- completed their schedules of assets and liabilities and statements of financial affairs, which were filed on September 6, 2019, and amended on October 14, 2019; and

- obtained approval to reject over 50 burdensome contracts and leases.

37. The Debtors' efforts to promote consensus whenever possible further supports the extension of the Exclusivity Periods. *See Mirant*, 2004 WL 2250986, at *2 (noting that an extension of exclusivity is typically granted where "the debtor showed substantial progress had been made in negotiations toward reorganization"); *see also In re Tribune Co.*, No. 08-13141 (Bankr. D. Del.), Hr'g Tr. Dec. 7, 2009, 70:2–4 (extending exclusivity based, in part, on the fact that "there are ongoing discussions, which may or may not result in a global resolution"); *In re MSR Resort Golf Course LLC*, No. 11-10372 (Bankr. S.D.N.Y.), Hr'g Tr. Nov. 3, 2011, 377:2–8 (granting debtors' exclusivity extension based, in part, on compromises reached between the debtors and their stakeholders and concluding that the debtors' "good-faith progress is also evidenced by these settlements, which evidence . . . progress in trying to reach some consensus on the end game strategy in these cases, and the timing for such a strategy").

38.     The Debtors intend to work toward consensus with all their major stakeholders on their plan of reorganization.  At the outset of these chapter 11 cases, the Debtors were faced with an uphill battle in light of the Girard Point Incident and the subsequent efforts to adjust and address all potential concerns to preserve and maximize value for the Debtors, their estates, and their stakeholders.  But thanks to the Debtors' concerted efforts, all parties have engaged in substantive negotiations to narrow the distance between their respective positions and discuss in earnest the terms of a possible global settlement.  Work remains to be done, and with additional time the likelihood of reaching a global settlement and filing a consensual chapter 11 plan increases.  The Debtors' and their stakeholders' continued efforts to negotiate in good-faith further supports an extension of the Exclusivity Periods.

## III.    The Debtors Are Not Pressuring Creditors by Requesting an Extension of the Exclusivity Periods.

39.     The Debtors' restructuring process is intended to produce a consensual plan that maximizes the value of the Debtors' estates for all of the Debtors' key economic stakeholders. The Debtors have been working to achieve consensus with their key stakeholders on a plan that maximizes value for all parties in interest.  *See River Bend-Oxford Assocs.*, 114 B.R. 111, 114 (Bankr. D. Md. 1990) ("Section 1121 is designed to afford a debtor an exclusive period in which to propose a plan [and] . . . furthers the purpose of a rehabilitation").

40.     Currently, the Filing Exclusivity Period is set to expire on November 18, 2019. This date creates an unnecessary constraint on the Debtors given the great progress that they, along with their advisors and other parties, have made during these chapter 11 cases.  Further, all parties will benefit from the Debtors having sufficient time to drive consensus in these cases.

IV.     **The Debtors Are Paying Their Bills as They Come Due.**

41.     Since the Petition Date, the Debtors have paid their postpetition debts in the ordinary course of business or as otherwise provided by Court order.

V.      **These Cases Are Less Than 120 Days Old.**

42.     The fact that these cases remain at an early stage in the chapter 11 process further supports the requested 180-day extension. *See In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.), Hr'g Tr. Sept. 16, 2014, 73:21–25 (granting debtors' request for a six-month extension within five months of petition date, and noting that "just a two month or three month even extension of exclusivity won't accomplish anything, we're going to be right back here having the same argument and you're going to get the same ruling, provided things continue to move"). Although the Debtors have made much progress, their accomplishments should not diminish the fact that less than four months have passed in these chapter 11 cases. Extension of the Exclusivity Period will benefit all stakeholders by facilitating the Debtors' efforts to confirm and consummate a value-maximizing plan, which will inure to the benefit of all stakeholders in the most expeditious manner available. The fact that these chapter 11 cases are at a relatively early stage further supports the requested extension. *See In re Borders Grp., Inc.*, 460 B.R. 818, 826 (Bankr. S.D.N.Y. 2011).

## Conclusion

43.     In light of the foregoing, the Debtors respectfully submit that sufficient cause exists here to extend the Exclusivity Period through and including May 18, 2020 and the solicitation period through and including July 16, 2020.

## Notice

44.     The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) the Committee; (c) the administrative agent under the Debtors' prepetition first lien term loan facility and counsel thereto; (d) the lenders under the Debtors' prepetition first lien term loan facility and

counsel thereto; (e) Merrill Lynch Commodities, Inc. and counsel thereto; (f) NGL Energy Partners LP and counsel thereto; (g) the lenders under the Debtors' prepetition promissory note and counsel thereto; (h) counsel to ICBC Standard Bank Plc; (i) the lenders under the Debtors' debtor-in-possession financing facility and counsel thereto; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the state attorneys general for all states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

45.    No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of the page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: November 18, 2019
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              pkeane@pszjlaw.com
              joneill@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com
              steven.serajeddini@kirkland.com
              matthew.fagen@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*