**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PES HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DISCLOSURE STATEMENT FOR THE FIRST AMENDED**
**JOINT CHAPTER 11 PLAN OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES**

Edward O. Sassower, P.C.
Steven N. Serajeddini (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
        steven.serajeddini@kirkland.com
        matthew.fagen@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 870
Wilmington, Delaware 19899
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
        joneill@pszjlaw.com
        pkeane@pszjlaw.com

Dated:  December 11, 2019

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................................4

II.      PRELIMINARY STATEMENT .......................................................................................4

III.      OVERVIEW OF THE PLAN ...........................................................................................5

     A.     The Equitization Restructuring. ...........................................................................5
     B.     The Asset Sale Restructuring. ...............................................................................5
     C.     Releases. ...............................................................................................................6
     D.     Reserves. ...............................................................................................................7

IV.      QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
     PLAN ...................................................................................................................................9

     A.     What is chapter 11? ..............................................................................................9
     B.     Why are the Debtors sending me this Disclosure Statement? ..............................9
     C.     Am I entitled to vote on the Plan? ......................................................................10
     D.     What will I receive from the Debtors if the Plan is consummated? ....................10
     E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
           Priority Tax Claim? .............................................................................................14
     F.     Are any regulatory approvals required to consummate the Plan? ......................14
     G.     What happens to my recovery if the Plan is not confirmed or does not go effective? ...................15
     H.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
           Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
           "Consummation?" ...............................................................................................15
     I.     What are the sources of Cash and other consideration required to fund the Plan? ....15
     J.     Are there risks to owning the New PES Interests upon emergence from chapter 11? ...................15
     K.     Will the final amount of Allowed General Unsecured Claims affect my distribution under
           the Plan? ..............................................................................................................15
     L.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............16
     M.     Will the Debtors be entitled to a discharge? ......................................................19
     N.     What is the deadline to vote on the Plan? ..........................................................19
     O.     How do I vote for or against the Plan? ...............................................................19
     P.     Why is the Bankruptcy Court holding a Confirmation Hearing? ......................19
     Q.     When is the Confirmation Hearing set to occur? ...............................................19
     R.     What is the purpose of the Confirmation Hearing? ...........................................20
     S.     What is the expected timeline for confirmation of the Plan? .............................20
     T.     What is the effect of the Plan on the Debtors' ongoing business? ......................21
     U.     Will any party have significant influence over the corporate governance and operations of
           the Reorganized Debtors? ..................................................................................21
     V.     Who do I contact if I have additional questions with respect to this Disclosure Statement
           or the Plan? .........................................................................................................22
     W.     Do the Debtors recommend voting in favor of the Plan? ...................................22

V.      IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT .......23

     A.     Certain Key Terms Used in this Disclosure Statement. .....................................23
     B.     Additional Important Information. ......................................................................24

VI.      THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ........26

     A.     The Debtors' Corporate Structure and History. .................................................26
     B.     The Debtors' Assets and Operations. .................................................................26
     C.     Regulatory Matters. ............................................................................................28
     D.     Environmental Matters. ......................................................................................28
     E.     The Debtors' Employees. ....................................................................................29

|  |  |  |
|---|---|---|
| F. | The Debtors' Prepetition Capital Structure. | 29 |

**VII.** **EVENTS LEADING TO THE DEBTORS' FINANCIAL DIFFICULTIES AND COMMENCEMENT OF THE CHAPTER 11 CASES** ........................................................ **31**

| A. | Prior Chapter 11 Cases. | 31 |
|---|---|---|
| B. | Developments After the Prior Chapter 11 Cases. | 31 |
| C. | Insurance Recovery Efforts. | 32 |
| D. | Operational and Financial Responses. | 32 |

**VIII.** **EVENTS OF THE CHAPTER 11 CASES** .......................................................................... **33**

| A. | Corporate Structure upon Emergence. | 33 |
|---|---|---|
| B. | Expected Timetable of the Chapter 11 Cases. | 34 |
| C. | First Day Relief. | 34 |
| D. | Other Requested First-Day Relief and Retention Applications. | 34 |
| E. | Schedules and Statements. | 34 |
| F. | Appointment of Creditors' Committee. | 34 |
| G. | Term Loan Priority Litigation. | 34 |
| H. | Global Resolution with ICBCS. | 34 |
| I. | Certain Additional Disclosures. | 35 |

**IX.** **RISK FACTORS** ............................................................................................................... **35**

| A. | Risks Related to the Restructuring. | 35 |
|---|---|---|
| B. | Risks Related to Recoveries Under the Plan. | 42 |
| C. | Risks Related to the Business Operations of the Debtors and Reorganized Debtors. | 43 |
| D. | Miscellaneous Risk Factors and Disclaimers. | 48 |

**X.** **SOLICITATION AND VOTING PROCEDURES** ........................................................ **49**

| A. | Classes Entitled to Vote on the Plan. | 49 |
|---|---|---|
| B. | Votes Required for Acceptance by a Class. | 49 |
| C. | Certain Factors to Be Considered Prior to Voting. | 49 |
| D. | Classes Not Entitled To Vote on the Plan. | 50 |
| E. | Solicitation Procedures. | 50 |
| F. | Voting Procedures. | 51 |
| G. | Voting Tabulation. | 52 |
| H. | Ballots Not Counted. | 52 |

**XI.** **CONFIRMATION OF THE PLAN** ................................................................................ **53**

| A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 53 |
|---|---|---|
| B. | Best Interests of Creditors—Liquidation Analysis. | 54 |
| C. | Feasibility. | 54 |
| D. | Acceptance by Impaired Classes. | 54 |
| E. | Confirmation Without Acceptance by All Impaired Classes. | 54 |

**XII.** **IMPORTANT SECURITIES LAWS DISCLOSURES** ................................................ **56**

| A. | Plan Securities. | 56 |
|---|---|---|
| B. | Issuance and Resale of Plan Securities Under the Plan. | 56 |

**XIII.** **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** .................... **57**

| A. | Introduction. | 57 |
|---|---|---|
| B. | Certain U.S. Federal Income Tax Consequences to the Debtors, the Reorganized Debtors, and Holders of PES Ultimate Interests. | 58 |
| C. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote. | 62 |
| D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims. | 66 |
| E. | FATCA. | 68 |
| F. | Information Reporting and Backup Withholding. | 69 |

**XIV.    RECOMMENDATION OF THE DEBTORS** .........................................................................................**70**

**EXHIBITS**

EXHIBIT A      Chapter 11 Plan

EXHIBIT B      Corporate Structure of the Debtors

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Disclosure Statement Order

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF CERTAIN NEW PES INTERESTS THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, AND EXPECT THAT THE OFFER AND ISSUANCE OF NEW PES INTERESTS UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145 OF THE BANKRUPTCY CODE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS

REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS CERTAIN FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, BUT NOT LIMITED TO, THOSE SUMMARIZED HEREIN.  WHEN USED IN THIS DISCLOSURE STATEMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "INTEND," AND "EXPECT" AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTORS BELIEVE THAT THEIR PLANS, INTENTIONS, AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING STATEMENTS ARE REASONABLE, THEY CANNOT ASSURE YOU THAT THEY WILL BE ACHIEVED.  THESE STATEMENTS ARE ONLY PREDICTIONS AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE OR RESULTS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY A FORWARD-LOOKING STATEMENT.  ALL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE DEBTORS OR PERSONS OR ENTITIES ACTING ON THEIR BEHALF ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS SET FORTH IN THIS DISCLOSURE STATEMENT.  FORWARD-LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE ON WHICH THEY ARE MADE. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.  EXCEPT AS REQUIRED BY LAW, THE DEBTORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.**

## I.      INTRODUCTION

PES Holdings, LLC ("PES Holdings") and certain of its direct and indirect subsidiaries and affiliates, as debtors and debtors in possession (each, a "Debtor," collectively, the "Debtors"), submit this disclosure statement (including all exhibits hereto, the "Disclosure Statement") pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[2]  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

The Debtors are owners and operators of the largest oil refining complex (the "Refining Complex") on the United States Eastern seaboard, which has been continuously operating in some form for over 150 years.  The Refining Complex sits on an approximately 1,300 acre industrial site roughly 2.5 miles from downtown Philadelphia.  It is comprised of two separate refineries that have a combined distillation and refining capacity of 335,000 barrels of crude oil per day when fully operational, which represented approximately 28 percent of the crude oil refining capacity of the United States' east coast—a region otherwise known as the Petroleum Administration for Defense District I. The Refining Complex, under normal operating conditions, produces a full range of transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products, including home heating oil, jet fuel, kerosene, fuel oil, propane, propylene, butane, cumene, and sulfur.  The Debtors market and distribute these products by truck, rail, pipeline, and waterborne vessels throughout population centers in the northeastern United States and by waterborne vessels to international markets.

On January 21, 2018, the Debtors filed petitions for relief under the Bankruptcy Code (the "Prior Chapter 11 Cases") in the Bankruptcy Court for the District of Delaware, primarily due to challenging macroeconomic trends in the energy sector and regulatory compliance costs that penalize independent merchant refiners.  On August 7, 2018, the Debtors successfully emerged from the Prior Chapter 11 Cases pursuant to a plan of reorganization (the "Prior Plan") that:  (a) secured a capital infusion of approximately $260 million; (b) extended certain of the Debtors' debt maturities through 2022; (c) reduced the Debtors' anticipated debt service obligations by approximately $35 million per year; (d) provided the Debtors with access to a new intermediation facility; and (e) provided the Debtors with relief from certain regulatory obligations.

After emerging from the Prior Chapter 11 Cases, the Debtors conducted a complex multi-stage operational and legal implementation of their intermediation facility with ICBC Standard Bank Plc ("ICBCS").  The Debtors completed this process on June 18, 2019.  Given the challenging commodity and regulatory environment in which the Debtors operate, the implementation of the new intermediation facility was a major step forward for the Debtors. This momentum was lost days later when, early on June 21, 2019, the Debtors suffered a historic, large-scale, catastrophic incident involving an explosion at the alkylation unit at their Girard Point refining facility (the "Girard Point Incident").

---

[2]     Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

As a result of the Girard Point Incident, the Girard Point refinery is currently inoperable and will require an extensive rebuild.  The Girard Point Incident left the Debtors significantly impaired, with an ability to only operate at a severely limited capacity through their Point Breeze refinery.  The significant fixed costs and obligations of operating the Refining Complex, weighed against the Debtors' reduced capacity, would have consumed over $100 million in liquidity within a few short weeks and precipitated the filing of these Chapter 11 Cases.  On July 21, 2019 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the Bankruptcy Court.

Through the Plan, the Debtors will, among other things, consummate one of two alternative and mutually exclusive transactions to maximize the value of the estate, ultimately effectuating the option that offers the best returns for the Allowed Claims.  The Equitization Restructuring contemplates a transaction and reorganization under which the New PES Interests are distributed to certain Holders of Allowed Claims as the primary form of consideration.  Alternatively, the Debtors may consummate an Asset Sale Restructuring whereby the Debtors would sell all, substantially all, or certain of their assets.

## III.   OVERVIEW OF THE PLAN

The Plan provides for the restructuring of the Debtors either through (a) an equitization of existing debt or (b) a third party sale transaction.  The key terms of the Plan are as follows:

### A.   The Equitization Restructuring.

If determined by the Debtors with the consent of the Required Term Loan Lenders before the Confirmation Hearing, the Debtors shall effectuate the Equitization Restructuring.  On the Effective Date, (i) the Reorganized Debtors shall issue the New PES Interests to fund distributions to certain Holders of Allowed Claims and Interests in accordance with Article III of the Plan, (ii) the Reorganized Debtors shall enter into the Exit Facility, if any, which shall be a new credit facility in an amount sufficient to pay on the Effective Date certain Holders of Claims as set forth in Article III of the Plan, and to provide incremental liquidity, if any, and (iii) the Reorganized PES Board shall be authorized to implement the Management Incentive Plan.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, the Exit Facility (if any), the Plan Sponsor Investment (if any), and the New PES Interests.

If an Equitization Restructuring occurs, on the Confirmation Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, not to be unreasonably withheld, and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

### B.   The Asset Sale Restructuring.

In the alternative, if the Debtors, with the consent of the Required Term Loan Lenders and Required DIP Lenders, so determine before the Confirmation Hearing, the Debtors shall effectuate the Asset Sale Restructuring.  On the Effective Date, the Debtors shall consummate the Asset Sales, and, among other things, the acquired assets, as set forth in the Asset Purchase Agreement, shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Asset Purchase Agreement and Confirmation Order.  The Purchaser shall be deemed not to be a successor of the Debtors.  On the Effective Date, the Purchaser shall pay to the Debtors the proceeds from the Asset Sales, and as to the extent provided for in the Asset Purchase Agreement.  Except as otherwise provided in the Plan, the Confirmation Order, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other

document incorporated in the Plan or the Plan Supplement, in each case to the extent of the Term Loan Lenders' consent (with respect to Term Loan Priority Collateral) and Intermediation Providers' consent (with respect to SOA Separate Assets and Collateral and Intermediation Priority Collateral), on the Effective Date, the assets of the Debtors that are not transferred to the Purchaser pursuant to the Asset Purchase Agreement, if any, shall vest in the Liquidating Trust free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, subject to funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, the Term Loan Claims, or the Intermediation Claims shall remain subject to the liens and claims of the DIP Lenders, Term Loan Lenders, and Intermediation Provider to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Term Loan Claims, and Intermediation Claims are satisfied as set forth in Article II.C and Article III.B.3 of the Plan.  On and after the Effective Date, except as otherwise provided for in the Plan, the DIP and Cash Collateral Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

If an Asset Sale Restructuring occurs, on the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:   (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.

C.      Releases.

The Plan contains certain releases (as described more fully in Article IV.L hereof), including mutual releases between the Debtors and the Reorganized Debtors on the one hand, and (i) the DIP Lenders; (ii) the DIP Agent; (iii) the Exit Facility Lenders; (iv) the Term Loan Lenders; (v) the Term Loan Administrative Agent; (vi) any Purchaser; (vii) the Plan Sponsor, (viii) any Holder of a Claim or Interest that does not out out of the releases in the Plan; (ix) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (i) through (viii), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (x) with respect to each of the foregoing Entities in clauses (i) through (viii), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, trustees investment bankers, and other professional advisors (with respect to clause (x), each solely in their capacity as such); ***provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases in the Plan shall not be a "<u>Released Party</u>**."

The Plan includes releases of claims held by the Debtors against the Debtors' directors and officers.  The Plan does not preserve any Claims or Causes of Action held by the Debtors against the Debtors' directors and officers.  The Debtors have analyzed and are not aware of any colorable Claims or Causes of Action against the Debtors' directors and officers.

The Plan also provides that all Holders of Claims and Interests that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of the release provisions contained in Article X of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Importantly, all Holders of Claims and Interests that are not in voting Classes that do not opt out of the release provisions contained in Article X of the Plan will be deemed to have expressly, unconditionally, generally,

individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (i) the releases, exculpations, and injunctions are specific; (ii) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (iii) the releases are a necessary part of the Plan; and (iv) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring. Further, the releases, exculpations, and injunctions have the support of the vast majority of the Debtors' creditors. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

**D.    Reserves.**

*1.    Equitization Restructuring Reserves.*

The following provision shall apply only if an Equitization Restructuring occurs.

