IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PES HOLDINGS, LLC, et al.,[1] | Case No. 19-11626 (KG) |
| Debtors. | (Jointly Administered) |

## AFFIDAVIT OF SERVICE OF PUBLICATION

PLEASE TAKE NOTICE that the undersigned certifies that the following document

**Notice of Hearing to Consider Confirmation
of The Chapter 11 Plan Filed by The Debtors and Related Voting
and Objection Deadlines**

was published in the following publications on the date provided.

| Publication | Date | Exhibit |
|---|---|---|
| USA Today | December 16, 2019 | A |
| The New York Times | December 16, 2019 | B |

*/s/ Darleen Sahagun*
Darleen Sahagun
Omni Agent Solutions
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300
*Claims, Noticing, and Administrative Agent for the Debtor*

---

[1] Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

**EXHIBIT A**



## VERIFICATION OF PUBLICATION

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF FAIRFAX**

Being duly sworn, Vanessa Salvo says that she is the principal clerk of USA TODAY, and is duly authorized by USA TODAY to make this affidavit, and is fully acquainted with the facts stated herein: on **Monday, December 16, 2019**, the following legal advertisement – **In re: PES HOLDINGS, LLC**–was published in the national edition of **USA TODAY.**

_____
Principal Clerk of USA TODAY
December 17, 2019

This __17__ day of __December__ month __2019__ year.

_____
Notary Public

Danitria Carruth Bradley
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 7819345
My Commission Expires 3/31/2023

# When Captain America is hurting the USA

### Reed earned moniker but his behavior wearing thin



**Eamon Lynch**
Columnist
Golfweek
USA TODAY NETWORK

Patriotism is the intrinsic creed of American sport. You don't become known as Captain America unless you have exhibited the holy trinity of traits: a fiery will to win, a bulletproof confidence and an eagerness to wrap yourself in the flag. You need to back it up with results, obviously, but our stubborn veneration of these attributes also helps annul any less admirable character quirks a winner might possess.

For example, an unscrupulous reputation earned as a sallow young man is forgotten if a major victory brings global prestige. It's simply assumed you'll rise to the responsibilities expected, like honor, integrity, professionalism, diplomacy. You're representing America, after all.

And if you're congenitally incapable of living up to the ideals Captain America embodies? If you are the sickly man and not the superhero? Just keep winning. It's the serum that transforms feeble into fearsome. You can even stray out of bounds – hey, we're all human! – and you'll be forgiven, as long as the ledger shows positive numbers. Rewrite the rule book in pursuit of victory. Push beyond arcane conventions. Be confident, brazen even. If you nudge beyond accepted norms and you're famous, they just let you keep doing it.

There will be critics who treat you unfairly, but some folks are just triggered by seeing a winner do things his own way rather than conduct himself like generations of long-dead predecessors. They wouldn't be making such a big deal of things if you weren't Captain America. They're just not supporters of the team. Simple as.

There will be challenging times, days when you're just trying to dig yourself out of a hole. That's when Captain America needs his team to circle the wagons against incoming fire. You'll need, say, a fellow winner to reassure everyone that things are good. A popular teammate to leaven the tension with humor, knowing you'll trade a pained smile for the air cover he provides. A law-abiding gentleman to offer praise, even if it feels undeserved. Armed with that, you can openly shovel scorn on your critics. Maybe even have someone knock the hell out of them.

Eventually the wins will begin to ebb and the losses will start to flow, and like lousy casino bets the occasional positive won't cover the many negatives. You'll still receive more grace than you give though. And in those moments of loss, people will know you stood firm against head winds that flipped weaker men. Others will perform better, and represent better, but the team won't break ranks while its interest and yours remain aligned. And that interest is winning. Who will bench Captain America for fear an unproven alternative delivers less?

It's like you always say: You make birdies, you don't hear much.

Investing in Captain America comes at a cost, of course. Everyone understands that accounting. Longtime allies will melt away. Reputations built on probity will be blemished. Men of character will sit on the sidelines while one with none takes the field. But payment for that will be due someone else. Captain America's end, when it comes, won't be amid the raucous cheers and backslapping that defined his victories. It will be a somber affair, decided in some nondescript office when powerful men, an eye trained on their disillusioned core supporters, say simply, enough.



Patrick Reed reacts to a missed putt on the 15th green during fourball matches in the Presidents Cup. WARREN LITTLE/GETTY IMAGES

---

## Jones
Continued from Page 1C

front corner of the end zone, but Kenny Vaccaro came out of nowhere to pick off the pass and foil that shot at a game-opening statement.

