IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11626 (KG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Objection Deadline: February 3, 2020@ 4:00p.m.** |
|  |  | **Hearing Date: February 6, 2020 @ 9:30 a.m.** |

## UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), through his undersigned attorneys, objects to confirmation of First Amended Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates ("Plan", D.E. 827)[2] and states as follows:

### JURISDICTION

1.      Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine this objection.

2.      Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District.  Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems,*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

[2]    Terms shall have the same meaning given them in the Plan, Disclosure Statement or Solicitation Procedures Motion or Plan Supplement unless otherwise noted herein.

*Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest

standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v.*

*Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S.

Trustee as a "watchdog").

3.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor

plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and

disclosure statements.

4.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Plan and

the issues raised in this objection.

<u>**PRELIMINARY STATEMENT**</u>

5.      The Plan contemplates a sale of  all the Debtors' interests in four of the Debtors to

HRP Philadelphia Holdings, LLC ("HRP") for $240 million subject to adjustment.   HRP was

the winning bidder at an auction held on January 17, 2020.  The Plan proposes to pay

administrative, priority and DIP claims in full.  All remaining junior classes of unsecured claims

will receive interests in a liquidating trust.  Interest Holders will receive no dividend.

6.      The U.S. Trustee objects to confirmation of the Plan for a variety of reasons,

including but not limited to:

    a.   A liquidating Debtor is not entitled to a discharge;

    b.   The Plan seeks to improperly utilize FRBP 9019 to discharge claims;

    c.   The Plan contains broad release provisions that are inconsistent with the

       Bankruptcy Code;

    d.   The Plan seeks to avoid payment of statutory fees subject to 28 U.S.C. 1930;

## STATEMENT OF FACTS

7.      On July 21, 2019, the Debtors filed their petitions.  All the cases are being jointly administered.  On August 5, 2019, the U.S. Trustee appointed an Official Committee of Unsecured Creditors.

8.      The Debtors originally filed their Plan on October 10, 2019 (D.E. 462).  A Disclosure Statement, with no financial exhibits, was also filed on October 10, 2019.  A corrected Disclosure Statement was filed on October 10, 2019 ("Disclosure Statement", D.E. 465).  On December 11, 2019, the Court approved the Debtors' Disclosure Statement and solicitation procedures for the First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates.  The First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates was filed at Docket Entry 661.  The Second Amended Plan was filed on the evening of January 29, 2020, five days prior to the plan objection deadline.

9.      The Claims Bar Date was October 21, 2019. The Governmental Claims Bar Date was January 17, 2020 (See D.E. 255).  According to the website maintained for the Debtors' by its Claims and Noticing Agent, Omni, as of January 21, 2020, 525 claims have been filed in the aggregate amount of $1,872,098,165.91, including approximately $42 million in administrative claims, $119.5 million in priority claims and $865 million in unsecured claims.  According to the Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions ("Stein Declaration", D.E. 32), the aggregate secured debt existing on the Petition Date was $1,750,081.016.

10.      The Debtors filed their various Schedules of Assets and Liabilities on September 6, 2019 at Docket Entries 308-323.  Only two of the eight Debtors listed assets with a value in their Schedules.  Debtor North Yard Logistics, L.P. (19-11628) scheduled assets with a value of

$64,787,686.99 (D.E. 310).  Debtor Philadelphia Energy Solutions Refining and Marketing LLC (19-11633), the Debtor's primary operating entity, scheduled assets with a value of $903,413,030.37 (D.E. 473).  The aggregate value of the scheduled assets is $968,200,717.36. The value of the scheduled assets does not account for potential insurance claims recoverable by the Debtors.

11.    On January 21, 2020, the Debtors filed their Plan Supplement at Docket Entry 780 ("Plan Supplement").  Exhibit D to the Plan Supplement identifies HRP as the winning bidder. Exhibit E to the Plan Supplement contains the Asset Purchase Agreement. The Asset Purchase Agreement proposes to purchase the Debtors' interests in four of the Debtors, identified in the Plan as the Acquired Debtors.[3]   Exhibit I to the Plan Supplement is a Recovery Analysis. Exhibit J to the Plan Supplement is the Debtors' Liquidation Analysis.  These two analyses contain footnotes which discuss the Debtors' potential insurance recoveries but the amounts are not included in the two analyses.

12.    The Plan divides claimants into four unclassified and nine classified groups of claims.  Administrative, Priority, and Other Secured Claims are unimpaired.  Secured, General Unsecured, and Intercompany Claims are impaired. Interest Holders are deemed to reject the Plan.

13.    The Plan defines numerous reserve funds including a GUC Distribution Reserve (Plan I.A.65), Other Secured Claims Reserve (Plan I.A.97), Priority Claims Reserve (Plan I.A.111), Professional Fee Reserve (Plan I.A.116), and a Wind Down Reserve (Plan I.A.169). Neither the Recovery nor Liquidation Analysis contain line items that identify these funds.

---

[3] The  Asset Purchase Agreement proposes a sale of the Debtors' interests in PES Holdings, LLC,  North Yard Logistics, L.P., North Yard GP, LLC and Philadelphia Energy Solutions Refining and Marketing. I.A.1 of the Plan now identifies these entities as the Acquired Debtors.

14.     The definition of Releasing Parties (I.A.124) includes:  "…all Holders of Claims and Interests not described in the foregoing clauses (a) through (i); ***provided however,* that any Holder of a Claim or Interest that opts out of the releases in the Plan shall not be a 'Releasing Party'."** (emphasis in original).  The Releasing Parties include the Acquired Entities.

15.     The definition of Released Parties (I.A.123) includes:  "…any holder of a Claim or Interest that does not opt out of the releases in the Plan… ***provided however,* that any Holder of a Claim or Interest that opts out of the releases in the Plan shall not be a Releasing Party'."** (emphasis in original).  The proposed Released Parties include the Acquired Entities.

16.     Exhibit B of the Plan Supplement identifies more than 200 potential claims in five sub-exhibits the Debtors may assert against third parties.  The vast majority of these third parties are claimants.  Each sub-exhibit contains substantially the following language:  "Furthermore, unless otherwise released under Article X of the Plan or the Purchase Agreement, the Reorganized Debtors and the Liquidating Trust, as applicable, expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or the Reorganized Debtors owe money to them."

17.     Plan section IV.A. reads in full as follows:

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

18.      Plan Section X.A reads in full as follows:

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

19.      Section X.B of the Plan provides for a complete discharge of the Debtors.

20.      Plan Section X.F includes third party releases  and reads in pertinent part as

follows:

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties;(3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.** (Emphasis in original).

21.      Plan Section I.G. contains the following new language purporting to limit the

Debtors' post-confirmation liability for United States Trustee Quarterly Fees pursuant to 28

U.S.C. §1930.  Plan Section II.D provides: "For the avoidance of doubt, on or after the Effective

Date, no Acquired Entities shall be responsible for the payment of United States Trustee

Program Fees pursuant to 28 U.S.C. §1930." Plan Section IV.E.9 states: "Entry of the

Confirmation Order shall constitute entry of a final decree closing the chapter 11 cases of the

Acquired Entities pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022,

effective as of the Effective Date."

## ARGUMENT

### I. Bankruptcy Code Section 1141 Controls the Debtors' Discharge

22.    Section 1141(d)(3) of the Bankruptcy Code states:

> "The confirmation of a plan does not discharge a debtor if-
> (A) the plan provides for the liquidation of all or substantially all
> of the property of the estate;
> (B) the debtor does not engage in business after consummation of
> the plan; and
> (C) the debtor would be denied a discharge under Section 727(a) of
> this title if the case were a case under chapter 7 of this title."

23.    The Debtors here are not be entitled to a discharge under Section 727(a)(1), which

provides: "The court shall grant the debtor a discharge, unless the debtor is not an individual...".

The Debtors are not individuals.

24.    The means for the Plan's performance is the sale of the Debtors' interests in the

Acquired Entities to HRP. All remaining assets will be administered by the Liquidating Trust.[4]

The Debtors are not entitled to a discharge. As appears from a review of the Debtors'

Organizational Structure Chart attached hereto as Exhibit A, the sale is a sale of substantially all

the assets of Debtor PES Ultimate Holdings, Inc., the parent entity of the Acquired Debtors. The

Acquired Entities are all those entities shaded in gray except for PES Administrative Services,

---

[4] Section IV.F.1 of the Plan provides in pertinent part that: "…the assets of the Debtors that are not Acquired
Entities other than assets sold to the Purchaser pursuant to the Purchase Agreement, as well as the assets defined as
"Excluded Assets" in the Purchase Agreement, shall vest in the Liquidating Trust…" Section IV.H establishes the
Liquidating Trust and provides: "The Liquidating Trust will have no objective to continue or engage in the conduct
of a trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the
Liquidating Trust." Section VII.A of the Plan provides for a Liquidating Trust Board to: "…wind down the
business and affairs of the Debtors' Estates…". Plan Section VII.B, entitled Wind Down, requires the Liquidating
Trust to take actions to effectuate dissolution of the Debtors.

LLC, a Debtor with no assets.  Because all the Debtors' assets are being sold or liquidated, the Debtors are not remaining in business and are not entitled to a discharge.

25.    A discharge provision in a liquidating plan was not approved in the case of *In re South Canaan Cellular Investments, Inc.*, 427 B.R. 44 (Bankr. E.D. Pa. 2010).  A discharge was not permitted in the case of *In re Repurchase Corporation*, 2008 WL 4379035 (N.D. Ill. 2008) where an insider proposed to purchase reorganization equity and to then distribute the funds raised to pay creditor dividends while retaining the debtor's NOLs.   Discharge was denied because the debtor was not engaged in business and not eligible for a discharge.  In *In re Western Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003), a corporate debtor proposed a plan to assign its insurance rights to a creditor trust and then wind up its affairs.  This was found to not be engaging in sufficient business to entitle the debtor to a discharge.  The Court stated:  "There would be no substance left to 11 U.S.C. § 1141(d) (3) if the level of assets and business activity retained by Western Asbestos entitled it to a discharge."  313 B.R. at 853.

26.    Section X.B of the Plan should be stricken in its entirety.

**II.**        **Releases**

**A.**        **Third Party Releases**

27.    There are numerous ways in which the proposed third party releases, the Debtor releases and exculpation provisions set forth in the Plan are contrary to the standards set forth by this Court in *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011), *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011), and other applicable law.

28.    Some Courts in this District have determined that third party releases of non-debtors should be allowed provided that they are consensual.  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011), *citing, inter alia, In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be

based on consent of the releasing party); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (holding that the release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan).  Recently, in Emerge Energy Services, LP, 2019 Bankr. Lexis 3717, it was held that unless the moving party can show that it can be shown that silence may constitute acceptance under basic contract principles, then silence cannot constitute consent:  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt out simply do not qualify." (2019 Bankr. Lexis 3717 at 55).  Here, a creditor is providing a third-party release unless they opt out of the third-party release provisions.  Silence, however, may no longer be construed as acceptance.

29.     Class 9 Interest Holders are deemed to reject the Plan and do not get to vote but are required to object to the Plan or they will be deemed to have consented to the third-party releases.  Requiring affirmative consent for the shareholders in these cases is important for two reasons.  First, the shareholders are not receiving any distribution under the Plan, and therefore no consideration for giving any releases. Second, requiring an affirmative expression of consent helps to ensure there is true consent, rather than consent assumed by silence, which could be caused by factors such as the confirmation hearing notice being wrongly addressed or misdelivered, or other mail failures or delays.

30.     Under the holding of *Washington Mutual*, and the other cases cited above, the procedure where the interest holders must return an opt-out form in order to opt-out of the release provisions must be rejected. The shareholders "are not entitled to vote in the first place" (*Washington Mutual, Inc.,* 442 B.R. at 355), because they are deemed to reject the plan. And if "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release"

(*id.*), then failing to return an opt-out form cannot be a manifestation of such consent. Thus, the third party releases the Debtors seek to impose on the interest holders are not consensual. Here, Interest Holders did not get to vote, and were not given the opportunity to opt out of the releases. Rather, although not required to do anything in the first place, they are required to actually object to the releases or be bound by them.

31.     There are certain categories of persons and entities included among the Released Parties, such as the Debtors' directors, officers and employees, and similar members of the Debtors or other parties that the Third Circuit Court of Appeals and this Court have already determined are not entitled to non-consensual third party releases. *See Continental Airlines*, 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Washington Mutual*, 442 B.R. 314 at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors , . . . . [as] [t]he only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan, [which] activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated) . . . ."); *In re Genesis Health Ventures,* Inc., 266 B.R. 606–07 (Bankr. D. Del. 2001) ("[T]he officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").   The same logic is also applicable to third party releases of the Debtors' professionals who, like the Debtors' directors and officers, will be protected by the exculpation provision.  *See Wash. Mut.*, 442 B.R. at 354.

32.     The Acquired Entities are Debtors in these proceedings. They are not entitled to a discharge, directly or indirectly.  A Debtor may not do by indirection what it cannot do directly. This principle was most recently restated by the Supreme Court in the case of Law v. Siegel, 571 U.S.415 (2014).  In discussing the principle that Section 105(a) of the Bankruptcy Code may not

be used to override explicit mandates of the Bankruptcy Code, the court noted: "That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." 571 U.S. at 421.   A plan may not rewrite the Bankruptcy Code. *See In re Beyond.com*, 289 Bankr. 138 (Bankr. N.D. CA. 2003). The attempt to provide a Debtor Release to the Acquired Entities is nothing more than an effort to obtain a discharge indirectly because the Debtors are not entitled to a discharge.[5]   The Acquired entities should not be released.

33.    The Debtors have the burden of justifying the validity of the non-consensual third-party releases for every party to be released.  Because an evidentiary predicate is necessary to approve the third-party releases, the U.S. Trustee reserves argument on this issue until the record at the confirmation hearing is closed.

**B.**    Debtors' Releases

34.    The Plan provides releases by the Debtors and their estates of many non-debtor parties.  Pursuant to this Court's decision in *Tribune*, 464 B.R. 126 (Bankr. D. Del. 2011), and *Washington Mutual,* 442 B.R. 314 (Bankr. D. Del. 2011), among others, the five factors set forth in In re *Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) should be considered to determine whether, notwithstanding § 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities.  *See Tribune* 464 B.R. at 186; *Wash. Mut.*, 442 B.R. at 346; *In re Spansion,* 426 B.R. 114, 142-43, n. 47 (Bankr. D. Del. 2010); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004).

35.    In the present cases, neither the Plan nor the Disclosure Statement address

---

[5] The Acquired Debtors may not receive a discharge or a release from themselves.  However, this does not preclude the sale or confirmation order from including appropriate free and clear language and customary successorship provisions in favor of the purchaser.

whether any of the *Zenith* factors are met for any of the parties who will receive releases from the Debtors or claimants.  Absent a showing, and appropriate finding by the Court, that each proposed Released Party has made a substantial contribution to the Plan,[6] and that the other elements of *Zenith* have been met, the releases given by the Debtors render the Plan  not confirmable.

36.     The Debtors have the burden to establish whether the *Zenith* factors have been met as to each of the non-debtors who are the beneficiaries of the Debtor Releases. Because an evidentiary predicate is necessary to approve the Debtor Releases, the U.S. Trustee reserves argument on this issue until the record at the confirmation hearing is closed.

37.  For the reasons aforesaid, the Acquired Entities should not be Released Parties.

**C.     The Proposed Compromise Language is Overbroad**

38.     Plan Section IV.A., entitled General Settlement of Claims, reads in full as follows:

> Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

39.     Plan Section X.A reads in full as follows:

---

[6]  An example of a "substantial contribution" can be found in *Coram*, where this Court, after examining the *Zenith* factors, allowed the debtors to release noteholders who had contributed $56 million in funding to the plan, which funds allowed the debtors to repay in full all creditors other than the noteholders, as well as make a significant distribution to the debtors' shareholders. 315 B.R. at 335.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

40.     The first paragraph of Plan Section IV.A, and similar language contained in Sections X.A and X.F of the Plan, purport to impose the settlement standards of FRBP 9019 upon all claims and interests.  The settlement of claims against a debtor subject to FRBP 9019 should be limited solely to those parties who have expressly entered into a settlement agreement. Bankruptcy Code Section 1123(b)(3) allows a Debtor to settle claims it has against others but not claims against the Debtor.  Claims against a Debtor are subject to the standards of Bankruptcy Code Sections 1129 and 1141.

41.     FRBP 9019 reads in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."   The standard for approval of a settlement is subject to the sound discretion of the court guided by the following criteria as set forth in *In re Martin*, 91 F. 3d 389 (3rd Cir. 1996):  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." 91 F.3d at 393 (citations omitted).

42.     Black's Law Dictionary defines compromise or settlement as follows: "An agreement between two or more persons to settle matters in dispute between them; an agreement for the settlement of a real or supposed claim in which each party surrenders something in concession to the other."  Black's Law Dictionary, 10th ed.

43.     Bankruptcy Code Section 1123(b)(3)(A) allows for a plan to: "…provide for- the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." However, the converse is not true.  This provision does not permit the Debtor to settle claims against it.  That is, absent an express settlement agreement between parties, the standards of Bankruptcy Code Section 1129 prevail over the standards of FRBP 9019.  The court must find that the compromise is fair and equitable and the plan otherwise satisfies the provisions of Bankruptcy Code Section 1129.  Included within Bankruptcy Code Section 1129(b)(1) is the requirement that the court find a plan to be "fair and equitable."

44.     In denying confirmation, Judge Walsh observed in *In re Nutritional Sourcing Corporation*, 398 B.R. 816 (Bankr. Del. 2008): "When evaluating a settlement provided for under a plan of reorganization, 'the Bankruptcy Court must determine that a proposed compromise forming part of a reorganization plan is fair and equitable'." 398 B.R. at 832. Accord:  *In re New Century TRS Holdings*, 390 B.R. 140 (Bankr. Del. 2008); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. Del. 2004).

45.     Other than an express settlement between a debtor and claimant that is subject to approval pursuant to FRBP 9019, Bankruptcy Code Section 1141 governs a debtor's discharge. In denying approval of a proposed third party release provision in a plan where the court had previously approved a settlement agreement pursuant to FRBP 9019, the non-debtor contended that language in the approved settlement resolved the issue, but the court disagreed, holding:

"Thus, the 9019 Order did not resolve with finality the treatment of the Bondholders in the Debtor's plan of reorganization. That could be accomplished only through the plan confirmation process…" (*In re Lower Bucks Hospital*, 471 B.R. 419, 457 (Bankr. E.D. PA. 2012)). In *Coram Healthcare Corp.*, supra, the Court found the standards of FRBP 9019 inapplicable to proposed third party releases: "…a release of claims by third parties against a non-debtor cannot be approved under the above standards." (315 B.R. at 335). The Court also disapproved a release proposed by the Trustee of the Debtor finding: "No release of the Debtors is appropriate, since the Debtors are entitled only to the discharge provided by section 1141(d)." (315 B.R. at 337).

46.    Sections IV.A., X.A and X.F of the Plan, should be revised to clearly indicate that the settlement standards of FRBP 9019 apply only to the express settlement agreements entered into between the Debtors and a settling party, and not, as presently proposed, to the entire universe of claims and interests. The Debtors' discharge is governed solely by Section 1141(d), and, as noted, the Debtors are not entitled to a discharge here.

## III.    **Miscellaneous Issues**

### A.  **Plan Supplement**

47.    For the more than 200 entities identified in Exhibit B of the Plan Supplement against whom the Debtors or Liquidating Trust may assert claims, the effect of the  Plan Supplement language identified in paragraph 16 above is to exclude the listed entity as a Released Party while remaining a Releasing Party unless the entity opts out of the releases. Thus, notwithstanding the language of the Plan the proposed mutual releases are illusory as to any claimant listed in Exhibit B of the Plan Supplement. This is a material change to the Plan buried in the exhibits to the Plan Supplement filed two weeks prior to the voting deadline and was made without the Debtors having complied with the provisions of 11 U.S.C. §1127, this language should be stricken from the Plan Supplement. This amendment, along with the omission of the

potential insurance recoveries from the financial analyses contained in the Plan Supplement also raise a question as to whether the Debtors provided adequate information in the Plan Supplement.

**B.    United States Trustee Quarterly Fees**

48.    United States Trustee Quarterly Fees are statutory.  Pursuant to 28 U.S.C. §1930(a)(6), the fees are payable until the earliest of the time that the case is closed, converted or dismissed.  Section 1129(a)(12) of the Bankruptcy Code requires that all quarterly fees have been paid and will be paid as a condition of confirmation.  The proposal that the fees shall not be payable after confirmation (Plan IV.E.9) or the Effective Date (II.D) and that entry of the Confirmation Order shall close the cases of the Acquired Entities is not appropriate.  Neither entry of the Confirmation Order nor the Effective date are dates authorized by the Statute for the termination of quarterly fees.  The Debtor may not rewrite statutes in the Plan.  Further, the Debtor may not obtain a Final Decree and close the case until the estate is fully administered.

49.    Federal Rule of Bankruptcy Procedure Rule 3022 requires that an estate be fully administered before a Debtor may receive a Final Decree.  Local Bankruptcy Rule 3022-1 requires a written motion after a confirmed plan has been fully administered.  The local rule requires a minimum 21day notice.  A provision included in an amended Plan filed five days prior the plan objection deadline does not comply.  Nor could it as the Plan has not yet been confirmed.  Plan Sections II.D and IV.E.9 should be stricken as inappropriate and premature.  When the Debtors' estates have been fully administered, then the Debtor may move for a final decree.

## **CONCLUSION**

50.     The Plan should not be confirmed.  The Debtors' discharge is governed by Section 1141 of the Bankruptcy Code.  Liquidating Debtors are not entitled to a discharge, directly or indirectly.  Absent proof of the contributions made by the proposed Releasees, the Debtor Releases should not be approved.  The third-party release provisions should not be approved as they are not consensual.  Federal Rule of Bankruptcy Procedure 9019 should be applied only to creditors who have expressly entered into a settlement.  U.S. Trustee quarterly fees are payable until the earlier of the time a case is converted, closed or dismissed.  The Plan may not rewrite the statute.

51.     The U.S. Trustee leaves the Debtors to their burden of proof.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court issue an order denying confirmation of the Plan, and/or granting such other relief as this Court deems appropriate, fair and just.

Dated: January 31, 2020
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**Region 3**

By:  */s/ David L. Buchbinder*
David L. Buchbinder, Esquire
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
david.l.buchbinder@usdoj.gov