# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| PES HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
| Debtors. | ) (Jointly Administered) |

## UNITED STATES' PROTECTIVE OBJECTION TO DEBTORS' PLAN OF REORGANIZATION, PLAN SUPPLEMENT AND CURE AMOUNTS

1.   The United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), hereby files this Protective Objection to Debtors' Plan of Reorganization (as amended) ("Plan").  [Second Amended Plan of Reorganization [Docket No. 827] (January 20, 2020).]   The United States has been in discussions with Debtors to try to resolve its objections and believes it has resolved most of EPA's objections as set forth in Appendix A and is hopeful that an agreement will be reached on remaining issues.  Given the fast-moving pace of this case and numerous updates to the Plan and related documents (which are continuing) and to avoid any misunderstandings, the United States hereby files this protective objection for EPA.  As more fully explained below, without the language that has been agreed upon and the other requested corrections and clarifications, the Plan would not be confirmable because of its failure to meet the requirements of 11 U.S.C. §§ 1123(a)(5), 1129(a)(1), 1129(a)(3), and 1129(a)(11).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC ("PESRM") (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

1

2. The United States, through EPA, enforces environmental laws including the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992, the Oil Pollution Act, ("OPA"), 33 U.S.C. §§ 2701-2762, Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671, and the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601-2697.

3. PESRM owned and operated a refinery with a street address of 3144 Passyunk Avenue, Philadelphia, Pennsylvania (the "Philadelphia Refinery"). The property currently constituting the Philadelphia Refinery includes two once-separate refineries (Point Breeze and Girard Point) and has been used for refining operations for approximately 150 years. The Philadelphia Refinery is adjacent to residential neighborhoods and is approximately 3.5 miles south of Downtown Philadelphia.

4. During the early hours of Friday, June 21, 2019, the equipment at the Philadelphia Refinery that uses highly toxic hydrofluoric acid ("HF") to convert isobutane and alkenes into alkylates for gasoline – known as the HF alkylation unit or the "433 HF Unit" – experienced a sudden loss of containment causing flammable process fluid containing HF to release from the 433 HF Unit, forming a ground-hugging vapor cloud. This cloud ignited, leading to three violent explosions, the last of which resulted in the rupture of a vessel containing flammable process material. This vessel broke into three large fragments which were launched into the air. Two fragments, one weighing about 23,000 pounds and the other 15,500 pounds, landed within the boundaries of the Philadelphia Refinery; the third, weighing approximately 38,000 pounds, flew across the Schuylkill River.

5. Important environmental concerns that need to be addressed at the Philadelphia Refinery include, but are not limited to: the safe storage and handling of the equipment and process materials remaining at the Philadelphia Refinery and compliance with existing regulatory (e.g. fence-line monitoring, Renewable Fuels Standards) and cleanup obligations pursuant to existing consent decrees and settlement agreements with EPA.

6. On March 21, 2006, the United States and other plaintiffs entered into a consent decree with Sunoco, the then-owner of the Philadelphia Refinery, to address numerous violations of the CAA. United States v. Sunoco, Inc., No. 05-02866 (E.D.PA 2006) (the "2006 Consent Decree"). By the Fourth Amendment to the 2006 Consent Decree, on April 18, 2013, PESRM became a party to the 2006 Consent Decree.

7. In 2012, prior to purchasing the Philadelphia Refinery, PESRM entered into an administrative Settlement Agreement with the United States. In re Philadelphia Energy Solutions LLC and Philadelphia Energy Solutions Refining and Marketing LLC, CERC/RCRA-03-2012-0224DC ("PPA Administrative Agreement"). The PPA Administrative Agreement provided for the scope of PESRM's cleanup obligations at the Philadelphia Refinery.

8. The CAA includes the Renewable Fuel Standard ("RFS") Program which seeks to reduce the nation's dependence on foreign oil and increase the production of clean renewable fuels. See Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, 1069 (codified at 42 U.S.C. § 7545(o)); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492, 1521-24 (codified at 42 U.S.C. § 7545(o)(2)). The RFS Program regulations are codified at 40 C.F.R. Part 80, Subpart M (the "RFS regulations") and provide for a program to facilitate compliance with the renewable fuel mandate including by refineries not using sufficient quantities of renewable fuels. 42 U.S.C. § 7545(o)(5). The RFS Program created renewable

identification numbers or RINs, which "represent the basic framework for ensuring that the statutorily required volumes of renewable fuel are used as transportation fuel in the U.S." 75 Fed. Reg. 14670, 14684 (Mar. 26, 2010).  The RFS regulations require gasoline and diesel refiners and importers (known as "obligated parties") to blend renewable fuels into transportation fuel or obtain RINs to meet their Renewable Volume Obligations ("RVOs"), which are based upon the volume of the gasoline and diesel fuel that the obligated party produces or imports into the United States. See 40 C.F.R. §§ 80.1406(b), 80.1407.  Obligated parties demonstrate compliance with their RVOs by producing renewable fuel and generating RINs themselves or acquiring RINs from other parties. To comply with the law, obligated parties must demonstrate to EPA that they have acquired and subsequently retired a sufficient number of RINs to meet their RVOs. See 40 C.F.R. § 80.1427(a)(1). See generally Nat'l Petrochemical & Refiners Ass'n v. EPA, 630 F.3d 145 (D.C. Cir. 2010).

9. On January 21, 2018, many of the Debtors ("2018 Debtors") filed a petition for bankruptcy in this Court. In re: PES Holdings, LLC 18-10122 (KG).  On April 5, 2018, this Court approved and entered as a final judgment a Consent Decree and Environmental Settlement Agreement ("2018 Consent Decree") relating to Debtors' failure to comply with the RFS Program.  [Docket No. 376].   The 2018 Debtors emerged from bankruptcy on August 7, 2018. [Docket No. 521]. Through March 2019, Debtors complied with the RINs retirement obligations set forth in the 2018 Consent Decree.

10. On July 21, 2019, Debtors filed this second bankruptcy case.  No. 19-11626 (Bankr. D. Del.).

11. As indicated in the solicitation version of the Debtors' Disclosure Statement at 28, PESRM failed to meet its RIN retirement obligation of approximately 154 million RINs to

satisfy its RVOs for the period of January 1, 2019 through June 30, 2019.  The deadline for such retirement was September 30, 2019 under the 2018 Consent Decree and will be March 31, 2020 under the CAA.  See 40 C.F.R. §§ 80.1427(b) and 80.1451(a)(1).

12. On January 17, 2020, the United States filed Protective Proofs of Claim on behalf of EPA for the recovery of response costs incurred and to be incurred by the United States under CERCLA, 42 U.S.C. §§ 9601-9675; for civil penalties under Section 113(b) of the CAA, 42 U.S.C. § 7413(b); for stipulated penalties pursuant to a judicial consent decree under the CAA; and for stipulated penalties pursuant to a consent decree and environmental settlement agreement entered by this Court in 2018.  In addition, with respect to compliance obligations/equitable remedies that are not within the Bankruptcy Code's definition of "claim," 11 U.S.C. § 101(5), the Proof of Claim was filed in a protective fashion only.  The Proofs of Claim state that they are without prejudice to any right under 11 U.S.C. § 553 or otherwise to set off or recoup against any debts owed (if any) to Debtors, including but not limited to in Philadelphia Energy Solutions Refining and Marketing, LLC, No. 19-510T (Fed. Cl.), and that the United States asserts a right of setoff against any debts owed (if any) to PESRM relating to Philadelphia Energy Solutions Refining and Marketing, LLC, No. 19-510T (Fed. Cl.).

13. On December 11, 2019, Debtors filed their First Amended Plan.  [Docket No. 661].  A Plan Supplement and Purchase and Sale Agreement were filed on January 22, 2020. [Docket No. 780].  A First Amended Plan Supplement with a list of Executory Contracts to be assumed with cure amounts was filed on January 28, 2020.  [Docket No. 819].  A Second Amended Plan was filed on January 29, 2020. [Docket No. 827].

14. The Second Amended Plan and related documents as filed were not sufficiently clear on the status of the 2012 PPA Administrative Agreement and 2006 Consent Decree.  The

5

Plan and related documents provide that they are executory contracts with zero cure amounts and the Plan has language that certain covenants and agreements are superseded.  First Amended Plan Supplement [Dk. No. 819-2]; Plan Article XIV.H.  The Plan as filed had overbroad discharge and release language that goes beyond what is permitted under the Bankruptcy Code.[2]  Plan at Article X.  The Plan as filed enjoined and failed to preserve any right of the United States of setoff or recoupment.  Plan at Articles IV.I, V.C, X.B, X.H.

15.    The Plan provides for future briefing and determination of whether the RINs obligations under the 2018 Consent Decree and CAA are non-dischargeable compliance obligations or dischargeable claims.  Plan at Article VI.K.  A briefing schedule has not yet been set.  The Plan as filed provided for a toggle mechanism, whereby either (1) the Acquired Entities or the Liquidating Trust as successor to Debtors will comply if required to, or (2) the liabilities will be treated as general unsecured claims depending on how the Court rules.  Plan at Article VI.K.  Unfortunately, as filed, neither the Plan nor Plan Supplement provided any mechanism for compliance if that is what the Court requires.  And other language may have been contended to permit the Liquidating Trust to distribute payments to creditors that would result in the Liquidating Trust being unable to comply with an order from this Court requiring compliance.  Plan at Articles II.C, IV.E, IV.H, VIII.  Toggle option (2) may have also been contended to fail to preserve any right of the United States of setoff or recoupment under that option.  Plan at Articles V.C, VI.K, VIII.D, X.B, X.H.

---

[2] The United States has submitted an opt out of the non-debtor release under the Plan.  Order (I) Approving The Adequacy of the Disclosure Statement, (II) Approving The Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief [Dk. No. 671]; and Article I(123-124), Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates, [Dk. No. 827].

**Protective Objections and Status**

16.     The Plan's discharge and release provisions were overbroad as filed and violative of the Bankruptcy Code but the United States believes that Debtors have agreed to corrective language for Governmental Units as set forth in Appendix A.

17.     Section 1141(d)(1) of the Code provides that "the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation[.]" The term "debt" is defined as "liability on a claim," 11 U.S.C. § 101(12).  Many compliance obligations are not monetary claims or equitable remedies within this definition, because the breach of these obligations does not "give[] rise to a right to payment," 11 U.S.C. § 101(5)(B).   Congress specified that where non-bankruptcy law provides an equitable remedy for performance and recognizes no alternative right to payment for a breach of performance, the equitable remedy survives bankruptcy. See 11 U.S.C. § 101(5)(B); See In re Ben Franklin Hotel Associates, 186 F.3d 301, 305 (3d Cir. 1999). Congress thus protected holders of such important rights to equitable remedies and decreed that they would not be forced to accept suboptimal monetary recoveries. See  In re Altegrity, Inc. 562 B.R. 253, 261 (Bankr. D. Del. 2016) ("I must determine whether a monetary award is a viable alternative to this type of relief" (citing In re Ben Franklin, 186 F.3d at 306)).  See also In re Continental Airlines, 125 F.3d 120 (3d Cir. 1997); In re Udell, 18 F.3d 403, 405, 408-10 (7th Cir. 1994); In re Davis, 3 F.3d 113, 116 (5th Cir. 1993).[3]

18.     Accordingly, the Plan as filed violates Section 1129(a)(1) insofar as it suggests that any other liabilities that do not fall within the Code's definition of claim are dischargeable

---

[3] *See also  In re Torwico Electronics, Inc.*, 8 F.3d 146 (3d Cir. 1993) (Injunctive obligation to remedy pollution not a claim where there is an ongoing threat.); *In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir. 1991) ("[A] cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim."); *United States v. Apex Oil Co.*, 579 F.3d 734 (7th Cir. 2009) (Request for injunction requiring groundwater cleanup not dischargeable because discharge of equitable remedies limited to where breach gives rise to right to payment.); *In re Mark IV Indus., Inc.*, 438 B.R. 460 (Bankr. S.D.N.Y. 2010), *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011).

7

claims.  Here Article X.B of the Plan states that the Plan seeks to discharge or release "Causes of Action," "liabilities," "obligations," and "rights."  "Causes of Action" is defined to include "rights," "obligations,' "liabilities," "offsets," "recoupment" and "setoffs" "of any kind or character whatsoever."  Plan at 2.  These provisions violate Sections 1141(d)(1) and 1129(a)(1) of the Code because they purport to discharge far more than is allowed by the Code.  In addition, Section 1141(d)(3) of the Code precludes any discharge at all for a liquidating debtor, 11 U.S.C. § 1141(d)(3).

19. The Plan also violated Section 1129(a)(1) and is proposed by means forbidden by law in violation of Section 1129(a)(3) to the extent that Article X and Plan Definitions at 2 might be misconstrued to limit any entity's liability as a future owner or operator of their responsibility to protect public health and safety when owning or operating property.  Nothing in the Bankruptcy Code permits a future owner or operator of property to evade its obligation to comply with environmental law as the owner of contaminated or defective property.

20. It is well-established that anyone who owns or operates property acquired from a debtor must comply with environmental law. No one is entitled to ignore hazards or disregard laws that protect the public and the environment. See, e.g., Ohio v. Kovacs, 469 U.S. 274, 285 (1985) ("[A]nyone in possession of [a] site . . . must comply with . . . environmental laws . . . Plainly that person . . . may not maintain a nuisance, pollute the waters . . . [,] or refuse to remove the source of such conditions."); In re General Motors Corp., 407 B.R. 463, 508 (S.D.N.Y. 2009) (a free and clear purchaser "would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility"); In re CMC Heartland

Partners, 966 F.2d 1143 (7th Cir. 1992) (a reorganized debtor that owns property that was contaminated prior to confirmation is liable to EPA as the present owner of the property).

21.     While it appears that the Acquired Companies will assume environmental liabilities as an owner or operator of property, the Plan and related documents had some unclear language such as language wiping out broadly defined "liens" which sometimes fails to exclude the Permitted and Transferred Liens (see, e.g., Plan at 23, 24), improper listing of consent decrees or administrative agreements as executory contracts with zero cure amounts,  First Amended Plan Supplement [Docket No. 819-2], and language that the Plan supersedes certain covenants and agreements, Plan at Article XIV.H.  Moreover, the Plan purports to allow potential changes in this regard even after the confirmation hearing and before the Effective Date.  See Plan Definitions at 9, 11; First Amended Plan Supplement [Docket No. 819] ("Certain documents, or portions thereof, contained or referenced in this First Amended Plan Supplement remain subject to continuing negotiations among the Debtors and parties in interest. The Debtors reserve all rights to amend, revise, or supplement the First Amended Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.").  Without corrective or clarifying language, the Plan would be in violation of Sections 1129(a)(1) and (3).

22.     Likewise, nonbankruptcy law requirements for approval of any transfer of environmental permits or licenses, requests to terminate permits or licenses, or to discontinue obligations thereunder are also important protections of public health and safety that need to be complied with. There is no authority under bankruptcy law to avoid these important safeguards and any language providing otherwise violates Sections 1129(a)(1) and (3).

23. Section 553 of the Bankruptcy Code expressly preserves creditors' rights of setoff which are not discharged in bankruptcy. See I.R.S. v. Luongo, 259 F.3d 323, 333 (5th Cir. 2001); In re Delaurentis Entertainment Group, Inc., 963 F.2d 1269, 1276-77 (9th Cir. 1992); In re Davidovich, 901 F.2d 1533, 1539 (10th Cir. 1990); In re Bridge Information Sys., Inc., 314 B.R. 421, 430 (E.D. Mo. 2004); 11 U.S.C. § 553 ("Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debtor. . . .").

24. The Plan here includes "setoff" in its definition of "Cause of Action" and thus attempts to override the express reservations set forth in Section 553 through the discharge and release provisions of the Plan. These provisions of the Plan are contrary to the Code and thus should not be approved. 11 U.S.C. § 1129(a)(1). Indeed, the EPA's Proofs of Claim have already preserved EPA's right of setoff including specifically a right of setoff against debts owed (if any) to Debtors relating to Philadelphia Energy Solutions Refining and Marketing, LLC, No. 19-510T (Fed. Cl.) and the United States expects to file a further notice relating to setoff before the confirmation hearing.

25. The United States objects to any treatment of consent decrees or administrative settlement agreements as executory contracts as they are more than mere contracts. See United States v. ITT Continental Baking Co., 420 U.S. 223, 236 (1975) (noting that consent decrees and administrative orders on consent "are motivated by threatened or pending litigation and must be approved by the court or administrative agency"). Debtors cannot, therefore, purport to take any action with regard to its obligations under decrees or administrative agreements under Section 365 or to try to supersede such decrees and agreements under Article XIV.H. For example, Administrative Orders "ha[ve] the force of law as surely as if [they] had been enacted directly by

Congress." FDIC v. Frates, 44 F. Supp. 2d 1176, 1201 (N.D. Okla. 1999). "While rules of contract may be employed as tools of interpretation, administrative orders derive their legal power from congressional and administrative mandate and not from contract law." United States v. American Nat'l Can Co., 126 F. Supp. 2d 521, 531 (N.D. Ill. 2000). The obligations of a responsible party pursuant to a consent decree or an EPA administrative agreement do not depend on EPA's performance, but arise from judicial or administrative mandate. Requirements to comply with the law are simply not governed by Section 365 and bankruptcy courts do not have authority to declare them superseded. Moreover, even if the 2006 Consent Decree were an executory contract the cure amount for stipulated penalties is not zero as indicated in EPA's proof of claim. And providing for a zero cure amount for the PPA Administrative Agreement does not make sense given the ongoing cleanup requirements under that Administrative Agreement. Even Section 365 of the Code requires adequate assurance of future performance and therefore does not permit any attempt to use a cure amount to circumvent future compliance. See 11 U.S.C. §§ 365(b)(1)(A) & (f)(2). The Plan's treatment of consent decrees and administrative agreements as executory contracts or as superseded is contrary to the Code and thus should not be approved. 11 U.S.C. § 1129(a)(1).

26.    As noted above, the Plan and related documents as filed did not contain a mechanism for compliance with the RINs obligations if so required by this Court. The buyer and Debtors do not agree as to who will be responsible. There was an unacceptable risk that creditors would be able to strip the Liquidating Trust's limited assets to pay creditors so that it would not be able comply with a future order of this Court. Indeed, several Plan provisions could be cited in an attempt to undertake such distributions. Plan at Articles II.C, IV.E, IV.H, VIII.

27.     If the Court finds that the Debtors' obligations under the 2018 Consent Decree and the CAA are non-dischargeable compliance obligations, Debtors' Plan as filed failed demonstrate how compliance would be obtained even though the Plan provides for such compliance.  Section 1129(a)(11) of the Code requires that for a plan to be confirmed, Debtors must show that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Section 1129(a)(11) establishes what is commonly known as the "feasibility" requirement. This Court cannot approve a plan unless it is reasonably likely to succeed. In re American Capital Equipment LLC, 688 F.3d 145, 156 (3d Cir. 2012); In re T-H New Orleans Ltd. Partnership, 116 F.3d 790, 801 (5th Cir. 1997).   Similarly, Section 1123(a)(5) requires that a Plan provides adequate means for its implementation.  11 U.S.C. § 1123(a)(5).  See In re Walker, 165 B.R. 994, 1003 (E.D.Va. 1994).

28.     The test for feasibility is whether the Plan proposes a realistic and workable framework for achievement of what it proposes as a practical matter under the facts.  Success does not have to be guaranteed but must be reasonably likely and cannot depend on the speculative results of future litigation.  In re W.R. Grace & Co., 729 F.3d 332, 348 (3d Cir. 2013); American Capital, 688 F.3d at 156; T-H New Orleans, 116 F.3d at 801.  Here, the Plan lacked sufficient information as to how any order for compliance by this Court would be met, let alone the required realistic and workable framework.  Would the Liquidating Trust be required to comply with such an Order or would the Acquired Companies?  What would prevent the Liquidating Trust from making early distributions to creditors even if such distribution made compliance impossible?  Without creating a dependable means to comply with the Debtors'

regulatory compliance obligations (if the Court so requires), the Plan cannot be confirmed pursuant to Sections 1129(a)(11) and 1123(a)(5) because it is at best an illusory scheme that is destined to fail and does not provide adequate means for its implementation. Debtors bear the burden of proving that a Plan is feasible. In re W.R. Grace & Co., 729 F.3d 332, 348 (3d Cir. 2013). A Plan should not be approved where compliance with its provisions and the rulings of this Court would be speculative and illusory at best. In re Walker, 165 B.R. 994, 1001 (E.D.Va. 1994), likewise involved a Plan that also lacked any mechanism for accomplishing its relevant provisions and had no restriction on Debtors using assets so as to render compliance with the Plan provisions at issue unlikely or dubious at best. The Plan was rejected as a "fundamental abuse" of Chapter 11 for posing "unacceptable risks" and lacking "reasonably specific provisions for an adequate means of implementation." Id. at 1002, 1004.

29. For similar reasons, the Plan also did not meet the requirement that it is proposed "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Plan violated Section 1129(a)(3) because it will leave the Liquidating Trust without any mechanism to comply with the Debtors obligations under the CAA. Proposing a Plan that does not provide a mechanism for compliance with regulatory obligations is forbidden by law and is contrary to the requirement of Section 1129(a)(3) of the Code. See In re Cajun Electric Power Co-op, Inc., 150 F.3d 503, 519 (5th Cir. 1998) (Plan may not propose "independent illegality"); Collier on Bankruptcy § 1129.02[3][b][ii] (plan that would violate non-bankruptcy regulatory law would be "forbidden by law" and would preclude confirmation even if no provision of Title 11 was violated); In re Koelbl, 751 F.2d 137, 139 (2d Cir. 1984); In re Rent-Rite Superkegs West Ltd., 484 B.R. 799, 809 (Bankr. D. Colo. 2012) (plan would be forbidden by law when a significant portion of income would be derived from illegal activity); In re Walker, 165 B.R. 994, 1001

(E.D.Va. 1994) (Plan rejected under Section 1129(a)(3) where Debtors failed to demonstrate reasonable likelihood that plan will achieve a result consistent with applicable law); In re Eagle-Picher Holdings, Inc., 345 B.R. 860 (Bankr. S.D. Ohio 2006) (debtor has burden of proof to demonstrate that plan for addressing contaminated properties complies with non-bankruptcy law). If a Plan has provisions that allow violation of regulatory obligations, such a Plan is proposed by means forbidden by law and should not be confirmed.

30. The United States believes that Debtors have now agreed to language that would provide for a mechanism to comply with RINs obligations if so required by the Court as set forth in Appendix A.

31. The United States does not object to appropriate exculpation clauses for fiduciaries and their professionals for their actions in formulating a plan or other court-approved actions as long as they have not engaged in fraud, willful misconduct, or gross negligence. See, e.g., In re PWS Holding Corp., 228 F.3d 224, 246-47 (3d Cir. 2000). However, the exculpation clause in Article X.G of the Plan is not limited to fiduciaries and their professionals and goes beyond actions formulating a plan or court-approved actions. See, e.g., In re Aegean Marine Petroleum Network Inc., 599 B.R. 717, 720-21 (Bankr. S.D.N.Y. 2019); In re Washington Mutual, Inc., 442 B.R. 314, 350-51 (Bankr. D. Del. 2011). In addition, the exculpation clause includes Debtors and includes actions relating to the Case. An exculpation clause should not be permitted to preclude claims or administrative expense claims against debtors or vary the standard of liability.

32. Plan provisions allowing substantive changes to Plan documents, see, e.g., Plan at 9, 11, Article XII, First Amended Plan Supplement, after the confirmation hearing without notice

and opportunity to object to affected parties are contrary to the Bankruptcy Code and should not be approved.  *See* 11 U.S.C. § 1127.

## CONCLUSION

For all of the above reasons, the United States respectfully requests that confirmation of the Plan be denied unless the above issues are addressed.

Respectfully submitted,

FOR UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

/s Alan S. Tenenbaum
ALAN S. TENENBAUM
National Bankruptcy Coordinator
JOHN BRODERICK
MATT INDRISANO
Trial Attorneys
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
alan.tenenbaum@usdoj.gov
(202) 514-5409
john.broderick@usdoj.gov
(202) 305-0302
matthew.indrisano@usdoj.gov

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on February 4, 2020, I electronically filed the foregoing UNITED STATES' PROTECTIVE OBJECTION TO DEBTORS' PLAN OF REORGANIZATION, PLAN SUPPLEMENT, AND CURE AMOUNTS with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants. In addition, I caused one true and correct copy of the foregoing to be sent via email to the following:

John McShane, PES Holdings, LLC
john.mcshane@pes-companies.com

David L. Buchbinder, Office of the United States Trustee
david.l.buchbinder@usdoj.gov

Laura Davis Jones
James E. O'Neill
Peter J. Keane
Pachulski Stang Ziehl & Jones LLP
ljones@pszjlaw.com
joneill@pszjlaw.com
pkeane@pszjlaw.com

Robert J. Dehney
Andrew R. Remming
Morris, Nichols, Arsht & Tunnell LLP
rdehney@mnat.com
aremming@mnat.com

Rafael Zahralddin-Aravena
Jonathan M. Stemerman
Elliott Greenleaf, PC
rxza@elliottgreenleaf.com
JXS@elliottgreenleaf.com

Edward O. Sassower
Steven N. Serajeddini
Matthew C. Fagen
Kirkland & Ellis LLP
edward.sassower@kirkland.com
steven.serajeddini@kirkland.com
matthew.fagen@kirkland.com

Damian S. Schaible
Aryeh E. Falk
Davis Polk & Wardwell LLP
damian.schaible@davispolk.com
aryeh.falk@davispolk.com

Robert Stark
Max D. Schlan
Steven D. Pohl
Sharon I. Dwoskin
Brown Rudnick LLP
rstark@brownrudnick.com
mschlan@brownrudnick.com
spohl@brownrudnick.com
sdwoskin@brownrudnick.com

/s Alan S. Tenenbaum
ALAN S. TENENBAUM
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice