### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 19-11626 (KG) |
| PES HOLDINGS, LLC , *et al.*, | Jointly Administered |
| Debtors. | **Objection Deadline: February 6, 2020** |
| | **Hearing Date: February 12, 2020 at 9:30 a.m. (ET)** |
| | **Re: D.I. 661, 662, 780** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO CONFIRMATION OF FIRST AMENDED
JOINT CHAPTER 11 PLAN OF PES HOLDINGS, LLC AND ITS
DEBTOR AFFILIATES AND CROSS-MOTIONS FOR A STAY PENDING
APPEAL, MEDIATION AND/OR CONVERSION TO A CHAPTER 7 PROCEEDING**

Dated:  February 6 2020

**BROWN RUDNICK LLP**
Robert J. Stark (*admitted pro hac vice*)
Chelsea Mullarney (*admitted pro hac vice*)
Max D. Schlan (*admitted pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
cmullarney@brownrudnick.com
mschlan@brownrudnick.com

James W. Stoll (*admitted pro hac vice*)
Steven B. Levine (*admitted pro hac vice*)
Sharon I. Dwoskin (*admitted pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: 617-856-8200
Email: jstoll@brownrudnick.com
slevine@brownrudnick.com
sdwoskin@brownrudnick.com

**ELLIOTT GREENLEAF, P.C.**
Rafael X. Zahralddin-Aravena (No. 4166)
Jonathan Stemerman (No. 4510)
1105 N. Market Street, Suite 1700
Wilmington, DE  19801
Telephone:  (302) 384-9400
Email:  rxza@elliottgreenleaf.com
jms@elliottgreenleaf.com

*Counsel to the Official Committee of Unsecured Creditors*

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................................1

    **I.**   **The Plan Does Not Comport With Or Accomplish Any Chapter 11 Objectives; It Is, Rather, An Artifice For Doling Out Control, Bonuses, And Releases To Insiders – All In Contravention Of The Bankruptcy Code.** .................................................. **2**

**II.**   **The Plan Was Not Effectively Solicited, Creditors Were Not Afforded An Opportunity To Understand How The Debtors Intend To Conclude Their Cases, And They Were Effectively Deprived Of Their Right To Appear And Be Heard** ..... **7**

**III.**   **The Debtors Are Unable To Satisfy Their Heavy Evidentiary Burdens Under Section 1129** ....................................................................................................... **8**

**IV.**   **The Cross-Motion: Stay Pending Appeal; Mediation; Conversion.** ........................... **9**

FACTUAL BACKGROUND .............................................................................................11

**I.**   **General Case Background.** ................................................................................. **11**

**II.**   **The Explosion And Its Aftermath.** ..................................................................... **11**

**III.**   **The Stakeholders, In Brief.** ............................................................................... **12**

**IV.**   **The Insurance Dispute; The Carriers' Refusal to Pay** ....................................... **13**

**V.**   **The Debtors' M&A Process; Hilco Feasibility Issues** ......................................... **14**

**VI.**   **The Plan, The Plan Supplement, And The Solicitation Process.** ............................ **15**

**VII.**   **Insider Bonuses And Releases**……………………………………………………..**19**

LEGAL ARGUMENT .......................................................................................................22

    **I.**   **Applicable Legal Standards.** ............................................................................. **22**

        **A.**   **Confirmation Standards.** ............................................................................ **22**

        **B.**   **Confirmation Due Process And Notice Requirements.** .................................. **25**

        **C.**   **Conversion Standards**……………………………………………………….**26**

**II.**   **The Plan Should Not Be Confirmed Because The Debtors Cannot Carry Their Heavy Burdens Of Proof And Persuasion Under The Bankruptcy Code** ................. **27**

        **A.**   **The Plan Inappropriately Delivers Control To The Term Loan Lenders, While Disenfranchising Unsecured Creditors** ................................. **27**

        **B.**   **Plan Solicitation Was Insufficient; Parties-In-Interest Were Not Provided Notice To Properly Cast Their Ballot, Rise And Be Heard** ........... **28**

        **C.**   **The Debtors Cannot Carry Their Fundamental Evidentiary Burdens** ......... **28**

        **D.**   **The Plan's Ratification Of Prepetition Bonuses And Inclusion Of The MIP Are Wrongful** ................................................................................... **29**

**III.**   **Should The Court Confirm The Plan, A Stay Pending Appeal Is Appropriate** ....... **31**

**IV.    Should The Court Deny Confirmation, The Case Should Be Sent To Mediation Or Converted**.................................................................................................... 33

**RESERVATION OF RIGHTS**………………………………………………………………...34

**CONCLUSION** ......................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

In re Am. Capital Equip., LLC,
  688 F.3d 145 (3d Cir. 2012).............................................................................................24, 26

In re Armstrong World Indus., Inc.,
  348 B.R. 111 (Bankr. D. Del. 2006) ......................................................................................22

In re Atlanta Packaging Prods., Inc.,
  99 B.R. 124 (Bankr. N.D. Ga. 1988) .......................................................................................3

BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15357 Mem'l Corp.),
  No. 06-10859-KG, 2009 WL 393948 (D. Del. Feb. 18, 2009)...............................................32

In re Beyond.com Corp.,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) ...................................................................................23

In re Brown,
  951 F.2d 564 (3d Cir.1991)....................................................................................................27

In re Bush Indus., Inc.,
  315 B.R. 292 (Bankr. W.D.N.Y. 2004) .................................................................................23

In re Cajun Elec. Power Coop., Inc.,
  150 F.3d 503 (5th Cir. 1998) .................................................................................................23

Case v. Los Angeles Lumber Prods. Co.,
  308 U.S. 106 (1939).................................................................................................................24

In re Countrywide Home Loans, Inc.,
  387 B.R. 467 (Bankr. W.D. Pa. 2008) ...................................................................................32

Czyzewski v. Jevic Holding Corp.,
  137 S.Ct. 973 (1917)..................................................................................................6, 10, 27, 33

In re D&F Const., Inc.,
  865 F.2d 673 (5th Cir. 1989) .................................................................................................24

DCNC North Carolina I, LLC v. Wachovia Bank, N.A.,
  Nos. 09-3775, 09-3776, 2009 WL 3209728 (E.D. Pa. Oct. 5, 2009) .....................................26

In re Dow Corning Corp.,
  244 B.R. 705 (Bankr. E.D. Mich. 1999) ................................................................................24

Everett v. Perez (In re Perez),
    30 F.3d 1209 (9th Cir. 1994) ...................................................22

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) ...................................................22, 24

In re Fairfield Sentry Ltd.,
    539 B.R. 658 (Bankr. S.D.N.Y. 2015) ...................................................3

In re Ferretti,
    128 B.R. 16 (Bankr. D.N.H. 1991) ...................................................25

In re Galerie Des Monnaies of Geneva, Ltd.,
    62 B.R. 224 (Bankr. S.D.N.Y. 1986) ...................................................25

Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.),
    367 B.R. 516 (Bankr. D. Del. 2007) ...................................................32

Hickey v. City of New York (In re World Trade Ctr. Disaster Site Litig.),
    503 F.3d 167 (2d Cir. 2007) ...................................................32

In re Highway Truck Drivers & Helpers Local Union # 107,
    888 F.2d 293 (3d Cir. 1989) ...................................................32

In re Indianapolis Downs, LLC,
    486 B.R. 286 (Bankr. D. Del. 2013) ...................................................24

In re Ira Haupt & Co.,
    361 F.2d 164 (2d Cir. 1966) ...................................................7

KOS Pharm., Inc. v. Andrx Corp.,
    369 F.3d 700 (3d Cir. 2004) ...................................................31

In re Lernout & Hauspie Speech Prods., N.V.
    301 B.R. 651 (Bankr. D. Del. 2003) ...................................................24

Loop Corp. v. U.S. Trustee,
    379 F.3d 511 (8th Cir. 2004) ...................................................4

In re Mechanical Maintenance, Inc.,
    128 B.R. 382 (E.D. Pa. 1991) ...................................................26

Meisel v. Armenia Coffee Corp. (In re Hudson's Coffee, Inc.),
    No. 06-1458, 2008 Bankr. LEXIS 2994 (Bankr. D.N.J. Oct. 31, 2008) ...................................................32

In re Montgomery Ward Holding Corp.,
    242 B.R. 147 (Bankr. D. Del. 1999) ...................................................30

In re Moore,
608 F.3d 253 (5th Cir. 2010) ................................................................................3

In re Oneida Motor Freight. Inc.,
848 F.2d 414 (3d Cir. 1988).................................................................................25

In re Quigley Co., Inc.,
437 B.R. 102 (Bankr. S.D.N.Y. 2010)..................................................................23

Republic of Philippines v. Westinghouse Elec. Corp.,
949 F.2d 653 (3d Cir. 1991).................................................................................32

In re Reserves Resort, Spa & Country Club LLC,
2013 WL 3523289 (Bankr. D. Del. July 12, 2013) ..............................................26

In re Residential Capital, LLC,
478 B.R. 154 (Bankr. S.D.N.Y. 2012)..................................................................29

In re Sacred Heart Hosp. of Norristown,
182 B.R. 413 (Bankr. E.D. Pa. 1995) ...................................................................22

In re Star Ambulance Serv., LLC,
540 B.R. 251 (Bankr. S.D. Tex. 2015) .................................................................24

In re Vita Corp.,
380 B.R. 525 (Bankr. C.D. Ill. 2008)...................................................................22

In re W.R. Grace & Co.,
475 B.R. 34 (Bankr. D. Del. 2012) ......................................................................23

In re Whiteshall Settlor's Trust,
758 F.2d 1136 (6th Cir. 1985) ..............................................................................10

**Statutes**

11 U.S.C. § 101(31) ....................................................................................................5

11 U.S.C. § 101(31)(B)..............................................................................................12

11 U.S.C. § 363 ................................................................................................ *passim*

11 U.S.C. § 503(c) ........................................................................................... *passim*

11 U.S.C. § 503(c)(1)..................................................................................................29

11 U.S.C. § 503(c)(3)..............................................................................................30, 31

11 U.S.C. § 702(a) ...................................................................................5, 9, 27, 28

11 U.S.C. § 705 ..................................................................................................27

11 U.S.C. § 1109(b) ............................................................................................25

11 U.S.C. § 1112(b) ............................................................................................26

11 U.S.C. § 1112(b)(1) .......................................................................................26

11 U.S.C. § 1112(b)(2) .......................................................................................26

11 U.S.C. § 1112(b)(4) .......................................................................................26

11 U.S.C. § 1112(b)(4)(A) ..................................................................................26

11 U.S.C. § 1112(b)(4)(M) .................................................................................26

11 U.S.C. § 1113 .............................................................................................4, 15

11 U.S.C. § 1125 .......................................................................................9, 22, 25

11 U.S.C. § 1125(a)(1) .......................................................................................25

11 U.S.C. § 1129 ........................................................................................... *passim*

11 U.S.C. § 1129(a) ............................................................................................27

11 U.S.C. § 1129(a)(1) .......................................................................................22

11 U.S.C. § 1129(a)(2) .......................................................................................22

11 U.S.C. § 1129(a)(3) .............................................................................23, 28, 29

11 U.S.C. § 1129(a)(4) ....................................................................................9, 23

11 U.S.C. § 1129(a)(5) ...................................................................................23, 27

11 U.S.C. § 1129(a)(7)(A) ..................................................................................23

11 U.S.C. § 1129(a)(11) ......................................................................................24

11 U.S.C. § 1129(b) .......................................................................................24, 28

11 U.S.C. § 1129(b)(2) .......................................................................................24

**Other Authorities**

Del. Bankr. L.R. 9019-3 ......................................................................................33

Fed. R. Bankr. P. 2002(b) ...................................................................................25

Fed. R. Bankr. P. 8005 ....................................................................................................................31

The Official Committee of Unsecured Creditors (the "Committee"), appointed in the Debtors' Chapter 11 cases, by and through its undersigned counsel, respectfully submits this: (i) Objection to the *Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates*, dated January 29, 2020 [D.I. 827] (the "Second Amended Plan," or "Plan");[1] (ii) Cross-Motion for a stay pending appeal, should the Court confirm the Plan; and (iii) Cross-Motions to direct the parties to mediation or convert the cases to a Chapter 7 proceedings (the "Objection and Cross-Motion"). In support of this Objection and Cross-Motion, the Committee respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.      The Plan should not be confirmed. It is not proposed in good faith. Its terms do not comply with applicable provisions of the Bankruptcy Code.[3] The Debtors have not, in prosecuting the Plan, complied with applicable provisions of the Bankruptcy Code. It provides for payments that are inappropriate and unreasonable, and for post-confirmation governance that is inconsistent with the interests of creditors and public policy. The Plan discriminates unfairly, is not fair and equitable, and otherwise fails the "best interests" test respecting unsecured claims. It is not feasible. The Plan fails all of these statutory requirements, and the cases should advance

---

[1]     Capitalized terms used in this Objection but not otherwise defined shall have the meanings ascribed to such terms in the Plan.

[2]     In furtherance of this Objection and Cross-Motion, the Committee submits the *Declaration of John T. Young in Support of Objection of the Official Committee of Unsecured Creditors to Confirmation of Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates; Cross-Motion for a Stay Pending Appeal, Mediation and/or Case Conversion to a Chapter 7 Proceedings* (the "Young Declaration"), attached hereto as **Exhibit A**.

[3]     11 U.S.C. §§ 101, et seq.

1

along a different track: mediation or, if the stakeholders will not agree to mediation, conversion. That is so for at least four reasons:

**I.    The Plan Does Not Comport With Or Accomplish Any Chapter 11 Objectives; It Is, Rather, An Artifice For Doling Out Control, Bonuses, And Releases To Insiders – All In Contravention Of The Bankruptcy Code.**

2.      From case inception, the Debtors have not presented themselves as a viable business enterprise.  There are no ongoing operations; there is no production; the Debtors do not generate income.  The vast bulk of the employee base was terminated prepetition, and only a thin skeleton crew remains.  The Debtors' sale process—which could be facilitated easily per Section 363 instead of Section 1129—entails transfer of ownership to either a buyer who will restart the refinery (i.e., sponsored-reorganization case) or to one with an entirely new vision (i.e., liquidation case).

3.      The evidence will show that, in connection with the Debtors' recent merger and acquisition ("M&A") process, two serious bidders emerged.  One bidder (IRG) proposed to buy the facility for $265 million, and rebuild/restart it as a refinery to be run by historical CEO Phil Rinaldi.  That bidder offered future business partnerships with the Debtors' historical suppliers, vendors, customers, and other trading counterparties; it envisioned continued collective bargaining and potentially returning nearly one thousand skilled employees who lost their positions.  Another bidder (Hilco) proposed to buy the facility for $240 million (i.e., $25 million less than IRG's bid), and largely raze it to the ground.  The Hilco bid does not offer any opportunity for the Debtors' historical trading partners, and it does not envision labor's return. Neither bid complied with the Court-approved bid procedures.   In the end, the Debtors decided

to advance with Hilco's bid due to a perceived risk that IRG might eventually fail to close.[4]  The

Plan is now premised on the Hilco bid, thus rendering it a plan of liquidation, not a plan of

reorganization.[5]

4.      To confirm that particular kind of plan, the Court's evaluation includes three

important questions.  First, if we are not reorganizing a business, if we are not preserving jobs

and trading relationships, if we are not assuming contracts or borrowing on an exit line of credit,

if the transaction in question is just a sale to Hilco for near-term bulldozing and building-over,

what do we need the Plan for?  Why not simply transfer the proverbial "bundle of sticks" per

Section 363, and then convert the cases to Chapter 7?  Stated inversely, what other things does

the Plan try to do?

5.      The answer to that last question is two-fold: (i) very little; and (ii) nothing good.

6.      Upfront, it bears observing that the Plan does not actually resolve any important

case issues.  It does not settle the payment dispute with insurance carriers over the Debtors'

---

[4]     The Committee understands that, as of the date of this filing, IRG continues to work on
its bid and may present a proposal that is both higher and better at or prior to the
confirmation hearing.  To the extent that situation arises, the Committee also contests, on
substantive grounds, the Debtors' decision to continue advancing with the inferior Hilco
bid. See, e.g., In re Moore, 608 F.3d 253, 263 (5th Cir. 2010) ("A trustee has the duty to
maximize the value of the estate.") (citing Commodity Futures Trading Comm'n v.
Weintraub, 471 U.S. 343 (1985)); In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130
(Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the
objective of bankruptcy sales and the trustee's duty with respect to such sales is to obtain
the highest price or greatest overall benefit possible for the estate"); In re Fairfield Sentry
Ltd., 539 B.R. 658, 670 (Bankr. S.D.N.Y. 2015), subsequently aff'd, 690 Fed. Appx. 761
(2d Cir. 2017)(holding that a debtor may consider a higher offer for an asset that is
increasing in value after having entered into a sale contract with a third party.)

[5]     The Plan is titled neither a plan of reorganization nor a plan of liquidation, reflecting the
"toggle" inherent in the Debtors' M&A process.

property damage and business interruption claims.[6]  It does not settle the intercreditor dispute

over the allocation of insurance proceeds.   It does not settle the allowed amount of the

intermediation claims, various large trade claims, or the union's collective bargaining rights

under Section 1113.  It does not settle <u>anything</u>.  All case disputes are left for continued litigation

and adjudication post-confirmation.   Most creditors, thus, have absolutely no idea if, what, or

when they are going to recover.

7.     Consistent with that ethereal approach, the Plan does not promise <u>anything</u> for

unsecured creditors.  They get whatever this or another Court eventually says they should get:

(i) after there is a final, non-appealable ruling on the intercreditor dispute over the allocation of

insurance proceeds; and (ii) after any such proceeds are recovered from insurance carriers.  This

is not what Chapter 11 plans are supposed to do.  This is what Chapter 7 offers, but with

important safeguards for unsecured creditors.[7]  Those safeguards are eviscerated by the Plan, and

intentionally so.

8.     The Plan, when reduced to its substantive elements (beyond serving as the conduit

for a Section 363 sale to Hilco), does only three things: (i) vests asset/case control with the

---

[6]     This dispute could yield substantial value to unsecured creditors, even if this Court were
to find that the Term Loan Lenders have a perfected, non-avoidable lien on the business
interruption insurance recoveries.  That is because the asset sale proceeds ($240 or $265
million) and insurance ($1.25 billion) more than fully cover the Debtors' pre- and post-
petition secured debt.

[7]     <u>See</u>, <u>e.g.</u>, <u>Loop Corp. v. U.S. Trustee</u>, 379 F.3d 511 (8th Cir. 2004)(granting U.S.
Trustee's motion after last round negotiations with lenders failed, the debtors were cash
flow negative, there were mounting costs to the estate, and the plan of liquidation was
evidence of a lack of likelihood of rehabilitation).

Debtors' obviously preferred creditor constituents, the Term Loan Lenders;[8] (ii) disenfranchises unsecured creditors from the post-confirmation resolution of important case issues; and (iii) doles out bonuses and releases to the directors, officers, and other insiders. All of this contravenes the Bankruptcy Code and foundational principles of bankruptcy jurisprudence.

9.    Regarding Term Loan Lender control, the Plan delivers post-confirmation control in two ways. First, on the Plan's Effective Date, there will be a liquidation trust vested with all residual case responsibilities, and the Term Loan Lenders will dominate the trust's oversight board. Second, the Debtors' DIP Loan (provided by the Term Loan Lenders) is left partially extant post-confirmation, so that the Term Loan Lenders continue to wield an economic "Sword of Damocles" over the trust (with a post-petition lien on the business interruption insurance and exorbitant loan costs). This does not comport with the Bankruptcy Code, which clearly provides that, among the other important safeguards of Chapter 7, the liquidation trustee is an independent fiduciary selected by unsecured creditors. See 11 U.S.C. § 702(a).

10.    Regarding disenfranchising unsecured creditors, it bears observing that, on the Plan's Effective Date, the Committee dissolves. Thereafter, unsecured creditors will not have a representative to protect their interests respecting all of the case issues left unresolved by the Plan (see Paragraph 6 above), including: (i) future resolution of all claims against the insurance carriers, (ii) intercreditor allocation of insurance proceeds, or (iii) general claims reconciliation. All of this is, again, placed in the Term Loan Lenders' hands. Consider the following hypothetical: If the Court were to find that the Term Loan Lenders do not have a lien on the

---

[8]    As discussed herein, the Term Loan Lenders are also the Debtors' principal stockholders, dominate the Board of Directors, and provided the Debtors' DIP Loan. They are classic "insiders," as that term is defined by Section 101(31). Among other indicia of proof, it is worth observing the Debtors' behavior in connection with the intercreditor dispute over insurance proceeds: The Debtors chose to lead that litigation on the Term Loan Lenders' behalf, which was astounding and quite telling.

business interruption insurance recoveries, and the Term Loan Lenders were to appeal that ruling, the Plan deprives unsecured creditors of any representative to join issue on appeal or to further appeal thereafter. Consider a second hypothetical: If the Court were to find that the Term Loan Lenders <u>do</u> have a perfected unavoidable lien on the business interruption insurance recoveries, the Term Loan Lenders—once in control of the Trust—are incentivized to settle the dispute at a level that only pays them, even if the estates have a strong claim for more.

11. The Plan's bonus and release scheme deserves particular attention. The Court was previously advised that, on the eve of the bankruptcy filing, the Debtors secretly doled out lavish "retention" bonuses to their executive team, with clear intent to evade Court evaluation under Section 503(c). These awards, given to just a few people, totaled more than <u>$5.25 million</u> and occurred at approximately the same time these same individuals were negotiating an amendment to the company's collective bargaining agreement—presumptively telling their union counterparts that there was simply insufficient funds (beyond $2.8 million) to provide severance and other benefits to more than 500 laid off union employees. No one knew of these bonuses until months into these cases, when they were unveiled in the Debtors' Schedules and Statements of Financial Affairs. The bonuses are clearly avoidable as fraudulent transfers, unjust enrichment, <u>ultra</u> <u>vires</u>, <u>etc.</u>, but the Plan releases all such liability.

12. But, it goes much further. The Plan allocates to these same individuals (who, in the meantime, have been drawing large salaries "running" a long-shuttered facility) a new, incremental bonus program, allocating to them potentially <u>tens of millions of dollars</u> more in bogus "incentive" bonuses, clearly in contravention of Sections 503(c) and 1129.

13. As the Supreme Court instructed in <u>Czyzewski v. Jevic Holding Corp.</u>, Bankruptcy Courts are simply not allowed to "creatively" interpret Bankruptcy Code provisions

(including section 1129) to achieve an end-run around foundational bankruptcy principles, especially where the case has floundered, Chapter 11 reorganization is no longer a viable case objective, and the debtor and/or secured lenders simply want to evade the safeguards Chapter 7 offers for unsecured creditors.  137 S.Ct. 973 (2017).  This comports with Judge Friendly's wise and historical admonition: "The conduct of bankruptcy proceedings not only should be right but must seem right." In re Ira Haupt & Co., 361 F.2d 164 (2d Cir. 1966).  Confirmation should be denied.

**II.    The Plan Was Not Effectively Solicited, Creditors Were Not Afforded An Opportunity To Understand How The Debtors Intend To Conclude Their Cases, And They Were Effectively Deprived Of Their Right To Appear And Be Heard.**

14.    The Plan is not the culmination of data collection, thoughtful analysis, and negotiation among stakeholders.  The Debtors prepared an earlier, wholly generic, version of the Plan and solicited votes on that earlier draft before it knew how its M&A process might conclude.  Materials originally delivered to creditors were vacuous, provided no meaningful information about prospective creditor recoveries and, regardless, suggested a potentially different case outcome than what is contemplated by the Plan.

15.    Catch-up disclosure efforts have been half-hearted at best.  Only a few days ago (i.e., only a few days before the confirmation hearing is scheduled to begin), the Debtors mailed to creditors a new solicitation package containing the Plan Supplement.  The Plan Supplement includes the Hilco Purchase and Sale Agreement (the "Hilco PSA"), Liquidating Trust Agreement, and updated recovery analyses.  But, nothing is described in an easy-to-understand or coherent way.  There is no update to the Disclosure Statement.  Unsecured creditors have to wade through the paper-soup of corporate documents (not to learn) but to try to figure out for themselves that: (i) the Term Loan Lenders take control of all important case issues; (ii) they are deprived of any meaningful opportunity to protect their interests going forward; (iii) they may

never receive a penny; and (iv) executives who oversaw the disaster walk away from the cases filthy rich.

16.     This is not the correct way to proceed.  These bankruptcy cases are important: The facility occupies a massive percentage of the City of Philadelphia; it occupies a position of economic significance and national security; many political and special interests have asked this Court to be especially deliberative and thoughtful as to how these cases should conclude, and the livelihood of thousands of people hangs in the balance.  Creditors were not given sufficient time to vote and, importantly, interpose objections and avail themselves of their rightful day in court. Due process is supposed to mean something.  Confirmation should be denied.

**III.     The Debtors Are Unable To Satisfy Their
         Heavy Evidentiary Burdens Under Section 1129.**

17.     The Committee holds the Debtors fully and completely to their burdens of proof and persuasion respecting all requirements of Plan confirmation.   Among other things, the Debtors must prove the following:

- **Good Faith.**  Again, the "bundle of sticks" can be sold to Hilco, and the cash proceeds given to the Term Loan Lenders, all via Section 363 (in Chapter 11 or 7).  The Plan's purpose, thus, amounts only to the following: (i) allocating control to the Term Loan Lenders; (ii) disenfranchising unsecured creditors; (iii) shielding the officers and directors from their avoidance risk; and (iv) lavishing on them substantially more money.  This is not "good faith."  Not by a long stretch.

- **Best Interests**.  The Debtors' "liquidation analysis" is not an "analysis" at all.  It is more verbiage than numbers, and says very little.  That is because the Debtors' selection of Hilco renders this a liquidation case; the Plan, in turn, intends to overtake and replace the basic rules of Chapter 7, but without offering up any value to unsecured creditors to compensate for the rule-shift.  Rather, unsecured creditors do worse, given (i) how the Term Loan Lenders, once in control, are disincentivized to enable unsecured creditors to realize any value from the cases and (ii) the substantial value erosion benefiting historical directors and officers.

- **Bankruptcy Code Compliance; Bonus Payments.**  The solicitation process was a disaster; it certainly violated Section 1125 and, as discussed above, fundamental notions of due process.  The bonuses (both sets) violate Sections 503(c) and 1129(a)(4).  The releases are inconsistent with applicable bankruptcy jurisprudence.

- **Trust Governance**.  The Debtors must prove that Term Loan Lenders' domination and control of the post-confirmation Liquidating Trust "is consistent with the interests of creditors . . . and with public policy."  Given that, under the circumstances of these cases, unsecured creditors should be selecting the trustee (via Section 702(a)) and given how the Plan obviously intends to disenfranchise unsecured creditor interests while complex claims against insurers and value-allocation issues are being litigated, the Committee is hard pressed to see how the Debtors could possible carry this burden.

- **Feasibility**.  As indicated above, the Hilco bid has its own closing risks, and they are substantial.  This will be the subject of serious inquest at trial.

- **Cram-Down**.  Should the unsecured class vote down the Plan (expected), the Debtors must establish that the Plan does not "discriminate unfairly" and is "fair and equitable" respecting their treatment.  After the Hilco sale closes and the sale proceeds are delivered to the Term Loan Lenders, the rest of their claim is an unsecured deficiency claim (presuming the final judgment on the inter-creditor allocation dispute is not favorable to them).  Yet, the Term Loan Lenders' deficiency claim apparently entitles those Term Loan Lenders to full case/asset control; the bulk of unsecured indebtedness (which may exceed the Term Loan Lenders' post-closing deficiency claim) are left to their peril.  That is certainly "unfair discrimination."  Moreover, given all of the above, the Debtors are simply incapable of showing that the Plan treats general unsecured creditors "fairly and equitably."

## IV.    The Cross-Motion: Stay Pending Appeal; Mediation; Conversion.

18.    Should the Court determine that confirmation is appropriate, the Committee respectfully requests that the Court immediately stay the confirmation order pending appeal.  The issues raised herein are substantial, including legal and evidentiary issues pertaining to: (i)

confirmation of a plan of liquidation following the Supreme Court's decision in Jevic; (ii) "good faith" and other Section 1129 requirements, given how the Plan vests exclusive control of critical value and value-allocation issues with the Term Loan Lenders, and bestows other lucrative benefits on insiders; and (iii) the Fifth Amendment due process rights of all stakeholders to understand the Plan, vote on that Plan and, perhaps most importantly, rise and be heard at the confirmation hearing.  It bears repeating that the Committee does not survive the Plan's Effective Date.  Lastly, the evidence will make plain that (i) the Hilco sale cannot close its transaction for at least several months; and (ii) the Plan leaves all issues for future litigation.  A stay will not harm the estates and is appropriate.

19.     Should the Court determine that confirmation is not appropriate (as it should), the Committee proposes that the cases be placed on a different track: mediation or conversion. These cases have long cried out for a consensual resolution, but that has proven evasive and there has not been sufficient time since the Auction result was announced for the parties to try to better engage.  The Committee believes that judicial mediation could be quite helpful.  This is the Committee's preferred way to proceed.

20.     But, if other parties-in-interest are bent on a confirmation test, and the Plan fails that test (as it should), then Chapter 7 conversion is the outcome demanded by the facts of the case. See, e.g., In re Whiteshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985) (internal citations omitted)("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable

state . . . . [I]f there is not a potentially viable business in place worthy of protection and rehabilitation, Chapter 11 has lost its *raison d'être*.").[9]

## FACTUAL BACKGROUND

### I.    General Case Background.

21.    On July 21, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for Chapter 11 relief.  Since the Petition Date, the Debtors have remained in possession of their assets as debtors-in-possession.  Even though the Debtors do not operate a viable business enterprise, the cases have not been converted to a Chapter 7 proceeding and neither a trustee nor an examiner has been appointed.  The Debtors were, in sum, given more than a full and fair opportunity to bring this bankruptcy to a consensual resolution.  That opportunity came to an unsuccessful conclusion over the last several days.

### II.    The Explosion And Its Aftermath.

22.    One month before their Chapter 11 filings, on June 21, 2019, a massive explosion occurred at the Debtors' facility, resulting in the complete shut-down of operations.[10]   All of their business contracts were breached; most of their workforce was laid off; the facility was placed on warm-idle.  With their bankruptcy filings, the Debtors said they were going to run an M&A process, looking for partners that would either (i) sponsor a rebuild/restart program or (ii)

---

[9]    The Committee respectfully submits that, should the cases regrettably need to go in this direction, there is something "Solomonic" about Chapter 7 conversion. After all, the Term Loan Lenders still get the benefit of their bargain (i.e., sale of their collateral and recovery of the proceeds); unsecured creditors get to select the trustee; no party-in-interest dominates/controls the trustee; and, to the extent that the trustee requires a management incentive program, he/she will independently determine what is proper, consistent with his/her fiduciary obligations, and without undue influence from insiders.

[10]    See *Declaration of Jeffrey S. Stein, Chief Restructuring Office of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [D.I. 32] (the "First Day Declaration").

buy the property and call in the bulldozers.  The Committee has long made clear its strong preference for a rebuild/restart that would assume trade relationships and return the Debtors' skilled labor force.

## III.    The Stakeholders, In Brief.

23.    The Debtors have two primary forms of secured debt: (i) a term loan totaling approximately $700 million (the "Term Loan"); and (ii) a working capital facility (largely enabling the Debtors to buy crude for its refining operations), sometimes referred to as the "Intermediation" facility in respect to which ICBCS has filed claims, totaling approximately $330 million.  See First Day Declaration at ¶ 32; Proof of Claim No. 103.  The Debtors also have a substantial amount of unsecured debt, in the form of unpaid trade claims, rejection damages claims, and collective bargaining and employee-related claims, aggregating more than $500 million.

24.    The Term Loan Lenders bear particular attention.  Their secured loan derived from the Debtors' prior bankruptcy case.  The Term Loan Lenders own (as a consequence of the prior bankruptcy) substantially all of the Debtors' stock and they dominate the Debtors' Board of Directors.  See *Verified Statement of Davis, Polk & Wardwell LLP and Morris, Nichols, Arsht, & Tunnell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 246].  They are also the DIP Loan Lenders, with a variety of "case control" covenants and other affirmative obligations bearing on how the Debtors may advance their Chapter 11 cases.  The Term Loan Lenders are classic "insiders," as that term is defined by Bankruptcy Code Section 101(31)(B).  See id.; DIP Credit Agreement [D.I. 580, Exhibit B].

12

IV.     **The Insurance Dispute; The Carriers' Refusal To Pay**.

25.     Much attention has focused on the Debtors' insurance.  Prior to the explosion, the Debtors acquired a $1.25 billion insurance policy, covering property damage and business interruption loss (the "Policy").  The Policy provides a minimum recovery from property damage coverage of $250 million (the "Stipulated Loss Value").  See Policy at § 5e.

26.     Although the Term Loan Lenders historically bargained for a "blanket" lien on the Debtors' properties, their credit agreement and other loan documents did not obligate the Debtors to purchase "business interruption" insurance.  That obligation was imposed by the "Intermediation" Lenders under their respective lending facility.  As such, the Term Loan Lenders were not identified as "loss-payees" or "additional insureds" respecting the Policy, only the "Intermediation" Lenders are identified as such.  Liens on insurance are governed New York state common law, and common law only recognizes lien perfection when the lender is identified as a "loss-payee," or "additional insured" to the insurer.  This issue and other related issues are being actively litigated before the Court, with the Debtors (strangely) championing the Term Loan Lenders' cause.  See Adv. Proc. No. 19-50282 (the "Insurance Adversary Proceeding").  Appeals are likely to follow.

27.     All of this ignores the fact that the Debtors' insurance carriers are now unwilling to pay any amounts for business interruption, which, by all accounts, makes up most of the claim on the Policy.  The estates are going to need to sue the carriers and that litigation likely will take some time.  Clearly, the Term Loan Lenders (speaking through the Debtors) want control over the insurance—even if they do not have an enforceable lien on it.

**V.      The Debtors' M&A Process; Hilco Feasibility Issues.**

28.      At case inception, the Debtors said that their assets were in play.  On November 14, 2019, the Court entered the *Order (a) Establishing Bidding Procedures, (b) Approving Bid Protections, and (c) Granting Related Relief* [D.I. 583] (the "Bidding Procedures Order").  The Bidding Procedures Order scheduled the Bid Deadline for January 10, 2020 and an Auction for January 17, 2020.

29.      On the Bid Deadline, the Debtors received six final bids but determined only two bids could participate at the Auction, one submitted by Industrial Realty Group ("IRG") and one submitted by Hilco Redevelopment Group ("Hilco").  As discussed above, the IRG bid envisions a potential rebuild/restart of the refinery under the leadership of former CEO Phil Rinaldi (i.e., sponsored-reorganization case resolution); the Hilco bid, in juxtaposition, envisions dismantling and different utilization of the property (i.e., liquidation case resolution).  The IRG bid was not accompanied by the requisite deposit and, therefore, did not comply with the Bid Procedures Order.  The Hilco bid was accompanied by the requisite deposit, but Hilco refused to participate in the Auction as a "back-up" bidder, also contrary to the Bid Procedures Order.  The Auction resulted in increased offers, but neither IRG nor Hilco would correct their respective deficiencies respecting the Bid Procedures Order.  In the end, the Debtors selected Hilco's final bid ($240 million) over IRG's final bid ($265 million) based on perceived closing risks attendant with IRG's lower deposit.

30.      Hilco's bid is not, however, free of its own closing risks.  It has various pre-closing conditions precedent, including important conditions involving environmental, labor and deed restrictions.  For example, the Hilco PSA requires that, prior to closing:

- Pennsylvania's Department of Environmental Protection ("PA DEP") approves a site-specific soil management plan, including the testing, handling, storage, transportation, disposal and reuse of facility soil for Hilco's intended use as a "tri-modal industrial park with ancillary commercial uses covering 1,252 acres. Hilco PSA at § 9.11

- The Court must terminate the collective bargaining agreement with the United Steelworkers pursuant to Bankruptcy Code Section 1113. To the Committee's knowledge, the Debtors have issued demands that the Union, on information and belief, finds unreasonable. There has been no proposal given to the Union to begin negotiations to terminate the collective bargaining agreement pursuant to the collective bargaining rights provided to the union under Section 1113 of the Bankruptcy Code. Id. at § 9.15.

- Consent must be obtained from the facility's prior owner (Sunoco) and PA DEP to change a restrictive covenant in the real property deed, which expressly limits "disturbance of the subsurface strata and soils" and use of the facility as anything other than a refinery. See Special Warranty Deed dated September 7, 2012.

- Regulatory, financial or other issues may arise that fall within an expansively defined "Company Material Adverse Effect" that would allow Hilco to reduce the purchase price or refuse to close and get its deposit back. See Hilco PSA, passim.

See *Plan Supplement for the First Amended Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates*, (the "Plan Supplement") [D.I. 780, Exhibit E Purchase Agreement].

31.     A Hilco closing relies, in sum, on a substantial amount of work, negotiation, and Court adjudication—none of which is a sure bet at this moment in time. Hilco may walk with its deposit if all of this is not successfully concluded by May 31, 2020. Id. at § 11.01(b)(ii).

## VI.    The Plan, The Plan Supplement, And The Solicitation Process.

32.     The Debtors' plan process has always had a fitting adjective: "Backwards." As the Court knows, Chapter 11 practice typically follows a series of steps: (1) the value of estate assets is first ascertained, at least by way of estimates, which creates a factual foundation for negotiations; (2) the stakeholders next convene to discuss an appropriate allocation of estate value, considering each party's ability to challenge any contemplated deal structure; (3) agreement is, hopefully, reached thereafter; (4) the parties, as a final step, incorporate their

agreement into a plan and, with Court authorization, send it out to creditors to vote. The Debtors here worked in reverse order.

33. On December 11, 2019, the Debtors filed the *First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* [D.I. 661] (the "First Amended Plan") and attendant Disclosure Statement. The First Amended Plan was an empty shell, and the Disclosure Statement told stakeholders virtually nothing. The documents did not identify or incorporate the terms of any asset purchase agreement (the Bid Deadline was still a month away); it incorporated a "toggle"—reorganization versus liquation—to be determined later. No stakeholder was given any basis to know if, when or what they would receive.

34. The First Amended Plan relied on a so-called "Liquidation Analysis," dated November 26, 2019. See *Notice Of Filing Of Exhibit C Liquidation Analysis To Corrected Disclosure Statement For The Joint Chapter 11 Plan Of PES Holdings, LLC And Its Debtor Affiliates* [D.I. 613, Exhibit. C]. The Liquidation Analysis was not an analysis at all. It asserted, in verbiage, not numbers, and without much substantive rationale, that creditors will do better under the Plan than in Chapter 7 proceedings (because the Debtors say so, ipse dixit).

35. On December 11, 2020, the Court entered an *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [D.I. 671] (the "Solicitation Order"). The Solicitation Order provided for a unique, two-part solicitation process to resolve an objection by the U.S. Trustee [D.I. 621] and an informal objection by the Committee. First, the Debtors were to include in the solicitation package a letter from the Committee (the "Original Solicitation Letter") indicating to creditors that they should hold their vote until they receive a

16

"Plan Supplement," which was to include far more information.  <u>See</u> Solicitation Order at ¶ 6.

Second,  in late January following completion of the Auction, the Debtors were to send to all

creditors the Plan Supplement containing more detail about their treatment, as well as a second

letter from the Committee offering its recommendation as to how creditors should vote.  <u>See</u> <u>id.</u>

at ¶ 16.  Nevertheless, the Committee's rights were fully reserved, including the right to contest

confirmation on the grounds that adequate information was not provided to creditors.  <u>See</u> Hr'g

Tr., December 11, 2019 p. 31:5-19, attached hereto as **<u>Exhibit B</u>**.

36.     The Debtors did not comply with the Solicitation Order: They did not send the

Original Solicitation Letter to creditors.  The Committee understands that more than thirty

unsecured creditors voted on the First Amended Plan, apparently confused and unguided without

the Committee's letter having been included in the solicitation package.

37.     On January 22, 2020, the Debtors filed the Plan Supplement.  To the best of the

Committee's knowledge, these documents were sent to processing and mailing the next day.  If

they were sent out by overnight courier (doubtful), creditors will have had only <u>11 calendar days</u>

<u>(or 8 business days)</u> to read and understand the Plan Supplement by the Plan objection and

voting deadline.

38.     But insufficient time is almost beside the point because the Plan Supplement **<u>did</u>**

**<u>not include a summary or other explanation of what transactions are about to occur or how</u>**

**<u>the Plan is supposed to work</u>**.  There is no update to the Disclosure Statement.  The new

transaction description is found all the way at the end of the Plan Supplement (Exhibit K) and

contains only the following, meaningless "description" of an entirely new Plan and the Hilco

transaction: "The Plan has been updated to conform to the Debtors' election to pursue a Sale

Restructuring with HRP Philadelphia Holdings, LLC, the Successful Bidder, as Purchaser, and

consistent with the terms of the Purchase Agreement.  The Debtors will file an amended Plan to reflect these changes in advance of the Confirmation Hearing."  See *Plan Supplement for the First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates*, [D.I. 780, Exhibit K, Summary and Explanation of Plan].  The Plan referenced in the last sentence was filed on January 29, 2020 and, to the best of the Committee's knowledge, was not separately mailed to creditors.  See *Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates*, dated January 29, 2020 [D.I. 827].

39.     The Committee, though also struggling to fully understand the Plan, discerns the following.  The new Plan (unlike the First Amended Plan) does not have a "toggle" feature, it focuses instead on the Hilco bid, a transaction disclosed (via copy of the Hilco PSA) for the first time in the Plan Supplement without material exhibits and schedules.  That transaction will close on the Plan's Effective Date, at which time the Committee will dissolve, Debtors' management must resign, and the estates' hard assets will be sold to Hilco for $240 million cash (presuming no purchase price adjustment).  That cash, less certain fees, will go to the Term Loan Lenders to pay down their DIP and Term Loan (less $25 million in "holdover" DIP Loan, which will have a lien on the business interruption insurance), and to fund the Liquidating Trust.  See id.  To be frank, the Committee (let alone general creditors) cannot figure out how the Liquidating Trust's beneficial interests are supposed to be allocated to creditors.  The Liquidating Trust is, however, vested with all residual estate assets (e.g., insurance claims, other causes of action, and precious metals), and takes responsibility for all disputed matters, including estate claims against the insurance carriers, the Insurance Adversary Proceeding, and reconciliation of unsecured claims (none of which is settled by the Plan).   The Delaware Trustee is a mail-drop, the Liquidating Trust Board has all the power, and the Term Loan Lenders dominate and control that board.

18

40.     The Plan Supplement contains an updated liquidation analysis, but it does not provide much more information than the first Liquidation Analysis originally filed in November. See *Plan Supplement For The First Amended Joint Chapter 11 Plan Of PES Holdings, LLC And Its Debtor Affiliates* [D.I. 780, Exhibit J] (the "Updated Liquidation Analysis").  The Updated Liquidation Analysis continues to rely on assumptions that the Debtors admit are "difficult to estimate," and includes a meaningless recovery estimate for unsecured creditors of 0% to 80%. See id.

## VII.    Insider Bonuses And Releases.

41.     Only eleven days after the refinery explosion (the "Girard Point Incident" and nineteen days before the Petition Date, on July 2, 2019, the Debtors surreptitiously adopted a "retention bonus" program for its executive team.  A handful of executives shared approximately $4.5 million, and the Chairman of the Board took nearly $775,000 (collectively, the "Retention Bonus Payments").  Each bonus was deemed fully earned and not subject to disgorgement if the executive remained at his/her employment—not through the date of a bankruptcy transaction (as is typical)—but through a date certain (September 15 or December 15, 2019).  The Debtors did not subject this program to Section 503(c) evaluation; it was not even disclosed to the Court or parties-in-interest until they were discovered in the Debtors' Schedules and Statements of Financial Affairs.  And, of course, prior to that date, those same executives negotiated the $2.8 million severance pool to be shared by approximately 550 unionized employees.  These bonuses are subject to avoidance attack, but the Plan releases all such exposure.

42.     On November 22, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) approving the Debtors' Key Employee Incentive Program and (II) Granting Related Relief* [D.I. 605] (the "KEIP Motion").  In the KEIP Motion the Debtors sought authority to provide incremental bonuses to the executive team, given that the "earn deadline" under the

original bonus program was about to run.  The incremental program offers more than $20 million to eight senior executives, all of whom received a prepetition bonus and have been drawing salary.

43.     The KEIP bonus payments contain two parts.  First, KEIP Participants earn a premium of $2.5 million to the budget (the "POR Confirmation Success Fee") if the Debtors (i) confirm a plan within fifteen months of the Petition Date and (ii) realize Net Proceeds of $300 million (the "Threshold").  Second, KEIP Participants receive 2.5% of realized Net Proceeds in excess of the Threshold.  See id. at ¶ 29.  In other words, the KEIP Participants receive the POR Confirmation Success Fee and 2.5% of any proceeds available as distribution to creditors in excess $300 million.  There is no cap on the KEIP or any change to the percentage calculation in excess of the Threshold.

44.     The KEIP was prepared by Willis Towers Watson US LLC ("WTW").[11]  WTW purportedly analyzed the reasonableness of the KEIP payments based on "'target total direct compensation,' which is a compensation-industry term that means the sum of base salary, target annual incentives, and long-term incentive grant values."  Friske Declaration at ¶ 23.  WTW "compared the total direct compensation (reflecting base compensation, plus the value of KEIP awards under various performance scenarios) for each KEIP Participant to target total direct compensation data for comparable roles from the above-referenced market data."  Id. at ¶ 24.  However, WTW's total direct compensation fails to take into account the KEIP Participants' prepetition Retention Bonus Payments.

---

11     See *Declaration of Douglas J. Friske in Support of Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* [D.I. 605-2] (the "Friske Declaration") at ¶ 16.

45.     WTW also used allegedly comparable Chapter 11 cases with KEIPs to determine the reasonableness of the structure of the KEIP in these Chapter 11 cases.  Specifically, WTW "analyzed the publicly disclosed KEIPs from twelve companies (the "Peer Companies")[12] with revenues in excess of $1 billion that recently adopted court-approved, post-petition KEIPs tied to asset sale value and/or value creation metrics."  Id. at ¶ 27.  A majority of the Peer Companies are retailers and none are refineries.  None of the Peer Companies suffered a catastrophic event that served as a catalyst for a bankruptcy filing.  None of Peer Companies relied on insurance proceeds as a major source of recovery for creditors.

46.     WTW "also compared the cost of the KEIP at 'midpoint' performance on both an absolute basis and as a percentage of revenue to the target or equivalent cost of the Peer Companies' KEIPs."  Id. at ¶ 30.  Based on the revenue metric alone, WTW determined the structure of the KEIP to be "reasonable and consistent with market practice."  Id. at ¶ 31.  Other than revenue, WTW failed to analyze any additional metrics for reasonableness, including book value of assets or on a per participant basis.

47.     To prevent a formal objection by the Committee, the Debtors adjourned the hearing on the KEIP Motion and repeatedly extended the Committee's objection deadline. Eventually, the Debtors chose to incorporate the KEIP into the Plan by including a so-called "Management Incentive Plan" with the Plan Supplement.  See Plan Supplement For The First

---

12     The Peer Companies include:   Alpha Natural Resources, Inc., Furniture Brands International, Gander Mountain Company, Inc., GenOn Energy, hhgregg, Inc., Marsh Supermarkets, NII Holdings, Inc., Quiksilver Inc., RadioShack (RS Legacy Corporation), Real Industry, Inc., Sears Holdings Corporation, and SunEdison.  Friske Declaration at ¶ 27.  The Committee pulled and reviewed all KEIP related material from the Peer Companies' Chapter 11 cases and incorporates the documents to this Objection by reference.  Any documents related to the Peer Companies' KEIPs may be provided upon request.

*Amended Joint Chapter 11 Plan Of PES Holdings, LLC And Its Debtor Affiliates*, [D.I. 780, Exhibit C] (the "MIP"). Aside from a different name, the MIP is materially and otherwise substantively indistinguishable from the KEIP.

## LEGAL ARGUMENT

## I.   Applicable Legal Standards.

### A.   Confirmation Standards.

48.   The Debtors, as Plan proponents, bear the burdens of proof and persuasion respecting all confirmation requirements.   See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 111, 120 (Bankr. D. Del. 2006); In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003). These are "heavy" burdens, requiring careful consideration of each inquiry under Section 1129. See In re Vita Corp., 380 B.R. 525, 528 (Bankr. C.D. Ill. 2008); In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 423 (Bankr. E.D. Pa. 1995).   This is especially so where, as here, a debtor acts as the plan proponent.   See, e.g., Everett v. Perez (In re Perez), 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.").

49.   The Debtors' burden of proof includes the following:

- **Section 1129(a)(1)**. The Court may confirm only if the Plan "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). That means the Plan cannot, among other things, provide insider payments in violation of Section 503(c).

- **Section 1129(a)(2)**. The Court may confirm the Plan only if the "proponent complies with the applicable provisions of this title." That means, most notably, the Debtors' solicitation efforts must comport with Section 1125 requirements.

- **Section 1129(a)(3).** The Court may confirm the Plan only if it "has been proposed in good faith and not by any means forbidden by law." A plan cannot comply with the "good faith" principle if it, among other things, deprives parties-in-interest of their due value and legal entitlements, reallocates such entitlements to favored stakeholders, and/or otherwise harms disfavored parties. See In re Quigley Co., Inc., 437 B.R. 102 (Bankr. S.D.N.Y. 2010)(plan process benefitting certain preferred creditors to the detriment of others not proposed in "good faith"); In re Bush Indus., Inc., 315 B.R. 292 (Bankr. W.D.N.Y. 2004) (plan that included preferred treatment for an insider violated "good faith" requirement).

- **Section 1129(a)(4).** The Court may confirm the Plan only after "[a]ny payment made or to be made . . . has been approved by, or is subject to the approval of, the court as reasonable." This covers, not only director and officer payments to be made under the MIP, but also past payments, not previously authorized by the Court per Section 503(c), that are being effectively ratified via confirmation. See, e.g., In re Cajun Elec. Power Coop., Inc., 150 F.3d 503 (5th Cir. 1998); In re Beyond.com Corp., 289 B.R. 138, 144 (Bankr. N.D. Cal. 2003) (Section 1129(a)(4) "ensures compliance with the policies of the Code that the bankruptcy court should police the awarding of fees in title 11 cases") .

- **Section 1129(a)(5).** The Court may confirm the Plan only if post-confirmation governance of the estate "is consistent with the interests of creditors and … with public policy." The Court's evaluation under this section includes post-confirmation liquidation trustees and the motivations of their overseers. See, e.g., Beyond.com, 289 B.R. at 144-45 ("While the court is not prepared to find that the services of Barratt as Liquidation Manager is unfit, or that management by Barratt or the committee is contrary to the interests of parties in the case or against public policy, the disclosures to date are insufficient to enable the court to conclude that the converse is true.").

- **Section 1129(a)(7)(A).** The Court may confirm the Plan only if a rejecting class "will receive … property of a value … not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7." Known as the "best interests test," every creditor is entitled to Plan treatment at least equal to what it might expect in a Chapter 7 liquidation. See In re W.R. Grace & Co., 475 B.R. 34, 141 (Bankr. D. Del. 2012). To make this value determination, the Debtors must prove what unsecured creditors distributions are likely to be under (i) the Plan and (ii) a hypothetical Chapter 7 proceeding. Id. (citing In re Affiliated Foods, Inc., 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000)). The court then makes an "independent finding, based on the evidence and

arguments presented, whether creditors will receive as much under the plan as they would" in a liquidation. Id. at 142-43.

- **Section 1129(a)(11).**    The Court may confirm the Plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."    The "feasibility" standard requires the Court to consider whether the plan offers a reasonable likelihood of success "on its own terms without a need for further reorganization on the debtor's part."   In re Am. Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012) (quoting In re Applied Safety, Inc., 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996).  In other words, "1129(a)(11) requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan."   In re Star Ambulance Serv., LLC, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015). Even a plan of liquidation "must be feasible."   In re Am. Capital Equip., LLC, 688 F.3d at 156.  Moreover, where consummation of a plan is conditioned upon expectation of approval by regulatory authorities, "the plan proponent bears the burden of demonstrating that achieving the necessary approvals is not subject to 'material hurdles' or readily anticipated, significant obstacles."   In re Indianapolis Downs, LLC, 486 B.R. 286, 298 (Bankr. D. Del. 2013)

- **Section 1129(b)**.  Presuming that unsecured creditors vote down the Plan (expected), it may be confirmed only if the Court finds that it "does not discriminate unfairly, and is fair and equitable" respecting unsecured creditors.  The "unfair discrimination" test includes plan provisions that allocate "materially greater risk to the dissenting class in connection with its proposed distribution."   In re Dow Corning Corp., 244 B.R. 705, 710-11 (Bankr. E.D. Mich. 1999); see In re Exide Techs., 303 B.R. 48, 79-80 (Bankr. D. Del 2003); In re Lernout & Hauspie Speech Prods., N.V. 301 B.R. 651, 661 (Bankr. D. Del. 2003).  The "fair and equitable" test prohibits plans that are just plain wrongful.  See, e.g., In re D&F Const., Inc., 865 F.2d 673, 675 (5th Cir. 1989)("Section 1129(b)(2) sets minimal standards plans must meet.  However, it is not to be interpreted as requiring that every plan not prohibited be approved.  A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'").  The "fair and equitable" test also prohibits over-compensation to insiders.  See Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 119-121 (1939).

B.      **Confirmation Due Process And Notice Requirements.**

50.      The Constitution's bankruptcy clause does not override the Fifth Amendment's due process clause.  Parties-in-interest are entitled to notice and a fair opportunity to be heard in bankruptcy cases, especially with respect to plan confirmation.  Section 1125 mandates that creditors receive "adequate information" respecting a proposed plan, to wit: "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor . . . to enable . . . a hypothetical investor [typical of the holders of claims in the case] to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  "In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

51.      This is not a small matter.  See In re Oneida Motor Freight. Inc., 848 F.2d 414, 417 (3d Cir. 1988) ("we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); In re Galerie Des Monnaies of Geneva, Ltd., 62 B.R. 224, 226 (Bankr. S.D.N.Y. 1986) (noting that "disclosure statements in the course of a voluntary reorganization are critical to the decisions of creditors to accept or reject a proposed plan," and when a debtor provides inaccurate information, the debtor "disenfranchise[s] its creditors from casting an informed ballot.").

52.      Creditors are typically afforded twenty-eight days, after being provided with such information, to interpose objections to the proposed plan.  See Fed. R. Bankr. P. 2002(b).  That is important because all parties-in-interest are afforded a statutory right to arise, appear and be heard by the Court on any issue in the bankruptcy cases.  11 U.S.C. § 1109(b).

C.   **Conversion Standards.**

53.   Not all Chapter 11 efforts succeed.   Nor should they.   If a company is not positioned for rehabilitation and the parties cannot otherwise reach agreement on a plan of liquidation, the Chapter 11 process has run its course.   Conversion follows.

54.   Section 1112(b) provides that "the Court shall convert a case to a case under Chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause."   11 U.S.C. § 1112(b)(1) (emphasis added).   Under Bankruptcy Code Section 1112(b), conversion or dismissal is mandatory upon a showing of "cause."   See DCNC North Carolina I, LLC v. Wachovia Bank, N.A., Nos. 09-3775, 09-3776, 2009 WL 3209728, *6 (E.D. Pa. Oct. 5, 2009); see also In re Reserves Resort, Spa & Country Club LLC, 2013 WL 3523289, *2 (Bankr. D. Del. July 12, 2013) (Gross, Bankr. J.).

55.   Although "cause" is not defined, Bankruptcy Code Section 1112(b)(4) provides a non-exclusive list of sixteen "causes" for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P); In re Am. Capital Equip., LLC, 688 F.3d 145, 162 n.10 (3d Cir. 2012) ("the listed examples of cause are not exhaustive") (quoting DCNC N.C. I, L.L.C. v. Wachovia Bank, Nos. 09-3775, 09-3776, 2009 WL 3209728, at *5 (E.D. Pa. Oct. 5, 2009); In re Mechanical Maintenance, Inc., 128 B.R. 382, 386 (E.D. Pa. 1991).   That list includes:   (A) a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (M) an inability to effectuate substantial consummation of a confirmed plan.   See 11 U.S.C. § 1112(b)(4)(A) and (M).

56.   If the movant establishes any basis for "cause," the burden then shifts to  the debtor to prove it falls within the Section 1112(b)(2)  "unusual circumstances" exception to Bankruptcy Code Section 1112(b)(1)'s mandatory conversion.   However, the Third Circuit instructs that, in presenting their rebuttal, "[c]ourts usually require the debtor do more than

26

manifest unsubstantiated hopes for a successful reorganization." In re Brown, 951 F.2d 564, 572

(3d Cir.1991) (citing In re Canal Place Ltd. P'ship, 921 F.2d 569, 577 (5th Cir.1991)).

57.     Upon conversion, a Chapter 7 trustee may be elected by unsecured creditors

holding allowable, undisputed, fixed and liquidated claims, pursuant to an election process

established by Bankruptcy Code Section 702(a).     Under Bankruptcy Code Section 705, a

committee of such creditors may be formed to advise the Chapter 7 trustee.

## II.     The Plan Should Not Be Confirmed Because The Debtors Cannot Carry Their Heavy Burdens Of Proof And Persuasion Under The Bankruptcy Code.

58.     The Plan does not meet the requirements of Section 1129.  It does not achieve any

of the foundational objectives of Chapter 11.  Rather, it is mere conduit for a Section 363 transfer

of a "bundle of sticks" to Hilco and, thereafter, a liquidation process.  But, in doing so, the

proposed terms are not consistent with the Bankruptcy Code.

59.     In evaluating the Plan, what it does and what it fails to do, the Supreme Court's

decision in Jevic is instructive.  Although the Court there was focused on structured dismissals,

the overarching theme of the opinion was that bankruptcy courts should not be persuaded to

"stretch" Bankruptcy Code provisions to enable an end-run around fundamental principles.  See

Czyzewski v. Jevic Holding Corp., 137 S.Ct. 973 (1917).  That is precisely what the Plan tries to

do.

### A.     The Plan Inappropriately Delivers Control To The Term Loan Lenders, While Disenfranchising Unsecured Creditors.

60.     The vesting of asset/case control in the Term Loan Lenders' hands—while

simultaneously disenfranchising unsecured creditor interests—does not meet the above-described

requirements of Section 1129(a) or (b).  As indicated above, Term Loan Lender control threatens

unsecured creditor value entitlements, regardless of whether the Term Loan Lenders are

ultimately adjudicated to have a perfected unavoidable lien on the business interruption insurance recoveries. This parochial vesting of control does not qualify as a "good faith" plan construct, as required by Section 1129(a)(3) and the cited case law. It is not consistent with the interests of creditors or public policy (clearly reflected by Congress in Section 702(a)), as mandated by Section 1129(a)(5) and the cited case law. It constitutes "unfair discrimination" by allocating materially greater risk on general unsecured creditors than on the Term Loan Lenders' deficiency claim, and it is just plain "unfair and inequitable" treatment. 11 U.S.C. § 1129(b).

**B.    Plan Solicitation Was Insufficient; Parties-In-Interest Were Not
Provided Notice To Properly Cast Their Ballot, Rise And Be Heard.**

61.    The Plan was not solicited properly. In prosecuting the Plan, the Debtors did not deliver to creditors a disclosure statement containing "adequate information." Respecting the limited information provided, the Debtors did not afford creditors sufficient time to review this information, formulate a vote and, importantly, interpose objections. This was fundamentally wrong.

**C.    The Debtors Cannot Carry
Their Fundamental Evidentiary Burdens.**

62.    The Plan does not meet the "best interests" or "feasibility" tests. As will be established at trial, the Debtors' "Liquidation Analysis" is unstudied, imprecise, and insufficiently reliable. It is also wrong, given the inherent risks that the Debtors' governance structure imposes on unsecured creditors, as well as the value leakage occasioned by insider bonuses and releases. And, respecting feasibility, the evidence will show substantial obstacles and inhibitions that render the Hilco sale far from assured.

### D.     The Plan's Ratification Of Prepetition
###        <u>Bonuses And Inclusion Of The MIP Are Wrongful</u>.

63.     The treatment reserved for the Debtors' officers and directors does not pass muster.  The Plan violates Section 503(c) and, in turn, Section 1129(a)(1), (3), (4) and (7).  Such treatment does not allow the Court to find that unsecured creditors are receiving "fair and equitable" treatment, as required by Section 1129(b).  Given the need for incremental analysis under Section 503(c), additional points must be made about the MIP.

64.     The MIP is a disguised retention plan that violates Bankruptcy Code Section 503(c)(1).  To demonstrate that a bonus plan falls outside the scope of Section 503(c)(1), the Debtors must prove by a preponderance of the evidence that the proposed MIP bonuses are part of a "pay for value" plan that offers real incentives based on performance, rather than a "pay to stay" plan.  To establish that a plan is incentive-based, a debtor must closely link the proposed bonuses to metrics that "are directly tied to challenging financing and operational goals for the business, tailored to the facts and circumstances of the case."  <u>In re Residential Capital, LLC</u>, 478 B.R. 154, 173 (Bankr. S.D.N.Y. 2012).  Accordingly, for a plan to be truly incentivizing, it should be tied to significant goals that are difficult to achieve.  <u>See id.</u> at 164 (when analyzing an incentive plan, "the issue is whether each of these hurdles is sufficiently challenging and incentivizing").  Here, the Debtors fail to satisfy their burden that the proposed MIP is truly a "pay for value" incentive plan tied to the achievement of challenging goals.

65.     To start, the POR Confirmation Success Fee cannot be described as anything but retentive.  The MIP allows fifteen months to confirm a plan of reorganization to qualify for the POR Confirmation Success Fee.  That requirement is met, in other words, the moment the program is approved by the Court (<u>i.e.</u>, confirmation).

66.     Moreover, the Threshold is too easily achievable and not tied to significant goals that are "sufficiently challenging and incentivizing." The proceeds from the sale transaction with Hilco, $240 million, will reach 80% of the Threshold. In addition, the minimum insurance recovery the Debtors anticipate through the Stipulated Loss Value will bring the Debtors well above the Threshold. In short, the Debtors' directors and officers can do nothing and yet reach the Threshold for millions of dollars in payments under the MIP.

67.     For similar reasons, the MIP should not be allowed under Bankruptcy Code Section 503(c)(3), which imposes a general prohibition on transfers or obligations outside the ordinary course of business (including transfers or obligations in favor of insiders) that are "not justified by the facts and circumstances of the case." In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999). That is so for several reasons:

68.     First, the Debtors cannot demonstrate that the results achieved justify the MIP. As discussed above, the Threshold is easily met, and the MIP therefore provides for payment to participants even when creditors do not receive a meaningful recovery. It bears remembering that, under MIP-participant oversight, the business was shuttered, trade relationships were destroyed and about one thousand employees lost their positions. Perhaps the insiders might consider sharing their tens of millions of dollars with the creditors and employees who, under this Plan, are likely to receive nothing.

69.     Second, WTW provided only a single metric—revenue—to come to a determination that the MIP is reasonable. When reviewed against another metric, such as assets, it is clear that the MIP is far from justified, serving as a far outlier when compared to the Peer Companies. Young Declaration at ¶¶ 8, 20, 23-24, 26, 29.

70.     Third, the MIP is not fair and equitable as it fails to recognize the prepetition Retention Bonus Payments.  WTW's analysis of total direct compensation fails to take into account the prepetition Retention Bonus Payments when factoring the total compensation of the MIP participants.  When taking into account the Retention Bonus Payments, the MIP participants are more than adequately compensated.  Combined with the prepetition Retention Bonus Payments, the Debtors' bankruptcy will make the MIP participants very wealthy, adding additional compensation anywhere from three (3) to eight (8) times their annualized base pay at $600 million in distributable proceeds.  Id. at ¶ 32.

71.     Fourth, the Debtors cannot establish that the MIP is consistent with industry standards.  None of the Peer Companies used for comparisons by WTW are refineries, and a majority served as retail operations.  These distinct differences between the Debtors and the Peer Companies only further establishes that the use of a revenue metric, discussed in greater detail above, was an improper metric for determining reasonableness of the MIP.  See id. at ¶ 29. Other metrics, such as assets or per participant averages, provide contrasting metrics that establish the MIP as an outlier to those incentive plans provide by the Peer Companies.  Id.

72.     Put simply, the Debtors have failed to meet their burden to justify the MIP as proposed.  If fails Section 503(c)(3) and, in turn, Section 1129.

**III.     Should The Court Confirm The Plan,
           A Stay Pending Appeal Is Appropriate.**

73.     Bankruptcy Rule 8005 contemplates a stay pending an appeal of a Bankruptcy Court's order.  See Fed. R. Bankr. P. 8005.  Under Bankruptcy Rule 8005, a stay pending appeal is appropriate to "maintain the status quo."  See KOS Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).  In bankruptcy cases, myriad circumstances can occur "that would

31

necessitate the grant of a stay pending appeal in order to preserve a party's position." In re Highway Truck Drivers & Helpers Local Union # 107, 888 F.2d 293, 298 (3d Cir. 1989).

74.     In evaluating whether a party is entitled to a stay pending appeal, courts consider (a) the likelihood that the moving party will succeed on the merits; (b) the possibility that the moving party will suffer irreparable harm absent relief; (c) whether the stay will inflict substantial harm on the nonmoving parties; and (d) whether the stay will harm the public interest. See Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991) (citing Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).

75.     None of these factors is, on its own, outcome determinative. Rather, a court "must balance all of the factors in order to decide whether or not to grant a stay." Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.), 367 B.R. 516, 519 (Bankr. D. Del. 2007) (finding all four factors weighed in favor of granting motion to stay proceedings pending appeal) (citation omitted); Meisel v. Armenia Coffee Corp. (In re Hudson's Coffee, Inc.), No. 06-1458, 2008 Bankr. LEXIS 2994, at * 4 (Bankr. D.N.J. Oct. 31, 2008) ("[N]o single factor is outcome determinative. Rather, [a court] must balance all of the elements in order to reach an appropriate determination."). See also In re Countrywide Home Loans, Inc., 387 B.R. 467, 479 (Bankr. W.D. Pa. 2008) (noting that "a balancing approach is more appropriate than a somewhat mechanical test"). Particularly, the Court should find that the more likely it is that the movant will succeed on appeal, the less strong showing of irreparable harm needs to be, and vice versa. See BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15357 Mem'l Corp.), No. 06-10859-KG, 2009 WL 393948 (D. Del. Feb. 18, 2009); see also Hickey v. City of New York (In re World Trade Ctr. Disaster Site Litig.), 503 F.3d 167, 170 (2d Cir. 2007) ("[T]he degree to which a factor must

be present varies with the strength of the other factors, meaning that more of one [factor] excuses less of the other.") (citations and internal quotations omitted).

76.     The issues raised herein are substantial and should be heard on appeal should the Plan be confirmed.     These include legal and evidentiary issues pertaining to: (i) use of a confirmation of a plan of liquidation to frustrate fundamental principles of the Bankruptcy Code following the Supreme Court's decision in Jevic; (ii) "good faith" and other Section 1129 requirements, given how the Plan vests exclusive control of critical value and value-allocation issues with the Term Loan Lenders, and bestows other lucrative benefits on insiders; and (iii) the Fifth Amendment due process rights of all stakeholders to understand the Plan, vote on that Plan and, perhaps most importantly, rise and be heard at the confirmation hearing.  Without the stay, the Debtors may consummate the Plan while an appeal is pending, rendering the appeal "equitably moot" and dissolving the Committee, leaving no fiduciary representative for unsecured creditors.  In the near term, however, as the Hilco sale cannot close for several months and the Plan leaves most key issues for future adjudication, a stay will not harm the estates.  Accordingly, should the Court confirm the Plan, a stay should be issued.

## IV.     Should The Court Deny Confirmation,
## The Cases Should Be Sent To Mediation Or Converted.

77.     Mediation is the preferred forum for dispute resolution in this Court.  See Del. Bankr. L.R. 9019-3 ("Notwithstanding any provision of law to the contrary, the Court may refer a dispute pending before it to mediation and, upon consent of the parties, to arbitration.").  The Committee believes the issues in these cases deserve a new opportunity for settlement.

78.     Should mediation not be an available solution, the Committee respectfully requests that the Court convert the cases to a proceeding under Chapter 7.  The statutory

predicates for conversion are amply satisfied and, given the present path of the cases, it is a "Solomonic" outcome (see footnote 6 herein).

## **RESERVATION OF RIGHTS**

79.    The Committee reserves all rights to supplement and augment this pleading as developments occur, including developments referenced in footnote 4.

[*Remainder of page intentionally left blank.*]

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court:   (i) deny confirmation of the Plan; (ii) order mediation or case conversion; and (iii) grant the Committee such other or further relief as the Court deems just and proper.

Dated:  February 6 2020

**ELLIOTT GREENLEAF, P.C.**

*/s/ Jonathan M. Stemerman*
Rafael X. Zahralddin-Aravena (No. 4166)
Jonathan Stemerman (No. 4510)
1105 N. Market Street, Suite 1700
Wilmington, DE  19801
Telephone:  (302) 384-9400
Email:  rxza@elliottgreenleaf.com
jms@elliottgreenleaf.com

- and -

**BROWN RUDNICK LLP**
Robert J. Stark *(admitted pro hac vice)*
Chelsea Mullarney *(admitted pro hac vice)*
Max D. Schlan *(admitted pro hac vice)*
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
cmullarney@brownrudnick.com
mschlan@brownrudnick.com

- and -

James W. Stoll *(admitted pro hac vice)*
Steven B. Levine *(admitted pro hac vice)*
Sharon I. Dwoskin *(admitted pro hac vice)*
One Financial Center
Boston, MA 02111
Telephone: 617-856-8200
Email: jstoll@brownrudnick.com
slevine@brownrudnick.com
sdwoskin@brownrudnick.com

*Counsel to the Official Committee*
*of Unsecured Creditors*