## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PES Holdings, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
| | ) |
| Debtors. | ) |
| | ) **Re: Docket No. [827]** |
| | ) **Hearing Date: February 12, 2020 at 9:30 a.m.** |
| | ) **Objection Deadline: Extended to February 7, 2020** |
| | ) **at 12:00 p.m.** |

## OBJECTION AND RESERVATION OF RIGHTS OF MULTIPLE INSURERS TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES

Multiple insurers (the "Insurers")[2] under policies issued to certain of the above-captioned debtors (the "Debtors"), by and through their undersigned counsel, submit this objection and reservation of rights ("Objection and Reservation of Rights") to the *Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* [Doc. No. 827] (the "Plan").[3] In support of this Objection and Reservation of Rights, the Insurers respectfully state as follows:

### INTRODUCTION

1.     Prior to the Debtors' chapter 11 filings on July 21, 2019 (the "Petition Date"), the Insurers issued property damage and business interruption insurance policies to certain of the Debtors (the "Insurance Policies"). The Debtors have made claims against the Insurance Policies in connection with losses sustained as a result of the fire that occurred at the Debtors' refining facility on June 21, 2019.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

[2]     The Insurers submitting this Objection and Reservation of Rights are listed on Annex 1 hereto.

[3]     Capitalized terms used but not defined here shall have the meanings given to them in the Plan.

2.      Since before the Petition Date, the Insurers have been actively engaged with the Debtors in pursuit of a resolution of the Debtors' claims against the Insurance Policies.  Indeed, these efforts have already resulted in advances by the Insurers of $50 million and $15 million on the property insurance losses in September and December 2019, respectively.[4]  The Insurers and the Debtors have been in near-constant contact to facilitate the evaluation and resolution of the Debtors' insurance claims as expeditiously as possible.

3.      The Insurers seek to resolve the Debtors' claims to the Insurance Policies consensually.  The process to determine the amount of losses covered under the Insurance Policies, however, is complex.  Determining the amount of the Debtors' business interruption losses, for example, involves considerable diligence and the construction of highly detailed models to estimate the value of the parts of the Debtors' business that were damaged (and the parts that were undamaged) as a result of the June 21, 2019 incident.  Given these complexities, it remains unclear whether a consensual resolution of all of the Debtors' insurance claims will be possible.  It certainly will not be before the hearing to consider confirmation of the Plan.

4.      On January 29, 2020, the Debtors filed the Plan, which contained substantial revisions to the prior version of the plan filed on December 11, 2019.  *See* Doc. No. 828-1.  The Insurers are concerned that certain aspects of the Plan, particularly as amended, could be interpreted to affect the Insurers' rights and defenses with respect to the Insurance Policies and the Debtors' claims for coverage thereunder.  That would be improper.  The Plan and related sale transaction should neither expand nor contract the rights of any of the parties—the Debtors or Insurers—in any potential coverage dispute over the Insurance Policies.  They should be neutral

---

[4] *See Stipulation and Agreed Order Regarding Advance of June 21 PD Insurance Proceeds* [Doc. No. 365]; *Second Stipulation and Agreed Order Regarding Advance of June 21 PD Insurance Proceeds* [Doc. No. 678].

with respect to insurance-coverage issues.  To the extent that the Plan may do otherwise, the

Insurers object and reserve all of their rights.

5.     To be clear, the Insurers do not seek to stand in the way of confirmation of the

Debtors' Plan.  But the Insurers do have a legitimate interest in protecting their contractual and

legal rights and in ensuring that the Plan does not improperly tilt the playing field against them in

the event the parties are not able to resolve all of their disputes with respect to the Debtors'

claims for insurance consensually.  Fortunately, there is a simple solution.  The Insurers have

proposed an "insurance neutrality" provision and related edits to specific Plan provisions

(attached as <u>Exhibit A</u>) that are intended to clarify that the Plan and related sale documents will

not alter the parties' rights with respect to insurance-coverage issues.  If the Plan is truly not

intended to affect the parties' rights, there should be no objection to including the proposed

modifications attached as <u>Exhibit A</u>.

6.     The Debtors agreed to extend the Insurers' deadline to object to the Plan to

February 7 at 12:00 p.m.  While the Debtors have agreed to include the Insurers' proposed

"insurance neutrality" insert in the confirmation order approving the Plan, they have indicated

that they will not agree to include the Insurers' proposed modification to two specific Plan

provisions.  Accordingly, the Insurers file this Objection and Reservation of Rights.

## <u>ARGUMENT</u>

**I.     THE PLAN SHOULD BE INSURANCE NEUTRAL AND SHOULD NOT ALTER THE INSURERS' RIGHTS WITH RESPECT TO INSURANCE-COVERAGE ISSUES**

7.     As noted, the Insurers have been working with the Debtors to resolve the Debtors'

claims for coverage under the Insurance Policies in connection with losses arising out of the pre-

petition fire at the Debtors' refining facility.  In the event that the parties are unable to reach a

consensual resolution of all claims against the Insurance Policies, the parties' respective rights

are governed by the terms of the Insurance Policies and applicable non-bankruptcy law, a dispute

that the federal and state courts routinely adjudicate outside of bankruptcy.  The fact that an

insured happens to be in bankruptcy should not give it any greater rights against its insurers than

it would have outside bankruptcy.  The Insurers therefore object to the Plan to the extent that the

Plan and related documents may purport to provide otherwise.

8.    For example, the Plan and related sale transaction documents contain provisions

that appear to implicate the Insurers' rights under the Insurance Policies.  In particular, the Plan

and sale documents provide for a sale of the Debtors' business, in which the Purchaser would

acquire 100% of certain of the Debtors' equity interests and the Acquired Debtors would retain

"bare legal title" to the claims for coverage under the Insurance Policies.  *See* Purchase and Sale

Agreement § 2.01 [Doc. No. 780-6]; Plan art. IV.E.1.  Yet the Plan and sale documents purport

to grant the Liquidating Trust all control over the litigation of those claims and the right to

receive all proceeds of those claims.  *See* Plan art. IV.E.1; First Am. Plan Supplement Ex. B(i),

B(v) [Doc. No. 819-3].  The Plan further contains broad "free and clear" language providing that

the equity interests and assets being sold to the Purchaser, or being retained by the Liquidating

Trust, will vest in those entities free and clear of all claims, liens, claims or other charges.  *See*

Plan art. IV.E.

9.    If the same transaction were done outside bankruptcy, it might give rise to

potential defenses to coverage.  For example, the Insurers may have arguments under the policies

and applicable non-bankruptcy law that an insured may not claim losses under a business-

interruption insurance policy for ongoing losses arising after a sale of the business (because there

is no ongoing business).  The Debtors, of course, may assert arguments to the contrary.  But

whether the provisions of the Plan and related documents would, in fact, give rise to any

coverage defense (or other defense) is not a question this Court need (or should) decide here. Rather, the point is that the Insurers—as well as the Debtors—should have whatever rights and defenses they would otherwise have if the same transaction were done outside bankruptcy. Nothing in the Plan and related documents should change any of that. Nor should this Court's confirmation of the Plan or its explicit "approval" of the various Plan documents under the Debtors' proposed confirmation order be construed as any kind of implicit adjudication of any such coverage defenses that the Insurers might otherwise have.

10.     It is settled law that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019). "Whatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand it either." *Id.* (internal quotation marks and alterations omitted); *Integrated Sols., Inc. v. Serv. Support Specialties*, 124 F.3d 487, 492 (3d Cir. 1997) ("once a property interest has passed to the estate, it is subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law" (citation omitted)).

11.     The Debtors are asserting claims under the Insurance Policies against the Insurers, non-debtor third parties, in an effort to augment the estate. Nothing in the Bankruptcy Code allows a debtor to expand its rights vis-á-vis a third-party defendant on a non-bankruptcy cause of action simply because the debtor happens to be in bankruptcy. To the contrary, the Bankruptcy Code's requirements for confirmation of a chapter 11 provide that the plan must not be proposed "by any means forbidden by law." 11 U.S.C. § 1129(a)(3). That reflects the basic bankruptcy principle that, absent express provision in the Bankruptcy Code otherwise, the parties' substantive entitlements in bankruptcy are to be determined according to applicable non-

bankruptcy law. *Butner v. United States*, 440 U.S. 48, 54-55 (1979) ("Congress has generally

left the determination of property rights in the assets of a bankrupt's estate to state law. …

Unless some federal interest requires a different result, there is no reason why such interests

should be analyzed differently simply because an interested party is involved in a bankruptcy

proceeding."); *Integrated Sols.*, 124 F.3d at 492-93.

12.    Accordingly, the Plan must be neutral with respect to insurance-coverage issues.

It should neither enlarge nor diminish the rights of either the Debtors or the Insurers in any

coverage dispute.  In recognition of that basic principle, courts have regularly approved

"insurance neutrality" provisions that make clear that confirmation of a plan does not affect the

respective rights of a debtor-insured and its insurers with respect to the debtor's claims for

insurance. *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 217-219 (3d Cir. 2004).

13.    To that end, the Insurers have proposed appropriate "insurance neutrality"

language, which is attached as <u>Exhibit A</u> hereto.  The neutrality provision is designed to clarify

that none of the provisions of the Plan, the related Plan and sale documents, or this Court's order

confirming the Plan will alter or affect any of the Insurers' rights or defenses with respect to the

Insurance Policies and the Debtors' claims for coverage thereunder.  That language will ensure

that the Plan respects the parties' rights under the Insurance Policies and applicable non-

bankruptcy law, as the Bankruptcy Code requires.  The Debtors have indicated that they will

include the "insurance neutrality" provision in any order confirming the Plan.  To the extent they

do not, the Insurers request that the Court order that such language be included.

## II.    THE PLAN SHOULD NOT EXTEND THE AUTOMATIC STAY BEYOND PLAN CONFIRMATION

14.    The Plan provides that "the automatic stay pursuant to Section 362 of the

Bankruptcy Code shall remain in full force and effect with respect to the Liquidating Trust and,

subject to the terms of the Global Resolution, the Insurers, in each case until the closing of these

Chapter 11 Cases." Plan art. X.H. There is no basis for extending the automatic stay beyond

plan confirmation. The provision should accordingly be revised to provide that the automatic

stay terminates upon the Plan's effective date.

15.    Section 362 of the Bankruptcy Code specifies when the automatic stay terminates.

It provides that "the stay of an act against property of the estate … continues until such property

is no longer property of the estate." 11 U.S.C. § 362(c)(1). The "stay of any other act …

continues until the *earliest* of-- (A) *the time the case is closed*; (B) the time the case is dismissed;

*or* (C) if the case is … a case under chapter … 11 …, *the time a discharge is granted or denied*."

*Id.* § 362(c)(2) (emphasis added).

16.    Pursuant to section 1141 of the Bankruptcy Code and the terms of the Plan,

confirmation of the Plan will vest the property of the estate in the Liquidating Trust or the

Purchaser, and it will grant the Debtors a discharge. *Id.* § 1141(b)-(d); Plan art. IV.E.1, X.B,

X.H.

17.    Accordingly, by its terms, the automatic stay will terminate upon confirmation of

the Plan. *See, e.g.*, *Orange Cty. Water Dist. v. Fairchild Corp. (In re Fairchild Corp.)*, No. C.A.

09-10899-CSS, 2014 WL 7215211, at *3 (D. Del. Dec. 17, 2014) ("The Confirmation Order

vested all the property of the Debtor's estate in a Liquidating Trust. This terminated the

automatic stay under both § 362(c)(1) and (2)[.]"); *In re Greater Am. Land Res., Inc.*, 452 B.R.

532, 538 (Bankr. D.N.J. 2011), *aff'd sub nom. Greater Am. Land Res., Inc. v. Town of Brick*, No.

11-cv-5308 (CCC), 2012 WL 1831563 (D.N.J. May 17, 2012) (confirmation of chapter 11 plan

terminated automatic stay under § 362(c)(2)); *Calderon v. Commodore Holdings Ltd.*, No. 02

Civ. 8273 (DC), 2004 WL 385062, at *2 (S.D.N.Y. Mar. 1, 2004) (same); *In re Good*, 428 B.R. 235, 242-43 (Bankr. E.D. Tex. 2010) (same).

18.     The Plan's provision purporting to continue the automatic stay until case closing directly contravenes the Bankruptcy Code.  Section 362 expressly provides that the automatic stay terminates upon the "earliest"—not the "latest"—of case closing or confirmation of a chapter 11 plan granting or denying a discharge.  11 U.S.C. § 362(c)(2).  Nothing in section 362(c) grants the court authority to extend the automatic stay beyond the statutory term Congress prescribed.  Nor does chapter 11.  To the contrary, Section 1129 mandates that a plan cannot be confirmed unless it "complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1); *see also id.* § 1123(b)(6) (plan may include only provisions that are "not inconsistent with the applicable provisions of this title").

19.     Moreover, even if any authority existed to extend the automatic stay beyond plan confirmation, there would be no basis for exercising that authority here.  The automatic stay is designed to give the debtor a temporary breathing spell from creditor collection efforts and lawsuits while the debtor attempts to formulate a plan of reorganization.  *In re VistaCare Grp., LLC*, 678 F.3d 218, 231 (3d Cir. 2012).  The Debtors have done that here.  If the Plan is confirmed, its terms will be binding on creditors, and the Plan will govern their rights going forward.  The automatic stay's purpose will have been fulfilled.

20.     But a debtor that has obtained the benefits of a chapter 11 proceeding and that has successfully achieved confirmation of a chapter 11 plan of reorganization should not be allowed to continue to invoke the protections of the Bankruptcy Code's automatic stay in an effort to obtain a litigation advantage against third parties in any post-confirmation litigation.  If the Debtors and the Insurers are unable to resolve the Debtors' insurance claims consensually, that

dispute should be resolved in whatever forum would otherwise be available to the parties outside bankruptcy.  The Debtors should not be able to use the automatic stay to prevent the Insurers from proceeding against the Debtors (or the Acquired Entities) in a forum of their choosing.  *See, e.g., In re Scarborough-St. James Corp.*, 535 B.R. 60, 70 (Bankr. D. Del. 2015) (holding that debtor's attempt to use the automatic stay to litigate issues "in its preferred forum" improperly used the automatic stay as a "sword" rather than a "shield").

21.    Accordingly, the Plan should be amended to provide that the automatic stay will terminate upon the Plan's effective date, or, in the alternative, to include the language contained in Exhibit A hereto clarifying that the automatic stay will terminate as of the effective date with respect to any claims or causes of action by the Insurers arising out of or relating to the Insurance Policies.

## III.    THE INSURERS RESERVE ALL RIGHTS WITH RESPECT TO THE PLAN'S JURISDICTIONAL PROVISIONS

22.    The Plan contains a provision purporting to retain jurisdiction of this Court to "adjudicate, decide, and resolve any and all matters or litigation related to or arising out of the Business Interruption and Property Damage Insurance Policies, including, for the avoidance of doubt, any actions by the Debtors or the Liquidating Trust, as applicable, (a) to enforce the obligations of, and/or seek damages against, the Insurers under the Business Interruption and Property Damage Insurance Policies."  Plan, art. XIII.25; *see also id.* art. IV.H.  While the Insurers remain hopeful that the Debtors' claims to the proceeds of the Insurance Policies will be resolved without the need for any party to resort to litigation in any court, the Insurers must, and do, reserve all rights, including the right to challenge this Court's jurisdiction and authority, in connection with any such potential litigation.

23.     It is clear as a matter of law that retention provisions in a plan cannot create jurisdiction where it does not otherwise exist. *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004). Where jurisdiction is otherwise absent, such provisions are "fundamentally irrelevant." *Id.* Nevertheless, to avoid any implication of consent or waiver (neither of which ought to be applicable to matters of subject-matter jurisdiction, in any event), the Insurers expressly reserve all rights to challenge the jurisdiction or authority of this or any other court over any matter arising out of or relating to the Insurance Policies notwithstanding anything to the contrary in the Plan. The Insurers request that any order confirming the Plan include the language contained in Exhibit A hereto confirming that the Plan does not purport to create jurisdiction in the absence of statutory authority.

## GENERAL RESERVATION OF RIGHTS

24.     As of the filing of this Objection and Reservation of Rights, the proposed confirmation order has not been filed, and the Debtors may propose further amendments and modifications to the Plan. Accordingly, the Insurers reserve all rights to amend and supplement this Objection and Reservation of Rights and to submit additional briefing, argument and/or evidence in support thereof at or prior to the confirmation hearing.

25.     Nothing contained in this Objection and Reservation of Rights shall be deemed (a) an acknowledgment of any claim in respect of, or an expansion of any coverage that may otherwise be available under, the Insurance Policies; (b) a consent by or on behalf of any person or entity to the personal jurisdiction of this Court or any other court in the United States; or (c) a waiver of any Insurer's right to arbitration under the applicable Insurance Policies. The Insurers expressly reserve, and do not waive, all of their rights, defenses, limitation and/or exclusions (whether arising under the Insurance Policies, applicable law, or otherwise) in respect of the

Insurance Policies and any claim or matter arising out of or relating thereto, including the right to

enforce the applicable Insurance Policies' arbitration provisions.

Dated: February 7, 2020

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

/s/ Craig Goldblatt
Craig Goldblatt [Del. Bar. No. 6665]
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: 202-663-6000
Craig.Goldblatt@wilmerhale.com

Benjamin W. Loveland
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
Benjamin.Loveland@wilmerhale.com