## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11626 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### DEBTORS' RESPONSE TO OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS, IN FURTHER SUPPORT OF AN ORDER CONFIRMING THE DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES

Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
          steven.serajeddini@kirkland.com
          matthew.fagen@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 870
Wilmington, Delaware 19899
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
          joneill@pszjlaw.com
          pkeane@pszjlaw.com

Dated:  February 10, 2020

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate Holdings, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

# TABLE OF CONTENTS

**Page(s)**

Preliminary Statement ........................................................................................................... 1

I.    The Objection of the Committee Should be Overruled. ...................................................... 4

    A.    The Plan Has Been Proposed with the Good-Faith Goal of Maximizing the Value of the Debtors' Estates for Distribution to All Stakeholders in Accordance with the Bankruptcy Code's Priority Scheme ..................................... 5

        1.    From Catastrophe to Value-Maximizing Transactions. ............................. 5

        2.    The Construct of the Plan Offers Myriad Benefits to the Estate's Constituents ................................................................................................. 6

        3.    The Sale of Certain Debtor Entities Pursuant to the Plan is the Result of the Debtors' Good-Faith Efforts to Maximize Value. ........................... 10

        4.    The Post-Emergence Governance Program Is Designed to Ensure Continued Value Maximization and Fair Representation of Stakeholders. ............................................................................................. 14

        5.    The Debtors' Release of the Senior Management Team Members Pursuant to the Plan is Appropriate and Reasonable. ............................... 18

        6.    The MIP Maximizes the Value of the Debtors' Estates and Benefits All Stakeholders ....................................................................................... 21

    B.    By Maximizing the Distributable Value and Establishing Fair Procedures for That Value to Be Distributed to Creditors and Equityholders--All in Accordance with the Bankruptcy Code's Priority Scheme--the Plan on Its Face Does Not Discriminate Unfairly Against, Is Fair and Equitable with Respect To, and Is in the "Best Interests" of Unsecured Creditors. ..................... 24

        1.    The Plan Is Feasible. ............................................................................... 32

        2.    The Plan Was Solicited and Has Been Prosecuted in Compliance with the Bankruptcy Code and in A Manner Designed to Maximize Distributable Value. ................................................................................. 33

    C.    The Committee's Motion for a Stay of the Confirmation Order Should be Rejected ................................................................................................................. 39

    D.    A Chapter 7 Liquidation Would Not be in the Creditors' Best Interest and the Committee's Request for Conversion Should be Denied. ............................... 41

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)......................................................................................................25, 41

*Goggin v. Div. of Labor Law Enforcement*,
336 U.S. 118 (1949)................................................................................................................7

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016) ...................................................................................32

*In re Adelphia Comm'ns. Corp.*,
333 B.R. 649 (S.D.N.Y. 2005)............................................................................................39

*In re Adelphia Comm'ns. Corp.*,
361 B.R. 337 (S.D.N.Y. 2007)............................................................................................40

*In re Adelphia Comm'ns. Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007).................................................................................31

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13 2010).............................26

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)................................................................................................26

*In re Blackhawk Mining LLC*,
No. 19-11595 (LSS) (Bankr. D. Del. August 29, 2019) .......................................................16

*In re Calpine Corp.*,
2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008)........................................................39, 40

*In re Charter Comm'ns.*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009).................................................................................30

*In re Ditech Holding Corp.*,
No. 19-10412-JLG (Bankr. S.D.N.Y. 2019)..........................................................................37

*In re DJK Residential, LLC*,
No. 08-10375 (JMP), 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008).........................................39

*In re Energy Future Holdings Corp.*,
No. 14-10979 (CSS) (Bankr. D.Del. Feb. 28, 2018) ..............................................................9

*In re Hollander Sleep Products LLC*,
No. 19- 11608 (Bankr. S.D.N.Y. 2019) ...................................................37

*In re Insys Therapeutics, Inc.*,
No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) ...............................16

*In re Midway Games Inc.*,
No. 09-10465 (KG) (Bankr. D. Del. May 21, 2010) ...............................16

*In re Mission Coal Comp., LLC*,
No. 18-04177-TOM11 (Bankr. N.D. Ala. April 15, 2019)......................16

*In re Molycorp, Inc.*,
No. 15-11347-CSS (Bankr. D. Del. 2016)...............................................37

*In re Patriot Coal Corp.*,
 No. 15-32450 (Bankr. E.D. Va. Oct. 9, 2015) .......................................16

*In re Pittsfield Weaving Co.*,
393 B.R. 271 (Bankr. D.N.H. 2008) .......................................................41

*In re Seahawk Drilling, Inc.*,
No. 11-20089 (RSS) (Bankr. S.D. Tex. Sept. 28, 2011).........................16

*In re Sears Holdings Corp.*,
No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) .........................16

*In re Specialty Retail Shops Holding Corp.*,
No. 19-80064-TLS (Bankr. D. Neb. 2019)...............................................37

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993)...................................................................7

*In re Timbers of Inwood Forest Assocs., Ltd.*,
808 F.2d 363 (5th Cir. 1987) ..................................................................42

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011),
*modified on recon.* 464 B.R. 2008 (Bankr. D. Del. 2011) .......................32

*In re Tronox, Inc.*,
No. 09-10156 (ALG) (Bankr. S.D.N.Y. Nov. 30, 2010) .........................10

*In re U.S. Medical, Inc.*,
531 F.3d 1272 (10th Cir. 2008) ..............................................................15

*In re Washington Mutual, Inc.*,
461 B.R. 200 (Bankr. D. Del. 2011) ........................................................32

iii

*In re Washington Mutual, Inc.*,
No. 08-12229 (MFW) (Bankr. D. Del. Feb. 24, 2012) ........................................................16

*In re Westmoreland Coal Co.*,
No. 18-35672 (DRJ) (Bankr. S.D. Tex. March 2, 2019) (same) ........................................16

*In re Woodbridge Group of Companies*,
No. 17-12560 (KJC) (Bankr. D. Del. Oct. 26, 2018) ........................................................16

*In re Z Gallerie, LLC*,
No. 19-10488-LSS (Bankr. D. Del. June 20, 2019) ....................................................16, 37

*Loop Corp. v. U.S. Tr.*,
379 F.3d 511 (8th Cir. 2004) ...........................................................................................15

*United States v. Speers*,
382 U.S. 266 (1965) ...........................................................................................................7

**Statutes**

11 U.S.C. § 503(b) ...............................................................................................................7

11 U.S.C. § 507 ....................................................................................................................7

11 U.S.C. §§ 701-784 ................................................................................................ *passim*

11 U.S.C. § 726 ....................................................................................................................7

11 U.S.C. §§ 1101-1195 ............................................................................................ *passim*

11 U.S.C. § 1112 ................................................................................................................43

11 U.S.C. § 1112(a)(4)(A) ..................................................................................................43

11 U.S.C. § 1112(a)(4)(M) .................................................................................................43

11 U.S.C. § 1112(b)(1) .......................................................................................................41

11 U.S.C. § 1112(b)(4) .......................................................................................................41

11 U.S.C. § 1125 ..........................................................................................................37, 38

11 U.S.C. § 1125(a)(1) .......................................................................................................33

11 U.S.C. § 1129(a)(2) .......................................................................................................33

11 U.S.C. § 1129(a)(7) .......................................................................................................31

11 U.S.C. § 1129(b)(1) .......................................................................................................26

11 U.S.C. § 1129(b)(2)(B)(i) ............................................................................25

11 U.S.C. § 1129(b)(2)(B)(ii) ...........................................................................25

11 U.S.C. Title 11 ...................................................................................... *passim*

12 Del. C. § 3301(d) ........................................................................................17

**Rules**

Bankruptcy Rule 9019 ......................................................................................16

**Other Authorities**

Arturo Bris, Ivo Welch, and Ning Zhu, *The Costs of Bankruptcy: Chapter 7
   Liquidation versus Chapter 11 Reorganization,*
   LXI The Journal of Finance 1253 .................................................................8

Ziad Raymond Azar, *Bankruptcy Policy, Legal Heritage, and Financial
   Development: An Agenda for Further Research,*
   24 Emory Bankr. Dev. J. 379 (2008) ............................................................8

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] submit this supplemental memorandum of law in response (the "Response") to the *Objection of the Official Committee of Unsecured Creditors to Confirmation of First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates and Cross-Motions for a Stay Pending Appeal, Mediation and/or Conversion to a Chapter 7 Proceeding* [Docket No. 924] (the "Objection") and in further support of confirmation of the *Third Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* (filed contemporaneously herewith) (as modified, amended, or supplemented from time to time, the "Plan").  The Debtors hereby incorporate into this Response the *Debtors' Memorandum of Law in Support of an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtors Affiliates* (the "Memorandum"), filed contemporaneously herewith.  In support of confirmation of the Plan, the Debtors respectfully state as follows.[3]

## **Preliminary Statement**

1.      These cases represent an unprecedented turnaround.  They sprang from disaster: the June 21 explosion caused permanent damage to the Debtors and their stakeholders.  Since that day, the Debtors have made it a priority to ensure the public health and safety, find a plan sponsor for their decimated business that would actually yield value, and preserve insurance recoveries for the benefit of creditors.  The Debtors' substantial efforts under these uniquely difficult circumstances have maximized value for stakeholders.  And against all odds, a little over 8 months since the accident, the Debtors are ready to confirm and consummate a chapter 11 plan.

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Bidding Procedures Order, or in the Memorandum, as applicable.

[3]    The Debtors incorporate by reference all applicable arguments and facts raised in the Memorandum.

2.      The Plan presents the best available outcome for each class of claims and interests. It is premised on a transaction with the Plan Sponsor, HRP Philadelphia Holdings, LLC, that provides $240 million of cash consideration to the estates in exchange for interests in the Reorganized Debtors, assumes all meaningful environmental liabilities and many others and provides for billions of dollars of investment into the site to transform the Debtors' business from a destroyed refinery complex to a mixed-use industrial site.  The Debtors recognize that while the City of Philadelphia and environmental and citizen groups embrace the prospect of repurposing the site; refinery vendors, the steelworkers union, and their proxy, the Committee, do not.  But that outcome is the result of the tremendous damage caused by the accident and market realities, not the Debtors.  The Debtors conducted a broad sale process open to all bidders, including several who considered the possibility of a refinery restart.  No credible bidder, including the ultimate Plan Sponsor, emerged that supported a restart.  The Plan Sponsor will invest billions in the site and create thousands of new jobs at the site—substantially more than what was lost.  The fact that those are not the same uses and jobs that previously existed is not a valid basis for objection to a plan.

3.      Nor is the fact that the transaction for the equity of the reorganized debtors is implemented as part of a plan—as it should and *must* be—somehow untoward.  Especially where that Plan does everything else it is supposed to do, such as satisfy all administrative claims, fund a trust to preserve the Debtors' claims against its insurers that will provide yet further recoveries, and distribute the remaining cash reaped from the transaction to the Debtors' stakeholders in accordance with their priorities, but for a gift to unsecured creditors.  The only remarkable thing is that the Plan does all of this given where the Debtors were on June 21.

4.    What's left of the Committee's objection is a critique of management compensation writ large.  The Debtors' already short-handed management team has worked tirelessly since the day of the disaster—which came about through no fault of their own—in a function that far exceed the hours, effort, and stress of their original roles.  To name just a few of their most important efforts:  they have successfully ensured the public health and safety since the accident; collaborated with local, state, and federal governmental entities regarding the site and the process; facilitated countless official and unofficial investigations; safely shut down the refinery; developed a plan to conduct an unprecedented extraction of millions of barrels of hydrocarbons from the refinery system; managed the Debtors' remaining workforce; helped market and lead the diligence efforts for the Debtors' assets with tens of buyers; led the Debtors' insurance adjustment and recovery efforts including the entirety of substance backing the Debtors claim and their engagement with the insurer's adjusted; managed the unwinding of the Debtors' refinery operations and related cost reduction efforts; and participated in all of the matters associated with these operation and success of the chapter 11 cases.  They do not require any party's pity for enduring this experience, but they are entitled to receive compensation for their work.  The simple fact that the Debtors prudently reduced their workforce once the accident made refining operations impossible, is not itself a basis to object to executive compensation.  As demonstrated by the Debtors' experts, their compensation was vastly below what executives of comparable expertise receive.  Viewed under the appropriate legal standards—whether it is for avoidance actions for prepetition payments or "reasonableness" under 1129(a)(4) for the management incentive plan—the proposed compensation is supported by law.  The compensation—and any releases relating to past compensation—were considered and investigated by independent bodies, disclosed publicly, and closely negotiated with the Debtors' near billion dollars' worth of stakeholders whose recoveries are actually affected by these issues.

5.      And that is the fatal flaw of the Committee's entire position.  It has focused all of its attacks on either management or circumstances out of anyone's control, while failing to articulate a valid basis for recovery in these cases.  Every alternative path the Committee touts— at this point it appears to be chapter 7—condemns unsecured creditors to a worse outcome.  The Debtors' assets are entirely encumbered or otherwise necessary to satisfy hundreds of millions of dollars of senior administrative claims.  That is not a source of pride for the Debtors, but it is the reality of the Debtors and the Committee's position.  The Plan provides Holders of General Unsecured Claims with the option of choosing to receive (a) their pro rata share of $5 million or (b) a waterfall recovery in accordance with the Bankruptcy Code.  That exceeds their legal entitlements, and is the best available outcome under the circumstances.[4]

6.      For these reasons, and as explained in greater detail in this Response, the Plan is a good and fair result, satisfies the standards for confirmation, and should be confirmed.

## I.      The Objection of the Committee Should be Overruled.

7.      The Committee objects to the Plan on the grounds that (a) it has not been proposed in good faith, (b) it discriminates unfairly, is not fair and equitable, and is not in the "best interests" of general unsecured creditors, (c) it does not meet the feasibility requirements of the Bankruptcy Code, and (d) the Debtors have not complied with the Bankruptcy Code in prosecuting and soliciting votes on the Plan.

8.      The Committee is simply wrong.  The Plan has been proposed with a clear good-faith goal: maximizing the value of the Debtors' assets for distribution to stakeholders in accordance with the Bankruptcy Code's priority scheme.  By maximizing the distributable value

---

[4]     The Debtors have been in active discussions with their stakeholders to secure a yet greater recovery for unsecured creditors, but the proposals to date have not been acceptable to the Committee.  The Debtors intend to continue to facilitate these discussions through the date of the Confirmation Hearing.

and establishing fair procedures for that value to be distributed to creditors and equityholders consistent with the Bankruptcy Code's priority scheme, the Plan on its face does not "discriminate unfairly" against, is "fair and equitable" with respect to, and is in the "best interests" of, general unsecured creditors.  The Plan is also consistent with the other provisions of the Bankruptcy Code.  And the Plan was solicited and has been prosecuted in compliance with the Bankruptcy Code.  To date, the Plan's framework has allowed the Debtors to reach consensus with the Term Loan Lenders, ICBCS, and the equityholders.

A.      **The Plan Has Been Proposed with the Good-Faith Goal of Maximizing the Value of the Debtors' Estates for Distribution to All Stakeholders in Accordance with the Bankruptcy Code's Priority Scheme.**

9.      The Committee's contention that the Plan does little to accomplish the objectives of chapter 11 is premised on two falsehoods: that the Plan must (1) contemplate a sale to a refinery restarter (which the Debtors did everything possible to facilitate); and (2) resolve an intercreditor dispute with respect to the encumbrance of the proceeds under the Debtors' business interruption insurance policies (the "BI Insurance Proceeds") (which would require a global settlement that, to date, has proved elusive).  But while the Plan—just like nearly every major plan—does not solve every single case or constituent issue, it still accomplishes a tremendous amount.

1.      **From Catastrophe to Value-Maximizing Transactions.**

10.      The restructuring and Plan process came quickly on the heels of a nearly fatal wound to the Debtors caused by the June 21 Incident.  From the (literal) ashes and toxic waste that rendered the largest of the Debtors' refinery complexes inoperable (and led to the shutdown of the smaller complex), the Debtors' management team embarked on a process to maximize the value that remained.  It was unclear at that point whether there would be *any* value to distribute to creditors beyond the proceeds recoverable under the Debtors' property and business interruption insurance policies, which the Debtors understood would not come easily.  Fortunately, the Debtors

5

were able to stabilize the refinery site; finance these Chapter 11 Cases; reach a global settlement with the Intermediation Provider; remove over 2.4 million barrels of hydrocarbons, which has to date generated approximately $3.3 million in incentive payments; and pursue any and all sources of value, including proceeds of the sale of certain of the Debtor entities to the Plan Sponsor. The Debtors relied heavily on the tools of chapter 11 to accomplish these value-maximizing objectives.

### 2. The Construct of the Plan Offers Myriad Benefits to the Estate's Constituents.

11. The Committee argues that the Plan does not accomplish "any chapter 11 objectives."[5] Much of the Committee's argument is premised on the claim that the Plan Sponsor does not intend to restart refinery operations. According to the Committee, the Debtors' Plan is essentially useless "if we are not reorganizing as a business, if we are not preserving jobs and trading relationships, if we are not assuming contracts or borrowing on an exit line of credit, if the transaction in question is just a sale to HRP for near-term bulldozing and building-over."[6] Several of the assumptions underlying the Committee's argument are wrong.[7] And the Committee completely ignores all of the benefits the Plan delivers.

12. Less than six months removed from the existence-altering incident of summer 2019, the Debtors now stand before the Court with a clear path forward to reorganize and sell the equity interests in PES Holdings and its subsidiaries at a price of $240 million, and reorganize the other Debtors to implement a go-forward governance structure to pursue the Debtors' property and

---

[5]    *See* Committee Obj. at p. 2.

[6]    *See* Committee Obj. ¶ 4.

[7]    For instance, the Committee criticizes the Plan because it does not resolve the adversary proceeding to determine the existence and relative priority of liens on the Debtors' BI Insurance Proceeds (Adv. Pro. No. 19-50282) (KG) (the "Adversary Proceeding"). But that dispute is being decided pursuant to the Adversary Proceeding. And the Plan will effect recoveries to various constituencies based on the outcome of the Adversary Proceeding.

business interruption insurance proceeds and other sources of value, which will be distributed in accordance with the Bankruptcy Code's priority scheme.   This occurs while the interests of all key constituents are preserved through leveraging the expertise of the Debtors' current management team: the individuals who have led the Debtors from the brink of liquidation to a $240 million proposed transaction.  The knowledge and experience to close this sale and maximize the value of the Debtors' insurance claim could not possibly be replicated by any team of replacements,[8] and the suggestion that recoveries would be the same were the process managed by a chapter 7 trustee is flat-out ridiculous.   Critically, under the Plan, the Debtors will remain administratively solvent.[9]   It is not clear that any alternative path exists that would avoid administrative insolvency.

13.     Specifically, the Plan provides for:

- Receipt of $240 million cash in Sale Proceeds;

- Vesting of other sources of value—including up to $1.25 billion in insurance proceeds under the Business Interruption and Property Damage Insurance Polices (the "Insurance Proceeds")—in the Liquidating Trust;

- Assurance that distributions adhere to the Bankruptcy Code's priority scheme;[10]

---

[8]   Stein Dep. 215:13-25; 216-1-15 ("Q: Why is it assumed that there would be a lower recovery from insurance claims in any liquidation scenario? A: . . . The Chapter 7 would involve essentially the termination of the entire management team and their retention of a third party trustee with no knowledge whatsoever of the company or its insurance claims . . . **And, in my opinion, it would be very difficult, if not impossible, for any third party to replace the entire management team and achieve the same level of recoveries**.") (emphasis added).

[9]   *See* Projected Creditor Recoveries [Docket No. 780, Exhibit I].

[10]   *Cf. In re SPM Mfg. Corp.*, 984 F.2d 1305, 1312 (1st Cir. 1993) (noting that, while section 507 provides that administrative expenses under 503(b), claims for wages, and unsecured tax claims have priority over other claims, in a chapter 7 case, "the distribution scheme of section 726 (and, by implication, the priorities of section 507) does not come into play until all valid liens on the property are satisfied.") (citing *United States v. Speers*, 382 U.S. 266, 269 n.3 (1965); *Goggin v. Div. of Labor Law Enforcement*, 336 U.S. 118, 126–27 (1949)).

- Incentivizing key management personnel with irreplaceable experience and knowledge to diligently pursue, and actually achieve, maximum distributable value for the benefit of all stakeholders, including the Committee;[11]

- Allowing the Debtors to emerge from a costly bankruptcy and stanching future expenses[12] (rather than sending the Debtors into a disorganized and likely more costly chapter 7 process[13] for which the Committee remains the sole advocate);

- Orderly satisfaction in full of Allowed Administrative Claims, Priority Tax Claims, DIP Claims, Other Secured Claims, Other Priority Claims, and Statutory Fees;

- Winding down of the estates and satisfaction of environmental obligations, including through the Plan Sponsor's assumption of PESRM's and the other purchased entities' outstanding compliance obligations;

- Reorganization of four Debtor entities—PES Holdings, PESRM, North Yard Logistics, L.P., and North Yard GP, LLC—pursuant to the Plan Sponsor's purchase, with potential for go-forward utilization of the Debtors' historical workforce and additional workers[14];

- Massive benefit and stimulus to the City of Philadelphia, and surrounding communities, through transition of the refinery site to a new enterprise guided by a well-capitalized redeveloper with a proven track record of responsibly redeveloping industrial real estate sites and creating many thousands of new

---

[11] Stein Dep. 215:13-25; 216-1-15 ("Q: Why is it assumed that there would be a lower recovery from insurance claims in any liquidation scenario? A: . . . The Chapter 7 would involve essentially the termination of the entire management team and their retention of a third party trustee with no knowledge whatsoever of the company or its insurance claims . . . **And, in my opinion, it would be very difficult, if not impossible, for any third party to replace the entire management team and achieve the same level of recoveries**.") (emphasis added).

[12] *See, e.g.*, *Omnibus Order Approving First Interim Fee Applications of Estate Professionals for the Period of July 21, 2019 Through September 30, 2019* [Docket No. 830] (the "Fee Application Order") (approving payment of more than $9.6 million in fees and expenses (exclusive of investment bankers' fees and expenses) during the July 21, 2019 through September 30, 2019 period, including more than $2.5 million in Committee professional fees and expenses).

[13] *See, e.g.*, Ziad Raymond Azar, *Bankruptcy Policy, Legal Heritage, and Financial Development: An Agenda for Further Research*, 24 Emory Bankr. Dev. J. 379, 417 (2008) ("in terms of post-bankruptcy ratios, chapter 7 is significantly more expensive [than chapter 11]"); *see also, e.g.*, Arturo Bris, Ivo Welch, and Ning Zhu, *The Costs of Bankruptcy: Chapter 7 Liquidation versus Chapter 11 Reorganization*, LXI The Journal of Finance 1253, 1269 ("our evidence suggests that it is the Chapter 11 procedure itself . . . that results in better reported asset retention in bankruptcy"), 1289 (noting that creditors in chapter 11 reorganizations fare "significantly better" than creditors in chapter 7 liquidation or chapter 7 conversions from chapter 11).

[14] Tschantz Dep. 84:2–17 ("[T]here's a wide range of existing employees that we would hope to have discussions with.").

jobs, dwarfing the economic benefit to the City that has ever previously existed at the site.[15]

14.    These are significant achievements.  And the Plan presents the best path forward to realizing these achievements and preserving significant opportunities for all creditors in interest.

15.    Since the outset of these chapter 11 cases, the Term Loan Lenders, the Intermediation Provider, the Debtors, the Term Loan Agent, and the Committee have been engaged in the Adversary Proceeding to dispute the priority of parties' liens on the BI Insurance Proceeds (the "Intercreditor Dispute").  The parties to that dispute have each filed dispositive motions,[16] fully briefed the matters,[17] and engaged in argument before this Court.  Now, after the conclusion of that lengthy process, the Committee criticizes the Plan because it does not purport to settle those same claims subject to litigation in the Adversary Proceeding.[18]  The Debtors would prefer a settlement, but cannot force one, and any suggestion that the Committee is free from blame for the absence of a settlement would defy reality.

16.    In any event, the parties have submitted to the orderly resolution of that dispute in the Adversary Proceeding.  If the Committee is correct (and the Debtors do not believe it is), its priority will be recognized through the Plan.  Period.  Courts routinely confirm plans that contemplate the resolution of an adversary proceeding and other claims post-confirmation.[19]

---

[15]    *Id.* at 14:14–20 ("Hilco Redevelopment Partners is a recognized authority in Brownfield Redevelopment, which in short is acquiring industrial assets that could be functionally obsolete or have no further purpose and redeveloping them into the highest and best use."); 20:2–31:17; 98:5–99:2; 119:12–120:7 (describing prior HRP projects involving industrial real estate sites that had substantial environmental liabilities and required coordination with government authorities and approval of soil management plans).

[16]    Adv. Pro. Docket Nos. 37, 34, 35.

[17]    Adv. Pro. Docket Nos. 50, 51, 52.

[18]    Adv. Pro. No. 19-50282 (KG).  *See* Committee Obj. ¶ 6.

[19]    *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D.Del. Feb. 28, 2018) (approving a chapter 11 plan with provision for reserve fund to pay potential liabilities stemming from ongoing litigation

Indeed, doing so is often in the best interests of the parties, who benefit a speedy resolution to the chapter 11 process but also retain their claims.  In any event, the Committee's insistence that the Plan resolve all claims is entirely without merit, and should be dismissed.

        **3.**      **The Sale of Certain Debtor Entities Pursuant to the Plan is the Result of the Debtors' Good-Faith Efforts to Maximize Value.**

17.      The Committee appears to be employing a "see what sticks" approach with respect to criticism of the sale.  First, they prop up a losing bid, noting that it had a higher purchase price and speculating that it was tied to a refinery restart, the latter of which is patently false.  Then they question HRP's ability to close (which the Debtors address more fully elsewhere in this Response), even though the losing bid the Committee half-heartedly champions is clearly *less* likely to close.  Then the Committee takes aim at accommodations made to the Bidding Procedures, but concede that both of the Auction participants required accommodations.  In short, it is clear what the Committee is doing:  threatening the Debtors and the Plan Sponsor with any mud-slinging it can think of in an effort to extract value to which the Committee has no legitimate right.

18.      The Sale is the culmination of the Debtors' several-months' long marketing process, led by the Debtors' senior leadership team and advisors, which was vetted by the Debtors' major stakeholders (including the Committee) and conducted pursuant to bidding procedures approved by the Court (the "Bidding Procedures").[20]

19.      Over the course of the sale process, the Debtors were in contact with a total of 223 potential purchasers and plan sponsors.[21]    Thirty-eight (38) parties signed non-disclosure

---

regarding termination fee); *In re Tronox, Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Nov. 30, 2010) (approving a chapter 11 plan with provision for creation of trust for ongoing environmental liability litigation).

[20]   *Order (A) Establishing Bidding Procedures, (B) Approving Bid Protections, and (C) Granting Related Relief* [Docket No. 583] (the "Bidding Procedures Order").

[21]   *See* Singh Decl. ¶ 9.

agreements; 36 parties accessed diligence, and 15 parties submitted indications of interest in the first round of bidding.[22]   From October 15, 2019 through January 9, 2020, the Debtors' management team hosted *43* site visits and management meetings with the parties involved in the second and third rounds of bidding.[23]   Additionally, throughout the pre-Auction sale process, the Debtors' management team and advisors fielded and answered 642 written diligence questions from parties in the third round of bidding alone.[24]   Through this process, the Debtors and their advisors made significant progress, achieving higher levels of certainty with respect to prospective financing, closing timelines, and the conditionality of proposed purchase agreements.[25]

20.    Pursuant to the Bidding Procedures Order, the Consultation Parties, including counsel to the Committee, received copies of the applicable bid portions of the Preliminary Qualification Documents; attended weekly update calls with the Debtors and the other Consultation Parties regarding the Preliminary Qualification Documents; received all information disclosed by any Acceptable Bidder in connection with the Bid Requirements; received copies of any Bids received from Qualified Bidders; and attended the Auction, at which the Committee made a statement.

21.    While the Committee implies that the IRG bid contemplated a restart, further implying that the Debtors did not place enough value on the benefits of a restart, the implication is completely unfounded.  First, it ignores the drastic efforts the Debtors employed to encourage a

---

[22]   *See id.*

[23]   *See id.* ¶ 11.

[24]   *See id.*

[25]   *See id.* ¶ 12.

restart bidder.  Second, it vastly overstates the IRG bid as a restart bid; it certainly was not at the Auction, and the Committee offers (and the Debtors are aware of) no evidence that it is so today.

22.     From the outset of the sale and marketing process, the Debtors made every effort to encourage a sale to a going-concern buyer.  But the Debtors were unable to find a refinery restart bidder with the financial and operational wherewithal to complete the sale.  The Debtors' engagement with former Philadelphia Energy Solutions LLC CEO Philip Rinaldi and his organization, Philadelphia Energy Industries, LLC (collectively, the "Rinaldi Party") is instructive. The Debtors' advisors made initial contact with the Rinaldi Party in June 2019, and executed a nondisclosure agreement with it on August 8, 2019, based on the understanding that the Rinaldi Party was pursuing a refinery restart bid.  The Debtors' virtual diligence dataroom was opened to the Rinaldi Party, as well as all other parties who had signed nondisclosure agreements, less than two weeks later, on August 19, 2019, and more than 5,000 documents were eventually shared with the Rinaldi Party.  Over the three rounds of bidding, the Debtors provided the Rinaldi Party answers to 133 diligence questions:  90 prior to the first round, an additional 39 between the first and second rounds, and an additional 4 between the second and third rounds.  The Debtors also facilitated site visits and meetings with senior management for the Rinaldi Party, including:  (1) a combination site visit and management meeting on October 25, 2019; (2) a site visit on December 16, 2019; (3) a site visit on December 17, 2019; (3) a site visit on December 18, 2019; and (4) a meeting with senior management on December 19, 2019.

23.     In fact, in an effort to bend over backwards to accommodate the Committee's preferences for a refinery restart bidder, the Debtors took the unusual step of arranging an in-person meeting between the Rinaldi Party and the Committee on December 16, 2019 at the

Debtors' offices in Philadelphia.  But despite the Debtors' diligent efforts and engagement, the

Rinaldi Party did not submit a Bid, Qualified or otherwise, in the third round of bidding.[26]

24.     Indeed, the Rinaldi Party process is illustrative.  Despite diligent engagement with

a variety of refinery restart parties, through robust, extensive, and, to some degree,

unprecedentedly broad marketing efforts, no white knight emerged:  no refinery restart bid

emerged with the financial and operational wherewithal to complete a sale (and certainly nothing

with the financial and operational wherewithal to actually re-start the refinery).

25.     Early in the process, the Debtors' advisors identified potential strategic buyers,

including refinery operators.[27]  The Debtors' advisors also took the abnormal step of making a

public announcement to the market and providing email addresses to any party—including

previously unidentified refinery restart bidders—interested in providing feedback.[28]

26.     To that extent, the outreach efforts were successful: during the first bidding round,

from around 15 bids received, the Debtors received between three and four indications of interest

from prospective buyers interested in a refinery restart, and moved every refinery restart bidder to

the second round of bidding. [29]  During the third round of bidding, the Debtors received a single

---

[26]    *See* Singh Decl. ¶ 12.

[27]    *See* 1/31/20 Singh Dep. Tr. at 26:7-14 (noting that the universe of potential buyers identified and contacted "included strategics that . . . break down into **refinery operators**," among others); 31:15-18 ("And so we created two types of [teasers], **one that's refinery restart oriented**, one that was more about the property, just what the land is") (emphases added).

[28]    *See id.* at 27:3-10 ("There was also something abnormal here, which is we made a public announcement in the market that we were pursuing strategic alternatives and it really gave our email addresses out there, really allowed for anyone else that has interest to really feedback into us.").

[29]    *See id.* at 41:21-25("Q.  Of the around 15 indications of interest you received, how many of them were interested in a refinery restart?  A.  I'd say in some form a refinery restart, between three to four."); 56:20-22 ("we essentially moved all the bidders to round two that were refinery restart bidders").

bid from a refinery restart bidder; it was massively lacking in numerous respects.[30]  Throughout

these three rounds of bidding, the Committee and the Committee advisors were provided access to

information as to the status of the bids, including the refinery restart bids.[31]  Following the third

round of bidding, the Debtors invited the single refinery restart bidder, as well as HRP and IRG,

to the Debtors' advisors offices for in-person negotiations.[32]  But days before the Auction, the

refinery restart bidder revealed that no financing had been or was likely to be secured, among

numerous other material issues.

27.      Nor did the IRG bid actually contemplate a combination with Rinaldi to restart the

refinery.  The parties may have been in discussions about possibilities, but those discussions were

not in any tangible or definitive form, and the Committee cannot credibly argue otherwise.  The

Debtors certainly have not been provided with any written indication that a credible refinery-restart

bidder exists, or ever existed.  The Debtors conducted the sale process in good faith.  They did not

foreclose valuable bids and went through extreme measures to attempt to find a legitimate "refinery

restart" bidder.  Ultimately, none emerged.

       **4.**      **The Post-Emergence Governance Program Is Designed to Ensure Continued Value Maximization and Fair Representation of Stakeholders.**

28.      The Committee suggests that the Debtors are acting under the invisible hand of "the

Debtors' obviously preferred creditor constituents, the Term Loan Lenders"[33] According to the

---

[30]   *See* Singh Decl. ¶ 13.

[31]   *See id.*

[32]   *See* 1/31/20 Singh Dep. Tr. at 109:16-23 ("And so Monday through Thursday there were everyone who was physically present here at K&E . . . .  And [the refinery restart bidder] was also invited to attend the same set of meetings.").

[33]   *See* Committee Obj. ¶ 8.

Committee, the Liquidating Trust is designed to funnel the BI Insurance Proceeds into the Term Loan Lenders' pockets.[34]  The invective laden in the Committee's brief is totally inappropriate and, frankly, exposes that the Committee has no good faith argument on the merits.

29.     First, the Debtors have tirelessly worked throughout these Chapter 11 Cases to ensure that general unsecured creditors will receive a recovery.  And their efforts have been successful: they have received $65 million in advances on property damage insurance proceeds that will be paid to their creditors through the Plan and they continue to litigate Claims relating to the BI Insurance Proceeds.  The Committee cites to *Loop Corp. v. U.S. Trustee*, a case where the court granted a motion to convert to a chapter 7 where debtors had sold most their assets, ceased operating, and whose administrative expenses consumed all of their cash flow.[35]  The situation in *Loop Corp.* could not be further from the Debtors and their chapter 11 Plan.  As discussed at length in the Memorandum filed contemporaneously herewith, the Debtors have proposed a feasible Plan that is supported by the Sale Transaction and will make significant distributions to the Debtors' creditors.   Regardless of the outcome of the Adversary Proceeding, the Debtors are administratively solvent and will likely realize more even more funds through the post-confirmation pursuit of the insurance claims.

30.     Moreover, there is nothing nefarious about the Liquidating Trust or the governance thereof.[36]  The Liquidating Trust is a means of distributing estate assets under the Plan, consistent

---

[34]   *See* Committee Obj. ¶¶ 9–10.

[35]   *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 513 (8th Cir. 2004).

[36]   The Committee contends that the Term Loan Lenders are "classic 'insiders,'" and that the Term Loan Lenders "dominate" the Board.  *See* Committee Obj. ¶ 24.  That is an utterly false statement.  The Restructuring Committee of the Debtors' Board of Directors, on which *zero* Term Loan Lenders' representatives sit, has made every relevant decision for the Debtors since July 3, 2019—well before this bankruptcy filing.  The Committee cannot possibly succeed in designating the Term Loan Lenders as insiders—the "insider" designation requires much more than board presence and equity ownership.  *See, e.g.*, *In re U.S. Medical, Inc.*, 531 F.3d 1272 (10th Cir. 2008) (holding that where objector had not provided evidence of control or undue influence, creditor with board

with those regularly approved in this jurisdiction and others.[37]   Governing boards such as the

Liquidating Trust Board are routine.[38]   These mischaracterizations also directly conflict with the

balanced governance structure contemplated through the Plan: (a) the Committee's presence on

the Liquidating Trust Board; (b) the balanced Business Interruption Litigation Committee; (c) the

fiduciary duties imposed upon all Liquidating Trustees, including the UCC Designee (as defined

herein), and (d) the settlement safeguards established by the Liquidating Trust Agreement, which

require that any settlement of the Intercreditor Dispute must be approved by the Court pursuant to

Bankruptcy Rule 9019, and vest the UCC Designee with standing to object to any such settlement.

       31.    The Plan also outlines a construct for balanced governance of the Liquidating Trust,

to be made up of five members, each a Liquidating Trustee:  one member to be designated by the

Committee (the "UCC Designee"); one member to be designated by Credit Suisse Asset

Management (the "CSAM Designee"); one member to be designated by Bardin Hill Investment

---

presence, equity ownership, an exclusive manufacturing relationship, and a "strategic alliance" between the companies was not an insider).

[37]   *See, e.g.*, *Findings of Fact, Conclusions of Law, and Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Modified Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) Bankr. D. Del. August 29, 2019) (approving the creation of a liquidating trust mechanism pursuant to confirmation of the debtors' chapter 11 plan); *Findings of Fact, Conclusions of Law, and Order Confirming the Modified First Amended Joint Plan of Reorganization of Z Gallerie, LLC and Z Gallerie Holding Company, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, *In re Z Gallerie, LLC*, No. 19-10488-LSS (Bankr. D. Del. June 20, 2019) (same); *Order Confirming the Fourth Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of its Debtor Affiliates*, *In re Mission Coal Comp., LLC*, No. 18-04177-TOM11 (Bankr. N.D. Ala. April 15, 2019) (same); *Order Confirming the Amended Joint Chapter 11 Plan of Westmoreland Coal Company and Certain of its Debtor Affiliates*, *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. March 2, 2019) (same); *Findings of Fact, Conclusions of Law, and Order (I) Confirming the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code and (II) Approving the Fourth Amended Disclosure Statement*, *In re Patriot Coal Corp.*, No. 15-32450 (Bankr. E.D. Va. Oct. 9, 2015) (same).

[38]   *See, e.g.*, *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) (confirming a plan providing for liquidating trust to be governed by a trust board); *In re Woodbridge Group of Companies*, No. 17-12560 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same*); In re Washington Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. Feb. 24, 2012) (same); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (same); *In re Seahawk Drilling, Inc.*, No. 11-20089 (RSS) (Bankr. S.D. Tex. Sept. 28, 2011) (same); *In re Midway Games Inc.*, No. 09-10465 (KG) (Bankr. D. Del. May 21, 2010) (same).

Partners, L.P. (the "BHIP Designee"); one member to be designated by the Ad Hoc Committee of Term Loan Lenders or, if no longer in existence, by the Required Term Loan Lenders (collectively with the CSAM and BHIP Designees, the "Term Loan Designees"); and one member to be designated by the Intermediation Provider (the "ICBCS Designee").[39]    Additionally, the Liquidating Trust Board shall form a committee (the "Business Interruption Litigation Committee"), which shall be comprised of one Term Loan Designee, the ICBCS Designee, and one individual to be jointly designated by the Intermediation Provider and the Ad Hoc Committee of Term Loan Lenders or, if such committee is no longer in existence, by the Required Term Loan Lenders (the "Independent Designee").[40]  All the Liquidating Trustees are fiduciaries, pursuant to section 3301(d) of the chapter 33 of title 12 of the Delaware Code, and will owe to the Liquidating Trust and all Beneficiaries (as defined in the Liquidating Trust Agreement—that is, Holders of Allowed Claims, including Allowed General Unsecured Claims) the same fiduciary duties as are owed by directors of corporations to such corporations and their stockholders under the Delaware General Corporation Law.[41]

32.    The Committee's misguided fear that Term Loan Lenders will be incentivized to settle the Intercreditor Dispute at a value that provides no recovery to general unsecured creditors is without any factual basis.  In fact, the Liquidating Trust Agreement establishes—and funds—a UCC Designee on the Liquidating Trust Board, and gives the UCC Designee standing to challenge any proposed settlement of the dispute regarding the Business Interruption and Property Damage

---

[39]    *See* Liquidating Trust Agreement § 2.1.

[40]    *See* Liquidating Trust Agreement § 2.13.

[41]    *See* Liquidating Trust Agreement § 2.4.

Insurance Policies. In short, the Liquidating Trust is not an attempt to divest any constituent of due process or other rights. The Committee's Objection should be overruled.

### 5. The Debtors' Release of the Senior Management Team Members Pursuant to the Plan is Appropriate and Reasonable.

33. The Committee asserts that the prepetition retention awards provided to key officers and employees in the wake of the June 21 Incident (the "Prepetition Retention Awards") were unreasonable, and were not paid in good faith, and that Plan's release of the Award Recipients (as defined below) is inappropriate.[42] But the Committee disregards the facts and circumstances surrounding the Debtors' Board of Directors' implementation of the Prepetition Retention Awards, based upon an independent compensation study performed by a third-party expert, and the record established over the Debtors' months-long restructuring efforts: the Prepetition Retention Awards were reasonable and necessary and all of the Debtors' stakeholders got tremendous value for them.

34. As the explosion unfolded, it immediately became apparent that tough decisions had to be made about personnel, and had to be made fast. Another bankruptcy appeared to be imminent, and following the destruction of the alkylation unit, which left the Debtors' refinery complex largely inoperable and and in need of an extensive rebuild,[43] a restart seemed unlikely.[44] While a fire continued to burn on site, the Debtors faced grave concerns regarding environmental liabilities, the safing of the refinery, and the extraction and evacuation of the Intermediation

---

[42]   *See* Committee Obj. ¶¶ 11, 76.

[43]   Stein Decl. ¶ 6.

[44]   *See* 1/31/20 Singh Dep. Tr. at 19:2–21 ("Sales process was not the kind of go-to position. We obviously had conversations with the lenders who would need to be part of a reorganization. And a reorganization would have required some source of liquidity, probably some sort of equitization but also an understanding for how much capital to be needed to restart the refinery. There was no interest in that from creditors. And so recognizing that the creditor groups which is the one that would have to take the laboring oar of a reorganization weren't willing to do it or had no interest in doing it, wanted us to go do a market check as well and so that kind of made it a pathway to pursue.").

Provider's property.[45]  At the same time, key employees' prior compensation opportunities fell well below market levels: incentive-based compensation was tied to operational thresholds which, because of the June 21 Incident, were no longer attainable; and while most members of management were protected by severance agreements, such agreements provided no protection in the specter of bankruptcy.[46]  Put differently, the key employees had no incentive to remain with the Debtors.[47]  But retaining these key employees would be essential if the Debtors wished to maintain stability and have any chance of maximizing value for their stakeholders.[48]

35.    Accordingly, the Debtors undertook a measured, deliberative and independent process, overseen by the Debtors' Board of Directors, and vetted by independent consultation expert Willis Towers Watson US LLC ("WTW") and the Debtors' restructuring advisors.  In June 2019, the Debtors engaged WTW to develop a pre-bankruptcy retention-based compensation program, intended to foster retention of eight officers and a limited number of key employees whom the company identified as critical to maximizing value and ensuring compliance with health, safety, and environmental obligations (the "Award Recipients").[49]  In early July the disinterested members of the Board approved the Prepetition Retention Awards, a series of one-time retention payments.[50]  The Debtors' Chief Restructuring Officer also reviewed and evaluated the Prepetition Retention Awards and found them reasonable in his business judgment.[51]

---

[45]    *See* 1/31/20 Stein Dep. Tr. at 26:7–15.

[46]    *See* Stein Decl. ¶ 10.

[47]    *See* 1/31/20 Stein Dep. Tr. at 25:16–17.

[48]    *See* 1/31/20 Stein Dep. Tr. at 25:22–25; Stein Decl. ¶ 8.

[49]    *See* Gartrell Decl. ¶ 8.

[50]    *See* 1/31/20 Stein Dep. Tr. 24:15-25; 25:2-25; 26: 2-19.

[51]    *See* Stein Decl. ¶ 8.

36.     The Committee asserts that the Prepetition Retention Awards were unreasonable and were not made in good faith, and that Plan's release of the Award Recipients is overbroad, "wrongful," and unfairly releases the Award Recipients from avoidance attacks.[52]  At bottom, the Committee's theory is that all Prepetition Retention Awards must be litigated as fraudulent transfers.  That is nonsense.  The claims are frivolous on their face given the tremendous value the Debtors received for the payments.  And the Committee suggests that the Debtors should initiate lawsuits against the very members of management that the Debtors need going forward to close the sale to HRP (or any sale) and maximize the value of the Debtors' insurance claims.  Short-sighted would not even begin to describe the poor judgment of any stakeholder who would contemplate such litigation.  The Prepetition Retention Awards, and the releases thereto, are reasonable, justified, fall within the Debtors' sound business judgment, and are in the best interests of the estates.

37.     Indeed, the the Holders of Secured Claims—including the DIP Lenders, who hold liens on the proceeds of any viable claim arising from avoidance actions—support the Plan and the releases.  The Debtors will demonstrate at the Confirmation Hearing that the Prepetition Retention Awards were reasonable, that there is no viable avoidance action on account thereto, and that pursuing such claims would benefit no one.

38.     *First*, reasonable value was provided in exchange for the Prepetition Retention Awards, as the Award Recipients provided a material benefit to the estate.  Specifically, the Award Recipients were instrumental to, among others, the negotiation of the DIP Facility, which provided the funds necessary to pursue the chapter 11 cases; to the resolution of disputes with the Intermediation Provider, which otherwise could have cost the estate millions in losses, and

---

[52]     *See* Committee Obj. ¶¶ 63-72.

implementation of the Global Resolution with respect to the extraction of the Intermediation Provider's collateral;[53] the pursuit of insurance proceeds under the Debtors' Business Interruption and Property Damage Insurance Policies, and the recovery of an initial $65 million in insurance proceed advances;[54] and the safing process and continued environmental compliance, which was instrumental to the sale and marketing process for the sale of the Debtors' business that resulted in the Debtors entering into the Purchase Agreement for a purchase price of $240 million.[55]

39.    *Second*, if the Plan did not provide for the Debtors' release of the Award Recipients, these key individuals would not remain with the Debtors, and the program would have been in vain.   If the Award Recipients are not released under the Plan, it would be entirely impractical to expect employees working tirelessly to support recoveries for a Plan that contemplated suing themselves.   Simply put, the Prepetition Retention Awards, were reasonable, and any asserted avoidance actions thereto are not viable.   The Committee's Objection should be overruled.

**6.    The MIP Maximizes the Value of the Debtors' Estates and Benefits All Stakeholders.**

40.    The Committee contends that the MIP (as defined herein) "does not pass muster"[56] because the Threshold is "too easily achievable," because consummation of the Sale is a foregone conclusion and confirmation is guaranteed and because "the Debtors' directors and officers can do nothing" and still reach the MIP thresholds.[57]   This is the same Committee that insists that the HRP

---

[53]   *See* Stein Decl. ¶ 14.

[54]   *See* Stein Decl. ¶ 12.

[55]   *See* Stein Decl. ¶ 13.

[56]   *See* Committee Objection ¶ 63.

[57]   *See id.* ¶ 66.

bid faces "substantial" closing risks, that recovery of insurance proceeds is uncertain, and that the Plan is unconfirmable.[58]   While the Committee vacillates between contradictory positions, the evidence will demonstrate at the Confirmation Hearing that the MIP is fully justified by the facts and circumstances of these Chapter 11 Cases and should be approved.

41.     The Plan contemplates the adoption of the Management Incentive Plan (the "MIP"), a post-Effective Date cash incentive program for eight members of the Debtors' senior leadership team that has been, through its evolution, based on the creation of value for the estate, and, accordingly, maximizing distributable value for the benefit of all stakeholders.[59]   The MIP provides for, among other things, a bonus payable upon the first quarterly date following the Effective Date on which proceeds, property, cash or other consideration received by the estate and distributable to Holders of Allowed Claims and Interests exceed, on a net basis, $300 million.   Put differently, the MIP pays the MIP Participants when the estate is paid—cash awards are tied directly to the recovery of value for the estate, and correspondingly, all stakeholders.

42.     The Debtors have made significant strides within the past several months.   But the Debtors' ability to maximize recoveries and overcome upcoming hurdles—to consummate the Sale; to recover the Insurance Proceeds; to take all steps necessary to effectuate the confirmed Plan—will be entirely dependent on the diligence of the senior leadership team.   The structure of the MIP incentivizes the MIP Participants to work tirelessly toward maximizing estate value and creditor recovery.

43.     The MIP was developed by the Debtors, in consultation with their advisors, including WTW, and the Debtors worked closely with their outside advisors, major constituents,

---

[58]   *See, e.g.*, *id.* ¶¶ 17, 27, 58.

[59]   *See* 1/31/20 Stein Dep. Tr. at 108:11–13.

and WTW to ensure that the terms, conditions, and payment structures were reasonable and in line with competitive practice.  As described in the Gartrell Declaration, based on the diligence and comprehensive market analysis performed by WTW, the MIP is consistent with market-based incentive compensation and is designed to incentivize the creation of long-term value for stakeholders.[60]  The MIP was included in the Plan Supplement and was unanimously approved by the Term Loan Lenders.

44.    Contrary to the Committee's assertions, the MIP, as its name suggests, is an incentive plan.  As evidenced by its terms, the purpose of the MIP is to incentivize the management team to maximize the value of the Reorganized Debtors after emergence from chapter 11 by distributing cash awards under the MIP whose value is directly tied to maximizing distributable assets for the benefit of creditors.  Participants are not merely paid for maintaining their employment for a certain time period.  Instead, the MIP incentivizes the best talent to rise to the challenge of maximizing the recoveries of all parties in interest through the Sale process and the ongoing insurance recovery effort.  In addition, the MIP was heavily negotiated at arm's length with the Term Loan Lenders, who are major stakeholders in these Chapter 11 Cases.

45.    To receive *any* compensation under the MIP, the plan participants will all have to work to close the sale—which will be far longer, far riskier, and far more expensive if the management team is not there to push the process.  And any further payments under the MIP are entirely dependent on the Debtors' post-confirmation success in pursuing insurance proceeds— another task that the management team is ***crucial*** to moving forward.  Those claims are far less valuable without the existing management team's experience, expertise, and focus in pursuing them, and the Trust simply will not have that if the MIP is not approved.  That is precisely why

---

[60]    *See* Gartrell Decl. ¶¶ 15–16.

the Term Loan Lenders—the primary economic stakeholders in the Debtors' insurance proceeds—negotiated these terms in the MIP and why the other secured creditors (the other primary stakeholders in the Debtors' insurance proceeds) also support it.

46.     As described in the Gartrell Declaration, the MIP is reasonable.  Each participant's "target total direct compensation" is below market absent the MIP, and remains below market even if the confirmation success fee is obtained.[61]  As further described in the Gartrell Declaration, the overall design of the MIP as well as the cost is reasonable and in line with the Debtors' peers.  Additionally, the Debtors subjected the MIP to the heightened disclosure, notice, and hearing requirements of the plan confirmation process.  Finally, the cost of the MIP is reasonable, as evidenced by the support of the Plan.  Accordingly, the Debtors submit that the facts and circumstances support that the current structure of the MIP, with its focus on driving value after emergence from these Chapter 11 Cases, is a reasonable exercise of the Debtors' business judgment.  The Committee's Objection should be overruled.

**B.      By Maximizing the Distributable Value and Establishing Fair Procedures for That Value to Be Distributed to Creditors and Equityholders--All in Accordance with the Bankruptcy Code's Priority Scheme--the Plan on Its Face Does Not Discriminate Unfairly Against, Is Fair and Equitable with Respect To, and Is in the "Best Interests" of Unsecured Creditors.**

47.     The Committee objects to the Plan on the grounds that it discriminates unfairly, is not fair and equitable with respect to, and is not in the "best interests" of general unsecured creditors.  This Objection is simply unfounded.  The Plan maximizes distributable value and establishes fair procedures that embody court-approved processes for the distribution of that value to creditors and equityholders in accordance with the Bankruptcy Code's priority scheme.

---

[61]     *See* Gartrell Decl. ¶ 20.

Accordingly, the Plan on its face does not discriminate unfairly against, is fair and equitable with respect to, and is in the "best interests" of unsecured creditors.

48.     **First**, the Plan is "fair and equitable" with respect to Holders of General Unsecured Claims because no Holder of a Claim or Interest junior to Holder of General Unsecured Claims in Class 5 will receive any recovery under the Plan on account of such junior Claim or Interests unless Holders of General Unsecured Claims are paid in full.[62]  Although Intercompany Interests in the Acquired Reorganized Debtors will be Reinstated under the Plan and, therefore, would be Unimpaired, such treatment is for the purposes of preserving the Acquired Reorganized Debtors' corporate structure as sold under the Purchase Agreement and will have no economic substance. All other Intercompany Interests in the Non-Acquired Reorganized Debtors and all Intercompany Claims will be cancelled.

49.     Additionally, pursuant to the Plan, the Holder of the Allowed Subordinated Remaining Volume Claim and Holders of Allowed Interests in PES Energy and PES Ultimate Interests are junior in priority and will not receive any recovery unless Holders of General Unsecured Claims get paid in full under the Plan.  Accordingly, the Committee is plainly mistaken in asserting that the Plan is not "fair and equitable" with respect to Class 5 (General Unsecured Claims).

50.     **Second**, the Plan does not "unfairly discriminate" against Class 5 (General Unsecured Claims).  A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated

---

[62]    *See Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

to a class allegedly receiving more favorable treatment.[63]  The Committee does not have any viable argument on this score.  As previously noted, all similarly situated Holders in Class 5 will receive substantially similar treatment, and Class 5 is not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests, including classes that are senior in the distribution waterfall.  No similarly situated class will receive more favorable treatment.

51.    As a matter of fact, the Committee is struggling to find *any* basis to back up its claim that the Plan discriminates unfairly against Class 5.  The Committee vaguely asserts that "the Term Loan Lender deficiency claim"—in the event the final judgment on the intercreditor allocation dispute is not favorable to them—"apparently entitles those Term Loan Lenders to full case/asset control" while "the bulk of unsecured indebtedness are left to their peril."[64]  But that is simply untrue.  There is no factual basis for the Committee's assertion that the Term Loan Lenders have "full case/asset control," but the Committee's theory also misses the point and does not address the controlling legal standard for confirmation under section 1129(b)(1) of the Bankruptcy Code.

52.    ***Third***, because holders of General Unsecured Claims will receive more value pursuant to the Plan than they would recovery in a hypothetical chapter 7 liquidation, the Plan is in "the best interests" of Holders of General Unsecured Claims. In fact, the Plan guarantees a definitive and tangible recovery to Holders of General Unsecured Claims that is higher than any recovery such holders could contemplate in a chapter 7 liquidation.  Through the Plan, unsecured

---

[63]    *See Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. 111, 121 (D. Del. 2006).

[64]    Committee Obj. ¶ 9.

creditors will be entitled to a baseline recovery of $5 million.  Notably, such treatment is *in addition* to any recoveries that may inure to such Holders through other Plan distributions, namely, from available proceeds from the Sale Transactions and any proceeds available through the Plan waterfall from the Debtors' Business Interruption and Property Damage Insurance Policies.

53.    Although the distribution of proceeds on account of the Business Interruption and Property Damage Insurance Policies has not yet materialized, such proceeds (when received) will be distributed in accordance with a court-approved process (in which the Committee has amply participated), once the Court enters an order determining the relative priority of parties-in-interest as to such proceeds.  Likewise, the proceeds received from the consummation of the Sale Transactions is the direct outcome of the thorough marketing, bidding, and sale process for the sale of the Debtors' business that was vetted by the Court.[65]  These are fair and equitable and are embodied in the Plan.  The Distribution Proceeds received through those processes will be distributed to Holders entitled to a recovery under the Plan, including Holders of General Unsecured Claims, in accordance with the priority scheme set for in the Bankruptcy Code.

54.    The Plan is also in "the best interests" of Holders of General Unsecured Claims because, as the Liquidation Analysis demonstrates, the Plan provides more distributable value to the estate than a chapter 7 liquidation.  This is undeniably true regardless of the Committee's fruitless attempt to argue that unsecured creditors "do worse" under the Plan than they would under a hypothetical chapter 7 liquidation.[66]

55.    Rather than demonstrate otherwise, the Committee resorts to blanket attacks that the Liquidation Analysis is "not an 'analysis' at all" and "says very little," and submits a

---

[65]    *See* Docket No. 583.

[66]    *See* Committee Obj. ¶ 17.

declaration that does not contain a Liquidation Analysis at all, merely modifying certain assumptions in the Debtors' Liquidation Analysis without offering legitimate bases to do so (and ignoring the additional $5 million recovery directed to unsecured creditors under the Plan).[67] It is simply impossible to believe, as the Committee baldly asserts, that a chapter 7 trustee could collect the exact same amounts for all of the Debtors' assets in a chapter 7 environment and could do so cheaper than the Debtors' management team under the currently-proposed chapter 11 plan. A chapter 7 process would be a disaster for all stakeholders and massive sums of value would be lost, to the detriment of all stakeholders.

56.     The Debtors' Liquidation Analysis recognizes the uncertainty of the situation given that the ultimate value of the Debtors' largest assets (their insurance proceeds) is not predictable, and uses sound assumptions and methodologies to reflect the range of Distribution Proceeds that can be expected to be distributed to Holders of Claims and Interests.[68] The two main sources of recovery under the Plan are the proceeds to be recovered from the Sale of the Purchased Interests and the proceeds under the Debtors' Business Interruption and Property Damage Insurance Policies. Given that the total proceeds that will be recovered under such policies is still uncertain at this time, the range of recoveries set forth in the Liquidation Analysis is appropriate. Regardless, in a liquidation scenario, there can be no dispute that proceeds from the Sale[69] and from such insurance policies[70] would be materially less than those recovered under the Debtors' Plan.

---

[67]   *See id.* ¶ 17; Ex. A.

[68]   *See generally* Sciametta Decl.

[69]   *See* Sciametta Decl. ¶ 18 ("[U]nder the Liquidation Analysis, it is assumed that a chapter 7 trustee would find it difficult to meet the closing conditions under the Purchase Agreement without the assistance and knowledge of the management team and could experience delays in the process, which could be significant. As such, the net proceeds from the sale could be materially less.")

[70]   *See* Sciametta Decl. ¶ 17 ("Net recoveries associated with the pursuit of the Debtors' property damage and business interruption insurance claim (the "Insurance Claim") are difficult to estimate and, in a liquidation

Accordingly, liquidation recoveries would be lower than recoveries provided by the Plan.[71]  As described above, this conclusion is bolstered by the agreement to provide a baseline recovery of $5 million to unsecured creditors, in addition to any recoveries that may inure to such Holders through other Plan distributions.  This additional cash recovery would not have inured to Holders of General Unsecured Claims in a liquidation scenario.

57.    Notably, the Committee does not provide any liquidation analysis of its own.  Instead, it has submitted the Declaration of John Young (the "Young Declaration") which states, without support, that the recoveries modeled under the Debtors' Liquidation Analysis are flawed because "Insurance Proceeds [in a liquidation scenario] should reflect the same recovery ranges as Debtors' Chapter 11 Recovery Analysis."[72]  The Young Declaration also assumes that a chapter 7 trustee would have the equivalent ability to monetize emissions credits and precious metals as the Debtors' current management team and advisors.  There is simply no basis for any of the Committee's assumptions.

58.    Moreover, the Young Declaration fails to provide any evidence to support the Committee's assertion that the Plan does not satisfy 1129(a)(7)'s best interests test.  Specifically, the Young Declaration does not make **any** attempt to calculate the recoveries for each Class of Claims under a hypothetical chapter 7 liquidation.  The Young Declaration states that: "[I]t is my

---

scenario, are expected to be materially less than those net recoveries from the pursuit of such claims under the Debtors' chapter 11 plan. The ability of a Trustee to pursue such claims in a liquidation would be significantly limited by, among other things, (i) the loss of the management team who possess critical institutional knowledge, factual background, and experience that is necessary for the Debtors to articulate, advocate for, and ultimately litigate (if necessary) the Debtors' Insurance Claim fully; and (ii) inadequate funding to cover legal costs, expert costs, and other costs of litigation out of pocket, which would likely result in lower net recoveries due to the need to finance litigation efforts directly or indirectly.")

[71]    *Id.* ¶ 19.

[72]    Decl. of John T. Young, Docket No. 924 ¶ 37.

29

opinion that a Chapter 7 liquidation is more beneficial to creditors than Chapter 11." This states nothing about the recoveries to non-accepting Classes of Claims. This states nothing about the best interests standard.[73]

59.    The evidence at the Confirmation Hearing will show that the analysis in the Young Declaration is severely flawed for numerous reasons. The Young Declaration fails to account for the reality that to fund the conversion of these cases without any significant unencumbered assets, a chapter 7 trustee would only be able to feasibly rely on the $50,000.00 provided for trustee fees under the Debtors' Final DIP Order.[74] The idea that a chapter 7 trustee could leverage $50,000 in resources to organize a fire sale that created more value than the Debtors' months-long marketing process led by PJT and the Debtors' management team defies reason. The Young Declaration also makes a series of errors (including forgetting about a large investment needed to be made to pursue the Debtors' insurance claims further) that further undermine its credibility. There is simply no legitimate basis to suggest that creditors in this case are better off in a chapter 7 liquidation.

60.    As a result, the Committee fails to present any persuasive evidence to support its assertion that recoveries in a liquidation would be higher than through the Debtors' Plan, the degree to which recoveries would be higher, or the likelihood that such higher recoveries could be obtained. The Committee's failure to present such evidence is fatal to its objection.[75] Fully aware of the deficiency of its argument, the Committee speculates that a different post-Confirmation

---

[73]    Young Decl. ¶ 39.

[74]    Final DIP Order [Docket No. 580], ¶ 9(a)

[75]    *See In re Charter Comm'ns.*, 419 B.R. 221, 261–62 (Bankr. S.D.N.Y. 2009) (overruling best interests objection where objecting party's expert: "[E]ngaged in a largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize. He also did not create his own liquidation analysis.").

governance structure and the loss of key personnel for a honeypot of avoidance actions would yield higher returns than those available in the present circumstances.

61.     The Liquidating Trust Board and the MIP ***create*** value rather than remove it.  And despite the Committee's wishful thinking that there would be any value in pursuing avoidance claims against the same management team that has been and will continue to create value by leading the Debtors' sale and insurance recovery processes, the Debtors are not aware of any valuable claims or causes of action to which any avoidance value should be ascribed.  Moreover, such recovery attempts could also impose significant costs and negatively impact the value of the Debtors' enterprise as a whole.  Any recoveries arising from avoidance actions would be speculative at best, and the Debtors rightfully excluded such speculative "recoveries" from their liquidation analysis for purposes of section 1129(a)(7).[76]  In the Debtors' informed judgment, the Liquidation Analysis properly accords avoidance actions zero value.  The Liquidation Analysis thus properly demonstrates that recoveries under the Plan will be higher than under any hypothetical chapter 7 liquidation.  The Plan thereby satisfies section 1129(a)(7) of the Bankruptcy Code.[77]

62.     For these reasons, the Plan does not discriminate unfairly against, is fair and equitable with respect to, and is in the "best interests" of unsecured.  The Committee's Objection should be overruled.

---

[76]     *In re Adelphia Comm'ns. Corp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007) ("speculative recoveries from a litigation trust don't factor into the various calculations that must be made at the point in time when a debtor seeks to confirm a [chapter 11] plan.").

[77]     *See* 11 U.S.C. § 1129(a)(7) (providing that the best interest test is met if each holder of a claim or interest in each impaired class "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective fate of the plan, that is *not less* than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date) (emphasis added).

31

### 1.    The Plan Is Feasible.

63.    The Committee's attacks on the feasibility of the Plan are largely grounded in its criticism of the transaction with HRP.  However, the Committee's concerns are unfounded, as it mischaracterizes the HRP plan of development as a "liquidation scenario" and wrongly assesses the closing conditions set forth in the HRP bid as posing near-insurmountable challenges to successful closing of the HRP Purchase Agreement.  Finally, even though the Committee's preferred bid, IRG, is not remotely close to as far along as HRP is to completing all necessary closing conditions, the Committee expresses concern about HRP's ability to "walk" with their deposit should the set of closing conditions not be satisfied.

64.    As noted elsewhere in this brief, HRP has a proven track record with remediating environmental liabilities on industrial sites and bringing new uses to those properties.  It has demonstrated that is has the capability to redevelop the land, revitalize the area, and bring jobs to the now-shuttered refining complex.  In this regard, the Committee's characterization of the HRP Bid as a "liquidation scenario" is incorrect and frankly unfortunate in refusing to recognize all of the benefits HRP (if past is prologue) will bring to stakeholders and to the City of Philadelphia.

65.    While the Debtors recognize that HRP Bid carries some closing risk, and that closing the Sale will require significant, concerted effort from the Debtors' management team, deal risk does not equate to infeasibility.  "Feasibility does not require that success be guaranteed but rather only a 'reasonable assurance of compliance with plan terms.'"[78]  The Debtors selected HRP based on a careful assessment of HRP's willingness and ability to close the transaction.[79]  HRP's

---

[78]    *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 276 (Bankr. D. Del. 2016) (quoting *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *modified on recon.* 464 B.R. 2008 (Bankr. D. Del. 2011) (citing *In re Washington Mutual, Inc.*, 461 B.R. 200, 252–253 (Bankr. D. Del. 2011).

[79]    Singh Dep. 97:13-19. ("We diligenced them [HRP] in so much as knowing their reputation, knowing the projects they've worked on, equally with IRG, same thing. You know a big part of getting comfortable around the environmental aspect of this really were (sic) identifying bidders that could take on the complexity of that.").

commitment and ability to close the sale as demonstrated by its $30 million deposit and extensive engagement with key constituents, including Sunoco (and its subsidiaries), the EPA, the Pennsylvania Department of Environmental Protection, and the City of Philadelphia.[80]

66.    The Debtors have a good faith belief that the transaction will close.  Accordingly, the Plan is feasible and the Committee's Objection should be overruled.

> **2.    The Plan Was Solicited and Has Been Prosecuted in Compliance with the Bankruptcy Code and in A Manner Designed to Maximize Distributable Value.**

67.    The Committee argues that the Plan cannot be confirmed because the Debtors' solicitation of the Plan, the Plan Supplement, and related documents was inadequate.  Under 11 U.S.C. § 1129(a)(2), a debtor may not solicit an acceptance or rejection of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  The term "adequate information" means information of a kind "that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).

68.    The Committee contends that the Plan was not adequately solicited and that creditors did not receive sufficient notice to understand the Plan and the transactions contemplated therein.  The Committee's objections to solicitation can be summarized as follows:

- The Plan provided no meaningful information about creditor recoveries;

---

96:23-97:6 (So we did not have a concern necessarily that there was environmental liabilities that we have not disclosed or that they may find that impact the bid because in my mind they have actually assumed that liability already and therefore is underwritten in their purchase price.").

[80]    Tschantz Dep. 90:5-13 ("Q: And if the plan is confirmed, what is [HRP]'s anticipated closing date of the PSA? A: [I]t's a function of a couple things.  It's a collective business decision as to the progress made by the ICBCS extraction plan, as well as receiving certain approvals for our soil management plan to be discussed with PA DEP. But as soon as commercially possible is our intent.").

- The original solicitation materials omitted the letter from the Committee recommending that Holder of General Unsecured Claims vote against the plan (the "<u>Committee Recommendation Letter</u>") Letter from the Committee in violation of the Solicitation Order;

- The Solicitation process violated principles of due process;

- Following the filing of the Plan Supplement on January 22, 2020, creditors had only 11 days to read and understand the documents contained in the Plan Supplement before the Voting Deadline;[81]

- The HRP Purchase Agreement, Liquidating Trust Agreement, and updated recovery analyses contained in the Plan Supplement were not described in an easy to understand way; and

- The Liquidation Analysis does not provide sufficient information.

69.    At the outset of these Chapter 11 Cases, the Debtors faced significant uncertainty. The catastrophic June 21 Incident left the Debtors unable to determine the best path forward, therefore necessitating a Plan that contained a toggle between an Equitization and a Sale Restructuring.  Given the countless unknowns, the toggle was clearly the best option available to the Debtors to maximize value for the Debtors' estates and stakeholders.

---

[81]    At the hearing before this Court for the approval of the Disclosure Statement, counsel to the Committee suggested that the Debtors' intention to inform creditors of its election of a Sale restructuring through the solicitation of the Plan Supplement, rather than the Plan, was inadequate.  *December 11, 2019 Hearing Tr.* 29:6-19.  Counsel noted that the Plan Supplement would not contain a copy of the Plan because re-soliciting the Plan would be cost prohibitive.  *Id.*  To the extent that counsel to the Committee renews this argument, it should be rejected.  The Plan Supplement contained a Notice of Sale Restructuring and Successful Bid, a Purchase Agreement, and a Description of Successful Bid.  [Docket No. 780].  In other words, the materials in the Plan Supplement made very clear that the Debtors had elected to pursue a Sale restructuring.

70.     Despite the inherent uncertainty in these Chapter 11 Cases, the Debtors went above and beyond to provide disclosures to voting creditors and other parties in interest.  Specifically, the Debtors provided, among other disclosures:

| Summary of Key Disclosure and Solicitation Events |
|---|
| October 10, 2019 | The Debtors filed the *Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates*,[82] the *Corrected Disclosure Statement for the Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates*.[83] |
| December 11, 2019 | The Debtors obtained the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* (the "Disclosure Statement Order")[84] approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and related notices, forms, and ballots (collectively, the "Solicitation Packages"). |
| December 17, 2019 | The Debtors caused the distribution of the Solicitation Packages and notice of the Confirmation Hearing and the deadline for objecting to confirmation of the Plan (the "Solicitation Date").  These materials included, among others: <br><br> • The Disclosure Statement;[85] <br><br> • Ballots to each Class entitled to vote;[86] <br><br> • Unimpaired Non-Voting Status Notice;[87] <br><br> • Impaired Non-Voting Status Notice;[88] <br><br> • Notice to Disputed Claim Holders;[89] |

---

[82]   Docket No. 462.

[83]   Docket No. 465.

[84]   Docket No. 671.

[85]   Docket No. 662.

[86]   Docket No. 671, Exhs. 3A, 3B, 3C, 3D.

[87]   *Id.*, Exh. 4.

[88]   *Id.*, Exh. 5.

[89]   *Id.*, Exh. 6.

| | |
|---|---|
| | • A Cover Letter;[90] and<br>• Notice of the Confirmation Hearing.[91] |
| January 22, 2020 | The Debtors filed the Plan Supplement[92] and delivered certain solicitation and Plan Supplement documents via overnight mail.[93]   The Plan Supplement mailing included:<br><br>• A summary of the Projected Creditor Recoveries under the Plan;[94]<br>• A Liquidation Analysis;[95] and<br>• A Summary and Explanation of Plan Changes.[96] |
| January 27, 2020 | The Debtors caused to be delivered via overnight mail, among others, supplemental solicitation materials, including:[97]<br><br>• The Committee Recommendation Letter;[98] and<br>• Instructions on to Holders of General Unsecured Claims on how to recast their vote.[99] |
| January 28, 2020 | The Debtors filed the *First Amended Plan Supplement*[100] and caused the notice of filing of the *First Amended Plan Supplement* to be served by overnight mail.[101] |

---

[90]   *Id.*, Exh. 7

[91]   *Id.*, Exh. 8.

[92]   Docket No. 780.

[93]   Docket Nos. 845, 875.

[94]   Docket No. 780, Exh. I.

[95]   *Id.*, Exh. J.

[96]   *Id.*, Exh. K.

[97]   Docket No. 910.

[98]   *Id.*, Exh. C.

[99]   *Id.*

[100]   Docket No. 819.

[101]   Docket No. 901.

| January 29, 2020 | The Debtors filed the *Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates*.[102] |
|---|---|
| February 6, 2020 | The Debtors filed the *Second Amended Plan Supplement for the Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates*.[103] |

71.    These numerous and detailed documents are more than sufficient to enable creditors to make an informed decision about the Plan.  The heart of the Committee's objection appears to be that the Debtors did not know as of the date the first Solicitation Package was distributed whether the Debtors would pursue an Equitization or Sale Restructuring.  But absolute certainty about the Plan is not a requirement under § 1125, which deliberately affords the Debtors flexibility in the solicitation process.[104]  The fact that the Plan contemplated a toggle reflects the Debtors' commitment to maximizing estate value for the benefit of their creditors, in particular Holders of General Unsecured Claims who would likely receive nothing in a chapter 7 liquidation.  In any event, the Debtors provided adequate information for creditors to make an informed decision on the Plan, inclusive of the toggle mechanism.

72.    As described in the Memorandum, the Plan Supplement contained detailed information about projected creditor recoveries under the Plan and a liquidation analysis.  Each of those documents explained the process and assumptions the Debtors used to arrive at those projections in addition to a numeric range of potential recoveries.  Any suggestion from the

---

[102]   Docket No. 827.

[103]   Docket No. 926.

[104]   Indeed, courts in this jurisdiction and others routinely confirm plans arising from solicited toggle plans  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488-LSS (Bankr. D. Del. 2019) (providing for the confirmation of a plan solicited as a toggle plan); *In re Specialty Retail Shops Holding Corp.*, No. 19-80064-TLS (Bankr. D. Neb. 2019) (same); *In re Ditech Holding Corp.*, No. 19-10412-JLG (Bankr. S.D.N.Y. 2019); *In re Hollander Sleep Products LLC*, No. 19- 11608 (Bankr. S.D.N.Y. 2019) (same); *In re Molycorp, Inc.*, No. 15-11347-CSS (Bankr. D. Del. 2016) (same).

Committee that the Debtors did not provide any meaningful information about creditor recoveries should be dismissed as unfounded.

73.    The Committee also objects, in part, because the Debtors inadvertently omitted the Committee Recommendation Letter from the Solicitation materials distributed on December 16, 2020.  Once the omission was brought to their attention, the Debtors immediately sent another solicitation package containing the Committee Recommendation Letter, instructions on how to re-submit a ballot, and a Class 5 Ballot.  There is no dispute that Holders of Claims in Class 5 received the Committee Recommendation Letter in advance of the Voting Deadline.  The Committee would have this Court deny confirmation of the Plan, which represents months of hard work and negotiation by the Debtors, their advisors, and stakeholders over a clerical error that the Debtors immediately corrected and that did not result in any prejudice to any creditor.

74.    In addition, the voting results reflect that the voting creditors understood the Plan, the transactions contemplated thereunder, and that they understood how to vote on the Plan.  Any suggestion from the Committee that any unsecured creditors were "confused and unguided" should be rejected.

75.    The Debtors' solicitation process met the requirements of § 1125.  The detailed information contained in the Disclosure Statement and Plan Supplement, including the Liquidation Analysis and Projected Creditor Recoveries, is more than adequate to give creditors information sufficient to make an informed decision on the Plan.  The inherent uncertainties in these Chapter 11 Cases necessitate a greater degree of flexibility in the solicitation process and the Debtors have met and exceeded their burden under § 1125.

C.    **The Committee's Motion for a Stay of the Confirmation Order Should be Rejected.**

76.    The Committee requests that, should the Court confirm the Plan, the Confirmation Order should immediately be stayed pending appeal.  This unique request effectively concedes defeat; no party confident in its position seeks a stay pending appeal before they have even lost. The Committee baldly asserts that "[a] stay will not harm the estates,"[105] and that therefore, "[a] stay is appropriate."  But the Committee has not sustained its heavy burden of proof (and cannot do so) and its request must be denied.

77.    A stay pending appeal is extraordinary relief,[106] and to obtain such relief party must carry a "heavy burden,"[107] demonstrating the familiar four factors: (1) that a stay would inflict no substantial injury on any other party; (2) that they would suffer irreparable injury if a stay is denied; (3) that they have a substantial possibility of success on the merits of their appeal; and (4) that the public interest favors a stay.[108]

78.    The Committee cannot meet this burden.  ***First,*** the stay would inflict harm on all other parties, including the Committee.  The Plan Sponsor's Bid of $240 million, including a $30 million deposit, is conditioned on a February 13, 2020 deadline for entry of a "Final Order"—i.e., an order confirming the Plan which has not been stayed.[109]  Thus, a decision to stay the Confirmation Order could be fatal to the consummation of the Plan.  Moreover, the threat of further unnecessary delay of these Chapter 11 Cases, which have been costing approximately $5

---

[105]    Committee Obj. ¶ 18.

[106]    *In re DJK Residential, LLC*, No. 08-10375 (JMP), 2008 WL 650389, at *5 (S.D.N.Y. Mar. 7, 2008).

[107]    *In re Adelphia Comm'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005.

[108]    *In re Calpine Corp.*, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).

[109]    *See* Purchase Agreement §§ 1.01, 11.01(b)(i).

million monthly in selected professional fees alone,[110] would further deplete creditor recoveries while the gears of the appellate process slowly turn. **Second**, the Committee makes no showing of what "irreparable injury" it would suffer if a stay was denied.[111]  Rather, the Committee would suffer no injury at all, as it has to date clearly been able to make use of its right to object in the chapter 11 cases and may continue to exercise its right to appeal entry of the Confirmation Order.

79.    **Third**, to the extent the Committee's Objection forms the basis for their appeal,[112] the Committee does not have a substantial likelihood on the success of the merits, as articulated throughout the Memorandum and this Response.  **Fourth**, there is a strong public interest in the efficient administration and finality of bankruptcy proceedings.[113]  Here, that interest in finality is all the greater given the fragility of the Plan and the enormous cost of these Chapter 11 Cases.  The public interest simply "'cannot tolerate any scenario under which private agendas can thwart the maximization of value.'"[114]  The Court should see the request for an immediate stay pending appeal as what it clearly is:  an attempt by the Committee to grab hold-out value so they can unjustly extract that value from the Debtors and the rightful recipients of that value.

80.    Further, the case law is clear that if a stay is granted, the Committee may be *required* to post a bond in the *full amount* of the potential harm to the Debtors absent exceptional

---

[110]   *See* Fee Application Order.

[111]   The Debtors further submit that the majority of courts hold that equitable mootness standing alone does not constitute irreparable injury.  *See DJK Residential*, 2008 WL 650389, at *3 (noting that the majority of courts have held that "a risk of mootness, standing alone, does not constitute irreparable harm").

[112]   *See* Committee Obj. ¶ 18 (stating that a stay pending appeal is appropriate because "the issues raised [in the Committee Objection] are substantial").

[113]   *See Calpine*, 2008 WL 207841, at *7.

[114]   *Calpine*, 2008 WL 207841, at *7 (internal quotations omitted).

circumstances.[115]   In this case, the Committee may be required to post a bond of at least $240 million, and in reality well over $1 billion.[116]  In the event of a stay pending appeal, is unclear that the Committee would possess the financial wherewithal to fulfill this obligation.

81.    For these reasons, the Committee's request for a stay pending appeal should be denied.

**D.    A Chapter 7 Liquidation Would Not be in the Creditors' Best Interest and the Committee's Request for Conversion Should be Denied.**

82.    The Committee has requested that this Court convert these Chapter 11 Cases to a chapter 7 liquidation.  The Committee argues, without much explanation, that there is "something 'Solomonic' about [c]hapter 7 conversion" in this case. [117]   This argument is nonsensical.

83.    Under 11 U.S.C. § 1112(b)(1), "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, which is in the best interest of creditors and the estate, for cause."  Though "cause" is not defined by the Bankruptcy Code, section 1112(b)(4) contains a non-exhaustive list of causes for conversion, including "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and "(M) inability to effectuate substantial consummation of a confirmed plan." The Committee bears the initial burden to demonstrate "cause."[118]

---

[115]   *In re Adelphia Comm'ns Corp.*, 361 B.R. 337, 350 (S.D.N.Y. 2007).

[116]   In reaching this calculation, the Debtors submit that, as noted, the ongoing efforts to recover the insurance proceeds under the Business Interruption and Property Damage Insurance Policies are valued at up to $1.25 billion, including $65 million of insurance proceeds advance already received by the Debtors.  Further, the Plan Sponsor's bid of $240 million cash, including a $30 million deposit, is conditioned on a February 13, 2020 deadline for entry of an order confirming the Plan and approving the Sale, and a May 31, 2020 Closing. Additionally, under the Plan, the Plan Sponsor shall retain all liabilities of the Acquired Reorganized Debtors, except for those expressly retained by the estates, which, while not quantified here, could be substantial.

[117]   Committee Obj., n. 7.

[118]   *In re Pittsfield Weaving Co.*, 393 B.R. 271, 274 (Bankr. D.N.H. 2008).

84.     Chapter 11 embraces the "two recognized policies . . . of preserving going concerns and maximizing property available to satisfy creditors."[119]   Principally, the "goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the [c]hapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors. . . . [I]t is incumbent upon the bankruptcy judge to effectuate the provisions of the Bankruptcy Code for the protection of creditors lest the judge keep the Code's word of promise to the ear of creditors and break it to their hope."[120]

85.     The interests of the Debtors' stakeholders are best served through the Plan and the chapter 11 process.  Holders of General Unsecured Claims would likely receive nothing in a liquidation.  Conversion to a chapter 7 would be an event of default under the HRP Bid (and the other bid the Debtors have received to date), leaving a chapter 7 trustee to start the process over with no unencumbered assets and only $50,000 in cash; a fire sale with massive value destruction would be inevitable.  Thereafter, conversion to a chapter 7 would result in a series of roadblocks to the Debtors' insurance recovery efforts that would reduce funds available to creditors.[121] Chapter 7 would result in the "termination of the entire management team," who are integral to the insurance recovery process and possess intimate knowledge about the Debtors' business.[122] Without their involvement, recoveries on the insurance proceeds, and thus distributions to

---

[119]   *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435, (1999).

[120]   *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987).

[121]   Stein Dep. at 215:15-25; 216:2-15.

[122]   *Id.*

creditors, would likely be significantly reduced.[123]  The truth is that absolutely nothing good would come from a liquidation.

86.    Confusingly, the reasoning behind the Committee's alternative request that the case be converted to chapter 7 runs directly contrary to the "wait-and-see" reasoning underlying their demand to deny confirmation until all intercreditor disputes and litigation has been resolved.  If the Committee truly believes that it is critical to know the answer to these disputes before confirmation, it is nearly impossible to follow the logic behind advocating to shut down the adversarial process that is underway by converting the case to chapter 7.

87.    Conversion would also harm the public interest.  HRP has a proven track record with remediating environmental liabilities on industrial sites and bringing new uses to those properties.[124]  It has the demonstrated capability to redevelop the land, revitalize the area, and bring jobs to the now-shuttered refining complex.[125]  It is at best unclear why the Committee appears insistent that none of this good work take place.  In the liquidation the Committee says it prefers, there would be substantial uncertainties about the future of the site, whether any redevelopment opportunities would exist, or if the land would simply sit barren for decades to come; and there would be no clear party to absorb environmental obligations, leading to further uncertainty over future use of the land, and potential peril to the surrounding neighborhood.  Not only does the sale to HRP represent the best outcome for the Debtors' estates, it is the best path forward to for countless others who hold a stake in the future of the land and the public.

---

[123]  *Id.*

[124]  *See* Singh Dep. at 93:14-19.

[125]  *Id.* at 96:9-22.

88.     In addition, the Committee has failed to meet its burden in establishing cause.  The Committee suggests that the continuation of the chapter 11 process will result in a substantial continuing loss to the Debtors' estate and the inability to effectuate substantial consummation of a confirmed plan pursuant to sections 1112(a)(4)(A) and (M).[126]

89.     Consistent with the goals of chapter 11, the Debtors' Plan will preserve and enhance value for the benefit of their creditors.  The Committee has failed to meet its burden in establishing cause under section 1112.  Even if the Committee had articulated cause, the Debtors submit they have demonstrated that the Plan will fulfill the fundamental goals of chapter 11 and represents the best path forward for these Chapter 11 Cases.

90.     For all of these reasons, the Court must overrule the Committee's Objection.

---

[126]   Committee Obj. ¶ 17.

WHEREFORE, the Debtors respectfully request that the Court deny the Objection and enter an order confirming the Plan.

Dated:  February 10, 2020  
Wilmington, Delaware

/s/ Laura Davis Jones
_____

Laura Davis Jones (DE Bar No. 2436)  
James E. O'Neill (DE Bar No. 4042)  
Peter J. Keane (DE Bar No. 5503)  
**PACHULSKI STANG ZIEHL & JONES LLP**  
919 North Market Street, 17th Floor  
P.O. Box 8705  
Wilmington, Delaware 19899-8705 (Courier 19801)  
Telephone:    (302) 652-4100  
Facsimile:    (302) 652-4400  
Email:         ljones@pszjlaw.com  
                   pkeane@pszjlaw.com  
                   joneill@pszjlaw.com  

- and -

Edward O. Sassower, P.C.  
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)  
Matthew C. Fagen (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900  
Email:         edward.sassower@kirkland.com  
                   steven.serajeddini@kirkland.com  
                   matthew.fagen@kirkland.com  

*Co-Counsel to the Debtors and Debtors in Possession*