**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| PES HOLDINGS, LLC, *et al.*,[1] | ) |
| | ) Case No. 19-11626 (KG) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF AN ORDER
CONFIRMING THE DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN
OF REORGANIZATION OF PES HOLDINGS, LLC AND ITS DEBTOR AFFILIATES**

Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
steven.serajeddini@kirkland.com
matthew.fagen@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI    STANG    ZIEHL    &
JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 870
Wilmington, Delaware 19899
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
joneill@pszjlaw.com
pkeane@pszjlaw.com

Dated:  February 10, 2020

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate Holdings, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is:  1735 Market Street, Philadelphia, Pennsylvania 19103.

# TABLE OF CONTENTS

**Page(s)**

**Preliminary Statement**................................................................................................1

**Argument**...............................................................................................................5

I.    Case Background and Objections ...........................................................................6

    A.    Procedural History. ....................................................................................6

    B.    Global Settlement........................................................................................9

    C.    The Plan Solicitation and Notification Process. ....................................10

    D.    Remaining Confirmation Objections. .....................................................12

II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code...............13

    A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ...........................................................................14

        1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ............................................14

        2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code...................................17

        3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code...................................23

    B.    The Plan Complies with Section 1123(d) of the Bankruptcy Code......................40

    C.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))...........................................................40

        1.    The Debtors Complied with Section 1125 of the Bankruptcy Code. ........41

        2.    The Debtors Complied with Section 1126 of the Bankruptcy Code. ........42

    D.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)). .........................................43

    E.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). ....................................45

    F.    The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ....................................................46

i

G.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). .................................................................................47

H.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). .................................................................................47

I.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...................................49

J.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). .................................................................................50

K.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ...............................................................51

L.     The Plan Is Feasible (§ 1129(a)(11)). ....................................................51

M.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...........53

N.     No Remaining Retiree Benefits Obligations (§ 1129(a)(13)). ...............54

O.     Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. .................54

P.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ............................................................................55

      1.     The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)). ...............55

      2.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)). .........................................................................57

Q.     The Debtors Complied with Section 1129(d) of the Bankruptcy Code. ...........58

R.     Modifications to the Plan. ....................................................................59

S.     Good Cause Exists to Waive the Stay of the Confirmation Order. ....................60

III.     The Objections to the Plan Should be Overruled. ...................................................61

A.     The Sale Transaction Should be Approved as a Sound Exercise of the Debtors' Business Judgement. ...........................................................61

      1.     The Sale Transaction Represents a Sound Exercise of the Debtors' Business Judgment and Should Be Approved. ..........................65

      2.     The Successful Bid is the Best Bid. ...........................................68

B.     The Objection of the U.S. Trustee Should be Overruled. ....................70

1.      The Discharge of Acquired Reorganized Debtors Is Appropriate............70

2.      The Third-Party Release Is Consensual and Permissible. .........................71

3.      The Debtor Release and Third-Party Release are Reasonable..................76

4.      The Plan's Compromise Language Has Been Restricted Such That the U.S. Trustee's Objection Thereon Is Resolved...................................77

5.      The Plan No Longer Provides that Entry of the Confirmation Order Shall Close the Cases of the Acquired Reorganized Entities Such That the U.S. Trustee's Objection Thereon Is Resolved. .........................77

C.      The Objection of the USW Should be Overruled. ...................................78

1.      The Treatment of the USW Before and During the Auction was Reasonable and Consistent with the Bidding Procedures.........................78

2.      The Solicitation Materials and the Plan Supplement Provide Adequate Information about the Plan. ........................................................79

3.      The MIP Will Maximize Value for the Estate. .........................................80

D.      The Insurers' Objection Should Be Overruled. ....................................80

1.      The Plan Does Not Negatively Impact or Alter the Insurers' Rights ........80

2.      The Extension of the Automatic Stay Beyond Plan Confirmation is Appropriate and Necessary to Facilitate the Administration of the Estate.......................................................................................................82

3.      The Court's Jurisdiction over the Insurance Adversary Proceedings Is Appropriate and Necessary to Facilitate the Administration of the Estate.......................................................................................................83

E.      PBRE's Objection Should be Overruled..............................................85

**Conclusion** ........................................................................................................................87

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
      526 U.S. 434 (1999) ................................................................................................48, 56

*Brite* v. *Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
      764 F.2d 406 (5th Cir. 1985) ........................................................................................44

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-
      Manville Corp.)*,
      60 B.R. 612 (Bankr. S.D.N.Y. 1986) ..................................................................38, 39, 65

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
      722 F.2d 1063 (2d Cir. 1983) ........................................................................................38

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
      699 F.2d 599 (2d Cir. 1983) ..........................................................................................26

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
      Ltd. P'ship)*,
      116 F.3d 790 (5th Cir. 1997) ........................................................................................44

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
      10 F.3d 944 (2d Cir. 1993) ............................................................................................15

*Gillman v. Continental Airlines (In re Continental Airlines)*,
      203 F.3d 203 (3d Cir. 2000) ....................................................................................32, 74

*In re 203 N. LaSalle St. Ltd. P'ship*,
      190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
      526 U.S. 434 (1999) ......................................................................................................57

*In re 500 Fifth Ave. Assocs.*,
      148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ........................................................................15

*In re Abbotts Dairies of Pa., Inc.*,
      788 F.2d 143 (3d Cir. 1986) ..........................................................................................44

*In re Abeinsa Holding, Inc.*,
      562 B.R. 265 (Bankr. D. Del. 2016) ..............................................................................27

*In re Adelphia Commc'ns. Corp.*,
      368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..........................................................................48

*In re Aleris Int'l, Inc.*,
    2010 WL 3492664 (Bankr. D. Del. May 13, 2010)..........................................................41, 58

*In re Ambanc La Mesa L.P.*,
    115 F.3d 650 (9th Cir. 1997) ........................................................................................56, 58

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006)................................................................................13, 14, 58

*In re Avaya Inc.*,
    No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 3, 2017)..........................................................76

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................................58

*In re Blackhawk Mining LLC*,
    No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019).......................................................29, 77

*In re Bridgeport Hldgs., Inc.*,
    388 B.R. 548 (Bankr. D. Del. 2008) ....................................................................................65

*In re Burns & Roe Enters., Inc.*,
    No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ............................................60

*In re Capmark Fin. Grp. Inc.*,
    No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ...............................52

*In re Century Glove*,
    Cir. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993) ...................44, 48

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986)...................................................................................45

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015)....................................................................................72

*In re Checkout Holding Corp.*,
    No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) ..............................................................29

*In re Conseco, Inc.*,
    301 B.R. 525 (Bankr. N.D. Ill. 2003) ......................................................................31, 72, 76

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004)........................................................................26, 31, 58

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009) *aff'd* 2010 WL 1223109 (S.D.N.Y.
    March 24, 2010), *modified on other grounds*, 634 F.3d 79 (2d Cir. 2011) ................31, 72, 76

*In re Dex One Corp.*,
No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013)................................................................61

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................................................15

*In re Emerald Oil, Inc.*,
No. 16-10704 (CSS) (Bankr. D. Del. Mar. 9, 2017)............................................................77

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005)..............................................................................................35

*In re EV Energy Partners, L.P.*,
No. 18-10814 (Bankr. D. Del. 2018) .....................................................................................74

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ......................................................................................26

*In re FAH Liquidating Corp.*,
No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ............................................................34

*In re Filene's Basement, LLC*,
11-13511 (KJC), 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014)....................................39

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................................52

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................................58

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988)....................................................................................45

*In re Gatehouse Media, Inc.*,
No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) ..........................................................61

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ........................................................................13, 32, 74

*In re GenOn Energy, Inc.*,
No. 17-33695 (Bankr. S.D. Tex. Dec. 12, 2017) ..................................................................74

*In re Geokinetics Inc.*,
No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ...........................................................61

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009).............................60

**Page(s)**

*In re GSC, Inc.*,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) .................................................................39

*In re GSE Envtl., Inc.*,
No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) ...........................................61

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007).................................................................15

*In re Horsehead Holding Corp.*,
No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) .............................................30

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ............................................................ *passim*

*In re Integrated Res., Inc.*,
147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ...................39, 65

*In re ION Media Networks, Inc.*,
No. 09-13125 (JMP) (Bankr. S.D.N.Y. Nov. 24, 2009) .........................................57

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987).................................................................................15

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ....................................................................58

*In re Laboratory Partners, Inc.*,
No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ...........................................34

*In re Lapworth*,
1998 WL 767456 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ....................................41

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) .....................................................................49

*In re Lernout & Hauspie Speech Prods., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003) .....................................................................58

*In re Lisanti Foods*,
329 B.R. 491 (Bankr. D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007)............................45

*In re Magnum Hunter Resources Corp.*,
No. 15-12533 (Bankr. D. Del. Mar. 14, 2016).....................................................77

*In re Martin*,
91 F.3d 389 (3d. Cir. 1996)...................................................................................38

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) .................................................................27

*In re Mission Coal Co.*,
    No. 18-04177 (TOM) (Bankr. N.D. Ala. Apr. 4, 2019) .......................................81

*In re Moore*,
    608 F.3d 253 (5th Cir. 2010) ...............................................................................69

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ....................................................................44

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................14

*In re One Aviation Corp.*,
    No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) ..........................................29

*In re PES Holdings, LLC*,
    No. 18-10122 (KG), Docket Nos. 244, 347, 510 ......................................6, 74, 77

*In re Physiotherapy Holdings, Inc.*,
    No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ...........................................61

*In re Premier Int'l Holdings, Inc.*,
    2010 WL 2745964 (CSS) (Bankr. D. Del. Apr. 29, 2010) ..................................35

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ..................................................................52

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).................................................................35, 37, 44

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004).................................................................................85

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................................14

*In re Samson Resources Corp.*,
    No. 14-11934 (CSS) (Bankr. D.Del. Feb. 13, 2017) ...........................................30

*In re Schipper*,
    933 F.2d 513 (7th Cir. 1991) ...............................................................................38

*In re Scimeca Found, Inc.*,
    497 B.R. 753 (Bankr. E.D. Pa. 2013) ..................................................................69

**Page(s)**

*In re Sea Garden Motel & Apartments,*
195 B.R. 294 (D. N.J. 1996) ....................................................52

*In re Source Home Entm't, LLC,*
No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015)......................61

*In re Southcross Holdings, LP,*
No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) .........................74

*In re Spansion,*
2010 WL 2905001 (Bankr. D. Del. April 16, 2010)......................36

*In re Spansion, Inc.,*
426 B.R. 114 (Bankr. D. Del. 2010) ................................ *passim*

*In re Specialty Equip. Corp.,*
3 F.3d 1043 (7th Cir. 1993) .........................................31, 72, 76

*In re Telesphere Commc's, Inc.,*
179 B.R. 544 (Bankr. N.D. Ill. 1999) .....................................38

*In re TK Holdings Inc.,*
No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ....................29

*In re Tresha-Mob, LLC,*
No. 18-52420-RBK, 2019 WL 1785431 (Bankr. W.D. Tex. Ap. 3, 2019) ............................69

*In re Tribune Co.,*
464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
B.R. 208 (Bankr. D. Del. 2011) ............................................52

*In re U.S. Fidelis,*
481 B.R. 503 (Bankr. E.D. Mo. 2012)......................................74

*In re U.S. Truck Co.,*
47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ....................52

*In re Ultra Petroleum Corp.,*
No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017) ....................77

*In re VER Techs. HoldCo LLC,*
No. 18-10834 (KG) (Bankr. D. Del. July 9, 2019) ......................76, 77

*In re Verso Corp.,*
No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ......................37

*In re W.R. Grace & Co.,*
475 B.R. 34 (D. Del. 2012)..............................................44, 52

**Page(s)**

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ................................................................ *passim*

*In re Westmoreland Coal Co.*,
  No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 2, 2019) ........................................81

*In re World Health Alts., Inc.*,
  344 B.R. 291 (Bankr. D. Del. 2006) ...................................................................26

*In re Z Gallerie LLC*,
  No. 19-10488 (LSS) (Bankr. D. Del. Jun. 20, 2019) ..........................................81

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ......................................................27, 28, 72

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993).........................................................................15, 56

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988).................................................................................52

*Lawsky v. Condor Capital Corp.*,
  No. 14 CIV. 2863 CM, 2015 WL 4470332 (S.D.N.Y. July 21, 2015) ....................69

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
  25 F.3d 1132 (2d Cir. 1994).................................................................................42

*Pacor v. Higgins*,
  743 F.2d 984 (3d Cir.1984)..................................................................................85

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) .............................................................................52

*Smith v. Van Gorkom*,
  488 A.2d 858 (Del. 1985) ..............................................................................39, 65

*United Artists Theatre Co. v. Walton*,
  315 F.3d 217 (3d Cir. 2000).................................................................................32

*United States v. Chem. Found.*,
  5 F.2d 191 (3d Cir. 1925) *aff'd as modified*, 272 U.S. 1 (1926)............................69

**Statutes**

11 U.S.C. §§ 101–1532...............................................................................................1

11 U.S.C. § 101(31) ..................................................................................................47

11 U.S.C. § 363..........................................................................................................38

**Page(s)**

11 U.S.C. § 363(b) ...................................................................................39, 69

11 U.S.C. § 363(b)(1) ...........................................................................38, 39, 65

11 U.S.C. § 365 .......................................................................................24, 40

11 U.S.C. § 365(a) ........................................................................................88

11 U.S.C. § 365(f) .........................................................................................61

11 U.S.C. § 365(h)(1)(A)(ii) ...............................................................86, 87, 88

11 U.S.C. § 503(b) .........................................................................................51

11 U.S.C. § 507(a)(1) .....................................................................................51

11 U.S.C. § 507(a)(2) .................................................................................50, 54

11 U.S.C. § 507(a)(8) .....................................................................................51

11 U.S.C. § 510(b) ........................................................................10, 16, 43, 57

11 U.S.C. §§ 701-784 .............................................................................*passim*

11 U.S.C. § 727(a) .........................................................................................71

11 U.S.C. §§ 1101-1195 ..........................................................................*passim*

11 U.S.C. § 1102 .............................................................................................1

11 U.S.C. § 1107(a) .........................................................................................1

11 U.S.C. § 1108 .............................................................................................1

11 U.S.C. § 1114 ...........................................................................................54

11 U.S.C. § 1122 ....................................................................................*passim*

11 U.S.C. § 1122(a) .......................................................................................14

11 U.S.C. § 1123 ....................................................................................*passim*

11 U.S.C. § 1123(a) .......................................................................................17

11 U.S.C. § 1123(a)(1) ...................................................................................17

11 U.S.C. § 1123(a)(2) ...................................................................................17

11 U.S.C. § 1123(a)(3) .................................................................18, 36, 44, 45

**Page(s)**

11 U.S.C. § 1123(a)(4).................................................................................18, 45, 46

11 U.S.C. § 1123(a)(5).......................................................................................18, 20

11 U.S.C. § 1123(a)(6).......................................................................................21, 22

11 U.S.C. § 1123(a)(7).......................................................................................22, 23

11 U.S.C. § 1123(b)........................................................................................... *passim*

11 U.S.C. § 1123(b)(1)..............................................................................................24

11 U.S.C. § 1123(b)(1)–(6)................................................................................23, 24

11 U.S.C. § 1123(b)(2)..............................................................................................24

11 U.S.C. § 1123(b)(3)(A).........................................................................................26

11 U.S.C. § 1123(b)(4).......................................................................................38, 39

11 U.S.C. § 1123(d)...................................................................................................40

11 U.S.C. § 1125.............................................................................................. *passim*

11 U.S.C. § 1125(a)...................................................................................................42

11 U.S.C. § 1125(a)(1)..............................................................................................42

11 U.S.C. § 1125(b).............................................................................................41, 42

11 U.S.C. § 1125(c)...................................................................................................42

11 U.S.C. § 1126.............................................................................................. *passim*

11 U.S.C. § 1126(c).............................................................................................43, 44

11 U.S.C. § 1126(e)...................................................................................................44

11 U.S.C. § 1126(f)....................................................................................................43

11 U.S.C. § 1126(g)...................................................................................................43

11 U.S.C. § 1127........................................................................................................60

11 U.S.C § 1127(a)....................................................................................................59

11 U.S.C. § 1129................................................................................................1, 3, 13, 14

11 U.S.C. § 1129(a)...................................................................................................55

**Page(s)**

11 U.S.C. § 1129(a)(1)..............................................................................14, 40

11 U.S.C. § 1129(a)(2)........................................................................36, 41, 44

11 U.S.C. § 1129(a)(3)....................................................................................44

11 U.S.C. § 1129(a)(5)..............................................................................46, 47

11 U.S.C. § 1129(a)(5)(A)(i)...........................................................................46

11 U.S.C. § 1129(a)(5)(A)(ii)..........................................................................46

11 U.S.C. § 1129(a)(5)(B)...............................................................................47

11 U.S.C. § 1129(a)(6)....................................................................................47

11 U.S.C. § 1129(a)(7)..............................................................................48, 49

11 U.S.C. § 1129(a)(7)(A)...............................................................................49

11 U.S.C. § 1129(a)(8)........................................................................50, 52, 55

11 U.S.C. § 1129(a)(9)..............................................................................50, 51

11 U.S.C. § 1129(a)(9)(A).........................................................................50, 51

11 U.S.C. § 1129(a)(9)(B)...............................................................................51

11 U.S.C. § 1129(a)(9)(C)...............................................................................51

11 U.S.C. § 1129(a)(10)......................................................................50, 51, 52

11 U.S.C. § 1129(a)(11)......................................................................52, 53, 54

11 U.S.C. § 1129(a)(12)..................................................................................54

11 U.S.C. § 1129(a)(13)..................................................................................54

11 U.S.C. § 1129(a)(14)..................................................................................55

11 U.S.C. § 1129(a)(15)..................................................................................55

11 U.S.C. § 1129(a)(16)..................................................................................55

11 U.S.C. § 1129(b).............................................................................55, 56, 57, 58

11 U.S.C. § 1129(b)(1).......................................................................55, 57, 58, 59

11 U.S.C. § 1129(b)(2)(B)(i)............................................................................56

**Page(s)**

11 U.S.C. § 1129(b)(2)(B)(ii) ...............................................................................56

11 U.S.C. § 1129(d) ......................................................................................50, 59

11 U.S.C. § 1141 .................................................................................................71

11 U.S.C. § 1141(d)(3) .......................................................................................71

28 U.S.C. 157(b)(2) ............................................................................................84

28 U.S.C. § 157(b)(2)(A) ..............................................................................84, 85

28 U.S.C. 1930 ....................................................................................................54

Securities Act of 1933 § 5 ..................................................................................59

**Rules**

Fed. R. Bankr. P. 1015(b) ....................................................................................1

Fed. R. Bankr. P. 3017 ........................................................................................41

Fed. R. Bankr. P. 3018 ........................................................................................41

Fed. R. Bankr. P. 3019 ..................................................................................59, 60

Fed. R. Bankr. P. 3020 ........................................................................................61

Fed. R. Bankr. P. 3020(e) ....................................................................................60

Fed. R. Bankr. P. 6004 ........................................................................................61

Fed. R. Bankr. P. 6004(h) ....................................................................................60

Fed. R. Bankr. P. 6006 ........................................................................................61

Fed. R. Bankr. P. 6006(d) ....................................................................................60

Fed. R. Bankr. P. 9019 ........................................................................................26

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ...........14

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ...............................................41

*New York Times* ...................................................................................................8

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)..................14

**Page(s)**

S. Rep. No. 989, 95th Cong., 2d Sess. (1978) ...............................................................41

*USA Today* ......................................................................................................................7

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of confirmation of the *Third Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* filed contemporaneously herewith (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors hereby incorporate into this Memorandum the *Debtors' Response In Support of an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtor Affiliates* (the "Debtors' Response to the Committee"), filed contemporaneously herewith. In support of confirmation of the Plan and in response to the objections thereto (collectively, the "Objections"), the Debtors respectfully state as follows.

## **Preliminary Statement**

1.      Early in the morning on June 21, 2019, a large-scale, catastrophic explosion at the alkylation unit at the Debtors' Girard Point refining facility caused substantial property damage and left the Girard Point refinery largely inoperable. This incident forced the Debtors into a preservation-focused operational status, leaving the Debtors with no choice but to commence these

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Confirmation Order (as defined herein), or the *Debtors' Response In Support of an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtor Affiliates* (filed contemporaneously herewith), as applicable.

A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Debtors' Chapter 11 Cases, are set forth in greater detail in the *Declaration of Jeffrey S. Stein, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 32]. On July 21, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 99]. No party has requested the appointment of a trustee or examiner in these chapter 11 cases. On October 11, 2019, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 197].

Chapter 11 Cases with the goals of preserving the safe operation of their refinery complex and maximizing value for all stakeholders.  The Debtors' path forward was anything but certain, and the estate fiduciaries were left with a litany of operational challenges in the wake of this catastrophe.  Although the path forward was once uncertain, through the tireless efforts of all involved, including the DIP Lenders, the Intermediation Provider, and the Committee, the Debtors stand before the Court having secured operations on their refinery site, established adequate financing to pursue recovery of insurance claims, and secured a commitment for a reorganization of certain debtor entities pursuant to a transaction with the Plan Sponsor that maximizes distributable value to key creditors and contemplates the investment of billions in the site and the creation of thousands of new jobs at the site (substantially more than what was lost).

2.      The Debtors have diligently pursued all available paths to maximize distributable value for all case constituents.  ***First***, the Debtors have pursued insurance recovery proceeds for losses suffered in connection with the fire that occurred in the Girard Point refinery on or around June 21, 2019 (the "June 21 Incident").  As of December 6, 2019, the Debtors, ICBC Standard Bank Plc ("ICBCS"), and the Committee completed briefing to determine whether the insurance proceeds for business interruption losses from the June 21 Incident constitute Term Loan Priority Collateral.  These issues were argued in front of the Court on January 14, 2020 and a ruling from this Court is currently pending.  Simultaneously, the Debtors and their management team continue to pursue claims under the Business Interruption and Property Damage Insurance Policies.

3.      ***Second***, beginning in August 2019, just weeks after the Petition Date, the Debtors embarked on a comprehensive sale process to evaluate potential strategic and/or financial buyers, refinery restart bidders, land redevelopment and/or real estate bidders, alternative fuel facility bidders, and decommissioning and environmental remediation bidders.  Following three rounds of

competitive bidding, diligence requests and site visits, and management discussions, the Debtors ultimately conducted an auction (the "Auction") between two parties that submitted Qualified Bids (as defined in the Bidding Procedures[3]).  The Auction culminated in a "best and final" offer from HRP Philadelphia Holdings, LLC ("HRP" or the "Plan Sponsor") of $240 million, which represented an increase of $86 million from HRP's Qualified Bid.  Moreover, HRP's bid is secured by a $30 million deposit, which is indicative of its commitment to close on this transaction. Following consultation with the Term Loan Lenders and the Committee, the Debtors announced HRP as the Winning Bidder (as defined in the Bidding Procedures Order), and executed the Purchase and Sale Agreement moments later.

4.       The Debtors now seek to confirm the Plan, which provides the Debtors with a path to swiftly conclude their Chapter 11 Cases, while simultaneously providing recoveries to all funded debt holders and Holders of General Unsecured Claims.  Pursuant to the Plan and the Purchase Agreement, the Debtors will sell 100% of the equity interests of PES Holdings, LLC to Plan Sponsor.[4]  The Plan establishes certain reserves to ensure payment of Claims and Interests pursuant to the Plan that will be funded as proceeds of the insurance recovery process are received by the Liquidating Trust.  The Plan has the support of the Debtors' key constituents, including 100% of Holders of Class 3 Term Loan Secured Claims, Class 4 Intermediation Secured Claims, and Class 6 Subordinated Remaining Volume Claims.  In addition, as forth herein, the Plan satisfies all applicable provisions of the Bankruptcy Code, including section 1129 of the Bankruptcy Code.

---

[3]    For the avoidance of doubt, the term "Bidding Procedures" has the meaning ascribed to it in the *Order (A) Establishing Bidding Procedures, (B) Approving Bid Protections, and (C) Granting Related Relief* [Docket No. 583] (the "Bidding Procedures Order").

[4]    The Purchase Agreement was filed in the Plan Supplement [Docket No. 780].

5.      Following the Bid Deadline, the Debtors engaged in several weeks of round-the-clock, good-faith negotiations with all key stakeholders and Plan Sponsor to develop and finalize the proposed transaction structure.  During these negotiations, each party agreed to make material concessions in furtherance of the Debtors' restructuring.

6.      The Debtors are continuing discussions and negotiations with the objecting parties, and have made a host of clarifications in the Plan and in their proposed version of the order confirming the Plan (the "Confirmation Order") to provide the objectors comfort, with hope that these issues can be resolved in their entirety in advance of the hearing to consider Confirmation of the Plan (the "Confirmation Hearing").  Additionally, the Debtors have made modifications to the Plan, or included provisions in the proposed order confirming the Plan, that address each of the resolved Objections, as well as informal objections asserted by other parties in interest.  The Debtors will continue working with objecting parties to resolve any remaining issues and will strive to obtain confirmation of the Plan on an uncontested basis.  To the extent any of the Objections remain unresolved, the Debtors reserve all rights to supplement this Memorandum in advance of the Confirmation Hearing.

7.      Given the history at play in these chapter 11 cases, the Plan is a remarkable result. Following the June 21 Incident, the Debtors were facing several possible outcomes, and none of them were promising.  Approximately eight months have now passed from the explosion that changed the course of the Debtors' future and that of the surrounding community.  The Debtors have used this time to run a robust marketing process, ultimately culminating in a $240 million purchase offer from a seasoned redeveloper that is dead-set on swiftly closing and concluding these cases.  Inevitably, a catastrophe case leaves some parties dissatisfied.  But, through the morass of challenges inherent to this enterprise, the Debtors have marched forward, and now stand

at the goal line of achieving a value-maximizing Plan that promises a hopeful future for this Philadelphia institution.

8.     Because the Plan satisfies all applicable provisions of the Bankruptcy Code, and as set forth more fully in this Memorandum, and the Debtors' Response to the Committee (filed contemporaneously herewith), the Plan should be confirmed.

## **Argument**

9.     This Memorandum is divided into three parts.  Part I provides the procedural history of the Plan and Disclosure Statement, the Debtors' solicitation efforts and voting results, and a summary of the various Objections filed with respect to the Plan.  Part II establishes the Plan's compliance with each of the applicable requirements for Confirmation, including that certain of the discretionary contents of the Plan, including the Plan's release provisions, are appropriate and should be approved.  Part III establishes that the remaining Objections to the Plan should be overruled.    In  further  support  of  Confirmation  of  the  Plan,  the  Debtors  have  filed contemporaneously herewith:

- the *Declaration of Paul H. Deutch on Behalf of Omni Management Group, Inc. Regarding Service of Solicitation Packages and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* (the "Voting Report");

- the *Declaration of Jeffrey S. Stein in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* (the "Stein Declaration");

- the *Declaration of John Singh in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* (the "Singh Declaration");

- the *Declaration of Josephine Gartrell in Support of the Debtors' Motion Seeking Entry of an Order (I) Approving the Debtors' KEIP and (II) Granting Related Relief* (the "Gartrell Declaration");

- the *Declaration of Joseph J. Sciametta in Support of Confirmation of Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates* (the "Sciametta

Declaration" and, together with the Voting Report, the Stein Declaration, the Singh Declaration, and the Gartrell Declaration, the "Declarations").

10.    For the reasons stated herein and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors respectfully request that the Court find that the Debtors have satisfied their burden and confirm the Plan.

## I.    Case Background and Objections

### A.    Procedural History.

11.    The Plan is the product of extensive, good-faith, arm's-length negotiations between the Debtors and their primary creditor constituencies, including, namely, the Term Loan Lenders, ICBCS, and the Committee.  Since the Petition Date, the Debtors have engaged in a multi-faceted process to maximize the value of the Debtors' estates for their stakeholders, including a comprehensive marketing process for the sale of the Debtors' business and a complex insurance process to recover on the Debtors' property damage and business interruption insurance policy claims relating to the June 21 Incident.

12.    The Debtors' marketing efforts have paid off.  The Debtors now intend to implement the Plan through the sale of 100% of PES Holdings, LLC's equity to HRP, acting as Plan Sponsor pursuant to the Purchase Agreement.  The main features of the Sale Transaction under the Plan include, among other things:

- the transfer of 100% of PES Holdings, LLC's membership interests to the Plan Sponsor;

- submission of a $30 million deposit, which is currently held in escrow, to secure the Plan Sponsor's commitment to close on the transaction; and

- assumption of PESRM's outstanding environmental compliance obligations, including potential obligations of PESRM under the Consent Decree.[5]

13.     On October 10, 2019, the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court"), among other pleadings, the *Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* and the *Corrected Disclosure Statement for the Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* [Docket No. 462], along with the Disclosure Statement Motion[6] pursuant to which the Debtors sought a hearing on approval of the Disclosure Statement and the related Solicitation and Voting Procedures.  On December 11, 2019, the Debtors filed the *First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* and the *Disclosure Statement for the First Amended Joint Plan of PES Holdings, LLC and its Debtor Affiliates* (the "Disclosure Statement").  On December 11, 2019, the Court entered the Disclosure Statement Order[7] which, in relevant part: (a) established February 3, 2020, at 5:00 p.m. prevailing Eastern Time, as the deadline to object to the Plan; (b) approved the solicitation procedures set forth in the Disclosure Statement; and (c) approved the form and manner of the Confirmation Hearing Notice (as defined in the Disclosure Statement Order).  The Debtors caused the Notice and Claims Agent, on or about December 17, 2019, to serve the Solicitation Packages and the Confirmation Hearing Notice in accordance with the terms of the

---

[5]    "Consent Decree" shall mean the Consent Decree and Environmental Settlement Agreement entered by the Court in the Debtors' prior bankruptcy case, *see In re PES Holdings, LLC*, No. 18-10122 (KG), Docket Nos. 244, 347, 510.

[6]    *See Debtors' Motion for Entry of an Order (I) Approving the Adequacy of Information in the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices In Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 464] (the "Disclosure Statement Motion").

[7]    *See Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 671] (the "Disclosure Statement Order").

Disclosure Statement Order.[8]  The Debtors caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *USA Today* (national edition) and *The New York Times* (national edition) on December 16, 2019, as evidenced by the *Affidavit of Service of Publication* [Docket No. 704].[9]

14.    On January 22, 2020, the Debtors filed with the Court the Plan Supplement [Docket No. 780], which included the following exhibits:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) a list of retained Causes of Action; (c) the form of Management Incentive Plan; (d) the Purchase Agreement; (e) the description of successful bid; (f) the form of Liquidating Trust Agreement; (g) the 1129(a)(5) disclosures; (h) the notice of sale restructuring and successful bid; (i) a disclosure table detailing the projected creditor recoveries following the Auction; (j) an updated liquidation analysis taking into account estimated recoveries based on the successful bid; and (k) a summary explanation of any Plan changes.  On January 22, 2020, the Debtors caused the notice of filing of the foregoing Plan Supplement documents to be delivered, and the foregoing Plan Supplement documents in clauses (h) to (k) and the letter from the Committee recommending how Holders of General Unsecured Claims should vote on the revised Plan to be delivered by overnight mail, upon the parties receiving notice of the Disclosure Statement, in accordance with paragraph 16 of the Disclosure Statement Order.

15.    On January 28, 2020, the Debtors filed the *First Amended Plan Supplement for the First Amended Joint Chapter 11 Plan of PES Holdings, LLC and its Debtor Affiliates* [Docket

---

[8]    *See Affidavit of Service* [Docket No. 713] (the "Affidavit of Solicitation").

[9]    Due to a clerical error, the letter from the Committee recommending that Holders wait to receive the Plan Supplement to vote was inadvertently excluded from the Solicitation Packages (as defined in the Disclosure Statement Order) sent to Holders entitled to vote on the Plan.  On January 27, 2020, the Debtors served a letter to all Holders that had voted prior to the filing of such Plan Supplement asking that such Holders submit a new vote either in favor or against the Debtors' Plan (the "Supplemental Solicitation Letter").

No. 819], which included a revised Schedule of Assumed Executory Contracts and Unexpired Leases, and Amended Retained Causes of Action List.  On February 6, 2020, the Debtors filed the *Second Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates* [Docket No. 926], which included a further revised Schedule of Assumed Executory Contracts and Unexpired Leases.

16.    On January 29, 2020, the Debtors filed the *Second Amended Joint Chapter 11 Plan of PES Holdings, LLC and Its Debtor Affiliates* [Docket No. 827].

17.    The deadline for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was February 3, 2020.  The deadline to file objections to the Plan was February 3, 2020 at 4:00 p.m., prevailing Eastern Time.  The Confirmation Hearing is scheduled for February 12, 2020 at 9:30 a.m., prevailing Eastern Time.  Concurrently with the filing of this Memorandum, the Debtors have submitted a proposed Confirmation Order (the "Proposed Confirmation Order").

**B.    Global Settlement.**

18.    The Plan embodies a good-faith compromise and settlement (the "Settlement") of Claims, Interests, Causes of Action, and controversies related to the Debtors and the restructuring. The Settlement is designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.[10]  The Debtors thoroughly analyzed those Claims, Interests, Causes of Action, and controversies and found that the Settlement will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests and is essential to the successful implementation of the Plan.[11]

---

[10]    *See* Stein Decl. ¶ 59.

[11]    *Id.*

19.     To effectuate this global settlement, the Plan includes mutual, consensual, and customary releases of claims held by the Debtors and parties in interest.  This global settlement is critical to bring closure to the Debtors, the Acquired Reorganized Debtors, and all parties in interest and to maximize recoveries for all stakeholders.

20.     The Debtors submit that the Sale Restructuring effectuated through the Plan is in the best interests of the Debtors' Estates, represents the best available restructuring option, and will maximize value the value of the Estates and maximize recoveries to all Holders of Claims and Interests.

### C.     The Plan Solicitation and Notification Process.

21.     The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan consolidates the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

22.     In compliance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[12]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired.  The following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

---

[12]     *See* 11 U.S.C. § 1126.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 9 | Interests in PES Energy and PES Ultimate Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

23.     The Debtors solicited votes on the Plan only from Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims.  The voting results, as reflected in the Voting Report, are summarized as follows:

| Class | Class Description | Number Accepting (%) | Number Rejecting (%) | Amount Accepting (%) | Amount Rejecting (%) | Class Voting Result |
|-------|-------------------|----------------------|----------------------|----------------------|----------------------|---------------------|
| 3 | Term Loan Secured Claims | 100.0 | 0.0 | 100.0 | 0.0 | Accepted |
| 4 | Intermediation Secured Claims | 100.0 | 0.0 | 100.0 | 0.0 | Accepted |
| 5 | General Unsecured Claims | 23.4 | 76.6 | 1.8 | 98.2 | Rejected |
| 6 | Subordinated Remaining Volume Claim | 100.0 | 0.0 | 0.0 | 0.0 | Accepted |

24.     As set forth above and in the Voting Report, Holders of Claims and Interests in Classes 3, 4, 5, and 6 were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").

25.     As a direct result of the Debtors' efforts to engage their key constituencies, the Plan enjoys the support of the Debtors' primary stakeholders—100 percent of Holders of Term Loan Secured Claims, Intermediation Secured Claims, and the Subordinated Remaining Volume Claim voted in favor of the Plan.

26.     The Plan facilitates the maximization of value of the Estates on terms supported by major parties in interest in these Chapter 11 Cases.  More specifically, the Plan details, among other things:  (a) the consummation of the Sale Restructuring; including the vesting of the Purchased Interests and other interest and assets in the Plan Sponsor and the Liquidating Trust, as

applicable (b) the sources of consideration for Plan distributions; (c) authorization of the Reorganized Debtors and Liquidating Trust, as applicable, to take all actions necessary to effectuate the Plan, including those actions necessary to effect the Sale Transactions, and all other actions contemplated under or necessary to implement the Plan; (d) the settlement and discharge of Claims and Interests as set forth in the Plan; and (e) the preservation and vesting of certain Causes of Action that constitute "Excluded Assets" under the Purchase Agreement in the Liquidating Trust.

27.     The formulation of the Plan is a significant achievement for the Debtors and represents months of tireless discussions with parties in interest following the June 21 Incident. Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders. The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests.

**D.      Remaining Confirmation Objections.**

28.     The Debtors received 13 formal objections with respect to Confirmation of the Plan (each, an "Objection"). The formal Objections were filed by the U.S. Trustee [Docket No. 851] (the "UST Objection"); Westchester Fire Insurance Company and its affiliated sureties [Docket No. 858] (the "Westchester Objection"); the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy Allied Industrial and Service Workers International Union (the "United Steelworkers") [Docket No 866] (the "USW Objection"); Cypress Fairbanks Independent School District and Harris County [Docket No. 870] (the "Texas Local Tax Authorities Objection"); the United States, on behalf of the Internal Revenue Service, the Bureau of Customs and Border Protection, and the Federal Communications Commission [Docket No. 915] (the "US Objection"); the Committee [Docket No. 924] (the "Committee Objection"); and multiple insurers [Docket No. 928] (the "Insurers Objection"). Formal limited objections were filed by Murex LLC [Docket

No. 857] (Limited Objection) (the "Murex Objection"); Point Breeze Renewable Energy, LLC [Docket No. 865] (Limited Objection) (the "PBRE Objection"); ETC Sunoco Holdings LLC f/k/a Sunoco, Inc. and certain affiliates and subsidiaries [Docket Nos. 868–869] (Limited Objection) (the "Sunoco Objection").  Additionally, a Protective Objection was filed by the United States of America, on behalf of the United States Environmental Protection Agency [Docket No. 911] (the "EPA Objection"); and a Response and Reservation of Rights was filed by Merill Lynch Commodities, Inc. (the "MLC Reservation of Rights") [Docket No. 855].  After the Objection Deadline, OSG Delaware Bay Lightering LLC filed a joinder to the Committee Objection [Docket No. 925] (the "OSG Joinder").

29.    The Debtors also received informal requests for clarification from ICBCS, ACE American Insurance Company and certain of its U.S.-based affiliated insurance companies ("Chubb"), and the Pennsylvania Department of Environmental Protection (collectively, the "Requesting Parties").  The Debtors and the Requesting Parties agreed to certain technical modifications to the Plan and the inclusion of additional language in the Confirmation Order.

30.    The Debtors will continue to seek to resolve those remaining Objections in advance of the Confirmation Hearing, but to the extent the Debtors are unable to consensually resolve such Objections in that time, the Debtors request that the Court overrule such Objections, as set forth in section III herein.

## II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

31.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[13]  As set

---

[13]    *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120, n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

32.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[14] As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

**1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

33.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

34.    For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[15] Instead, claims or

---

[14]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[15]    *Armstrong World Indus., Inc.*, 348 B.R. at 159.

interests designated to a particular class must be substantially similar to each other.[16]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[17]

35.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into ten separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[18]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.      Class 1:  Other Secured Claims;

b.      Class 2:  Other Priority Claims;

c.      Class 3:  Term Loan Secured Claims;

d.      Class 4:  Intermediation Secured Claims;

e.      Class 5:  General Unsecured Claims;

f.      Class 6:  Subordinated Remaining Volume Claim;

---

[16]   *Id.*

[17]   Courts have identified grounds justifying separate classification, including: (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

[18]   *See* Plan Art. III.

g.      Class 7:  Intercompany Claims;

h.      Class 8:  Intercompany Interests;

i.       Class 9:  Interests in PES Energy and PES Ultimate Interests; and

j.       Class 10:  Section 510(b) Claims.

36.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[19]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[20]  Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

37.     For example, the classification scheme distinguishes between Holders of Term Loan Secured Claims (Class 3) from Holders of DIP Claims (unclassified), because of the different circumstances of each class.  Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.[21]  In addition, the Plan classifies Interests in PES Energy and PES Ultimate Interests (Class 9) separately from Interests that a Debtor holds in another Debtor because the Debtors' ownership structure is dependent upon maintaining the Intercompany Interests and, therefore, the Intercompany Interests may be preserved under the Plan

---

[19]     *See* Stein Decl. ¶ 25.

[20]     *See id.* ¶ 26.

[21]     *See id.* ¶ 27.

for the administrative convenience of ensuring the preservation of the Debtors' corporate structure after the Effective Date.[22]

38.      Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

### 2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

39.      Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements, and no party has asserted otherwise.

*(1)      Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

40.      For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[23]

*(2)      Specification of Unimpaired Classes (§ 1123(a)(2))*

41.      Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[24]

---

[22]    *See id.*

[23]    *See* Stein Decl. ¶ 28.

[24]    *See* Plan Art. III.A.1; Stein Decl. ¶ 24.

### (3)    Treatment of Impaired Classes (§ 1123(a)(3))

42.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[25]

### (4)    Equal Treatment within Classes (§ 1123(a)(4))

43.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[26] The Plan meets this requirement because holders of Allowed Claims or Interests will receive the same rights and treatment as other holders of Allowed Claims or Interests within such holders' respective Class.[27]

### (5)    Means for Implementation (§ 1123(a)(5))

44.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[28] The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented.[29] Among other things, Article IV of the Plan provides for:

> a.    the consummation of the Sale Transactions, including, among other things, the transfer and vesting of the Purchased Interests and other assets or equity, as set forth in the Purchase Agreement, in the Plan Sponsor free and clear of all Liens, Claims, charges, or other encumbrances to the maximum extent permitted by applicable law, other than the

---

25    *See id.*

26    11 U.S.C. § 1123(a)(4).

27    *See* Stein Decl. ¶ 29.

28    11 U.S.C. § 1123(a)(5).

29    *See* Stein Decl. ¶ 29.

Transferring Liens, pursuant to the terms of the Purchase Agreement and Confirmation Order;

b.      the sources of consideration for Plan distributions, which include Cash on hand on the Effective Date and the revenues and proceeds of all interests and assets sold to the Plan Sponsor under the Purchase Agreement and proceeds from all Causes of Action constituting Excluded Assets, and not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, including the proceeds from the Business Interruption and Property Damage Insurance Policies;

c.      the dissolution of the existing board of directors or managers, as applicable, of the Debtors, the dismissal of any remaining officers, directors, managers, or managing members of any Debtor, and the dissolution of the Non-Acquired Reorganized Debtors on the Effective Date;

d.      the formation of the Liquidating Trust for the benefit of the Liquidating Trust beneficiaries as determined by the Liquidating Trust Agreement, to administer and distribute the Liquidating Trust Assets and fulfill the Liquidating Trust Obligations;

e.      the establishment by the Liquidating Trust of each of the Distribution Reserve Accounts for distribution of Distribution Proceeds to Holders of Allowed Claims and Interests under the Plan;

f.      the automatic termination of all Liens on any property of any Debtors or the Acquired Reorganized Debtors, the automatic release of all property subject to such Liens, and the automatic discharge and release of all guarantees of any Debtors or the Acquired Reorganized Debtors; provided, subject to the funding of the Professional Fee Escrow Account, until the DIP Claims are satisfied in accordance with Article II.C of the Plan, the Term Loan Claims are satisfied in accordance with Article III.B.3 of the Plan, and the Intermediation Claims are satisfied in accordance with Article III.B.4 of the Plan, the Liens of the DIP Lenders, Term Loan Lenders, and Intermediation Provider shall attach to the proceeds of the Sale Transactions and shall continue to attach to (x) the assets of the Debtors that are not Acquired Reorganized Debtors (other than assets sold to the Plan Sponsor pursuant to the Purchase Agreement) and

19

(y) the assets defined as Excluded Assets in the Purchase Agreement;

g.   the authorization and approval in all respects of all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, including: (a) the implementation of the Restructuring Transactions; (b) consummation of the Sale Transactions; and (c) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date), and, on or after the Effective Date, the authorization of the appropriate officers of the Debtors or the Liquidating Trust, as applicable, to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or the Liquidating Trust, as applicable;

h.   unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey, on the Effective Date, to the Liquidating Trust all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action constituting Excluded Assets (including, subject to the Litigation Control Agreement, the control over any Retained Matters), whether arising before or after the Petition Date, which shall vest in the Liquidating Trust pursuant to the terms of the Plan; and

i.   the settlement and discharge of Claims and Interests as set forth in the Plan.

45.   The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. The Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

*(6)*    *Issuance of Non-Voting Securities (§ 1123(a)(6))*

46.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[30]  On the Effective Date, other than the interests and assets sold to the Plan Sponsor under the pursuant to the Purchase Agreement, all assets of the Debtors, including the assets defined as "Excluded Assets" in the Purchase Agreement, will be transferred to the Liquidating Trust.[31]  The Liquidating Trust shall be responsible for, *inter alia*:   (a) resolving Disputed Claims; (b) making all distributions to Holders of Allowed Claims as provided under the Plan; (c) establishing and funding the Distribution Reserve Accounts; (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List that are Liquidating Trust Assets and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith;(e) filing appropriate tax returns; (f) complying with continuing obligations under the Purchase Agreement, if any, and the DIP and Cash Collateral Orders (as applicable), and (g) administering the Plan in an efficacious manner.[32]  The Liquidating Trust will also be responsible for winding-down the Debtors' estates, and Non-Acquired Reorganized Debtors shall also be deemed to be dissolved as of the Effective Date, subject to the provision of the Plan.[33]  Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to the Non-Acquired Reorganized Debtors.[34]  On the Effective Date, the

---

[30]    11 U.S.C. § 1123(a)(6).

[31]    *See* Plan Art. I.A.93.

[32]    *Id.* Art. VII.A.

[33]    *Id.* Art. VII.G.

[34]    Stein Decl. ¶ 29 n.4.

charters or equivalent organizational documents of the Acquired Reorganized Debtors will be amended to prohibit the issuance of nonvoting equity securities. Because the Acquired Reorganized Debtors will not have multiple classes of voting equity securities, the provision of section 1123(a)(6) regarding the distribution of voting power is not applicable. Accordingly, the Plan complies with section 1123(a)(6) of the Bankruptcy Code, and no parties have asserted otherwise.

*(7)    Directors and Officers (§ 1123(a)(7))*

47.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." In accordance with Article IV.F.3 of the Plan, as of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required. Article VII.E also provides for the dissolution of the Non-Acquired Reorganized Debtors on the Effective Date and the formation of the Liquidating Trust to manage the Liquidating Trust Assets, which include all assets and interests of the Debtors that are not transferred to the Plan Sponsor or retained by the Acquired Reorganized Debtors, including Excluded Assets. The selection of the members of the Liquidating Trust Board by the Required Term Loan Lenders, the Intermediation Provider, the Committee, pursuant to the Liquidating Trust Agreement to manage the affairs of the Liquidating Trust is consistent with the interests of Holders of Claims and Interests and public policy.[35] To the extent the standard under section 1123(a)(7) applies to the Acquired Reorganized Debtors, the manner of selecting of

---

[35]    *See* Stein Decl. ¶ 29.

officers, directors, and/or managers of such Acquired Reorganized Debtors by the Plan Sponsor also is consistent with the interests of Holders of Claims and Interests and public policy. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

48.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[36]

49.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, and 8 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims and Interests within such Classes.[37]  On the other hand, Classes 3, 4, 5, 6, 7, 9, and 10 are Impaired since the Plan modifies

---

[36]    *See* 11 U.S.C. § 1123(b)(1)–(6).

[37]    *See* Plan Art. III.

the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[38]

50.    In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides for the rejection of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[39]

51.    The Plan also contains provisions implementing certain releases and exculpations, compromising claims and interests, and permanently enjoining certain causes of action. Additionally, the Plan provides for the sale of the Purchased Interests, which includes all assets of the Acquired Reorganized Debtors (excluding Excluded Assets), to the Plan Sponsor pursuant to the Purchase Agreement.

52.    Each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b) and no party has asserted otherwise.

> (1)    *The Plan Settlement of Claims and Controversies Is Fair and Equitable and Should be Approved.*

53.    The Plan incorporates the Settlement which provides for the compromise and settlement of numerous Claims, Interests, Causes of Action, and controversies designed to achieve

---

[38]    *See id.*

[39]    *See* Plan Art. V.

a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.  Through the

Settlement, the Plan resolves a host of alleged Claims and Causes of Actions, which are all highly

uncertain to succeed and pursuit thereof could cause extensive delay, cost, and uncertainty in these

Chapter 11 Cases and otherwise.  Accordingly, except as otherwise set forth in the Plan or herein,

in consideration for the distribution and other benefits provided under the Plan, including various

release, exculpation, and injunction provisions, the Plan shall constitute a good-faith compromise

and settlement of all Claims and controversies resolved pursuant to the Plan.  Each component of

the Settlement is an integral, integrated, and inextricably linked part of the Settlement.[40]

54.    The compromises set forth in the Plan are critical to bringing closure to these and

other matters addressed in the Plan and to permitting the Debtors to maximize the value of the

Estate for the benefit of all parties in interest and maximize recoveries for all Holders of Claims

and Interests.[41]

(2)    *The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.*

55.    The Plan also includes certain releases, an exculpation provision, and an injunction

provision.  These discretionary provisions are proper because, among other things, they are the

product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their

key constituents, and are consistent with applicable precedent.[42]

(i)    **The Debtor Release Is Appropriate.**

---

[40]    *See* Stein Decl. ¶ 59.

[41]    *See* Stein Decl. ¶ 21.

[42]    *See* Stein Decl. ¶ 32.

56.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[43]  Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[44]  Article X.E. of the Plan provides for releases by the Debtors, the Liquidating Trust, and their Estates, and the Acquired Reorganized Debtors, as of the Effective Date, of, among things, certain Claims, rights, and causes of action that the Debtors, the Liquidating Trust, and their Estates, and the Acquired Reorganized Debtors may have against the Released Parties (the "Debtor Release").[45]

---

[43]     *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (citation omitted); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).

[44]     *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[45]     "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the DIP Lenders; (b) the DIP Agent; (c) the Term Loan Lenders; (d) the Term Loan Administrative Agent; (e) any Plan Sponsor; (f) the Acquired Reorganized Debtors; (g) any Holder of a Claim or Interest that does not opt out of the releases in the Plan; (h) with respect to each of the Debtors, and each of the foregoing entities in clauses (a) through (g), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; and (i) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, trustees investment bankers, and other professional advisors (with respect to clause (i), each solely in their capacity as such); provided, however, that any Holder of a Claim or Interest that opts out of the releases in the Plan shall not be a "Released Party."  *See* Plan Art. I.A.129.

57.    Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[46] The analysis includes an inquiry into whether there is:  (1)  identity of interest between the debtor and non-debtor; (2) substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[47]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[48]

58.    The Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates.  As described in the Stein Declaration,[49] and as an analysis of the *Zenith* factors demonstrates, the Debtor Release embodied in Article X.E of the Plan should be approved.

> ***First***, an identity of interest exists between the Debtors and the parties to be released. Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan and Purchase Agreement without the Debtor Releases. Like the Debtors, these parties seek to confirm the Plan and implement the transaction.[50]  Moreover, with respect to certain of the releases—e.g., those releasing

---

[46]    *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

[47]    *See In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110 and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937)

[48]    *Id.* (citing *In re Master Mortg.*, 168 B.R. at 935).

[49]    *See* Stein Decl. ¶¶ 34–41.

[50]    *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the Debtors and the released parties arising out the shared common goal of confirming and implementing the Plan."); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

the Debtors' current and former directors, officers, affiliates, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Debtors.[51]  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Debtors themselves.

***Second***, the substantial contributions are clear.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a value-maximizing transaction and avoid a liquidation.  As Delaware bankruptcy courts have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[52]  Moreover, the Released Parties have expended time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  Here, the value contributed by the Released Parties is certainly substantial.  Specifically, in addition to providing significant non-monetary value, the Term Loan Lenders provided a $100 million DIP Facility but agreed to accept less than payment in full on their prepetition Term Loan Secured Claim and participate in the transaction in order to ensure the success of the Plan.  Likewise, the Intermediation Provider agreed to the Debtors' use of its cash collateral and on a consensual path forward regarding the extraction of its collateral, thereby providing the Debtors with the required liquidity and support to successfully emerge from these Chapter 11 Cases.  Without the contributions of each of these parties, the Plan and the transaction contemplated therein would not be possible.

***Third***, the Debtor Release is essential to the Debtors' reorganization because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the Restructuring Transactions contemplated therein.  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11.  The Debtor Release, therefore, is essential to the Debtors' reorganization.

---

[51]   *See In re Indianapolis Downs, LLC,* 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

[52]   *See Id.* at 304 (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.,* 442 B.R. at 347 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [plan of reorganization] or to creditors"); *In re Zenith Elecs. Corp.,* 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

**Fourth**, as evidenced by the Voting Report and noted herein, in the aggregate, the majority of the Debtors' stakeholders support the Plan.[53]  Broken out by class, creditors in Class 3 representing 100 percent by amount of voted claims and 100 percent by number in the aggregate voted to accept the Plan.  Creditors in Class 4 representing 100 percent by amount of voted claims and 100 percent by number in the aggregate voted to accept the Plan, creditors in Class 6 representing 100 percent by amount of voted claims and 100 percent by number in the aggregate voted to accept the Plan, and creditors in Class 5 representing approximately 98 percent by amount of voted claims andapproximately 76 percent by number in the aggregate voted to reject the Plan.[54]  In the aggregate, this amounts to creditors representing 86.2 percent by amount of voted claims and 75.6 percent by number in the aggregate voting to accept the Plan.[55]  Given the critical nature of the Debtor Release, these figures evidence the Debtors' key stakeholders' support for the Debtor Release and the Plan.  Even if the Court determined that this support does not constitute "overwhelming acceptance," as noted above, these factors are neither exclusive nor conjunctive.[56]

**Fifth**, the Plan provides for meaningful recoveries under the circumstances for all creditors potentially giving up colorable claims under the releases.  As demonstrated by the transaction and marketing process and the Liquidation Analysis filed as part of the Plan Supplement, the ranges of recoveries for Holders of Term Loan Secured Claims, Intermediation Secured Claims, and General Unsecured Claims are materially higher under the Plan than they would have been in a chapter 7 liquidation scenario.[57]  Through the Sale Transaction, the Plan maximizes value and provides meaningful recoveries for all stakeholders under the circumstances.

59.    For the reasons set forth above, and as supported by the Stein Declaration, the *Zenith* factors supports approval of the Debtor Release.  Moreover, the breadth of the Debtor Release is consistent with those regularly approved in this jurisdiction and others.[58]  The Debtors

---

[53]    *See* Voting Decl., <u>Exhibit E</u>.

[54]    *See id.*

[55]    *See id.*

[56]    *See In re Washington Mut., Inc.*, 442 B.R. at 346.

[57]    *See* Docket No. 780, Ex. J.

[58]    *See, e.g.*, *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D.Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same).

have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release easily meet the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' Estates.  Thus, the Court should approve the Debtor Release in the Plan.

> **(ii)    The Third-Party Release is Wholly Consensual and Is Appropriate.**

60.    Specifically, Article X.F of the Plan provides that each Releasing Party shall release any and all Causes of Action such parties could assert against the Debtors and other Released Parties (the "<u>Third-Party Release</u>," and together with the Debtor Release, the "<u>Releases</u>"). The Releasing Parties include, among others, the Debtors, the Non-Acquired Reorganized Debtors, the Acquired Reorganized Debtors, the DIP Lenders, the DIP Agent, the Term Loan Lenders, the Term Loan Administrative Agent, the Plan Sponsor, and all Holders of Claims or Interests that do not affirmatively opt out of the Releases.[59]  The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan and therefore should be approved.

61.    Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[60]  Consensual releases are

---

[59]  "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Non-Acquired Reorganized Debtors; (c) the Acquired Reorganized Debtors; (d) the DIP Lenders; (e) the DIP Agent; (f) the Term Loan Lenders; (g) the Term Loan Administrative Agent; (h) any Plan Sponsor; (i) with respect to each of the Debtors, and each of the foregoing entities in clauses (a) through (h), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, trustees investment bankers, and other professional advisors (with respect to clause (i), each solely in their capacity as such); and (k) all Holders of Claims and Interests not described in the foregoing clauses (a) through (i); *provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases in the Plan shall not be a "Releasing Party."  *See* Plan Art. I.A.124.

[60]  *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 305 (collecting cases); *Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual").

permissible on the basis of general principles of contract law.[61]  The law is clear that a release is consensual where parties have received sufficient notice of a plan's release provisions and have had an opportunity to object to or opt out of the release and failed to do so (including where such holder abstains from voting altogether).[62]  Here, all parties in interest had ample opportunity to evaluate and exercise their right to opt out of the Third-Party Release.  The ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release provision in the Plan and clearly informed such of Holders of the steps they should take if they disagreed with the scope of the Third-Party Release.  Likewise, the notices distributed to Holders of Claims or Interest not entitled to vote on the Plan informed such Holders of their ability to opt out of the Third-Party Release by filing an objection thereto with the Court.  Thus, affected parties were on notice of the Third-Party Release and of their ability to opt out.  Tellingly, the fact that approximately [43]% of ballots of Holders in Class 5 opted out of the Third-Party Release is a prime illustration that Holders were in fact adequately put on notice of their ability to opt out.  As such, the Third-Party Release is consensual as to all Claims and Interest Holders who decided not affirmatively opt out of the Third-Party Release.

---

[61]    *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004).

[62]    *See, e.g.*, *In re Indianapolis Downs, LLC,* 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *aff'd* 2010 WL 1223109 (S.D.N.Y. March 24, 2010), *modified on other grounds*, 634 F.3d 79 (2d Cir. 2011); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the Article X release is purely consensual and within the scope of releases that *Specialty Equipment* permits.") (citing *In re Specialty Equip. Corp.*, 3 F.3d 1043 (7th Cir. 1993)).

62.    Based on the foregoing, the Debtors have established that the Third-Party Release is consensual, and there is no need to consider the factors governing non-consensual third-party releases under *Continental*[63] and its progeny.  Nonetheless, even if the court determines that such releases are non-consensual, the Third-Party Release is appropriate and should be approved.

63.    Courts in the Third Circuit have held that a non-consensual release may be approved if such release is fair and necessary to the reorganization, and the court makes specific factual findings to support such conclusions.[64]  In addition, the Third Circuit has found that, for such releases to be permissible, fair consideration must be given in exchange for the release.[65]

64.    The circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan and it is fair and appropriate.  Without the efforts of the Released Parties both in providing bridge financing, providing the DIP Financing and consensual use of cash collateral, and actively participating in the transaction and Plan negotiations, the Debtors would not be seeking a Sale Transaction at this juncture.[66]  In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and

---

[63]    *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-14 (3d Cir. 2000).

[64]    *See id.* (noting that the "hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, specific factual findings to support these conclusions"); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (evaluating certain factors to determine whether the "hallmarks" of permissible non-consensual releases are met, including "(i) the non-consensual release is necessary to the success of the reorganization, (ii) releases have provided a critical financial contribution to the Debtors' plan; (iii) the releasee's financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release"); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (evaluating similar factors to determine whether non-consensual third party releases were permissible); *cf. Washington Mutual*, 442 B.R. at 355 ("[T]he Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of third party releases.").

[65]    *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2000) (citing *In re Continental Airlines*, 203 F.3d at 215)).

[66]    Stein Decl. ¶ 45.

facilitating a smooth administration thereof.[67]   Finally, throughout the entire case and all these negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both pre- and postpetition, including by expending substantial time to cooperate with the Intermediation Provider to develop and implement processes that facilitate the Intermediation Provider's preservation and extraction of its collateral and to pursue the Debtors' insurance recovery process.[68]

65.     Moreover, the third parties bound by the Releases have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release.[69]  The DIP Lenders, the DIP Agent, the Term Loan Lenders, the Term Loan Administrative Agent, the Plan Sponsor, Holders of General Unsecured Claims, and other Released Parties have made massive concessions and commitments that have allowed the Debtors to maximize the value of their estates and enabled the Debtors to effectuate the Sale Transactions.[70] The Released Parties have been active and important participants in the development of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.[71]  Specifically, as discussed above, in addition to providing significant non-monetary value, the Term Loan Lenders provided a $100 million DIP Facility but agreed to accept less than payment in full on their prepetition Term Loan Secured Claim and participate in the transaction in order to ensure the

---

[67]     *Id.*

[68]     *Id.*

[69]     *Id.* ¶ 46.

[70]     *Id.*

[71]     *Id.*

success of the Plan.[72]  Likewise, the Intermediation Provider agreed to the Debtors' use of its cash collateral and on a consensual path forward regarding the extraction of its collateral, thereby providing the Debtors with the required liquidity and support to successfully emerge from these Chapter 11 Cases.[73]  Without the contributions of each of these parties, the Plan and the transaction contemplated therein would not be possible.[74]  In addition to significant concessions under the Plan, the Released Parties made the contributions as discussed above, each in exchange for, among other things, the Third-Party Release.[75]

66.    The Debtors submit that the Third-Party Release is consensual or otherwise appropriate under *Continental* and its progeny.  Accordingly, the Third-Party Release should be approved.

### (iii)    The Exculpation Provision Is Appropriate.

67.    Article X.G of the Plan provides for the exculpation of the Exculpated Parties. The exculpation is fair and appropriate under both applicable law[76] and the facts and circumstances of these Chapter 11 Cases.  The Plan's exculpation provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders.[77]  The exculpation

---

[72]    *Id.*

[73]    *Id.*

[74]    *Id.*

[75]    *Id.*

[76]    *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).

[77]    Stein Decl. ¶ 48.

34

provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.[78]

68.    Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[79] Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[80] Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[81]

69.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.[82] Moreover,

---

[78]    *Id.*

[79]    *See, e.g.*, *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (evaluating the exculpation clause based on the manner in which the clause was made a part of the agreement, the necessity of the limited liability to the plan negotiations, and that those who participated in proposing the plan did so in good faith).

[80]    *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[81]    *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[82]    Stein Decl. ¶ 49.

the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

70.    Here, the Debtors and their officers, directors, and professionals, actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.[83]  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from Holders of Claims entitled to vote.[84]  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Purchase Agreement, and related documents in furtherance of the Sale Transaction contemplated by the Plan.[85]  Furthermore, the exculpation provision is limited to acts during these Chapter 11 Cases and does not extend beyond such time period.  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

---

[83]    *Id.*

[84]    *See* Voting Report.

[85]    *See* Hr'g Tr. 58:18–19, *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ("[T]he debtors did not do this alone; they did it with the help of many others.").

71.     Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.[86]  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful reorganization, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.[87]  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.

72.     Under the circumstances, it is appropriate for the Court to approve the exculpation provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[88]

### (iv)     The Injunction Provision Is Appropriate.

73.     The injunction provision set forth in Article X.H of the Plan merely implements the Plan's release, discharge, and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Liquidating Trust, or the other Released Parties on account of or in connection with or with respect to any such claims or interests released, discharged, or subject to exculpation.  Thus, the injunction provision is a key provision of the Plan because it enforces the release, discharge, and exculpation provisions that are centrally important to the Plan.  As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision

---

[86]     Stein Decl. ¶ 50.

[87]     *Id.*

[88]     *See PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision with willful misconduct and gross negligence exceptions); *In re Indianapolis Downs, LLC*, 486 B.R. at 306 (same).

must also be appropriate.  Moreover, this injunction provision is narrowly tailored to achieve its purpose.

> (3)    *The Restructuring Transaction Should Be Approved Under Sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code as Sound Exercise of the Debtors' Business Judgment.*

74.    The Court may authorize the Debtors to sell the Purchased Interests and all other assets and equity transferred to the Plan Sponsor under the Purchase Agreement pursuant to sections 363(b)(1) and 1123(b)(4) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Similarly, section 1123(b)(4) provides that a "plan may provide for the sale of all or substantially all of the property of the estate."  To approve a sale under section 363(b)(1) of the Bankruptcy Code, the debtor is required to show that the decision to sell the property outside of the ordinary course of business was based on a sound exercise of the debtor's business judgment.[89]  Accordingly, for the purpose of selling property of the estate, the Debtors need only show a legitimate business justification for the proposed action.[90]

75.    The business judgment rule shields a debtor's management decisions from judicial second guessing.[91]  Once a debtor articulates a valid business justification, the law vests the

---

[89]    *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

[90]    *See, e.g.*, *Lionel*, 722 F.2d at 1070; *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

[91]    *Johns-Manville Corp.*, 60 B.R. at 615-16 (a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth).

debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[92]  Parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence."[93]  Generally, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

76.     The Debtors' sale of the equity and assets under the Purchase Agreement Transaction represents a sound exercise of the Debtors' business judgment, is essential to the Debtors' Plan, and is justified under section 363(b) of the Bankruptcy Code.  The Debtors believe that the Sale Transaction represents the most efficient and appropriate means of maximizing the value of the Debtors' estate.  Moreover, the sale is appropriate under section 1123(b)(4) as it is provided for by the Plan, which, for the reasons set forth in herein, satisfies all of the requirements to be confirmed.  Accordingly, the sale of the Purchased Interests pursuant to the Purchase Agreement should be approved.

77.     Accordingly, the Debtors submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code.  In light of the foregoing, because the Plan fully complies with section 1122 and 1123 of the Bankruptcy Code,

---

[92]  *In re GSC, Inc.*, 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

[93]  *Integrated Res.*, 147 B.R. at 656 (citations omitted).

the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

78.      Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

79.      The Plan complies with section 1123(d) of the Bankruptcy Code.   The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V of the Plan or the Confirmation Order.[94] In accordance with the Proposed Confirmation Order and the amounts set forth in the Plan Supplement and section 365 of the Bankruptcy Code, the Plan Sponsor will satisfy monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases otherwise agree.

**C.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

80.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[95] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan

---

[94]    *See* Plan Art. V.C.

[95]    *See* 11 U.S.C. § 1129(a)(2).

acceptance requirements set forth in section 1126 of the Bankruptcy Code.[96]  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order.

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code.

81.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[97] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[98]

82.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement in accordance with section 1125(a)(1).[99]  The Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the

---

[96]    *See In re Lapworth*, 1998 WL 767456, at *3 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

[97]    11 U.S.C. § 1125(b).

[98]    *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[99]    *See generally* Disclosure Statement Order.

relevant dates for voting and objecting to the Plan.[100]  As stated in the Voting Report, the Debtors, through the Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[101]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and parties deemed to reject the Plan.[102]

83.    Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code.

84.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[103]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

- Classes 1 (Other Secured Claims), 2 (Other Priority Claims), and 8 (Intercompany Interests), which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[104]  Pursuant to section 1126(f) of the Bankruptcy Code, holders of

---

[100]  *Id.*

[101]  *See* Voting Decl. ¶¶ 6–12; *see also* Affidavit of Solicitation.  As previously noted, due to a clerical error, the letter from the Committee recommending that Holders wait to receive the Plan Supplement to vote was inadvertently excluded from the Solicitation Packages sent to Holders entitled to Vote on the Plan.  On January 27, 2020, the Debtors served the Supplemental Solicitation Letter to all Holders that had voted prior to the filing of such Plan Supplement asking that such Holders submit a new vote either in favor or against the Debtors' Plan.

[102]  *See* Voting Decl. ¶¶ 4–5; *see also generally* Affidavit of Solicitation.

[103]  *See* 11 U.S.C. § 1126.

[104]  *See* Plan, Art. III.A.

Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Classes 7 (Intercompany Claims), 9 (Interests in PES Energy and PES Ultimate Interests) and 10 (Section 510(b) Claims) are Impaired under the Plan (the "Deemed Rejecting Classes").[105]   Pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

85.     Accordingly, the Debtors solicited votes only from the Voting Classes, Holders of Allowed Claims and Interests in Classes 3, 4, 5, and 6, because each of these Classes is Impaired and entitled to receive a distribution under the Plan.[106]   With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[107]

86.     The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[108]   Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

### D.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

87.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."   Where a plan satisfies the

---

[105]   *Id.*

[106]   *Id.  See generally* Affidavit of Solicitation.

[107]   11 U.S.C. § 1126(c).

[108]   *See generally* Voting Decl., <u>Exhibit E</u>.

purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[109]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[110]

88.    The Plan was proposed with honesty, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these cases, the Debtors, their board of managers, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  The Plan follows an extensive marketing process to solicit interest in the Debtors and extensive arm's-length negotiations among the Debtors, the DIP Lenders, the Intermediation Provider, the Committee, the Plan Sponsor and other parties interested in ensuring that stakeholders realize the highest possible recoveries under the circumstances.[111]  Indeed, the Debtors' management team and advisors expended countless hours to conduct comprehensive and complex marketing and insurance recovery processes and evaluating and negotiating the Restructuring Transaction to provide the most value for their stakeholders.[112]  Importantly, the Plan is supported by the Debtors' key economic stakeholders,

---

[109] *E.g.*, *PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite* v. *Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[110] *E.g.*, *T-H New Orleans*, 116 F.3d at 802 (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

[111] *See* Stein Decl. ¶ 58.

[112] *Id.*

namely, the Term Loan Lenders and DIP Lenders.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

### E.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).

89.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[113]

90.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[114]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[115]  Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures established by the Court.[116]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

---

[113]    *Lisanti Foods*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[114]    *See* Stein Decl. ¶ 60.

[115]    *See* Plan, Art. II

[116]    *Id.*

F.     **The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

91.     The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[117]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[118]

92.     Here, Article IV.E of the Plan provides for the dissolution the existing board of directors or managers, as applicable, of the Debtors and the dismissal of any remaining directors or officers of the Debtors.  The Plan also provides that all Non-Acquired Reorganized Debtors shall be deemed dissolved on the Effective Date.  As such, section 1129(a)(5) of the Bankruptcy Code is inapplicable to the Plan.  To the extent section 1129(a)(5) applies to the Liquidating Trust, it will have satisfied the requirements of this provision by, among other things, disclosing the manner by which the Liquidating Trust Board members will be selected in the Plan Supplement.[119]

93.     In addition, section 1129(a)(5)(B) also requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[120]  Here, as described above, the Plan provides that all Non-Acquired Reorganized Debtors shall be deemed dissolved

---

[117]   11 U.S.C. § 1129(a)(5)(A)(i).

[118]   11 U.S.C. § 1129(a)(5)(A)(ii).

[119]   *See* Docket No. 780-9, Ex. H.

[120]   11 U.S.C. § 1129(a)(5)(B).

on the Effective Date, and no reorganized debtor will subsist following the Effective Date. Therefore, section 1129(a)(5)(B) is inapplicable to the Plan.

### G. The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).

94.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

### H. The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

95.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)     each holder of a claim or interest of such class—
>
> > (i)     has accepted the plan; or
> >
> > (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

96.     The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[121]

---

[121]   *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr.

As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Class 3, Class 4, and Class 6 have voted to accept the Plan.  Class 5 has voted to reject the Plan.  The Deemed Rejecting Classes did not vote on the Plan.  Accordingly, to satisfy the best interests test, the Debtors must demonstrate that each Holder of a Claim in Classes 5 and in the Deemed Rejecting Classes will receive at least as much under the Plan as that Holder would receive in a chapter 7 liquidation.[122]

97.    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.    As set forth in the Plan Supplement,[123] the Stein Declaration,[124] and the Sciametta Declaration,[125] the Debtors, with the assistance of Alvarez & Marsal North America, LLC, the Debtors' restructuring advisors, prepared a supplement unaudited liquidation analysis, which is attached to the Plan Supplement as Exhibit J (the "Liquidation Analysis").[126]  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[127]  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and

---

S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[122]  *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[123]  *See* Plan Supplement Ex. I, Ex. J.

[124]  *See* Stein Decl. ¶ 64.

[125]  *See* Sciametta Decl. ¶ 10.

[126]  *See* Plan Supplement, Ex. J.

[127]  *See* Sciametta Decl. ¶ 14

incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.[128]  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.[129]

98.    Based on the unaudited Liquidation Analysis, and the assumptions included therein, the value of any distributions if the chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.[130]  As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.[131]  Based on the recoveries set forth above, the Plan satisfies the best interests test as required by the Bankruptcy Code.

I.    **The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

99.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  Holders of Claims in Classes 4, 5, and 6, and Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, thus, were not entitled to vote.  Consequently, while the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to Classes 4, 5, and 6 and to the Deemed Rejecting Classes, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

---

[128]    *See id.*

[129]    *See id.*

[130]    *See* Stein Decl. ¶ 64.

[131]    *See* Sciametta Decl. ¶ 20.

**J.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

100.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code— administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

101.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim will receive payment in full in Cash on the Effective Date.  *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.    *Third*, Article II.A of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority

50

Tax Claims payment in full in Cash on the Effective Date.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

### K.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

102.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

103.    Class 3, Class 4, and Class 6, which are Impaired, voted to accept the Plan independent of any insiders' votes.    Thus, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### L.    The Plan Is Feasible (§ 1129(a)(11)).

104.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[132]

---

[132]    11 U.S.C. § 1129(a)(11).

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[133] Rather, a debtor must provide only a reasonable assurance of success.[134]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[135]

105.    Here, the Plan is feasible.   The Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear path to emergence from these Chapter 11 Cases and the ability of the Debtors to satisfy all of their obligations under the Plan. The implied value of the transactions contemplated by the Plan includes:

- $240 million of cash from the Plan Sponsor;

- the retention by the Plan Sponsor of all liabilities of the Acquired Reorganized Debtors, except for those expressly retained by the Estates;

- the retention by the Estates of certain Causes of Action that constitute Excluded Assets; and

- the receipt of up to $1.25 billion in insurance proceeds under the Business Interruption and Property Damage Insurance Policies, including $65 million of insurance proceeds advance already received by the Debtors.[136]

---

[133]  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

[134]  *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[135]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

[136]  *See* Stein Decl. ¶ 69.

106.    The Debtors project that the value created by such transactions will be sufficient to satisfy all Priority and Administrative Claims under the Plan, including all DIP Claims, Professional Fee Claims.[137]  In addition, the Debtors anticipate and project that the Sale Proceeds, the insurance proceeds, and Retained Causes of Action that are Excluded Assets will provide sufficient cash to honor all requirements and obligations under the Plan and Purchase Agreement, including resolving Disputed Claims.[138]

107.    The Debtors have therefore established that the Liquidating Trust will have sufficient funds to satisfy all requirements and obligations under the Plan.[139]  Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.

**M.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

108.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

109.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.D of the Plan provides (a) all fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors, (b) on and after the Effective Date, to the extent applicable, the Liquidating Trust shall pay any and all such fees when due and

---

[137]    *See id.* ¶ 70.

[138]    *See id.*

[139]    *See id.* ¶ 71.

payable, and (c) the Liquidating Trust shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Reorganized Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**N.      No Remaining Retiree Benefits Obligations (§ 1129(a)(13)).**

110.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).[140]   Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

**O.      Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

111.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.[141]   Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.[142]  Finally, each of the Debtors are a moneyed, business, or commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in

---

[140]   *See* Stein Decl. ¶ 73.

[141]   *See id.*

[142]   *See id.*

accordance with any applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.[143]

**P.   The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

112.   Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[144]

113.   As noted above, Class 3, Class 4, and Class 6, which are Impaired Classes of Claims entitled to vote on the Plan, have voted in favor of the Plan.  However, Holders of Claims in Class 5 and the Deemed Rejecting Class have or are deemed to have rejected the Plan.  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code

**1.   The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).**

114.   A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[145]

---

[143]   *See id.*

[144]   *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[145]   *Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative,  if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[146]

115.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that Class 5 and the Deemed Rejecting Classes have or are deemed to have rejected the Plan, respectively, the Plan is confirmable.[147]  Class 4 (Intermediation Secured Claims) is comprised of all Allowed Intermediation Secured Claims.  Class 5 (General Unsecured Claims) is comprised of all General Unsecured Claims.  Class 6 (Subordinated Remaining Volume Claim) is comprised of the Subordinated Remaining Volume Claim.  Class 7 (Intercompany Claims) is comprised of all Claims held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate, Class 9 (Interests in PES Energy and PES Ultimate Interests) is comprised of all Interests in PES Energy and PES Ultimate Interests, and Class 10 (Section 510(b) Claims) is comprised of all Section 510(b) Claims.  There are no Claims or Interests that are junior to Intermediation Secured Claims, General Unsecured Claims, the Subordinated Remaining Volume Claim, Intercompany Claims, Interests in PES Energy and PES Ultimate Interests, or to Section 510(b) Claims that are receiving any recovery under the Plan before any Class that is senior in priority, nor is any Holder of a Claim or Interest receiving more than payment in full of its Claim or Interest.

116.    In addition, although Intercompany Interests may be reinstated under the Plan and, therefore, become Unimpaired, such treatment is for the purposes of preserving the Debtors'

---

[146]    *Id.*

[147]    To the extent any rejecting class amends its vote and determines to accept the Plan, the Debtors will file an amended Voting Report to reflect such update.

corporate structure and will have no economic substance.[148]  Accordingly, the Plan is "fair and

equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b)

of the Bankruptcy Code.

> **2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

117.    Although the Bankruptcy Code does not provide a standard for determining when

"unfair discrimination" exists, courts typically examine the facts and circumstances of the

particular case to make the determination.[149]  In general, courts have held that a plan unfairly

discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially

different treatment for creditors and interest holders with similar legal rights without compelling

justifications for doing so.[150]  A threshold inquiry to assessing whether a proposed plan of

---

[148]  *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP) (Bankr. S.D.N.Y. Nov. 24, 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan. The Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure.").

[149]  *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[150]  *See Coram*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[151]

118.    Here, the Plan's treatment of the non-accepting Impaired Class (*i.e.*, Classes 4, 5, and 6 and the Deemed Rejecting Classes) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims in Classes 4, 5, and 6 and in the Deemed Rejecting Classes are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  The Plan's treatment of Class 4, 5, and 6 and the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  Furthermore, where the Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

119.    For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the rejection by Classes 4, 5, and 6 and the deemed rejection by the Deemed Rejecting Classes.

### Q.    The Debtors Complied with Section 1129(d) of the Bankruptcy Code.

120.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[152]  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.[153]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

---

[151]    *See Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *Armstrong World Indus.*, 348 B.R. at 121).

[152]    *See* Stein Decl. ¶ 74.

[153]    *Id.*

### R.    Modifications to the Plan.

121.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[154]

122.    The Debtors previously revised the Plan with certain technical modifications mainly designed to embody the Debtors' choice to effectuate the Sale Transaction and reflect the terms of transaction contemplated in the Purchase Agreement.  The Debtors then later made certain modifications to resolve formal and informal comments to the Plan by parties in interest (collectively, the "Modifications").[155]  Following the launch of the solicitation process, the Debtors filed a second amended Plan on January 29, 2020 [Docket No. 827] and a third amended Plan filed substantially contemporaneously herewith.  The Modifications are immaterial or otherwise do not

---

[154]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[155]    *See* Docket Nos. 827, 828.

affect the treatment of creditors and stakeholders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

### S.    Good Cause Exists to Waive the Stay of the Confirmation Order.

123.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

124.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[156]  As noted above, these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.[157]

---

[156]    *See, e.g., In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re GSE Envtl., Inc.*, No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same).

[157]    *See* Stein Decl. at ¶ 10.

125.    Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

**III.    The Objections to the Plan Should be Overruled.**

126.    The deadline to file objections to the Plan was February 3, 2020, at 4:00 p.m., prevailing Eastern Time (the "Plan Objection Deadline").  As of the Plan Objection Deadline (as extended for certain parties), the Debtors received thirteen objections to confirmation of the Plan.  The Debtors are optimistic that the majority of the remaining objections will be resolved in advance of the Confirmation Hearing—specifically, based on ongoing negotiations and conversations, the Debtors believe that the DOJ Objection, the EPA Objection, the Sunoco Objection, the Taxing Authorities Objection, and the Westchester Objection will be partially or fully resolved through proposed language in the revised Plan and/or the Confirmation Order. Attached hereto as **Exhibit A** is a chart summarizing the objections received, the resolutions reached to date between the Debtors and the various objecting parties, and the Debtors' position with respect to each objection to the extent a resolution has not been reached.  The Debtors will update the Court regarding the status of all objections prior to or at the Confirmation Hearing.  To the extent that the Debtors do not anticipate reaching resolution with the Objecting Parties ahead of the Confirmation Hearing, a reply to their Objections follows.

**A.    The Sale Transaction Should be Approved as a Sound Exercise of the Debtors' Business Judgement.**

127.    As described more fully in the Debtors' Response to the Committee, the Committee questions the Debtors' selection of the Successful Bid,[158] alleges that Industrial Realty Group, LLC ("IRG") "may present a proposal that is both higher and better" and "contests, on

---

[158]   For the avoidance of doubt, the term "Successful Bidder" shall have the meaning ascribed to it in the Bidding Procedures.

substantive grounds, the Debtors' decision to continue advancing with the inferior HRP bid."[159] The Committee has no ground to stand on. The Sale Transaction, and the Debtors' actions following the Sale Transaction, represent a sound exercise of the Debtors' business judgment, and the HRP bid is superior to any other bids received.

128.     As further explained in the Singh Declaration, from August 2019 through January 2020, the Debtors and their advisors, in consultation with the Consultation Parties (as defined in the Bidding Procedures), conducted a thorough and comprehensive marketing and sale process for the sale of the Debtors' business.[160]  As part of this months-long process, the Debtors' advisors contacted hundreds of potential bidders, supported extensive diligence through provision of documents, site visits, and management meetings, and facilitated three rounds of bidding. These efforts culminated in January 2020 with the Debtors holding four days of intensive negotiations with final bidders at the offices of the Debtors' counsel, Kirkland & Ellis LLP ("Kirkland & Ellis") and a formal Auction to determine the best bid for the Debtors' assets. At the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, determined in their business judgement that HRP's bid was the Successful Bid and received approval of the selection of HRP as the Winning Bidder from the Restructuring Committee of the Debtors' Board of Directors.

129.     While IRG's final bid at the Auction contained a headline purchase price $25 million higher than HRP's, the Debtors did not believe that this premium justified the risks associated with the IRG bid.

130.     **First**, and most importantly, IRG has not presented sufficient committed financing to support its proposal. This was the case when IRG submitted its final bid on January

---

[159]   Committee Obj. at n. 4.

[160]   Singh Decl. at ¶¶ 7-13.

10, and that remained the case at the January 17 Auction, when the Debtors, in consultation with the Consultation Parties, selected HRP as the Successful Bidder.  IRG's final bid at the Auction contained a 30-day financing contingency that would allow them to walk away (only losing its $5 million deposit) at any time during this 30-day period.

131.    ***Second***, at the Auction, IRG offered only a $5 million deposit, representing less than 2 percent of the proposed $265 million purchase price.  As described in the Singh Declaration, the Debtors made clear to IRG during the Auction process that this deposit was insufficient.[161] Moreover, coupling this small deposit with a financing contingency created significant closing risk.  Particularly in light of HRP's refusal to allow their bid to serve as the Back-Up Bid,[162] the Debtors would have been left with no alternative Qualified Bid had they selected IRG as the Winning Bidder and financing did not materialize.

132.    ***Third,*** even assuming IRG were able to secure financing in a timely fashion, the Debtors had other concerns with regards to IRG's preparation and ability to timely close.  A proposal that increases the distributable value available for creditors by $25 million, while certainly important to evaluate, does not fundamentally change this calculus in light of how quickly tens of millions are absorbed by debt service, estate operational costs, and professional fee accruals.  No amount of committed funding will cure the Debtors' inability to timely consummate a transaction in the absence of the necessary diligence.  IRG has simply failed to commit any substantial form of diligence effort to place itself in a position to consummate a transaction with

---

[161]    Singh Decl. at ¶ 15.

[162]    For the avoidance of doubt, the term "Back-Up Bid" has the meaning ascribed to it in the Bidding Procedures Order.

the Debtors.  Conversely, HRP has engaged in a tremendous amount of effort and diligence to close the transaction, including by:

- seeking the Pennsylvania Department of Environmental Protection's ("PaDEP") approval of a soil development plan;

- engaging with various constituencies with regards to settlement of certain of the Debtors' outstanding liabilities, including Sunoco (and its subsidiaries); and

- engaging with the EPA, the USW, and the City of Philadelphia with regards to potential go-forward usage of the refinery site.

133.    The obstacles to consummation are significant, well-known, and not subject to dispute.  And if an IRG proposal ultimately fails to satisfy conditions to closing—including, among others, receiving approval from PaDEP—there is no way to measure how much lower the next proposal—if there is a next proposal—will be.  Simply put, the Debtors do not have a proposal from any other party reflecting the same level—indeed any discernible level—of certainty supporting the Purchase Agreement.

134.    The Committee apparently objects to the selection of HRP as the Winning Bidder and instead seeks approval of a fantasy alternate sale to IRG.[163]  The Committee's objection should be overruled and its unjustified effort to force the Debtors to participate in a speculative sale of their Interests to IRG should be denied.

- *First*, the proposed Sale Transaction represents a sound exercise of the Debtors' business judgment.

- *Second*, the Back-Up Bid is far less compelling given that the proposed Sale Transaction due to the fact that the Back-Up Bid transaction, unlike the proposed Sale Transaction, is subject to material contingencies not present in the Successful Bid.

---

[163]    *See* Committee Obj. at ¶28-29.

### 1.    The Sale Transaction Represents a Sound Exercise of the Debtors' Business Judgment and Should Be Approved.

135.    As a rule, and as previously mentioned, a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors . . . acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company."[164]   In objecting to the proposed Sale Transaction, the Committee must actually establish "bad faith, self-interest, or gross negligence."[165]   In other words, if the proposed Sale Transaction satisfies the business judgment rule, then it should be approved under section 363(b)(1) of the Bankruptcy Code.  As the Committee knows, it cannot satisfy this burden.  The Debtors' transactions with the Plan Sponsor result from an independent, arm's length process.  The marketing process and the Court-approved Bidding Procedures for the Debtors' assets were designed to test the market to solicit the highest and best offer for the Debtors' assets.  The discussions between the Debtors and the Plan Sponsor and all other potential bidders were led by the Debtors' independent Chief Restructuring Officer and the Debtors' restructuring professionals and in consultation with the Consultation Parties pursuant to the Bidding Procedures. The proposed Sale Transaction, therefore, is entitled to deference under the business judgment standard and should be approved.  Indeed, the Committee does not actually argue that the Debtors must undertake another marketing process.  Rather, the Committee has requested that the Debtors select a different Winning Bidder by fiat.

---

[164]    *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  *See also In re Bridgeport Hldgs., Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets).

[165]    *Integrated Res.*, 147 B.R. at 656.  *See also In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

136.    In any event, the Debtors respectfully submit that sound business reasons support their decision to enter into the Purchase Agreement with the Plan Sponsor.  Inexplicably, the Committee would prefer that the Debtors give up these major concessions for a highly speculative path that seeks essentially the same result.

- *First*, the Sale Transaction provides manifest benefits to these estates, including the headline purchase price of $240 million;

- *Second*, the Debtors extensively marketed their assets during the sale and marketing processes for nearly six months;[166]

- *Third*, the Debtors respectfully submit that it is reasonably likely that IRG will not submit a revised bid approaching, let alone exceeding, the amount of closing certainty of the Successful Bid.  And should IRG in fact submit a similar or even better bid than HRP's, the contingencies associated with the IRG bid and, conversely, the substantial diligence efforts already carried out by HRP following its selection as Plan Sponsor make HRP's bid substantially more likely to close than any bid that IRG could submit.

- *Fourth*, the transaction will enable the Debtors to expeditiously exit from their chapter 11 cases without incurring additional operating expenses at a time when the Debtors have limited cash on hand.

137.    In addition, as detailed above, following the Auction, the Debtors have continued to engage in discussions with the Plan Sponsor regarding ways to improve the value of the proposed Sale Transaction in connection with settlement discussions with the Environmental Protection Agency and Sunoco.

138.    Notwithstanding these uncertainties, as an exercise of their ongoing fiduciary obligation to maximize recoveries to the estates, and in accordance with the fiduciary flexibilities in the Bidding Procedures Order, the Debtors remained open to continuing a dialogue with IRG or any other party in interest to discuss the terms of a value maximizing transaction.  On Thursday, January 30, the Debtors received a revised form of proposed Purchase Agreement from IRG.

---

[166]    *See* Singh Decl. at ¶¶ 7-13.

Unfortunately, several key terms in this document were either wholly missing or were inadequate, rendering the document incomplete:

- No reference to an amount of a deposit for the security of IRG's performance was included;

- No signature was provided, thus the document could not be evaluated as a binding proposal;

- No business plan was provided, thus the Debtors were left unable to evaluate how they IRG was planning to use the property or address issues operational and/or employment issues; and

- No disclosure schedules and/or exhibits were provided—including the form Litigation Control Agreement, the form Confirmation Order, the Facility Turnover Requirements, and/or the Form Assignment and Assumption and FIRPTA Certificate.

139. Although this document did indicate some improvements as compared to IRG's Auction Bid, including removal of a 30-day financing period, together, the sea of missing information precluded the Debtors from even evaluating IRG's proposal as a binding Bid (as defined in the Bidding Procedures). Even assuming the Debtors were able to evaluate IRG's form Purchase Agreement as a binding Bid, this form document contained material revisions as compared to the IRG's "Auction" form Purchase Agreement which were unfavorable to the Debtors.

140. On February 3, 2020, the Debtors finally received a proposed execution version of the Purchase Agreement from IRG. Again, the revised document from IRG represented certain improvements but remained deficient as compared to HRP's documentation. Specifically, the proposed escrow amount of $15 million represented only 50% of HRP's $30 million deposit offer. Among other issues which effectively fictionalized the scenario of a timely closing, this document also included at least a 100-day closing requirement (increased from 60-days). The following day, the Debtors received IRG's $15 million deposit. At this point, the Debtors, together with their

advisors and the Board of Directors' (the "Board") Restructuring Committee began to evaluate IRG's proposal as a binding Bid and vowed to continue working with IRG (and their counsel) to improve the terms of this bid. Ultimately, the terms of IRG's bid did not improve materially, and thus the Debtors together with the Restructuring Committee, determined that the HRP bid was the value-maximizing offer. The Debtors eventually received a revised proposal from IRG on February 9, 2020. Although the Debtors are still evaluating the terms of this proposal as of the submission of this Memorandum, the revised proposal does not appear to represent significant material changes from IRG's prior proposals.

141.    For all the reasons stated above, the HRP transaction was proposed in good faith and has a sound business purpose. There are simply no other actionable alternatives that comparably embrace the Debtors' primary principles of maximizing distributable value and minimizing consummation risk.

142.    Moreover, all potentially interested parties have had a significant period of time in which to develop a reasonably comparable proposal. None have emerged. Allowing such parties additional time in the hopes that another white knight Plan Sponsor will emerge when none has following a 6-months marketing process is a reckless proposition. Indeed, should those efforts prove to be unsuccessful (as they are very likely to be), the very creditors that are objecting to the Purchase Agreement will suffer the consequences. And such a reckless set of circumstances puts at risk the recoveries of the Debtors' creditors who have not objected to the Motion.

### 2.    The Successful Bid is the Best Bid.

143.    The Committee proposes that this Court (and the Debtors) apply an incorrect legal standard. In the context of a sale outside of the ordinary course of business under section 363(b), the debtor must "demonstrate that the proposed sale price is the highest and best offer, though a

bankruptcy court may accept a lower bid in the presence of sound business reasons."[167] Importantly, the Debtors have a duty to maximize the value of their estates that requires them to consider multiple relevant factors when selecting the highest *or best* offer for their assets.[168] Specifically, "[i]n determining whether the highest bid is the 'best bid,' the fiduciary and reviewing court must consider factors such as 'the risks associated with each bid and the probabilities that the proposed terms will come to fruition' as well as 'contingencies, conditions, timing or other uncertainties in an offer that may render it less appealing.'"[169]

144.    Although the Auction ended with IRG's bid having a higher headline purchase price than HRP's, during and after the Auction the two bids were—and, as they continue to evolve, remain—vastly different in terms of diligence effort and contingencies, among other things.  As described above, the Debtors, with the assistance of their advisors and in consultation with the Consultation Parties, have identified and valued all material differences between the bids, including the IRG Bid's $15 million deposit (as compared to the $30 million deposit of the Winning Bid) and the higher likelihood of consummating the Winning Bid.  Taking all of these factors into account, the Debtors, in the exercise of their business judgement, have valued the Successful Bid as the value-maximizing bid.

145.    The testimony will show that the selection of the Successful Bid has been fair and, if anything, conservative with respect to the value of the various deficiencies in IRG's bids at the

---

[167]    *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010).

[168]    *See, e.g.*, *In re Scimeca Found, Inc.*, 497 B.R. 753, 779 (Bankr. E.D. Pa. 2013); *Lawsky v. Condor Capital Corp.*, No. 14 CIV. 2863 CM, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015); *see generally United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925) ("It is common knowledge of all lawyers and many business men that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two.") *aff'd as modified*, 272 U.S. 1 (1926).

[169]    *In re Tresha-Mob, LLC*, No. 18-52420-RBK, 2019 WL 1785431 at *2 (Bankr. W.D. Tex. Ap. 3, 2019) (quoting *Lawsky*, 2015 WL 4470332, at *9)

Auction and afterward.  The Debtors' decision to select the Plan Sponsor as the Winning Bidder was not taken lightly and was the product of careful consideration of the value of each component of the bidders' proposals, and input from key constituents, including the DIP Lenders and the Debtors' Board, who are supportive of the Debtors' designation of the Successful Bid.  To be sure, valuing bids with different terms, credit support and conditionality involves discretion.  That discretion was exercised reasonably by the Debtors at the Auction and should be upheld by the Court here.

### B. The Objection of the U.S. Trustee Should be Overruled.

#### 1. The Discharge of Acquired Reorganized Debtors Is Appropriate.

146.    The U.S. Trustee objects to the granting of a discharge to the Debtors under section 1141 of the Bankruptcy Code on the basis that "the Debtors are not remaining in business."[170]

147.    Under section 1141(d)(3), "the confirmation of a plan does not discharge a debtor if (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under Section 727(a) of [the Bankruptcy Code] if the case were a case under chapter 7 of [the Bankruptcy Code]."[171]  While the Debtors believe that all Debtors are entitled to a discharge under section 1141(d)(3), in an effort to reach consensual resolution with the U.S. Trustee, the Debtors have revised the discharge provision of the Plan such that the discharge solely applies to Debtors that constitute Acquired Reorganized Debtors.[172]  The

---

[170]  *See* U.S. Trustee Obj. ¶ 24.

[171]  U.S.C. § 1141(d)(3).

[172]  *See* Plan Art. X.B.

Acquired Reorganized Debtors are wholly entitled to a discharge because such Acquired Reorganized Debtors will remain in business after the Effective Date. The conjunctive requirements of section 1141(d)(3) do not apply to such Acquired Reorganized Debtors.

148. The property of the Acquired Reorganized Debtors' will not be liquidated under the Plan. On the opposite, while the Purchased Interests are being sold to the Plan Sponsor under the Purchase Agreement, none of the assets of the Acquired Reorganized Debtors will be liquidated but, instead, will transfer to the Plan Sponsor and remain with the Acquired Reorganized Debtors.[173]

149. For these reasons, the U.S. Trustee's objection to the discharge of the Acquired Reorganized Debtors should be overruled.

### 2. The Third-Party Release Is Consensual and Permissible.

150. The U.S. Trustee argues that the Third-Party Release in Article X of the Plan is non-consensual and overly broad.[174]

151. *First*, the Third-Party Release is consensual. The case law is clear that a release is consensual where parties have received sufficient notice of the plan's release provisions and have had an opportunity to object to or opt out of the release and failed to do so (including where such holder abstains from voting altogether).[175] Generally, voting in favor of a plan is sufficient

---

[173]  *See* Plan Art. IV.E.

[174]  *See* UST Obj. ¶¶ 27–33.

[175]  *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved"); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound,

to demonstrate consent to any third-party release contained therein.[176] Similarly, those Holders of Claims that have not objected to the releases in the Plan or are paid in full and thus deemed to have accepted the Plan, may generally, and consensually, be bound by third-party release provisions.[177] Article X.F. of the Plan provides that each Releasing Party—including all Holders of Claims and Interests not otherwise described as Releasing Party—shall release any and all Claims and causes of action such parties could assert against the Debtors, the Non-Acquired Reorganized Debtors, and the Released Parties from any and all Causes of Action taking place on or before the Effective Date.[178]   However, the Plan expressly provides that such Third-Party Release shall exclude any Holder of a Claim or Interest that opts out of the releases.[179]

152.    As previously mentioned, all parties in interest had ample opportunity to evaluate and exercise their right to opt out of the Third-Party Release.  The ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release provision in the Plan and clearly informed such of Holders of the steps they should take if they disagreed with

---

either by voting for the Plan or by choosing not to opt out of the release. Therefore, the Article X release is purely consensual and within the scope of releases that *Specialty Equipment* permits.").

[176]   *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding that a third-party release binds those voting in favor of the plan); *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (same); *In re Specialty Equip. Companies, Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993) (same); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 82 (Bankr. S.D.N.Y. 2015) (same).

[177]   *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 306 ("In this case, the third-party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases.")*; In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) ("I note that no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan. While I recognize—and fully appreciate—the importance of the UST's supervision of the administration of bankruptcy cases . . . the silence of the unimpaired classes on this issue is persuasive. This aspect of the Third-Party Release is not over-reaching. The unimpaired classes are being paid in full and have received adequate consideration for the release.").

[178]   *See* Plan Art. X.F.

[179]   *See* Plan Art. I.A.130.

the scope of the Third-Party Release. Likewise, the notices distributed to Holders of Claims or Interest not entitled to vote on the Plan informed such Holders of their ability to opt out of the Third-Party Release by filing an objection thereto with the Court. Thus, affected parties were on notice of the Third-Party Release and of their ability to opt out. Tellingly, the fact that approximately 43% of Holders in Class 5 opted out of the Third-Party Release is a prime illustration that Holders were in fact adequately put on notice of their ability to opt out. As such, there can be no dispute that the Third-Party Release, which only applies only to Holders that chose not to opt out, it is consensual under the weight of authority (in this district and others) of what constitutes consent in the context of a third-party release.[180]

153.    ***Second***, even if the Court were to find that the Third-Party Release is non-consensual with respect to certain Releasing Parties—which it should not find—the Court should nevertheless approve the Third-Party Release under the circumstances of the Chapter 11 Cases.

154.    As previously mentioned, the Third Circuit has identified the factors necessary to approve nonconsensual third-party releases. Specifically, the Third Circuit has explained that the "hallmarks" of permissible nonconsensual third-party releases are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."[181] Delaware courts that have subsequently ruled on this issue have considered, among other things, whether (a) the releasee has provided a critical contribution to the debtor's plan and (b) whether the release is fair

---

[180]    *See, e.g.*, *EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. 2018) (approving third-party releases with objection "opt-out" mechanic); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) (same); *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. Dec. 12, 2017) (same); *In re Southcross Holdings, LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) (same); *see also In re U.S. Fidelis*, 481 B.R. 503, 517 (Bankr. E.D. Mo. 2012) (holding that a creditor must file an objection in order for the third-party release to be deemed non-consensual).

[181]    *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000).

to the nonconsenting creditors (i.e., whether the nonconsenting creditor was compensated for their contributions).[182]

155.    Here, the factors identified by the Third Circuit counsel in favor of the Third-Party Release in the Plan, even on a nonconsensual basis.  *First*, the Third-Party Release was offered in exchange for key pieces of the Plan, such as the DIP Facility and the Purchase Agreement, among others.  The support of the Term Loan Lenders and the Plan Sponsor was critical in the strategic development of the Plan and in paving the way for a successful emergence from these Chapter 11 Cases.  And absence of support of the Term Loan Lenders, and the Plan Sponsor would doom the prospects of this Plan that satisfies all Other Secured Claims and Other Priority Claims in full, and would threaten the feasibility, or otherwise jeopardize the prospects of reorganization under any alternative Plan.  *Second*, and as noted previously, all Holders of Other Secured Claims and Other Priority Claims are receiving payment in full of their Allowed Claims and otherwise are being rendered Unimpaired, and have, therefore, received adequate consideration in exchange for the Third-Party Release.

156.    Importantly, the U.S. Trustee's argument that the Third-Party Release improperly releases claims held by Holders of Class 9 Interests (Interests in PES Energy and PES Ultimate Interests) is entirely misplaced.

157.    *First*, the U.S. Trustee argues that releases from Interest Holders in Class 9 are inappropriate given that such interests holders "are not receiving any distribution under the Plan, and therefore no consideration for giving any releases."[183]   Contrary to the U.S. Trustee's

---

[182]   *See In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607-08 (Bankr. D. Del. 2001) (describing the factual conclusions that may support nonconsensual third-party releases).

[183]   *See* UST Objection ¶ 29.

assertions, Interest Holders in Class 9 do receive a distribution under the Plan.  Specifically, the

Plan now provides that Interest Holders in Class 9 may receive their Pro Rata Share of the

Distribution Proceeds if any such Distribution Proceeds remain available following distribution to

all other Holders entitled to distribution under the Plan, in accordance with the priority scheme of

the Bankruptcy Code.[184]

158.   ***Second***, the U.S. Trustee alleges that "Class 9 Interests Holders are deemed to reject

the Plan and do not get to vote but are required to object to the Plan or they will be deemed to have

consented to the third-party releases."[185]   However, and as previous mentioned, courts have

recognized that consensual releases are permissible, and that a release is consensual where parties

have received sufficient notice of a plan's release provisions and have had an opportunity to object

to or opt out of the release and failed to do so.[186]   The notices distributed to Interest Holders in

Class 9 informed them of their ability to opt out of the Third-Party Release by filing an objection

thereto with the Court.   As such, Interest Holders in Class 9 were on notice of the Third-Party

Release and their ability to opt out thereof.   Accordingly, the Third-Party Release is consensual

---

[184]   *See* Plan Arts. III.B.9, VIII.K.

[185]   *See* UST Objection ¶ 29.

[186]   *See, e.g.*, *In re Indianapolis Downs, LLC,* 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *aff'd* 2010 WL 1223109 (S.D.N.Y. March 24, 2010), *modified on other grounds*, 634 F.3d 79 (2d Cir. 2011); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the Article X release is purely consensual and within the scope of releases that *Specialty Equipment* permits.") (citing *In re Specialty Equip. Corp.*, 3 F.3d 1043 (7th Cir. 1993).

with respect to Interest Holders in Class 9 who did not affirmatively chose to opt out of the Third-Party Release.

159.    Accordingly, the Third-Party Release is justified, including with respect to Interest Holders in Class 9, even on a nonconsensual basis.[187]

### 3.    The Debtor Release and Third-Party Release are Reasonable.

160.    The Plan's release provisions are reasonable and appropriate.  The U.S. Trustee argues that the Debtor Release and Third-Party Release are overly broad and contrary to applicable law.  *First*, the Debtor Release and Third-Party Release easily meet the applicable standard because they are fair, reasonable, and in the best interests of the Debtors' estates.  The breadth of the Debtor Release and Third-Party Release is consistent with those regularly approved in this jurisdiction and others,[188] and is limited by the subject-matter limitation clearly contained in the releases.[189]

---

[187] The U.S. Trustee's Objection that the list of retained Causes of Action filed as part of the Plan Supplement provides "illusory" mutual releases to holders listed thereon because it would exclude those parties from the "Released Parties" while remaining a "Releasing Party" unless the entity opts out must also be overruled.  *See* UST Obj. ¶ 47.  As further described herein, holders were provided adequate notice of the releases and of their ability to opt out as well as of the filing of the plan supplement.  *See* Docket No. 845.  Lists of retained causes of action with similar language are regularly filed in this jurisdiction or others in advance of the voting deadline.  *See In re VER Techs. HoldCo LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 9, 2019) (fourteen days between filing of retained causes of action list and voting deadline); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 3, 2017) (twenty-one days between filing of retained causes of action list and voting deadline); *In re Emerald Oil, Inc.*, No. 16-10704 (CSS) (Bankr. D. Del. Mar. 9, 2017) (five days between filing of retained causes of action list and voting deadline); *In re Magnum Hunter Resources Corp.*, No. 15-12533 (Bankr. D. Del. Mar. 14, 2016) (fourteen days between filing of retained causes of action list and voting deadline).

[188] *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (approving similar debtor and third-party release provisions including, among other categories, direct and indirect equity holders and professional and financial advisors); *In re VER Techs. HoldCo LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018) (same); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) (same); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Mar. 14, 2017).

[189] *See* Plan Art. X.E–F (providing that the releases do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan).

161.    ***Second***, the releases form an integral part of the Plan.  Each of the released parties, as stakeholders and critical participants in the Debtors' reorganization process, share a common goal with the Debtors in seeing the Plan succeed, and have afforded value to the Debtors and aided in the reorganization process.[190]  Specifically, the U.S. Trustee's contention that the Debtors' directors and officers should not be entitled to a release in these cases is particularly egregious given their critical and uncontested role in bringing value to the estate.[191]  Accordingly, the Court should overrule the Objections to the scope of the Debtor Release and Third-Party Release.

**4.    The Plan's Compromise Language Has Been Restricted Such That the U.S. Trustee's Objection Thereon Is Resolved.**

162.    The Plan has been revised to exclude Holders of Claims and Interests that have not expressly entered into a settlement with the Debtors from the Plan's compromise language.[192] As such, the U.S. Trustee has represented that his objection thereon is resolved.

**5.    The Plan No Longer Provides that Entry of the Confirmation Order Shall Close the Cases of the Acquired Reorganized Entities Such That the U.S. Trustee's Objection Thereon Is Resolved.**

163.    The Plan no longer provides that entry of the Confirmation Order shall close the cases of the Acquired Reorganized Debtors, and the Liquidating Trustee shall remain liable for paying quarterly fees of the U.S. Trustee until all Chapter 11 Cases of the Debtors are closed. As such, the U.S. Trustee has represented that his objection thereon is resolved.

---

190    *See* Stein Decl. ¶ 34.

191    *See id.*

192    *See* Plan Arts. IV.A, X.A, X.E., X.F.

C.    **The Objection of the USW Should be Overruled.**

1.    **The Treatment of the USW Before and During the Auction was Reasonable and Consistent with the Bidding Procedures.**

164.    The USW contends that they were deprived of their rights as Consultation Parties during the Auction because the USW was not "asked for its view as to the highest or best bid."[193]

165.    Pursuant to the Bidding Procedures Order, "[u]pon the conclusion of the Auction . . . or upon such other time that the Debtors, in the exercise of their reasonable, good-faith business judgment, and in consultation with the Consultation Parties, identify the highest or otherwise best Qualified Bid or Qualified Bids for the Interests and/or some or all Assets, as applicable (each, a "Successful Bid"), which will be determined by considering, among other things, (a) whether the Bid or Bids are for the purchase of the Interests or for some or all of the Assets, . . . and (f) any other criteria as may be considered by the Debtors in their reasonable, good-faith business judgment and in consultation with the Consultation Parties."[194]    Counsel to the USW is a Consultation Party under the Bidding Procedures Order, and thus entitled to certain rights in connection to the Auction.[195]

166.    Consistent with the Bidding Procedures Order, counsel to the USW was invited to the Auction at Kirkland & Ellis' New York offices, attended the all-day Auction, and even made an on the record statement during the Auction.[196]    Aside from this active participation, the USW

---

[193]    USW Obj. at ¶ 8.

[194]    Bidding Procedures Order, Exh. 1 at Art. I.

[195]    *Id*. at Art. A.

[196]    *See* 1/17/2020 Auction Tr: at 6:15 and 30:20-25, 31:2-13 ("Richard Seltzer of Cohen, Weiss and Simon, the United Steel Workers, a consultation party.    We're incredibly disappointed that to our knowledge the bidder chose, and there's no commitment or plans for refinery operations.    We also reserve all our rights as to the auction and our contract.    We expect that there will (*sic*.) clarification and confirmation that all maintenance and safety work that's currently being done by the members of the steel worker's union will be continued as long as those

was free to make other comments or raise any issues, including to the Debtors' representatives.  It did not.  The Debtors fulfilled their obligations under the Bidding Procedures Order and the USW cannot now, long after the Auction has concluded, allege that it was afforded less than fair treatment.

167.    In addition, the USW's consultation rights are supplemented by virtue of the fact that the USW is a member of the Committee , which is also a Consultation Party under the Bidding Procedures Order.[197]   Whatever rights that the USW was entitled at the Auction were further protected by the Debtors' continuing input from and consistent negotiations with the Committee.

### 2.    The Solicitation Materials and the Plan Supplement Provide Adequate Information about the Plan.

168.    The USW contends that it did not receive adequate information about the sale, potential recoveries, feasibility, the sufficiency of funds for administrative or priority claims, or the basis for the release and exculpation provisions of the Plan.[198]

169.    As described at length above in response to the Committee's Objection, the Debtors have met the requirements for solicitation pursuant to section 1125.[199]   The Plan Supplement contained numerous documents that explained the projected recoveries for creditors, expected recoveries in a liquidation, and the source of funds for distributions under the Plan.[200]   The USW also received the Disclosure Statement and ballots, which contained extensive information about

---

[197] Bidding Procedures Order at Art. A.

[198] USW, Obj. at ¶ 7.

[199] To the extent that the Debtors address the solicitation elsewhere in this Memorandum, the Debtors incorporate that response here.

[200] *See* Plan Supplement.

maintenance and safety operations continue and will be done by those workers.  We expect that if there is any refinery operations on the site, those also will be conducted by members represented by the Steel Workers.").

the releases and exculpation provisions.[201]  There is simply no basis for the USW to claim that it did not receive adequate information.

### 3.    The MIP Will Maximize Value for the Estate.

170.    The USW objects to the MIP, arguing in tandem with the Committee that the MIP is a "give-away" to the MIP executives.  To the extent the Debtors address the MIP elsewhere in this Memorandum and/or the Debtors' Response to the Committee, the Debtors incorporate that response here.

### D.    The Insurers' Objection Should Be Overruled.

### 1.    The Plan Does Not Negatively Impact or Alter the Insurers' Rights

171.    The Insurers[202] claim that the Plan and the Sale Transaction documents infringe upon the Insurers' rights by granting the Debtors greater rights than they otherwise would have outside of bankruptcy, specifically contesting the inclusion of the "free and clear" language provided for in the Plan and the Sale Transaction documents.  The Insurers additionally generally allege that the Plan and Sale Transaction documents undercut the Insurers' rights, and that confirmation of the Plan would be tantamount to an "implicit adjudication of any such coverage defenses that the Insurers might otherwise have.[203]

172.    None of the provisions of the Plan or the Sale Transaction documents impinge upon the Insurers' rights under the Insurance Policies.  The "free and clear" language contained in the Plan and Sale Transaction documents does not abuse the chapter 11 process to gain a strategic advantage or additional rights, as the Insurers allege.  Given that the Insurers are not challenging

---

[201]    *See* Affidavit of Service, [Docket No. 713].

[202]    For the avoidance of doubt, the term "Insurers" shall have the meaning ascribed to it in the Insurers Objection.

[203]    *See* Insurers Objection ¶ 9.

the validity of the Sale Transaction itself, the Insurers are myopic in focusing on the specific "free and clear" portion of the Plan.  It is common practice for plans providing for similar equity sales to include this free and clear language in a recognition of bankruptcy courts' ability to approve such sales.[204]  In contrast, in support of what they characterize as "regularly approved" insurance neutrality provisions, the Insurers cite to only one case from 2004, and point to no other precedent or examples of such language.  The contrast between the regularity with which courts approve the Debtors' "free and clear language" and the lack of precedent for the Insurers' proposed language raises concerns about the "neutrality" of the Insurers' proposed insurance neutrality provisions.

173.    In their critique of the Liquidating Trust structure, the Insurers speak in hypotheticals, listing no concrete rights that are *actually* undermined by the Plan.[205]  Instead, their objection simply gestures towards rights they allege may be undermined in an attempt to disrupt the Debtors' insurance recovery process, a crucial step in effectuating the Debtors' chapter 11 Plan.  As discussed in the supplemental , the Liquidating Trust structure set forth in the Plan is a commonly utilized conflict resolution structure that courts routinely approve in balancing the need for expediency and timely resolution of a chapter 11 case with the need for a structured resolution of litigation impacting a debtor's estate.

174.    Although the Insurers claim otherwise, the Plan and Sale Transaction documents are neutral with respect to insurance-coverage issues, and do not seek to augment the Estate by taking advantage of the bankruptcy process.  Accordingly, the "insurance neutrality" provisions

---

[204]    *See*, *e.g.*, *In re Z Gallerie LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Jun. 20, 2019) (approving chapter 11 plan providing for asset sale to purchaser free and clear of all liens, claims, charges, interest, or other encumbrances); *In re Mission Coal Co.*, No. 18-04177 (TOM) (Bankr. N.D. Ala. Apr. 4, 2019) (same); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Mar. 2, 2019) (same).

[205]    *See* Insurers' Objection ¶ 9 (If the same transaction were done outside bankruptcy, it *might* give rise to  *potential* defenses to coverage. For example, the Insurers *may* have arguments . . . (emphasis added)).

suggested by the Insurers are superfluous and unnecessary, as the Plan already supports the balance of rights and protections accorded both parties under the Insurance Policies and does not seek to undermine the Insurers' rights under the Insurance Policies.

> **2.      The Extension of the Automatic Stay Beyond Plan Confirmation is Appropriate and Necessary to Facilitate the Administration of the Estate**

175.    The Insurers allege that the Debtors are intending to use the automatic stay to "obtain a litigation advantage against third parties" with "no basis."[206]  However, the extension of the automatic stay contemplated by the Plan is requested with careful consideration to the exigencies of the case and not proposed as a play to obtain an unfair advantage.

176.    The cases the Insurers cite for support of their Objection are distinguishable from the circumstances here, as most represent cases where the resolution of all outstanding litigation impacting upon the debtors' estate had been achieved at the time of confirmation.  In the cases cited by the Insurers, as well as in many other chapter 11 cases, it may make sense to terminate the automatic stay upon plan confirmation as the case has been resolved and the objectives of chapter 11 have been achieved—thus, in "normal" or "ordinary" chapter 11 cases there is no need for the automatic stay post-confirmation.  However, this situation, particularly the insurance recovery portion of the case, is no normal situation.  As the insurance recovery portion is an integral aspect of the case that may become the majority of the recognized recoveries of the plan, unlike in many chapter 11 cases the Debtors' case is not "complete" until the insurance recovery proceedings portion has been resolved.

177.    The Insurers additionally urge a reading of the Plan that the "confirmation of the Plan will vest the property of the estate in the Liquidating Trust or the Plan Sponsor, and it will

---

[206]    *See* Insurers Objection ¶¶ 14, 20.

grant the Debtors a discharge" from the automatic stay.  This would certainly be true if the amount

of insurance proceeds that would be received as property of the estate had been fully litigated and

ascertained at the time of Plan confirmation.  However, given that the amount of insurance

proceeds will not be determined at the time of Plan confirmation, it is inaccurate to say that the

property has sufficiently vested in the Liquidating Trust such that the automatic stay can be

discharged.  The extension of the automatic stay until the insurance disputes have run their course

reflects the Debtors' careful balancing of (a) the need for the protection of the automatic stay and

this recognition that the proceeds haven't "vested" in the Liquidating Trust until the amount of

proceeds has been ascertained, and (b) the recognition of the cash burn that would occur should

the Debtors not consummate the Plan.  Accordingly, the extension of the automatic stay is not

intended to obtain an unfair advantage; instead, the unique circumstances at hand compel such an

extension.

### 3. The Court's Jurisdiction over the Insurance Adversary Proceedings Is Appropriate and Necessary to Facilitate the Administration of the Estate

178. The Insurers contest the Plan's provision retaining jurisdiction over the ongoing

proceedings relating to the insurance recovery in an "absence of statutory authority."  However,

the Court's jurisdiction over these Chapter 11 Cases necessarily covers the insurance recovery

litigation, as it is a core element in the Debtors' reorganization.  Far from "purporting to retain"

jurisdiction in a gamesmanship-like manner, the Plan contemplates the Court's jurisdiction over

the insurance-related dispute in recognition of the integral role that such litigation plays in the

Debtors' successful implementation of the Plan.  The Court has statutory authorization to exercise

its jurisdiction because of this integral role.

179. Bankruptcy courts have jurisdiction under 28 U.S.C. § 157(b)(2) over all core

proceedings in a chapter 11 case, which are defined in a non-exclusive list.  Estate administration

is one such core proceeding under § 157(b)(2)(A), and the Third Circuit has noted that an action is related to the bankruptcy proceedings "if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."[207]  The bulk of the recoveries under the Plan turn on the Debtors' ability to obtain the insurance proceeds. Rather than being a standalone proceeding that can be severed from the rest of the administration of the estates, the insurance dispute is an integral portion of the Court's overall administration of the case.  Accordingly, the insurance litigation qualifies as a core proceeding under § 157(b)(2)(A), and the Court has jurisdiction over the insurance adversary proceedings because the proceedings are a crucial element of the Debtors' administration of the estate.

180.    Even if it is not a core proceeding and the Court considers the insurance dispute to be a collateral matter rather than a core proceeding, the Court still retains jurisdiction as the Third Circuit's "close nexus" test is satisfied.  Under the close nexus test, a bankruptcy court has jurisdiction over a collateral matter to the chapter 11 proceedings if "there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter."[208]  The close nexus test scrutinizes the relationship between the collateral causes of action and the bankruptcy proceedings, with matters affecting the "interpretation, implementation, consummation, execution, or administration" of the confirmed plan having a sufficient connection to the case to satisfy the close nexus test and thus allowing the bankruptcy court to exercise jurisdiction.[209]   As noted above, the insurance recovery is intricately tied to the overall

---

[207]  *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)

[208]  *In re Resorts Int'l*, 372 F.3d at 166–67.

[209]  *Id*. at 169.

restructuring proceeding and to the administration of the Debtors' estates as contemplated by the Plan. This heightened level of interconnectedness between the insurance litigation and the these Chapter 11 Cases, if not a core proceeding, certainly satisfies the close nexus test as a collateral proceeding, and the Court is permitted by law to exercise jurisdiction over the dispute.

### E.     PBRE's Objection Should be Overruled.

181.    Point Breeze Renewable Energy, LLC ("PBRE") objects on a limited basis to confirmation of the Plan to the extent the Plan seeks to reject a certain Option Agreement (the "Option Agreement") and a certain Site Lease Agreement (the "Site Lease Agreement"), both dated November 1, 2017. PBRE contends that, even if the Option and Site Lease Agreements are rejected, that it would retain its alleged possessory rights in the Debtors' property pursuant to 11 U.S.C. § 365(h)(1)(A)(ii). PBRE further argues that the Option Agreement was not executory and therefore not eligible for rejection.

182.    11 U.S.C. § 365(h)(1)(A)(ii) provides that if the Debtors "reject an unexpired lease of real property under which the Debtor is lessor and . . . (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to . . . any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law."

183.    On November 1, 2017, PBRE and PESRM entered into a series of related agreements relating to certain land owned by the Debtors. Among these agreements was the Site Lease Agreement, the effectiveness of which was conditioned on the exercise of a related Option Agreement. The Option Agreement contained various conditions precedent, including subdivision approval and PBRE's acquisition of financing. The Option Agreement also required

PBRE to deliver written notice and consideration to the Debtors in order to exercise its option to lease.

184.    As of the Petition Date, PBRE had not satisfied the conditions precedent.  The Site Lease Agreement, therefore, had not gone effective and PBRE had no possessory rights. Subsequently, on January 9, 2020, after the Debtors' automatic stay was in place, PBRE attempted to waive the conditions precedent and exercise the Option Agreement.

185.    .PBRE's attempt to exercise the option is void as a violation of the automatic stay. Section 362(a)(3) forbids any act to "obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  Any action taken in violation of the automatic stay is void and without effect, even if the party taking such action had no knowledge of the bankruptcy filing.  Thus, PBRE's January 9, 2020 letter purporting to exercise the option was ineffective as an attempt to take control over property of the Debtors' estate.  PBRE does not have a valid lease and therefore has no right to possession pursuant section 365(h)(1)(A)(ii).

186.    Even if the Option Agreement was not executory and thus not eligible for rejection, PBRE would still not have possessory rights because the term of the lease had not commenced on the Petition Date.  Pursuant to section 365(h)(1)(A)(ii), a non-debtor lease may retain its rights under a lease only when the "term of such lease has commenced."  The Bankruptcy Code does not define the word "term," but courts in this district have voiced support of the principle that a "word is known by the company it keeps,—that is to say, which of various possible meanings a word should be given must be determined in a manner that makes it 'fit' with the words with which it is closely associated."

187.    In this context, it is clear that the "term" of the lease had not commenced.  On the Petition Date, PBRE had not satisfied the conditions precedent and, by its own terms, the Site

Lease had not gone effective.  There were no rights under the Site Lease for PBRE to "retain." Section 365(h)(1)(A)(ii) is therefore inapplicable and PBRE has no possessory rights in the Debtor's property.

188.     Through the Plan, the Debtors seek to reject the Option Agreement and all of the agreements related thereto.    The Debtors submit this is a sound exercise of their business judgment, will maximize value for the estate by unburdening the Debtors' property from these onerous agreements, and is an appropriate exercise of the Debtors right to reject an executory contract pursuant to section 365(a).

## Conclusion

189.     For all of the reasons set forth herein and in the Stein Declaration, the Singh Declaration, the Sciametta Declaration, the Gartrell Declaration, and the Voting Report, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

**[Remainder of page intentionally left blank]**

Dated:  February 10, 2020          */s/ Laura Davis Jones*
Wilmington, Delaware               Laura Davis Jones (DE Bar No. 2436)
                                   James E. O'Neill (DE Bar No. 4042)
                                   Peter J. Keane (DE Bar No. 5503)
                                   **PACHULSKI STANG ZIEHL & JONES LLP**
                                   919 North Market Street, 17th Floor
                                   P.O. Box 8705
                                   Wilmington, Delaware 19899-8705 (Courier 19801)
                                   Telephone:    (302) 652-4100
                                   Facsimile:    (302) 652-4400
                                   Email:        ljones@pszjlaw.com
                                                 pkeane@pszjlaw.com
                                                 joneill@pszjlaw.com

                                   - and -

                                   Edward O. Sassower, P.C.
                                   Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
                                   Matthew C. Fagen (admitted *pro hac vice*)
                                   **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   601 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:    (212) 446-4800
                                   Facsimile:    (212) 446-4900
                                   Email:        edward.sassower@kirkland.com
                                                 steven.serajeddini@kirkland.com
                                                 matthew.fagen@kirkland.com

                                   *Co-Counsel to the Debtors and Debtors in Possession*