(a)    **Claims Reserve.**

If an Equitization Restructuring occurs and the Holders of Allowed General Unsecured Claims and the Allowed Subordinated Remaining Volume Claim are to receive their Pro Rata share of the GUC Equitization Reserve in accordance with Article III.B.5 and Article III.B.6 of the Plan, on the Effective Date, the Reorganized Debtors shall establish the GUC Equitization Reserve to be administered by the Reorganized Debtors. As soon as practicable after the Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases have been filed, the Reorganized Debtors shall make a Pro Rata distribution to all Allowed General Unsecured Claims from the GUC Equitization Reserve using the amount of the total amount of Allowed and Disputed General Unsecured Claims as the denominator in calculating such Pro Rata distribution. The Reorganized Debtors shall make one or more additional distributions to General Unsecured Claims, in their discretion, until all General Unsecured Claims have been resolved. The Reorganized Debtors shall hold Cash in the GUC Equitization Reserve in the same Pro Rata share in trust for the benefit of the Holders of Disputed General Unsecured Claims. Once all General Unsecured Claims have been resolved, the Reorganized Debtors shall make a final distribution on account of Allowed General Unsecured Claims in order to distribute the remaining Cash in the GUC Equitization Reserve attributable to Allowed General Unsecured Claims Pro Rata to all Allowed General Unsecured Claims using the total amount of Allowed General Unsecured Claims as the denominator. The Reorganized Debtors shall distribute all such amounts (net of any expenses, including any taxes relating thereto but excluding any legal fees or time of employees of the Reorganized Debtors associated with the reconciliation of such claims), as provided in the Plan, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the GUC Equitization Reserve. As soon as practicable after the Reorganized Debtors have made the final distribution to Holders of Allowed General Unsecured Claims in accordance with Article VIII.D of the Plan, the Reorganized Debtors shall distribute Pro Rata the remainder of the funds in the GUC Equitization Reserve to the Holder of the Allowed Subordinated Remaining Volume Claim.

*2.    Asset Sale Restructuring Reserves.*

The following provisions shall apply only if an Asset Sale Restructuring occurs and a Plan Administrator is appointed. The following reserves shall be administered by the Plan Administrator.

(a)    **Establishment of Reserve Accounts.**

The Plan Administrator shall establish each of the Distribution Reserve Accounts (which may be effected by either establishing a segregated account, which shall be at an institution reasonably acceptable to the Term Loan

Lenders and the Intermediation Provider to the extent Holders of Term Loan Secured Claims or Holders of Intermediation Secured Claims have not been paid in full, or establishing book entry accounts, in the sole discretion of the Plan Administrator).

(b)    **Wind-Down Reserve.**

On the Effective Date, the Plan Administrator shall establish the Wind-Down Reserve by depositing Cash in the amount of the Wind-Down Amount into the Wind-Down Reserve. The Wind-Down Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Reorganized Debtors and the Plan Administrator as set forth in the Plan; *provided* that all costs and expenses associated with the winding up of the Reorganized Debtors and the storage of records and documents shall constitute expenses of the Reorganized Debtors and shall be paid from the Wind-Down Reserve. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes. Any amounts remaining in the Wind-Down Reserve after payment of all expenses of the Reorganized Debtors and the Plan Administrator shall constitute Distribution Proceeds and promptly be transferred to the General Account and shall be distributed in accordance with Article VIII of the Plan without any further action or order of the Bankruptcy Court.

(c)    **Other Secured Claims Reserve.**

On the Effective Date, the Plan Administrator shall establish the Other Secured Claims Reserve by depositing Cash in the amount of the Other Secured Claims Reserve Amount into the Other Secured Claims Reserve. The Other Secured Claims Reserve Amount shall be used to pay Allowed Other Secured Claims. If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan, and shall otherwise constitute Distribution Proceeds and promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Other Secured Claims Reserve after satisfaction of all Allowed Other Secured Claims shall constitute Distribution Proceeds and promptly be transferred to the General Account and shall be distributed in accordance with Article VIII of the Plan without any further action or order of the Bankruptcy Court.

(d)    **Priority Claims Reserve.**

On the Effective Date, the Plan Administrator shall establish the Priority Claims Reserve by depositing Cash in the amount of the Initial Priority Claims Reserve Amount and the Additional Priority Claims Reserve Amount into the Priority Claims Reserve. The Priority Claims Reserve shall be used to pay Holders of all Allowed Priority Claims in full in Cash, to the extent that such Allowed Priority Claims have not been paid in full on or before the Effective Date. If all or any portion of a Priority Claim shall become a Disallowed Claim, then the amount on deposit in the Priority Claims Reserve attributable to such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims will be paid in full in Cash in accordance with the Plan, and shall otherwise constitute Distribution Proceeds and promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Priority Claims Reserve after payment of all Allowed Priority Claims shall constitute Distribution Proceeds and promptly be transferred to the General Account and shall be distributed in accordance with Article VIII of the Plan without any further action or order of the Bankruptcy Court.

(e)    **GUC Distribution Reserve.**

Following payment in full of all Allowed Term Loan Claims and Allowed Intermediation Secured Claims as set forth in Article II and Article II of the Plan, and after funding of the Wind-Down Reserve, the Other Secured Claims Reserve, and the Priority Claims Reserve, the Plan Administrator shall establish and thereafter maintain the GUC Distribution Reserve in a separate, segregated account by depositing the Distribution Proceeds allocated to General Unsecured Claims and the Subordinated Remaining Volume Claim in accordance with Article VIII of the

Plan, into the GUC Distribution Reserve. The GUC Distribution Reserve shall be used to pay Allowed General Unsecured Claims on a Pro Rata basis, and, upon complete satisfaction of the Allowed General Unsecured Claim, the Subordinated Remaining Volume Claim on a Pro Rata Basis, *provided* that Distribution Proceeds in the GUC Distribution Reserve shall only be used to pay the Allowed Subordinated Remaining Volume Claim to the extent Allowed General Unsecured Claims have been paid in full pursuant to Article VIII.D of the Plan, *provided, further*, that the Plan Administrator may, in his sole discretion, upon five Business Days notice to the Bankruptcy Court, donate the funds in the GUC Distribution Reserve to a suitable charitable organization (for example, the American Bankruptcy Institute Endowment Fund, CARE, or similar organization) without any further action or order of the Bankruptcy Court if distribution of the funds to Holders of Allowed General Unsecured Claims on a Pro Rata basis is not feasible, and such distribution would not satisfy the outstanding Allowed General Unsecured Claims such that the Allowed Subordinated Remaining Volume Claim would receive a recovery.

###### (f)     Distributions to Term Loan Claims.

Following the Effective Date, the Plan Administrator shall deliver to the Term Loan Administrative Agent, on a daily basis, all Distribution Proceeds at such time for distribution to the Holders of Allowed Term Loan Secured Claims until such claims are paid in full in cash including (to the extent Allowed) all interest accrued and accruing under the Term Loan Credit Agreement until such payment in full in cash.

###### (g)     Additional Distributions.

After the Allowed Administrative Claims and Allowed Priority Claims have been satisfied or funded pursuant to Article II of the Plan, any Distribution Proceeds shall be allocated and distributed in the following priority (in each case on a Pro Rata basis): *first*, either (a) to holders of Allowed Term Loan Secured Claims pursuant to Article VIII.G of the Plan or (b) to holders of Allowed Intermediation Secured Claims, whichever has priority over the underlying collateral to be distributed; *second*, to whichever of (a) or (b) that does not have priority; (c) *third*, to holders of Allowed General Unsecured Claims; and (d) *fourth*, to the Holder of the Subordinated Remaining Value Claim.

## IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.     What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.     Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

**C.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | Intermediation Secured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Subordinated Remaining Volume Claim | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 9 | Interests in PES Energy and PES Ultimate Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim or Interest | Treatment | Estimated Allowed Amount ($ mm) | Projected Plan Recovery |
|-------|-------------------|-----------|----------------------------------|--------------------------|
| N/A | Administrative Claims | Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, | $[●] | 100% |

| Class | Claim or Interest | Treatment | Estimated Allowed Amount ($ mm) | Projected Plan Recovery |
|---|---|---|---|---|
| | | settlement, and release of and in exchange for its Claim, payment in full in Cash from the Priority Claims Reserve on the Effective Date or as soon as reasonably practicable thereafter. | | |
| N/A | DIP Claims | Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed DIP Claims, each Holder of an Allowed DIP Claim will be indefeasibly repaid in full in Cash on the Effective Date. | $[●] | 100% |
| N/A | Priority Tax Claim | Except to the extent that a Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of a Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash from the Priority Claims Reserve on the Effective Date or as soon as reasonably practicable thereafter. | $[●] | 100% |
| N/A | Professional Fee Claims | All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Reorganized Debtors or the Plan Administrator, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash. | $[●] | 100% |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive, at the Debtors' election (subject to the reasonable consent of the Required Term Loan Lenders): (a) payment in full in Cash, which may come from the Other Secured Claims Reserve; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of | $[●] | 100% |

11

| Class | Claim or Interest | Treatment | Estimated Allowed Amount ($ mm) | Projected Plan Recovery |
|---|---|---|---|---|
| | | such Claim; or (d) other treatment rendering such Claim Unimpaired.[3] | | |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim will receive payment in full in Cash from the Priority Claims Reserve. | $[●] | 100% |
| 3 | Term Loan Secured Claims | The Term Loan Claims shall be allowed in the aggregate principal amount of [$698,639,651.00] plus accrued and unpaid interest and fees thereon as of the Petition Date plus, to the extent the Term Loan Claims are secured, accrued interest and fees (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case that are chargeable or reimbursable under the Term Loan Credit Agreement) to the extent permitted by section 506 of the Bankruptcy Code. Each Holder of an Allowed Term Loan Secured Claim will receive its share, in accordance with section 7.03(a) of the Term Loan Credit Agreement, of: (i) if an Equitization Restructuring occurs, (a) the New PES Interests, if any, after dilution by the Plan Sponsor Investment and (b) any Cash (other than Cash constituting Intermediation Priority Collateral or SOA Separate Assets and Collateral) in excess of the Minimum Liquidity Amount that is not required to make distributions to Administrative Claims, Priority Tax Claims, or Other Secured Claims, fund the Priority Claims Reserve or pay fees and expenses that are required to be paid pursuant to the Plan, including the Professional Fee Claims; (ii) if the Asset Sale Restructuring occurs, (a) the Distribution Proceeds available for distribution to Holders of Allowed Term Loan Secured Claims from time to time as provided in Article VIII of the Plan; and (b) the Liquidating Trust Units as provided in the Liquidating Trust Agreement and in accordance with Article IV.G of the Plan; and (iii) whether an Equitization Restructuring or Asset Sale Restructuring occurs, Cash proceeds of the Intermediation Priority Collateral to the extent such proceeds remain available after Holders of Allowed Intermediation Secured Claims are paid in full in accordance with Article III.B.4 of the Plan. To the extent that such distribution is not sufficient to pay the Allowed Term Loan Claims in full, any unsatisfied amount shall constitute an Allowed Term Loan Deficiency Claim. | $[●] | [●]% |

---

[3]    Certain Holders of Other Secured Claims may be entitled to legal fees, expenses, and interest on account of their Claims, as applicable.

| Class | Claim or Interest | Treatment | Estimated Allowed Amount ($ mm) | Projected Plan Recovery |
|---|---|---|---|---|
| 4 | Intermediation Secured Claims | Whether an Equitization Restructuring or Asset Sale Restructuring occurs, each Holder of an Allowed Intermediation Secured Claim shall receive its Pro Rata Share of: (a) Cash proceeds of Intermediation Priority Collateral and the SOA Separate Assets and Collateral; *provided*, for the avoidance of doubt, that the amount of any surcharge applied pursuant to the Final DIP Order shall reduce the amount of the Intermediation Priority Collateral proceeds but not be deducted from the Intermediation Claims; (b) all other assets that constitute Intermediation Priority Collateral or the net Cash proceeds thereof; and (c) Cash proceeds of the Term Loan Priority Collateral to the extent such proceeds remain available after Holders of Allowed Term Loan Secured Claims are paid in full in accordance with Article III.B.3 of the Plan (or, to the extent applicable, Liquidating Trust Units on account thereof). In the event that an Equitization Restructuring occurs and, pursuant to the Plan, Holders of Term Loan Secured Claims are to receive Plan distributions in excess of one hundred percent (100%) of the total amount of the Allowed Term Loan Claims, then Holders of Allowed Intermediation Secured Claims shall receive such additional consideration as such Holders may consent to or as necessary to satisfy the terms of section 1129(b) of the Bankruptcy Code. To the extent such distribution is not sufficient to pay the Allowed Intermediation Secured Claims in cash in full, any unsatisfied amount shall constitute an Allowed Intermediation Deficiency Claim. Accrued and unpaid interest and fees thereon as of the Petition Date plus, to the extent the Intermediation Secured Claims are secured, accrued interest and fees (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case that are chargeable or reimbursable under the Intermediation Facility) to the extent permitted by section 506(b) of the Bankruptcy Code. | $[●] | [●]% |
| 5 | General Unsecured Claims | Each Holder of a General Unsecured Claim will receive its Pro Rata share of (i) if an Equitization Restructuring occurs, the GUC Equitization Reserve; and (ii) if an Asset Sale Restructuring occurs, the Distribution Proceeds as provided in Article VIII.H of the Plan. Any such distributions on account of Term Loan Deficiency Claims shall be made in accordance with section 7.03 of the Term Loan Credit Agreement. | $[●] | [●]% |
| 6 | Subordinated Remaining Volume Claim | The Holder of the Allowed Subordinated Remaining Volume Claim will receive, following the full satisfaction of all Allowed General Unsecured | $[●] | [●]% |

| Class | Claim or Interest | Treatment | Estimated Allowed Amount ($ mm) | Projected Plan Recovery |
|-------|-------------------|-----------|--------------------------------|-------------------------|
| | | Claims, its Pro Rata Share of (i) if an Equitization Restructuring occurs, the GUC Equitization Reserve; and (ii) if an Asset Sale Restructuring occurs, the Distribution Proceeds as provided in Article VIII.H of the Plan. | | |
| 7 | Intercompany Claims | Whether an Equitization Restructuring or Asset Sale Restructuring occurs, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims. | $[●] | 0% / 100% |
| 8 | Intercompany Interests | Whether an Equitization Restructuring or Asset Sale Restructuring occurs, each Allowed Intercompany Interest shall be Reinstated for administrative convenience or canceled and released without any distribution on account of such interests at the option of the Debtors. | $[●] | 0% / 100% |
| 9 | Interests in PES Energy and PES Ultimate Interests | Whether an Equitization Restructuring or Asset Sale Restructuring occurs, each Allowed Interest in PES Energy and each PES Ultimate Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in PES Energy or Holder of PES Ultimate Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests. | $[●] | 0% |
| 10 | Section 510(b) Claims | Whether an Equitization Restructuring or Asset Sale Restructuring occurs, Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | $[●] | 0% |

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II.A of the Plan.

**F.      Are any regulatory approvals required to consummate the Plan?**

Yes, the Debtors will file applications with the Federal Energy Regulatory Commission ("FERC") seeking approval of the Restructuring Transactions contemplated by the Plan, as well as make any filings required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act").

**G.**     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of a liquidation scenario, *see* Art. XI.B of this Disclosure Statement.

**H.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article XI of the Plan for a description of the conditions precedent to consummation of the Plan.

**I.**     **What are the sources of Cash and other consideration required to fund the Plan?**

If the Equitization Restructuring occurs, the Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, the Exit Facility (if any), the Plan Sponsor Investment (if any), and the New PES Interests.

If the Asset Sale Restructuring occurs, the Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

**J.**     **Are there risks to owning the New PES Interests upon emergence from chapter 11?**

Yes. *See* Article IX of this Disclosure Statement.

**K.**     **Will the final amount of Allowed General Unsecured Claims affect my distribution under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims is approximately $[__]. Whether an Equitization Restructuring or Asset Sale Restructuring occurs, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of (i) the Distribution Proceeds, if any and (ii) if an Equitization Restructuring occurs, the GUC Equitization Reserve. There is a chance that there will be no Distribution Proceeds or no amounts funded to the GUC Equitization Reserve.

Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, the projected amount of General Unsecured Claims set forth herein is subject to material change (either higher or lower) and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses as well as the Girard Point Incident and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. To the extent net recoveries on these claims are higher or lower than the amounts estimated by the Debtors, the value of recoveries to Holders of General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors or any official committees appointed in the Chapter 11 Cases may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of General Unsecured Claims, and such changes could be material.

**L.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article X of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Term Loan Lenders.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All Holders of Claims or Interests that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of the release provisions contained in Article X of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

All Holders of Claims and Interests that are not in voting Classes that do not opt out of the release provisions contained in Article X of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, to the extent requested by the Bankruptcy Court, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1.     *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Confirmation Order, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors or the Reorganized Debtors, as applicable. If an Equitization Restructuring occurs pursuant to the Plan, then the DIP Agent, the Term Loan Administrative Agent, the Intermediation Provider, the SXL Promissory Note Lender, and NGL shall execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Equitization Restructuring; *provided* that if an Asset Sale Restructuring occurs, then, subject to the funding of the Professional Fee Escrow Account, all Liens securing the DIP Claims, Term Loan Secured Claims, Intermediation Secured Claims, the Other Secured Claims, or any other obligations shall continue in full force and effect on and after the Effective Date and nothing in the Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of such Claims or any Lien securing any such Claim.**

### 2.     *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise provided for in the Plan or the Plan Supplement, for good and valuable consideration, on and after the Effective Date, each Released**

Party is deemed released and discharged by the Debtors, the Reorganized Debtors, Plan Administrator, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

    (a)    the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Documents;

    (b)    any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

    (c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New PES Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

    (d)    the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth above, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases set forth above are:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the releases set forth above; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any claim released by the releases set forth above against any of the Released Parties.

    *3.*    *Release by Holders of Claims or Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor or Reorganized Debtor, as applicable, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

    (a)    the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

    (b)    any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction,

contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, and, for the avoidance of doubt, solely with respect to the Released Parties and Releasing Parties, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.

4.     *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the Exit Facility Credit Agreement, the Exit Facility Documents, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.     *Injunction*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or Reorganized Debtors, or the other Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

**M.**    **Will the Debtors be entitled to a discharge?**

Section 1141(d)(3) of the Bankruptcy Code provides that a non-individual debtor is not entitled to a discharge if (i) the plan provides for the liquidation of all or substantially all of the property of the estate; (ii) the debtor does not engage in business after consummation of the plan; and (iii) the debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if the case is a case under chapter 7.  If an Equitization Restructuring occurs, the Debtors will be entitled to a discharge.  If an Asset Restructuring occurs, the U.S. Trustee asserts that the Debtors may not become entitled to a discharge.

**N.**    **What is the deadline to vote on the Plan?**

The Voting Deadline is January 27, 2020, at 5:00 p.m. (prevailing Eastern Time).

**O.**    **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Omni Agent Solutions (the "Solicitation Agent"). *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT.   ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.

**P.**    **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.**    **When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for January 30, 2019, at 9:30 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be

modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than January 27, 2020, at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *USA Today* (national edition) to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**R.     What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.     What is the expected timeline for confirmation of the Plan?[4]**

On [●], the Court entered the *Order (i) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. [●]] (the "Disclosure Statement Order") which, among other things, established the following dates and deadlines for confirmation of the Plan, subject to modification as necessary:

    i.    *Voting Record Date.* December 6, 2019 as the date for determining (a) which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in connection therewith and (b) whether Claims or Interests have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of the respective Claim or Interest;

    ii.    *3018 Motion Deadline.* The date that is seven (7) days from the later of (a) the mailing of the Confirmation Hearing Notice and (b) the filing of a claim objection as the deadline by which creditors seeking to have a claim temporarily allowed for purposes of voting to accept or reject the Plan pursuant to Bankruptcy Rule 3018(a) be required to file a motion (the "3018 Motion"), to the extent applicable;

    iii.    *Solicitation Deadline.* Five (5) days after entry of the Disclosure Statement Order, but in no event later than December 19, 2019 as the deadline for distributing Solicitation Packages, including Ballots, to Holders of Claims or Interests entitled to vote to accept or reject the Plan (the "Solicitation Deadline");

    iv.    *Publication Deadline.* Five (5) days after entry of the Disclosure Statement Order, but in no event later than December 19, 2019 as the last date by which the Debtors will submit the Confirmation Hearing Notice for publication in a format modified for publication;

---

[4]    Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the motion seeking entry of the Disclosure Statement Order (as defined herein) [Docket No. 464].

v.      *Plan Supplement Filing Date.*  January 20, 2020 as the date by which the Debtors must file the Plan Supplement;

vi.     *3018 Motion Objection Deadline.*  January 20, 2020 as the deadline by which the Debtors or other parties in interest must file objections to any 3018 Motions, to the extent applicable;

vii.    *Voting Deadline.*  January 27, 2020, at 5:00 p.m. (prevailing Eastern Time) as the deadline by which all Ballots must be properly executed, completed, and delivered so that they are actually received (the "Voting Deadline") by Omni Management Group, Inc.;

viii.   *Plan Objection Deadline.*  January 27, 2020, at 4:00 p.m. (prevailing Eastern Time) as the deadline by which objections to the Plan must be filed with the Court and served so as to be actually received by the appropriate notice parties;

ix.     *Deadline to File Voting Report.*  January 29, 2020, at 4:00 p.m. (prevailing Eastern Time) as the date by which the report tabulating the voting on the Plan (the "Voting Report") shall be filed with the Court;

x.      *Confirmation Brief and Plan Objection Reply Deadline.*  January 29, 2020, at 4:00 p.m. (prevailing Eastern Time) as the deadline by which the Debtors shall file their brief in support of Confirmation of the Plan and deadline by which replies to objections to the Plan must be filed with the Court; and

xi.     *Confirmation Hearing Date.*  January 30, 2020 at 9:30 a.m. (prevailing Eastern Time) as the date and time for the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing Date").

**T.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article XI of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**U.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

***1.      Equitization Restructuring.***

If the Equitization Restructuring occurs, as of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the New Boards and new officers of each of the Reorganized Debtors shall be appointed.  In subsequent terms, following the Effective Date, members of the New Board and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity and affiliation of any Person proposed to serve on the New Boards will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, as well as those Persons that will serve as officers of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the New Boards will be disclosed in the New Organizational Documents.

### 2. Asset Sale Restructuring.

If the Asset Sale Restructuring occurs, as of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as an officer, director, and manager, as applicable, of the Debtors with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of PES Energy under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or sale director of the Reorganized Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors. The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.

**V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent:

By electronic mail at:
Email: tabulation@omnimgt.com with a reference to "PES 2019" in the subject line.

By telephone at:
(818) 906-8300 or (866) 989-6149 (toll free)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at https://www.omnimgt.com/PESHoldings2019 (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov (for a fee).

**W.    Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## V.        IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.        Certain Key Terms Used in this Disclosure Statement.

The following are some of the defined terms used in this Disclosure Statement.  This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only.  Please refer to the Plan for additional defined terms.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

"Chapter 11 Cases" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, asserted against a Debtor, whether or not assessed or Allowed.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court, if any, to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, including any adjournments thereof.

"Interests" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors, and acceptable to the Required Term Loan Lenders, no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  If an Equitization Restructuring occurs, the Plan Supplement shall include the following:  (a) the New Organizational Documents; (b) the Exit Facility Credit Agreement, if any; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) the Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) the New Stockholders' Agreement, if any; (g) a document listing the members of the New Boards and the officers of the Reorganized Debtors, if any; (h) the Management Incentive Plan, if any; *(i)* the Plan Sponsor Agreement, if any; (k) the Liquidating Trust Agreement; (l) the identity of the Plan Administrator and the compensation of the Plan Administrator, if any; (m) a notice of consummation of the Equitization Restructuring; (n) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated under the Plan; and (o) any additional information the Debtors deem material to the Holders' decision to vote to accept or reject the Plan (including financial projections).  If an Asset Sale Restructuring occurs, the Plan Supplement shall include the following:  (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b)  a list of retained Causes of Action; (c) the Asset Purchase Agreement; (d) the identity of the Plan Administrator and the compensation of the Plan Administrator, if any; (e) the Liquidating Trust Agreement; (f) the Management Incentive Plan, if any; (g) a description of the bids received and/or the tentative successful bid or stalking horse, as applicable; (h) a chart detailing the projected creditor recoveries following the auction (to the extent applicable, based on the tentative successful bid); (i) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated under the Plan; (j) any additional information the Debtors deem material to the Holders' decision to vote to accept or reject the Plan; (k) a notice of consummation of the Asset Sale Restructuring and a notice of successful bidder, if any; (l) an updated Liquidation Analysis taking into account estimated recoveries based on the successful bid, if any; (m) a disclosure table listing creditor recovery estimates based

upon a successful bid, if any; (n) a letter from the Creditors' Committee recommending how Holders of General Unsecured Claims should vote on the revised Plan; (o) a summary explanation of any Plan changes; *provided* that the foregoing Plan Supplement documents in clauses (k) to (o) shall be delivered via overnight mail after the Debtors select a successful bidder at the auction (if the auction occurs), but under no circumstances later than 6 days prior to the Voting Deadline, to the parties receiving notice of the Disclosure Statement by overnight mail. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article XII of the Plan.

**B.     Additional Important Information.**

The effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article XI of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "*Risk Factors,*" and the Plan before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other securities may be issued pursuant to other applicable exemptions under federal or state securities laws.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to the following:

- business strategy;

- technology;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- refined product prices and the overall health of the refined products industry;

- the amount, nature, and timing of capital expenditures, including future development costs;

- availability and terms of capital;

- successful results from the Debtors' operations;

- the integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- costs of conducting the Debtors' operations;

- general economic and business conditions;

- effectiveness of the Debtors' risk management activities;

- environmental liabilities;

- counterparty credit risk;

- the outcome of pending and future litigation;

- governmental regulation and taxation of the refined products industry;

- developments in supplier countries;

- uncertainty regarding the Debtors' future operating results;

- plans, objectives, and expectations;

- variations in the market demand for, and prices of, refined products;

- the adequacy of the Debtors' capital resources and liquidity;

- access to capital and general economic and business conditions;

- risks in connection with acquisitions;

- the potential adoption of new governmental regulations impacting the Debtors' businesses; and

- the Debtors' ability to satisfy future cash obligations and environmental costs.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance, all of which are based on various estimates and assumptions. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot assure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or

achievements to be different from those they may project, and, except as required by law, the Debtors expressly disclaim any obligation to update the projections made herein, whether as a result of new information, future events, or otherwise. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not Confirmed; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business and market conditions; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

The Debtors are privately held limited liability companies, limited partnerships, and a corporation. As of the Petition Date, the Debtors employed approximately 950 individuals, approximately 620 of whom were unionized members of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and its Philadelphia Local 10-1 (the "Union").[5] The Debtors conduct their operations through two business segments, refining and logistics, which are operated by Debtor entities Philadelphia Energy Solutions Refining and Marketing, LLC ("PESRM") and North Yard Logistics, L.P. ("NYL"), respectively. PESRM includes the operations of the Refining Complex. NYL owns and operates the North Yard Terminal, which provides rail unloading services to the Refining Complex.

### A.    The Debtors' Corporate Structure and History.

The Refining Complex has a proud Philadelphia history, and has been continuously operating in some form since the mid 1860's. Until the Girard Point Incident, the Refining Complex had the capacity to refine 335,000 barrels of crude oil per day, and was the largest oil refining complex on the U.S. eastern seaboard. The Refining Complex produces a full range of transportation fuels, such as gasoline and ultra low sulfur diesel, as well as other refined products, including home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur.

The Debtors were formed in 2012, in connection with the Debtors' acquisition of the Refining Complex from Sunoco Inc. ("Sunoco"), a subsidiary of Energy Transfer Partners, L.P. ("Energy Transfer Partners"). The Debtors believed that rapid growth in the production of light, sweet domestic crude oil from developing shale formations such as the Bakken, Eagle Ford, and Permian, constrained domestic pipeline infrastructure, the federal ban on the export of domestic crude oil, and relatively static domestic distillation capacity, would create opportunities to secure domestic crude oil at advantaged prices relative to other sources of crude oil. Accordingly, in 2013, $100 million was invested to construct a crude oil rail terminal on the North Yard of the Refining Complex (the "North Yard Terminal") to capitalize on this development. One year later, an additional $30 million investment doubled the North Yard Terminal's capacity to unload four crude unit trains per day, or 280,000 barrels per day, making the North Yard Terminal the largest crude oil unloading terminal on the east coast. In addition to the investments in the North Yard Terminal, the Debtors invested, over the past five years, approximately $630 million in the Refining Complex's infrastructure to enable it to operate safely and efficiently, and to position it for success in the highly competitive transportation and fuel market. The Debtors also had expanded their employee base to approximately 1,100 employees, though that number was reduced to approximately 950 employees following the Girard Point Incident.

### B.    The Debtors' Assets and Operations.

#### 1.    PESRM.

---

5    In June 2015, the Debtors renewed the terms of a collective bargaining agreement (the "CBA") with the Union that covers all represented hourly employees and contains a no-strike clause effective through the CBA's September 8, 2019 expiration date.

PESRM is an independent merchant refiner that operates the Refining Complex. The Refining Complex is located on a 1,300 acre tract of land, 2.5 miles from downtown Philadelphia, that includes two interconnected refineries: Girard Point and Point Breeze. The Refining Complex processes a mix of predominantly light, sweet crude oils from West Africa, Canada, North Dakota, Texas, and other parts of the world and produce a full range of refined products (including gasoline, ultra low sulfur diesel, home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur) that PESRM markets. The specific locations of the Refining Complex's major refinery units are described in the map below:



These refinery units allowed Girard Point and Point Breeze to collectively distill up to 335,000 barrels per day into a full range of refined products, including but not limited to gasoline (approximately 50 percent of refined product yields) and diesel (approximately 38 percent of refined product yields).

PESRM's earnings and cash flow from operations are primarily affected by the relationship between refined product prices and the prices for crude oil and other non crude feedstocks, which is best illustrated in the gross refining margin financial metric ("Gross Refining Margin"). Gross Refining Margin is the difference between (a) the amount of revenue received for the refined products produced by the Refining Complex and (b) the amount paid for crude oil and the other raw materials refined in the Refining Complex (input costs). The proceeds represented by the Gross Refining Margin are used to fund, among other things, operating expenses (i.e., direct labor, plant management salaries, engineering and technical salaries, utilities, maintenance expense, operating materials, chemicals, and catalysts used in the refining process), administrative expenses, capital expenditures, regulatory compliance costs, and debt service.

While operating expenses, administrative expenses, and capital expenditures are relatively predictable and stable over time, Gross Refining Margin and regulatory compliance costs are volatile and highly unpredictable. As a result, the cash available to service debt and provide a return on invested capital varies widely from period to period and, at times, can be negative for extended periods.

The cost of acquiring crude oil and other non crude feedstocks, and the price of refined products ultimately sold, depend on numerous factors beyond PESRM's control, including the supply of and demand for, crude oil, gasoline, diesel, and other refined products, which in turn depend on other factors, including changes in global and regional economies, weather conditions, global and regional political affairs, crude oil production levels, the availability of imports, the marketing of competitive fuels, pipeline capacity, prevailing exchange rates, and the extent

of government regulation.  While PESRM's costs of products sold fluctuate significantly with movements in crude oil prices, income fluctuates significantly with movements in refined product prices.  Therefore, the effect of changes in crude oil prices on PESRM's operating results is influenced by how the prices of refined products adjust to reflect such changes.

> ### 2.    NYL.

NYL owns and operates the North Yard Terminal, the east coast's largest crude oil rail unloading terminal, located in the North Yard of the Refining Complex.  Following an expansion project completed in October 2014, the North Yard Terminal currently has unloading capacity of four crude unit trains per day, or 280,000 barrels per day.

The major components of the North Yard Terminal include 6.4 miles of track on the Debtors' property, one mile of additional track with rights of way on adjacent land owned by a third party, two 4,000 foot, 24 inch underground pipeline manifolds, a 20,000 barrel per hour pumping station, 1,500 feet of 24 inch pipeline, and a custody transfer meter station.

NYL provides rail unloading services to PESRM by receiving, handling, and transferring crude oil that is delivered to PESRM by rail.  NYL does not take ownership of, or receive any payments for the crude oil it handles.

### C.    Regulatory Matters.

As owners of fuel refineries, certain of the Debtors' subsidiaries are subject to regulation by various federal, state, and local government agencies.  These include, among others, the United States Environmental Protection Agency, the Pennsylvania Department of Environmental Protection, and the City of Philadelphia Department of Public Health, Air Management Services.  In addition, the Girard Point Incident has resulted in extensive oversight and investigations from multiple federal, state, and local agencies.

### D.    Environmental Matters.

The Debtors are also subject to a wide range of environmental laws in the ownership and operation of refineries. These laws generally require that governmental permits and approvals be obtained before construction and during operation of refining facilities.  In addition, the Girard Point Incident has resulted in extensive oversight and investigations from multiple federal, state, and local environmental agencies.  The Debtors are also party to that certain July 2, 2012 Refining Contribution Agreement (as amended) between the Debtors, Sunoco, and Carlyle PES, L.L.C. establishing Sunoco as the responsible party for any remediation costs attributable to environmental damage as of the closing on or about August 7, 2012.

The United States on behalf of the United States Environmental Protection Agency (the "EPA") believes that the Debtors are currently in violation of a Consent Decree and Environmental Settlement Agreement entered by this Court in the Debtors' prior bankruptcy case.  *See In re PES Holdings, LLC*, No. 18-10122 (KG), Docket Nos. 244, 347, 510 (the "Consent Decree").  The Consent Decree involved the Clean Air Act's Renewable Fuel Standard (the "RFS") program's requirement that refiners either blend renewable fuels into gasoline or diesel fuel or obtain and retire Renewable Identification Numbers ("RINs") to meet yearly Renewable Volume Obligations ("RVOs"). In particular, and among other things, the Consent Decree requires that Debtors retire RINs on a semi-annual basis for their Prior Plan post-effective date RVOs through 2022.  On September 30, 2019, Debtors failed to retire approximately 154,000,000 RINs to satisfy their RVOs for the period of January 1, 2019 through June 30, 2019.  The September 30, 2019 RIN retirement deadlines set forth in the Consent Decree are an acceleration of the Debtors' requirement under the CAA to retire these RINs by March 31, 2020.  40 C.F.R. § 80.1451(a)(1).

The United States on behalf of the EPA believes that bankruptcy is not a shield from compliance obligations under environmental law or the Consent Decree.  The EPA believes that the Debtors' RIN retirement requirement is an obligation to comply with the law which does not fall within the Bankruptcy Code's definitions of a dischargeable "debt" and "claim."  11 U.S.C. §§ 101(5), (12).  Indeed, the EPA believes that the Debtors can only comply with applicable law by obtaining RINs on the open market from third parties, and that no payments would or could be made to the United States.  Accordingly, the EPA believes that the Debtors' RIN retirement liability is an injunctive compliance obligation that is not subject to discharge, and that the Debtors' Plan must provide for compliance with this obligation.  The EPA believes that if the Plan fails to provide for such compliance, it is proposing something that is "forbidden by law," and cannot be confirmed.  *See* 11 U.S.C. § 1129(a)(3).  The EPA also believes that, in such

case, the Plan would not provide adequate means for its implementation and compliance with applicable legal requirements, *see* 11 U.S.C. §§ 1123(a)(5), 1129(a)(11), and thus would not be feasible. The United States on behalf of EPA therefore believes that the Plan must be modified to provide for compliance with the law and is otherwise patently unconfirmable.

The Debtors believe that, among other things, any failure to comply with the Consent Decree and the Debtors' related RIN retirement requirement does fall within the Bankruptcy Code's definitions of a dischargeable "debt" and "claim." 11 U.S.C. §§ 101(5), (12). Under the Bankruptcy Code, "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—(A) discharges the debtor from any debt that arose before the date of such confirmation[.]" 11 U.S.C. § 1141(d)(1)(A). "Debt" means liability on a claim. 11 U.S.C. § 101(12). "Claim" means a right to payment, or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. 11 U.S.C. § 101(5). Thus, civil penalties or injunctive relief resulting from the Debtors' violation of the Consent Decree that are or give rise to, a right to payment, constitute a "claim" that is dischargeable under the Bankruptcy Code. If the United States seeks civil penalties (whether stipulated or otherwise) against the Debtors for violating the Consent Decree, such penalties amount to a "right to payment" of the United States. The Consent Decree provides language requiring the Debtors to pay the United States for any stipulated penalties imposed for violations of the Consent Decree. Consent Decree ¶¶ 15, 17-19, 22. Similarly, under the fuels section of the Clean Air Act, any person who violates the RFS "shall be liable to the United States for a civil penalty[.]" 42 U.S.C. § 7545(d)(1). Because any such penalties amount to a "right to payment" of the United States, the Debtors assert that these are "claims" that are dischargeable under the Bankruptcy Code.

In light of this dispute, the Debtors and the United States on behalf of the EPA have agreed to a toggle mechanism for the treatment of any of the Debtors' liabilities under the Consent Decree. Specifically, the Plan provides that the Court shall determine, at any time prior to or following the Confirmation Hearing, whether such liabilities constitute injunctive compliance obligations or are a dischargeable "debt" and/or a "claim" under the Bankruptcy Code. If it is determined by the Court (a) that the Debtors have liabilities under the Consent Decree which are an injunctive compliance obligation, such liabilities shall not be classified as "claims" within the meaning of section 101(5) of the Bankruptcy Code, and nothing in the Plan or Confirmation Order shall discharge, release, exculpate, impair, or otherwise preclude any such liabilities, (b) that the Debtors have liabilities under the Consent Decree which constitute dischargeable "debt" and/or a "claim" pursuant to the Bankruptcy Code, such liabilities shall constitute Class 5 General Unsecured Claims and the EPA shall receive pro rata distributions accordingly, or (c) alternative treatment is warranted, then the treatment shall be as provided by order of the Court.

E.    **The Debtors' Employees.**

As of the Petition Date, the Debtors employed approximately 950 employees, approximately 65 percent of whom were covered by a collective bargaining agreement. Since then the Debtors have reduced their workforce to approximately 181 critical employees that perform a variety of critical functions, including engineering, accounting, business administration, finance, human resources, information technology, management, marketing, facilities maintenance, security, and other key functions. They are essential to the preservation and enhancement of the value of the Debtors' businesses and the administration of the Debtors' estates during the ongoing restructuring process.

In light of the impending September 8, 2019 expiration of the CBA and the necessary, substantial alterations to the Debtors' workforce needs in the wake of the Girard Point Incident, the Debtors and the Union bargained in good faith on the terms of a modification and extension of the CBA. The Debtors and the Union exchanged a series of proposals for such modification and extension that culminated in that certain memorandum of understanding, dated as of August 22, 2019, between Debtor PESRM and the Union (the "MOU").

On August 29, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to Sections 363 and 1113 of the Bankruptcy Code (I) Authorizing Entry Into Memorandum, of Understanding and (II) Granting Related Relief* [Docket No. 286]. Approval of the Debtors' entry into the MOU would preserve, on mutually acceptable terms, those jobs necessary to safely operate the Debtors' refinery complex in "caretaker" mode while the Debtors move forward with a marketing process to identify a value-maximizing path forward.

F.    **The Debtors' Prepetition Capital Structure.**

1.    *The Debtors' Debt Obligations.*

As of June 30, 2019, the Debtors had approximately $1.75 billion in total funded debt, consisting of (a) the Term Loan Facility, in an aggregate outstanding amount of approximately $698.6 million; (b) the SXL Promissory Note, in an outstanding amount of $75.0 million; (c) the NGL Installment Sale Agreement, in an outstanding amount estimated at approximately $26.4 million; and (d) the Intermediation Facility, in an outstanding amount estimated at approximately $950.0 million.  The chart below reflects the Debtors' capital structure as of the June 30, 2019.

| Capital Structure | | | |
|---|---|---|---|
| | Maturity | Outstanding | Interest |
| **PES Holdings** | | | |
| Tranche A | 12/31/22 | $120,000,000 | 8.85%* |
| Tranche A-2 | 2/11/22 | $59,738,319 | 10.6%* |
| Tranche B | 12/31/22 | $77,500,000 | 7.1%* |
| Tranche C | 12/31/22 | $441,401,332 | 10.09%* |
| **Total PES Holdings Debt** | | **$698,639,651** | |
| **PESRM** | | | |
| SXL Promissory Note | 8/7/28 | $75,000,000 | 8.30%[6] |
| NGL Installment Sale Agreement | 4/30/21 | $26,441,365 | 12.00% |
| Intermediation Facility | Rolling | $950,000,000[7] | N/A |
| **Total PESRM Debt** | | **$1,051,441,365** | |
| **Total Debt** | | **$1,750,081,016** | |
| * These represent variable rates, and are a function of the Eurodollar Rate or ABR plus an applicable margin for each Tranche as defined in the Term Loan Facility documents.  Applicable margin per Tranche is (A:  5.25-6.25%; A2:  7-8% ; B:  3.5-4.5%; C:  2.5%-4%). | | | |

(a)    **Term Loan Facility.**

PES Holdings is the borrower under the approximately $698.6 million Term Loan Facility by and among PES Holdings, the Term Loan Lenders, and the Term Loan Administrative Agent.  The Term Loan Facility is guaranteed by certain subsidiaries of PES Holdings.  The Term Loan Facility consists of four tranches.  Tranche A ("Tranche A") is comprised of approximately $120 million in secured term loan debt; tranche A-2 ("Tranche A-2"), which was funded in February of 2019, is comprised of approximately $59.7 million in secured term loan debt; tranche B ("Tranche B") is comprised of approximately $77.5 million in secured term loan debt; and tranche C ("Tranche C") is comprised of approximately $441.4 million of secured term loan debt.

(b)    **SXL Promissory Note.**

PESRM is the borrower on the $75 million SXL Promissory Note.  The SXL Promissory Note Lender has a priority security interest in the "aboveground storage tanks" (as defined in the Pennsylvania Tank Act, 25 Pa. Code § 245.1) referenced in the SXL Promissory Note.

---

[6]    In connection with the issuance of the SXL Promissory Note, PESRM also entered into a sharing agreement with the SXL Promissory Note Lender, whereby PESRM agreed to a contractual maximum quarterly payment of $3.1 million to be paid to the SXL Promissory Note Lender, which is offset by interest payments and subject to potential further reduction through the sharing of certain benefits obtained through commercial agreements between the parties.

[7]    The estimate shown herein of the outstanding amount under the Intermediation Facility is dated as of July 8, 2019.

(c)        **NGL Installment Sale and Purchase Agreement.**

PESRM is purchasing an on-site third-party natural gas liquids rail terminal (the "<u>South Yard Terminal</u>") from NGL pursuant to the NGL Installment Sale Agreement.  NGL has a purchase money security interest in the South Yard Terminal.

(d)        **Intermediation Facility.**

Upon emergence from the Prior Chapter 11 Cases on August 7, 2018, the Debtors entered into a series of agreements that governed the Debtors' post-emergence intermediation process, including the Intermediation Facility with Merrill Lynch Commodities, Inc. ("<u>MLC</u>") and ICBCS.  The Intermediation Facility contemplated a three-step post-effective date process under which ICBCS would replace MLC as the provider of the Debtors' Intermediation Provider.  As part of the first phase of the process, MLC provided PESRM with an exit phase-in intermediation facility for crude oil and refined products on agreed-upon terms.  In exchange, MLC received certain cash collateral, and other collateral and guarantees.  In the second phase, ICBCS replaced MLC as the Debtors' primary crude oil Intermediation Provider.  Finally, in the third phase, ICBCS replaced MLC as the Debtors' refined products Intermediation Provider.  The third phase was completed on June 18, 2019.  ICBCS's extension of credit under the Intermediation Facility is variable and was estimated at approximately $950 million as of June 30, 2019.  On July 19, 2019, ICBCS delivered to the Debtors a notice of event of default under the Intermediation Facility.

> *2.*        *The Equity Interests in the Debtors.*

Parent PES Energy Inc. (the "<u>Parent</u>") is a privately-held Delaware corporation with two classes of outstanding equity.  Class A shares convey both voting rights in the Parent and rights to the proceeds of the Parent ("<u>Class A</u>") and class B shares convey only voting rights in the Parent, with no rights to proceeds ("<u>Class B</u>").  Class A shares represent 85 percent of total shares outstanding and consequently, 85 percent of voting authority.  Conversely, Class B shares represent 15 percent of total shares outstanding and 15 percent of voting authority.  Class B shares are coupled with a membership interest in Debtor PES Ultimate Holdings, LLC, a Delaware limited liability company, pursuant to which holders of Class B shares derive their economic interests in the Company.

# VII.    EVENTS LEADING TO THE DEBTORS' FINANCIAL DIFFICULTIES AND COMMENCEMENT OF THE CHAPTER 11 CASES

A.        **Prior Chapter 11 Cases.**

The Debtors filed the Prior Chapter 11 Cases in January 2018.  The reason for the filing of the Prior Chapter 11 Cases was a combination of exceptionally volatile market conditions and burdensome regulatory compliance cost imposed on the Debtors (particularly with respect to the Clean Air Act's renewable fuel standard program (42 U.S.C. § 7545(o), including regulations promulgated thereunder, the "<u>RFS Program</u>")).

After confirmation of the Prior Plan on March 26, 2018, the Debtors successfully emerged from the Prior Chapter 11 Cases in August 2018 having secured a capital infusion of approximately $260 million, reduced their anticipated debt service obligations by approximately $35 million per year, extended certain of their debt maturities through 2022, secured access to the Intermediation Facility, and reduced their obligations under the RFS Program pursuant to a negotiated and court-approved settlement between the Debtors and the United States (on behalf of the Environmental Protection Agency).

B.        **Developments After the Prior Chapter 11 Cases.**

Following the effective date of the Prior Chapter 11 Cases, the Debtors continued to pursue initiatives to improve their profitability, while also implementing and transitioning their highly complex Intermediation Facility with ICBCS over multiple stages.  This transition was completed on June 18, 2019, and was a major boost to the Debtors.  Just days later, on June 21, 2019, the Girard Point Incident occurred, which caused substantial property damage and left the Girard Point refinery significantly damaged:

The Girard Point Incident and the unavailability of an immediate advance on the related insurance proceeds severely jeopardized the Debtors' liquidity, forced the Debtors into a preservation-focused operational status until

they receive such proceeds, and ultimately forced the Debtors to seek debtor-in-possession financing and to commence these chapter 11 cases. The Debtors' goal in the near term remains to preserve the safe operation of the Refining Complex while they seek to recover as quickly as possible on their property and business interruption insurance claims and pursue various transactions to preserve their operations and maximize value.

### C.    Insurance Recovery Efforts.

The Debtors have sustained significant losses as a result of the Girard Point Incident. The scope of the physical damage is massive and immediately apparent; much of the Girard Point facility has severely damaged. Girard Point has been rendered largely inoperable, and it will remain so until an extensive rebuild effort can put the refinery back on its feet and allow it to resume generating revenue.

The Debtors have $1.25 billion in the aggregate in property and business interruption insurance coverage to protect against these kinds of losses (in addition to other insurance policies that cover other aspects of the Girard Point Incident). The Debtors are working with the insurers under that program to make the Debtors whole for the physical loss of the refinery and the resulting interruption of the Debtors' business. These insurance proceeds are the very heart of these chapter 11 cases:  the sooner the Debtors can recover, the sooner the business can complete its recovery.

Over the past several weeks, the Debtors have engaged with the insurers through their broker and have met directly with the insurers' loss adjuster to advance the dialogue and to underscore the urgency of providing payment under the policies. To date, the Debtors have received approximately $44 million in advance payments from the insurers. Having now filed these cases, the Debtors will continue to work with their insurers to obtain payment for their losses in an appropriate amount and on a schedule that recognizes the exigencies of restoring the Refining Complex and allowing the Debtors to emerge as a going concern for the benefit of their stakeholders.

### D.    Operational and Financial Responses.

In June 2019, the Debtors retained Kirkland & Ellis LLP ("Kirkland") as their legal advisors, PJT Partners Inc. ("PJT") as their investment bankers, and Alvarez & Marsal North America, LLC ("A&M") as their restructuring advisors, principally for the purpose of providing services related to preparing a contingency plan with the Debtors that could be used in the event the Debtors and potentially certain of their direct and indirect subsidiaries determined to file for chapter 11 bankruptcy protection.

The Debtors took immediate steps to reduce their workforce and manage their payables to preserve liquidity while ensuring adherence to health, safety, and environmental obligations. The Debtors also immediately began a process to engage with their insurers—as it relates to property and business interruption insurance claims for the losses caused by the Girard Point Incident—to advance a dialogue toward an immediate advance and a global resolution that will allow the Debtors to restore their operations. The Debtors are in the process of obtaining such advance. But they were ultimately successful in securing a debtor in possession financing facility from their Term Loan Lenders.

Additionally, the Debtors appointed Jeffrey S. Stein as Chief Restructuring Officer in July 2019. Mr. Stein has been tasked with such duties and responsibilities customarily associated with the position of Chief Restructuring Officer including, without limitation, some or all of the following:  (i) identify and explore PES Holdings' refinancing/restructuring options that are intended to be deleveraging and value accretive to PES Holdings; (ii) assess options to PES Holdings' capital structure; (iii) manage and implement the restructuring of PES Holdings and its subsidiaries; (iv) explore and recommend asset acquisition(s), disposition(s), merger(s) or other strategic transaction(s); (v) communicate and/or negotiate with outside constituents, including, but not limited to, lenders to PES Holdings; (vi) develop and implement cash management strategies and processes designed to enhance liquidity; (vii) review and analyze the revised business plan(s), including financial and operating budgets, provided by PES Holdings' management; (viii) review and recommend changes that would enhance the efficiency and cost effectiveness of PES Holdings' corporate organization; (ix) review PES Holdings' business reporting systems and recommend changes to improve effectiveness; and (x) provide such other similar services as may be requested by the board of directors of PES Energy.

Since July 2019, the Debtors have also been conducting a comprehensive assessment of insurance recovery options. Working with their advisors, they have aggressively sought to recover insurance proceeds for both physical damage caused by the Girard Point Incident and the resulting business interruption. While recovery efforts remain

ongoing the Debtors are confident that these efforts will provide essential resources to pay claims and repair portions of the Debtors' facilities.

## VIII.   EVENTS OF THE CHAPTER 11 CASES

### A.   Corporate Structure upon Emergence.

If the Equitization Restructuring occurs, and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions Memorandum), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

If the Asset Sale Restructuring occurs, and subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

On the Plan Effective Date, the Liquidating Trust will be formed for the benefit of the Liquidating Trust beneficiaries, as determined by the Liquidating Trust Agreement, to implement distributions of the Liquidating Trust Assets. The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets pursuant to the Liquidating Trust Agreement, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets.

For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (i) a first-step transfer of the Liquidating Trust Assets to the Holders of Term Loan Secured Claims, Intermediation Secured Claims, General Unsecured Claims, and the Subordinated Remaining Volume Claim, as applicable, and (ii) a second-step transfer by such Holders to the Liquidating Trust. As a result, the beneficiaries of the Liquidating Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

The Liquidating Trust will, in an expeditious but orderly manner, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Liquidating Trust shall perform no actions other than receiving and distributing the Liquidating Trust Assets, and not for any other purpose (including conducting any claims reconciliation).

The Plan Administrator shall be the trustee responsible for executing the purpose of the Liquidating Trust, which shall continue to have all of the rights and powers granted to the Reorganized Debtors as set forth in this Plan and applicable non-bankruptcy law. The Plan Administrator shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement, including standing to prosecute any claims under the Business Interruption and Property Damage Insurance Policies.

### B.  Expected Timetable of the Chapter 11 Cases.

The Debtors expect the Chapter 11 Cases to proceed quickly, consistent with the milestones set forth in the Final DIP Order.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 210 days of the Petition Date, if not earlier.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.  First Day Relief.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  At a hearing on July 23, 2019 (the "First Day Hearing"), the Bankruptcy Court granted all of the relief requested in the First Day Motions.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.omnimgt.com/PESHoldings2019.

### D.  Other Requested First-Day Relief and Retention Applications.

In addition, the Debtors filed motions and/or applications seeking certain customary relief, including an order directing the joint administration of the three Chapter 11 Cases under a single docket and orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland as their legal advisors, Pachulski Stang Ziehl & Jones LLP as their local counsel, PJT as their investment bankers, A&M as their restructuring advisors, and Omni Agent Solutions as their Solicitation Agent.

### E.  Schedules and Statements.

The Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs on or before September 6, 2019.

### F.  Appointment of Creditors' Committee.

On August 5, 2019, the Creditors' Committee was appointed pursuant to section 1102(a)(1) of the Bankruptcy Code.  *See* Docket No. 161.

### G.  Term Loan Priority Litigation.

On August 7, 2019, the Debtors and the DIP Agent commenced an adversary proceeding, Case No. 19-50282, in the Bankruptcy Court (the "Priority Litigation"), against ICBCS seeking a declaratory judgment that the Debtor Plaintiffs' insurance proceeds for business interruption losses resulting from the Girard Point Incident constitute "Term Loan Priority Collateral" as defined in that certain intercreditor agreement dated August 7, 2018, between the Debtors, ICBCS, and the Term Loan Lenders (the "Intercreditor Agreement").  On August 21, 2019, the Court entered an agreed order scheduling certain dates and deadlines to govern the conduct of the Priority Litigation.  Litigation on this matter remains ongoing in Bankruptcy Court.  The outcome of this litigation could significantly impact the value of claims based on the relative priority attributed to the proceeds of any claim under the Debtors' business interruption insurance policies relating directly or indirectly to the incident that occurred at the Debtors' refinery complex on June 21, 2019.

### H.  Global Resolution with ICBCS.

After months of extensive, good faith negotiations, the Debtors and ICBCS reached a global resolution of outstanding issues regarding, *inter alia*, the terms of the extraction of ICBCS's hydrocarbon collateral from the Debtors' infrastructure, ICBCS's payment of costs related thereto, and the involvement of ICBCS in the Debtors'

pursuit of insurance proceeds in connection with the Girard Point Incident. The terms sheets reflecting such global resolution have been approved by the Bankruptcy Court as part of the Final DIP Order and are attached thereto as Exhibit C.

### I.    Certain Additional Disclosures

The Chubb Companies ("Chubb") have objections to the Disclosure Statement and Plan, which the Debtors assert believe are confirmation rather than disclosure statement objections. Chubb has provided the Debtors with suggested changes to the Plan to address its objection. The Debtors are considering the changes. If no agreement is reached, Chubb reserves the right to object to confirmation of the Plan.

## IX.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

> *1.    **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.***

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies; and

- the Debtors' enterprise value.

### 2. Certain Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### (a) Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### (b) The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article XI of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

#### (c) Failure to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

#### (d) The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article XI of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently

provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### (e)      Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Accrued Professional Compensation Claims.

### (f)      The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### (g)      Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

### (h)      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect solutions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### (i)      Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article X of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

### 3.      *Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.*

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including

certain risks that are beyond the Debtors' control, such as uncertainty surrounding any reconstruction of facilities and equipment damaged in the Girard Point Incident, unforeseen remediation costs, changes in economic conditions, changes in the Debtors' industry, and changes in commodity prices. As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

#### 4. *Risks Related to the New PES Interests.*

The following are some of the risks that apply to Holders of Claims against the Debtors who become Holders of the New PES Interests if any are distributed pursuant to the Plan. There are additional risk factors attendant to ownership of the New PES Interests that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

##### (a) The Estimated Value of the New PES Interests in Connection with the Plan May Differ from the Actual Value of the New PES Interests.

The estimated value of the New PES Interests for purposes of estimating recovery percentages under the Plan represents a valuation of the Reorganized Debtors and assumes that, among other things, such Reorganized Debtors continue as an operating business. Such valuation does not purport to constitute an appraisal of the Reorganized Debtors or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors or their assets, which may be materially different than the estimated value of the New PES Interests. Accordingly, the estimated value of the New PES Interests does not necessarily reflect the actual market value of the New PES Interests that might be realized after Confirmation and Consummation of the Plan, which may be materially lower than the estimated valuation of the New PES Interests as set forth in this Disclosure Statement. Accordingly, such estimated value is not necessarily indicative of the prices at which the New PES Interests may trade after giving effect to the transactions set forth in the Plan.

##### (b) An Active Trading Market May Not Develop for the New PES Interests.

The New PES Interests are a new issue of securities and, accordingly, there is currently no established public trading market for the New PES Interests. The Debtors do not currently intend to apply to list the New PES Interests on any national securities exchange and, as such, there can be no assurance that an active trading market for the New PES Interests will develop. If no active trading market in the New PES Interests develops, the market price and liquidity of the New PES Interests may be adversely affected. If a trading market does not develop or is not maintained, holders of New PES Interests may experience difficulty in reselling such securities at an acceptable price or may be unable to sell them at all. Even if a trading market were to exist, such market could have limited liquidity and the New PES Interests could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, prevailing interest rates, conditions in financial markets, or prospects and investor expectations thereof. As a result, there may be limited liquidity in any trading market that does develop for the New PES Interests. Finally, the New Organizational Documents may also contain restrictions on the transferability of the New PES Interests (such as rights of first refusal/offer, tag-along rights, and/or drag-along rights, among others), which may adversely affect the liquidity in the trading market for the New PES Interests.

##### (c) The Trading Prices for the New PES Interests May Be Depressed Following the Effective Date.

Following the Effective Date, recipients of the New PES Interests under the Plan may seek to dispose of such securities to obtain liquidity, which could cause the initial trading prices for these securities to be depressed, particularly in light of the lack of established trading markets for these securities. Further, the possibility that recipients of New PES Interests may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the New PES Interests.

       (d)       **A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors.**

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding New PES Interests in the Reorganized Debtors. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.

       (e)       **The Issuance of New PES Interests under the Management Incentive Plan will Dilute the New PES Interests.**

The Reorganized PES Board will be authorized to implement the Management Incentive Plan. If the Reorganized Debtors distribute such equity-based awards to management pursuant to the Management Incentive Plan, it is contemplated that such distributions will dilute the New PES Interests issued on account of Claims under the Plan and the ownership percentage represented by the New PES Interests distributed under the Plan.

       (f)       **The New PES Interests are an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors.**

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New PES Interests would rank junior to all debt claims against the Reorganized Debtors. As a result, holders of New PES Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

       (g)       **Certain Holders of New PES Interests May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

To the extent that New PES Interests are issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code, such New PES Interests may be resold by the holders thereof without registration under the Securities Act, unless the holder is an "underwriter" with respect to such securities. Resales by Persons who receive New PES Interests pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act or another applicable exemption.

The New PES Interests will not be registered under the Securities Act or any state securities law, and the Reorganized Debtors make no representation regarding the right of any holder of New PES Interests to freely resell the New PES Interests.

       (h)       **The Payment of Dividends, If Any, With Respect to the New PES Interests Will Be at the Discretion of the Boards of Directors or Managers of the Reorganized Debtors.**

Any future determination by the Reorganized Debtors to pay dividends with respect to any of the New PES Interests will be at the discretion of the board of directors or managers of the Reorganized Debtors and will be dependent on then-existing conditions, including the financial condition, results of operations, capital requirements, contractual restrictions, business prospects, and other factors that the board of directors or managers of the Reorganized Debtors considers relevant. As a result, the trading price of the New PES Interests could be materially and adversely affected.

       (i)       **The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

       (j)       **The Terms of the New PES Interests Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New PES Interests have not been finalized and are subject to ongoing negotiations. The results of such negotiations may alter the terms of the New PES Interests in a material manner. As a result, the final terms of the New PES Interests may be less favorable to Holders of Claims or Interests than as described herein and in the Plan.

5.    ***Risks Related to the Exit Facility (if an Equitization Restructuring Occurs).***

(a)    **The Reorganized Debtors' Substantial Debt Obligations Could Adversely Affect Their Financial Condition and Prevent Them From Fulfilling Their Obligations Under the Exit Facility Documents and Prevent Them from Capitalizing on Business Opportunities.**

At emergence, the Debtors on a consolidated basis may have substantial indebtedness, consisting primarily of the Exit Facility. This indebtedness may require significant interest and principal payments. Subject to the limits contained in the Exit Facility Documents, the Debtors may be able to incur additional debt from time to time to finance working capital, capital expenditures, investments or acquisitions, or for other purposes. If the Debtors do so, the risks related to their high level of debt could intensify. The Debtors' high level of debt obligations could have important consequences to the Holders of the Exit Facility, including the following:

- making it more difficult for the Reorganized Debtors to satisfy their obligations with respect to the Exit Facility and their other debt;

- limiting the Reorganized Debtors' ability to obtain additional financing for working capital, capital expenditures, acquisitions, and general corporate purposes;

- requiring a substantial portion of the Reorganized Debtors' cash flows to be dedicated to debt service payments and lease obligations instead of other purposes;

- increasing the Reorganized Debtors' vulnerability to general adverse regulatory, economic, and industry conditions;

- limiting the Reorganized Debtors' flexibility in planning for and reacting to changes in the industry in which they compete;

- placing the Reorganized Debtors at a disadvantage compared to other, less leveraged competitors; and

- increasing their cost of borrowing.

In addition, the Exit Facility Documents contain financial and other restrictive covenants that could limit the Debtors' ability to conduct their business, make new investments, pay dividends, prepay junior debt, raise additional debt or equity financing and compete effectively or take advantage of new business opportunities. The terms of any future indebtedness the Debtors may incur could include more restrictive covenants. The Debtors cannot assure you that they will be able to maintain compliance with these covenants in the future and, if the Debtors fail to do so, they may not be able to obtain waivers from the lenders and/or amend the covenants. The Debtors' failure to comply with those potential covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of their debt, including the Exit Facility. If the Debtors are forced to refinance these borrowings on less favorable terms, their results of operations and financial conditions could be adversely affected.

(b)    **Despite Current Indebtedness Levels, the Debtors May Still Be Able To Incur Substantially More Debt.**

The Debtors may be able to incur substantial additional indebtedness in the future. Although the terms of the Exit Facility Documents may limit the Debtors' ability to incur additional indebtedness in many respects, the terms of the Exit Facility Documents may nonetheless permit them to incur significant additional indebtedness. In addition, it is anticipated that none of the Exit Facility Documents will prevent the Debtors from incurring obligations that do

not constitute indebtedness as defined in those documents.  If new debt is incurred by the Debtors, the related risks that they now face could intensify.

<div align="center">

**(c)**        **To Service Their Indebtedness, the Reorganized Debtors Will Require a Significant Amount of Cash.**

</div>

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness, including the Exit Facility, and to fund working capital needs and planned capital expenditures will depend on their ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, business, legislative, regulatory, and other factors that are beyond their control.

If the Reorganized Debtors' businesses do not generate sufficient cash flow from operations or if future borrowings are not available to them in an amount sufficient to enable them to pay their potential indebtedness or to fund their other liquidity needs, the Reorganized Debtors may need to refinance all or a portion of their future indebtedness on or before the maturity thereof, sell assets, reduce or delay capital investments or seek to raise additional capital, any of which could have a material adverse effect on their operations.  In addition, the Reorganized Debtors may not be able to affect any of these actions, if necessary, on commercially reasonable terms or at all.  The Reorganized Debtors' ability to restructure or refinance their future indebtedness will depend on the condition of the capital markets and the Reorganized Debtors' financial condition at such time.  Any refinancing of the Reorganized Debtors' debt could be at higher interest rates and may require them to comply with more onerous covenants, which could further restrict their business operations.  The terms of existing or future debt instruments may limit or prevent them from taking any of these actions.  In addition, any failure to make scheduled payments of interest and principal on their outstanding indebtedness would likely result in a reduction of their credit rating, which could harm their ability to incur additional indebtedness on commercially reasonable terms or at all.  The Reorganized Debtors' inability to generate sufficient cash flow to satisfy their debt service obligations, or to refinance or restructure their obligations on commercially reasonable terms or at all, would have an adverse effect, which could be material, on their business, financial condition, and results of operations.  Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and the willingness of third parties to do business with them could be adversely affected.

<div align="center">

**(d)**        **The Reorganized Debtors' Failure To Comply With the Agreements Relating to Their Outstanding Indebtedness Could Result in Events of Default.**

</div>

If there were an event of default under any of the agreements relating to the Reorganized Debtors' outstanding indebtedness, the holders of the defaulted debt may be able to cause all amounts outstanding with respect to that debt to be due and payable immediately.  The Debtors cannot assure you that their assets or cash flow would be sufficient to fully repay borrowings under their outstanding debt instruments if accelerated upon an event of default.  Further, if the Reorganized Debtors are unable to repay, refinance, or restructure their indebtedness under their secured debt, the holders of such debt could proceed against the collateral securing that indebtedness.  In addition, any event of default or declaration of acceleration under one debt instrument may also result in an event of default under one or more of the Reorganized Debtors' other debt instruments.

<div align="center">

**(e)**        **The Collateral Securing the Exit Facility is Subject To Casualty Risks.**

</div>

The Exit Facility Documents may require the Reorganized Debtors and the guarantors to maintain adequate insurance or otherwise insure against risks to the extent customary with companies in the same or similar businesses operating in the same or similar locations as the Debtors.  There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part.  As a result, the Debtors cannot assure you that the insurance proceeds will compensate the Reorganized Debtors fully for their losses.  If there is a total or partial loss of any collateral securing the Exit Facility, the Debtors cannot be sure that any insurance proceeds received by them will be sufficient to satisfy their obligations, including the Exit Facility.

<div align="center">

**(f)**        **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt.**

</div>

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result

<div align="center">

41

</div>

of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

**(g)    The Terms of the Exit Facility Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the Exit Facility Documents have not been finalized and are subject to ongoing negotiations. The results of such negotiations may affect the rights of the holders of the New PES Interests following the Effective Date. As a result, the final terms of the Exit Facility Documents may be less favorable to Holders of Claims or Interests than as described herein and in the Plan.

**(h)    The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful.**

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit Facility.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Facility. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

### 6.    *Necessary Governmental Approvals May Not Be Granted.*

Consummation of the Restructuring Transactions depends upon the approval of FERC, approval by the United States Department of Justice under the HSR Act, and any other approvals required by a Governmental Unit. Failure by any Governmental Unit to grant a necessary approval could prevent consummation of the Restructuring Transactions and Confirmation of the Plan.

### B.    Risks Related to Recoveries Under the Plan.

### 1.    *The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.*

The Financial Projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular. There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the Exit Facility and the New PES Interests. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Debtors to seek additional working capital. The Reorganized Debtors may be unable to obtain such working capital when it is required, or may only be able to obtain such capital on unreasonable or cost prohibitive terms. For example, the Reorganized Debtors

may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors, and also have a negative effect on the value of the New PES Interests.  In addition, if any such required capital is obtained in the form of equity, the New PES Interests to be issued to Holders of Allowed Claims in Class 3 under the Plan could be diluted.

> **2.      *Estimated Valuations of the Debtors, the New PES Interests, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.***

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions. In addition, there can be no guarantee that the Reorganized Debtors will have adequate liquidity to fund the New Organizational Documents.

> **3.      *Holders of Claims or Interests That Acquire the New PES Interests May Assert Significant Control Over the Reorganized Debtors.***

If an Equitization Restructuring occurs, on the Effective Date, the Reorganized Debtors shall issue the New PES Interests to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan, as well as options, or other equity awards, if any, under the Management Incentive Plan.  As a result, following Consummation of an Equitization Restructuring, certain Holders of Allowed Claims may exercise substantial influence over the Reorganized Debtors and their affairs.

> **4.      *The Tax Implications of the Debtors' Bankruptcy and Reorganization Are Highly Complex.***

Holders of Allowed Claims and Allowed Interests should carefully review Section IX of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

> **5.      *The Insurance Settlement May Not Be Consummated.***

The Plan is premised on the consensual resolution by the Debtors Insurance Claims.  If the insurance settlement is not consummated, recoveries to creditors under the Plan could be materially reduced.

**C.      Risks Related to the Business Operations of the Debtors and Reorganized Debtors.**

> **1.      *The Debtors Are Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring.***

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy.  These risks include, among other things:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to pleadings filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to Consummate, the Plan to emerge from bankruptcy;

- the Debtors' ability to obtain and maintain normal trade terms with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to attract and retain customers; and

- the Debtors' ability to fund and execute their business plan.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Plan.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, as well as their suppliers and employees, which, in turn, could adversely affect the Debtors' operations and financial condition. Also, pursuant to the Bankruptcy Code, the Debtors need Bankruptcy Court approval for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate effect that events occurring during the Chapter 11 Cases will have on their businesses, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation.

### 2. *Potential for the Loss of Key Members of the Executive Management Team.*

If the Debtors were to lose key members of their senior management team on account of the Chapter 11 Cases or otherwise, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

### 3. *If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited.*

The Debtors may require additional capital to fund their operations and obligations, which will depend on several factors, including:

- the Debtors' ability to enter into new customer agreements or to extend the duration of the Debtors' existing agreements, and the terms of such agreements;

- the success rate of the Debtors' sales efforts;

- costs of recruiting and retaining qualified personnel;

- expenditures and investments to implement the Debtors' business strategy;

- the Debtors' ability to enter into sale-leaseback transactions; and

- the identification and successful completion of acquisitions.

If the Debtors cannot raise additional capital, the Debtors may be required to curtail internal growth initiatives and/or forgo the pursuit of acquisitions. The Debtors do not know whether additional financing will be available on commercially acceptable terms, if at all, when needed. If sufficient funding is not available or is not available on commercially acceptable terms, the Debtors' ability to fund their operations, support the growth of their business, or otherwise respond to competitive pressures could be significantly delayed or limited, which could materially adversely affect the Debtors' business, financial condition, or results of operations.

      **4.**       *Project Performance Issues and Delayed Customer Payments May Result in Additional Costs to the Debtors, Reductions in Revenues.*

The Debtors may encounter difficulties as a result of delays in materials provided by the customer or a third-party, delays, or difficulties in equipment and material delivery, schedule changes, delays from the Debtors' customer's failure to timely obtain permits or rights-of-way or meet other regulatory requirements, weather-related delays, and other factors, some of which are beyond the Debtors' control, that impact the Debtors' ability to complete a project in accordance with the original delivery schedule. Further, the Debtors contract with third-party subcontractors to assist them with the completion of contracts, and such subcontractors may be unavailable or delayed in performing services for the Debtors or other parties. Any delay or failure by these third-parties in the completion of their portion of the project may result in delays in the overall progress of the project or may cause the Debtors to incur additional costs, or both. If the Debtors' subcontractors fail to satisfy their obligations to the Debtors or other parties, the Debtors may be unable to maintain these customer relationships or may be required to expend significant additional costs. Delays and additional costs may be substantial and, in some cases, the Debtors may be required to compensate the customer for such delays.

Similarly, delays in customer payments may require the Debtors to make working capital investments or obtain other financing. Delays may also disrupt the final completion of the Debtors' contracts as well as the corresponding recognition of revenues and expenses therefrom. In certain circumstances, the Debtors guarantee project completion by a scheduled acceptance date or achievement of certain acceptance and performance testing levels. Failure to meet any of these schedules or performance requirements could also result in additional costs or penalties and such amounts could exceed expected project profit. In extreme cases, the above-mentioned factors could result in project cancellations and lost earnings. In addition, such delays or cancellations may impact the Debtors' reputation or relationships with customers, adversely affecting the Debtors' ability to secure new contracts.

      **5.**       *Refining Industry Hazards Risks.*

The Debtors' refining operations involve hazardous activities, including acquiring, transporting, and unloading fuel and operating large pieces of equipment. In addition to natural risks (such as earthquake, flood, storm surge, lightning, hurricane, tornado, and wind), hazards (such as fire, explosion, collapse, and machinery failure) are inherent risks in the Debtors' operations. These hazards can cause significant injury to personnel or loss of life, severe damage to and destruction of property, plant and equipment, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in one or more of the Debtors being named as a defendant in lawsuits asserting claims for substantial damages, environmental cleanup costs, personal injury, and fines and/or penalties.

      **6.**       *Terrorism & Cyber-Attack Risks.*

As refiners, the Debtors face heightened risk of terrorism, including cyber terrorism, either by a direct act against one or more of their refining facilities or an act against the distribution infrastructure that is used to transport fuel. Although the entire industry is exposed to these risks, our facilities and distribution infrastructure located in the Philadelphia area are particularly at risk because of the proximity to major population centers.

Systematic damage to one or more of the Debtors' facilities and/or distribution infrastructure could result in the inability to operate for an extended period of time. If the Debtors' refining facilities are shut down, the Debtors would be unable to fulfill obligations under various supply and offtake arrangements, resulting in lost revenues and potential fines, penalties, and other liabilities. The cost to restore the Debtors' refining facilities after such an occurrence could be material.

      **7.**       *Employee and Labor Risks.*

Given the nature of the highly specialized work the Debtors perform, many of the Debtors' employees are trained in and possess specialized technical skills. At times of low unemployment rates of skilled laborers in the areas the Debtors serve, it can be difficult for the Debtors to find qualified and affordable personnel. The Debtors may be unable to hire and retain a sufficient skilled labor force necessary to support the Debtors' operating requirements and growth strategy. The Debtors' labor expenses may increase as a result of a shortage in the supply of skilled personnel. Additionally, the Debtors may also be forced to incur significant training expenses if they are unable to hire employees

with the requisite skills.  Accordingly, labor shortages or increased labor or training costs could materially adversely affect the Debtors' business, financial condition, or results of operations.

Further, approximately 56 percent of the Debtors' employees are represented by a union and covered under collective bargaining agreements, which are subject to periodic negotiation and renewal.  Failure to reach agreement with any of these unions in the future negotiations regarding the terms of their collective bargaining agreements or certain other labor disputes may result in a labor strike, work stoppage or slowdown.  A strike, work stoppage or slowdown by, or other significant labor dispute with, the Debtors' employees could result in a significant disruption to the Debtors' operations or higher ongoing labor costs.  In addition, the Debtors' ability to make adjustments to control compensation and benefits costs, or otherwise adapt to changing business needs, may be limited by the terms and duration of their collective bargaining agreements.

Certain of the Debtors' project sites can also place the Debtors' employees and others in difficult or dangerous environments, including locations high above the ground or near large or complex equipment, moving vehicles, high voltage, or dangerous processes.  If the Debtors fail to implement appropriate safety procedures or if the Debtors' procedures fail, the Debtors' employees, subcontractors and others may suffer injuries.  The failure to comply with such procedures or applicable regulations, including those established by the Occupational Safety and Health Administration, could subject the Debtors to losses and liability.

### 8.      *Competitive Technology Risks.*

The Debtors refine fossil fuels at a large central facility.  The market for these fuels could be disrupted by newer technologies such as fuel cells, battery storage, microturbines, windmills, and photovoltaic solar cells.  It is possible that advances in such competitive technologies, or governmental incentives for renewable energies, will reduce their costs to levels that make the Debtors less competitive in the energy market.

### 9.      *Volatile Market Prices.*

Because the Debtors sell refined fossil fuels into the wholesale spot market, it is not guaranteed any rate of return on its capital investments.  Rather, its financial condition, results of operations and cash flows will depend, in large part, upon prevailing market prices for such fuel.  Wholesale fossil fuel markets are subject to significant price fluctuations over relatively short periods of time and can be unpredictable.  Such factors that may materially impact the markets and the Company's financial results include:

- economic conditions;

- the existence and effectiveness of demand-side management;

- conservation efforts and the extent to which they impact fuel demand;

- regulatory constraints on pricing (current or future) or the functioning of the fuel trading markets and fuel trading generally;

- the proliferation of advanced shale gas drilling increasing domestic natural gas supplies;

- fuel price volatility; and

- increased competition or price pressure driven by renewable sources.

Given the volatility of commodity prices, to the extent the Reorganized Debtors do not secure long-term supply and offtake agreements, revenues and profitability will be subject to increased volatility, and the Reorganized Debtors' financial condition, results of operations and cash flows could be materially adversely affected.

### 10.    *Regulatory Risks.*

The Reorganized Debtors' business is subject to extensive energy and environmental regulation, with respect to, among other things, air quality, water quality, and waste disposal, by federal, state and local authorities. The Reorganized Debtors will be required to comply with numerous laws and regulations and to obtain numerous governmental permits for the operation or ownership of its facilities, as the case may be.  Typically, environmental laws require a lengthy and complex process for obtaining licenses, permits and approvals prior to construction, operation or modification of a project or refining facility.  As a result, there is a possibility that the Reorganized Debtors will not be able to obtain all necessary licenses, permits and approvals for their facilities.  If there is a delay in obtaining, or complying with, required approvals or permits, or if the Reorganized Debtors fail to obtain such permits, the operation of their facilities may be interrupted or subject the Reorganized Debtors to civil or criminal liability, the imposition of liens or fines, or actions by regulatory agencies seeking to curtail the Reorganized Debtors' operations.  The Reorganized Debtors may also be exposed to risks arising from past, current or future contamination at their facilities.  Additionally, the Reorganized Debtors cannot assure that existing regulations will not be revised or reinterpreted, that new laws and regulations will not be adopted or become applicable to them or their facilities, or that future changes in laws and regulations will not have a material effect on their business.

Federal laws and regulations govern, among other things, transactions by and with wholesale sellers and purchasers of fossil fuels, the development and construction of refining facilities, the ownership and operation of refining facilities, and the transport of refined fuels.  Refining facilities are also subject to federal, state and local laws and regulations that govern, among other things, the geographical location, zoning, land use, and operation of a facility. The Reorganized Debtors believe that they will have obtained all material refining-related federal, state and local permits and approvals currently required to operate their facilities.  The Reorganized Debtors also recognize that additional regulations and permitting requirements will arise from any effort to repair damaged parts of the facility and return them to full working order. The Reorganized Debtors cannot guarantee that all such permits will be secured.

FERC may impose various forms of market mitigation measures, including price caps and operating restrictions, where it determines that potential market power may exist and mitigation is required.  FERC also may impose penalties, costs, fines and/or refund obligations arising from past, current or future FERC jurisdictional activities and sales.

The Reorganized Debtors are required to comply with numerous statutes, regulations and ordinances relating to the safety and health of employees and the public, which are constantly changing.  The Reorganized Debtors may incur significant additional costs to comply with new requirements.  If the Reorganized Debtors fail to comply with existing or new requirements, they could be subject to civil or criminal liability and the imposition of liens or penalties. The Reorganized Debtors cannot assure that they will, at all times, be in compliance with all applicable health and safety laws and regulations or that steps to bring their facilities into compliance would not materially and adversely affect its ability to service debt obligations on the Exit Facility.

The operation of any refining facility represents a degree of danger for its employees and the general public. Injuries caused by such potential hazards can subject the Reorganized Debtors to liability that, despite the existence of insurance coverage, can be significant.  Such liabilities could be significant but are very difficult to predict.  The range of possible liabilities includes amounts that could adversely affect the Reorganized Debtors' liquidity and results of operations.

The Reorganized Debtors will need to devote significant resources to environmental monitoring, emissions control equipment and emission allowances to comply with environmental regulatory requirements. The adoption of additional laws and regulations could adversely affect the Reorganized Debtors. Some environmental laws are also generally becoming more stringent. The impact of these and other future regulations is not currently known. If the Reorganized Debtors cannot comply with all applicable regulations, there is a possibility they could be required to retire or suspend operations at their facilities, or restrict or modify the operations of their facilities, and their business, results of operations and financial condition could be adversely affected.

### D.    Miscellaneous Risk Factors and Disclaimers.

#### 1.    *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

#### 2.    *No Legal or Tax Advice Is Provided By This Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

#### 3.    *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

#### 4.    *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

#### 5.    *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

#### 6.    *No Representations Outside This Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.    VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE.**

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Disclosure Statement Order attached hereto as **Exhibit D**.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Term Loan Secured Claims | Impaired |
| 4 | Intermediation Secured Claims | Impaired |
| 5 | General Unsecured Claims | Impaired |
| 6 | Subordinated Remaining Volume Claim | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**D.      Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 9 | Interests in PES Energy and PES Ultimate Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

**E.      Solicitation Procedures.**

*1.      Solicitation Agent.*

The Debtors have retained Omni Agent Solutions, to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

*2.      Solicitation Package.*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- a Ballot and applicable voting instructions, together with a pre-paid, pre-addressed return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto; provided that the Plan Supplement documents shall not be part of the Solicitation Package and, pursuant to the Plan, will be filed with the Bankruptcy Court no later than 14 days prior to the Confirmation Hearing.

*3.      Distribution of the Solicitation Package and Plan Supplement.*

The Debtors are causing the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes five (5) days after entry of an order approving the Disclosure Statement, but in no event later than December 19, 2019 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Solicitation Agent by:  (a) calling the Solicitation Agent at (866-989-6149) and asking for the "Solicitation Group" or (b)  writing to the Solicitation Agent at PES 2019, LLC c/o Omni Bankruptcy, 5955 DeSoto Ave., Suite 100, Woodland Hills, California 91367.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for

free by visiting the Debtors' restructuring website, https://omniagentsolutions.com/pesholdings2019, or for a fee via PACER at https://www.pacer.gov/. Holders should choose only one method to return their Ballot.

At least fourteen (14) days before the Confirmation Hearing, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by: (a) calling the Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://omniagentsolutions.com/pesholdings2019; or (c) writing to the Solicitation Agent at PES 2019, LLC c/o Omni Bankruptcy, 5955 DeSoto Ave., Suite 100, Woodland Hills, California 91367.

The Debtors and the Creditors' Committee have agreed to include in the Plan Supplement, if an Asset Sale Restructuring occurs, (i) a notice of consummation of the Equitization Restructuring or the Asset Sale Restructuring, as applicable, and in the event of an Asset Sale Restructuring, a notice of successful bidder; (ii) an updated Liquidation Analysis taking into account estimated recoveries based on the successful bid, if any; (iii) a disclosure table listing creditor recovery estimates based upon a successful bid, if any; (iv) a letter from the Creditors' Committee recommending how Holders of General Unsecured Claims should vote on the revised Plan; (v) a summary explanation of any Plan changes; and (vi) a letter from the Creditors' committee recommending how Holders of General Unsecured Claims should vote on the revised Plan. The foregoing Plan Supplement documents shall be delivered via overnight mail after the Debtors select a successful bidder at the auction (if an auction occurs), but in no circumstances later than six days prior to the Voting Deadline to the parties receiving notice of the Disclosure Statement by overnight mail.

## F.     Voting Procedures

December 6, 2019 (the "Voting Record Date"), is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to PES 2019, LLC c/o Omni Bankruptcy, 5955 DeSoto Ave., Suite 100, Woodland Hills, California 91367, so that such Holder's Ballot is actually received by the Solicitation Agent on or before the Voting Deadline, i.e. January 27, 2020, at 5:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser and agent for the relevant facility provide satisfactory confirmation of the transfer to the Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials. You may also receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan (as applicable). If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be treated as a single creditor for voting purposes and (ii) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT

INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.    **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Solicitation Agent.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

H.    **Ballots Not Counted.**

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL-FREE NUMBER AT (866)-989-6149. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XI.   CONFIRMATION OF THE PLAN

### A.   Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Term Loan Secured Claims, Holders of Class 4 Intermediation Secured Claims, Holders of Class 5 General Unsecured Claims, Holders of Class 6 Subordinated Remaining Volume Claim, Holders of Class 7 Intercompany Claims, Holders of Class 8 Intercompany Interests, Holders of Class 9 Interests in PES Energy and PES Ultimate Interests, and Holders of Class 10 Section 510(b) Claims).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

B. **Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan satisfies the best interests test because, among other things, the Debtors expect that the recoveries available to Holders of Allowed Claims under the Plan will be greater than the recoveries available in a chapter 7 liquidation, for the reasons discussed in the Liquidation Analysis, attached hereto as **Exhibit C**.

C. **Feasibility.**

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the deleveraging of the Debtors and the distribution of their assets. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

D. **Acceptance by Impaired Classes.**

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

E. **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b)

of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

### 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

#### (a)    Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

#### (b)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

#### (c)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which

such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.    IMPORTANT SECURITIES LAWS DISCLOSURES

### A.    Plan Securities.

The Plan provides for the Reorganized Debtors to distribute the New PES Interests to certain Holders of Allowed Claims.   The Debtors believe that the class of New PES Interests will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws.

### B.    Issuance and Resale of Plan Securities Under the Plan.

#### 1.    Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if three principal requirements are satisfied:  (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer, issuance and distribution of the New PES Interests to Holders of Allowed Term Loan Secured Claims will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The Debtors believe that the issuance of the New PES Interests with respect to Allowed Claims is covered by section 1145 of the Bankruptcy Code.  Accordingly, the Debtors believe that the New PES Interests issued to Holders of Allowed Term Loan Secured Claims may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtors.  The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  In addition, the Debtors believe that the New PES Interests governed by section 1145 of the Bankruptcy Code generally may be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states.  However, the availability and applicability of such exemptions is subject to confirmation upon examination of the corresponding individual state Blue Sky Laws.

**Recipients of the New PES Interests are advised to consult with their own legal advisors as to the availability and applicability of any exemption from registration under the Bankruptcy Code, Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.**

#### 2.    Resales of the New PES Interests by Underwriters or Affiliates; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a

Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of New PES Interests issued to Holders of Allowed Term Loan Secured Claims by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of the New PES Interests who are deemed to be "underwriters" may be entitled to resell their New PES Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required holding period has been met and, under certain circumstances, if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New PES Interests would depend upon various facts and circumstances applicable to that Person. Given the complex nature of the question of whether a particular person may be an "underwriter" and other issues arising under applicable securities law, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New PES Interests issued to Holders of Allowed Term Loan Secured Claims and, in turn, whether any Person may freely resell New PES Interests. **The Debtors recommend that potential recipients of the New PES Interests consult their own counsel concerning their ability to freely trade such securities without registration under, and compliance with, the federal securities laws and applicable state Blue Sky Laws.**

**IN VIEW OF THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATUE BLUE SKY LAW.**

## XIII.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims entitled to vote on the Plan (*i.e.*, Holders of Term Loan Secured Claims, Intermediation Secured Claims and Unsecured Claims). It does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote on the Plan or, except as set forth in Section B under the heading --"COD Income", to Holders of PES Ultimate Interests (other than PES Energy). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published

administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax or the base erosion and anti-abuse tax, persons subject to special tax accounting rules as a result of any item of gross income with respect to the Claims being taken into account in an applicable financial statement (as defined in section 451 of the Code), persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold the New PES Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and persons who are themselves in bankruptcy. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and Holders of Claims described below also may vary depending on the nature of any restructuring transactions that the Debtors and/or Reorganized Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of the partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partnership and the partner. Partnerships and partners (or other beneficial owners) of such partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors, the Reorganized Debtors, and Holders of PES Ultimate Interests.**

PES Holdings is a partnership and its subsidiaries (together with PES Holdings, the "PES Holdings Group") are disregarded entities for U.S. federal income tax purposes. PES Ultimate, which owns 99.99% of PES Holdings

(and 0.01% of PES Holdings through its wholly-owned subsidiary PES Intermediate, LLC ("PES Intermediate")) is also a partnership for U.S. federal income tax purposes. PES Energy, which owns interests in PES Ultimate, is treated as a corporation for U.S. federal income tax purposes. Because PES Holdings and PES Ultimate are partnerships for U.S. federal income tax purposes, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by PES Holdings or PES Ultimate, but by PES Intermediate, PES Energy and other Holders of PES Ultimate Interests, if any.

For the purposes of this disclosure, PES Intermediate and PES Energy shall sometimes be referred to as the "PES C Corporations."

### 1. Effects of Restructuring on Tax Attributes of Debtors.

The tax consequences of the implementation of the Plan to the Debtors and Holders of PES Ultimate Interests will differ depending on whether the Debtors pursue the Equitization Restructuring or the Asset Sale Restructuring. The Debtors have not yet determined whether to pursue the Equitization Restructuring or the Asset Sale Restructuring, or a combination of both.

If the Debtors pursue the Asset Sale Restructuring, then the PES Holdings Group would realize gain or loss upon the transfer of its assets in an amount equal to the difference between the aggregate fair market value of the assets transferred by the PES Holdings Group and the PES Holdings Group's aggregate tax basis in such assets. Such gain or loss would be allocated by PES Holdings to PES Ultimate and PES Intermediate. PES Ultimate would allocate such gain or loss to PES Energy and the other Holders of PES Ultimate Interests (if any). Gain, if any, allocated to PES Intermediate and PES Energy would be reduced by the amount of their respective available net operating losses ("NOLs"), NOL carryforwards and other available tax attributes, and any remaining gain would be recognized by PES Intermediate and PES Energy as a cash tax obligation.

If the Debtors pursue the Equitization Restructuring, the Debtors expect to take the position that the New PES Interests that will be received by Holders of Allowed Term Loan Secured Claims will first be issued and contributed by PES Energy to PES Ultimate, contributed by PES Ultimate to PES Holdings, and then distributed (in addition to the other consideration, if applicable) to such holders pursuant to the Plan and to treat such transactions as occurring in the same order for U.S. federal income tax purposes. Additionally, the PES Holdings Group may transfer certain assets to the Liquidating Trust, which is intended to be treated as a grantor trust, for the benefit of certain Holders. The formation of the Liquidating Trust is a taxable event and the PES Holdings Group will be treated as having transferred such assets to those certain Holders in a taxable transaction resulting in gain or loss allocated to PES Ultimate and PES Intermediate and PES Energy, as described in the preceding paragraph.

As of December 31, 2018, the PES C Corporations estimate that they have approximately $176.5 million of federal NOLs. The Debtors are currently generating additional losses, which will ultimately increase the PES C Corporations' NOLs and other tax attributes. In the case of an Equitization Restructuring, any NOLs remaining upon implementation of the Plan may be able to offset future taxable income indefinitely, thereby reducing the PES C Corporations' future aggregate tax obligations. Such NOLs may be used to offset 80% of taxable income in a given year.

### 2. COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any cash (i.e., the Distribution Proceeds) and (ii) the fair market value of any consideration (i.e., New PES Interests and the Liquidating Trust assets underlying the Liquidating Trust Units), in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108(d)(6) of the Tax Code, when an entity that is a flow-through entity recognizes COD Income, its partners are treated as receiving their allocable share of such COD Income. Any applicable exceptions and attribute reduction, as described in the next paragraph, are generally are applied at the partner level rather than the entity level. Accordingly, PES Ultimate and PES Intermediate will be treated as receiving their respective allocable

shares of COD Income from the PES Holdings Group, and PES Ultimate will allocate its share of COD Income to PES Energy and the non-Debtor holders of PES Ultimate Interests, if any.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or (b), to the extent that the taxpayer is insolvent immediately before the discharge. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. Such reduction in tax attributes occurs only after the tax for the tax year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the PES Holdings Group and allocated to the PES C Corporations with respect to a sale of all or a portion of their assets in the event of the Asset Sale Restructuring or the creation of the Liquidating Trust). In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (including, in the case of a partner in a partnership such partner's outside basis in his partnership interest), but not below the amount of liabilities to which the debtor remains subject; (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. However, a partner in a partnership may only make this election with respect to the portion of its outside basis attributable to depreciable assets if the partnership so consents. Any COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

No determination has yet been made as to whether the Reorganized Debtors (succeeding to the PES C Corporation's tax attributes) would elect first to reduce tax basis in their property (generally, each such PES C Corporation's outside basis in its partnership interest in PES Ultimate or PES Holdings) or to first reduce NOLs. At this time, regardless of whether the Reorganized Debtors make this election, no assurance can be given that the Reorganized Debtors would have NOLs or other tax attributes remaining after reduction for COD income.

###### 3.     *Limitation on Utilization of NOLs and Other Tax Attributes.*

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, to the extent the Reorganized Debtors succeed to the PES C Corporation's tax attributes (i.e., if the Debtors pursue the Equitization Restructuring), the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under Section 382 and Section 383 of the Code.

Under Sections 382 and 383 of the Code, if the PES C Corporation Debtors undergo an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Debtors allocable to periods prior to the Effective Date (collectively, the "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New PES Interests pursuant to the Plan will result in an "ownership change" of the PES C Corporations for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies.

###### (a)     **General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, or 1.89 percent for September 2019). The annual limitation may be increased

to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

> **(b)** **Special Bankruptcy Exceptions.**

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). However, the Debtors do not expect the 382(l)(5) Exception to be available to the PES C Corporations because any such creditors would not be qualified creditors of the PES C Corporations. As such, the Debtors expect the exception in Section 382(l)(6) of the Code (the "382(l)(6) Exception") to apply.

Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The availability to the Reorganized Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan. As discussed above, however, no assurance can be given that the Reorganized Debtors would have NOLs allocable to periods prior to the Effective Date remaining after giving after reduction for COD income.

> *4.* *Tax Consequences of the Liquidating Trust.*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of Term Loan Secured Claims, Intermediation Secured Claims, General Unsecured Claims, and Subordinated Remaining Volume Claim, as applicable, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

**C.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote.**

The following discussion assumes that the Debtors will pursue either the Equitization Restructuring or the Asset Sale Restructuring currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of either of the transactions.

*1.      Consequences to Holders of Allowed Other Priority Claims.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of Allowed Other Priority Claims, each holder thereof will receive payment in full in Cash from the Priority Claims Reserve.

The receipt of an interest in the Priority Claims Reserve by a U.S. Holder of an Allowed Other Priority Claim should be treated as a taxable exchange pursuant to Section 1001 of the Code. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the Cash to be received by such U.S. Holder from the Priority Claims Reserve and (b) such U.S. Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Claim were held for more than one year. To the extent that a portion of the Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income. *See* "Accrued Interest" below.

*2.      Consequences to Holders of Allowed Term Loan Secured Claims.*

Pursuant to the Plan, in exchange for the full and final satisfaction, compromise, settlement, release and discharge of Allowed Term Loan Secured Claims, each Holder thereof will receive its share, in accordance with section 7.03(a) of the Term Loan Credit Agreement, of:  (a) if an Equitization Restructuring occurs, (i) the New PES Interests, if any, after dilution by the Plan Sponsor Investment and (ii) any Cash (other than Cash constituting Intermediation Priority Collateral and any GUC Equitization Reserve) in excess of the Minimum Liquidity Amount that is not required to make distributions to Administrative Claims, Priority Tax Claims, or Other Secured Claims,

fund the Priority Claims Reserve or pay fees and expenses that are required to be paid pursuant to the Plan, including the Professional Fee Claims; (b) if an Asset Sale Restructuring occurs, (i) the Distribution Proceeds available for distribution to Holders of Allowed Term Loan Secured Claims from time to time as provided in Article VIII of the Plan; and (ii) the Liquidating Trust Units as provided in the Liquidating Trust Agreement and in accordance with Article IV.G of the Plan; and (c) whether an Equitization Restructuring or Asset Sale Restructuring occurs, Cash proceeds of the Intermediation Priority Collateral to the extent such proceeds remain available after Holders of Allowed Intermediation Secured Claims are paid in full in accordance with Article III.B.4 of the Plan.  To the extent that such distribution is not sufficient to pay the Term Loans Claims in full, any unsatisfied amount shall constitute a Term Loan Deficiency Claim.

As discussed above, the Debtors expect to take the position that, in the event of an Equitization Restructuring, the New PES Interests that will be received by the Holders of Allowed Term Loan Secured Claims will be first issued and contributed by PES Energy to PES Ultimate Holdings, and contributed by PES Ultimate to Holdings, and then distributed  (in addition to the other consideration) to such holders pursuant to the plan, and to treat such transactions as occurring in the same order for U.S. federal income tax purposes. The Debtors believe, and intend to take the position that, this treatment applies for U.S. federal income tax purposes and the remainder of this discussion assumes this.  The tax consequences to the Debtors, the Reorganized Debtors and holders of Allowed Term Loan Secured Claims described herein could be materially different in the event this characterization was not respected for U.S. federal income tax purposes.

Additionally, as discussed above, the Debtors expect (and the Liquidating Trust documents shall provide) that the trustee(s) of the Liquidating Trust will treat the Liquidating Trust as a grantor trust of which the Holders of Allowed Term Loan Secured Claims, among others, are the grantors. Each Holder of an Allowed Term Loan Secured Claim should accordingly be treated as having (a) received its Pro Rata share of the Liquidating Trust Assets from the Debtors and (b) contributed such assets to the Liquidating Trust in exchange for Liquidating Trust Units.

The receipt of Distribution Proceeds and, if applicable, Liquidating Trust Units and New PES Interests by a U.S. Holder should be treated as a taxable exchange pursuant to Section 1001 of the Code.  Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the sum of the Distribution Proceeds received and the fair market value of the Liquidating Trust Assets and, in the case of the Equitization Restructuring, the New PES Interests deemed to be received, if any, and (b) such U.S. Holder's adjusted tax basis in its Claim.

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Term Loan Secured Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations.  To the extent that a portion of the consideration received in exchange for its Allowed Term Loan Secured Claim is allocable to accrued but untaxed interest (or OID), the U.S. Holder may recognize ordinary income.  See "Accrued Interest" and "Market Discount" below.

A U.S. Holder's tax basis in any New PES Interests should be equal to its fair market value.  A U.S. Holder's holding period for any New PES Interests received on the Effective Date should begin on the day following the Effective Date.

A U.S. Holder of such Claims should obtain a tax basis in its Pro Rata share of each of the Liquidating Trust Assets equal to the fair market value of such Holder's Pro Rata share of each of the Liquidating Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to the Plan.  The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

### 3. Consequences to Holders of Allowed Intermediation Secured Claims and Allowed Unsecured Claims.

Pursuant to the Plan, in exchange for the full and final satisfaction, compromise, settlement, release and discharge of Allowed Intermediation Secured Claims and Allowed Secured Claims, whether an Equitization Restructuring or Asset Sale Restructuring occurs, each Holder thereof will receive its Pro Rata Share of:  (a) Cash

proceeds of Intermediation Priority Collateral and the SOA Separate Assets and Collateral, or shall receive delivery of its Pro Rata share of such Intermediation Priority Collateral and SOA Separate Assets and Collateral; (b) proceeds of the business interruption portion of any Business Interruption and Property Damage Insurance Policies, solely to the extent determined pursuant to a Final Order that such proceeds constitute Intermediation Priority Collateral, less the amount of any surcharge applied to such proceeds consistent with the DIP and Cash Collateral Orders, not to exceed the amount applied to repayment of the DIP Facility in accordance with the Final Order approving the DIP Facility; (c) all other assets that constitute Intermediation Priority Collateral or SOA Separate Assets and Collateral, or the net Cash proceeds thereof; and (d) Cash proceeds of the Term Loan Priority Collateral to the extent such proceeds remain available after Holders of Allowed Term Loan Secured Claims are paid in full in accordance with Article III.B.3 of the Plan.  To the extent such distribution is not sufficient to pay the Intermediation Claims in cash in full, any unsatisfied amount shall constitute an Intermediation Deficiency Claim.

The receipt of consideration pursuant to (i) or (ii) of the prior sentence by a U.S. Holder should be treated as a taxable exchange pursuant to Section 1001 of the Code. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the Distribution Proceeds received and the fair market value of the Liquidating Trust Assets deemed to be received, and (b) such U.S. Holder's adjusted tax basis in its Claim.

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Intermediation Secured Claim or Allowed Unsecured Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest (or OID), the U.S. Holder may recognize ordinary income. See "Accrued Interest" and "Market Discount" below.

A U.S. Holder of such Claims should obtain a tax basis in its Pro Rata share of each of the Liquidating Trust Assets equal to the fair market value of such Holder's Pro Rata share of each of the Liquidating Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to the Plan.  The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

### 4. *Accrued Interest.*

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest in such event.

### 5. *Market Discount.*

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis

in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 6.   *Medicare Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 7.   *Dividends on New PES Interests.*

Any distributions made on account of the New PES Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized PES as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New PES Interests. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### 8.   *Sale, Redemption or Repurchase of New PES Interests.*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New PES Interests. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New PES Interests for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

### 9.   *Limitation on Use of Capital Losses.*

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

10.    *Ownership of Liquidating Trust Units.*

The U.S. federal income tax obligations of Holders of Allowed Term Loan Secured Claims, Allowed Intermediation Secured Claims and Allowed Unsecured Claims, with respect to their beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Holders of such Claims will be required to report on their U.S. federal income tax returns their share of the Liquidating Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Liquidating Trust. This requirement may result in such Holders being subject to tax on their allocable share of the Liquidating Trust's taxable income prior to receiving any cash distributions from the Liquidating Trust. In general, a distribution of Cash by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust).

D.    **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims.**

1.    *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims.*

The following discussion assumes that the Debtors will undertake the restructuring transactions (either the Equitization Restructuring or the Asset Sale Restructuring) currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New PES Interests.

(a)    **Gain Recognition.**

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the restructuring transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b)    **Accrued but Untaxed Interest.**

Payments made to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Reorganized PES and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject

to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).  A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

> **2.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New PES Interests.**

> **(a)      Dividends.**

Distributions on New PES Interests will generally constitute dividends for U.S. federal income tax purposes to the extent paid out of Reorganized PES's accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of Reorganized PES's current and accumulated earnings and profits will generally constitute a return of capital and will first be applied against and reduce a non-U.S. Holder's adjusted tax basis in its New PES Interests, but not below zero.  Distributions not treated as dividends and in excess of a Holder's adjusted basis will generally be treated as capital gain subject to the rules discussed under "--Gain on Disposition of New PES Interests".

Dividends paid to a non-U.S. Holder of New PES Interests will generally be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.  However, dividends that are effectively connected with the conduct of a trade or business by the non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the non-U.S. Holder) are not subject to withholding, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. Holder were a United States person as defined under the Tax Code.  Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. Holder of New PES Interests who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends, will be required (a) to complete the applicable IRS Form W-8BEN or Form W-8BEN-E and certify under penalty of perjury that such Holder is not a United States person as defined under the Tax Code and is eligible for treaty benefits or (b) if the New PES Interest is held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. Holders that are passthrough entities rather than corporations or individuals.  A non-U.S. Holder of New PES Interests eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

> **(b)      Gain on Disposition of New PES Interests.**

Any gain realized on the sale, exchange or other taxable disposition of New PES Interests generally will not be subject to U.S. federal income tax unless:

> > **(i)      the gain is effectively connected with a trade or business of the non-U.S. Holder in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment of the non-U.S. Holder);**

> (ii)     **the non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or**
>
> (iii)    **Reorganized PES is a "United States real property holding corporation" ("<u>USRPHC</u>") for U.S. federal income tax purposes at any time within the shorter of the five-year period preceding the disposition or the non-U.S. Holder's holding period for New PES Interests.**

A non-U.S. Holder described in the first bullet point above will generally be subject to tax on the net gain derived from the sale or other disposition under regular graduated U.S. federal income tax rates applicable to such Holder as if it were a United States person as defined under the Tax Code. In addition, if a non-U.S. Holder described in the first bullet point above is a corporation for U.S. federal income tax purposes, it may be subject to a "branch profits tax" equal to 30% of its effectively connected earnings and profits (subject to adjustments) or at such lower rate as may be specified by an applicable income tax treaty.

An individual non-U.S. Holder described in the second bullet point above will generally be subject to a flat 30% (or such lower rate as may be specified by an applicable income tax treaty) tax on the gain derived from the sale or other disposition, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the United States, provided such non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

If the exception in the third bullet applies, a Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New PES Interests under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further the buyer of the New PES Interests generally will be required to withhold tax equal to 15% of the amount realized on the sale and the Non-U.S. Holder generally will be required to file a U.S. federal income tax return. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5% of the value of such interests during a specified testing period and (b) such interest is regularly traded on an established securities market.

At this time Reorganized PES has not determined whether it is likely to be a USRPHC for U.S. federal income tax purposes. In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non- U.S. Holder held such interest.

## E.     FATCA.

Pursuant to the Foreign Account Tax Compliance Act ("FATCA"), withholding at a rate of 30% generally will be required on certain U.S.-source payments such as dividends on and, potentially in the future, the gross proceeds of a disposition of, the New PES Interests, held by or through (i) a foreign financial institution (including investment funds) that does not qualify under certain exemptions, unless such institution enters into, and complies with, an agreement with the United States government to collect and provide to the United States tax authorities (or, pursuant to an applicable intergovernmental agreement, such institution provides the required information to the tax authority of such institution's jurisdiction of tax residence) substantial information regarding United States account Holders of such institution (which would include certain equity and debt Holders of such institution, as well as certain account Holders that are foreign entities with United States owners) and agrees to withhold on certain payments or (ii) a foreign entity that is not a financial institution that does not qualify under certain exemptions, unless such entity certifies to the applicable withholding agent that such entity does not have "substantial United States owners" (as defined in the Tax Code) (which generally includes any United States person who directly or indirectly owns more than 10% of the

entity) or provides the applicable withholding agent with information regarding the entity's substantial United States owners, which the withholding agent will in turn provide to the United States government.  Accordingly, the entity through which the New PES Interests are held will affect the determination of whether such withholding is required.  Foreign financial institutions and foreign entities that are not financial institutions may be subject to the provisions of an intergovernmental agreement between the United States and the jurisdiction in which such financial institution or foreign entity is located that may modify these requirements.  A Holder of consideration received pursuant to the Plan should consult its own tax advisors regarding these rules and whether they may be relevant to the ownership and disposition of the consideration received pursuant to the Plan. Proposed Treasury Regulations, upon which taxpayers are permitted to rely, currently suspend indefinitely the application of withholding under FATCA to gross proceeds from the disposition of New PES Interests.

**Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such holders' exchange of any of its Claims pursuant to the Plan and on its ownership of loans provided under the New PES Interests.**

F.    **Information Reporting and Backup Withholding.**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Code.  In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

<div style="margin-left:40%">

PES Holdings, LLC on behalf of itself and each of the other Debtors

By:    */s/ Jeffrey S. Stein*

Name:   Jeffrey S. Stein
Title:    Chief Restructuring Officer

</div>

Prepared By:

Dated: December 11, 2019
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
        pkeane@pszjlaw.com

- and -

Edward O. Sassower, P.C.
Steven N. Serajeddini (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
        steven.serajeddini@kirkland.com
        matthew.fagen@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Chapter 11 Plan**

**Exhibit B**

**Corporate Structure of the Debtors**

**Exhibit C**

**Liquidation Analysis**

**Best Interests of Creditors—Liquidation Analysis**.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan satisfies the best interests test because, among other things, the Debtors expect that the recoveries available to Holders of Allowed Claims under the Plan will be greater than the recoveries available in a chapter 7 liquidation, for the reasons discussed below.

1.    *The Debtors are Best Positioned to Increase Asset Sale Recoveries Under a Chapter 11 Asset Sale.*

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor's deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority, followed by subordinated unsecured creditors' claims, if any. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

If the Asset Sale Restructuring occurs, all or substantially all of the Debtors' assets will be sold through the Asset Sales and the Plan will effect a liquidation of the Debtors' remaining assets. Although a chapter 7 liquidation would achieve the same goal (*i.e.*, a sale of the entirety of the Debtors' assets), the Debtors believe that the Plan will provide greater proceeds and recoveries to Holders of Term Loan Secured Claims, Intermediation Secured Claims, General Unsecured Claims, and Subordinated Remaining Volume Claim than would be realized in a chapter 7 liquidation because a sale of the Debtors' assets in chapter 7 would likely realize materially lower sale proceeds than a sale through the Asset Sale Restructuring. A chapter 7 trustee would be unlikely to have the technical expertise and knowledge of the Debtors' businesses and assets that is required to maximize the proceeds from the sale of the Debtors' assets. This is particularly true in light of the highly technical nature of the Debtors' business and insurance recovery process. The management team provides valuable business and industry specific knowledge that would continue to be leveraged in consummating an Asset Sale and pursuing insurance-related recoveries.

A chapter 7 trustee would not have the same degree of familiarity with the Debtors' insurance recovery process for the substantial property damage and business interruption that the Debtors suffered in connection with the incident at the Girard Point refinery (the "Girard Point Incident"). The Debtors' business interruption claim involves modeling and diligence to establish the losses associated with the interruption to the Debtors' business as a result of the Girard Point Incident. Due to its historical knowledge and nonpareil understanding of the Debtors' operations and its experience, including the manner in which the business was interrupted, the Debtors' management team—which has been in place since well before the Girard Point Incident—is in the best position lead the modeling and diligence efforts and engage with the insurance providers to pursue the business interruption and property damage claims.

This knowledge and experience is critical to maximizing estate recovery on account of the Debtors' insurance claims. A chapter 7 trustee and his/her counsel, in contrast, would likely require, among other things, a significant amount of time to become familiar with the details of the Debtors' business and the insurance recovery process, further lengthening the time until insurance proceeds and a successful sale are realized and thus reducing the present value of any recovery for Holders.

With respect to the Asset Sale specifically, the Debtors are responsible for managing and facilitating the process to consummate one or more sale transactions under the Plan. The Debtors' industry experience, knowledge of their business operations and historical results has been the primary point of diligence and the topic of many meetings with potential buyers. If the Debtors were to lose the benefit of this knowledge and these efforts in

consummating a Sale under the Plan and instead have a chapter 7 trustee begin a new sale process without the requisite operation and historical knowledge, recoveries to Holders would be substantially reduced.

The Debtors' knowledge of their business and operations is also critical to ensuring the environmental safety and compliance of the Debtors' facilities. For instance, this familiarity has allowed the management team to work closely with federal and local regulators, advisors, and other constituents with respect to the ongoing investigation, which insight is critical in light of their years of experience with the Debtors' operations. In contrast, a chapter 7 trustee and his/her counsel would not immediately be familiar with the operational and environmental constraints and risks associated with the Debtors' assets and would thereby be at a significantly higher risk of breaching applicable permits and regulations and incurring additional liabilities.

Finally, the Debtors and ICBCS have reached an agreement on a consensual process to extract ICBCS's hydrocarbons out of the Debtors' facilities. The Debtors believe that such terms, which are the result of extensive, good faith negotiations with ICBCS, maximize value for the benefit of the estates and all parties in interest. In a chapter 7 case, there is no assurance that a chapter 7 trustee would be capable of performing on the Debtors' agreed-upon extraction plan. In that case, there would be additional costs incurred and, therefore, further reduced recoveries for Holders.

> **2.    The Costs Associated with a Conversion to Chapter 7 Are Higher Than Those Incurred in these Chapter 11 Cases.**

A chapter 7 liquidation beginning on what would have been the Effective Date would also provide less recovery for creditors than the Plan in part because the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders and potentially causing bids already obtained to be lost) and expense incurred by the chapter 7 trustee and any professionals retained thereby in familiarizing themselves with the cases, would likely exceed the costs professionals would incur in connection with a company-administered process. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

With respect to professional costs, a chapter 7 trustee's fees would likely be materially higher than the fees paid to the Debtors' management team. Section 326(a) of the Bankruptcy Code entitles a chapter 7 trustee to receive up to 3% of any gross distributions made in excess of $1 million. In comparison, under the Debtors' proposed key employee incentive program, which is subject to Bankruptcy Court approval, the Debtors' current management team would be entitled to share 2.5% of any net distributed proceeds for distributed proceeds over $300 million plus a $2.5 million success fee if the Plan is confirmed within 15 months of the Petition Date. Accordingly, the cost incurred by the Debtors to retain management through a successful Asset Sale is likely lower than fees that would have to be paid to a chapter 7 trustee.

In a chapter 7 liquidation, the Debtors' estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the chapter 11 cases (such as compensation for professionals), which may constitute Allowed Claims in any chapter 11 case. Conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

A liquidation sale under chapter 7 would also subject the Debtors to additional tax liabilities. Section 1146 of the Bankruptcy Code exempts transfers and security exchanges made under a confirmed chapter 11 plan from certain transfer taxes that the Debtors would otherwise be liable for outside of chapter 11. But this tax exemption is only applicable to transfers made under a confirmed chapter 11. *See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc. (In re Piccadilly)*, 554 U.S. 33, 45–47 (2008) (interpreting the 1146(a) exemption to apply only to post-confirmation transfers under a confirmed chapter 11 plan). As a result, any sale conducted under chapter 7 would subject the Debtors to transfer tax liabilities otherwise exempted under a chapter 11 plan.

The Debtors respectfully submit in light of the foregoing that a chapter 7 liquidation would result in increased expenses and decreased proceeds for the estate, along with the prospect of additional claims not asserted in the chapter 11 case. Accordingly, the Debtors believe that the Plan is in the best interests of its creditors.

**Exhibit D**

**Disclosure Statement Order**