Watson and Co. did manage to put the early gaffe behind them, eventually taking a 14-0 lead into halftime. However, late in the third quarter, while poised to re-establish a two-touchdown lead following a Tennessee score, another Watson pass was tipped at the goal line and intercepted in the end zone. The Titans then took the ball the length of the field to tie the score with 13 minutes to play.

Suddenly, the Texans found their mettle tested again.

And twice more they responded, outscoring Tennessee 10-7 to capture the victory, improve to 9-5 and regain sole possession of first place in the division.

The players drew encouragement from their ability to handle adversity. They confirmed the internal beliefs that the debacle in Denver would not derail them, and they proved to themselves that even when things don't go exactly according to plan, they can overcome such transgressions.

"We're capable of executing in a much different way," said wide receiver Kenny Stills, who had two touchdown catches. "We know we don't have to play these close games if we don't hurt ourselves."

But that's the big question about this Texans team as it heads toward the final two games. Are they actually good enough to avoid self-inflicted wounds and handily defeat the elite teams of the AFC?

On one hand, the answer seems like a resounding yes. That's certainly what you'll get asking any member of the locker room. They'll point to a road win at Kansas City and a home victory over New England.

But their season's resume also features that blowout loss to Denver, a hapless performance against Baltimore, a split with Indianapolis and a defense that statistically ranks among the bottom third of the league. And considering all that, the Texans make it hard for you to truly believe in them.

They definitely deserve credit for the way they responded to a high-pressure situation and beat the Titans (winners of six of their seven previous games) to avoid ceding control of the division to their hosts. But ball security and inconsistencies on defense kept Tennessee in that game more than any Titans' heroics.

It's hard to know what to make of them because of the lack of consistency. They're clearly not as good as the team that thumped the Patriots. But they're clearly better than the squad that got thumped by the Broncos. But, are they special enough? Special at all?

Watson makes you want to say yes. So, too, do the weapons he has on offense, notably Stills, DeAndre Hopkins, Will Fuller and Carlos Hyde. And as they feed off of their young quarterback's talents and confidence, players and coaches believe they always have a chance.

But, that defense ... the necessary heroics on that side of the ball just don't come with the level of frequency that championship contenders produce.

Houston's defense did hold bruising back Derrick Henry, who entered the game averaging 149 rushing yards in his last four outings, to just 86 yards. But the same unit offered little resistance to Ryan Tannehill, who led his team downfield to score and pull within three points with a 75-yard drive that didn't even take two minutes.

In the next two weeks, it's important the Texans figure out how to eliminate the inconsistent play on both sides of the ball. They can certainly contend with any team in the conference when they play mistake-free football. But as Sunday's performance, and the season as a whole, has shown, that's a big if.

Now it's time to prove themselves. Yes, they can quickly recover from many missteps. But their margin for error is slim. When facing elite squads, they may quickly find themselves in holes that are too large to escape.



Titans quarterback Ryan Tannehill and the Texans' Deshaun Watson talk after the game. CHRISTOPHER HANEWINCKEL/USA TODAY

---

## DiMeglio
Continued from Page 1C

terous galleries and inspired by the leadership of captain Ernie Els, controlled the narrative the first two days and pushed the Americans into an unfamiliar role where they had to call on some heroics to pull out victory.

Trailing 6-1 at one point, the Americans won 15 of the last 23 points available to capture the Cup for the 11th time in 13 attempts. But the Americans were on edge throughout, and their 16-14 triumph Sunday wasn't secure until the second-to-last match when Matt Kuchar tied Louis Oosthuizen.

It was a thriller, a page turner, a life saver for the Cup.

"Great strides were made, especially in our team play," Els said. "I really felt that our team play was really the core of our team, and that never was (before). We never felt like we could play foursomes or fourball together as a team. We did that well.

"The people around the world will look at these guys in a different way. I think you guys have seen what can happen. If you compare our team on paper with other teams in other sports, you would have laughed us out of the building. But we gave it a hell of a go and we came mightily close to winning and upsetting one of the greatest golf teams of all time."

In doing so, despite losing eight of the 12 points Sunday, the Internationals gave the Presidents Cup a pulse, for there was victory in defeat. Calls for radical changes need not be answered. There's life in this event and it will carry on till 2021, when the two meet at Quail Hollow in North Carolina.

Woods' first crack at captaincy left him wanting for more, whether as a captain or a player or both. He relishes pressurized confrontation on the golf course and he got all he and his team could handle in the land Down Under.

"The whole team played extremely well today on a very difficult golf course against a very formidable International team," he said. "They were up big and the guys went in and got it done. It came down to the very end. We knew that was going to happen."

Woods, who was 3-0-0 and became the all-time leader in matches won in the Presidents Cup with 27, was moved to tears.

"I've cried in pretty much every Cup we've won," he said. "I've been doing this a long time. Any time you have moments where you're able to do something that is bigger than us as an individual, is so much more meaningful and so much more special."

---

## LEGAL MONDAY

For advertising information: 1.800.872.3433   www.marketplace.usatoday.com

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: PES HOLDINGS, LLC, et al.,[1] Chapter 11, Case No. 19-11626 (KG) Debtors. (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

PLEASE TAKE NOTICE THAT on December 11, 2019, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Disclosure Statement Order") (a) authorizing PES Holdings, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the Disclosure Statement for the Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **February 6, 2020 at 9:00 a.m.**, prevailing Eastern Time, before the Honorable Kevin Gross, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom Three, Wilmington, Delaware 19801.

PLEASE BE ADVISED: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**
**Voting Record Date.** The voting record date is **December 6, 2019** (the "Voting Record Date"), which is the date for determining which Holders of Claims or Interests in Classes 3, 4, and 5 are entitled to vote on the Plan.
**Voting Deadline.** The deadline for voting on the Plan is on **February 3, 2020, at 5:00 p.m.**, prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' notice and claims agent, Omni Management Group, Inc. (the "Notice and Claims Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**
ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE X.F CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.
YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE X.F OF THE PLAN ONLY IF YOU (A) DO NOT VOTE TO ACCEPT THE PLAN AND (B) RETURN A BALLOT CHECKING THE BOX TO "OPT OUT" FROM THE THIRD PARTY RELEASES, SUBJECT TO ANY FINAL ORDER OF THE BANKRUPTCY COURT TO THE CONTRARY. REGARDLESS OF WHETHER THE COURT DETERMINES THAT YOU HAVE A RIGHT TO OPT-OUT OF THE RELEASES, IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, OR (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR VOTE TO REJECT THE PLAN AND, IN EITHER CASE, FAIL TO CHECK THE BOX TO "OPT OUT" FROM THE THIRD PARTY RELEASES, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE X.F OF THE PLAN.
**Plan Objection Deadline.** The deadline for filing objections to the Plan is **February 3, 2020, at 4:00 p.m.**, prevailing Eastern Time (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 3, 2020, at 4:00 p.m.**, prevailing Eastern Time: (i) **Debtors:** PES Holdings, LLC, 1735 Market Street, Philadelphia, Pennsylvania 19103, Attn.: John McShane; (ii) **Counsel to the Debtors:** Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899, Attn: Laura Davis Jones, James E. O'Neill, and Peter J. Keane -and- Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Edward O. Sassower P.C., Steven N. Serajeddini, and Matthew C. Fagen; (iii) **United States Trustee:** Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: David Buchbinder; (iv) **Counsel to the Official Committee of Unsecured Creditors:** Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn.: Robert J. Stark and Max D. Schlan -and- Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn.: Steven D. Pohl and Sharon I. Dwoskin -and- Elliott Greenleaf, P.C., 1105 North Market Street, Suite 1700, Wilmington, Delaware 19801, Attn.: Rafael X. Zahralddin-Aravena and Jonathan M. Stemerman; and (v) **Counsel to the DIP Lenders:** Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn.: Damian S. Schaible and Aryeh E. Falk -and- Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn.: Robert J. Dehney and Andrew R. Remming

**ADDITIONAL INFORMATION**
**Obtaining Solicitation Materials.** The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM or flash drive), please feel free to contact the Debtors' Notice and Claims Agent, by: (a) calling the Debtors' restructuring hotline at (866) 989-6147 (domestic toll-free) or (813)-906-8300 (international toll) (ask for Solicitation Group); (b) visiting the Debtors' restructuring website at: https://cases.omniagentsolutions.com/pesholdings2019/; and/or (c) writing to PES Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.
**Filing of the Plan Supplement.** The Debtors will file the Plan Supplement (as defined in the Plan) on or before January 27, 2020 and will serve notice on all Holders of Claims or Interests entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.
**BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Dated: December 16, 2019, Wilmington, Delaware  /s/ Peter J. Keane
Laura Davis Jones (DE Bar No. 2436), James E. O'Neill (DE Bar No. 4042), Peter J. Keane (DE Bar No. 5503), **PACHULSKI STANG ZIEHL & JONES LLP**, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Telephone: (302) 652-4100, Facsimile: (302) 652-4400, Email: ljones@pszjlaw.com, jkeane@pszjlaw.com, joneill@pszjlaw.com -and- Edward O. Sassower, P.C., Steven N. Serajeddini (admitted pro hac vice), Matthew C. Fagen (admitted pro hac vice), **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP**, 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: edward.sassower@kirkland.com, steven.serajeddini@kirkland.com, matthew.fagen@kirkland.com, Co-Counsel to the Debtors and Debtors in Possession

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.
[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

# EXHIBIT B



620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Dec 16 _____ 2019

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of **The New York Times**, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of

**The New York Times** on the following date or dates, to wit on

DEC 16 2019   B4   NATIONAL

_Alice Weber_

Sworn before me the
10th day of Dec, 2019

_Michelle M. Scibilia_

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: ) Chapter 11
PES HOLDINGS, LLC, et al.,[1] ) Case No. 19-11626 (KG)
Debtors. ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

PLEASE TAKE NOTICE THAT on December 11, 2019, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Disclosure Statement Order") (a) authorizing PES Holdings, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the Disclosure Statement for the Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **February 6, 2020 at 9:00 a.m.** prevailing Eastern Time, before the Honorable Kevin Gross, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom Three, Wilmington, Delaware 19801.

PLEASE BE ADVISED: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**
**Voting Record Date.** The voting record date is **December 6, 2019** (the "Voting Record Date"), which is the date for determining which Holders of Claims or Interests in Classes 3, 4, and 5 are entitled to vote on the Plan.

**Voting Deadline.** The deadline for voting on the Plan is on **February 3, 2020, at 5:00 p.m.** prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' notice and claims agent, Omni Management Group, Inc. (the "Notice and Claims Agent") on or before the Voting Deadline. A failure to follow such instructions may disqualify your vote.

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**
ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE X.F CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE X.F OF THE PLAN ONLY IF YOU (A) DO NOT VOTE TO ACCEPT THE PLAN AND (B) RETURN A BALLOT CHECKING THE BOX TO "OPT OUT" FROM THE THIRD PARTY RELEASES. SUBJECT TO ANY FINAL ORDER OF THE BANKRUPTCY COURT TO THE CONTRARY, REGARDLESS OF WHETHER THE COURT DETERMINES THAT YOU HAVE A RIGHT TO OPT-OUT OF THE RELEASES, IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, OR (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR VOTE TO REJECT THE PLAN AND, IN EITHER CASE, FAIL TO CHECK THE BOX TO "OPT OUT" FROM THE THIRD PARTY RELEASES, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE X.F OF THE PLAN.

**Plan Objection Deadline.** The deadline for filing objections to the Plan is **February 3, 2020, at 4:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 3, 2020, at 4:00 p.m.** prevailing Eastern Time: (i) **Debtors:** PES Holdings, LLC, 1735 Market Street, Philadelphia, Pennsylvania 19103, Attn.: John McShane; (ii) **Counsel to the Debtors:** Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899, Attn: Laura Davis Jones, James E. O'Neill, and Peter J. Keane -and- Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Edward O. Sassower P.C., Steven N. Serajeddini, and Matthew C. Fagen; (iii) **United States Trustee:** Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: David Buchbinder; (iv) **Counsel to the Official Committee of Unsecured Creditors:** Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn.: Robert J. Stark and Max D. Schlan -and- Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn.: Steven D. Pohl and Sharon I. Dworkin -and- Elliott Greenleaf, P.C., 1105 North Market Street, Suite 1700, Wilmington, Delaware 19801, Attn.: Rafael X. Zahralddin Aravena and Jonathan M. Stemerman; and (v) **Counsel to the DIP Lenders:** Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn.: Damian S. Schaible and Aryeh E. Falk -and- Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn.: Robert J. Dehney and Andrew R. Remming.

**ADDITIONAL INFORMATION**
**Obtaining Solicitation Materials.** The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM or flash drive), please feel free to contact the Debtors' Notice and Claims Agent, by: (a) calling the Debtors' restructuring hotline at (866) 989-6147 (domestic toll-free) or (818)-906-8300 (international toll) (ask for Solicitation Group); (b) visiting the Debtors' restructuring website at: https://cases.omniagentsolutions.com/pesholdings2019/; and/or (c) writing to PES Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement.** The Debtors will file the Plan Supplement (as defined in the Plan) on or before January 21, 2020 and will serve notice on all Holders of Claims or Interests entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Dated: December 16, 2019, Wilmington, Delaware, /s/ Peter J. Keane
Laura Davis Jones (DE Bar No. 2436), James E. O'Neill (DE Bar No. 4042), Peter J. Keane (DE Bar No. 5503), **PACHULSKI STANG ZIEHL & JONES LLP,** 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Telephone: (302) 652-4100, Facsimile: (302) 652-4400, Email: ljones@pszjlaw.com, pkeane@pszjlaw.com, joneill@pszjlaw.com -and- Edward O. Sassower, P.C., Steven N. Serajeddini (admitted pro hac vice), Matthew C. Fagen (admitted pro hac vice), **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: edward.sassower@kirkland.com, steven.serajeddini@kirkland.com, matthew.fagen@kirkland.com, Co-Counsel to the Debtors and Debtors in Possession

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.
[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

# Netflix Shuns Commercials, but Not Brands

**FROM FIRST BUSINESS PAGE**

cheese) tied to the new Netflix series "Green Eggs and Ham," based on the Dr. Seuss book. The sandwich generated a lot of publicity for Netflix in the lifestyle press while also putting the Netflix name in front of the millions of people who buy a Subway sandwich each day.

"We believe we will have a more valuable business in the long term," Netflix said, "by staying out of competing for ad revenue and instead entirely focusing on competing for viewer satisfaction."

In another recent cross-promotion, Netflix charged the clothing company Diesel a license fee to make outfits inspired by "La Casa de Papel," one of Netflix's most popular shows. Online ads from Diesel hammered home the connection by showing the Netflix name, mentioning "La Casa de Papel" and featuring characters in the distinctive red jumpsuits worn by the show's protagonists.

Netflix is "actively beefing up its marketing team," according to the research firm Forrester. "They're being more flexible in the types of partnerships they can offer," said Ellie Bamford, an executive at the marketing agency R/GA.

When Netflix worked with Samsung and Aviation American Gin on a commercial last month featuring the actor Ryan Reynolds and his new Netflix film "6 Underground," no money changed hands. For Netflix, such deals are mostly about keeping people aware of the Netflix brand.

Netflix declined to say whether deals with companies would become a larger revenue stream in the future.

But companies have long been eager to go into business with Netflix, even before it scored 34 Golden Globe nominations this month. The platform has something brands crave: a young audience. Its average viewer is 31, part of a group highly sought by companies as younger people avoid broadcast and cable television and are known to hate ads.

"Brands want to be in front of this audience," Ms. Bamford said. "Reaching these unreachables, these cord-cutters who don't want to be fed an ad, is a huge concern."

Major companies flirt with Netflix on social media, and Netflix is flirting back. This month, the company's Twitter account, with seven million followers, participated in a saucy meme about things people say during sex, trading quips about it with the Wendy's Twitter account (3.4 million followers) and Penguin Random House (1.3 million followers). Last spring, Netflix posted a tweet that included a photo of nine cast members from one of its original shows, "Sense8," as they appeared to be celebrating in an Audi convertible, and then had a joking exchange about it with the Audi account (two million followers).

In contrast to its cheery social-media tone, Netflix is "not necessarily the easiest to work with" on promotional partnerships with companies, said Stacy Jones, the chief executive of the entertainment marketing company Hollywood Branded. She described Netflix as "very picky," saying it "wants to be the lead."

"They're in a power position right now," Ms. Jones said. "They know the market, and they're controlling it and keeping it very tight."

Netflix is careful to guard its reputation, asking some of the companies it has worked with to avoid putting its logo on dart boards, paper napkins and doormats. But marketing executives said Netflix was increasingly open to lending its name to outside projects, including joint marketing campaigns and products based on its shows.

With so much content, Netflix has had trouble sustaining attention for some shows, which can come and go in a weekend of binge-watching, never to be mentioned again. The arrangements with the brands are one way it can keep attention focused on a given program. This month, Netflix posted a job listing for someone who would develop products, games and events to "drive meaningful show awareness" and make them "part of the zeitgeist for longer periods of time."

Netflix has a brand partnerships group, led by the executive Barry Smyth, which works with companies to use Netflix's name



A scene in the Netflix series "Daybreak," above, name-checked an array of brands, including Aquaphor and Tide, none of which paid for the mentions. Mike Myers, below, poked fun at product placement in the 1992 film "Wayne's World."



EVERETT COLLECTION

in promotional campaigns and has recently hired people away from Fox, Lionsgate and other media companies. In a recent job listing for a position in Europe, Netflix said it wanted to "amplify the scope and impact of our marketing campaigns when we work with other brands."

This summer, Netflix's biggest series, "Stranger Things," a supernatural sci-fi show set in the 1980s, struck deals with 75 companies. In one, Netflix teamed up with Baskin Robbins on new ice cream flavors like the chocolate-

### Giving shout-outs onscreen and flirting with companies on social media.

icing-topped Eleven's Heaven, named after the character Eleven, and Upside Down Pralines, a reference to the alternate dimension in the show, the Upside Down. In another deal, Coca-Cola briefly revived the failed 1985 beverage New Coke, which appeared in "Stranger Things" episodes, adding to its retro atmosphere.

The brands did not pay to appear on the show, but Netflix took a licensing fee for a "Stranger Things" promotion in London designed by the immersive-theater company Secret Cinema, which recreated a mall from the series that sold special cosmetics from Mac and products from Coach. The pop-up mall opened in November, four months after Netflix made the show's third season available to subscribers.

The platform does not need to make money from major companies to benefit from working with them. The idea is to fuel subscriptions by drumming up interest in its shows through alliances with "brands where we feel like their audience will love our content as much as our audience does," Netflix said in a statement.

In a conference call with analysts this year, the Netflix chief executive Reed Hastings said the "Stranger Things" promotions were intended "to get more people excited about 'Stranger Things,' so they join Netflix, they tell their friends about it."

The same logic may extend to product placements. Netflix has typically left such decisions up to individual producers, saying in a statement that "most of the brands that appear in shows and movies are added by creators who believe they add to the authenticity of the story." Netflix added that "instances where those placements are paid are rare and not a business focus for us."

That is a contrast with many of Netflix's rivals, which have actively courted companies with offers to display their products on-screen — even introducing them to showrunners and providing them with script drafts. Hulu, for instance, has a team dedicated to working brands into its shows, with the number of paid arrangements increasing 200 percent from 2018 to 2019, it said. Netflix does not have an equivalent team.

Still, products have appeared in Netflix shows for years (In 2013, a blogger posted a slide show of at least 57 corporate mentions on "House of Cards.") Research last year suggested that more brand-name products appeared on shows tagged as Netflix Originals compared with the ones it streams from other studios.

In the recent post-apocalyptic series "Daybreak," characters comment on the array of products stockpiled in an apartment: Red Bull energy drinks, Settlers of Catan board games, Tide Pods and more. None of the companies paid to be included. But such product placements can be a boon to producers who are looking to have realistic props in a scene without having to pay for them.

In the new Netflix holiday movie "The Knight Before Christmas," a character spends nearly three minutes exploring a Sony television and Amazon's Echo smart speaker. Both products were included free, but their presence set off a flurry of news articles and discussions on social media. Although much of the commentary was mocking, it drew attention to an otherwise standard seasonal film.

Such appearances are part of a long history of corporate cameos, like Ray-Ban in "Top Gun" and Reese's Pieces in "E.T. the Extra-Terrestrial." Mike Myers even joked about product placement in "Wayne's World": "I will not bow to any sponsor," he declared, posing with a slice from Pizza Hut.

Some streaming subscribers have deemed the constant presence of products to be annoying and "a big turnoff." And many companies have tired of the effort that goes into negotiating product placements, wondering whether a few TV commercials and billboards could reach the same number of people with less trouble.

Carrie Drinkwater, the executive director of integrated investments at the Mediahub agency, said her team once tried to fit a client into the plot of the Netflix show "Unbreakable Kimmy Schmidt," only to balk after the production company involved set an "astronomical" price.

"It's a lot of money to integrate," she said, "and it's really hard to do it in an authentic way, and you don't know how much it will resonate."

---

# As 'Bombshell' Opens, Talk of Kelly's Return

**FROM FIRST BUSINESS PAGE**

spoken. Ms. Kelly attended a screening of "Bombshell" in New York last month, according to two people familiar with the event, but made no public remarks about it.

Ms. Kelly declined to comment for this article. On Friday, in an Instagram post, she wrote that watching "Bombshell" was "an incredibly emotional experience for me," and that she had seen the film "once it was past the point of any possible edits, though there are certainly some I would have made."

Her quietude may be strategic. Behind the scenes, Ms. Kelly is pondering a route back into the national media, according to several people who requested anonymity in describing private conversations with the anchor.

In recent weeks, Ms. Kelly has begun to re-emerge. After months of communicating primarily via Twitter, she appeared on Tucker Carlson's prime-time show in October — to the chagrin of many of Mr. Carlson's Fox News colleagues — and has posted two self-produced interviews to her Instagram account, including one with the House minority leader, Representative Kevin McCarthy.

Still, these appearances are a far cry from Ms. Kelly's previous perch as a daily presence in American living rooms, first in prime time on Fox News and then, less successfully, in the 9 a.m. hour of NBC's "Today." On Fox News, she regularly drew two million to three million viewers a night; her Instagram videos have received a small fraction of that.

Ms. Kelly's portrayal in "Bombshell" may return the anchor to public consciousness, and the depiction is, on balance, a positive one. Ms. Theron's Kelly is a tack-sharp anchor who presses Donald J. Trump on his sexism during a major debate, puts up with verbal abuse from right-wing trolls (and newsroom colleagues) and ultimately comes forward about being harassed by Mr. Ailes, a testimonial that seals the once-invincible TV king's fate.

But like the real-life Ms. Kelly, the movie version has already proved divisive.

In The New York Times, Manohla Dargis described the on-screen Ms. Kelly as "a warrior" who "could lead an army or maybe a rebellion, if she chose," even as the character hesitates between principle and ambition. (The film also dings Ms. Kelly for lobbing softball questions at Mr. Trump in a 2016 prime-time interview.) But Ms. Dargis, as well as critics at BuzzFeed News and The Guardian, also faulted the filmmakers for playing down Ms. Kelly's role in Mr. Ailes's success; after all, she was a willing star on his network for years.

Her rocky tenure at NBC — where she clashed with colleagues and drew low ratings — has dimmed the likelihood of a return to broadcast television. Instead, Ms. Kelly has discussed potential jobs in digital news, including conversations with podcast production companies, according to the people familiar with her thinking.

Ms. Kelly, the people said, believes she can find a niche as an equal-opportunity skeptic amid a divided news media. She has told friends that she did not feel comfortable at her previous employers. "I felt like the Rachel Maddow of Fox News and the Sean Hannity of NBC," she has said.

Ms. Kelly is not currently restricted from working for another outlet, and she is still collecting the remainder of her roughly $30 million exit agreement with NBC, according to two people familiar with the terms of her deal. Other people who have spoken with her say they do not expect an imminent career announcement.

"She will be an asset to any television (or other) network who is seeking an exceptional journalist who has a gift of finding the right angle to a story or interview," said Eric Bolling, a former Fox News personality who now hosts a national affairs show for Sinclair Broadcast Group.

Any attempt to revive her fortunes, however, will face resistance.

It was nearly three years ago that Ms. Kelly made her splashy, $69 million deal with NBC, which gave her a Sunday night news-magazine show as well as a daytime slot and made her one of the richest personalities in television news. The move went sideways in a hurry.

An early broadcast of "Sunday Night With Megyn Kelly" sparked criticism after she interviewed the Infowars leader Alex Jones, and the show failed to find an audience. The sunny environment of morning television proved an odd fit for Ms. Kelly's prosecutorial persona; the anchor initially delivered poor ratings and caused a stir after she offended a guest, Jane Fonda, by asking about her plastic surgery; she later assailed Ms. Fonda on-air as "Hanoi Jane."

Since "Megyn Kelly Today" was canceled in October 2018, viewership for the hour has gone up 9 percent, according to Nielsen, a noticeable uptick when ratings across the board have gone down.

All the while, Ms. Kelly was attacked from the left for her comments over the years at Fox News, most prominently a segment where she insisted that Santa Claus is white. (The Santa uproar is mentioned several times in "Bombshell.") Last fall, she stunned co-workers by musing on-air that it was once appropriate for white people to dress up in blackface for Halloween. Days later, her show was canceled.

Ms. Kelly believed that NBC executives had used the blackface uproar as a pretext to fire her because they were uncomfortable with her reporting on the network's own harassment scandal, involving the "Today" host Matt Lauer, who had been fired after allegations of sexual misconduct in November 2017. On Twitter, she

### Any attempt to revive her fortunes will likely face resistance.

continues to suggest a double standard: Last week, she posted a video from an early-2000s episode of Comedy Central's "The Man Show" in which Jimmy Kimmel, now the host of ABC's late-night program, wore blackface to portray the basketball player Karl Malone.

"America's late night darling Jimmy Kimmel? Who every Hollywood star cozies up to?" Ms. Kelly tweeted. "The very same stars who then lecture the rest of us on woke culture? Whatever could he have done??"

Her attack on Mr. Kimmel is typical of the online persona Ms. Kelly has cultivated over the past year. In between updates on her family life in Manhattan and a newly adopted dog, Ms. Kelly has aimed spiky commentary at the mainstream media, including former NBC colleagues like Seth Meyers and the "Today" host Craig Melvin.

On Mr. Carlson's show in October, Ms. Kelly faulted NBC for failing to commission an independent investigation of its newsroom culture. Her appearance was a hit: More than four million people tuned in, higher than Mr. Carlson's average audience and making it the most-watched program in all of cable that night.

Her efforts since have not had the same reach. Ms. Kelly joined Instagram last month to promote an interview she secured with a young TV producer involved in a dust-up at ABC News over the network's decision, several years ago, not to air an investigative report about Jeffrey Epstein. The interview has been viewed about 272,000 times on YouTube.

On Mr. Carlson's show, Ms. Kelly said she was relishing spending time with her young children. But her comments suggested that "Bombshell," and Ms. Theron's portrayal of her, might not be the final word.

"I'll get back on that horse soon, because this has been fun," Ms. Kelly told Mr. Carlson, smiling. "I'll probably get back out there."



Charlize Theron, as Megyn Kelly, with Liv Hewson, as Lily Balin, in the movie "Bombshell." Ms. Kelly did not participate in the making of the film.

HILARY B GAYLE/LIONSGATE

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: ) Chapter 11
PES HOLDINGS, LLC, et al.,[1] ) Case No. 19-11626 (KG)
Debtors. ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

PLEASE TAKE NOTICE THAT on December 11, 2019, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (the "Disclosure Statement Order") (a) authorizing PES Holdings, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the Disclosure Statement for the Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for the solicitation, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **February 6, 2020, at 9:00 a.m.**, prevailing Eastern Time, before the Honorable Kevin Gross, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom Three, Wilmington, Delaware 19801.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date.** The voting record date is **December 6, 2019** (the "Voting Record Date"), which is the date for determining which Holders of Claims or Interests in Classes 3, 4, and 5 are entitled to vote on the Plan.

**Voting Deadline.** The deadline for voting on the Plan is on **February 3, 2020, at 5:00 p.m.**, prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' notice and claims agent, Omni Management Group, Inc. (the "Notice and Claims Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE X.F CONTAINS A THIRD-PARTY RELEASE.** THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE X.F OF THE PLAN ONLY IF YOU (A) DO NOT VOTE TO ACCEPT THE PLAN AND (B) RETURN A BALLOT CHECKING THE BOX TO "OPT OUT" FROM THE THIRD-PARTY RELEASES. SUBJECT TO ANY FINAL ORDER OF THE BANKRUPTCY COURT TO THE CONTRARY, REGARDLESS OF WHETHER THE COURT DETERMINES THAT YOU HAVE A RIGHT TO OPT-OUT OF THE RELEASES, IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, OR (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR VOTE TO REJECT THE PLAN, AND IN EITHER CASE, FAIL TO CHECK THE BOX TO "OPT OUT" FROM THE THIRD PARTY RELEASES, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE X.F OF THE PLAN.

**Plan Objection Deadline.** The deadline for filing objections to the Plan is **February 3, 2020, at 4:00 p.m.**, prevailing Eastern Time (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state the name and address of the objecting party, the nature of the Claim or Interest of such party, and the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related matter) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to

actually received on or before **February 3, 2020, at 4:00 p.m.**, prevailing Eastern Time: (i) **Debtors:** PES Holdings, LLC, 1735 Market Street, Philadelphia, Pennsylvania 19103, Attn.: John McShane; (ii) **Counsel to the Debtors:** Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899, Attn: Laura Davis Jones, James E. O'Neill, and Peter J. Keane -and- Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Edward O. Sassower P.C., Steven N. Serajeddini, and Matthew C. Fagen; (iii) **United States Trustee:** Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: David Buchbinder; (iv) **Counsel to the Official Committee of Unsecured Creditors:** Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attn.: Robert J. Stark and Max D. Schlan -and- Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attn.: Steven D. Pohl and Sharon I. Dwoskin -and- Elliott Greenleaf, P.C., 1105 North Market Street, Suite 1700, Wilmington, Delaware 19801, Attn.: Rafael X. Zahralddin-Aravena and Jonathan M. Stemerman; and (v) **Counsel to the DIP Lenders:** Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn.: Damian S. Schaible and Aryeh E. Falk -and- Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn.: Robert J. Dehney and Andrew R. Remming.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials.** The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM or flash drive), please feel free to contact the Debtors' Notice and Claims Agent, by: (a) calling the Debtors' restructuring hotline at (866) 989-6147 (domestic toll-free) or (818)-906-8300 (international toll) (ask for PES Restructuring); (b) visiting the Debtors' restructuring website at: https://cases.omniagentsolutions.com/pesholdings2019/; and/or (c) writing to PES Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.deb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement.** The Debtors will file the Plan Supplement (as defined in the Plan) on or before January 21, 2020 and will serve notice on all Holders of Claims or Interests entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN:** IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

Dated: December 16, 2019, Wilmington, Delaware /s/ Peter J. Keane
Laura Davis Jones (DE Bar No. 2436), James E. O'Neill (DE Bar No. 4042), Peter J. Keane (DE Bar No. 5503), **PACHULSKI STANG ZIEHL & JONES LLP**, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Telephone: (302) 652-4100, Facsimile: (302) 652-4400, Email: ljones@pszjlaw.com, jokeane@pszjlaw.com, jonneill@pszjlaw.com -and- Edward O. Sassower, P.C., Steven N. Serajeddini (admitted pro hac vice), Matthew C. Fagen (admitted pro hac vice), **KIRKLAND & ELLIS LLP**, **KIRKLAND & ELLIS INTERNATIONAL LLP**, 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: edward.sassower@kirkland.com, steven.serajeddini@kirkland.com, matthew.fagen@kirkland.com, Co-Counsel to the Debtors and Debtors in Possession

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan.